No. 25-5553

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *in his official capacity as Governor of the State of California*; STATE OF CALIFORNIA,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; PETER HEGSETH, *in his official capacity as Secretary of the Department of Defense*; UNITED STATES DEPARTMENT OF DEFENSE,
*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL BY SEPTEMBER 11 AND AN IMMEDIATE ADMINISTRATIVE STAY BY SEPTEMBER 4

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7234*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................1

STATEMENT ...........................................................................................3

    A.    Legal Background ...................................................................3

    B.    Factual Background .................................................................5

    C.    Prior Proceedings..................................................................7

ARGUMENT ............................................................................................9

    A.    The federal government is likely to prevail on the merits. ........................9

        1.    Plaintiff's PCA claim fails on threshold grounds. ...........................10

        2.    The federal government is not violating the PCA. ........................16

    C.    The other stay factors strongly favor the government..............................21

CONCLUSION .......................................................................................23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ............................................................................. 13

*Bissonette v. Haig*,
    776 F.2d 1384 (8th Cir. 1985) ............................................................. 20

*Bryan v. United States*,
    524 U.S. 184, 195 (1998) ..................................................................... 20

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................................. 11

*Davis v. State*,
    No. 8:24-cv-02907, 2025 WL 992899 (M.D. Fla. Mar. 17, 2025) ............. 12

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ...................................................................... 11, 12

*In re Debs*,
    158 U.S. 564 (1895) ...................................................................... 18, 19

*In re Neagle*,
    135 U.S. 1 (1890) ......................................................................... 18, 19

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................. 11

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ............................................................. 11

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) ................................................ 8, 10, 21, 23

*Newsom v. Trump*,
    No. 3:25-cv-04870, 2025 WL 1663345 (N.D. Cal. June 12, 2025) ............. 8

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................. 9

*NRC v. Texas*,
    605 U.S. 665 (2025) ....................................................................... 10, 13

*Perpich v. Department of Def.*,
    496 U.S. 334 (1990) ............................................................ 3, 4

*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994) ............................................... 12

*Shivkov v. Artex Risk Sols., Inc.*,
    974 F.3d 1051 (9th Cir. 2020) ........................................ 19

*Smith v. United States*,
    293 F.3d 984 (7th Cir. 2002) ......................................... 12

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) ......................................................... 12

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) .................................................... 12

*United States v. Dreyer*,
    804 F.3d 1266 (9th Cir. 2015) ...................................... 20

*United States v. Khan*,
    35 F.3d 426 (9th Cir. 1994) ................................. 18, 19, 20

*United States v. Klimavicius-Viloria*,
    144 F.3d 1249 (9th Cir. 1998) ........................... 18, 19, 20

*United States v. Texas*,
    599 U.S. 670 (2023) .................................................. 12, 16

**U.S. Constitution:**

Art. I, § 8, cl. 15 ......................................................................... 3

Art. II, § 2, cl. 1 ........................................................................ 3

**Statutes:**

10 U.S.C. § 10101 ...................................................................... 3

10 U.S.C. § 10106 ...................................................................... 4

10 U.S.C. § 12406 ........................................................ 4, 6, 7, 15

10 U.S.C. § 12406(3) ................................................ 2, 8, 10, 14, 15

18 U.S.C. § 1385 ..................................................................... 4, 10, 11, 14, 20

**Executive Orders:**

Executive Order 11519, 35 Fed. Reg. 5003 (1970) ..........................................15

**Other Authorities:**

*Auth. to Use Troops to Prevent Interference With Fed. Emps. by Mayday Demonstrations &*
    *Consequent Impairment of Gov't Functions*, 1 Op. O.L.C. Supp. 343, 343 (1971) ............18

Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus*
    *Act and Related Matters: The Use of the Military to Execute Civilian*
    *Law* (2018) ...................................................................................... 4, 15

U.S. Dep't of Def., Instr. 3025.21, *Defense Support of Civilian Law Enforcement Agencies*
    (Feb. 27, 2013)................................................................................4

## INTRODUCTION

The district court has again entered an extraordinary order that interjects the court into the military chain of command and superintends the Executive Branch's control over lawfully federalized National Guard members, who have been deployed to protect federal officers and property from mob violence. A unanimous panel of this Court stayed the district court's previous order, concluding that the President likely acted lawfully when he deployed the National Guard to address violent attacks that interfered with federal immigration officers' federal functions in Los Angeles and that the district court's order threatened the federal government's significant and uncontested interest in protecting its personnel and property. The district court's latest order enjoins the government on a different claim—that the President and the Department of Defense have violated the Posse Comitatus Act (PCA)—but it is equally, if not more, erroneous: the order exceeds the court's authority, misconstrues the PCA, impermissibly intrudes on the authority that Congress vested in the President as Commander in Chief, and threatens the safety of federal personnel. This Court should stay the order pending appeal.

The government takes seriously its obligations under the PCA and has not violated those obligations. Plaintiffs' arguments to the contrary fail for multiple reasons, and the district court erred in concluding otherwise. At the threshold, there is no private right of action for civil injunctive relief from an asserted violation of the PCA. The PCA is a criminal statute, and there is no tradition or practice of allowing

ultra vires review to challenge the federal government's alleged violation of that law, which protects public rights. Implying a private cause of action in this context would intrude on the Executive's prosecutorial discretion over whether and how to enforce federal criminal law. Moreover, the PCA's prohibition on the use of federal armed forces to enforce the law is, by its plain terms, inapplicable when such law enforcement is expressly authorized by statute. And the statute the President invoked to federalize the Guard here—the invocation of which this Court has already held was likely lawful—expressly authorizes the Guard to "execute those laws" of the United States that the President deemed the regular forces "unable . . . to execute." 10 U.S.C. § 12406(3).

Even if plaintiffs could overcome these threshold obstacles, plaintiffs adduced no evidence—during a multi-day trial—that the National Guard and the Marines engaged in federal law enforcement, let alone that defendants willfully violated the law by ordering conduct they knew was unlawful. Protecting federal personnel as they conduct federal operations is not law enforcement prohibited by the PCA, and the district court erred in holding otherwise.

At every turn, the district court justified its flawed rulings by questioning the validity of prior pronouncements of the Supreme Court and this Court. That underscores the appropriateness of this Court's immediate intervention. The balancing of harms also weighs strongly in favor of relief pending appeal. The district

court's order impinges on the Commander in Chief's supervision of military operations, countermands a military directive, and puts federal officers (and others) in harm's way.

This Court should also grant an administrative stay pending consideration of this motion. Defendants-appellants ask this Court to decide this motion by 9 am PT on September 11, 2025, so that the Solicitor General can seek immediate relief in the Supreme Court, if necessary, before the district court's temporary stay expires at 12 noon PT on September 12, 2025.

## STATEMENT

### A.    Legal Background

**1.** The Constitution authorizes Congress to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15 (Congress can "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"). Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation marks omitted). The National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command, *see* 10 U.S.C. § 10101. Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*,

3

496 U.S. at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

**2.** Congress has granted the President several authorities under which he may call forth the National Guard, including 10 U.S.C. § 12406. Section 12406 authorizes the President to call the National Guard into federal service if certain conditions are met. As relevant here, the third condition provides that "[w]henever . . . the President is unable with the regular forces to execute the laws of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . execute those laws." *Id.*

**3.** The PCA makes it a federal crime to "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. When activated into the U.S. National Guard, members of a State National Guard are "part of the Army" or the "Air Force," as the case may be, within the meaning of Section 1385. *Id.*; *see* U.S. Dep't of Def., Instr. 3025.21, *Defense Support of Civilian Law Enforcement Agencies* para. 2.d (Feb. 27, 2013); *see also* Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 61-62 (2018) (CRS Report). Accordingly, the PCA criminalizes the willful use of federalized members of the National Guard "to execute the laws" of the United States except as authorized by the Constitution or another federal statute.

### B.    Factual Background

**1.**  On June 6, 2025, officers from U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) conducted immigration-enforcement operations in Los Angeles, California.  *See* A5 ¶ 7.[1]  Protesters tried to prevent ICE officials from operating by throwing objects at ICE vehicles.  A5 ¶ 7. That evening, a crowd gathered at an ERO facility.  A6 ¶ 9.  The mob quickly turned violent, throwing "concrete chunks, bottles of liquid, and other objects" at federal officers attempting to prevent the mob from breaching the federal property.  A6-7 ¶ 11.  The federal officers were "pinned down in a defensive position by protesters and severely outnumbered," while rioters attempted "to use large rolling commercial dumpsters as a battering ram" to "break open the garage gate and break into the federal building."  A6-7 ¶ 11.

The next day, the violence intensified and spread as officers prepared for additional enforcement operations.  A9 ¶ 18.  Large crowds assaulted a group of ERO and Customs and Border Protection officers for seven hours, launching potentially lethal commercial-grade, "mortar-style fireworks" at the officers, trapping one officer in her vehicle while violently pummeling it with stones, shattering the wrist of another officer, and damaging federal buildings.  A9-10 ¶¶ 20-21.  The violence continued in

---

[1] Citations to "A" are to the addendum accompanying this motion.

the days that followed:  More officers were injured, and federal buildings were seriously damaged.  A16-22.

    **2.**  On June 7, 2025, the President signed a memorandum activating members of the California National Guard to protect federal personnel and property.  A63-64. The President found that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue" in response to ICE and other officials' enforcement of federal law.  A63.  "In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property."  A63.  "In light of these incidents and credible threats of continued violence," the President invoked Section 12406 to mobilize the National Guard "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property."  A63.

    Based on the President's order, Secretary of Defense Peter Hegseth federalized 2,000 Guardsmen and eventually activated an additional 2,000 federal Guardsmen and deployed several hundred Marines.  A66-68.

    **3.**  Once in service, National Guard members and Marines began "providing protection to Federal installations, personnel, and functions consistent with the President's June 7 memorandum."  A27-28 ¶ 9; *see* A140-41, A146-47, A153-54, A156, A168-70, A172, A229.  The Guard members and Marines "establish[ed] outside perimeters, observation posts, and perimeter patrols for federal property at locations

6

targeted by protests," and the National Guard members "provided personnel protection" for federal law-enforcement officers conducting operations in Los Angeles County "to enable [them] to conduct their Federal functions safely and with minimal interference from bystanders."  A27-28 ¶ 9(A)-(C); *see* A140-41, A146-47, A153-54, A156, A168-70, A172, A229.

As of August 8, 2025, there were approximately 300 Guardsmen assigned to the mission in Los Angeles, continuing to protect federal personnel and property.  *See* A59 ¶ 21.[2]  The Marines have been released.  A59 ¶ 19.

### C.    Prior Proceedings

**1.**  Shortly after the National Guard members were activated, the State of California and Governor Gavin Newsom sued alleging, among other things, that the President exceeded his authority under 10 U.S.C. § 12406 and that the defendants violated the PCA.

Plaintiffs sought a temporary restraining order, which the district court granted. Concluding that the federalization of the Guard was not authorized by Section 12406, the district court enjoined defendants "from deploying members of the California National Guard in Los Angeles" and directed defendants "to return control of the California National Guard to Governor Newsom."  *Newsom v. Trump*, No. 3:25-cv-

---

[2] On August 5, 2025, Secretary Hegseth issued an order that maintains the presence of 300 federalized National Guard troops in California for 90 days.  On September 2, 2025, plaintiffs sought a preliminary injunction against that order.

04870, 2025 WL 1663345, at *10-16, *21 (N.D. Cal. June 12, 2025).  The court did not reach the PCA claim.  *Id.* at *17.

**2.**  Defendants appealed, and in a published opinion issued after oral argument, a unanimous panel of this Court granted a stay pending appeal.  *Newsom v. Trump*, 141 F.4th 1032, 1040-41 (9th Cir. 2025) (per curiam).  On the merits, the panel held that the President likely acted within his authority in federalizing the National Guard under 10 U.S.C. § 12406(3).  *Id.* at 1052.  The panel also noted that the federal government provided ample evidence of "protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard on June 7."  *Id.*  The panel did not address the PCA.

On the remaining stay factors, the panel concluded that "[b]oth irreparable harm and the public interest weigh in favor of [d]efendants."  *Newsom*, 141 F.4th at 1054.  It recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and a "significant interest[]" in preventing violent attacks like those that occurred before the National Guard deployed.  *Id.* at 1054-55.  The panel held that those interests outweighed any "speculative" concerns plaintiffs may have "about escalation and interference with local law enforcement."  *Id.* at 1055.

**3.**  After discovery, plaintiffs sought another preliminary injunction based on their PCA claims.  From August 11-13, 2025, the district court held a hearing on the motion and a trial on the merits of the PCA claim.  On September 2, 2025, the district

court enjoined Secretary Hegseth and the Department of Defense "from deploying, ordering, instructing, training, or using the National Guard currently deployed in California, and any military troops heretofore deployed in California, to execute the laws, including but not limited to engaging in arrests, apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants, unless and until [d]efendants satisfy the requirements of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus Act."  A369 & n.29.  The court stayed its injunction until 12 noon on September 12, 2025, A369, and entered partial final judgment for plaintiffs, A370.

## ARGUMENT

The government is entitled to a stay because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay.  *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

### A.    The federal government is likely to prevail on the merits.

Plaintiffs' request for injunctive relief should have been rejected at the threshold.  The PCA is a criminal statute, and allowing plaintiffs to enforce such a statute via a civil claim for injunctive relief impermissibly usurps the Executive Branch's prosecutorial discretion.  The claim also fails because the PCA's prohibition on the willful use of the armed forces "as a posse comitatus or otherwise to execute the laws" excludes "cases" and "circumstances expressly authorized" by federal

9

statute—here, 10 U.S.C. § 12406(3). As this Court held, the President "likely acted within his authority in federalizing the National Guard under" that provision, *Newsom v. Trump*, 141 F.4th 1032, 1052 (9th Cir. 2025) (per curiam)—one of several binding holdings that the district court flouted. In any event, no evidence suggests the National Guard engaged in law enforcement within the PCA's meaning, and the district court's contrary conclusion was premised on a legally erroneous view of what that entails.

### 1. Plaintiffs PCA claim fails on threshold grounds.

**a.** Plaintiffs lack a cause of action to enforce the PCA. That Act imposes criminal penalties for "willfully us[ing] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Plainly, the PCA does not provide a cause of action for civil claims, and the district court did not conclude otherwise. *See* A365 n.26. Instead, the district court created an extra-statutory path for relief, applying the narrow exception that allows for ultra vires review of agency action. A365-67. That was error.

Nonstatutory ultra vires review is an artifact of history. *NRC v. Texas*, 605 U.S. 665, 680 (2025). Before the Administrative Procedure Act was enacted, "courts sometimes entertained a bill in equity to attack administrative action when no statutory review was available." *Id.* (quotation marks and citation omitted). The ultra

10

vires doctrine preserves such review in limited circumstances, but it cannot be used to create a cause of action far removed from what was available in a court of equity in 1789.  *Cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).

That is precisely what the district court did here.  There is no longstanding tradition of suits in equity for private enforcement of the criminal laws against the government.  Ultra vires review historically has been used to redress injuries caused by violations of regulatory statutes.  *Leedom v. Kyne*, 358 U.S. 184 (1958) (National Labor Relations Act); *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023) (Antiquities Act). Criminal statutes, by contrast, protect the rights of the public and "rarely impl[y] a private right of action."  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).  This contrast is especially stark in criminal statutes with specific intent requirements—like the PCA.  *See* 18 U.S.C. § 1385 (requiring "willful[]" conduct).  It would be exceedingly strange for a criminal statute to allow for civil actions—let alone injunctions—contingent on peering into the intent of the federal government or its officers.  This explains why the district did not cite, and the government is not aware of, any case in which a court enjoined the government from violating a criminal law.

A365-67.[3]  There is no historical tradition of authorizing enforcement of criminal laws via private civil injunction against the Executive.

Certainly, the court observed that injunctions have issued against executive officials for violation of other types of laws.  *See* A364.  But reliance on those inapposite examples contravenes the Supreme Court's direction to identify a much closer historical fit to support a court's exercise of its equitable powers.  *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554-56 (2025) (rejecting analogy between universal injunctive relief and decree obtained on a bill of peace); *Grupo Mexicano*, 527 U.S. at 319 (rejecting analogy between injunction preventing asset transfer to relief obtained by creditors post-judgment).

The district court's reasoning also ignores the significance of criminal law to this inquiry.  The Executive Branch has exclusive authority over prosecuting federal crimes, including its exercise of prosecutorial discretion.  *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 (2023).  That authority cannot be transferred to private citizens, *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), and courts cannot adjudicate a private citizen's (or a State's) grievance over the Executive Branch's prosecutorial decisions, *see Texas*, 599 U.S. at 680-81.  These principles operate as a

---

[3] Numerous courts have held that the PCA does not create a private civil cause of action.  *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Davis v. Florida*, No. 8:24-cv-02907, 2025 WL 992899, at *5-6 (M.D. Fla. Mar. 17, 2025), *report and recommendation adopted*, 2025 WL 987514 (M.D. Fla. Apr. 2, 2025).

"limitation[]" on "[t]he power of federal courts of equity to enjoin unlawful executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  By allowing plaintiffs to pursue their PCA claim, the district court violated these principles and impermissibly empowered California to override the federal government's decisions with respect to the enforcement of federal criminal law.

The district court similarly erred in suggesting that its conclusion that defendants "exceeded the authority delegated to them by Congress and directly violated the [PCA]" was sufficient to justify plaintiffs' ultra vires claim.  A366.  As discussed below, the government has complied with the PCA in all respects.  But regardless, an ultra vires claim is a "Hail Mary pass" that will not lie merely because an "agency has arguably reached a conclusion which does not comport with law."  *NRC*, 605 U.S. at 681 (quotation marks omitted).  Plaintiffs cannot possibly satisfy that demanding standard, where, as here, the weight of authority supports the defendants' conclusion that protecting federal personnel and property, as the Guard members did here, is not impermissible law enforcement under the PCA.  Nor can plaintiffs base their PCA claim on the on-the-ground operational decisions of the National Guard and Marines while deployed in Los Angeles, A41-45, as those sorts of tactical decisions are not the kind of gross abuse of power that triggers ultra vires review.  *See NRC*, 605 U.S. at 680-81.

**b.**  Plaintiffs' PCA claim fails at the threshold for the additional reason that the alleged National Guard actions challenged here are expressly permitted by the PCA.

The PCA's prohibition on the use of armed forces "as a posse comitatus or otherwise to execute the laws" does not apply "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Section 12406(3)—the statute that, as a prior stay panel already held, likely authorized the President's mobilization of the National Guard—expressly authorizes the President to federalize the National Guard "to execute the laws of the United States" when he is unable to do so with "regular forces." *See* 10 U.S.C. § 12406(3). The parallel between Section 12406(3) and the PCA is undeniable. The latter prohibits use of the military to "execute the laws" unless authorized by, *inter alia*, an Act of Congress, 18 U.S.C. § 1385, and Section 12406(3) allows the National Guard to be federalized for that purpose. Thus, the federalized National Guard may be used to execute federal law where regular forces are unable to do so, without violating the PCA. Otherwise, Section 12406(3) would be meaningless.

The district court did not contend with this text, instead focusing on the purported novelty of the interpretation. *See* A343-44. But Congress's own research service has recognized Section 12406(3) as an exception to the PCA. *See* CRS Report 31 n.224. More fundamentally, novelty cannot foreclose an interpretation where the text of the statute demands it. At bottom, the district court's objections amount to a disagreement with this Court's prior stay decision, which the district court characterized as lacking any "limiting principle" and creating an "expansive view of presidential discretion to invoke [Section] 12406(3)." A348. That disagreement does

14

not authorize the district court to ignore this Court's precedent, the text of the PCA, and the obvious parallels between the PCA and Section 12406(3).

Contrary to the district court's suggestion, *see* A348-49, this Court's prior interpretation of Section 12406(3) does not nullify the PCA. Section 12406 authorizes only the National Guard to execute laws, so it would not authorize the President to use other members of the armed forces to execute laws. Section 12406(3) also requires the President to determine that the regular forces are unable to execute the laws; the PCA prohibits execution of the laws where the President has not so determined. Finally, the Guard members can execute only "those laws" that the regular forces are unable to execute. 10 U.S.C. § 12406.

The district court's interpretation is also inconsistent with historical practice. President Nixon invoked Section 12406(3) to federalize the National Guard during the Postal Strike of 1970. *See* Executive Order 11519, 35 Fed. Reg. 5003 (1970). It is undisputed that the troops there were used to deliver mail—*i.e.*, execute the federal mail laws—and no one suggested they violated the PCA in doing so. Section 12406(3) provides express authorization for the conduct complained of here, and that is sufficient to bring it within the PCA's express exception.

**c.** Finally, plaintiffs lack standing. The only injury the district court relied upon—harm to federal-state relations—is not tied to the specific conduct plaintiffs claim was unlawful. *See* A341. Ensuring the safety of federal personnel and property does not intrude upon states' police powers, the latter being directed to the protection

15

of state citizens and interests. After all, it is beyond dispute that ICE agents would be free to protect federal personnel and property, and nothing about that protection would intrude upon California's interest in policing its citizens. At minimum, there is no standing as to the Marines' actions, which were limited to protecting property and thus could not implicate California's policing powers. Even if plaintiffs have a redressable injury, it would not be judicially cognizable. *Texas*, 599 U.S. at 676-78 (desire to see criminal law enforced against another is not a cognizable interest).

### 2.      The federal government is not violating the PCA.

Even if plaintiffs could overcome these threshold obstacles, they have not established that the federal government in fact is violating the PCA.

The President clearly limited the National Guard members' mission to "protect[ing] ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law," and "protect[ing] Federal property, at locations where protests against these functions are occurring or are likely to occur." A63. At trial, witnesses testified that the National Guard and Marines deployed to Los Angeles adhered to this limited protective mission. William Harrington, who until recently served as the Deputy Chief of Staff of the unit responsible for the deployed troops, described the military's role as "provid[ing] force protection," A153-54, A156, and emphasized that the military did not "interact[]with any civilians," A154; *see also* A156. Major General Scott M. Sherman, who served as commanding general of the deployed force until July 10,

described the training the Guard members and Marines received about their mission, *see, e.g.*, A168, which instructed soldiers that "they weren't allowed to do any law enforcement actions" and "were strictly there to protect law enforcement, allowing them to do their law enforcement job," A229.  Ernesto Santacruz, the Field Office Director of the Los Angeles ERO Field Office, explained that he understood the military's role in immigration enforcement operations was "only . . . to protect federal property and only to protect federal personnel." A295.  The size of a protective force, and the benefits protection offers for the effectiveness of federal operations, do not render a protective mission any less protective in nature.  *Contra* A360-61 n.24.

The district court nevertheless concluded that National Guard members were engaged in impermissible law enforcement, reasoning that protecting federal officials who are executing the laws and forming perimeters around their operations itself constitutes law enforcement prohibited by the PCA.  *See* A359-62.  That logic defies common sense:  When National Guard members protect federal law enforcement agents who are engaged in immigration enforcement actions, it is the federal law enforcement agents—not any Guard personnel—who are executing federal immigration laws.  By analogy, when the Secret Service protects the President, they are not executing the President's authorities; and when the U.S. Marshals protect the judiciary, they are not exercising the judicial power of the United States.

The court's reasoning is also inconsistent with the longstanding understandings of the Executive and the courts.  The Executive Branch has long recognized that the

17

PCA "does not impair the President's inherent authority to use troops for the protection of federal property and federal functions." *Auth. to Use Troops to Prevent Interference With Fed. Emps. by Mayday Demonstrations & Consequent Impairment of Gov't Functions*, 1 Op. O.L.C. Supp. 343, 343 (1971). The Supreme Court has similarly observed that the Executive Branch has inherent power to use the military to protect federal personnel as they perform federal functions. *See In re Neagle*, 135 U.S. 1, 65, 69 (1890); *see also In re Debs*, 158 U.S. 564, 582 (1895). And this Court has twice rejected the argument that providing security for law enforcement operations violates the PCA. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998); *United States v. Khan*, 35 F.3d 426, 432 (9th Cir. 1994).

The district court dismissed the importance of this inherent protective authority, asserting that the President cannot "declare an exception to the [PCA]." A355; *see also* A350-58. But that proceeds from the erroneous assumption that protecting federal personnel and property is impermissible law enforcement under the PCA. That is, the district court suggests the federal government must rely on state or local law enforcement to protect federal personnel and property. *See* A362. There is no basis in the statutory text or precedent to support such a conclusion. Instead, clear authority demonstrates that Congress, in crafting the PCA's prohibition on the use of the military to "execute the laws," would have understood it to preserve the Executive's core protective functions.

18

The court's logic is also internally inconsistent.  The court seems to concede that "protecting federal property [is] unlikely as a descriptive matter to execute federal laws in violation of the [PCA]," A358 n.22, and yet somehow concludes that the protection of federal personnel is impermissible.  The court fails to explain why safeguarding federal officials is any more of a law-enforcement function than safeguarding federal property.  And the very example it provides belies any such distinction.  *See* A358 n.22.  Preventing protesters from "blocking federal employees from reaching their job posts" involves protecting both persons and property.  *See* A358 n.22.  After all, those protesters might seek to harm the employees or damage the property—both in service of preventing employee access.

The district court similarly erred in attempting to distinguish the Supreme Court and this Court's precedent.  The court dismissed as dicta the Supreme Court's discussion of the President's authority in *In re Neagle* and *In re Debs*.  But Supreme Court dicta "have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold"; courts cannot "blandly shrug them off because they were not a holding." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1067 (9th Cir. 2020) (quotation marks omitted).  The court also implausibly distinguished this Court's precedents in *Klimavicius-Viloria* and *Khan* as involving "passive" and "isolated" military actions.  A361.  In both cases, the military was arguably more involved than the Guard members are here, as the Navy provided equipment and logistical support to law enforcement, along with backup security.  *See Klimavicius-*

19

*Viloria*, 144 F.3d at 1259; *Khan*, 35 F.3d at 432.  And the limited protective function that the National Guard served here distinguishes its actions from cases relied on by the district court, which involve direct and extensive military involvement in law enforcement.  In one, the defendants purportedly "seized and confined plaintiffs within an 'armed perimeter'" and sealed off a village for ten weeks. *Bissonette v. Haig*, 776 F.2d 1384, 1385 (8th Cir. 1985).  In the other, a military official "initiated an operation to search for individuals sharing child pornography online," prepared a report that "formed the basis of the state warrant to search [the criminal defendant's] home," the execution of which "yielded the evidence that led to the charges against [the defendant]," and conducted an "investigation" that was "active."  *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc).

The district court further erred when it concluded that defendants acted willfully—a predicate for any PCA violation.  *See* 10 U.S.C. § 1385.  The district court reasoned that it did "not matter" if defendants "believed that some constitutional or other exception applied" to allow for their conduct.  A362.  But willfulness in the criminal-law context requires "knowledge that the conduct [was] *unlawful*." *Bryan v. United States*, 524 U.S. 184, 195 (1998) (emphasis added).  If defendants believed they were acting *lawfully*, their conduct cannot be willful.  That is precisely what occurred here.  The President and Secretary Hegseth federalized the National Guard, invoking "10 U.S.C. § 12406" to "enforce[] . . . Federal law," A63; *see also* A66-68, and limited

the Guard's mission to protecting federal personnel and property—functions that do not constitute impermissible law enforcement under the PCA, *see supra* pp. 17-19.

## C.   The other stay factors strongly favor the government.

In staying the district court's prior order, a unanimous panel of this Court held that the equitable factors support defendants. *See Newsom*, 141 F.4th at 1054-56.  The panel recognized that the federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law" and determined that the mob violence in Los Angeles threatened to irreparably harm that interest.  *Id.* at 1054.  And the panel further explained that any concerns that the mobilization would inflame tension or impair the State's ability to perform critical functions "are counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured."  *Id.* at 1055.

That remains true today.  At trial, witnesses testified that National Guard members continue to respond to requests for assistance, A216-17, and that National Guard members have been critical in addressing threats to ERO personnel as they conduct immigration enforcement.  Ernesto Santacruz, the ERO Field Director, explained that prior to the Guard's federalization, he received reports of officer assaults multiple times a day.  A297.  Those officer assaults hampered ERO's ability to perform its federal functions, as officers had to pivot to address the violence.  A297.  During one incident, a mob outnumbered officers taking an individual into custody, helped that individual to escape, and forced the officers to flee as it became too

dangerous.  A297-98.  During another, 1,500 protesters became violent and assaulted federal officers outside a three-building federal complex.  A299.  During a third incident, a crowd started forming around an operation and quickly became violent: Officers were "assaulted by members of the public with projectiles" and "rocks," and "there was an individual" present who "had a weapon that appeared to look like he was shooting in the direction of" federal officers.  A303-04.

After the National Guard deployment, these incidents decreased.  A300.  The numbers of officer assaults "reduce[d] drastically."  A297.  And, as Santacruz explained, the presence of the Guard has deterred potential bad actors and has helped assure federal officers that they will not be assaulted.  *See* A300-01.  The district court's injunction threatens once again to expose federal personnel to violence and to impede federal officials' ability to enforce federal law.

On the other side of the ledger, plaintiffs still have not established irreparable injury warranting extraordinary relief.  Plaintiffs continue to argue that deployment of the National Guard will inflame tensions in Los Angeles and divert resources from other important state functions.  *See* A88-90.  But even after a trial, plaintiffs have not provided any evidence supporting their speculative assertions.  And the stay panel already determined that those interests "are counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured."  *Newsom*, 141 F.4th at 1055.  Indeed, California's purported harms are weaker on the present record, where all but approximately 300 Guard members have been released.

22

The district court's speculation about potential future National Guard deployments, A368, cannot support an injunction here.

## CONCLUSION

The Court should stay the district court's order pending appeal and should grant an immediate administrative stay pending consideration of the motion.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANNA O. MOHAN

*/s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*
*Sharon.swingle@usdoj.gov*

September 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,526 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ J. Kain Day*
J. KAIN DAY

**ADDENDUM**

## TABLE OF CONTENTS

Declaration of Ernesto Santacruz, Jr., Dkt. 25-1 (June 11, 2025) ...................................A1

Supplemental Declaration of Ernesto Santacruz, Jr., Dkt. 84-1 (June 18, 2025) ...... A15

Declaration of Major General Scott M. Sherman, Dkt. 84-3 (June 18, 2025) ........... A23

Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction, Dkt. 127 (July 30, 2025) .................................................................................. A30

Stipulation of Facts, Dkt. 147 (August 8, 2025) ............................................................ A57

Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Dkt. 150 (August 9, 2025) ................................................................................................... A69

Transcript of Proceedings Volume 1 (August 11, 2025)............................................ A110

Opinion Granting Injunctive Relief, Dkt. 176 (September 2, 2025)......................... A318

Judgment, Dkt. 182 (September 2, 2025) ...................................................................... A370

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Case No. 3:25-cv-04870 |
| | **DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | Hon. Charles R. Breyer |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | United States District Judge |
| Defendants. | |

## DECLARATION OF ERNESTO SANTACRUZ, JR.

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     I have been employed by ICE, or its predecessor Immigration and Naturalization Service (INS), since May 2002. Prior to my position as FOD, I served as the ERO Los Angeles Deputy Field Office Director, Acting Assistant Field Office

Director, and Assistant Field Office Director. I have also served ERO as a Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent. Prior to the creation of ICE, I served as a Detention Enforcement Officer with INS.

3.      As the FOD for ERO Los Angeles, I direct and oversee ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which consists of 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which

consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

4.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and have been delegated limited customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

5.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

**A4**

6.     ERO Los Angeles officers are authorized to execute civil immigration arrest warrants for aliens ordered removed by immigration judges, aliens subject to expedited removal orders, and aliens for whom ERO officers have probable cause of their removability. *See* 8 U.S.C. §§ 1225, 1226, 1231, 1357; *see also* 8 C.F.R. §§ 235.3(b), 236.1(b), 241.2, 287.5(e), 287.8(c).

7.     On Friday, June 6, 2025, ICE conducted immigration enforcement operations in several locations in the Los Angeles area. A crowd of people gathered at the site of an ICE law enforcement operation in the Garment District, tried to prevent ICE authorities from leaving in their official vehicles, and threw objects at the vehicles. Members of the crowd walked and ran alongside the vehicles creating dangerous conditions for both the officers and crowd. One protestor attempted to stop a law enforcement van's progression by standing directly in front of the van and placing his hand on the vehicle's hood. The man also backpedaled in front of a departing SUV, then tripped and fell in front of the vehicle. Fortunately, the driver of the SUV was able to reverse and drive around him without harming him. Individuals arrested during the immigration enforcement operation were taken to the ERO facility in the federal building at 300 N. Los Angeles Street for processing.

8.     At 3:23 p.m. on June 6, Mayor Karen Bass posted on X: "This morning, we received reports of federal immigration enforcement actions in multiple locations in Los Angeles. As Mayor of a proud city of immigrants, who contribute to our city in

4

**A5**

so many ways, I am deeply angered by what has taken place. These tactics sow terror in our communities and disrupt basic principles of safety in our city. My Office is in close coordination with immigrant rights community organizations. We will not stand for this."

9.      At about 5:00 p.m., I personally observed protesters pass by the front of the 300 North Los Angeles Street building heading northwest on Los Angeles Street. However, the situation turned violent and riotous as the marchers turned right and headed southeast down East Aliso Street, and then headed south on North Alameda Street.

10.      Around this time, the number of demonstrators swelled to approximately 500 at 300 North Los Angeles Street, in downtown Los Angeles, and an additional 300 at an underground parking garage gate off of North Alameda Street. This gate leads to a multilevel parking structure under all of the federal buildings in this complex, including a Veterans Affairs (VA) medical facility, the Roybal Courthouse, the 300 North Los Angeles Street Federal building, and the Metropolitan Detention Center.

11.      I observed that approximately five Federal Protective Service (FPS) inspectors, who use security expertise to protect federal facilities and protect employees, were pinned down in a defensive position by protesters and severely outnumbered while trying to defend the damaged back Alameda Street gate. The

protestors were throwing concrete chunks, bottles of liquid, and other objects at the

FPS officers, as well as attempting to use large rolling commercial dumpsters as a

battering ram to breach the parking garage gate and damaged federal property. The

FPS officers defended the parking garage entrance against the protesters who were

violently trying to break open the garage gate and break into the federal building

complex.

12.    At that time, just inside the federal building, approximately 130 aliens

arrested by ICE earlier in the day were being processed by federal immigration

officers.

13.    I feared for the safety of all the office workers, federal employees, and

lawfully detained aliens in the building. This being late on a Friday afternoon, I had

to call all available officers in the building to report to the back Alameda Street gate

to prevent FPS from being overrun, which would have resulted in a breach of the

entire federal complex. All available ERO officers and HSI agents reported to the

location. The ICE officers formed a line of protection in front of the garage entrance

and held the line by using pepper balls and other alternatives to lethal force, aiming

to minimize harm and de-escalate situations. The combination of FPS, ERO, and

HSI law enforcement officers successfully prevented a breach and held the line

from approximately 5:15 p.m. to 10:30 p.m., including about an hour and a half

before the Los Angeles Police Department (LAPD), having been called by FPS,

arrived on scene to push the crowd to Temple Avenue.

14.      During this time, I observed that the demonstrators continued to be violent, using chairs, dumpsters, and other items as weapons against federal law enforcement officers.

15.      Thereafter, LAPD responded to the request from FPS for assistance and according to media reports, indicate that their response was delayed due to "significant traffic congestion, the presence of demonstrators, and…the fact that federal agents had deployed irritants into the crowd before LAPD's arrival."

16.      At approximately 7:00 p.m., approximately two hours after the protesters congregated in the area, LAPD declared an "unlawful assembly," ordered protestors to leave, and gave them 5 minutes to comply. The crowd did not comply. By 8:00 p.m., LAPD blocked the crowd's path to the Metropolitan Detention Center. Protestors threw large chunks of concrete at those officers. The LAPD fired non-lethal foam projectiles and bean bag rounds in response. The federal building was heavily vandalized.

17.      The demonstrators had all departed by 11:00 p.m., with the LAPD officers following them away from the property. However, there was damage to both the Federal Building at 300 North Los Angeles Street and the Edward R. Roybal Federal Building and United States Courthouse at 255 East Temple Street, which is next door. Both locations were heavily vandalized, the window to the guard shack

**A8**

was broken, there was evidence of tampering on the retractable anti-vehicle barriers, and the roll up entrance gate was working sporadically. Federal law enforcement officers secured the entrance gate throughout Friday night.

18.     On the next morning of Saturday, June 7, 2025, while federal officers prepared for an immigration enforcement operation at a Department of Homeland Security office in Paramount, California, a large crowd gathered. A large contingent of approximately 110 Customs and Border Protection (CBP) officers had arrived from the San Diego area to assist with immigration enforcement operations and as a precautionary measure in the aftermath of Friday night's violence. Prior to the start of the immigration enforcement action, these CBP officers stood in uniform in an industrial park in advance of discussing the day's upcoming operations.

19.     Coincidently, a Home Depot retail store – which was not the target of any intended operation – was located just across the street from the DHS office parking lot being used for staging.

20.     A large crowd gathered and blocked traffic in the area. The crowd became violent and attacked the ERO and CBP officers. This led to about seven hours of non-stop fighting, from about 9:30 a.m. to approximately 5:00 or 6:00 p.m. The violent crowd boxed in ERO and CBP officers throwing mortar-style fireworks with multiple explosions, rocks and mangos at them, and used shopping carts to

barricade the street, prompting our officers to try clear a path so federal vehicles could enter and exit. One ERO officer was trapped inside her law enforcement vehicle when the crowd surrounded it, pounding it, shaking it, and violently pummeling it with stones, necessitating a rescue from other officers on scene. A protester shattered the wrist of a CBP officer with a thrown object. The violent and riotous crowd set at least one vehicle on fire and possibly also set a propane tank on fire, which exploded and thankfully did not injure anyone.

21.    HSI reports that the perimeter fence of the DHS office in Paramount was cut in two places, three government vehicles were damaged, the business park sign was vandalized, and mortar-style fireworks with multiple explosions were thrown at the federal officers. In addition, at approximately 4:00 p.m., the Los Angeles Sheriff's Department (LASD) declared an "unlawful assembly" in Paramount, and the protest spread to the neighboring Compton area.

22.    Later that Saturday night, another protest formed in the vicinity of the Federal complex at 300 N. Los Angeles Street, near the location of the previous night's riot, at North Alameda Avenue and East Temple Street. According to media reports, the LAPD eventually declared this to be an unlawful assembly.

23.    I was informed by Homeland Security Investigations on the morning of Sunday, June 8, National Guard troops arrived in downtown Los Angeles. Specifically, 300 National Guard troops deployed to Paramount, Compton, and

A10

downtown Los Angeles.

24.    On Sunday afternoon, at around 3:00 p.m., a large crowd of people marched from the steps of Los Angeles City Hall to the 300 N. Los Angeles Street federal complex. Protestors confronted a line of federal agents stationed outside. LAPD issued a citywide Tactical Alert. Shortly thereafter, the LAPD issued a dispersal order and made additional arrests.

25.    Then, protestors entered the 101 Freeway in downtown Los Angeles, blocking the Aliso Street off-ramp. California Highway Patrol (CHP) officers dispersed the crowd by 5 p.m. and moved them to the Civic Center.

26.    At approximately 9:00 p.m., LAPD declared the downtown protest to be an unlawful assembly and ordered protestors to leave. The protesters did not leave. They continued to move through downtown, setting off commercial-grade fireworks toward federal officers and throwing objects at passing law enforcement vehicles. The protestors lit fires in dumpsters and trash bins and looted at least one store. Protestors vandalized dozens of buildings with graffiti, including the Federal Courthouse and LAPD Headquarters.

27.    By the end of the weekend, the Federal building at 300 N. Los Angeles Street was vandalized in numerous locations, pieces of the bollards used for building security were broken, and the security checkpoint was in ruins. Numerous federal officers and agents have been injured by projectiles thrown at them such as

rocks, water bottles, and bricks.

28.     Many law enforcement personnel, including the five FPS officers who initially held the North Alameda Street gate while severely outnumbered.  On Monday, June 9, at approximately 5:00 p.m. additional protests are formed at the 300 North Los Angeles Street federal complex, as well as at the Federal Building in Santa, Ana, Orange County, California. Based on federal agency reports, a crowd of 1,000 demonstrators gathered near the Roybal Federal Building. At this time a demonstrator drove by the building and fired paintballs at the FPS inspectors, hitting at least one in the head and neck. At the Santa Ana Federal Building, violent protestors attacked a 13-passenger federal van carrying multiple aliens and officers, rocking the vehicle, and smashing the windows. The violent protestors also damaged multiple vehicles in the surrounding parking lot.

29.     This federal complex was largely closed today Monday will again be closed Tuesday, due to the civil unrest. This is a disruption for the many federal agencies working in this building, as well as the co-located federal courthouse, VA medical facility, and Federal Bureau of Prisons facility.

30.     From what I understand, the LAPD reported they are on tactical alert and declared a partial mobilization of 400 additional officers.

31.     The aggressive horde at the Roybal Building moved downtown to Little Tokyo and City Hall later in the evening, where they clashed with LAPD officers,

injuring five, and also injured five LAPD horses. LAPD deployed less-lethal munitions and made multiple arrests.

32.     LAPD declared an unlawful assembly for the area of the Civic Center part of Los Angeles and had to shut down Route 101 in central Los Angeles in response to demonstrators throwing objects onto the freeway and damaging multiple police vehicles.

33.     Even with the LAPD, LASD, and CHP all engaged in the ensuing law enforcement activities, I believe the safety of local federal facilities and safety of those conducting immigration enforcement operations in this area of responsibility requires additional manpower and resources. Aside from the horrendous actions of the violent demonstrators at the various federal protected locations, I am also aware that there were significant instances of demonstrators posting the location, images, and family information of federal law enforcement employees online in an attempt to dox, threaten, and obstruct federal law enforcement personnel and their families and impede lawful federal activity. Demonstrators have also been posting the locations of federal law enforcement employees conducting immigration enforcement operations to threaten and obstruct their work.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best

of my information, knowledge, and belief.


Executed on this 11th day of June 2025.

ERNESTO M    Digitally signed by
SANTACRUZ    ERNESTO M
            SANTACRUZ JR
JR            Date: 2025.06.11
            08:16:31 -07'00'

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | Case No. 3:25-cv-04870 |
| | **SUPPLEMENTAL DECLARATION OF ERNESTO SANTACRUZ, JR.** |
| Plaintiffs, | |
| v. | Hon. Charles R. Breyer |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | United States District Judge |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF ERNESTO SANTACRUZ, JR.

I, Ernesto Santacruz, Jr., hereby declare:

1.     I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since April 6, 2025.

2.     The purpose of this declaration is to provide an update on the current conditions on the ground in the Los Angeles Area of Responsibility (AOR) with respect to immigration enforcement operations and the security of federal property

1

A16

and personnel. This declaration supplements the information in my June 11, 2025

declaration filed with the Defendants' Opposition to Plaintiffs' Motion for a

Temporary Restraining Order. *See Newsom v. Trump*, No. 25-4870 (N.D. Cal. filed

June 11, 2025), Dkt. 22-1.

3.      It is my understanding that, as of June 18, 2025, approximately 3,000

Department of Defense personnel, which includes approximately 2,000 members

of the California National Guard, are in the Los Angeles area providing protection

of federal personnel, property, and functions.

4.      The 300 North Los Angeles Street Federal Building in downtown Los

Angeles, California continues to be the site of daily protests and was closed to the

public from June 9-16, 2025. Members of the National Guard have been essential

to protecting the building, the Edward R. Roybal Federal Building and U.S.

Courthouse, and the Federal Bureau of Prisons Metropolitan Detention Center - all

located in the same city block - from further damage or attempts at incursion and

provide security to those federal employees working inside, like myself.

5.      Prior to the National Guard's deployment, rioters and protestors assaulted

federal, state, and local law enforcement officers with rocks, fireworks, and other

objects. They also damaged federal property by spray painting death threats to

federal law enforcement officers enforcing federal immigration laws. Photos and

videos for those assaults and threatening graffiti can be found here:

2

A17

https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (last visited June 18, 2025) and include "Kill ICE," "Death to ICE," "Hang Trump," and "Dead Cops." Several suspects have been arrested for possessing Molotov cocktails and assaulting federal officers during recent civil unrest in downtown Los Angeles, Paramount, and Santa Ana. *See* https://www.nbclosangeles.com/news/local/molotov-cocktail-attacks-la-paramount-protests/3721306/ (last visited on June 18, 2025).

6.      It is my understanding that federal facilities in Westwood, Santa Ana, Long Beach, and other locations in California have been the sites of continuing violent protests during the last week. Many of these protests have been directed at objecting to ICE operations and attempting to impede those operations. For example, on June 14, 2025, the Los Angeles Police Department declared an unlawful assembly outside the 300 North Los Angeles Federal Building and the Edward R. Roybal Federal Building and U.S. Courthouse after violent opportunists in the crowd of over 1,000 people began assaulting law enforcement officers with rocks, bricks, bottles, fireworks, and other objects. "Officers Deploy Tear Gas, Rubber Bullets to Clear Protestors in Downtown Los Angeles," available at: https://ktla.com/news/local-news/no-kings-protestors-ordered-to-disperse-tear-gassed-in-downtown-los-angeles/ (last visited June 18, 2025). One suspect was taken into custody after spitting on a Federal Protective Service (FPS) officer and

3

A18

National Guard members. Protestors also threw red paint on FPS and National Guard members.

7.     The National Guard has been extremely helpful this week by protecting federal property and personnel during immigration enforcement operations. Through their protective efforts, the Guards have assisted on most operations that ICE and its federal partners conducted this week, enhancing the level of safety for ICE and its federal partners to proceed with those operations. The Guards are acting as a security element, accompanying federal officers and agents during operations to ensure safety of all involved.

8.     On Saturday, June 14th, the protests at the 300 N. Los Angeles Federal Building, which included protests directed at ICE operations, continued throughout the day. The National Guard has been protecting the entire perimeter of the federal complex all week, as protestors are gathered throughout the area continuously. Protestors blocked the parking garage exits on Alameda Street, preventing ICE transport vehicles from exiting with approximately 130 immigration detainees. As the protests grew, ICE was forced to not utilize the U.S. Marshall's transport bus as originally intended. The National Guard cleared a path for several unmarked vans to remove the detainees in small groups. The National Guard's assistance was key to protecting ICE officials' ability to continue these immigration enforcement operations.

A19

9.      Having the National Guard at our fingertips as a Quick Reaction Force is key to maintaining officer safety and continuing our immigration enforcement operations. The Guard's Quick Reaction Force is available 24/7 to federal law enforcement officers conducting operations in the Los Angeles area if and when they encounter violent mobs or individuals impeding federal immigration enforcement operations or threatening the safety of federal officers. The resources that they bring to protect federal immigration officials from interference in their enforcement efforts and their presence at federal facilities enable federal law enforcement officers to continue operations and enforce federal law in the Los Angeles area.

10.     The Guard's presence prevented other incidents like the one in Paramount on June 7, 2025, discussed in my prior declaration. There, an unruly mob attacked ERO and U.S. Customs and Border Protection (CBP) officers, engaged them in an hours-long fight while the local law enforcement did not intervene for several hours. I believe that the Guard's presence since their deployment to Los Angeles has prevented this from reoccurring during our subsequent immigration enforcement operations and has been critical to maintaining the safety of all law enforcement officers involved.

11.     The presence of the National Guard and other Department of Defense personnel has enabled ICE to continue to carry out its congressionally mandated

A20

duties in the Los Angeles area. It is the additional manpower and resources provided by these Guards – indeed, their mere presence – that has ensured the safety of local federal facilities and the safety of those enforcing federal laws here this week.

12.    If these resources were not at my disposal, our immigration enforcement mission would be greatly impacted. The safety of our continued operations would be in doubt, placing both federal employees and the general public, including those peacefully protesting ICE operations, at an unnecessarily greater risk. Because of the current threat, we would not be able to carry out as many immigration enforcement operations as we have been able to with the Guards' assistance.

13.    The National Guard, with approximately 900 troops assigned to protect federal buildings, has also been instrumental in enhancing the ability to protect federal property from damage or breach attempts.

14.    Our local law enforcement colleagues, including the Los Angeles Police Department (LAPD), Los Angeles County Sheriff's Department (LASD), and California Highway Patrol (CHP), have all engaged in taxing law enforcement activities throughout the week, with the assistance of their mutual aid network. But the National Guard provides resources and protective capabilities that are unparalleled.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 18th day of June 2025.

ERNESTO M
SANTACRUZ JR

Digitally signed by ERNESTO M
SANTACRUZ JR
DN: cn=ERNESTO M
SANTACRUZ JR, o=U.S.
Government, ou=People,
email=Ernesto.M.SantacruzJr@ice.
dhs.gov, c=US
Date: 2025-06-18T08:59:45-0700

Ernesto Santacruz, Jr.
Field Office Director
DHS ICE ERO Los Angeles

7

# EXHIBIT 3

## IN THE UNITED STATES COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

GAVIN NEWSOM, et al.                      )
                                          )
        *Plaintiffs,*                     )
                                          )        No. 3:25-CV-04870
v.                                        )
                                          )
DONALD TRUMP, et al.                      )
                                          )
        *Defendant*                       )
_____

### DECLARATION OF MAJOR GENERAL SCOTT M. SHERMAN

I, Major General Scott M. Sherman, hereby state and declare as follows:

1.      I am currently employed by the United States Army as the Commanding General of Task

Force 51 and the Deputy Commanding General for the United States Army North (ARNORTH).

ARNORTH is the Army Service Component Command (ASCC) of the United States Northern

Command (USNORTHCOM).  I have held the position of Deputy Commanding General of

ARNORTH since September 2023, and also serve as the Commanding General of Task Force 51

since that time.  On June 11, 2025, Task Force 51, ARNORTH's contingency command post,

which provides a rapidly deployable capacity to partner with civilian authorities and DoD

entities in response to Homeland Defense and Homeland Security Operations, was ordered to

deploy to the vicinity of Los Angeles, California.  I have served as a commissioned Army officer

for more than 33 years.  My current responsibilities include serving as a principal deputy

commander and overseeing the logistical, administrative, and sustainment operations of

ARNORTH as well as ensuring the training, discipline, and readiness of the units under

ARNORTH's command.  I have reviewed the Complaint in the matter of *Gavin Newsom, et al. v.*

*Donald Trump, et al.*, Case No. 3:25-CV-04870 (N.D. Cal.).  This declaration is based on my

personal knowledge, as well as information made available to me during the routine execution of my official duties.

2.     On June 7, 2025, the President of the United States issued a memorandum with the subject "Department of Defense (DoD) Security for the Protection of Department of Homeland Security (DHS) Functions." The memorandum noted that "[n]umerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and [do] significant damage to Federal immigration detention facilities and other Federal property." The memorandum directed members of the National Guard into federal service "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." It further directed the Secretary of Defense to call at least 2,000 National Guard personnel into service for 60 days, subject to change at his discretion. It also further delegated to the Secretary of Defense the authority to utilize the regular forces to assist with this mission. The Secretary of Defense issued guidance accordingly that same day. The following day, the Secretary authorized the activation of the 2nd Battalion, 7th Marine Regiment, 1st Marine Division (2/7 USMC).

3.     The Chief of the National Guard Bureau transmitted the Secretary of Defense's orders on Saturday, June 7, to the Adjutant General of the California National Guard. At 10:17pm Pacific Standard Time, the California Adjutant General responded, "consider our forces mobilized."

4.     USNORTHCOM is one of DoD's eleven unified combatant commands. Its mission is to provide command and control of the DoD homeland defense efforts and to coordinate defense

support of civil authorities.  ARNORTH supports USNORTHCOM in its mission as the ASCC and Joint Forces Land Component Command for USNORTHCOM.

5.      When federalized, members of the State National Guard serve pursuant to Title 10 of the United States Code under the command of the President and the Secretary of Defense.  In this case, the Secretary of Defense authorized USNORTHCOM to execute command and control of mobilized and federalized members of the California National Guard as well as 2/7 USMC.  On June 8, 2025, USNORTHCOM further delegated operational control of the federalized National Guard forces (the 79th Infantry Brigade Comat Team) to ARNORTH, and, on June 11, 2025, it similarly delegated tactical control of Marine forces to ARNORTH.  These command and control authorities were further delegated to Task Force 51 on June 12, 2025.  On June 14, 2025, Task Force 51 was additionally delegated operational control of the federalized National Guard 49th Military Police Brigade (49th MP BDE).

6.      Following the President's June 7, 2025 directive, ARNORTH published Operational Order (OPORD) 01-23 and Fragmentary Order (FRAGORD) 25-501.000 to direct federalized members of the California National Guard to temporarily protect ICE Officers and other U.S. Government personnel who are performing federal functions, as well as federal property, where protests are occurring in Los Angeles County, California.

7.      On June 10, 2025 and June 14, 2025, members of the 2/7 USMC were assigned to Task Force 51 under OPORD 01-23 pursuant to USNORTHCOM General Administrative (GENADMIN) Message 039.G.000.  On June 14, 2025, members of the 49th MP BDE were mobilized in support of OPORD 01-23 pursuant to USNORTHCOM FRAGORD 039.F.005.

8.      Since Saturday, June 7, selected units of the California National Guard have been in a Title 10 status supporting operations in Los Angeles County consistent with the directions of the

President's June 7 memorandum and ARNORTH's FRAGORD 25-501.000.  As part of its ongoing operations in Los Angeles County, Task Force 51 receives requests for assistance from Federal Government agents and agencies related to protection of federal personnel performing official functions, as well as requests for protection duties such as fixed observation posts, perimeter security of federal property, and escorts for Government personnel conducting federal law enforcement duties.  Task Force 51 reviews the requests for compliance with the President's June 7 memorandum and directives from higher DoD headquarters.  Upon approval, Task Force 51 assigns trained personnel in accordance with those directives.  Task Force 51 oversees the assignments and tasking for the federalized members of the California National Guard, which includes the 79th Infantry Brigade Combat Team (79th IBCT), the 49th MP BDE, as well as the 2/7 USMC.  All Title 10 personnel activities are limited to protective functions.  Title 10 personnel are not performing law enforcement or any other functions.

9.      As of June 17, 2025, Task Force 51 is composed of 4,119 California National Guard members mobilized in a Title 10 status, 821 Active-Duty United States Marines, and approximately 382 vehicles (not counting those of the 49th MP BDE which is not yet conducting operations).  These forces are providing protection to Federal installations, personnel, and functions consistent with the President's June 7 memorandum. Members of the 79th IBCT and the 2/7 USMC have conducted, or are currently conducting, the following protection operations (members of the 49th MP BDE have joined the task force and are completing their training prior to conducting any missions):

        A.  Initially, federalized National Guard members of the 79th IBCT provided installation protection by establishing outside perimeters, observation posts, and perimeter patrols for federal property at locations targeted by protests, including the Edward R. Roybal

Federal Building and Courthouse (Roybal Complex), the Wilshire Federal Building;
an ICE facility in the city of Paramount; Santa Ana Federal Building, and other
locations where the Federal Government has a presence and carries out its Federal
functions.

B. Members of the 79th IBCT have also provided personnel protection for ICE Officers,
Customs and Border Protection (CBP) Officers, Homeland Security Investigation
(HSI) Special Agents, and Federal Bureau of Investigation (FBI) Special Agents,
conducting operations throughout the Los Angeles County area. Protection is
provided to enable Federal Law Enforcement officers to conduct their Federal
functions safely and with minimal interference from bystanders.

C. Beginning on June 13, 2025, after completing non-lethal training and Federal
Protection Mission training, members of the 2/7 USMC assumed protection duties for
various fixed sites noted in paragraph 9A above.

D. To date, federalized members of the National Guard have not detained any
individuals, though one individual was temporarily detained by an active-duty United
States Marine on Friday June 13, 2025, at approximately 12:45pm Pacific Standard
Time, when the individual attempted to enter a restricted area multiple times. The
individual was advised to get off the federal property and was temporarily detained
after he attempted to enter the property despite being warned to stop. The individual
was placed in flexi-cuffs and turned over to a DHS agent approximately 30 minutes
later and eventually to the Los Angeles Police Department as soon as they arrived a
few minutes later.

E.  There has been one reported injury to a service member when a protester grabbed and pulled on the protective shield the Soldier was holding.  When the Soldier pulled on the shield and the protester let go, the shield struck the Soldier in the mouth chipping one of his teeth.  The Soldier was taken to the dentist for urgent care and was otherwise unharmed.

SHERMAN.SCO
TT.MARSHALL.1
153670885

Digitally signed by
SHERMAN.SCOTT.MARSH
ALL.1153670885
Date: 2025.06.18 08:58:13
-07'00'

MAJOR GENERAL SCOTT M. SHERMAN
COMMANDING GENERAL
JOINT TASK FORCE 51

1   **ROB BONTA**
    Attorney General of California
2   MICHAEL L. NEWMAN
    THOMAS S. PATTERSON
3   Senior Assistant Attorneys General
    ANYA M. BINSACCA
4   MARISSA MALOUFF
    JAMES E. STANLEY
5   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
6   LUKE FREEDMAN
    BRENDAN HAMME
7   BARBARA HORNE-PETERSDORF
    LORRAINE LOPEZ
8   KENDAL MICKLETHWAITE
    MEGHAN H. STRONG
9   MEGAN RICHARDS
    JANE REILLEY
10   Deputy Attorneys General
      455 Golden Gate Ave.
11    San Francisco, CA 94102
      Telephone: (415) 510-3879
12    E-mail:  Jane.Reilley@doj.ca.gov
    *Attorneys for Plaintiffs*

13

14              IN THE UNITED STATES DISTRICT COURT

15            FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17

18

| | |
|---|---|
| 19 **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,** | **NO. 3:25-cv-04870-CRB** |
| 20 Plaintiffs, | **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| 21 **v.** | |
| 22 **DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,** | |
| Defendants. | |

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

    I.     Defendants Have Continued to Violate the Posse Comitatus Act ........................ 2

    II.    Nearly 2,000 Federalized National Guard Troops Remain Deployed .................. 4

Argument .................................................................................................................. 4

    I.     Defendants Have Violated and Are Violating the Posse Comitatus Act ............... 4

        A.    The Posse Comitatus Act Bars Civilian Law Enforcement by the Military. .................................................................................................. 4

        B.    Defendants Have Violated the Posse Comitatus Act Under Each of the Three Applicable Tests. ................................................................. 7

            1.    Defendants Are Making Direct, Active Use of Military Personnel to Execute the Laws ........................................................ 7

                    i)     Federalized National Guard Troops Have Performed Security Functions During Civil Law Enforcement Operations. .............................. 8

                    ii)    Federalized National Guard Troops Have Formed Armed Perimeters and Blockades. .......... 10

                    iii)   Task Force 51 Troops Have Apprehended and Detained Civilians. ....................................... 11

            2.    Defendants' Use of Military Personnel Pervades the Activities of Civilian Law Enforcement ................................... 13

            3.    Task Force 51 Troops Have Subjected Civilians to the Exercise of Regulatory, Proscriptive, or Compulsory Military Power ........................................................................ 16

    II.    Defendants' Responses to Plaintiffs' Claims Lack Merit. .................................. 17

        A.    Plaintiffs May Pursue an Ultra Vires Claim for Violation of the Posse Comitatus Act. ......................................................................... 17

        B.    Section 12406(3) Is Not an Exception to the Posse Comitatus Act ......... 19

Conclusion ................................................................................................................ 22

i

# TABLE OF AUTHORITIES

<u>Page</u>

CASES

*Bissonette v. Haig*
    776 F.2d 1384 (8th Cir. 1985) ................................................................ *passim*

*Black Lives Matter D.C. v. Trump*
    544 F. Supp. 3d 15 (D.D.C. 2021) .................................................................. 17

*Gilbert v. United States*
    165 F.3d 470 (6th Cir. 1999) ......................................................................... 16

*Hooper v. City of Seattle*
    2020 WL 3100855 (W.D. Wash. June 11, 2020) ............................................. 7

*Laird v. Tatum*
    408 U.S. 1 (1972) ........................................................................................... 19

*Murphy Co. v. Biden*
    65 F.4th 1122 (9th Cir. 2023) .............................................................. 17, 18, 19

*United State v. Jaramillo*
    380 F. Supp. 1375 (D. Neb. 1974) ................................................................... 5

*United States v. Alvarado*
    2014 WL 12785138 (D.N.M. Nov. 20, 2014) ................................................ 21

*United States v. Banks*
    539 F.2d 15 (9th Cir. 1976) ............................................................................ 18

*United States v. Dreyer*
    804 F.3d 1266 (9th Cir. 2015) (en banc) .................................................... 5, 13

*United States v. Eleuterio*
    2024 WL 1620383 (D.V.I. Apr. 15, 2024) ..................................................... 18

*United States v. Gerena*
    649 F. Supp. 1179 (D. Conn. 1986) ............................................................. 5, 6

*United States v. Khan*
    35 F.3d 426 (9th Cir. 1994) ............................................................................. 5

*United States v. McArthur*
    419 F. Supp. 186 (D.N.D. 1975) .................................................................. 5, 6

*United States v. Red Feather*
    392 F. Supp. 916 (D.S.D. 1975) ................................................................ 5, 18

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Walden*
    490 F.2d 372 (4th Cir. 1974) ........................................................................ 1, 4, 5

*United States v. Yunis*
    924 F.2d 1086 (D.C. Cir. 1991)..................................................................5, 10, 18

*Wrynn v. United States*
    200 F. Supp. 457 (E.D.N.Y. 1961) .................................................................. 5, 19

**STATUTES**

United States Code, Title 10
    §§ 251-254 ................................................................................................................ 21
    §§ 271-284 ................................................................................................................ 21
    § 275 .................................................................................................................. *passim*
    § 375 ............................................................................................................................ 18
    § 12405 ....................................................................................................................... 19
    § 12406 .............................................................................................................. *passim*
    § 12406(3) .................................................................................................................. 19

United States Code, Title 18
    §112 .............................................................................................................................. 6
    §351 .............................................................................................................................. 6
    §831 .............................................................................................................................. 6
    §1116 ............................................................................................................................ 6
    § 1385 ................................................................................................................ 1, 6, 19
    §1751 ............................................................................................................................ 6

Posse Comitatus Act (PCA) ............................................................................... *passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Fourth Amendment ..................................................................................................... 19
    Article I § 8, cl. 15-16 ................................................................................................. 1

A33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

"The policy that military involvement in civilian law enforcement should be carefully restricted has deep roots in American history." *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974). In drafting the Declaration of Independence in 1776, Thomas Jefferson specifically criticized King George III for "render[ing] the Military independent of and superior to the Civil Power" and objected to the king's orders that "kept among us, in Times of Peace, Standing Armies without the consent of our Legislatures." The Declaration of Independence paras. 13-14 (U.S. 1776). The Nation's Founders memorialized that objection in several provisions of the Constitution, including the Militia Clauses, which reserve for Congress the authority to call forth the militia. U.S. Const. art. I, § 8, cl. 15-16. And in 1878, Congress further codified these principles in passing the Posse Comitatus Act and prohibiting the military from engaging in civilian law enforcement or executing the law domestically. 18 U.S.C. § 1385.

Defendants' stationing of federal troops—the federalized National Guard and, until recently, the Marines—in the Nation's second-largest city flies in the face of these founding principles. For nearly 60 days, the residents of Los Angeles and its surrounding regions have been subjected to a form of military occupation, with federal troops working alongside federal civilian law enforcement agents, often indistinguishable from each other, including while civilian law enforcement agents are engaged in operations in communities. Even as Defendants acknowledge that the Posse Comitatus Act prohibits members of the military from engaging in civilian law enforcement activities, the military has done exactly that by impeding the free movement of civilians by forming perimeters and blockades on public roads and sidewalks, apprehending or detaining civilians, and participating in ICE raids across Southern California.

Defendants have violated the Posse Comitatus Act and will continue to do so absent judicial intervention. This Court should therefore grant injunctive relief.

1

**BACKGROUND**

Plaintiffs incorporate by reference the Statement of Facts set forth in their motion for preliminary injunction.  ECF No. 77 at 2-9.

**I.    DEFENDANTS HAVE CONTINUED TO VIOLATE THE POSSE COMITATUS ACT.**

At the time that Plaintiffs filed their motion for preliminary injunction, Task Force 51[1] troops were already pervading civilian law enforcement activities by accompanying Immigration and Customs Enforcement officers on as many as 75 percent of their at-large daily enforcement missions in Los Angeles (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7)),

███████████████████████████████████████████████████████████████████

██████████████████; ECF No. 39-1, Espíritu Decl., Exs. 2, 3), ████████████████████

████████████████████████████████████████████████████████████████

██████████████████, and ███████████████████████████████████████

███████████████████████████████.  See also Reilley Decl., Exs. 5-10 (showing federalized National Guard soldiers participating in federal law enforcement operations in Los Angeles).

Since Plaintiffs filed their motion for preliminary injunction, the evidence of Task Force 51's direct and active involvement in civilian law enforcement operations has only grown more extensive.  On June 19, 2025, Defendants deployed ███████████████ federalized National Guard troops to Mecca, California—over 100 miles east of Downtown Los Angeles—████████ ████████████████████ during a law enforcement operation at a cannabis farm.  ████████████████ ████████████████████████████████████; *Id.*, Exs. 14-18.  The federalized National Guard troops engaged in civil law enforcement activity by forming a "security perimeter" around the marijuana farm where the operation was taking place, thereby preventing civilians from entering and exiting.  *Id.*, Exs. 14-18.

---

[1] Task Force 51 is the U.S. Army North's Contingency Command Post.  All military personnel that have been deployed to Los Angeles—including federalized National Guard soldiers and Marines—are under the command and control of Task Force 51.  Reilley Decl., Ex. 19.

1    Then, on July 7, 2025, Defendants ordered ████████ federalized National Guard

2    troops to Los Angeles's MacArthur Park in support of an operation ████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████. Defendants deployed these federalized National Guard

6    troops to MacArthur Park ████████████████████████████████████

7    ████████████████████████████████ This deployment of

8    federal troops occurred ████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████

12   And most recently, on July 10, 2025, federalized National Guard troops ████████

13   ████████ during law enforcement operations at cannabis farms in Camarillo, California (which

14   is over 50 miles from Downtown Los Angeles) and Carpinteria, California (which is over 80

15   miles north of Downtown Los Angeles). ████████████████████████████

16   ████████████████. Like that at MacArthur Park, ████████████████, yet

17   Defendants nevertheless ordered the federalized National Guard troops to participate. ████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████. During both operations,

22   federalized National Guard troops engaged in civilian law enforcement activities by forming

23   "security perimeters" on public property, thereby impeding the free movement of civilians, and

24   were stationed immediately adjacent to federal law enforcement agents also engaged in perimeter

25   control. *Id.*, Exs. 22-23; Solorzano Decl., Exs. A and B; Flores-Haro Decl., Exs. A-P.

26   On at least two occasions, the federal troops have gone even further in their law

27   enforcement activities by apprehending and detaining civilians. During the Carpinteria operation,

28   federalized National Guard troops apprehended a protestor, restraining her movement and

3

1   attempting to physically move her across the perimeter that the troops had established on a public

2   road.  Solorzano Decl., Ex. B.  And early in the deployment, on June 13, 2025, a Task Force 51

3   Marine detained a civilian ███████████ at the Wilshire Federal Building in Los Angeles.  ████

4   ████████████ .  ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   **II.   NEARLY 2,000 FEDERALIZED NATIONAL GUARD TROOPS REMAIN DEPLOYED.**

8          In recent weeks, Task Force 51 has released approximately half of the federalized National

9   Guard troops, as well as all of the Marines, who had been deployed to Los Angeles.  Reilley

10  Decl., Ex. 13 (Harrington Dep. Tr. 31:11-32:3, 33:10-17).  However, nearly 2,000 federalized

11  National Guard troops remain in Los Angeles, and the federal military commanders of those

12  troops continue to respond to requests for assistance from federal law enforcement agencies.  *Id.*,

13  211:19-212:7.  At the time Plaintiffs' preliminary injunction motion was filed, Defendants'

14  deployment of Task Force 51 had already caused serious harm to Plaintiffs by escalating tensions

15  within the city and reigniting protests.  ECF No. 77 at 26-27.  The damage continues.

16  Defendants' ongoing use of federalized troops to conduct civil law enforcement sows chaos and

17  fear daily throughout Southern California.

18                                    **ARGUMENT**

19         Plaintiffs are likely to succeed on the merits of their *ultra vires* claim based on Defendants'

20  violations of the Posse Comitatus Act.  And as set forth in Plaintiffs' motion for preliminary

21  injunction, the remaining equitable factors also favor injunctive relief.  ECF No. 77 at 26-30.

22  Accordingly, the Court should grant Plaintiffs' motion and issue an injunction.

23  **I.   DEFENDANTS HAVE VIOLATED AND ARE VIOLATING THE POSSE COMITATUS ACT.**

24         **A.   The Posse Comitatus Act Bars Civilian Law Enforcement by the Military.**

25         The Court's "interpretation of the scope and importance of the letter and spirit of the Posse

26  Comitatus Act . . . is influenced by the traditional American insistence on exclusion of the

27  military from civilian law enforcement."  *United States v. Walden*, 490 F.2d 372, 376 (4th Cir.

28  1974).  In its simplest form, the Posse Comitatus Act prohibits military personnel from directly

1    engaging in civilian law enforcement activities. *See United States v. Dreyer*, 804 F.3d 1266,

2    1272 (9th Cir. 2015) (en banc). Courts apply three tests to determine whether particular activities

3    run afoul of the law. *United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) (adopting tests set

4    out in *Yunis*, 681 F. Supp. at 892). "If any one of these tests is met, the assistance is not indirect,"

5    and the PCA has been violated. *Dreyer*, 804 F.3d at 1275 (quoting *United States v. Khan*, 35

6    F.3d 426, 431 (9th Cir. 1994).

7        **First**, courts consider "whether civilian law enforcement agents made 'direct active use' of

8    military personnel to execute the laws." *Yunis*, 681 F. Supp. at 892 (quoting *United States v. Red*

9    *Feather*, 392 F. Supp. 916, 921 (D.S.D. 1975)); *see Dreyer*, 804 F.3d at 1275. Under this test,

10   mere use of military equipment does not violate the Posse Comitatus Act, but active use of

11   military *personnel* does. *Yunis*, 681 F. Supp. at 892. For example, the use of Marines as

12   undercover agents actively investigating crime or the active direct participation of Air Force

13   helicopter pilots flying an Air Force helicopter to search for an escaped civilian prisoner both

14   violated the Posse Comitatus Act. *Red Feather*, 392 F. Supp. at 924 (citing *United States v.*

15   *Waldern*, 490 F.2d 372 (4th Cir. 1974) and *Wrynn v. United States*, 200 F. Supp. 457 (E.D.N.Y.

16   1961)).

17       **Second**, courts consider "whether 'use of any part of the Army or Air Force pervaded the

18   activities' of the civilian law enforcement agents." *Yunis*, 681 F. Supp. at 892 (quoting *United*

19   *State v. Jaramillo*, 380 F. Supp. 1375 (D. Neb. 1974)). For example, in *Dreyer*, the court found

20   that the Naval Criminal Investigative Service's investigation "pervaded the actions of civilian law

21   enforcement" where an NCIS agent conducted an investigation that extended statewide and "was

22   not reasonably tied to military bases, military facilities, military personnel, or military

23   equipment." 804 F.3d at 1275-76.

24       **Third**, courts consider "whether the military personnel subjected citizens to the exercise of

25   military power which was regulatory, proscriptive, or compulsory in nature." *Yunis*, 681 F. Supp.

26   at 892 (citing *United States v. McArthur*, 419 F. Supp. 186 (D.N.D. 1975)); *see Dreyer*, 804 F.3d

27   at 1275. "A power regulatory in nature is one which controls or directs." *United States v.*

28   *Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986). "A power proscriptive in nature is one that

5

1    prohibits or condemns." *Id.* And a "power compulsory in nature is one that exerts some coercive

2    force." *Id.* As with the use of equipment, "[t]he borrowing of highly skilled personnel . . . for a

3    specific, limited, temporary purpose" is permissible. *Id.* (quoting *McArthur*, 419 F. Supp. at 194).

4    But the use of military personnel to establish "roadblocks" and "an armed perimeter" is

5    "regulatory, proscriptive, or compulsory" because "these activities directly restrain[] plaintiffs'

6    freedom of movement," thereby violating the Posse Comitatus Act. *Bissonette v. Haig,* 776 F.2d

7    1384, 1391 (8th Cir. 1985).

8        The Department of Defense has itself issued statutorily mandated guidance regarding what

9    specific activities violate the Posse Comitatus Act and would meet these tests. Via 10 U.S.C. §

10   275, Congress ordered the Secretary of Defense to "prescribe such regulations as may be

11   necessary to ensure that any activity . . . under this chapter [which includes § 12406] does not

12   include or permit direct participation by a member of the Army, Navy, Air Force, or Marine

13   Corps, in a search, seizure, arrest, or other similar activity." The Department of Defense duly

14   issued 3025.21 Defense Support of Civilian Law Enforcement Agencies, Change 1, dated

15   February 18, 2019 ("DoDI 3025.21"), which states that "DoD shall be prepared to support

16   civilian law enforcement agencies . . . while recognizing and conforming to the legal limitations

17   on direct Department of Defense involvement in civilian law enforcement activities." DoDI

18   3025.21 states that "[s]upport of civilian law enforcement agencies by Department of Defense

19   personnel shall be provided in accordance with sections 112, 351, 831, 1116, 1751, and 1385

20   (also known and hereinafter referred to as 'The Posse Comitatus Act, as amended') of title 18,

21   U.S.C." And it prohibits Department of Defense personnel from providing forms of direct

22   civilian law enforcement assistance, including arrests, apprehensions, security functions, crowd

23   and traffic control, and operating, manning, or staffing checkpoints. DoDI 2035.21, Encl. 3 at

24   1.c.(1).

25       Consistent with the restrictions imposed by DoDI 2035.21, ████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████

6

1  ███████████████████████████████████████

2  ███████████████████████████████████████

3  ████████████████████████████████████ █ ███

4  ██████, Task Force 51 troops were "specifically told" they could not "imped[e] vehicle or

5  pedestrian traffic."  Reilley Decl., Ex. 13 (Harrington Dep. Tr. 105:8-18).

6      Thus, to the extent they engage in any of the above-described prohibited conduct,

7  Defendants violate the Posse Comitatus Act—not to mention their own regulations and 10 U.S.C.

8  § 275.

9      **B.  Defendants Have Violated the Posse Comitatus Act Under Each of the Three Applicable Tests.**

10

11      Defendants' activities have violated the Posse Comitatus Act when analyzed under each of

12  the three applicable tests.[3]  And they have shown that they will continue to violate the Posse

13  Comitatus Act for as long as they are allowed to keep military personnel stationed in Los Angeles

14  unchecked by judicial review.

15      **1.  Defendants Are Making Direct, Active Use of Military Personnel to Execute the Laws.**

16

17      Since the time they were deployed to Los Angeles, Task Force 51 troops have continually

18  played a direct, active role in civilian law enforcement activities, in violation of the Posse

19  Comitatus Act.  Specifically, Task Force 51's direct, active involvement in law enforcement

20  _____

21  [2] Despite the fact that both DoDI 2035.21 ████████████████ ███████ prohibit crowd control, arrests, and apprehensions,

22  ████████████████████████████████████████████

23  ██████████.

24      As noted in the parties' joint response to consolidation, Plaintiffs have had limited opportunity to engage in discovery in this action and therefore object to consolidation to the extent they are prejudiced in presenting their case on the expedited discovery set by the Court and

25  without full discovery.  *See Hooper v. City of Seattle*, 2020 WL 3100855, at *2 (W.D. Wash. June 11, 2020).  Plaintiffs note that the best evidence of Defendants own actions is in Defendants', not

26  Plaintiffs', possession, and that the expedited timeline for trial has limited their ability to obtain testimony from third-party eyewitnesses.  However, Plaintiffs submit that even the expedited

27  discovery they have obtained to date supports a finding that Defendants have violated the PCA. To the extent the Court finds otherwise, Plaintiffs renew their request that they be permitted leave

28  to seek fulsome discovery before the Court rules on the merits of their claim.

7

1    activities has thus far fallen into three categories: (1) performing security functions during federal

2    law enforcement operations, (2) forming armed perimeters and blockades that restrict the free

3    movement of civilians, and (3) apprehending and detaining civilians.  Each of these violates the

4    Posse Comitatus Act.

5              i)        **Federalized National Guard Troops Have Performed Security
                         Functions During Civil Law Enforcement Operations.**
6

7           First, Task Force 51 troops have played an active, direct role in federal law enforcement

8    activities since the outset of the deployment by performing security functions during federal law

9    enforcement operations.  See ECF No. 25-4, Knell Decl. ¶¶ 7-8 (attesting that Task Force 51

10   troops are "protecting federal personnel performing official functions . . . at designated locations

11   through security patrols, observation posts, and outer cordon security perimeter of buildings" and

12   listing assignments, including "continu[ing] to provide protection for ICE Officers, Customs and

13   Border Protection Officers, and Federal Bureau of Investigations Special Agents performing

14   official functions so that such federal personnel may carry out their assigned duties").  By their

15   own statutorily mandated guidance, Defendants acknowledge that directly providing "security

16   functions" for civilian law enforcement agents is a violation of the Posse Comitatus Act.  DoDI

17   2035.21, Encl. 3 at 1.c.(1).  Yet by their own admissions, Defendants have ordered Task Force 51

18   troops to actively provide security during civil law enforcement operations on a near-continuous

19   basis since the deployment began.  See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-

20   77:7); *Id.*, ██████████████████████████████████████████████

21   ██████████████████████████████; ECF No. 39-1, Espíritu Decl., Exs. 2, 3.

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████, this is a distinction

26   without a difference.  Regardless of whether Defendants' activities are characterized as providing

27   "protection" or "security," Defendants violate the Posse Comitatus Act by directly and actively

28   engaging in such activities.

8

1    Defendants have previously attempted to draw an artificial distinction between providing

2    security for law enforcement agents and participating in law enforcement activity.  See ECF No.

3    84 at p. 24.  But Defendants' argument ignores the fact that, but for the current deployment, the

4    security functions that Task Force 51 troops are performing would otherwise be performed by

5    federal law enforcement agents themselves.  See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 33:10-

6    17) ("I mean anyone can be a quick reaction force in the sense that if you have enough personnel

7    to be able to do – have that luxury to have a team, it all depends in what capacity and what

8    instance."); see also ECF No. 8-1, Espíritu Decl., Ex G at 53 (describing ICE military-style

9    actions).  This fact is fatal to Defendants' position.  Activities conducted by military personnel

10   that could and would otherwise be performed by law enforcement agents do not cease to be "civil

11   law enforcement" by recharacterizing them as "force protection" of a less-than-desired number of

12   available civilian law enforcement personnel.  Defendants' effort to minimize the use of the

13   federalized National Guard to their law enforcement mission is also flatly contradicted by prior

14   testimony.  Ernesto Santacruz, ICE's Enforcement and Removal Operations Field Office Director

15   for Los Angeles, attested under oath that "[t]he National Guard has been extremely helpful . . . by

16   protecting federal property and personnel during immigration enforcement operations" and that

17   "[h]aving the National Guard at our fingertips as a Quick Reaction Force is key to maintain

18   officer safety and continuing our immigration enforcement operations."  ECF No. 84-1, Santacruz

19   Decl. ¶ 9. [4]  Having so heavily emphasized the use of the federalized troops to their mission,

20   Defendants' contrived, paper-thin distinction between protecting law enforcement and engaging

21   in law enforcement activities is not credible.  As Defendants asserted, the security functions

22

23   ───────────────
     [4] Despite his repeated attestations before this Court and the Ninth Circuit about the
     importance of the federalized troops to ICE operations and officer safety, Santacruz repeatedly
24   disavowed any knowledge of what the National Guard actually did to protect ICE officers or
     assist operations.  See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 31:20-32:24 ("What exactly was
25   the National Guard doing to protect those officers in at large operations?" "Well, it is hard for me
     to say. I am not boots on the ground. I am not an employee on the ground to have seen or witness
26   what they were actually doing"); id., at 62:23-63:10 ("Can you provide a specific example based
     on the operation that has been completed as to what it looks like when the National Guard
27   precents obstruction of ICE officer's duties?" "Like I mentioned, before, I am not on the ground
     to see what took place or how it happened as, of course, the position and level I am in, I sit at the
28   command center, so I don't have firsthand knowledge of how that looks like.").  Santacruz's most
     recent testimony calls into question the veracity of his prior statements.

9

1   engaged in by Task Force 51 troops are an integral part of the law enforcement operations being

2   carried out by federal agents.

3       Defendants' other attempts to characterize Task Force 51's involvement in security

4   functions as passive are also unavailing and contradicted by the evidence.  See, e.g., Reilley

5   Decl., Exs. 5-10, 14-18, 22-23; Solorzano Decl., Ex. B; ECF No. 39-1, Espíritu Decl., Exs. 2, 3

6   (depicting active involvement by Task Force 51 troops in civil law enforcement operations).

7   Providing security for federal law enforcement officers necessarily involves participating in law

8   enforcement operations planning, accompanying law enforcement officers on field operations,

9   conducting continuous surveillance, apprehending civilians, and controlling crowds, all which

10   amount to direct and active participation in law enforcement activities.  See *Yunis*, 681 F. Supp.

11   At 892 (noting that courts have found Posse Comitatus Act violations where military personnel

12   are "both visible and involved" in a law enforcement operation).

13       There is no dispute that Task Force 51 troops have continuously partaken in security

14   functions since the deployment began.  Because these security activities constitute direct and

15   active law enforcement activity, Defendants have violated the Posse Comitatus Act.

16           **ii)**    **Federalized National Guard Troops Have Formed Armed**
                **Perimeters and Blockades.**

17

18       Similarly, Task Force 51 troops have routinely actively and directly engaged in the

19   formation of armed perimeters and blockades, both within and beyond the city limits of Los

20   Angeles, in violation of both the Posse Comitatus Act and the Department of Defense's own

21   guidance.  See *Bissonette*, 776 F.2d at 1391 (the formation of armed perimeters by military

22   personnel violates the Posse Comitatus Act); DoDI 2035.21 (prohibiting "security functions" and

23   "crowd and traffic control"); ██████████████

24   ██████████████████████████

25       Defendants have conceded that the Posse Comitatus Act prohibits Task Force 51 troops

26   from taking any action that "imped[es] vehicle or pedestrian traffic," Reilley Decl., Ex. 13

27   (Harrington Dep. Tr. 105:8-18) and have denied any knowledge of federalized National Guard

28   troops forming perimeters during field operations (*Id*., Ex. 26 (Response to Interrogatory No.

10

14)); *see Bissonette*, 776 F.2d at 1391 ("direct[] restrain[t]" of pedestrians' "freedom of movement" violates the Posse Comitatus Act).  But Defendants' denial is belied by numerous photographs and videos that clearly show federalized National Guard troops forming perimeters on public roads and sidewalks in Los Angeles (*Id.*, Exs. 5-10), forming a perimeter around a marijuana farm in Mecca, California (*Id.*, Exs. 14-18), and forming perimeters on public roads in Carpinteria, California (*Id.*, Exs. 22-23; Solorzano Decl., Exs. A and B) and Camarillo, California (Flores-Haro Decl., Exs. A-P).  Indeed, even the Department of Defense's own Defense Visual Information Distribution Service—the mission of which is to "provide an accurate, reliable source for media organizations to access U.S. service members" (Reilley Decl., Ex. 27)—describes the conduct of the federalized National Guard troops as "establishing" and "providing" "security perimeter[s]" (*Id.*, Exs. 14-17, 22-23).  And Defendants' own declarant, Ernesto Santacruz, who has significant law enforcement experience, further confirmed at his deposition that multiple of the above-cited images show federalized National Guard troops forming a perimeter.  *Id.*, Ex. 1 (Santacruz Dep. Tr. 52:18-54:6, 54:16-55:4).  Although Defendants may attempt to avoid conceding these Posse Comitatus Act violations by calling these perimeters by a different name, they cannot avoid the conclusion that the activities engaged in by the federalized National Guard troops are precisely the sort of "security function" and "crowd and traffic control" that the Department of Defense's own guidelines explicitly forbid. ████████████████████ ████████████████████████████████████████ ██████████████████████████████.

Because federalized National Guard troops have actively and directly engaged in forming perimeters and barricades that impede the free movement of civilians, Defendants have violated the Posse Comitatus Act.

### iii)    Task Force 51 Troops Have Apprehended and Detained Civilians.

Task Force 51 troops have also directly and actively engaged in the apprehension and detention of civilians, in violation of both DoDI 2035.21 (which prohibits "arrests," "apprehensions," and "other similar activities") ████████████████████████

11

1    ██████████████████████████████████████████.  *See also*

2    Reilley Decl., Ex. 13 (Harrington Dep. Tr. 177:20-178:6 (testifying that he cannot conceive of

3    "any scenario" where a Task Force 51 soldier would be able to temporarily detain a civilian who

4    is not committing any crime without violating the Posse Comitatus Act)).  Thus far, Plaintiffs

5    have identified two such apprehensions and detentions.

6        First, on June 13, 2025, a Task Force 51 Marine detained ██████████████████

7    ████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████

9    ████████████████████████  Defendants have attempted to downplay

10    this detention by claiming that it was temporary and noting that it took place on federal property,

11    but none of this changes the fact that a Task Force 51 Marine directly and actively engaged in the

12    quintessential law enforcement activity of detaining ████████ a civilian—████████

13    ██████████████████████████████████████████████████████

14    ██████████████████

15        Second, on July 10, 2025, federalized National Guard troops apprehended a protestor in

16    Carpinteria, California, restraining her movement and attempting to physically move her across

17    the perimeter that the troops had established on a public road.  Solorzano Decl., Ex. B.  ████████

18    ██████████████████████████████████  the protestor whom the

19    federalized National Guard troops apprehended did not pose a threat to anyone and was not

20    committing any crime; rather, she was simply standing with a megaphone on the side of a *public*

21    road (which Defendants have presented no evidence they had lawful authority to limit access to).

22    *Id*.  And remarkably, the federalized National Guard troops directly engaged in this apprehension,

23    even though a Homeland Security Investigations police officer—who is authorized to conduct

24    civilian law enforcement activities and presumably would have apprehended the protestor himself

25    if he believed he had a justification for doing so—stood only a few feet away and did nothing.  *Id.*

26        Faced with the foregoing evidence, Defendants cannot credibly deny that the federalized

27    National Guard soldiers and Marines deployed to Los Angeles have engaged in the direct, active

28    apprehension and detention of civilians.  Such conduct violates the Posse Comitatus Act.

12

### 2.   Defendants' Use of Military Personnel Pervades the Activities of Civilian Law Enforcement

Defendants' conduct also violates the Posse Comitatus Act under the second test, because the federalized National Guard soldiers have pervaded the activities of civilian law enforcement. As explained by the Ninth Circuit in *Dreyer,* the military pervades the activities of civilian law enforcement when it participates in law enforcement activities that are not "reasonably tied to military bases, military facilities, military personnel, or military equipment."  804 F.3d at 1275-76.

Defendants have pervaded the activities of civilian law enforcement by ordering federalized National Guard soldiers to participate in law enforcement operations that have nothing to do with the military.  Defendants' principal response is that the military is merely providing "security" and "protection" that "is distinct from the military members' own engagement in ordinary law enforcement."  ECF No. 25 at 20-21; *see* ECF No. 84 at 30.  Defendants appear to view that form of assistance as an "indirect," rather than a "direct," form of law enforcement.  *See id.*  But that characterization is inaccurate.  *See supra* pp. 7-9 (explaining why the security assistance provided by deployed troops is an impermissible form of direct law enforcement); DoDI 2035.21 (defining "direct civilian law enforcement activities" to include "security functions").

In any case, that characterization would not avoid a PCA violation.  As discussed above, if any "one of [three] tests is met"—including pervasive entanglement— the PCA is violated.  *Dreyer*, 804 F.3d at 1275.  Here, military forces are pervasively intertwined with civilian law enforcement activities.  Armed troops are working side by side with ICE agents in conducting arrests and raids in the streets, homes, and workplaces of Los Angeles.  Until approximately two weeks ago, federalized National Guard troops were involved in as many as 75 percent of the Immigration and Customs Enforcement's at-large daily law enforcement operations in Los Angeles, ██████████████████████████████████.  Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7, 133:17-24); ████████████████████ ███████████.  Indeed, beyond mere pervading, ██████████████████████ ██████████████████████████████████████.

13

1 ████████████████████████████████████████████████████████

2 ██████████████.  That substantial level of involvement makes increasing contact between the

3 military and civilians unavoidable, and there is a significant risk that the military's role will grow

4 to include other activities that are practically indistinguishable from urban policing operations.

5          The core mission of the federal military personnel, and the actions the federal troops have

6 taken to carry out that mission, has nothing to do with "military bases, military facilities, military

7 personnel, or military equipment," as they have had no plausible connection to the purpose of the

8 federalization order, which was "to temporarily protect" federal agents and federal property "at

9 locations where protests…are occurring or are likely to occur."  ECF No. 8-1, Espíritu Decl., Ex.

10 E.  For example, federalized National Guard troops have partaken in operations involving the

11 execution of search warrants on private property in Mecca, Camarillo, and Carpinteria, each of

12 which is over 50 miles away from the locations of the initial protests that gave rise to the

13 federalization order.  ████████████████████████████████████

14 ██████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 ██████████████████████████████ yet federalized National Guard soldiers were

19 nevertheless ordered to participate in this operation.

20          Similarly, on July 7, 2025, federalized National Guard troops mobilized to Los Angeles's

21 MacArthur Park in support of an operation ████████████████████████████

22 ███████████████████████████████████████████████████

23 ███████████████████████████████████████████████████

24 ████████████████████████████████████████████████.  The federalized troops participated

25 in this operation ████████████████████████████████████

26 ██████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████████████████████.

1    These operations establish that Defendants are not placing any meaningful limitations on

2  the federalized National Guard troops' involvement in law enforcement activities.  To the

3  contrary, Defendants appear to be ordering federalized National Guard troops to participate in any

4  sizeable federal law enforcement operation that takes place within the greater Southern California

5  area. ████████████████████████████████████████

6  ████████████████████████████████████████████

7  ███████████████    or simply to make continued use of the federalized Guard to justify the

8  continued federalization.  Either rationale, however, underscores a use of military personnel that

9  flies in the face of our nation's tradition of limiting military involvement in civil domestic law

10  enforcement and the purpose behind the Posse Comitatus Act.  Defendants are using the

11  federalized troops as a force multiplier to conduct their civil law enforcement aims, completely

12  unattached from the alleged purpose of the original federalization (concerning protests at federal

13  facilities in downtown Los Angeles), even setting aside the staleness of that initial invocation.  By

14  routinely partaking in such operations, the federalized National Guard troops are pervading the

15  activities of civilian law enforcement.

16    Moreover, when federalized National Guard soldiers do participate in federal law

17  enforcement operations, it is extremely difficult to differentiate the soldiers from the federal law

18  enforcement agents present.  This is due in large part to the fact that many federal agents wear

19  camouflage uniforms that are virtually identical to those worn by the federalized National Guard

20  troops.  Indeed, at their depositions, both Task Force 51 Deputy Chief of Staff Harrington and

21  Enforcement and Removal Operations Field Office Director Santacruz were unable to confirm

22  whether certain photographs taken of uniformed individuals throughout the deployment showed

23  federalized National Guard soldiers, ICE agents, or other federal agents.  Reilley Decl., Ex. 1

24  (Santacruz Dep. Tr. 84:20-86:18); Ex. 13 (Harrington Dep. Tr. 125:24-129:23).  Additionally, the

25  federalized National Guard troops and federal agents are often so thoroughly intermingled that it

26  is not readily apparent who is military and who is not. See, e.g., Reilley Decl., Exs. 22-23; Flores-

27  Haro Decl., Exs. A-P.  Because of this, when carrying out an operation together, the federalized

28  National Guard troops and federal law enforcement agents often appear to be part of one large,

15

1    amorphous force—a dynamic that further underscores Defendants' pervasion of law enforcement

2    activities.

3        Defendants' contrary view of the Posse Comitatus Act would usher in a vast and

4    unprecedented shift in the role of the military in our society. If the Act allowed military forces to

5    accompany ICE agents on raids and arrests in the manner unfolding across the Los Angeles area,

6    there would be no logical basis to preclude members of the Armed Forces from accompanying

7    other law enforcement agents when performing their duties. Armed troops could, for example,

8    accompany FBI agents, food safety inspectors with the Department of Agriculture, Fish and

9    Wildlife agents, or Medicare fraud investigators when those civilian officials conduct searches,

10   field interviews, interrogations, or other law enforcement operations; or accompany federal voting

11   rights officials to "monitor" polling places during elections. Virtually every federal agency has

12   an investigative or enforcement arm. And many might welcome armed support from the military.

13   Providing that support would magnify the ability of officials at every level of government to

14   coerce and control individuals subject to their jurisdiction. The Posse Comitatus Act was

15   designed to protect against that kind of erosion of individual liberty. *See generally Gilbert v.*

16   *United States*, 165 F.3d 470, 472 (6th Cir. 1999) ("The [PCA] reflects a concern, which antedates

17   the Revolution, about the dangers to individual freedom and liberty posed by use of a standing

18   army to keep civil peace.").

19        **3.    Task Force 51 Troops Have Subjected Civilians to the Exercise of
                   Regulatory, Proscriptive, or Compulsory Military Power.**

20

21        Finally, Defendants have violated the Posse Comitatus Act by virtue of Task Force 51

22   troops' exercise of regulatory, proscriptive, or compulsory military power upon civilians. As set

23   forth above, Task Force 51 troops have repeatedly performed security functions for federal agents

24   during field operations, formed perimeters and blockades on public roads and sidewalks, and

25   apprehended and detained civilians. See Section IV(A), *supra.* These law enforcement activities

26   "directly restrain" civilians' "freedom of movement" and therefore violate the Posse Comitatus

27   Act. *Bissonette*, 776 F.2d at 1391.

28

1    In addition, the very presence of the Task Force 51 troops in Los Angeles has had, and will

2    continue to have, a proscriptive effect on the on the city's civilian population.  Indeed, as

3    admitted by the testimony of Defendants' own declarant, deterrence to "the public" is the point.

4    See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 74:1-3; 122:25-123:3) (testifying that "having the

5    National guard there readily available . . . it was a huge deterrent for the public" and "the mere

6    presence, that deterrent factor, would make someone from the public think twice of intervening").

7    This proscriptive effect is what prompted the concern raised by Thomas Jefferson about King

8    George III's standing armies, *supra* p. 1, and it is the precise result that the Posse Comitatus Act

9    was designed to prevent.  Our nation's foundational principle of keeping the military out of

10   civilian affairs has long served as a bulwark against the coercive control over civilians that is

11   inherent to military rule.  Each day that the federalized National Guard troops remain deployed

12   erodes that bulwark and violates the Posse Comitatus Act.

13   **II.    DEFENDANTS' RESPONSES TO PLAINTIFFS' CLAIMS LACK MERIT.**

14          **A.    Plaintiffs May Pursue an Ultra Vires Claim for Violation of the Posse
                    Comitatus Act.**
15

16          As a threshold matter, the Court should find, as it already recognized in granting Plaintiffs'

17   TRO motion, that Plaintiffs may pursue an *ultra vires* claim based on Defendants' violation of the

18   Posse Comitatus Act.  ECF No. 64 at 27.[5]  As they did with § 12406, Defendants seek to place

19   their conduct entirely beyond the Court's review rather than engage with their compliance (or

20   lack thereof) with the law, and they assert that Plaintiffs may not seek injunctive relief based on a

21   violation of the Posse Comitatus Act because it is a criminal statute with no express cause of

22   action.  ECF No. 84 at 23.  But Plaintiffs do not seek to find a private cause of action in the Posse

23   Comitatus Act.  Rather, they bring an *ultra vires* claim based on Defendants' failure to abide by

24   the Posse Comitatus Act's specific prohibition on the use of the military to perform civil law

25   _____

26          [5] At the TRO stage, Plaintiffs and the Court relied on out-of-circuit authority, see, e.g.,
     *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 41 (D.D.C. 2021), but after further
     research and examination, that authority does not set out the appropriate standard for *ultra vires*
27   claims in the Ninth Circuit. See, e.g., *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023).
     But even under the standard set forth in *Black Lives Matter*, Plaintiffs would have a valid ultra
28   vires claim.  ECF No. 64 p. 27.

                                              17

1    enforcement functions.  As the Ninth Circuit has held, "actions by subordinate Executive Branch

2    officials that extend beyond delegated statutory authority—i.e., *ultra vires* actions—are

3    reviewable."  *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) ("plaintiffs advancing

4    *ultra vires* claims must plead 'plausible factual allegations identifying an aspect of the

5    designation that exceeds the President's statutory authority'").

6        The Posse Comitatus Act's history confirms that this case involves exactly the type of

7    conduct Congress sought to prevent in passing the Posse Comitatus Act.  The Posse Comitatus

8    Act is "not just any act of Congress.  It is the embodiment of a long tradition of suspicion and

9    hostility towards the use of military force for domestic purposes."  *Bissonette*, 776 F.2d at 1389.

10   Congress passed the Posse Comitatus Act "in response to the use of military personnel to enforce

11   laws in the South during the reconstruction period following the Civil War."  *Yunis*, 681 F. Supp.

12   at 892; *see also United States v. Banks*, 539 F.2d 15, 16 (9th Cir. 1976).  "Although relying on the

13   military to quell riots and rebellion had become common practice in the United States, Congress

14   grew concerned that military personnel trained to fight wars would not be especially concerned

15   with upholding and enforcing the constitutional rights of civilians."  *United States v. Eleuterio*,

16   2024 WL 1620383, at *2 (D.V.I. Apr. 15, 2024).  "Consequently, Congress set out in the Posse

17   Comitatus Act to create a bright line separation between military duties and the duties of civilian

18   law enforcement personnel."  *Id.*  The Posse Comitatus Act's "immediate objective . . . was to

19   end the use of federal troops in former confederate states" and "to preclude the military from

20   assisting local law enforcement officers in carrying out their duties."  *Yunis*, 681 F. Supp. at 892;

21   *see also United States v. Red Feather*, 392 F. Supp. 916, 922-23 (D.S.D. 1975).  Later, Congress

22   ordered the Secretary of Defense "to issue regulations prohibiting 'direct participation' by

23   military personnel in a civilian 'search, seizure, arrest, or other similar activity' unless expressly

24   authorized by law."  *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (quoting 10

25   U.S.C. § 375 (1988), renumbered at 10 U.S.C. § 275)).

26       Thus, Congress's intent was not merely to prevent the use of the military as a posse

27   comitatus in the criminal context but to broadly bar military involvement in civilian law

28   enforcement.  And because Defendants have disregarded that statutory command, Plaintiffs may

18

1   seek to put an end to their unlawful activity through an *ultra vires* cause of action. *See Murphy*

2   *Co.,* 65 F.4th at 1131; *see also Bissonette*, 776 F.2d at 1388-91 (holding Plaintiffs in civil action

3   stated a claim for relief based on the Posse Comitatus Act and Fourth Amendment where they

4   alleged that the federal government and military personnel maintained roadblocks and an armed

5   perimeter that seized and confined them against their will). The Supreme Court has made clear

6   that "when presented with claims of judicially cognizable injury resulting from military intrusion

7   into the civilian sector, federal courts are fully empowered to consider claims of those asserting

8   such injury." *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972). "Nothing in our Nation's history . . . can

9   properly be seen as giving any indication that actual or threatened injury by reason of unlawful

10  activities of the military would go unnoticed or unremedied." *Id.* Plaintiffs rightfully seek to

11  remedy such an injury here.

12  **B.    Section 12406(3) Is Not an Exception to the Posse Comitatus Act.**

13      The Posse Comitatus Act is "a statute that is absolute in its command and explicit in its

14  exceptions." *Wrynn v. United States*, 200 F. Supp. 457, 465 (E.D.N.Y. 1961). It applies to all

15  conduct by the military "except in cases and under circumstances *expressly* authorized by the

16  Constitution or Act of Congress." 18 U.S.C. § 1385 (emphasis added); *see also* 10 U.S.C. § 275

17  (prohibiting "direct participation by a member of the Army, Navy, Air Force, or Marine Corps in

18  a search, seizure, arrest, or other similar activity unless participation in such activity by such

19  member is otherwise authorized by law). Defendants assert that 10 U.S.C. § 12406 provides an

20  exception such that federalized National Guard soldiers are not bound by the Posse Comitatus

21  Act, ECF Nos. 95 at 1 & 99 at 2-3, but no such express authorization can be found in that law.[6]

22  To the contrary, the statute immediately preceding section 12406 specifies that "[m]embers of the

23  National Guard called into Federal service are, from the time when they are required to respond to

24  the call, subject to the laws and regulations governing the Army," which includes the Posse

25  Comitatus Act. 10 U.S.C. § 12405. Section 12406 makes no mention of the Posse Comitatus Act

26  _____

27      [6] Defendants do not, and cannot, assert that section 12406, which concerns only the
    federalization of the National Guard, applies to the Marines. Thus, regardless of whether section
    12406 is an exception to the PCA, all Marines deployed to Los Angeles were bound by the PCA

28  and will remain bound during any future deployment.

19

1    or civilian law enforcement.  Because Congress did not expressly exclude section 12406 from the

2    restraints of the Posse Comitatus Act, the Court should decline Defendants' invitation to read an

3    exception into the law.

4         Defendants' litigation position that section 12406 is an exception to the Posse Comitatus

5    Act is directly contradicted by the views of Department of Defense leadership, who uniformly

6    concede that that the Posse Comitatus Act applies to the current deployment of federal troops.

7    Task Force 51 Deputy Chief of Staff Harrington testified that the federalized National Guard

8    troops are subject to the Posse Comitatus Act and are not allowed to engage in civilian law

9    enforcement.  Reilley Decl., Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-65:14).  Not only

10   that, Harrington testified that when he raised the issue to the commanding general and at a

11   briefing, "everyone in the briefing agreed" that "as soon as California's National Guard troops

12   were called into federal service, they would be subject to the Posse Comitatus Act."  *Id.*  There

13   was no equivocation or confusion among the career military personnel executing the

14   federalization.  ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████.

19        Moreover, Defendants' own guidance belies their litigation position.  As required by 10

20   U.S.C. § 275, the Department of Defense issued DoDI 3025.21, which acknowledges that "[t]he

21   primary restriction on Department of Defense participation in civilian law enforcement activities

22   is the Posse Comitatus Act" and provides guidance to ensure military activities do not violate the

23   Posse Comitatus Act.  DoDI 3025.21, Encl. 3, § 1.a.(1).  Defendants have confirmed that they are

24   required to follow DoDI 3025.21 with respect to Task Force 51's deployment to Los Angeles.

25   See Reilley Decl., Ex. 26 (Defendants' Responses to Interrogatories Nos. 1, 4, and 19).  DoDI

26   3025.21 identifies the limited categories of exceptions to the Posse Comitatus Act when "active

27   participation in direct law-enforcement-type activities" is permitted.  DoDI 3025.21, Encl. 3, §

28   1.a.(1).  Section 12406 is not found among those categories.  Actions in "specified circumstances

1   with respect to insurrection, domestic violence, or conspiracy that hinders the execution of State

2   or Federal law" are permitted, but only when taken pursuant to 10 U.S.C. §§ 251-254, *not* 10

3   U.S.C. § 12406. *Id.* § 1.b.(4).  Similarly, Center for Law and Military Operations, Domestic

4   Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) lists authorities that allow for

5   direct DOD participation in civil law enforcement, omitting 10 U.S.C. § 12406.  Thus, not only

6   do Defendants' own regulations confirm that there is no exception to the Posse Comitatus Act

7   could be read into § 12406 , but also Defendants would be acting in violation of their own

8   regulations and the law that required they promulgate them, 10 U.S.C. § 275, in ordering § 12406

9   troops to engage in civilian law enforcement activities.

10      Defendants' acknowledgement in DoDI 3025.21 that § 12406 does not create an exception

11  to the Posse Comitatus Act comports with other statutes, and with principles of statutory

12  interpretation.  Other acts of Congress creating an exception to the Posse Comitatus Act do so by

13  "expressly grant[ing] authority for military assistance to civilian law enforcement."  *United States*

14  *v. Alvarado*, 2014 WL 12785138, at *3 (D.N.M. Nov. 20, 2014); *see, e.g.*, 10 U.S.C. §§ 271-284

15  (Chapter 15, Military Support for Civilian Law Enforcement).  Section 12406 contains no

16  reference to civilian law enforcement, let alone an express congressional authorization for

17  federalized National Guard members to engage in civilian law enforcement activities.

18      The Court should accept Defendants' admissions and own regulatory guidance on the

19  exceptions to the Posse Comitatus Act and should look to the plain text of and the lack of any

20  express authorization in § 12406 creating an exception to the Posse Comitatus Act.  The Posse

21  Comitatus Act applies to the National Guard even when they are federalized under § 12406.  And

22  all of their activities must strictly abide by its restrictions.

23  ///

24  ///

25  ///

26

27

28

PLAINTIFFS' SUPP. BRIEF ISO MTN. FOR PRELIMINARY INJUNCTION

## CONCLUSION

The Court should grant Plaintiffs' motion and issue an injunction restraining Defendants from continuing to violate the Posse Comitatus Act.  Because the Court has consolidated Plaintiffs' motion for a preliminary injunction with a trial on the merits, that injunction should be permanent.

Dated:  July 30, 2025                             Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANYA M. BINSACCA

MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
BRENDAN HAMME
BARBARA HORNE-PETERSDORF
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGHAN H. STRONG
MEGAN RICHARDS

*/s/ Jane Reilley*

JANE REILLEY
Deputy Attorney General
  455 Golden Gate Avenue
  San Francisco, CA 94110
  Telephone: (415) 510-3879
  E-mail:  Meghan.Strong@doj.ca.gov

*Attorneys for Plaintiffs*

PLAINTIFFS' SUPP. BRIEF ISO MTN. FOR PRELIMINARY INJUNCTION

A55

# CERTIFICATE OF SERVICE

Case Name:  *Newsom v. Trump*          No.    **3:25-cv-04870-CRB**

I hereby certify that on July 30, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**[REDACTED] PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**[REDACTED] DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (with Exhibits 1-30)**

**DECLARATION OF MONICA J. SOLORZANO (with Exhibits A-B)**

**DECLARATION OF GENEVIEVE FLORES-HARO (with Exhibits A-P)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 30, 2025, at San Francisco, California.


M. Paredes                                   */s/ M. Paredes*
Declarant                                        Signature

SF2025303707
44735661.docx

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LORRAINE LOPEZ
BARBARA HORNE-PETERSDORF
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
Deputy Attorneys General
  455 Golden Gate Ave.
  San Francisco, CA  94102
  Telephone: (213) 269-6667
  E-mail:  barbara.hornepetersdorf@doj.ca.gov
*Attorneys for Plaintiffs*

BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
JEAN LIN
Special Litigation Counsel
CHRISTOPHER D. EDELMAN
Senior Counsel
GARRY D. HARTLIEB
BENJAMIN S. KURLAND
JODY D. LOWENSTEIN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
  1100 L Street, NW
  Washington, DC 20005
  Telephone: (202) 598-9280
  E-mail: jody.d.lowenstein@usdoj.gov

*Counsel for Defendants*

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*,<br><br>*Defendants*. | Case No. 3:25-cv-04870-CRB<br><br>**STIPULATION OF FACTS** |

A57

Pursuant to the Court's orders setting pre-trial deadlines, ECF Nos. 117, 123, the parties hereby stipulate to the following facts in advance of the trial set to begin in this matter on August 11, 2025.

### STIPULATED FACTS

1. Plaintiff State of California is one of the fifty United States of America.

2. Plaintiff Gavin Newsom is the Governor of the State of California.

3. Defendant Donald J. Trump is the President of the United States of America.

4. Defendant Pete Hegseth is the Secretary of Defense of the United States of America.

5. Defendant the United States Department of Defense is a department of the United States Government.

6. On June 7, 2025, the President issued a memorandum addressed to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security ("Presidential Memorandum"). A true and correct copy of the Presidential Memorandum is attached as Exhibit A and is admissible in this action.

7. On June 7, 2025, the Secretary of Defense issued a "Memorandum for Adjutant General of the California National Guard Through: the Governor of California" with the subject "Calling Members of the California National Guard into Federal Service" ("June 7 DoD Memorandum"). A true and correct copy of the June 7 DoD Memorandum is attached as Exhibit B and is admissible in this action.

8. On June 9, 2025, the Secretary of Defense issued a "Memorandum for Adjutant General of the California National Guard Through: The Governor of California" with the subject "Calling Additional Members of the California National Guard into Federal Service" ("June 9 DoD Memorandum"). A true and correct copy of the June 9 DoD Memorandum is attached as Exhibit C and is admissible in this action.

9. On June 8, 2025, the U.S. Northern Command delegated operational control of the federalized California National Guard's 79th Infantry Brigade Combat Team to U.S. Army North.

10. On June 9, 2025, U.S. Army North delegated operational control of federalized Guardsmen to its contingency command post, Task Force 51.

11. On June 9, 2025, the Secretary of Defense authorized the activation of the 2nd Battalion, 7th Regiment, 1st Marine Division to the Federal Protection Mission in California.

12. On June 11, 2025, the U.S. Northern Command delegated tactical control of those Marines to U.S. Army North.

13. On June 12, 2025, U.S. Army North delegated tactical control of the Marines to Task Force 51.

14. On June 14, 2025, Task Force 51 was delegated operational control of the federalized California National Guard's 49th Military Police Brigade.

15. Between June 12, 2025, and August 4, 2025, any federalized Guardsmen and Marines deployed in California were under Task Force 51's command and control.

16. All federalized Guardsmen and Marines deployed to California were trained on the Standing Rules for the Use of Force.

17. On July 1, 2025, Task Force 51 released 150 members of the California National Guard from Title 10 federal service.

18. On July 19, 2025, Task Force 51 released the California National Guard's 79th Infantry Brigade Combat Team, which comprised approximately 2,000 troops, from Title 10 federal service.

19. On July 22, 2025, Task Force 51 released all active-duty Marines from the Federal Protection Mission in California.

20. On August 1, 2025, Task Force 51 released most of the California National Guard's 49th Military Police Brigade from Title 10 federal service.

21. As of August 8, 2025, there are approximately 300 Service members conducting the Federal Protection Mission in California, all of whom are federalized California Guardsmen in a Title 10 status under U.S. Army North's command and control.

*     *     *

Dated: August 8, 2025                    Respectfully submitted,

A59

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LORRAINE LOPEZ
BARBARA HORNE-PETERSDORF
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG

*/s/ Barbara Horne-Petersdorf*

Deputy Attorney General
  455 Golden Gate Ave.
  San Francisco, CA  94102
  Telephone:
  E-mail:

*Attorneys for Plaintiffs*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch
(CA Bar No. 296283)

ALEXANDER K. HAAS
Director
Federal Programs Branch
(CA Bar No. 220932)

JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel

*/s/ Jody D. Lowenstein*
CHRISTOPHER D. EDELMAN
(DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB
(IL Bar No. 6322571)
BENJAMIN S. KURLAND

A60

(DC Bar No. 1617521)
JODY D. LOWENSTEIN
(MT Bar No. 55816869)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Counsel for Defendants*

# EXHIBIT A

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Department of Defense Security for the Protection
                of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

**A63**

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                    DONALD J. TRUMP

**A64**

DEFS_00000008

# EXHIBIT B



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN 0 7 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT:  Calling Members of the California National Guard into Federal Service

     The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations.  The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

     This memorandum implements the President's direction.  Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days.  The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command.  The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

**A66**

DEFS_00000009

# EXHIBIT C



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN – 9 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Additional Members of the California National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. Also on June 7, 2025, I implemented that order by directing 2,000 members of the California National Guard be called into Federal Service for a period of 60 days (see attached memorandum).

This memorandum further implements the President's direction. An additional 2,000 members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachments:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

**A68**

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
BRENDAN HAMME
BARBARA HORNE-PETERSDORF
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
Deputy Attorneys General
  300 S. Spring Street
  Los Angeles, CA 90013
  Telephone: (213) 269-6667
  E-mail:  Barbara.HornePetersdorf@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,** | **NO. 3:25-cv-04870-CRB** |
| Plaintiffs, | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | Hon. Charles R. Breyer |
| **DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,** | Courtroom 6<br>Trial: August 11, 2025<br>Time: 10:00 a.m. |
| Defendants. | |

A69

# TABLE OF CONTENTS

Overview ........................................................................................................... 1

Proposed Findings of Fact ................................................................................. 1

    I.       The facts set forth in the Stipulation of Facts (ECF No. 147), attached as Exhibit 32 to the concurrently filed Declaration of Barbara Horne-Petersdorf, are hereby incorporated by reference. ....................................... 1

    II.      Task Force 51 ............................................................................................. 1

    III.    Application of Posse Comitatus Act to Federal Protection Mission ...................... 2

    IV.    Task Force 51's Training Regarding Posse Comitatus Act .................... 4

    V.     Public Affairs Messaging ........................................................................... 5

    VI.    Federal Law Enforcement Agencies Submit Requests for Assistance from Task Force 51 ............................................................................................... 5

    VII.    Task Force 51 Accompanies Federal Law Enforcement Agencies on Operations and Performs Law Enforcement Functions. ........................................ 6

    VIII.   Task Force 51 Troops Engaged in Security Functions. ........................ 9

    IX.    Task Force 51 Troops Apprehended and Detained Civilians. .............. 10

    X.     Federalized National Guard Troops Remain Deployed. ...................... 10

    XI.    Standing ................................................................................................... 11

Proposed Conclusions of Law ........................................................................ 12

    I.       The Posse Comitatus Act Prohibits Military Personnel from Engaging in Civilian Law Enforcement Activities. ..................................................... 12

    II.      Task Force 51 Troops Deployed for the Federal Protection Mission Are Subject to the Posse Comitatus Act and 10 U.S.C. § 12406 Provides No Exception. ................................................................................................. 13

    III.    Plaintiffs Have Standing to Bring This Action. .................................. 18

    IV.    Plaintiffs May Pursue an Ultra Vires Claim for Violation of the Posse Comitatus Act. ........................................................................................ 20

    V.     Defendants Acted Ultra Vires Because Task Force 51 Troops Directly Participated in Civilian Law Enforcement Activities. .......................... 23

    VI.    Defendants Acted Ultra Vires Because They Pervaded Activities of Civilian Law Enforcement. ..................................................................... 30

    VII.    Defendants Acted Ultra Vires by Subjecting Civilians to Regulatory, Proscriptive, and Compulsory Military Power ...................................... 34

    VIII.   The Court Enters Prospective Injunctive Relief to Prevent Ongoing and Future Violations ..................................................................................... 35

    IX.    The Court Declines Defendants' Request for a Stay. ........................... 37

Plaintiffs Gavin Newsom, in his official capacity as Governor of the State of California, and the State of California (together, "Plaintiffs") respectfully submit the following Proposed Findings of Fact and Conclusions of Law.

## OVERVIEW

Plaintiffs seek injunctive relief to enjoin Defendants Donald Trump, in his official capacity as President of the United States, Pete Hegseth, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, "Defendants"), from violating the Posse Comitatus Act, 18 U.S.C. § 1385.  Defendants deployed federalized National Guard troops and Marines to the city of Los Angeles and surrounding regions for an initial period of sixty days and on August 6, 2025—mere days before trial—the Department of Defense issued a new activation order deploying troops for an additional 90 days, through November 6, 2025.  As detailed below, these federal troops work alongside federal civilian law enforcement agencies in operations in the field.  Even as Defendants acknowledge that the Posse Comitatus Act prohibits members of the military from engaging in civilian law enforcement activities, the military has done exactly that.  The evidence shows that Defendants violated the Posse Comitatus Act by impeding the free movement of civilians through forming perimeters and blockades on public roads and sidewalks, apprehending or detaining civilians, and participating in federal civil law enforcement activities, including Immigration and Customs Enforcement ("ICE") raids across Southern California.

## PROPOSED FINDINGS OF FACT

I.    **THE FACTS SET FORTH IN THE STIPULATION OF FACTS (ECF NO. 147), ATTACHED AS EXHIBIT 32 TO THE CONCURRENTLY FILED DECLARATION OF BARBARA HORNE-PETERSDORF, ARE HEREBY INCORPORATED BY REFERENCE.**

II.   **TASK FORCE 51**

1.  Task Force 51 is the U.S. Army North's Contingency Command Post.  (Reilley Decl., Ex. 19, ECF No. 127-2, at 99[1].)

---

[1] With the exception of citations to bates numbers (i.e. DEFS_00000001) and deposition transcripts, pin cites in this filing refer to page numbers appearing in CM/ECF-generated headers of the cited document.

2. The deployment of the National Guard and Marines under the command of Task Force 51 pursuant to the Presidential Memorandum issued June 7, 2025, and the Memoranda issued by the Secretary of Defense on June 7 and 9, 2025 (*see* Horne-Petersdorf Decl., Ex. 32) is known as the "Federal Protection Mission."  (Reilley Decl., Ex. 26, ECF No. 127-2, at 121-22.)

### III.  APPLICATION OF POSSE COMITATUS ACT TO FEDERAL PROTECTION MISSION

3. Task Force 51 Deputy Chief of Staff William Harrington testified that the federalized National Guard troops are subject to the Posse Comitatus Act and are not allowed to engage in civilian law enforcement.  (Sealed Reilley Decl., ECF No. 126-4, Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-65:14, ECF No. 126-10).)

4. Mr. Harrington testified that when he raised the issue to the commanding general at a briefing, "everyone in the briefing agreed" that "as soon as California's National Guard troops were called into federal service, they would be subject to the Posse Comitatus Act" and "would lose the ability to conduct law enforcement because of the Posse Comitatus Act."  (*Id*.)

5. █████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████
█████████████████████████████████████████
█████████████████

6. ████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████

7. ████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████





**IV.   TASK FORCE 51'S TRAINING REGARDING POSSE COMITATUS ACT**

19. In this training, Task Force 51 troops were "specifically told" they could not "imped[e] vehicle or pedestrian traffic." (Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 105:8-18)).

20. ███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████
███████████████████████████████████████
█████████████████████████████

21. ████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████
████████████████████████████████████
███████████████████

22. ████████████████████████████████████
████████████████████████████████████
███████████████████████████

## V.   PUBLIC AFFAIRS MESSAGING

23. ███████████████████████████████████
████████████████████████████████
████████████████████.)

## VI.   FEDERAL LAW ENFORCEMENT AGENCIES SUBMIT REQUESTS FOR ASSISTANCE FROM TASK FORCE 51.

24. Federal agencies submit requests for assistance for Task Force 51 support through a Department of Defense liaison. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:12-15, 26:20-23, 31:1-19)).) ███████████████████
████████████████████████████████
████████████████████████████████



**VII. TASK FORCE 51 ACCOMPANIES FEDERAL LAW ENFORCEMENT AGENCIES ON OPERATIONS AND PERFORMS LAW ENFORCEMENT FUNCTIONS.**

28. At the time that Plaintiffs filed their motion for preliminary injunction on June 16, 2025 (ECF No. 77), Task Force 51 troops had participated in federal law enforcement operations in Los Angeles.  (Reilley Decl., Exs. 5-10.)

29. Task Force 51 troops were accompanying ICE officers on as many as 75 percent of their at-large daily enforcement operations in Los Angeles.  (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19; 76:18-77:7).)



35. The Department of Defense's Defense Visual Information Distribution Service—the mission of which is to "provide an accurate, reliable source for media organizations to access U.S. service members" (Reilley Decl., Ex. 27)—described the conduct of the federalized National Guard troops as "establishing" and "providing" "security perimeter[s]" where the operation was taking place (id., Exs. 14-15).



43. In both the Camarillo and Carpinteria operations, federalized National Guard troops formed "security perimeters" on public property and were stationed immediately adjacent to federal law enforcement agents also engaged in perimeter control. (Reilley Decl., Exs. 22-23; Solorzano Decl., ECF No. 127-3; Solorzano Decl. Ex. A, ECF No. 127-4, at 2; Solorzano Decl., Ex. B, ECF No. 127-4, at 4; Flores-Haro Decl., ECF No. 127-5; Flores-Haro Decl., Exs. A-P, ECF No. 127-6.)

44. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

45. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
███████████████████████

**VIII. TASK FORCE 51 TROOPS ENGAGED IN SECURITY FUNCTIONS.**

46. Since the outset of the deployment, Task Force 51 has been "protecting federal personnel performing official functions . . . at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings" and "continue[s] to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal Bureau of Investigations Special Agents performing official functions so that such federal personnel may carry out their assigned duties").)  (Knell Decl., ECF No. 25-4 ¶¶ 7-8.; *see* Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7); ███████████████████ ████████████████████████████; Horne-Petersdorf Decl., Ex. 40 at DEFS 00005036 ("If necessary, this support may include crowd control and establishment of security perimeters to ensure federal personnel are protected from harm or threat of bodily injury while those they protect perform their federal duties.")

47. ████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████

48. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

A79

███████████████████████████████████████████

███████████████████████████████

**IX.  TASK FORCE 51 TROOPS APPREHENDED AND DETAINED CIVILIANS.**

49. During the Carpinteria operation, federalized National Guard troops apprehended a protestor, restraining her movement and attempting to physically move her across the perimeter that the federalized troops had established on a public road.  (Solorzano Decl., Ex. B.)

50. The protestor whom the federalized National Guard troops apprehended was standing with a megaphone on public property, on the side of a public road (which Defendants have presented no evidence they had lawful authority to limit access to).  (*Id*.)

51. The federalized National Guard troops directly engaged in this apprehension, even though a Homeland Security Investigations police officer stood only a few feet away and did not engage with the individual.  (*Id*.)

52. ████████████████████████████████

███████████████████████████████████████

██████████████████

53. ████████████████████████████████

██████████████████████████████████

54. ██████████████████████████████

██████████████████████████

**X.  FEDERALIZED NATIONAL GUARD TROOPS REMAIN DEPLOYED.**

55. In recent weeks, Task Force 51 stated it would release approximately half of the Federalized National Guard troops, as well as all of the Marines, who had been deployed to Los Angeles.  (Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 31:11-32:3; 33:10-17)).)

56. On August 1, 2025, Task Force 51 announced its intent to "release[] the majority of the 49th Military Police Brigade from the Federal Protection Mission. There are now approximately 300 total service members conducting the Federal Protection Mission, all from the California National Guard in a Title 10 status."  (Horne-Petersdorf Decl., Ex. 41.)

57. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

58. On August 6, 2025 DoD issued a new activation order deploying troops for an additional 90 days, through November 6, 2025.  (Pls' Suppl. Reply Br., ECF No. 140, Strong Decl., ECF No. 140-1, Ex. 31, Activation Order.)

## XI.    STANDING

59. The deployment of Task Force 51 troops has escalated tensions within the city of Los Angeles and reignited protests.  (*See Amici Curiae* Brief of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals, ECF No. 124-1, at 9.)  Protesters only arrived at the scene of immigration enforcement operations in Camarillo, Carpinteria, and Macarthur Park in Los Angeles to protest the massive show of force.  (*Id.* at 9-10.)

60. From June 7 through June 14, 2025, CHP's costs over and above normal operating expenses in connection with the protests surrounding Task Force 51's deployment are estimated to have totaled approximately $7 million.  (Zizi Decl., ECF No. 77-3, at ¶ 8.)

61. CHP's largest expenditures came on June 9, 10, and 11 after the National Guard was deployed.  (*Id.*)

62. The number of arrests made by CHP and other law enforcement agencies increased following deployment of the National Guard on June 8.  (*Id.* ¶ 12.)

63. Restaurants, farmers' markets, and festivals, including July 4th celebrations, have shut down and economic activity has been stifled, as individuals are afraid to leave their homes due to the immigration enforcement operations supported by Task Force 51.  (Horne-Petersdorf Decl., Exs. 42-43.)

64. The Los Angeles Chamber of Commerce recently explained that "[r]ather than pursue more reasonable and orderly means to implement its immigration policy, the Administration's recent enforcement actions undermine public safety, harm our communities, and destabilize our economy."  (Horne-Petersdorf Decl., Ex. 44.)

## PROPOSED CONCLUSIONS OF LAW

I.     THE POSSE COMITATUS ACT PROHIBITS MILITARY PERSONNEL FROM ENGAGING IN CIVILIAN LAW ENFORCEMENT ACTIVITIES.

1. The Court's "interpretation of the scope and importance of the letter and spirit of the Posse Comitatus Act . . . is influenced by the traditional American insistence on exclusion of the military from civilian law enforcement." *United States v. Walden*, 490 F.2d 372, 376 (4th Cir. 1974).

2. The Posse Comitatus Act preserves that tradition by barring the military from engaging in "direct active involvement in the execution of the laws" or other conduct that "pervade[s] the activities of civilian authorities." *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc) (citation omitted).

3. First enacted in 1878, the Posse Comitatus Act now provides:

   > Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this this title or imprisoned not more than two years, or both.

   18 U.S.C. § 1385.

4. "'Posse comitatus (literally "power of the county") was defined at common law as all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder.'" *Dreyer*, 804 F.3d at 1272 (quoting H.R.Rep. No. 97–71, pt. 2, at 4 (1981) (citing 1 William Blackstone, Commentaries 343–44)).

5. In its simplest form, the Posse Comitatus Act prohibits military personnel from directly engaging in civilian law enforcement activities. *See Dreyer*, 804 F.3d at 1272.

6. Courts apply three tests to determine whether particular activities run afoul of the law. *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (adopting tests set out in *United States v. Yunis*, 681 F. Supp. 896, 892 (D.D.C. 1988)).

7. "If any one of these tests is met, the assistance is not indirect," and the Posse Comitatus Act has been violated. *Dreyer*, 804 F.3d at 1275 (quoting *United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994)).

8. Pursuant to 10 U.S.C. § 275, the Department of Defense issued 3025.21 Defense Support of Civilian Law Enforcement Agencies, Change 1 ("DoDI 3025.21") regarding what specific activities violate the Posse Comitatus Act and would meet these tests.  *See* DoDI 3025.21, Encl. 3, §§ 1.a.(1), 1.g.(3).  DoDI 3035.21 states that "DoD shall be prepared to support civilian law enforcement agencies . . . while recognizing and conforming to the legal limitations on direct Department of Defense involvement in civilian law enforcement activities."  DoDI 3035.21 at 4.(b).  "Support of civilian law enforcement agencies by DoD personnel shall be provided in accordance with sections 112, 351, 831, 1116, 1751, and 1385 (also known and hereinafter referred to as 'The Posse Comitatus Act, as amended') of title 18, U.S.C."  *Id.*

## II.   TASK FORCE 51 TROOPS DEPLOYED FOR THE FEDERAL PROTECTION MISSION ARE SUBJECT TO THE POSSE COMITATUS ACT AND 10 U.S.C. § 12406 PROVIDES NO EXCEPTION.

9. The Posse Comitatus Act applies both to National Guard troops federalized under 10 U.S.C. § 12406 ("Section 12406") and the Marine Corps.  In 2021, Congress revised the Posse Comitatus Act to provide that the law's prohibitions apply to all of the United States armed forces, including the Marine Corps.  Pub.L. 117-81, Div. A, Title X, § 1045(a), Dec. 27, 2021, 135 Stat. 1904.

10. The Posse Comitatus Act also applies to the National Guard when it is federalized under Title 10, because, once federalized, National Guard soldiers become a component of the regular armed forces.  *See e.g.,* 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army.").

11. Accordingly, courts have uniformly found that the Posse Comitatus Act applies to National Guard soldiers in Title 10 status.  *United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir. 1997); *United States v. Benish*, 5 F.3d 20, 25-26 (3rd Cir. 1993); *see also United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000) (recognizing that naval policies exempt National Guard members "when not" in Federal Service), *cited in Dreyer*, 804 F.3d at 1273.

12. The Posse Comitatus Act is "a statute that is absolute in its command and explicit in its exceptions."  *Wrynn v. United States*, 200 F. Supp. 457, 465 (E.D.N.Y. 1961).

13. It applies to all conduct by the military "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress."  18 U.S.C. § 1385; *see also* 10 U.S.C. § 275 (prohibiting "direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law).

14. Section 12406 does not provide an exception such that federalized National Guard soldiers are not bound by the Posse Comitatus Act.

15. The statute immediately preceding Section 12406 specifies that "[m]embers of the National Guard called into Federal service are, from the time when they are required to respond to the call, subject to the laws and regulations governing the Army," which include the Posse Comitatus Act.  10 U.S.C. § 12405.

16. Section 12406 makes no mention of the Posse Comitatus Act or civilian law enforcement. *See generally* 10 U.S.C. § 12406.

17. Defendants argue that the phrase "execute the laws" in Section 12406(3) could authorize the broad scope of conduct they now seek to justify.  (Defs' Corrected Opp'n, ECF No. 136, at 18.)  However, "execute the laws" can be read to encompass all manner of activities, some of which would violate the PCA while others would not.  That is why, in the example of the 1970 Postal Strike (*id.*), the federalized National Guard were able to lawfully deliver the mail—because their actions in doing so did not violate the Posse Comitatus Act.  They could execute the laws without engaging in civilian law enforcement, revealing precisely why the words "execute the laws," on their own, cannot be read as an affirmative authorization for the National Guard to engage in conduct prohibited by the Posse Comitatus Act.  Unlike delivering the mail, the actions of the military here—embedding with federal law-enforcement agents, not minding the U.S. Mail—fall within the ambit of the Posse Comitatus Act.

18. Moreover, by limiting their argument to subsection (3) of Section 12406, Defendants apparently believe that Congress—without explicitly recognizing or acknowledging that it was doing so—sought to pass in a single statute two federalization scenarios in which the

National Guard is bound by the Posse Comitatus Act and one in which it is not. That defies both common sense and the norms of statutory interpretation. *See Fischer v. United States*, 603 U.S. 480, 486 (a court must consider a statute's subpart both in "'the specific context' in which [it] appears 'and the broader context of the statute as a whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

19. The cases Defendants cite regarding other statutorily authorized PCA exceptions are not persuasive. (Defs' Corrected Opp'n 20 (citing *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022); *United States v. Allred*, 867 F.2d 856, 870-71 (5th Cir. 1989)). In *Hernandez-Garcia*, the court found that the Marines did not violate the PCA when they used a night vision scope to detect the defendant entering the United States at the southern border because another law expressly authorized exactly that: Congress had directed the Secretary of Defense to "provide assistance to [Border Patrol] by deploying military use of 'ground-based surveillance systems to support continuous surveillance of the southern land border of the United States.'" 44 F.4th at 1164 (quoting Pub. L. No. 114-92 129 Stat. 729 § 1059 (2015)). Congress thus explicitly authorized a specific activity in a specific place, *i.e.*, specific "cases and circumstances," 18 U.S.C. § 1385, and that is exactly the activity and place the Marines were engaged in. Similarly, in *Allred*, the court found that a judge advocate's role as a Special Assistant to the United States Attorney and participation in grand jury and other proceedings did not violate the Posse Comitatus Act because Congress had authorized exactly that appointment and those activities via statute. 867 F.2d at 871 (citing 28 U.S.C. §§ 515, 543 and 10 U.S.C. § 806(d)(1)). These express and specific congressional authorizations are in stark contrast to the passing, non-specific reference in Section 12406 to executing the laws generally.

20. Because Congress did not expressly exclude Section 12406 from the restraints of the Posse Comitatus Act, the Court declines Defendants' invitation to read an exception into the law.

21. Defendants' litigation position that Section 12406(3) is an exception to the Posse Comitatus Act is contradicted by the views of Department of Defense leadership, who concede that the Posse Comitatus Act applies to the current deployment of federal troops. Task Force 51

███████████████████████████ Deputy Chief of Staff Harrington testified that the federalized National Guard troops are subject to the Posse Comitatus Act and are not allowed to engage in civilian law enforcement. (████████████████████████████

████████████ Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-65:14).) Mr. Harrington also testified that when he raised the issue to the commanding general and at a briefing, "everyone in the briefing agreed" that "as soon as California's National Guard troops were called into federal service, they would be subject to the Posse Comitatus Act." (Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-65:14).) There was no equivocation or confusion among the career military personnel executing the federalization. (*Id.*)

22. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

23. Moreover, Defendants' own guidance belies their litigation position. As required by 10 U.S.C. § 275, the Department of Defense issued DoDI 3025.21, which acknowledges that "[t]he primary restriction on Department of Defense participation in civilian law enforcement activities is the Posse Comitatus Act" and provides guidance to ensure military activities do not violate the Posse Comitatus Act. DoDI 3025.21, Encl. 3, § 1.a.(1) (Feb. 18, 2019). Defendants have confirmed that they are required to follow DoDI 3025.21 with respect to Task Force 51's deployment to Los Angeles. (Reilley Decl., Ex. 26 (Defs' Responses to Interrogatories Nos. 1, 4, and 19).)

24. DoDI 3025.21 identifies the limited categories of exceptions to the Posse Comitatus Act when "active participation in direct law-enforcement-type activities" is permitted.  DoDI 3025.21, Encl. 3, § 1.a.(1).  Section 12406 is not found among those categories.  Actions in "specified circumstances with respect to insurrection, domestic violence, or conspiracy that hinders the execution of State or Federal law" are permitted, but only when taken pursuant to 10 U.S.C. §§ 251-254, not Section 12406.  *Id.* § 1.b.(4).

25. Similarly, Center for Law and Military Operations, Domestic Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) lists authorities that allow for direct DOD participation in civil law enforcement, omitting Section 12406.  Thus, not only do Defendants' own regulations confirm that no exception to the Posse Comitatus Act could be read into Section 12406, but also Defendants would be acting in violation of their own regulations and the law that required they promulgate them, 10 U.S.C. § 275, in ordering Section 12406 troops to engage in civilian law enforcement activities.

26. Defendants' acknowledgement in DoDI 3025.21 that Section 12406 does not create an exception to the Posse Comitatus Act comports with other statutes, and with principles of statutory interpretation.  Other acts of Congress creating an exception to the Posse Comitatus Act do so by "expressly grant[ing] authority for military assistance to civilian law enforcement."  *United States v. Alvarado*, 2014 WL 12785138, at *3 (D.N.M. Nov. 20, 2014); *see, e.g.*, 10 U.S.C. §§ 271-284 (Chapter 15, Military Support for Civilian Law Enforcement). Section 12406 contains no reference to civilian law enforcement, let alone an express congressional authorization for federalized National Guard members to engage in civilian law enforcement activities.

27. The Court accepts Defendants' admissions and own regulatory guidance on the exceptions to the Posse Comitatus Act and looks to the plain text of and the lack of any express authorization in Section 12406 creating an exception to the Posse Comitatus Act.  The Posse Comitatus Act applies to the National Guard even when they are federalized under Section 12406.  And all their activities must strictly abide by its restrictions.

1    28. Defendants do not, and cannot, assert that Section 12406, which concerns only the

2    federalization of the National Guard, applies to the Marines.  Thus, regardless of whether

3    Section 12406 is an exception to the Posse Comitatus Act, all Marines deployed to Los

4    Angeles were bound by the Posse Comitatus Act and will remain bound during any future

5    deployment.

6    **III.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.**

7    29. "[S]tates have a variety of sovereign and quasi-sovereign interests that they validly may seek

8    to vindicate in litigation." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).  Where a

9    State articulates "sufficiently concrete and particularized harms to its ability to exercise its

10    sovereign prerogatives," that is sufficient to establish standing. *Arizona v. Yellen*, 34 F.4th

11    841, 852 (9th Cir. 2022); *see also Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136

12    (11th Cir. 2023) ("States are not normal litigants for the purposes of invoking federal

13    jurisdiction and may suffer injuries to their sovereignty that private parties do not."

14    (quotation marks omitted)).

15    30. As the Supreme Court has recognized, there are two general categories of state interests,

16    "[f]irst, a State has a quasi-sovereign interest in the health and well-being—both physical and

17    economic—of its residents in general.  Second, a State has a quasi-sovereign interest in not

18    being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp &*

19    *Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607 (1982).

20    31. California has a "recognized quasi-sovereign interest" in the "comfort[] and welfare of its

21    citizens." *Id.* at 599 (quotation marks omitted) (citing *Pennsylvania v. West Virginia*, 262

22    U.S. 553, 592 (1923)); *see also Missouri v. Illinois*, 180 U.S. 208, 241 (1901) (similar).  That

23    includes a "substantial" interest in "maintaining a stable, healthful environment in its cities."

24    *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 828 (4th Cir. 1979).

25    32. ██████████████████████████████████████████████████████████

26    ████████████████████████████████████████████████████████████

27    ██████████████████████████████████████████████████████).

28

18

33. Indeed, the *Amici Curiae* Brief of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals flagged the escalation of tensions caused by the increased presence of military personnel as a serious concern contributing to violations of the PCA, rather than providing a permissible justification for the involvement of federal military personnel in traditional law enforcement operations, stating "Amici are concerned about the unintended consequences of interpreting the Posse Comitatus Act to license the deployment of the military in ways that escalate tensions, thereby creating the need for the military's protection of federal functions, perversely satisfying the Posse Comitatus Act." (ECF No. 124-1 at 9; *see also id.* at 9-10 (noting that protesters only arrived at the scene of immigration enforcement operations in Camarillo and Carpinteria "to protest the massive show of force" that was described as "like a war scene," and that in MacArthur Park, "[p]rotesters arrived in response to the intimidating, militarized presence in a community park typically full of civilians").)

34. The economic well-being of the people of California has suffered as well. Defendants' actions have negatively impacted the California economy by chilling economic activity in Los Angeles. Restaurants, festivals, including July 4th celebrations, and farmers' markets have shut down and economic activity has been stifled, as individuals are afraid to leave their homes due to the militarized raids. (Horne-Petersdorf Decl., Exs. 42-43.) As the LA Area Chamber of Commerce recently explained, "[r]ather than pursue more reasonable and orderly means to implement its immigration policy, the Administration's recent enforcement actions undermine public safety, harm our communities, and destabilize our economy." (*Id.*, Ex. 44.) California's fiscal harms as a result of the military's unlawful actions are sufficient to confer standing. *See City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (an "expected loss of tax revenue can constitute a sufficient injury" to confer Article III standing); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (loss of funding sufficient to confer standing).

35. Defendants' violations of the Posse Comitatus Act have increased civil unrest, requiring diversion of state law enforcement and state resources, including through an increase in the

number of arrests made by CHP.  (ECF No. 77-3, Zizi Decl., at ¶¶ 8, 12.)  These costs are directly attributable to the increased presence of the National Guard in Los Angeles. Moreover, Defendants' actions have chilled economic activity in Los Angeles in restaurants, festivals, and farmers' markets, which have shut down, stifling economic activity, as individuals are afraid to leave their homes due to the militarized raids.

36. California further has a quasi-sovereign interest in "securing observance of the terms under which it participates in the federal system." *Snapp*, 458 U.S. at 607-608.  The Posse Comitatus Act is animated by concerns of federalism, as "[t]he purpose of this statute is to prevent use of the federal army to aid civil authorities in the enforcement of civilian laws." *Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999).  As a sovereign State, California can seek redress for federalism-related harms and federal courts have traditionally provided a forum for States to do so.  *See, e.g.*, *Snapp*, 458 U.S. at 607-608; *New York v. United States*, 505 U.S. 144 (1992).  Defendants' conduct threatens the State's police power guaranteed by the Tenth Amendment to the U.S. Constitution.  *United States v. Morrison*, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation.").

## IV.  PLAINTIFFS MAY PURSUE AN ULTRA VIRES CLAIM FOR VIOLATION OF THE POSSE COMITATUS ACT.

37. As the Ninth Circuit has held, "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—i.e., ultra vires actions—are reviewable." *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) ("plaintiffs advancing ultra vires claims must plead 'plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority'").

38. The Posse Comitatus Act's history confirms that this case involves exactly the type of conduct Congress sought to prevent in passing it.  The Posse Comitatus Act is "not just any act of Congress. It is the embodiment of a long tradition of suspicion and hostility towards the

use of military force for domestic purposes." *Bissonette v. Haig*, 776 F.2d 1384, 1389 (8th Cir. 1985).

39. Congress passed the Posse Comitatus Act "in response to the use of military personnel to enforce laws in the South during the reconstruction period following the Civil War." *Yunis*, 681 F. Supp. at 892; *see also United States v. Banks*, 539 F.2d 15, 16 (9th Cir. 1976).

40. "Although relying on the military to quell riots and rebellion had become common practice in the United States, Congress grew concerned that military personnel trained to fight wars would not be especially concerned with upholding and enforcing the constitutional rights of civilians." *United States v. Eleuterio*, 2024 WL 1620383, at *2 (D.V.I. Apr. 15, 2024). "Consequently, Congress set out in the Posse Comitatus Act to create a bright line separation between military duties and the duties of civilian law enforcement personnel." *Id*.

41. The Posse Comitatus Act's "immediate objective . . . was to end the use of federal troops in former confederate states" and "to preclude the military from assisting local law enforcement officers in carrying out their duties." *Yunis*, 681 F. Supp. at 892; *see also United States v. Red Feather*, 392 F. Supp. 916, 922-23 (D.S.D. 1975).

42. Later, Congress ordered the Secretary of Defense "to issue regulations prohibiting 'direct participation' by military personnel in a civilian 'search, seizure, arrest, or other similar activity' unless expressly authorized by law." *Yunis*, 924 F.2d at 1094 (quoting 10 U.S.C. § 375 (1988), renumbered at 10 U.S.C. § 275)).

43. Congress's intent was not merely to prevent the use of the military as a posse comitatus in the criminal context, but to broadly bar military involvement in civilian law enforcement. And because Defendants have disregarded that statutory command, Plaintiffs may seek to put an end to their unlawful activity through an ultra vires cause of action. *See Murphy Co.*, 65 F.4th at 1131; *see also Bissonette*, 776 F.2d at 1388-91 (holding plaintiffs in civil action stated a claim for relief based on the Posse Comitatus Act and Fourth Amendment where they alleged that the federal government and military personnel maintained roadblocks and an armed perimeter that seized and confined them against their will).

44. Plaintiffs' Posse Comitatus Act claim "asks only that we apply our familiar tools of statutory construction and fulfill our enduring 'duty . . . to say what the law is.'" *Murphy Co.*, 65 F.4th at 1130 (quoting *Marbury v. Madison*, 5 U.S. 1, 26 (1803)); *see also id.* at 1130-31 (concluding that *ultra vires* challenges that raise core separation of powers principles are reviewable).

45. The Supreme Court has made clear that "when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury." *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972). "Nothing in our Nation's history . . . can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied." *Id.*

46. Defendants rely on *Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762 (2025) to claim that Plaintiff's ultra vires claim is categorically unavailable. (Defs' Corrected Suppl. Opp'n 8.) However, this reliance is unavailing. There, the Court rejected the specific *ultra vires* claim because—unlike here—the plaintiffs had an alternative path to judicial review. *NRC*, 145 S. Ct. at 1176. But in doing so, the Court re-affirmed that ultra vires review is permitted "when an agency has taken actions entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Id.* (quoting *Railway Clerks v. Ass'n for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)). Such is the case here, and because no other "statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review'" or otherwise forecloses "all other forms of judicial review," this case satisfies the requirements for ultra vires review. *Id.*

47. Defendants assert that the Posse Comitatus Act has a willfulness requirement that Plaintiffs must prove here to bring an ultra vires claim. (Defs' Corrected Suppl. Opp'n 7.) The Court disagrees. The intent requirement is inapplicable to the threshold question of whether Plaintiffs may bring an ultra vires claim for violation of the Posse Comitatus Act. Additionally, Plaintiffs assert that Defendants' willfulness is shown by ████████

██████████████████████████████████████████

[REDACTED] The Court agrees that Defendants' willfulness is revealed through their [REDACTED]

48. Accordingly, Plaintiffs may proceed to bring an ultra vires claim against Defendants for violation of the Posse Comitatus Act.

## V.    DEFENDANTS ACTED ULTRA VIRES BECAUSE TASK FORCE 51 TROOPS DIRECTLY PARTICIPATED IN CIVILIAN LAW ENFORCEMENT ACTIVITIES.

49. Under the first test, courts consider "whether civilian law enforcement agents made 'direct active use' of military personnel to execute the laws." *Yunis*, 681 F. Supp. at 892 (quoting *Red Feather*, 392 F. Supp. at 921); *see Dreyer*, 804 F.3d at 1275.

50. Congress ordered the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter [which includes § 12406] does not include or permit *direct participation* by a member of the Army, Navy, Air Force, or Marine Corps, in a search, seizure, arrest, or other similar activity." 10 U.S.C. § 275 (emphasis added). DoDI 3035.21 prohibits Department of Defense personnel from providing forms of direct civilian law enforcement assistance, including arrests, apprehensions, security functions, crowd and traffic control, and operating, manning, or staffing checkpoints. DoDI 2035.21, Encl. 3 at 1.c.(1).

51. The mere use of military equipment does not violate the Posse Comitatus Act, but active use of military personnel does. *Yunis*, 681 F. Supp. at 892.

52. For example, the use of Marines as undercover agents actively investigating crime or the active direct participation of Air Force helicopter pilots flying an Air Force helicopter to

search for an escaped civilian prisoner both violated the Posse Comitatus Act. *Red Feather*, 392 F. Supp. at 924 (citing *United States v. Waldern*, 490 F.2d 372 (4th Cir. 1974) and *Wrynn v. United States*, 200 F. Supp. 457 (E.D.N.Y. 1961)).

53. Here, Task Force 51's direct, active involvement in law enforcement activities has thus far fallen into three categories: (a) performing security functions during federal law enforcement operations; (b) forming armed perimeters and blockades that restrict the free movement of civilians, and (c) apprehending and detaining civilians. Each of these activities violates the Posse Comitatus Act.

   a.   **Federalized National Guard Troops Performed Security Functions During Law Enforcement Operations.**

   i.   Task Force 51 troops have played an active, direct role in federal law enforcement activities since the outset of the deployment by performing security functions during federal law enforcement operations. (*See* ECF No. 25-4, Knell Decl. ¶¶ 7-8 (attesting that Task Force 51 troops are "protecting federal personnel performing official functions . . . at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings" and listing assignments, including "continu[ing] to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal Bureau of Investigations Special Agents performing official functions so that such federal personnel may carry out their assigned duties").)

   ii.  By their own statutorily mandated guidance, Defendants acknowledge that directly providing "security functions" for civilian law enforcement agents is a violation of the Posse Comitatus Act. DoDI 2035.21, Encl. 3 at 1.c.(1).

   iii. Yet by their own admissions, Defendants have ordered Task Force 51 troops to actively provide security during civil law enforcement operations on a near-continuous basis since the deployment began. (*See* Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7); █████████████

iv. ███████████████████████████████████████

████████████████████████████████████████ █

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Regardless of whether Defendants' activities are characterized as providing "protection" or "security," Defendants violate the Posse Comitatus Act by directly and actively engaging in such activities.

v. Defendants have previously attempted to draw a distinction between providing security for law enforcement agents and participating in law enforcement activity. (*See* ECF No. 84 at 24.) But Defendants' argument ignores the fact that, but for the current deployment, the security functions that Task Force 51 troops are performing would otherwise be performed by federal law enforcement agents themselves. (*See* Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 33:10- 17) ("I mean anyone can be a quick reaction force in the sense that if you have enough personnel to be able to do – have that luxury to have a team, it all depends in what capacity and what instance.").)

vi. This fact is fatal to Defendants' position. Activities conducted by military personnel that could and would otherwise be performed by law enforcement agents do not cease to be "civil law enforcement" by recharacterizing them as "force protection" of a less-than-desired number of available civilian law enforcement personnel. Moreover, █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ .

A95

1         █████████ What Defendants describe as "force protection" is no more than the

2     ordinary organizing of law enforcement personnel into pairs or teams for their

3     mutual protection.

4    vii.  Defendants' effort to minimize the use of the federalized National Guard to their

5     law enforcement mission is also flatly contradicted by prior testimony. Ernesto

6     Santacruz, ICE's Enforcement and Removal Operations Field Office Director for

7     Los Angeles, testified at deposition that "[t]he National Guard has been extremely

8     helpful . . . by protecting federal property and personnel during immigration

9     enforcement operations" and that "[h]aving the National Guard at our fingertips

10     as a Quick Reaction Force is key to maintain officer safety and continuing our

11     immigration enforcement operations." (ECF No. 84-1, Santacruz Decl. ¶ 9.)

12    viii.  Having so heavily emphasized the use of the federalized troops to their mission,

13     Defendants' distinction between protecting law enforcement and engaging in law

14     enforcement activities is not credible. As Defendants asserted, the security

15     functions engaged in by Task Force 51 troops are an integral part of the law

16     enforcement operations being carried out by federal agents.

17    ix.  Defendants' other attempts to characterize Task Force 51's involvement in

18     security functions as passive are also unavailing and contradicted by the evidence.

19     (*See, e.g.*, Reilley Decl., Exs. 5-10, 14-18, 22-23; Solorzano Decl., Ex. B.)

20    x.  Providing security for federal law enforcement officers necessarily involves

21     participating in law enforcement operations planning, accompanying law

22     enforcement officers on field operations, conducting continuous surveillance,

23     apprehending civilians, and controlling crowds, all of which amount to direct and

24     active participation in law enforcement activities. *See Yunis*, 681 F. Supp. at 892

25     (noting that courts have found Posse Comitatus Act violations where military

26     personnel are "both visible and involved" in a law enforcement operation).

27    xi.  There is no dispute that Task Force 51 troops have continuously engaged in

28     security functions since the deployment began. Because these security activities

26

constitute direct and active law enforcement activity, Defendants have violated
the Posse Comitatus Act.

**b.    Federalized National Guard Troops Formed Armed Perimeters and Blockades.**

xii.   Task Force 51 troops have routinely actively and directly engaged in the
formation of armed perimeters and blockades, both within and beyond the city
limits of Los Angeles, in violation of both the Posse Comitatus Act and the
Department of Defense's own guidance.  *See Bissonette*, 776 F.2d at 1391 (the
formation of armed perimeters by military personnel violates the Posse Comitatus
Act); DoDI 2035.21, Encl. 3., at 1.(c)(1) (prohibiting "security functions" and
"crowd and traffic control"); ██████████████████████████████████████
████████████████████████████████████ ).

xiii.  Defendants have conceded that the Posse Comitatus Act prohibits Task Force 51
troops from taking any action that "imped[es] vehicle or pedestrian traffic,"
(Reilley Decl., Ex. 13 (Harrington Dep. Tr. 105:8-18)) and have denied any
knowledge of federalized National Guard troops forming perimeters during field
operations (*id*., Ex. 26 (Response to Interrogatory No. 14)).

xiv.  But Defendants' denial is belied by numerous photographs, videos, and
deposition testimony that clearly show federalized National Guard troops forming
perimeters on public roads and sidewalks in Los Angeles (Reilley Decl., Exs. 5-
10), forming a perimeter and outer cordon around a marijuana farm in Mecca,
California (*id*., Exs. 14-18; ██████████████████████████ ), forming
perimeters on public roads in Carpinteria, California (*id*., Exs. 22-23; Solorzano
Decl., Exs. A-B) and Camarillo, California (Flores-Haro Decl., Exs. A-P), and
███████████████████████████████████████████
████████████████████████████

xv.   ███████████████████████████████████████
███████████████████████████████████████

███████████████████████████

███████████████████████████

████

xvi.  Indeed, even the Department of Defense's own Defense Visual Information

Distribution Service—the mission of which is to "provide an accurate, reliable

source for media organizations to access U.S. service members" (Reilley Decl.,

Ex. 27)—describes the conduct of the federalized National Guard troops as

"establishing" and "providing" "security perimeter[s]" (*id*., Exs. 14-17, 22-23).

And Defendants' own declarant, Ernesto Santacruz Jr., who has significant law

enforcement experience, further confirmed at his deposition that multiple of the

above-cited images show federalized National Guard troops forming a perimeter.

(Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 52:18-54:6, 54:16-55:4).)

xvii.  Although Defendants may call these perimeters by a different name, they cannot

avoid the conclusion that the activities engaged in by the federalized National

Guard troops are precisely the sort of "security function" and "crowd and traffic

control" that the Department of Defense's own guidelines explicitly forbid. ████

███████████████████████████

███████████████████████████

█████████████████

xviii.  Because federalized National Guard troops have actively and directly engaged in

forming perimeters and barricades that impede the free movement of civilians,

Defendants have violated the Posse Comitatus Act. *See Bissonette*, 776 F.2d at

1391 ("direct[] restrain[t]" of pedestrians' "freedom of movement" violates the

Posse Comitatus Act).

**c.  Task Force 51 Troops Apprehended and Detained Civilians.**

xix.  Task Force 51 troops have also directly and actively engaged in the apprehension

and detention of civilians, in violation of both DoDI 2035.21 (which prohibits

"arrests," "apprehensions," and "other similar activities") and the Department of

Defense's training on the Standing Rules for the Use of Force (which prohibits "arrests" and "apprehensions"). (*See also* Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 177:20-178:6 (testifying that he cannot conceive of "any scenario" where a Task Force 51 soldier would be able to temporarily detain a civilian who is not committing any crime without violating the Posse Comitatus Act)).)

xx. Plaintiffs have identified two such apprehensions and detentions.



Defendants have attempted to downplay this detention by claiming that it was temporary and noting that it took place on federal property, but none of this changes the fact that a Task Force 51 Marine directly and actively engaged in the quintessential law enforcement activity of detaining and restraining a civilian—who, as it happens, was neither threatening anyone nor breaking any law, and who had every right to be on the federal property in question.

xxi. Second, on July 10, 2025, federalized National Guard troops apprehended a protestor in Carpinteria, California, restraining her movement and attempting to physically move her across the perimeter that the troops had established on a public road. (Solorzano Decl., Ex. B.) Like the veteran who was detained and physically restrained by the Marines, the protestor whom the federalized National Guard troops apprehended did not pose a threat to anyone and was not committing any crime; rather, she was simply standing with a megaphone on the side of a public road (which Defendants have presented no evidence they had lawful authority to limit access to). (*Id.*)

A99

xxii.  And the federalized National Guard troops directly engaged in this apprehension even though a Homeland Security Investigations police officer—who is authorized to conduct civilian law enforcement activities and presumably would have apprehended the protestor himself if he believed he had a justification for doing so—stood only a few feet away and did nothing.  (*Id.*)

xxiii.  The federalized National Guard soldiers and Marines deployed to Los Angeles have engaged in the direct, active apprehension and detention of civilians.  Such conduct violates the Posse Comitatus Act.

## VI.  DEFENDANTS ACTED ULTRA VIRES BECAUSE THEY PERVADED ACTIVITIES OF CIVILIAN LAW ENFORCEMENT.

54. Courts consider "whether 'use of any part of the Army or Air Force pervaded the activities' of the civilian law enforcement agents." *Yunis*, 681 F. Supp. at 892 (quoting *United States v. Jaramillo*, 380 F. Supp. 1375 (D. Neb. 1974)); s*ee Red Feather*, 392 F. Supp. at 922 (explaining that Congress intended to prohibit the use of federal military troops to execute the laws "whatever size or designation to include one single soldier or large units").

55. For example, in *Dreyer*, the court found that the Naval Criminal Investigative Service's investigation "pervaded the actions of civilian law enforcement" where an NCIS agent conducted an investigation that extended statewide and "was not reasonably tied to military bases, military facilities, military personnel, or military equipment."  804 F.3d at 1275-76.

56. Defendants have pervaded the activities of civilian law enforcement by ordering federalized National Guard soldiers to participate in law enforcement operations that have nothing to do with the military.  Defendants' principal response is that the military is merely providing "security" and "protection" that "is distinct from the military members' own engagement in ordinary law enforcement."  (ECF No. 25 at 20-21; *see* ECF No. 84 at 30.)  Defendants appear to view that form of assistance as an "indirect," rather than a "direct," form of law enforcement.  (*See id.*)  That characterization is inaccurate.  *See* DoDI 2035.21, Encl. 3, § 1.c.(1) (defining "direct civilian law enforcement activities" to include "security functions").

57. In any case, that characterization would not avoid a Posse Comitatus Act violation. As discussed above, if any "one of [three] tests is met"—including pervasive entanglement— the Posse Comitatus Act is violated. *Dreyer*, 804 F.3d at 1275.

58. Here, military forces are pervasively intertwined with civilian law enforcement activities. Armed troops are working side by side with ICE agents in conducting arrests and raids in the streets, homes, and workplaces of Los Angeles. Until approximately two weeks ago, federalized National Guard troops were involved in as many as 75 percent of ICE'S at-large daily law enforcement operations in Los Angeles, including immigration-related arrests and search warrant operations. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7, 133:17-24); ███████████████████████████████████████

59. Indeed, beyond mere pervading, ███████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████.) That substantial level of involvement makes increasing contact between the military and civilians unavoidable, and there is a significant risk that the military's role will grow to include other activities that are practically indistinguishable from urban policing operations.

60. The core mission of the federal military personnel, and the actions the federal troops have taken to carry out that mission, has nothing to do with "military bases, military facilities, military personnel, or military equipment," *Dreyer*, 804 F.3d at 1275-76, as they have had no plausible connection to the purpose of the federalization order, which was "to temporarily protect" federal agents and federal property "at locations where protest . . . are occurring or are likely to occur." (Horne-Petersdorf Decl., Ex. 32, ECF No. 147-1, at 2.)

61. For example, federalized National Guard troops have participated in operations involving the execution of search warrants on private property in Mecca, Camarillo, and Carpinteria, each of which is over 50 miles away from the locations of the initial protests that gave rise to the federalization order. These operations did not pose any particular risk to the federal agents who were executing the search warrants. For instance, ████████████████████
████████████████████████████████████████████████

A101



.)

62. 

63. These operations establish that Defendants are not placing any meaningful limitations on the federalized National Guard troops' involvement in law enforcement activities. To the contrary, Defendants appear to be ordering federalized National Guard troops to participate in any sizeable federal law enforcement operation that takes place within the greater Southern California area. In the absence of any actual need, 

) or simply to make continued use of the federalized Guard to justify the continued federalization.

64. Either rationale, however, underscores a use of military personnel that flies in the face of our Nation's tradition of limiting military involvement in civil domestic law enforcement and the purpose behind the Posse Comitatus Act. Defendants are using the federalized troops as a force multiplier to conduct their civil law enforcement aims, completely detached from the alleged purpose of the original federalization (concerning protests at federal facilities in downtown Los Angeles), even setting aside the staleness of that initial invocation. By routinely participating in such operations, the federalized National Guard troops are pervading the activities of civilian law enforcement.

65. Moreover, when federalized National Guard soldiers do participate in federal law enforcement operations, it is extremely difficult to differentiate the soldiers from the federal law enforcement agents present. This is due in large part to the fact that many federal agents wear camouflage uniforms that are virtually identical to those worn by the federalized National Guard troops. Indeed, at their depositions, both Task Force 51 Deputy Chief of Staff Harrington and Enforcement and Removal Operations Field Office Director Santacruz were unable to confirm whether certain photographs taken of uniformed individuals throughout the deployment showed federalized National Guard soldiers, ICE agents, or other federal agents. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 84:20-86:18); Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 125:24-129:23).)

66. Additionally, the federalized National Guard troops and federal agents are often so thoroughly intermingled that it is not readily apparent who is military and who is not. (*See, e.g.*, Reilley Decl., Exs. 22-23; Flores-Haro Decl., Exs. A-P.) Because of this, when carrying out an operation together, the federalized National Guard troops and federal law enforcement agents often appear to be part of one large amorphous force—a dynamic that further underscores Defendants' pervasion of law enforcement activities.

67. Defendants' view of the Posse Comitatus Act would usher in a vast and unprecedented shift in the role of the military in our society. If the Act allowed military forces to accompany ICE agents on raids and arrests in the manner unfolding across the Los Angeles area, there would be no logical basis to preclude members of the Armed Forces from accompanying other law

enforcement agents when performing their duties. Armed troops could, for example, accompany FBI agents, food safety inspectors with the Department of Agriculture, Fish and Wildlife agents, or Medicare fraud investigators when those civilian officials conduct searches, field interviews, interrogations, or other law enforcement operations; or accompany federal voting rights officials to "monitor" polling places during elections. Virtually every federal agency has an investigative or enforcement arm.

68. Providing that support would magnify the ability of officials at every level of government to coerce and control individuals subject to their jurisdiction. The Posse Comitatus Act was designed to protect against that kind of erosion of individual liberty. *See generally Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999) ("The [Posse Comitatus] Act reflects a concern, which antedates the Revolution, about the dangers to individual freedom and liberty posed by use of a standing army to keep civil peace.").

## VII. DEFENDANTS ACTED ULTRA VIRES BY SUBJECTING CIVILIANS TO REGULATORY, PROSCRIPTIVE, AND COMPULSORY MILITARY POWER.

69. Under the third test, courts consider "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *Yunis*, 681 F. Supp. at 892 (citing *United States v. McArthur*, 419 F. Supp. 186 (D.N.D. 1975)); *see Dreyer*, 804 F.3d at 1275.

70. "A power regulatory in nature is one which controls or directs." *United States v. Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986).

71. "A power proscriptive in nature is one that proscribes or condemns." *Id*.

72. And a "power compulsory in nature is one that exerts some coercive force." *Id*.

73. As with the use of equipment, "[t]he borrowing of highly skilled personnel . . . for a specific, limited, temporary purpose" is permissible. *Id*. (quoting *McArthur*, 419 F. Supp. at 194).

74. But the use of military personnel to establish "roadblocks" and "an armed perimeter" is "regulatory, proscriptive, or compulsory" because "these activities directly restrain[] plaintiffs' freedom of movement," thereby violating the Posse Comitatus Act. *Bissonette*, 776 F.2d at 1391.

75. Here, by performing security functions for federal agents during field operations, forming perimeters and blockades on public roads and sidewalks, and apprehending and detaining civilians, Task Force 51 has engaged in law enforcement activities that "directly restrain" civilians' "freedom of movement" and therefore violate the Posse Comitatus Act. *Id*.

76. Moreover, Plaintiffs have shown that the presence of the Task Force 51 troops in Los Angeles has had, and will continue to have, a proscriptive effect on the on the city's civilian population. Indeed, as admitted by the testimony of Defendants' own declarant, deterrence to "the public" is the point. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 74:1-3; 122:25-123:3) (testifying that "having the National guard there readily available . . . it was a huge deterrent for the public" and "the mere presence, that deterrent factor, would make someone from the public think twice of intervening").)

77. This proscriptive effect is what prompted the concern raised by Thomas Jefferson about King George III's standing armies, and it is the precise result that the Posse Comitatus Act was designed to prevent.

**VIII. THE COURT ENTERS PROSPECTIVE INJUNCTIVE RELIEF TO PREVENT ONGOING AND FUTURE VIOLATIONS.**

78. Prospective injunctive relief is warranted to prevent ongoing and future violations of the Posse Comitatus Act.

79. Continued violations of the Posse Comitatus Act are realistically threatened, justifying injunctive relief. *See Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006). Plaintiffs can demonstrate a likelihood of recurring injury "where the harm alleged is directly traceable to a written policy," or "the harm is part of a 'pattern of officially sanctioned . . . behavior.'" *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 504-05 (2005)) (citations omitted). Here, both conditions are met.

80. Our nation's foundational principle of keeping the military out of civilian affairs has long served as a bulwark against the coercive control over civilians that is inherent to military rule.

81. Each day that the federalized National Guard troops remain deployed erodes that bulwark and violates the Posse Comitatus Act.

82. First, the President's June 7, 2025 Memorandum places no temporal or geographical limits on the use of troops, and so there is an enduring threat of repeated injury in the form of re-deployment of troops who will engage in continued violations. ECF No. 25-2 at 3 (indicating that the duration of duty is "60 days *or at the discretion of the Secretary of Defense*" and the location is wherever protests "are *likely to occur… .*") (emphasis added). That threat is real and immediate.

83. Indeed, on August 6, 2025—mere days before trial—DoD issued a new activation order deploying troops for an additional 90 days, through November 5, 2025. (Pls' Suppl. Reply Br., ECF No. 140, Strong Decl., ECF No. 140-1, Ex. 31, Activation Order.) Moreover, Defendants' policies and trainings explicitly authorize violations of the Posse Comitatus Act, making the need for injunctive relief particularly marked. ████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ And Defendants' actions are part of a pattern of officially sanctioned behavior. As shown above, the military's involvement in operations pervades the activities of civil law enforcement.

84. Defendants' insistence that perimeters, blockades, and other security functions are permissible suggests they will continue to engage in these activities unless enjoined by the Court. *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719-20 (2022). Defendants, in fact, continue to vigorously defend their ongoing actions and have never indicated it any willingness to cease the challenged activities.

85. The Court therefore grants injunctive relief that prohibits Defendants from ordering or allowing the military to engage in activities that the Posse Comitatus Act prohibits. *See* ECF No. 8-4, Proposed Order Granting Temporary Restraining Order (proposing injunction on ordering or permitting military to enforce federal law; to execute or assist in federal agents'

enforcement of federal law, including but not limited to all law-enforcement functions such as execution of warrants, arrests, searches, checkpoints, or cordons; and to patrol communities or otherwise engage in general law enforcement activities beyond the immediate vicinity of federal buildings or other real property owned or leased by the federal government).

## IX. THE COURT DECLINES DEFENDANTS' REQUEST FOR A STAY.

86. The Court finds that Defendants violated and are violating the Posse Comitatus Act, and those violations should not be permitted to continue for even one day to ensure no further harm comes to the State. Nor do Defendants suffer any risk of harm from an injunction. Defendants have begun withdrawing the majority of troops from Los Angeles, which affirms that even Defendants agree that any risk to federal personnel and property—to the extent one ever existed—has passed. Moreover, as Defendants continue to insist they are not violating the Posse Comitatus Act, they can hardly claim injury from an injunction requiring them to abide by it. There is no good cause for staying any injunction or judgment issued by the Court.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

Dated:  August 9, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
BRENDAN HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGHAN H. STRONG
MEGAN RICHARDS

*/s/ Barbara Horne-Petersdorf*
BARBARA HORNE-PETERSDORF
Deputy Attorneys General
   300 S. Spring Street
   Los Angeles, CA 90013
   Telephone: (213) 269-6667
   E-mail:
   Barbara.HornePetersdorf@doj.ca.gov
*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

Case Name:  ___*Newsom, et al. v. Trump, et al.*___     Case No.  ___**3:25-cv-04870-CRB**___

I hereby certify that on <u>August 9, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **[REDACTED] PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2. **[REDACTED] DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

3. **EXHIBIT 32 TO DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

4. **[REDACTED] EXHIBITS 33 THROUGH 39 TO DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

5. **EXHIBITS 40 THROUGH 44 TO DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 9, 2025,</u> at San Francisco, California.

___Melissa Mendiola___
Declarant

___*(signature)*___
Signature

SF2025303707
44751688.docx

**A109**

<pre>
                                      Volume 1

                                   Pages 1 - 207

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable Charles R. Breyer, Judge

        GAVIN NEWSOM, in his official      )
        capacity as Governor of the State of )
        California; STATE OF  CALIFORNIA,   )
                                            )
                 Plaintiffs,                )
                                            )
          VS.                               )  NO. 3:25-CV-04870 CRB
                                            )
        DONALD TRUMP, in his official       )
        capacity as President of the United )
        States; PETE HEGSETH, in his official )
        capacity as Secretary of the        )
        Department of Defense; UNITED STATES )
        DEPARTMENT OF DEFENSE,              )
                                            )
                 Defendants.                )
        _____)


                                    San Francisco, California
                                    Monday, August 11, 2025


                           TRANSCRIPT OF PROCEEDINGS
        APPEARANCES:

        For Plaintiffs:
                           CALIFORNIA DEPARTMENT OF JUSTICE
                           OFFICE OF THE ATTORNEY GENERAL
                           455 Golden Gate Avenue, Room 11000
                           San Francisco, California 94102
                      BY:  JANE E. REILLEY
                           LORRAINE A. LOPEZ
                           MEGHAN STRONG
                           KENDAL MICKLETHWAITE
                           DEPUTY ATTORNEYS GENERAL

               (APPEARANCES CONTINUED ON FOLLOWING PAGE)

        REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                      CSR No. 7445, Official United States Reporter
</pre>

2

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                         CALIFORNIA DEPARTMENT OF JUSTICE
 3                       OFFICE OF THE ATTORNEY GENERAL
                         455 Golden Gate Avenue, Room 11000
 4                       San Francisco, California 94102
               BY:   ANYA M. BINSACCA
 5                   MARISSA MALOUFF
                     SUPERVISING DEPUTY ATTORNEYS GENERAL
 6

 7   For Defendants:
                         UNITED STATES DEPARTMENT OF JUSTICE
 8                       Civil Division, Federal Programs Branch
                         1100 L Street, NW
 9                       Washington, D.C. 20005
               BY:   GARRY D. HARTLIEB, TRIAL ATTORNEY
10                   JODY D. LOWENSTEIN, TRIAL ATTORNEY
                     JEAN LIN, SPECIAL LITIGATION COUNSEL
11                   BENJAMIN S. KURLAND, TRIAL ATTORNEY
                     ANDREW BERNIE, TRIAL ATTORNEY
12                   ABIGAIL STOUT, TRIAL ATTORNEY

13
                         UNITED STATES DEPARTMENT OF JUSTICE
14                       Civil Division
                         950 Pennsylvania Avenue NW
15                       Washington, D.C. 20530
               BY:   ERIC J. HAMILTON
16                   JOHN BAILEY
                     DEPUTY ASSISTANT ATTORNEYS GENERAL
17

18   Also Present:
                     Kimberly Knight, Paralegal
19                   Noel Garcia, Legal Analyst
                     Major General Scott Sherman
20

21

22

23

24

25
```

A111

```
 1              I N D E X

 2

 3    Monday, August 11, 2025 - Volume 1

 4

 5                                               PAGE   VOL.

 6    Plaintiffs Rest                             202    1

 7

 8    PLAINTIFFS' WITNESSES                       PAGE   VOL.

 9    HARRINGTON, WILLIAM
       (SWORN)                                     14    1
10    Direct Examination by Ms. Reilley            14    1
      Cross-Examination by Mr. Lowenstein          43    1
11    Redirect Examination by Ms. Reilley          47    1

12    SHERMAN, SCOTT MARSHALL
       (SWORN)                                     49    1
13    Direct Examination by Ms. Reilley            50    1
      Cross-Examination by Ms. Lin                112    1
14    Redirect Examination by Ms. Reilley         143    1

15    SANTACRUZ, ERNESTO
       (SWORN)                                    147    1
16    Direct Examination by Ms. Lopez             147    1
      Cross-Examination by Mr. Hartlieb           179    1

17

18              E X H I B I T S

19    TRIAL EXHIBITS                 IDEN  EVID   VOL.

20     5                                    58     1

21     10                                   24     1

22     12                                   66     1

23     15                                   53     1

24     28                                   36     1

25     31                                   85     1
```

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 38 | | 73 | 1 |
| 41 | | 81 | 1 |
| 53 | | 71 | 1 |
| 54 | | 72 | 1 |
| 64 | | 77 | 1 |
| 66 | | 78 | 1 |
| 68 | | 79 | 1 |
| 69 | | 83 | 1 |
| 75 | | 91 | 1 |
| 76 | | 92 | 1 |
| 79 | | 86 | 1 |
| 80 | | 86 | 1 |
| 83 | | 93 | 1 |
| 86 | | 94 | 1 |
| 87 | | 95 | 1 |
| 92 | | 96 | 1 |
| 94 | | 96 | 1 |
| 95 | | 97 | 1 |
| 96 | | 98 | 1 |
| 114 | 110 | 111 | 1 |

5

PROCEEDINGS

<u>Monday - August 12, 2025</u>                                        10:00 a.m.

1

2                         P R O C E E D I N G S

3                              ---o0o---

4          THE COURTROOM DEPUTY:  Calling Civil Action C 25-4870,

5     Newsom vs. Trump.

6          Counsel, please state your appearances for the record.

7          MS. STRONG:  Good morning, Your Honor.  Meghan Strong

8     of the California Department of Justice for plaintiffs.  With

9     me at counsel table are Jane Reilley, Lorraine Lopez, Kendall

10    Micklethwaite, Anya Binsacca, and Marissa Malouff.

11         THE COURT:  Good morning.

12         MR. HAMILTON:  Good morning, Your Honor.

13    Eric Hamilton for the defendants.  With me at counsel table is

14    John Bailey, Garry Hartlieb, Jean Lin, Jody Lowenstein,

15    Ben Kurland, Andrew Bernie, Abby Stout.

16         THE COURT:  Good morning.

17         MR. HAMILTON:  Thank you.

18         THE COURT:  Well, let me thank the parties, first of

19    all, for complying with the many orders that we've issued in

20    the last two or three weeks concerning preparation, discovery,

21    and so forth.  It's extremely helpful to have an order to

22    things, especially in cases that are high-profile cases and

23    where there are deadlines to be met, and the parties did meet

24    the deadlines and I'm grateful for that.

25         So I thought I would make a brief statement as to what I

**PROCEEDINGS**

1    understand - when I say "I," I mean the Court -- understand

2    this process to be, where we are as of today.

3         The trial that is going to commence this morning is about

4    a single factual issue to which a number of legal challenges

5    have been asserted.

6         First, the factual issue.  The factual issue is as

7    follows:  Did the military, in this case the Marines and the

8    federalized National Guard, violate the Posse Comitatus Act?

9    Now, that act, which is a statute, which means it's a law,

10   reads as follows, and it's rather brief.  It's 18 U.S.C.,

11   Section 1385, and it's entitled "Use of Army, Navy, Marine

12   Corps, Air Force, and Space Force as Posse Comitatus."  It

13   reads [as read]:

14        "Whoever, except in cases and under

15        circumstances expressly authorized by the

16        Constitution or Act of Congress, willfully uses any

17        part of the Army, the Navy, the Marine Corps, the

18        Air Force, or the Space Force as a posse comitatus or

19        otherwise to execute the laws shall be fined under

20        this title or imprisoned . . . ."

21        And it goes on to discuss the penalty.

22        Now, the first question, obviously, is it doesn't say

23   "National Guard"; however, I think it's recognized by the

24   parties that with the federalization of the National Guard,

25   they then would be included within this prohibition, which is

A115

7

PROCEEDINGS

1    listed as -- which is contained in the Posse Comitatus Act.

2        So it means, in the Court's view, in other words, the

3    military, as defined, cannot be used to enforce domestic laws

4    unless expressly authorized by the Constitution or act of

5    Congress.  The factual question which the Court must address is

6    whether the military was used to enforce domestic law and, if

7    so, whether there continues to be a threat that it would be

8    done again.  Evidence will be presented on this issue today and

9    tomorrow.

10        On Wednesday, the Court will hear argument on the major

11   legal issues that have -- that the federal government has

12   raised in connection with the implementation of this statute,

13   and the major issues are as follows:

14        One, the Posse Comitatus Act provides no civil cause of

15   action for relief.  The Posse Comitatus Act is a criminal

16   statute and, therefore, to bring it in a civil context is not

17   permitted under the law.  That's number one.

18        Number two, California, the State of California, cannot

19   bring a claim that the military was acting *ultra vires* under

20   these circumstances.

21        Number three, California lacks standing to bring the

22   claim.

23        And, number four, that there is another statute, which is

24   12406, under which the National Guard was federalized, and that

25   statute constitutes federal authorization for exempting this

A116

8

**PROCEEDINGS**

 1  conduct under the Posse Comitatus Act because, remember, when I
 2  read the Posse Comitatus Act, it's not a blanket, it's not a
 3  blanket statute.  It says "unless expressly authorized by act
 4  of Congress or by the Constitution."  And the federal
 5  government takes the position that 14604 -- I'm sorry --
 6  12406 -- I'm getting my numbers transposed.  That's a little
 7  dangerous when I do that -- it's 12406, expressly constitutes
 8  that exception to the Posse Comitatus Act.
 9       We'll have that discussion, and I promise you we'll have
10  it, on Wednesday after the evidentiary issues have been -- have
11  been presented to the Court.
12       So I also want to point out, to anybody who's interested,
13  is that the parties have written extensively on this subject.
14  This is not the first time these issues have been raised in
15  this Court, and both sides have addressed it.  I will give you
16  another opportunity to address those issues, but I want you to
17  be assured that I actually have considered it, I have read your
18  briefs, and I understand -- at least I believe I understand
19  what the issues are.
20       So thank you.  That is my opening.  I gave the opening
21  statement here today.  So I think that we should move right
22  into the evidentiary portions because we have a number of
23  witnesses.  I want to make sure that they're heard and go
24  through it and there's ample time for cross-examination of the
25  witnesses.

A117

PROCEEDINGS

1     So I turn to the State of California.  They are the

2  plaintiff in this case.

3     And you may call your first witness.

4          MS. STRONG:  Thank you, Your Honor.

5     Before we call our first witness, I just have one

6  housekeeping item and one exhibit-related item I want to bring

7  the Court's attention to.

8          THE COURT:  Okay.

9          MS. STRONG:  So, first, the parties have already

10  discussed and agreed that the witnesses shall be sequestered

11  during respective testimony, except that I understand that

12  defendants are designating a party representative.  I believe

13  they designated Major General Sherman as their party

14  representative.

15          THE COURT:  Okay.  And he may attend.

16          MS. STRONG:  In addition, Your Honor, as you may have

17  seen if you've had the chance review --

18          THE COURT:  Let me clarify the sequestration.

19     What we've done is we've put the witnesses in a secure

20  location, in a courtroom actually, but they're there.  They're

21  not here to hear the evidence, but they have -- they are with

22  each other.  It's unrealistic to assume that they would never

23  talk to each other.  It may be a good idea that they do talk to

24  each other.  I don't know.  But they're sequestered in that

25  sense.

10

PROCEEDINGS

```
 1          MS. STRONG:  Yes, Your Honor.
 2          THE COURT:  They're not sequestered one from the
 3   other.
 4          MS. STRONG:  Yes, Your Honor, that's my understanding,
 5   and they don't have access to the audio feed or otherwise
 6   ability to --
 7          THE COURT:  I believe that's correct.
 8          MS. STRONG:  -- hear the testimony.
 9          THE COURT:  I believe that's correct.
10          MS. STRONG:  So the second item, Your Honor, is on our
11   exhibit list, you may have seen the parties have stipulated to
12   the admissibility and to admit the vast majority of the
13   exhibits on the exhibit list; and in order to streamline trial
14   today and enable free use of these exhibits during the exams,
15   we'd like to go ahead and admit all of the stipulated exhibits
16   now.
17          THE COURT:  So admitted.
18          MS. STRONG:  Thank you.  Would Your Honor like me to
19   individually address each exhibit or can we reference them?
20          THE COURT:  No.  I would like you not to have to
21   address it.
22          MS. STRONG:  Thank you, Your Honor.  That's my
23   preference as well.
24       In that case, that's all from me.  I'm going to turn it
25   over to my colleague to call our first witness.
```

A119

PROCEEDINGS

```
 1          THE COURT:  Okay.  Is there anything from the federal
 2   government that you want to address?  Good morning.
 3          MS. LIN:  Good morning, Your Honor.
 4          THE COURT:  And you have to give me your name again,
 5   please.
 6          MS. LIN:  Jean Lin on behalf of the Department of
 7   Justice.
 8          THE COURT:  Thank you.
 9          MS. LIN:  So one housekeeping that the defendants have
10   is that we have a pending motion to seal two types of
11   information, and one is a small redaction -- redaction to
12   certain exhibits that the parties either have stipulated to or
13   not; and then the -- and the other is we have one document that
14   we wanted to seal in entirety, and we have that motion pending.
15   And if Your Honor would like to hear arguments about the
16   sealing motion because it would affect portions that are
17   redacted as well as one document that we're withholding, we're
18   hoping to withhold in full.
19          THE COURT:  Well, I don't want to hear it now unless
20   it's necessary for me to hear it now in light of the order of
21   evidence.
22          But, I mean, the problem, quite practically speaking, is
23   clearing the courtroom, having the hearing.  I mean, if it's
24   under seal, it's under seal.  But is it necessary for me to
25   adjudicate that now?
```

**PROCEEDINGS**

1   **MS. LIN:**  So for defendants, we don't intend to talk

2   about any portions of the exhibits that have been redacted or

3   withheld in full.  That's one.

4   And when we filed the motion yesterday, the defendants --

5   the plaintiffs represented that they do not oppose --

6   **THE COURT:**  Well, let me --

7   **MS. LIN:**  -- the motion.

8   **THE COURT:**  -- see what the plaintiff says.

9   **MS. STRONG:**  We don't take a position on the sealing

10  itself, Your Honor.  We'll defer to the Court on that.

11  We do intend to use the exhibits that are redacted.

12  However, we think that the easiest way to address this is for

13  us to simply put the redacted versions up.  If we display

14  anything on the public screen, we'll use the redacted versions.

15  Your Honor and the witness will, of course, have the

16  under-seal, unredacted issues, but we think that would

17  reasonably address this issue during the trial.

18  **THE COURT:**  Okay.  Let's do it that way, and let's

19  proceed.

20  Thank you.

21  **MS. STRONG:**  Thank you, Your Honor.

22  **MS. LIN:**  Okay.  Thank you, Your Honor.

23  **THE COURT:**  Thank you very much.

24  Okay.  Good morning.

25  **MS. REILLEY:**  Good morning, Your Honor.  Deputy

PROCEEDINGS

1   Attorney General Jane Reilley for the plaintiffs.

2        Plaintiffs call Deputy Chief of Staff William Harrington

3   as their first witness.

4             **THE COURT:**  Thank you.  Now, is the witness in the --

5             **MS. REILLEY:**  I believe he's one of the witnesses

6   who's been sequestered.

7             **THE COURT:**  Okay.  Well, maybe the marshals can...

8             **MS. REILLEY:**  And his name is William Harrington.

9             **THE COURT:**  Thank you.

10                 (Pause in proceedings.)

11            **THE COURT:**  By the way, I might as well address, while

12   we're waiting, the -- as the parties know, the sound is being

13   broadcast.  So there is a link.  The link is a public link,

14   anyone can access it, and so they will hear, if they're

15   interested, these proceedings.

16        In terms of the video, I issued an order, I think on

17   Saturday, granting the federal government -- I've got to talk

18   about federal government and state government -- the federal

19   government's request, and therefore, there is no video of these

20   proceedings.

21        However, the Court is a public court.  It's open.  People

22   come in.  They can look at the witnesses as the witnesses

23   testify.  Okay?  So we just understand that.

24        And I've now filled the necessary time because the witness

25   is here.

A122

HARRINGTON - DIRECT / REILLEY

1    (Witness enters the courtroom and steps forward to be sworn.)

2          THE COURT:  Would you come forward, please.

3          THE COURTROOM DEPUTY:  Good morning.  Step up.  Watch

4    your step.

5          Please raise your right hand.

6                    WILLIAM  HARRINGTON,

7    called as a witness for the Plaintiffs, having been duly sworn,

8    testified as follows:

9          THE WITNESS:  Yes, ma'am.

10         THE COURTROOM DEPUTY:  Thank you.  You may be seated.

11         Please state your full name for the record and spell your

12   last name.

13         THE WITNESS:  William Harrington, H-a-r-r-i-n-g-t-o-n.

14         THE COURTROOM DEPUTY:  Thank you.

15         THE COURT:  You may proceed.

16         MS. REILLEY:  Thank you, Your Honor.

17                    DIRECT EXAMINATION

18   BY MS. REILLEY:

19   Q.   Good morning, Mr. Harrington.

20   A.   Good morning, ma'am.

21   Q.   It's nice to see you again.

22         Do you recall that I deposed you in this matter

23   approximately two weeks ago?

24   A.   I do remember.

25   Q.   All right.  And --

HARRINGTON - DIRECT / REILLEY

```
 1              THE COURT:  And could you go a bit closer to the
 2    microphone and keep your voice up?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  Thank you.
 5    BY MS. REILLEY:
 6    Q.   Mr. Harrington, you are a civilian who's employed by the
 7    U.S. Army; is that right?
 8    A.   Yes, ma'am.
 9    Q.   Would you please state your rank and current assignment
10    with the Army?
11    A.   GS-13, Deputy Chief of Staff, Task Force 51.
12    Q.   What is Task Force 51?
13    A.   Task Force 51 is U.S. Army North's deployable contingency
14    command post.
15    Q.   Task Force 51 was involved in the deployment of
16    federalized California National Guard soldiers and Marines to
17    Los Angeles that began in June of this year; is that correct?
18    A.   Yes, ma'am.
19    Q.   And specifically Task Force 51 had operational control
20    over all of the federalized California National Guard soldiers
21    who were deployed to Los Angeles?
22    A.   Yes, ma'am.
23    Q.   That was approximately 4,000 soldiers in total; correct?
24    A.   Yes, ma'am.
25    Q.   Task Force 51 also had tactical control over all of the
```

**HARRINGTON - DIRECT / REILLEY**

1   Marines who were deployed to Los Angeles?

2   **A.**   Yes, ma'am.

3   **Q.**   And that was approximately 700 Marines in total?

4   **A.**   Correct.

5   **Q.**   If today I use the phrase "Task Force 51 troops," do you

6   understand that I'm referring to all of the federalized

7   California National Guard soldiers and all of the Marines who

8   are under Task Force 51's command during the deployment to

9   Los Angeles?

10  **A.**   Yes, ma'am.

11  **Q.**   And the U.S. Department of Defense oversees the entire

12  Army, including Task Force 51; is that right?

13  **A.**   Correct.

14  **Q.**   During the deployment to Los Angeles, Task Force 51 worked

15  with and provided assistance to members of the Department of

16  Homeland Security?

17  **A.**   Yes, ma'am.

18  **Q.**   And the Department of Homeland Security has several

19  divisions, including Immigration and Customs Enforcement,

20  Enforcement and Removal Operations, Customs and Border

21  Protection, and Homeland Security Investigations?

22  **A.**   Yes, ma'am.

23  **Q.**   But the Department of Homeland Security is not part of the

24  military; right?

25  **A.**   No, ma'am.

**HARRINGTON - DIRECT / REILLEY**

1  Q.   The Department of Homeland Security is a federal law
2  enforcement agency?
3  A.   Correct.
4  Q.   And the Department of Defense, which includes Task
5  Force 51 and is made up of military, is separate from the
6  Department of Homeland Security, which is made up of federal
7  law enforcement agents; is that right?
8  A.   Yes, ma'am.
9  Q.   How long have you served as the deputy chief of staff for
10 Task Force 51?
11 A.   For about two and a half years.
12 Q.   In that role, you're responsible for managing the staff of
13 Task Force 51; is that correct?
14 A.   Correct.
15 Q.   You also carry out any tasks that are assigned to you by
16 the chief of staff for Task Force 51?
17 A.   Yes, ma'am.
18 Q.   Previously you were an instructor for the U.S. Army
19 Northern Command's Defense Support for Civil Authorities
20 course?
21 A.   It wasn't U.S. Army.  North Com is a joint headquarters,
22 so it's not underneath the Department of the Army.
23 Q.   All right.  But it was underneath the Department of
24 Defense; is that correct?
25 A.   Yes, ma'am.

**HARRINGTON - DIRECT / REILLEY**

1   Q.   And that course applied to all of the military branches,

2   not just the Army?

3   A.   Yes, ma'am.

4   Q.   All right.  And the course was entitled "Defense Support

5   to Civil Authorities"; is that right?

6   A.   Yes, ma'am, the Phase 2 course.

7   Q.   The Phase 2 course?

8   A.   Yes.

9   Q.   All right.  And you were the instructor of that Phase 2

10  course for two years?

11  A.   Yes, ma'am.

12  Q.   And that course covers how the Department of Defense

13  provides security to federal law enforcement agencies when the

14  need arises; is that right?

15  A.   Well, there is a legal brief and part of that legal brief

16  includes Posse Comitatus.

17  Q.   All right.  And in June you deployed to Los Angeles with

18  Task Force 51; is that correct?

19  A.   Yes, ma'am.

20  Q.   One of your responsibilities during that deployment was to

21  write a nightly report for the commanding general of Task

22  Force 51?

23  A.   Yes, ma'am.

24  Q.   At the beginning of the deployment, Major General Scott

25  Sherman was the commanding general of Task Force 51 with

A127

HARRINGTON - DIRECT / REILLEY

1   respect to that deployment; is that correct?

2   A.   Yes, ma'am.

3   Q.   And Major General Scott Sherman was in command until

4   July 10th?

5   A.   Yes, ma'am.

6   Q.   And from July 10th onward, is it correct that Major

7   General Neve Nell was the commanding general?

8   A.   Yes, ma'am.

9   Q.   In your nightly reports to the commanding general, you

10  included information about the daily activities of Task

11  Force 51; correct?

12  A.   Yes.

13  Q.   And that included information about Task Force 51's

14  activities in response to requests for assistance from the

15  Department of Homeland Security?

16  A.   Yes, ma'am.

17  Q.   And the information you included in your nightly reports

18  came from information uploaded to a centralized network by each

19  of Task Force 51 units; is that right?

20  A.   Yes, ma'am.

21  Q.   And you also received real-time reports from the units via

22  email, phone calls, and Microsoft Team messages?

23  A.   Correct.

24  Q.   But you never personally were present during any of

25  Task Force 51's field operations during the deployment; is that

**HARRINGTON - DIRECT / REILLEY**

1    right?

2    **A.**    Correct.

3    **Q.**    So the information you included in your nightly reports

4    was received secondhand from the units?

5    **A.**    I don't know if it was secondhand.  It was direct

6    reporting from the units; but, yes.

7    **Q.**    Okay.  So but all the -- you didn't personally witness any

8    of the actions that you included in your report; is that right?

9    **A.**    Correct.

10   **Q.**    All right.  You first received orders in connection with

11   Task Force 51's deployment to Los Angeles on June 7th; is that

12   correct?

13   **A.**    Yes, ma'am.

14   **Q.**    And on that day you received a phone call ordering you to

15   come to Army North headquarters for a briefing?

16   **A.**    Yes, ma'am.

17   **Q.**    You attended that June 7th briefing; correct?

18   **A.**    I did.

19   **Q.**    And the commanding general of Army North was also present

20   at that briefing?

21   **A.**    Yes, ma'am.

22   **Q.**    The chief of staff for Army North was also present?

23   **A.**    Yes, ma'am.

24   **Q.**    So was the G3?

25   **A.**    Yes, ma'am.

HARRINGTON - DIRECT / REILLEY

1    Q.   And the G3 is the operations officer; correct?

2    A.   Correct, ma'am.

3    Q.   And the Task Force 51 lawyer was present at the briefing?

4    A.   I don't remember.

5    Q.   All right.  What about the staff judge advocate?  Was that

6    individual present at the briefing?

7    A.   I think they're the same person, ma'am.  I don't -- I

8    don't remember if she was there or not.

9    Q.   All right.  At the June 7th briefing, you were told that

10   Task Force 51 would be deployed to Los Angeles; is that right?

11   A.   Yes, ma'am.

12   Q.   And you were told that Task Force 51 would serve as the

13   command and control headquarters for the deployment?

14   A.   Yes, ma'am.

15   Q.   And at the time you attended that briefing, you already

16   knew what the Posse Comitatus Act was; correct?

17   A.   Correct, ma'am.

18   Q.   And your knowledge of the Posse Comitatus Act comes from

19   trainings that you've received during your time at the

20   Department of Defense; is that right?

21   A.   Yes, ma'am.

22   Q.   And it also comes from your time as an instructor of the

23   Defense Support to Civil Authorities Phase 2 course?

24   A.   Correct, ma'am.

25   Q.   I believe you mentioned earlier that course included a

HARRINGTON - DIRECT / REILLEY

 1   legal brief that addressed the Posse Comitatus Act?

 2   A.   Yes, ma'am.

 3   Q.   And you during your time as instructor, you received that

 4   legal briefing 28 times?

 5   A.   About 28 times.  I've sat through it about that number.

 6   Q.   Okay.  So during the June 7th briefing, you raised the

 7   issue of the Posse Comitatus Act; correct?

 8   A.   I did, ma'am.

 9   Q.   Specifically you said that any -- if any National Guard

10   troops were federalized as part of the deployment, they would

11   lose the ability to conduct law enforcement activities because

12   of the Posse Comitatus Act; correct?

13   A.   Correct, ma'am.

14   Q.   And when you said that, the commanding general of

15   U.S. Army North specifically said that federalized National

16   Guard troops involved in the mission would not be performing

17   law enforcement functions; is that right?

18   A.   Correct, ma'am.

19   Q.   And everyone in the briefing agreed that as soon as

20   California National Guard troops were called into federal

21   service, they would be subject to the Posse Comitatus Act; is

22   that right?

23   A.   Yes, ma'am.

24   Q.   And because of the Posse Comitatus Act, those federalized

25   National Guard troops would not be able to engage in law

HARRINGTON - DIRECT / REILLEY

```
 1   enforcement activities?
 2              MR. LOWENSTEIN:  Objection, Your Honor.  This is
 3   improper opinion testimony under 701.
 4              THE COURT:  Overruled.
 5   BY MS. REILLEY:
 6   Q.   You may answer the question.
 7   A.   Can you repeat the question, please.
 8   Q.   Certainly.  And this goes back to the --
 9              THE COURT:  You're asking him what his understanding
10   is, what his state of mind is, as distinct from a legal
11   opinion; but his legal opinion may very well govern his state
12   of mind.  But he can testify as to what his beliefs were, what
13   he thought of the law, and so forth.
14              MS. REILLEY:  Thank you, Your Honor.
15   BY MS. REILLEY:
16   Q.   Mr. Harrington, the question was:  Because of the Posse
17   Comitatus Act, it's your understanding that those federalized
18   troops would not be allowed to engage in civilian law
19   enforcement activities --
20   A.   Correct.
21   Q.   -- during their deployment?
22        Thank you.
23        And during the June 7th briefing, you were reassured that
24   federalized National Guard troops would not engage in any
25   actions that would violate the Posse Comitatus Act during the
```

A132

HARRINGTON - DIRECT / REILLEY

1    deployment; right?

2  **A.**    Correct, ma'am.

3  **Q.**    And you're not aware of anyone within the U.S. Northern

4    chain of command who ever believed that the federalized

5    National Guard troops in Los Angeles were not subject to the

6    Posse Comitatus Act; is that right?

7  **A.**    Okay.  There was like a double negative in there, so

8    I think you're saying that everyone knew that Posse Comitatus

9    applied; is that correct?

10           **THE COURT:**  To your knowledge.

11           **THE WITNESS:**  Yes, sir.  Yes, ma'am.

12  **BY MS. REILLEY:**

13  **Q.**    You never heard anyone express an opinion that they

14    thought Posse Comitatus did not apply; is that correct?

15  **A.**    Correct.

16  **Q.**    All right.  Thank you.

17           Task Force 51 troops received training on which specific

18    activities they are not allowed to engage in because of Posse

19    Comitatus; is that correct?

20  **A.**    Yes, ma'am.

21  **Q.**    And this training included a slideshow presentation?

22  **A.**    Yes, ma'am.

23           (Trial Exhibit 10 received in evidence.)

24  **BY MS. REILLEY:**

25  **Q.**    Mr. Harrington, in front of you there's a binder.  I'll

A133

HARRINGTON - DIRECT / REILLEY

```
 1   ask you to turn to Tab 10 of that binder.  This is a document
 2   that's been previously admitted as Exhibit 10.
 3        Mr. Harrington, do you recognize this document?
 4   A.   I do.
 5   Q.   This is a copy of the slide deck that was used during the
 6   training that Task Force 51 troops received during the
 7   deployment to Los Angeles; is that correct?
 8   A.   Yes, ma'am.
 9   Q.   Do you know who created this slide deck?
10   A.   I do not.
11   Q.   And you did not attend any of the training sessions where
12   these slides were presented to the Task Force 51 troops; is
13   that correct?
14   A.   That's correct.
15   Q.   You're not aware of any transcripts or recordings that
16   show what was said during the training sessions?
17   A.   Correct.
18   Q.   So apart from what's included in these slides, you do not
19   know what information, if any, was provided to the troops
20   during the training sessions?
21   A.   Correct.
22   Q.   If you could please turn to what's been marked as
23   page DEFS00001100, and we'll publish that page to the screen in
24   front of you.
25   A.   Okay.  I'm on the page, ma'am.
```

HARRINGTON - DIRECT / REILLEY

1  Q.   All right.  And do you recognize this training slide?

2  A.   Yes, ma'am.

3  Q.   At the top of the page, it says "PCA," and that refers to

4  the Posse Comitatus Act; correct?

5  A.   Yes, ma'am.

6  Q.   And the slide goes on to read [as read]:

7           "PCA prohibits active direct pursuit, arrest,

8       apprehension, search and seizure, security patrols,

9       traffic control, crowd control, riot control,

10      evidence collection, and interrogation."

11 A.   Yes, ma'am.

12         THE COURT:  One moment, please.

13      Lashanda, it's not on the screen.

14      Is it on the screen?  Is the audience able to see it?  No.

15         THE COURTROOM DEPUTY:  Noel has it.  The tech person

16 will need to display it.

17         THE COURT:  The tech.  Okay.  Can you explain to --

18         THE COURTROOM DEPUTY:  We tested on Thursday, so he

19 just needs to publish.

20         THE COURT:  Okay.  Let's wait just a minute because

21 you're going through these, and I think it's useful for

22 everybody to be able to see the exhibit.

23         MS. REILLEY:  Thank you, Your Honor.

24         THE COURT:  So let's wait till your tech person...

25                    (Pause in proceedings.)

A135

HARRINGTON - DIRECT / REILLEY

```
 1              THE COURT:  It's very important to have a tech person
 2    under the age of 50.
 3                        (Pause in proceedings.)
 4              THE COURT:  All right.  I now see it on the screen.
 5    BY MS. REILLEY:
 6    Q.   Mr. Harrington, do you see that?
 7              THE COURT:  Can you see it as well?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  Okay.  Thank you.
10    BY MS. REILLEY:
11    Q.   All right.  And the page that's shown on the screen in
12    front of you, that is the same document we were just
13    discussing; is that correct?
14    A.   Yes, ma'am.
15    Q.   Thank you.
16         While he was the commander of Task Force 51 with respect
17    to the deployment to Los Angeles, Major General Sherman made it
18    very clear that the troops were not to impede vehicle or
19    pedestrian traffic; is that right?
20    A.   Yes, ma'am.
21    Q.   And that's because impeding vehicle or pedestrian traffic
22    is a law enforcement function?
23    A.   Yes, ma'am.
24    Q.   And the troops were told that they were not allowed to
25    block public roads under the Posse Comitatus Act?
```

A136

HARRINGTON - DIRECT / REILLEY

```
 1    A.   Yes, ma'am.

 2    Q.   Task Force 51 troops were trained that they could detain

 3    civilians, though; is that correct?

 4    A.   Yes, ma'am.

 5    Q.   But there's no scenario that you can conceive of where a

 6    Task Force 51 soldier would be able to detain a civilian who is

 7    not committing any criminal act without violating Posse

 8    Comitatus; is that right?

 9    A.   No, ma'am.  I do not agree with that statement.

10    Q.   All right.  You gave a deposition in this matter two weeks

11    ago.  Do you recall that testimony from earlier?

12    A.   Yes, ma'am.

13    Q.   All right.  If you could, please, turn to Volume 4 of the

14    binder.  If you could please turn to Tab 98.

15         Do you recognize this as the transcript of the deposition

16    that you gave in this matter?

17    A.   (Witness examines document.)  Yes, ma'am.

18    Q.   When you were deposed in this matter, you gave testimony

19    under oath; correct?

20    A.   Yes, ma'am.

21    Q.   And as part of that oath, you swore to tell the truth as

22    completely and accurately as you could; right?

23    A.   Yes, ma'am.

24    Q.   And after the deposition, you had a chance to review your

25    transcript and make any changes to it?
```

HARRINGTON - DIRECT / REILLEY

1    **A.**   Yes, ma'am.

2    **Q.**   Then you signed the transcript under oath; is that

3    correct?

4    **A.**   Yes, ma'am.

5    **Q.**   Could you please turn to page 177 of your deposition.  Let

6    me know when you're at that page.

7    **A.**   (Witness examines document.)  Okay.  I'm there, ma'am.

8              **MS. REILLEY:**  May I have one moment, Your Honor.

9              **THE COURT:**  Yes.

10                        (Pause in proceedings.)

11   **BY MS. REILLEY:**

12   **Q.**   All right.  And do you recall at your deposition when I

13   asked you [as read]:

14             "Can you conceive of any scenario where a

15        Task Force 51 soldier would be able to temporarily

16        detain a civilian who is not committing any criminal

17        act without violating Posse Comitatus?"

18             **THE COURT:**  Well, are you referring to a particular

19   page?  Are you referring to a particular page?

20             **MS. REILLEY:**  Yes, Your Honor.  We are pulling that

21   cite.

22             **THE COURT:**  Okay.  Let's wait a moment and see if we

23   can find the page.

24        If not, you can return to this; but I think in fairness to

25   the witness, the witness should be able to look at --

A138

HARRINGTON - DIRECT / REILLEY

1    MS. REILLEY:  Yes, Your Honor, and I apologize for the

2  delay.

3    THE COURT:  That's all right.

4    MS. REILLEY:  We're pulling the cite now.

5  BY MS. REILLEY:

6  Q.  Oh, if I could please have you turn to page 179, I

7  apologize, of your deposition transcript, and if I could direct

8  your attention to line 18.

9    Do you see where I asked you [as read]:

10   "Can you conceive --

11   And this is, again, based on your training and experience

12  as a deputy chief of staff.

13   [As read]:

14   "Can you conceive of any scenario where a

15   Task Force 51 soldier would be able to temporarily

16   detain a civilian who is not committing any criminal

17   act without violating Posse Comitatus?"

18   Do you see where I asked you that question?

19  A.  Yes, ma'am.

20  Q.  If you could please turn to the following page, page 180,

21  of your deposition.

22   Do you see at line 6 where you responded [as read]:

23   "No, ma'am"?

24  A.  (Witness examines document.)  Yes, ma'am.

25  Q.  And you did not change that testimony when you reviewed

HARRINGTON - DIRECT / REILLEY

1   and signed your transcript; correct?

2   **A.**   Yes, ma'am.

3   **Q.**   During the deployment to Los Angeles, Task Force 51

4   responded to requests for assistance from federal law

5   enforcement agencies; is that right?

6   **A.**   Correct.

7   **Q.**   And that included requests for assistance from the

8   Department of Homeland Security and its subdivisions?

9   **A.**   Yes, ma'am.

10  **Q.**   During the deployment, Task Force 51 received a total of

11  64 requests for assistance from federal law enforcement

12  agencies; is that right?

13  **A.**   Yes, ma'am.

14  **Q.**   Some of those requests for assistance involved

15  Task Force 51 guarding federal buildings?

16  **A.**   Protecting federal buildings, yes, ma'am.

17  **Q.**   And many of the other requests for assistance asked for

18  Task Force 51 troops to provide force protection to federal law

19  enforcement agents while they were conducting search warrant

20  operations?

21  **A.**   While they were providing -- while they were executing

22  federal functions, yes, ma'am.

23  **Q.**   All right.  And those federal functions were search

24  warrant operations?

25  **A.**   Those are some of the federal functions.

HARRINGTON - DIRECT / REILLEY

```
 1   Q.   All right.  And Task Force 51 approved and responded to
 2   the majority of the 64 requests for assistance it received;
 3   correct?
 4   A.   Yes, ma'am.
 5   Q.   And whenever they responded to a request for assistance
 6   during the deployment, Task Force 51 troops carried weapons
 7   with live ammunition in their magazines?
 8   A.   Yes, ma'am.
 9   Q.   One of the requests for assistance asked for Task Force 51
10   troops to be involved in a law enforcement operation near
11   Mecca, California; is that correct?
12   A.   Yes, ma'am.
13   Q.   That law enforcement operation took place in mid-June?
14   A.   Yes, ma'am.
15   Q.   And that law enforcement operation involved a marijuana
16   farm; is that correct?
17   A.   Yes, ma'am.
18   Q.   Task Force 51 approved and responded to the request for
19   assistance related to the Mecca operation; is that right?
20   A.   Yes, ma'am.
21   Q.   Approximately 300 Task Force 51 troops participated in
22   that operation?
23   A.   Correct, ma'am.
24   Q.   And approximately 20 of Task Force 51's military vehicles
25   were also involved in the Mecca operation; correct?
```

HARRINGTON - DIRECT / REILLEY

1    **A.**    I don't know the number of vehicles, but probably a little

2    more than that to carry 300 troops.

3    **Q.**    All right.  So probably 20 or more vehicles; correct?

4    **A.**    Yes, ma'am.

5    **Q.**    And those military vehicles were Humvees?

6    **A.**    Well, they were Humvees; LMTVs, which are large cargo

7    vehicles; and probably JLTVs, which is -- you know, it's --

8    it's an updated version.  It's kind of like a Humvee but it's

9    slightly larger.

10   **Q.**    If you know, could you please state the full term of the

11   acronyms you just gave in your prior response?

12   **A.**    Oh.  Let's see.  LMTV is a light medium transportation

13   vehicle.  You know, it's a cargo vehicle.  It can also carry

14   soldiers.

15        JLTV, I think it stands for joint land tactical vehicle.

16   Some- -- you know, something to that effect.  It's -- it

17   carries a handful of soldiers in it.

18   **Q.**    During the Mecca operation, federal agents did not require

19   any force protection from the Task Force 51 troops; is that

20   right?

21   **A.**    Correct, ma'am.

22   **Q.**    And there was also a request for assistance for

23   Task Force 51 troops to be involved in a law enforcement

24   operation in Camarillo, California; is that right?

25   **A.**    Yes, ma'am.

HARRINGTON - DIRECT / REILLEY

1  Q.   That law enforcement operation also involved a marijuana

2  farm?

3  A.   Yes, ma'am.

4  Q.   And Task Force 51 approved and responded to that request

5  for assistance; correct?

6  A.   Well, I think it was in the approval process and then the

7  requesting federal agency canceled the request.

8  Q.   All right.  Was there ever an occasion where Task Force 51

9  troops participated in a law enforcement operation in

10 Camarillo?

11 A.   Yes, ma'am.

12 Q.   All right.  That was not in response to a standalone

13 request for assistance?  That's your testimony?

14 A.   Correct.

15 Q.   All right.  Was that -- were the Task Force 51 troops'

16 involvement in that operation as a mobile response force?

17 A.   Yes, ma'am.

18 Q.   All right.  And there were approximately 80 Task Force 51

19 soldiers who were on site in Camarillo during that operation;

20 correct?

21 A.   Yes, ma'am.

22 Q.   And Task Force 51 military vehicles were also involved in

23 the Camarillo operation?

24 A.   Yes, ma'am.

25 Q.   Those military vehicles were Humvees and transportation

**HARRINGTON - DIRECT / REILLEY**

1    vehicles?

2    **A.**   Yes, ma'am.

3    **Q.**   There's also a request for assistance that asked

4    Task Force 51 troops to be involved in a law enforcement

5    operation in Los Angeles' MacArthur Park on July 7th; is that

6    correct?

7    **A.**   Yes, ma'am.

8    **Q.**   And Task Force 51 approved and responded to that request

9    for assistance?

10    **A.**   Well, we -- Task Force 51 did not approve that one.  That

11    one went up to a higher level authority for approval.

12    **Q.**   Did the Secretary of Defense ultimately approve the

13    MacArthur Park operation?

14    **A.**   I believe so, ma'am.

15    **Q.**   So Task Force 51 troops did participate in the

16    MacArthur Park operation?

17    **A.**   Yes, ma'am.

18    **Q.**   Thank you.

19    And there were approximately 80 Task Force 51 troops who

20    participated in the MacArthur Park operation; correct?

21    **A.**   Yes, ma'am.

22    **Q.**   And military vehicles from Task Force 51 were involved in

23    that operation as well?

24    **A.**   Yes, ma'am.

25    **Q.**   And those were Humvees and tactical vehicles?

HARRINGTON - DIRECT / REILLEY

```
 1   A.   Yes, ma'am.

 2        (Trial Exhibit 28 received in evidence.)

 3   BY MS. REILLEY:

 4   Q.   All right.  If you could please turn to Tab 28 of Volume 1

 5   of the binder in front of you.  This has been previously

 6   admitted as Exhibit 28.

 7   A.   (Witness examines document.)

 8   Q.   And, Mr. Harrington --

 9        THE COURT:  Let's see if we can get it up on the

10   screen.

11        MS. REILLEY:  We were going to -- Your Honor, we were

12   going to publish two pages of the document.

13        THE COURT:  Okay.  So identify those, and they can --

14   they can go on the screen.

15        MS. REILLEY:  Thank you, Your Honor.

16   BY MS. REILLEY:

17   Q.   So the first page we were going to publish is 2875.

18        Mr. Harrington, first I want to ask you about all of the

19   documents that -- pages that are included within Exhibit 28,

20   and that's labeled 2872 through 2893.  Do you recognize those

21   documents?

22   A.   Yes, ma'am.

23   Q.   These are Task Force 51 documents related to the July 7th

24   MacArthur Park operation; correct?

25   A.   Yes, ma'am.
```

37

HARRINGTON - DIRECT / REILLEY

1  Q.   All right.  If I could please have you turn to page 2875,

2  and this has also been published on the screen in front of you.

3       And, Mr. Harrington, this page is entitled "Operation

4  Excalibur Executive Summary."  Does Operation Excalibur refer

5  to the MacArthur Park operation?

6  A.   It does, ma'am.

7  Q.   Could you please read aloud the paragraph that's written

8  under the header "Mission"?  And if it's helpful, we've zoomed

9  in on that portion on the screen in front of you.

10 A.   Okay.  It says [as read]:

11          "On Order 118 CAF Squadron provides static

12       interagency site protection, mounted mobile security,

13       and joint force land component command reserve

14       support to Customs and Border Patrol and supporting

15       federal agencies whose intent at MacArthur Park is to

16       demonstrate, through a show of presence, the capacity

17       and freedom of maneuver of federal law enforcement

18       within the Los Angeles joint operations area."

19 Q.   That is your understanding of the mission of the

20 MacArthur Park operation; correct?

21 A.   Well, I don't know what the lead federal agencies' intent

22 was.  That's what -- this is what our slide says; but, yes,

23 ma'am.

24 Q.   And you don't have any reason to dispute the description

25 you just read; correct?

HARRINGTON - DIRECT / REILLEY

1    A.   No, ma'am.

2    Q.   If you could please read aloud the section that's written

3    under the header "Purpose," and we will zoom in on that section

4    on the screen in front of you.

5    A.   Okay.

6         [As read]:

7              "The purpose of this operation is to enable and

8         protect the execution of joint federal law

9         enforcement missions in a high-visibility urban

10        environment while preserving public safety and

11        demonstrating federal reach and presence."

12   Q.   That is your understanding of the purpose of the

13   MacArthur Park operation; correct?

14   A.   Yes, ma'am.

15   Q.   If you could please turn to page 2892 of the document?

16   And we will publish that page to the screen now.

17        Mr. Harrington, that page is entitled "Operation Excalibur

18   Executive Summary Risk Assessment."  Do you see that's written?

19   A.   Yes, ma'am.

20   Q.   And you recognize this page; correct?

21   A.   Yes, ma'am.

22   Q.   Do you see where -- near the bottom of the page, where it

23   says "Risk of inaction low"?

24   A.   Yes, ma'am.

25   Q.   Could you please read aloud the four lines immediately

HARRINGTON - DIRECT / REILLEY

1   below the statement "Risk of inaction low"?

2   **A.**   [As read]:

3           "Current intelligence does not indicate a

4       high-value target or threat to federal functions at

5       this location.  No indication that failure to act

6       would result in loss of life or significant property

7       damage.  Expected law enforcement action is limited

8       in scale, with few detainees anticipated and no

9       high-risk warrants involved.  Operation not informed

10      by time-sensitive intelligence or part of an

11      integrated targeting cycle."

12  **Q.**   You watched the MacArthur Park operation live on

13  television; is that right?

14  **A.**   Yes, ma'am.

15  **Q.**   And other members of Task Force 51 watched the broadcast

16  with you?

17  **A.**   Yes, ma'am.

18  **Q.**   When you watched the broadcast, you saw that the federal

19  agents in the park walked through the park uninhibited;

20  correct?

21  **A.**   Yes, ma'am.

22  **Q.**   And it wasn't necessary for Task Force 51 troops to

23  provide any force protection during the MacArthur Park

24  operation; is that right?

25  **A.**   Correct, ma'am.

HARRINGTON - DIRECT / REILLEY

1   Q.   And federal law enforcement agents ultimately didn't end

2   up making any arrests during the MacArthur Park operation; is

3   that right?

4   A.   Correct, ma'am.

5   Q.   Mr. Harrington, do you currently have any involvement with

6   the Los Angeles deployment?

7   A.   What do you mean?  I don't understand the question.

8   Q.   As of the time I took your deposition, you were still

9   deployed to Los Angeles; correct?

10  A.   Yes, ma'am.

11  Q.   Are you still deployed to Los Angeles?

12  A.   No, ma'am.

13  Q.   When did your involvement with the deployment in

14  Los Angeles end?

15  A.   Friday the 8th of August.

16  Q.   How did you learn that your involvement in the deployment

17  was ending on August 8th?

18  A.   I was told that I was coming here.

19  Q.   After the trial in this matter concludes, are you going to

20  return to Los Angeles?

21  A.   No, ma'am.

22  Q.   Will you be going back to Fort Sam Houston?

23  A.   I will.

24  Q.   All right.  Do you have any knowledge of what the

25  remaining federalized National Guard soldiers in Los Angeles

HARRINGTON - DIRECT / REILLEY

```
1    are doing?

2    A.   Yes, ma'am.

3    Q.   What is your understanding of what those federalized

4    troops are doing?

5    A.   They're supporting the requests for assistance from the

6    lead federal agency.

7    Q.   So federalized National Guard soldiers are continuing to

8    assist federal law enforcement agents in Southern California;

9    is that correct?

10   A.   Well, they're -- they are still supporting requests for

11   assistance, yes, ma'am.

12   Q.   At the time that your involvement in the deployment ended

13   on August 8th, how many requests for assistance was

14   Task Force 51 continuing to respond to?

15   A.   Four, ma'am.

16   Q.   Are you aware that this morning Secretary of Defense

17   Hegseth announced the deployment of National Guard troops in

18   Washington, D.C.?

19           MR. LOWENSTEIN:  Objection.  Scope.  Relevance.

20           THE COURT:  Well, the relevance, I would assume, is

21   the likelihood -- is whether or not it's likely that this

22   deployment or kind of deployment will occur in the future.  I

23   mean, that's one of the tests for injunctive relief; right?

24   Right?

25           MR. LOWENSTEIN:  That's correct.
```

HARRINGTON - DIRECT / REILLEY

1    **THE COURT:**  Right.  So it's relevant to -- present

2  conduct may be relevant on that issue.  The extent to which

3  it's relevant, how it's the same, how it's different, those are

4  all factors to be considered obviously, but I think it's

5  relevant.  So on that basis, the objection is overruled.

6    **MS. REILLEY:**  Thank you, Your Honor.

7  BY MS. REILLEY:

8  **Q.**  And, Mr. Harrington, did -- you testified that you are

9  aware of that announcement that was made this morning?

10  **A.**  No, I was not aware.

11  **Q.**  All right.  Secretary Hegseth said in his announcement

12  that the D.C. National Guard will, quote, "stand with their law

13  enforcement partners," closed quote, and that, quote, "we did

14  the same thing in Los Angeles," closed quote.  Did you hear

15  that statement?

16  **A.**  No, ma'am.

17    **MR. LOWENSTEIN:**  Objection.  Foundation.  He wasn't

18  aware of this.

19    **THE COURT:**  Well, the question is did he -- I assume

20  if he's unaware of it, he didn't hear it.  I mean, that

21  generally is the case.

22    Did he say he didn't hear the announcement?  Somebody may

23  have said something to him and so forth.  So I'll allow the

24  question is he aware of it; however, the fact that the

25  statement is made or what was contained in the statement is not

HARRINGTON - CROSS / LOWENSTEIN

1    evidence in and of itself by virtue of the question that's

2    asked.

3        So to the extent it may assume facts not in evidence, it

4    would be granted, but I don't have the statement in front of me

5    to know whether it's attributed to the Secretary or not.  Okay?

6    Satisfied?

7            MR. LOWENSTEIN:  Yes.  Thank you.

8            THE COURT:  Great.

9        Go ahead.

10   BY MS. REILLEY:

11   Q.   Mr. Harrington, you said that you were not aware of that

12   statement that Secretary Hegseth made this morning?

13   A.   Correct, ma'am.

14   Q.   Do you have any involvement with the deployment of

15   National Guard troops in the D.C. area?

16   A.   No, ma'am.

17           MS. REILLEY:  At this time, plaintiffs have no further

18   questions for Mr. Harrington.

19           THE COURT:  Any cross?

20           MR. LOWENSTEIN:  Yes, Your Honor.

21           THE COURT:  Okay.

22                   CROSS-EXAMINATION

23   BY MR. LOWENSTEIN:

24   Q.   Jody Lowenstein for defendants.

25       Good morning, Mr. Harrington.

HARRINGTON - CROSS / LOWENSTEIN

```
 1    A.    Good morning, sir.
 2    Q.    I just have a few questions for you.
 3          You're testifying here today based on your personal
 4    knowledge; correct?
 5    A.    Yes, sir.
 6    Q.    You've testified a bit about your background earlier.  Do
 7    you recall that?
 8    A.    Yes, sir.
 9    Q.    Are you a lawyer?
10    A.    No, sir.
11    Q.    Do you have a law degree?
12    A.    No, sir.
13    Q.    Your understanding of the Posse Comitatus Act is not
14    informed by any specialized legal training; is that right?
15    A.    Correct, sir.
16    Q.    Do you recall testifying just a moment ago about
17    Task Force 51's involvement in the Mecca operation?
18    A.    Yes, sir.
19    Q.    And you testified in response to counsel's question that
20    they were involved in that operation.  Do you recall that?
21    A.    Yes, sir.
22    Q.    Can you explain what you mean by "they were involved in
23    that operation"?
24    A.    Well, they were asked to provide force protection for the
25    agents while they were performing their federal functions.  The
```

**HARRINGTON - CROSS / LOWENSTEIN**

1  soldiers actually did not engage in any activity other than

2  they were located near the facility, several hundred yards

3  away.  There was actually a canal between where the soldiers

4  were and the facility that the agents were performing their law

5  enforcement functions.

6      Soldiers had no interactions with any civilians.  They

7  were -- they were near the facility, did not go in the

8  facility, did not interact with any civilians.  So they were

9  there to -- you know, prepared to provide force protection but

10  did not actually get employed to do that.

11  **Q.**  In your view, did Task -- any Task Force 51 troops perform

12  law enforcement functions at the Mecca operation?

13  **A.**  No, sir.

14  **Q.**  Do you recall receiving questions regarding an operation

15  in Camarillo?

16  **A.**  Yes, sir.

17  **Q.**  And in response to counsel's questions, you testified that

18  Task Force 51 troops were involved in and participated in that

19  operation.  Do you recall testifying to that?

20  **A.**  Yes, sir.

21  **Q.**  Can you explain what you mean when you testified that

22  Task Force 51 was involved in and participated in the Camarillo

23  operation?

24  **A.**  Yes, sir.  So the federal agents, CBP, and I think there

25  was ICE and ERO as well, were already executing their law

HARRINGTON - CROSS / LOWENSTEIN

1   enforcement functions at the facility in Camarillo.  And as I
2   stated before, they had canceled the request for assistance to
3   Task Force 51, which was RFA Number 48.  They canceled it.
4       And as they were executing the operation, crowds formed on
5   the roads near the facility, so we received a request for a
6   mobile response force to provide force protection of those
7   agents.
8   Q.  Do you recall or do you know what kind of conduct those
9   crowds were engaging in at the Camarillo operation?
10  A.   Yes, sir.  They were -- they were throwing rocks at the
11  agents.  They were throwing rocks at the vehicles.  They had
12  damaged the vehicles.  They had built -- they had taken
13  sections of garden hose and run nails through the hoses as
14  spike strips, and they were popping the tires of the federal
15  law enforcement vehicles.  So they were -- it was an unruly
16  crowd.
17  Q.  Did Task Force -- any Task Force 51 troops engage in any
18  law enforcement functions during the Camarillo operation?
19  A.   No, sir.
20  Q.  Do you recall receiving questions regarding the
21  MacArthur Park operation?
22  A.   Yes, sir.
23  Q.  In response to counsel's questions, do you recall
24  testifying that Task Force 51 participated in that operation?
25  A.   Yes, sir.

HARRINGTON - REDIRECT / REILLEY

1   **Q.**   Can you please explain what you meant by Task Force 51

2   participated in the MacArthur Park operation?

3   **A.**   So we had approximately 80 soldiers, I think it was 19

4   vehicles, and they were there to provide force protection of

5   the federal agents who were -- they had established four

6   separate traffic control points around the park and two

7   separate blocking positions. Our soldiers were near those

8   positions to provide force protection of the agents.

9       And, again, they were not employed, did not interact with

10   the civilians at any of those locations, and the operation took

11   about 20 minutes total. It actually took more time to drive

12   there than it took the agents to walk through the park. And

13   then our soldiers returned back to joint force training base

14   Los Alamitos around noon that day.

15   **Q.**   Did Task Force 51 -- did any Task Force 51 troops engage

16   in any law enforcement functions during the MacArthur Park

17   operation?

18   **A.**   No, sir.

19       **MR. LOWENSTEIN:** No further questions, Your Honor, for

20   the witness.

21       **THE COURT:** Okay. Redirect or recross?

22       **MS. REILLEY:** Thank you, Your Honor.

23                 **REDIRECT EXAMINATION**

24   BY MS. REILLEY:

25   **Q.**   Mr. Harrington, Mr. Lowenstein just asked you a moment ago

HARRINGTON - REDIRECT / REILLEY

1  about your knowledge of the activities that troops participated

2  in during the Mecca operation.  Do you recall that testimony?

3  A.   Yes, ma'am.

4  Q.   You were not present at the Mecca operation; correct?

5  A.   Correct.

6  Q.   So any information that you have about activities

7  performed during that operation came from the units who were

8  present; is that right?

9  A.   Yes, ma'am.

10  Q.   All right.  And as to the Camarillo operation, you also

11  were not present for that operation; correct?

12  A.   Correct.

13  Q.   So any information that you have about the activities that

14  were engaged in at that operation you received from the troops;

15  correct?

16  A.   Not all of it, ma'am.  Some of it, received from reports

17  from the unit.  The rest of the information, we watched it live

18  on TV in the Operations Center.

19  Q.   All right.  And as to MacArthur Park, the only information

20  that you have about what actually happened on the ground during

21  MacArthur Park came from watching the news broadcasts and

22  hearing from the troops who were present; correct?

23  A.   No, ma'am.  There was -- we had the Deputy Secretary of

24  DHS in our Operations Center who had a feed to -- so an

25  aircraft that also showed footage of the operation.

**PROCEEDINGS**

1  **Q.**   Was that a DHS aircraft?

2  **A.**   Yes, ma'am.

3          **MS. REILLEY:**  All right.  No further questions.

4          **THE COURT:**  Anything further?

5          **MR. LOWENSTEIN:**  Nothing further, Your Honor.

6          **THE COURT:**  Thank you.  You're excused.  Thank you for

7  coming.

8                        (Witness excused.)

9          **THE COURT:**  Call your next witness.

10         **MS. REILLEY:**  Thank you, Your Honor.

11     Plaintiffs call Major General Scott Sherman.

12         **THE COURT:**  Okay.

13   (Witness enters the courtroom and steps forward to be sworn.)

14         **THE COURTROOM DEPUTY:**  Good morning.

15         **THE WITNESS:**  Good morning.

16                  **SCOTT MARSHALL SHERMAN**,

17  called as a witness for the Plaintiffs, having been duly sworn,

18  testified as follows:

19         **THE WITNESS:**  I do.

20         **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

21     Please state your full name for the record and spell your

22  last name.

23         **THE WITNESS:**  Sure.  Scott Marshall Sherman, last

24  spelling, S-h-e-r-m-a-n.

25         **THE COURTROOM DEPUTY:**  Thank you.

**A158**

SHERMAN - DIRECT / REILLEY

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | **BY MS. REILLEY:** |
| 3 | **Q.** Good morning, Major General Sherman. |
| 4 | **A.** Good morning. |
| 5 | **Q.** Do you recall giving a deposition in this matter last |
| 6 | Wednesday? |
| 7 | **A.** I do. |
| 8 | **Q.** And you remember me from that deposition, don't you? |
| 9 | **A.** I do. |
| 10 | **Q.** Nice to see you again. |
| 11 | **A.** Nice to see you. |
| 12 | **Q.** Would you please state your rank and current assignment |
| 13 | with the U.S. Army? |
| 14 | **A.** Sure. I'm a major general in the United States Army. I |
| 15 | am the deputy commanding general support for U.S. Army North, |
| 16 | and I'm also the commander of Task Force 51, which is the |
| 17 | contingency command post for U.S. Army North. |
| 18 | **Q.** You've held these positions for approximately two years; |
| 19 | is that correct? |
| 20 | **A.** That's correct. Since September of 2023. |
| 21 | **Q.** For how many years have you been a soldier in the |
| 22 | U.S. Army? |
| 23 | **A.** I've been a soldier for 33 years. |
| 24 | **Q.** In June of this year, you deployed to Los Angeles with |
| 25 | Task Force 51; correct? |

**SHERMAN - DIRECT / REILLEY**

 1  **A.**   Correct.

 2  **Q.**   And from June 9th until June 10th, you served as the

 3  commanding general of Task Force 51 with respect to that

 4  deployment; is that right?

 5  **A.**   That is correct.

 6  **Q.**   And today if I use the phrase "Task Force 51 troops," do

 7  you understand that I'm referring to the federalized California

 8  National Guard soldiers and Marines who were under

 9  Task Force 51's control and command during that deployment?

10  **A.**   I do.

11  **Q.**   As commanding general, is it true that one of your

12  responsibilities during the deployment was to ensure

13  Task Force 51 troops were properly trained?

14  **A.**   That is correct.

15  **Q.**   And another of your responsibilities was to ensure

16  Task Force 51 troops were prepared for their operations?

17  **A.**   Correct.

18  **Q.**   You were also responsible for ensuring Task Force 51

19  troops followed the law; is that right?

20  **A.**   Correct.

21  **Q.**   You never personally accompanied any Task Force 51 troops

22  during any field operations; is that right?

23  **A.**   That's correct.  Only at -- only at the positions where we

24  were doing protection of federal property.

25  **Q.**   All right.  So in any operations that took place off of

SHERMAN - DIRECT / REILLEY

1   federal property, you did not personally attend; is that fair?

2   A.   That's correct.

3   Q.   All right.  You would receive briefings on the field

4   operations after they took place, though; is that right?

5   A.   Before and after, yes, that's correct.

6   Q.   All right.  So your knowledge of what took place during

7   Task Force 51's field operations was received from the

8   briefings you received before and after the fact; correct?

9   A.   Correct, and reports from commanders.

10  Q.   All right.  Prior to deploying to Los Angeles in June, you

11  were aware of the Posse Comitatus Act; correct?

12  A.   Correct.

13  Q.   And your knowledge of the Posse Comitatus Act is based on

14  trainings and legal guidance you've received throughout your

15  33 years as a soldier?

16  A.   That is correct.

17  Q.   And as commanding general, it's important that you have a

18  clear understanding of the Posse Comitatus Act so you can

19  ensure that your troops are complying with it; is that right?

20  A.   That is correct.

21  Q.   Based on your training and experience, it's your

22  understanding that Task Force 51 troops who are deployed to

23  Los Angeles are subject to the Posse Comitatus Act; right?

24  A.   That is correct.

25  Q.   And based on your training and experience, it's your

SHERMAN - DIRECT / REILLEY

1    understanding that because Task Force 51 troops are subject to

2    the Posse Comitatus Act, they cannot engage in civil law

3    enforcement activities; correct?

4    A.    That is correct.

5          (Trial Exhibit 15 received in evidence.)

6    BY MS. REILLEY:

7    Q.    If you could please turn to Tab 15 of the binder that's in

8    front of you.

9    A.    (Witness examines document.)

10   Q.    And we are going to publish page 2532 of this document to

11   the -- to the screen.

12         THE COURT:  All right.

13   BY MS. REILLEY:

14   Q.    Major General Sherman, do you recognize the document at

15   Tab 15?  And this has been previously admitted as Exhibit 15.

16   A.    I do recognize it.

17   Q.    And this is a memorandum from Undersecretary of Defense

18   Elbridge Colby to Secretary of Defense Hegseth; is that right?

19   A.    That is correct.

20   Q.    And this memorandum includes the Undersecretary of

21   Defense's assessment of what Task Force 51 soldiers and Marines

22   could legally do during the deployment to Los Angeles?

23   A.    That was in line with the Posse Comitatus Act, that is

24   correct.

25   Q.    And you reviewed this memorandum during the deployment in

SHERMAN - DIRECT / REILLEY

```
 1   or around mid-June?

 2   A.   That is correct.

 3   Q.   And if you could please turn to page 2532, and this will

 4   be published to the screen.

 5   A.   (Witness examines document.)  I'm there.  I'm sorry.

 6   Q.   It's all right.  We're just getting it queued up on the --

 7   A.   Okay.

 8   Q.   -- on the screen.

 9                      (Pause in proceedings.)

10        THE COURT:  With technology, one has to have a great

11   deal of hope.  You see, we hope it will arrive in due course,

12   but...

13        MS. REILLEY:  Yes, Your Honor.

14                      (Pause in proceedings.)

15   BY MS. REILLEY:

16   Q.   Major General Sherman --

17        THE COURT:  Let's just wait a second and see.  He

18   seems to be on to something here.  We can also use the Elmo.

19                      (Pause in proceedings.)

20        MS. REILLEY:  Your Honor, I understand from our team

21   that there's an HDMI disconnect with the --

22        THE COURT:  Well, what about the Elmo?  Will that

23   work?

24        THE COURTROOM DEPUTY:  Do you have a hard copy that

25   you can show?
```

SHERMAN - DIRECT / REILLEY

```
 1              THE COURT:  Or we could take a recess if that's --
 2              MS. REILLEY:  If we could take a brief recess to
 3    attempt to address --
 4              THE COURT:  Yeah, okay.  We'll be in recess for
 5    ten minutes.
 6              MS. REILLEY:  Thank you, Your Honor.
 7              THE COURT:  Okay.  Thank you.
 8                   (Recess taken at 11:03 a.m.)
 9                 (Proceedings resumed at 11:17 a.m.)
10              THE COURT:  The record will show all parties are
11    present.
12         My understanding is the federal government is able to show
13    these exhibits; is that correct?
14              MS. LIN:  Yes, Your Honor.
15              THE COURT:  So I want to thank the federal government
16    for accommodating the state government.  It's a wonderful
17    example of federal-state cooperation.
18                        (Laughter.)
19              THE COURT:  Thank you so much, and we'll proceed.
20              MS. REILLEY:  Thank you, Your Honor.
21    BY MS. REILLEY:
22    Q.   And we will publish at this time page 2532 of Exhibit 15.
23         Major General Sherman, do you see the header in this
24    document that reads "Detention/Arrest Authority"?
25    A.   I do.
```

SHERMAN - DIRECT / REILLEY

```
 1    Q.   Can you please read aloud the paragraph immediately below
 2    that header?
 3    A.   [As read]:
 4              "CUI" -- which is just unclassified material
 5         but -- "DHS has requested service members' direct
 6         assistance in detaining and/or arresting individuals
 7         observed to be committing a crime.  Use of military
 8         personnel in a Title X duty status to enforce the
 9         law, such in the arrest or detention of civilians for
10         violations of the federal criminal code, would be a
11         violation of the Posse Comitatus Act, 18 U.S. Code
12         paragraph 1385, which prohibits the use of military
13         for domestic law enforcement purposes."
14    Q.   You agreed with this portion of the Undersecretary's
15    memorandum when you read it in June; correct?
16    A.   I agree with part of it.  It's not the full document but,
17    yes.
18    Q.   All right.  But as to the portion you just read, you agree
19    with that; correct?
20    A.   I would.
21    Q.   At the outset of the deployment, did you ever hear from
22    any source that there was a rebellion in Los Angeles?
23    A.   No, not a rebellion, but there were there people that were
24    preventing federal officials and federal law enforcement from
25    doing their job and also threatening federal buildings, that is
```

SHERMAN - DIRECT / REILLEY

1    correct.

2    **Q.**    But no one that you spoke with from the Department of

3    Defense ever used the term "rebellion"; correct?

4    **A.**    That is correct.

5    **Q.**    All right.  And even though the Posse Comitatus Act

6    applies to Task Force 51 troops, you also believe that there is

7    an exception to the Posse Comitatus Act that also applies to

8    the troops; correct?

9    **A.**    Through my training -- I'm not a lawyer, but through my

10   training I've gotten that there are constitutional exceptions.

11   **Q.**    And specifically with respect to this deployment, it's

12   your understanding that Task Force 51 troops are allowed to

13   protect federal property and personnel as they do their federal

14   law enforcement functions; is that correct?

15   **A.**    That is correct, in accordance with the second paragraph

16   here, under detention and arrest authority.

17   **Q.**    All right.  And you learned about this exception by

18   reading the operations order that was issued by the U.S. Army

19   Northern Command at the outset of the deployment; is that

20   right?

21   **A.**    And also the training that we received on the standing

22   rules on the use of force, which were provided by our legal

23   personnel.

24          **MS. REILLEY:**  All right.  If you could please turn to

25   Tab 5 of the binder in front of you.  This has been previously

**SHERMAN - DIRECT / REILLEY**

```
 1    introduced as Exhibit 5.

 2          (Trial Exhibit 5 received in evidence.)

 3          THE WITNESS:  (Witness examines document.)

 4    BY MS. REILLEY:

 5    Q.   You recognize this document; correct?

 6    A.   Yes.  This is General Order Number 1 signed by Lieutenant

 7    General Allan Pepin, the commander of U.S. Army North.

 8    Q.   And it's your understanding that this order set forth the

 9    exception to the Posse Comitatus Act that applied to the Task

10    Force 51 troops?

11    A.   I don't know that to be fact.  I'd have to read it.

12    Q.   If you could please read it.

13    A.   Can you help me -- where it is?  This is a three-page

14    document.

15    Q.   You testified at your deposition that this general order

16    was the document that, in your view, set forth the exception to

17    the Posse Comitatus Act; correct?

18    A.   Well, this order is established.  Any General Order 1 is

19    your baseline personnel conduct that's expected of any

20    personnel, any DOD personnel that are under the command.

21    Q.   So it is your testimony that this General Order Number 1

22    does not set forth the exception to the Posse Comitatus Act

23    that applied to the troops in Los Angeles?

24    A.   This is more about Code of Conduct, personal Code of

25    Conduct, what they're allowed to do.  It talks about what we
```

**SHERMAN - DIRECT / REILLEY**

1   expected of them as far as what their -- what we expect of

2   soldiers to do, how they should be treating everybody, how they

3   should be treating anybody that they encounter.  And it talks

4   right here in 5(b) about follow and adhere to the standing

5   rules in the use of force.

6   Q.  Was there a different order that was issued with respect

7   to the Los Angeles deployment that you believe set forth the

8   exception to the Posse Comitatus Act that applied to the

9   troops?

10  A.  It was strictly briefed to them when they got the standing

11  rules on the use of force that is in line with the memorandum

12  that the Secretary signed to his guidance to the commander of

13  U.S. Northern Command that our mission was to protect federal

14  facilities, allowing federal personnel that were there and

15  federal law enforcement to do their job; and then outside

16  federal facilities, to support federal law enforcement strictly

17  to protect them to allow them to do their federal law

18  enforcement job.

19  Q.  And that exception that you just testified about, that was

20  written in Secretary Hegseth's memorandum at the outset of the

21  deployment?

22  A.  It's not written directly, but it is the guidance that we

23  were given.  It was -- it was discussed with the soldiers in

24  the standing rules and the use of force of why the Secretary's

25  memo and why their guidance is that they're allowed to protect

SHERMAN - DIRECT / REILLEY

1   federal facilities and then also protect federal law

2   enforcement as they do their federal law enforcement duties.

3   Q.   So you never saw the exception to the Posse Comitatus Act

4   that you just testified about written down in any of the

5   materials in this deployment; is that your testimony?

6   A.   It was written down in the standing rules on the use of

7   force brief that was given by our legal personnel that was

8   given to every soldier and Marine that went on the mission.

9   Q.   All right.  So other than those training slides, that was

10  the only place where this exception was written; correct?

11  A.   That is correct.

12  Q.   All right.  And under that exception, Task Force 51 troops

13  were trained that they could set security perimeters; is that

14  correct?

15  A.   They could set security perimeters around the federal

16  facility on the federal property if there was a crowd

17  demonstrating that was threatening the facility.  They could

18  get -- even with the federal law enforcement that was there in

19  the facility to protect the facility.

20       And then, the federal law enforcement, as they were doing

21  the federal law enforcement job, if they encountered any kind

22  of crowds or any kind of -- anyone or even a vehicle that was

23  presenting any kind of threat to them, they could get in front

24  of those personnel to protect them.

25  Q.   So it's your testimony that Task Force 51 troops were

**SHERMAN - DIRECT / REILLEY**

1    trained they could set security perimeters on federal property

2    if there was a threat; correct?

3    A.    Correct, and they could guard the property like they did

4    all the time they were there.

5    Q.    Was there any standardized definition of threat that was

6    used by Task Force 51?

7    A.    No.  It made a decision on the ground by both the -- if

8    you're talking about facilities that were guarded by the

9    Marines on the ground or by the commanders or their platoon

10   leaders even that were there on the ground, witnessing what was

11   happening in front of them.

12   Q.    So if the commander on the ground felt threatened, they

13   could order Task Force 51 troops to set a perimeter on federal

14   property; correct?

15   A.    That is correct, if they felt that they were threatened.

16   Q.    And directing your attention to field operations that took

17   place off federal property, Task Force 51 troops were trained

18   that they could set security perimeters off of federal

19   property; correct?

20   A.    Only to protect federal law enforcement, allowing them to

21   do their federal law enforcement job.

22   Q.    So, again, Task Force 51 troops could set security

23   perimeters off federal property as long as the commander on the

24   ground felt threatened; right?

25   A.    As long as there was a group there that was some kind of

SHERMAN - DIRECT / REILLEY

1   event happening that they felt there was a threat to the

2   federal law enforcement or a threat to the soldiers that were

3   there, correct.

4   Q.   But Task Force 51 didn't have any standardized definition

5   of what constituted a threat for purposes of forming a security

6   perimeter off of federal property; right?

7   A.   No.   That's within commander's guidance within -- they're

8   allowed to make a decision on the ground, because every

9   situation is different, that they're allowed to take in what's

10  happening, understand what's happening; if they feel it's a

11  threat to either the soldiers or to federal law enforcement,

12  then they could.

13  Q.   So even if the crowd wasn't making physical threats

14  towards anyone, a commander on the ground could still order

15  troops to form a security perimeter if that commander felt the

16  crowd was a threat; is that right?

17  A.   It was also a feeling.   If the federal law enforcement was

18  not allowed to do their job, if he had -- if he or she had that

19  feeling on the ground that they were being not able to do their

20  job because a crowd was reacting with them or that they felt

21  unsafe, then they could.

22  Q.   All right.   So even if no one in the crowd was committing

23  any criminal act, Task Force 51 commanders could order their

24  troops to set a security perimeter; correct?

25  A.   In line with the explicit guidance they were given, that

63

**SHERMAN - DIRECT / REILLEY**

1    if they felt there was any kind of threat or was not allowing

2    federal law enforcement to do their job, in that particular

3    incident, whatever it was, then they could.

4    **Q.**   That's a "yes" to my question, Major General Sherman?

5    **A.**   Yes.

6    **Q.**   Thank you.

7        Task Force 51 troops have set security perimeters around

8    federal buildings during the deployment; correct?

9    **A.**   That is correct.

10   **Q.**   And Task Force 51 troops also set security perimeters

11   during field operations that took place off the federal

12   property; correct?

13   **A.**   Yes.

14   **Q.**   Including at private residences?

15   **A.**   Only of -- one time that I know of right offhand, that's

16   correct.

17   **Q.**   And Task Force 51 troops were also trained that they were

18   not allowed to set traffic blockades unless there was a hostile

19   vehicle coming towards a federal law enforcement agent;

20   correct?

21   **A.**   That is correct.  It needed to be something hostile that

22   was threatening federal law enforcement.

23   **Q.**   And that's because setting up a traffic control point is

24   considered a law enforcement function; right?

25   **A.**   That is correct.

A172

SHERMAN - DIRECT / REILLEY

1  Q.   Task Force 51 troops were trained that they could

2  temporarily detain civilians; correct?

3  A.   They could if they deemed that that -- it was a threat --

4  that person was a threat to either the soldiers or to the

5  federal law enforcement.

6  Q.   And on June 12th of 2025, a Task Force 51 Marine did

7  detain a civilian; correct?

8  A.   That is correct.

9  Q.   That took place at the Wilshire federal building?

10  A.   That is correct.

11  Q.   And the civilian in question was a veteran who was going

12  to the VA; right?

13  A.   That is correct.

14  Q.   And the Marines told the veteran to stop, but he didn't

15  because he was wearing headphones; right?

16  A.   That is correct.

17  Q.   And at some point you learned that the Marines told the

18  veteran to leave the property and come back in the correct way,

19  and it was only after the civilian came back in the correct way

20  that he was detained; right?

21  A.   The only --

22        MS. LIN:  Objection.  Foundation.

23        THE COURT:  Overruled.

24  BY MS. REILLEY:

25  Q.   You may answer the question.

**SHERMAN - DIRECT / REILLEY**

1   A.   The only time I've seen that, and I don't know it to be

2   correct, is an email that you showed me during my deposition.

3   Q.   All right.  So -- and that email came from a Department of

4   Homeland Security area commander; correct?

5   A.   I believe it came from, yes, Federal Protective Service,

6   some individual.

7   Q.   So prior to when I showed you that email at deposition,

8   you never were informed about the civilian coming back in the

9   correct way before he was detained; is that correct?

10  A.   That person -- that is not correct.  That person did not

11  come in the correct way even when they came in.  Even if that

12  person did cross the yellow line, which is what -- or cross

13  underneath the tape barrier, which is what that email said,

14  even when that person came to the right location to be entered

15  into the facility, that person did not stop, did not provide

16  identification, did not identify themselves and why their

17  business was supposed to be on the federal -- or why they were

18  there on the Wilshire building.

19  Q.   Would you please turn to Tab 12 of the binder in front of

20  you.  This is a document that's been produced by the federal

21  government as DEFS00001212 through '14.

22       Major General Sherman, is this the email that you were

23  just testifying about?

24  A.   I believe it is.

25  Q.   All right.  And we're going to publish page 1213 at this

66

SHERMAN - DIRECT / REILLEY

```
 1   time.

 2           MS. LIN:  Objection.  This is not in evidence and this

 3   is a hearsay, out-of-court statement --

 4           THE COURT:  Okay.

 5           MS. LIN:  -- that's being offered for the truth of the

 6   matter asserted, and we move to exclude this piece of evidence.

 7           THE COURT:  I think the question -- I think the

 8   question is whether he heard about this.

 9           MS. REILLEY:  Correct, Your Honor.

10           THE COURT:  So it goes to his state of mind.  It's not

11   being introduced for the truth of the matter.  It's being

12   introduced for other than the truth of the matter, so it's not

13   hearsay.

14           MS. REILLEY:  Correct, Your Honor.

15       So at this time, we will publish page 1213, and we will

16   move Tab 12 into evidence as Exhibit 12.

17           THE COURT:  Okay.  But not being introduced for the

18   truth of the matter.

19           MS. REILLEY:  Correct.

20           THE COURT:  Admitted.

21       (Trial Exhibit 12 received in evidence.)

22   BY MS. REILLEY:

23   Q.   All right.  Major General Sherman, do you see the document

24   that's labeled 1213 on the screen in front of you?

25   A.   I do.
```

A175

**SHERMAN - DIRECT / REILLEY**

```
 1   Q.   Do you see where it reads [as read]:

 2            "Summary:  FPS advise the subject will be

 3        released and not cited per guidance from on-duty

 4        AUSA.  The subject is a veteran and came under yellow

 5        tape to come into the VA.  After the USMC told him to

 6        leave, he did so and came back in the correct way.

 7        The USMC detained him for repeat offense.  The

 8        individual has departed property and will return

 9        another day"?

10        Do you see where that's written?

11   A.   I do.

12   Q.   Is this the email that I showed you at your deposition

13   that you were just testifying about?

14   A.   It is.

15   Q.   All right.  And "FPS" stands for Federal Protective

16   Service; is that right?

17   A.   That is correct.

18   Q.   USMC is the United States Marine Corps?

19   A.   It is.

20   Q.   And that refers to members of the U.S. Marine Corps who

21   were under Task Force 51's control during the deployment;

22   correct?

23   A.   That's correct.

24   Q.   All right.  And you did not learn any of the information

25   that's contained in this email while you were the commanding
```

**A176**

**SHERMAN - DIRECT / REILLEY**

1  general of Task Force 51; correct?

2  **A.**   I did not.

3  **Q.**   And if you ever heard from any source that the veteran who

4  was detained was detained after he came back onto federal

5  property the correct way, you would have asked the battalion

6  commander to investigate that detention; correct?

7  **A.**   Yes.  If he came in the wrong -- if he did not come in the

8  right way, if he did not stop and have himself identified, that

9  is correct.

10  **Q.**   All right.  And because you did not hear this information,

11  you did not order any investigation of the detention; correct?

12  **A.**   That is correct.

13  **Q.**   And while he was detained by the Marines, the civilian's

14  hands were restrained in flex cuffs; correct?

15  **A.**   That is correct.  For his safety and for the Marines'

16  safety, that is correct.

17  **Q.**   And the Marines detained the veteran for approximately

18  25 minutes?

19  **A.**   That is correct.  While they were waiting for law

20  enforcement to come and take control of him, that is correct.

21  **Q.**   And the Marine who detained the veteran never determined

22  that the veteran was threatening federal agents or any other

23  person; correct?

24  **A.**   No, because the questioning that needed to happen then

25  would have to be done by law enforcement.  That's a law

**SHERMAN - DIRECT / REILLEY**

1    enforcement action.  So they flex cuffed that person just for

2    his safety and for their safety, sat him down on a picnic

3    table, covered, and waited for federal law enforcement to come

4    and take control of him.

5    **Q.**  But prior to the detention actually taking place, the

6    Marines who were at the federal Wilshire building never saw the

7    veteran partake in any action they considered to be a threat;

8    correct?

9    **A.**  Well, they didn't know because he came through the stop.

10   He did not stop.  He had his headphones on, got told quite a

11   few times -- I don't know the number, at least two -- to stop,

12   "You need to stop." He did not.  He went right through,

13   barreled right through the checkpoint, and then that's when

14   they stopped him.

15   **Q.**  And other than not stopping because he was wearing his

16   headphones, there is no other conduct that that veteran was

17   engaging in that was cited for the -- as a reason for the

18   detention; correct?

19   **A.**  That's correct.

20   **Q.**  During the deployment to Los Angeles, federal law

21   enforcement agencies would submit requests for assistance to

22   Task Force 51; right?

23   **A.**  That is correct.

24   **Q.**  And as commanding general, you had primary responsibility

25   for approving those requests for assistance?

SHERMAN - DIRECT / REILLEY

1   A.   I did once they were -- they went through the staffing

2   process and were legally reviewed, that's correct.

3   Q.   And as part of the staffing process's review, there was a

4   legal review performed; correct?

5   A.   That is correct.

6   Q.   All right.  And whenever they responded to requests for

7   assistance, Task Force 51 troops were armed with weapons that

8   had live ammunition in the magazine; right?

9   A.   In the magazine but not in the chamber.

10  Q.   Based on their training, the average Task Force 51

11  soldier/Marine could load an active round into a chamber in a

12  matter of about two seconds?

13  A.   That is what I said in my deposition, correct.

14  Q.   And that's correct?

15  A.   That is.

16  Q.   And Task Force 51 troops were also armed with batons

17  whenever they went out into the field; correct?

18  A.   That was part of what they were also with.  That was part

19  of the civil disturbance operations kit.

20  Q.   All right.  And Task Force 51 wore face shields whenever

21  they went out in the field; right?

22  A.   That is correct.

23  Q.   They also had body armor?

24  A.   That is correct.

25  Q.   They wore helmets?

**SHERMAN - DIRECT / REILLEY**

1    **A.**    They did.

2    **Q.**    Task Force 51 troops accompanied federal law enforcement

3    agents on warrant service operations; right?

4    **A.**    They did.

5    **Q.**    And they also accompanied Immigrations and Customs

6    Enforcement agents as those agents made arrests?

7    **A.**    They did.

8         (Trial Exhibit 53 received in evidence.)

9    **BY MS. REILLEY:**

10   **Q.**    If you could please turn to Tab 53, and this is included

11   in Volume 2 of the evidence binder.  And this has been

12   previously admitted as Exhibit 53, and we'll publish it to the

13   screen now.

14        **THE COURT:**  Okay.

15   **BY MS. REILLEY:**

16   **Q.**    And, Major General Sherman, you've seen these photographs

17   before; correct?

18   **A.**    I have during the deposition.

19   **Q.**    And you don't know when these photographs were taken?

20   **A.**    I do not.

21   **Q.**    Directing your attention to the left-hand photograph, the

22   individual shown in that photograph who's wearing a camouflage

23   uniform, that's a Task Force 51 soldier; right?

24   **A.**    It is.

25   **Q.**    And you don't know what the soldier in this photograph is

SHERMAN - DIRECT / REILLEY

1   doing?

2   **A.**   I do not.

3   **Q.**   Looking now at the right-hand photograph, you are not able

4   to tell if the two individuals wearing camouflage uniforms in

5   that photograph are Task Force 51 soldiers; right?

6   **A.**   I cannot.

7        (Trial Exhibit 54 received in evidence.)

8   **BY MS. REILLEY:**

9   **Q.**   If you can please turn to Tab 54, and this has been

10  previously admitted as Exhibit 54, and we'll publish it to your

11  screen now.

12       You've seen this photograph before; correct?

13  **A.**   I have.

14  **Q.**   And the individual who's shown on the right-hand side of

15  the photograph who's wearing a camouflage uniform, that's a

16  Task Force 51 soldier; right?

17  **A.**   Well, I can't tell from that, but I can tell from the

18  vehicle, when it says "79th IBTC 143rd MP."

19  **Q.**   All right.  So the Humvee shown on the right side of the

20  vehicle is a Task Force 51 vehicle; correct?

21  **A.**   It could be, depending on when the date of this picture

22  was.

23  **Q.**   Do you see the date on this photograph is June 10th, 2025?

24  **A.**   Yes.  So with that, it would be.

25  **Q.**   All right.  And you don't know where this photograph was

A181

SHERMAN - DIRECT / REILLEY

```
 1  taken; right?

 2  A.   I do not.

 3  Q.   And you can't explain what the soldier in this photograph

 4  is doing; yes?

 5  A.   I cannot.

 6       (Trial Exhibit 38 received in evidence.)

 7  BY MS. REILLEY:

 8  Q.   All right.  If you could please turn to Tab 38 of your

 9  binder, and we'll publish this.  This is an exhibit that's been

10  previously admitted as Exhibit 38.

11       Major General Sherman, you recognize this document;

12  correct?

13  A.   Only -- yes.  You showed me in the deposition.

14  Q.   Prior to your deposition when I showed you this document,

15  you never saw it while you were the commanding general of

16  Task Force 51?

17  A.   No.  This is at a platoon level.  I never saw it.

18  Q.   And this was drafted by a second lieutenant of the Third

19  Platoon, Company Bravo, First Battalion, 160th Infantry?

20  That's correct?

21  A.   That is correct.

22  Q.   This document is dated June 13th, 2025?

23  A.   Yes.  I'm sorry.  Yes.

24  Q.   And at that time, the Third Platoon, Company Bravo, First

25  Battalion, 160th Infantry was under Task Force 51's command;
```

A182

74

SHERMAN - DIRECT / REILLEY

```
 1    correct?
 2    A.    It was.
 3    Q.    And under "Patrol Narrative," do you see where it reads,
 4    quote [as read]:
 5              "On 13 June 2025, at approximately 0500,
 6         soldiers from COB 1160N attended an FBI briefing
 7         IVO" -- there's an address that's been redacted --
 8         "in the city of Carson, California, to execute the
 9         arrest of" --
10         And there's an individual's name who's been redacted.
11         Do you see where that's written?
12    A.    I do.
13    Q.    And you were aware that Task Force 51 troops were involved
14    in this operation on or around June 13th; correct?
15    A.    I can't recall the exact operation, no.
16    Q.    All right.  Did you -- do you recall testifying at your
17    deposition that you vaguely recalled this operation?
18    A.    Yeah.  I vaguely recall.  I don't know the exact
19    specifics.
20    Q.    You were not personally present during this operation;
21    right?
22    A.    I was not.
23    Q.    You did not receive any briefing on this operation after
24    it took place; correct?
25    A.    I did not.
```

SHERMAN - DIRECT / REILLEY

1    Q.    So you don't have any information about what actually

2    happened during this operation other than what's written in

3    this report; right?

4    A.    Correct.

5    Q.    Directing you to the bottom of the page, where it says

6    "Patrol Narrative," do you see that box?

7    A.    I do.

8    Q.    Could you please read aloud the three paragraphs written

9    in that box.

10   A.    The three paragraphs here?

11   Q.    Yes.

12   A.    [As read]:

13           "On 13 June '25 at approximately 0500, soldiers

14         from Bravo Company, 1" -- "First Battalion 160th

15         Infantry attended an FBI briefing in the vicinity of

16         this address, 21356 Avalon Boulevard, in the city of

17         Carson, California, to execute an arrest of an

18         individual."

19         Can I ask a question real quick?  You want me to read here

20   the stuff that's been redacted?

21   Q.    No.  Please read the version off the screen, if you would.

22   A.    Yeah, okay.

23   Q.    Thank you.

24           MS. LIN:  Your Honor, one moment.  The screen document

25   is the unredacted.

A184

SHERMAN - DIRECT / REILLEY

```
 1              THE COURT:  Sorry?

 2              MS. LIN:  If you could please read off the redacted

 3    version.

 4              MS. REILLEY:  The version on the screen is redacted.

 5              MS. LIN:  Okay.  Just to make sure.  Thank you.

 6              THE COURT:  Yes.  So you should read it off the screen

 7    rather than that.

 8              THE WITNESS:  Yes, Your Honor.

 9         [As read]:

10              "Videos of this person surfaced on 7 June 2025

11         when it was reported he was throwing rocks and

12         injuring federal officers on the 6400 block of

13         Alondra Boulevard in the city of Paramount.  Soldiers

14         arrived at the briefing site today and learned the

15         objective would be at" -- that's PII -- "in the city

16         of Long Beach.  They were tasked to cordon the

17         southbound lanes of Long Beach Boulevard from

18         East Ellis Street and East 55th Street.  One van with

19         12 packs was set up to block on the south side of the

20         objective along with" -- or -- "along Long Beach

21         Boulevard, and one van with 12 packs was set up to

22         block on the north side of the objective.

23              "When National Guard, DEA, and FBI elements

24         arrived at the objective, blockades were established,

25         and each blockade was accompanied by a marked
```

SHERMAN - DIRECT / REILLEY

1        Los Angeles Sheriff's vehicle.  Both blockades were

2        also accompanied by DEA SWAT and armed with less than

3        lethal munitions such as pepper ball guns.

4            "National Guard soldiers established their

5        blocking positions at approximately 0600, and the

6        DEA" -- and that's 0600 hours -- "and the DEA and FBI

7        began their operation at the target residence.  PII

8        was not located, but his brother was detained.  It is

9        known" -- "It is unknown if his brother was arrested.

10       The motorcycle that this person was riding during the

11       assault on the federal officers was recovered and

12       stored for evidence."

13  BY MS. REILLEY:

14  Q.    And you do not know or have any information as to whether

15  Task Force 51 soldiers prevented any civilians from using the

16  public road as part of this operation; right?

17  A.    I do not.

18            MS. REILLEY:  Thank you.

19       (Trial Exhibit 64 received in evidence.)

20  BY MS. REILLEY:

21  Q.    If you could please turn to Tab 64 of the binder.  And

22  this has been previously admitted as Exhibit 64, and we'll

23  publish that exhibit to the screen.

24       And, Major General Sherman, you recognize this document as

25  a printout from the DVIDS website; correct?

SHERMAN - DIRECT / REILLEY

```
 1   A.    I do.
 2   Q.    And "DVIDS" stands for Defense Visual Information
 3   Distribution Service?
 4   A.    That is correct.
 5   Q.    And this is a website run by the Department of Defense?
 6   A.    That is correct.
 7   Q.    The photograph shown here was taken by Sergeant Chase
 8   Murray; correct?
 9   A.    That is correct.
10   Q.    And Sergeant Murray was a part of Task Force 51 when this
11   photograph was taken?
12   A.    He was a member of the public affairs section, that is
13   correct.
14   Q.    Attached to Task Force 51?
15   A.    That is correct.
16   Q.    And the four individuals standing behind the yellow
17   caution tape in this photograph are all Task Force 51 soldiers;
18   right?
19   A.    It appears so, yes.
20   Q.    And you don't know what the soldiers in this photograph
21   are doing; correct?
22   A.    I do not.
23         (Trial Exhibit 66 received in evidence.)
24   BY MS. REILLEY:
25   Q.    If you could please turn to Tab 66 of the binder, which
```

SHERMAN - DIRECT / REILLEY

1   has been previously admitted as Exhibit 66, and we'll publish

2   this document to the screen.

3   **A.**   (Witness examines document.)

4   **Q.**   Showing you another photograph that was taken by

5   Sergeant Murray that was published on the DVIDS website, the

6   five individuals in the foreground of this photograph who are

7   wearing camouflage uniforms and holding shields are also

8   Task Force 51 soldiers; correct?

9   **A.**   They are.

10  **Q.**   And you can't explain what those soldiers in this

11  photograph are doing; right?

12  **A.**   I cannot.

13       (Trial Exhibit 68 received in evidence.)

14  **BY MS. REILLEY:**

15  **Q.**   If you could please turn to Tab 68, which has been

16  previously admitted as Exhibit 68, and we'll publish that to

17  the screen.

18       This is another photograph taken by Sergeant Murray that

19  was published on the DVIDS website.

20       And the four individuals in this photograph who are

21  holding shields are also Task Force 51 soldiers; correct?

22  **A.**   The four holding the shields are Task Force 51 soldiers.

23  **Q.**   And you don't know what the soldiers in this photograph

24  are doing; correct?

25  **A.**   I do not.

SHERMAN - DIRECT / REILLEY

1  Q.   And you don't know where this photograph was taken; right?

2  A.   I do not, except the buildings look similar to the last

3  photograph you showed me.

4  Q.   All right.  And while you were the commanding general of

5  Task Force 51, you approved two requests for assistance that

6  involved search warrant operations at cannabis farms; correct?

7  A.   Correct.

8  Q.   The first was an operation in Mecca, California?

9  A.   Correct.

10 Q.   And Mecca is a long way from the center of Los Angeles;

11 right?

12 A.   It is.

13 Q.   You didn't have any specific knowledge of any particular

14 threat related to the Mecca operation; correct?

15 A.   No, we did not.

16 Q.   And you didn't have any specific information that there

17 were going to be riots during the Mecca operation; right?

18 A.   We did not.

19 Q.   There were approximately 300 Task Force 51 soldiers who

20 participated in the Mecca operation; correct?

21 A.   That is correct.

22 Q.   And there were only about 200 federal law enforcement

23 agents involved in that operation; right?

24 A.   That is correct.

25 Q.   So during the Mecca operation, Task Force 51 troops

**SHERMAN - DIRECT / REILLEY**

1  outnumbered federal law enforcement agents by over a hundred?

2  **A.**   That is correct.

3  **Q.**   The Mecca operation involved approximately 50 military

4  vehicles?

5  **A.**   That is correct.

6  **Q.**   And those military vehicles included Humvees?

7  **A.**   They did.

8  **Q.**   And 5-ton trucks?

9  **A.**   They did.

10  **Q.**   During the Mecca operation, neither the Task Force 51

11  troops nor the federal law enforcement agents faced any

12  resistance; right?

13  **A.**   I do not know about the federal law enforcement.  I know

14  that our soldiers did not face any resistance on the outside.

15  **Q.**   And no Task Force 51 soldier was required to provide force

16  protection to any federal agent during the Mecca operation;

17  correct?

18  **A.**   No.  Not inside the perimeter, that is correct.

19       (Trial Exhibit 41 received in evidence.)

20  **BY MS. REILLEY:**

21  **Q.**   All right.  If you could please turn to Tab 41 of your

22  binder.  This has been previously admitted as Exhibit 41, and

23  we'll publish this document to the screen.

24       You recognize this document; correct?

25  **A.**   I do.

SHERMAN - DIRECT / REILLEY

1    Q.    This is a storyboard of the Mecca operation that was made

2    by the 143rd Military Police Battalion?

3    A.    That is correct.

4    Q.    And the 143rd Police Battalion was part of Task Force 51

5    at the time of the Mecca operation; correct?

6    A.    That is correct.

7    Q.    Could you please read aloud the paragraph under the header

8    "End State," which is in the bottom left corner of the

9    document?

10   A.    [As read]:

11             "Joint federal and military companies,

12        headquarters and headquarters company, 143rd MP

13        Battalion, 40th Military Police Company,

14        330th Military Police Company, and 670th Military

15        Police Company established outer cordons and secured

16        designated sites, enabling safe entry for DEA

17        personnel.

18             "Actions resulted in the seizure of narcotics,

19        approximately 87 suspected human trafficking victims,

20        and disruption of illegal marijuana cultivation" -- I

21        can't read that last one -- "tied to organized

22        criminal activity."

23   Q.    And you saw this slide shortly after the Mecca operation

24   took place; correct?

25   A.    I did.

SHERMAN - DIRECT / REILLEY

```
 1          (Trial Exhibit 69 received in evidence.)
 2   BY MS. REILLEY:
 3   Q.   If you could please turn to Tab 69 of your binder.  This
 4   has been previously admitted as Exhibit 69, and we'll publish
 5   that document to the screen.
 6        You recognize this photograph that was published on the
 7   DVIDS website?
 8   A.   I do.
 9   Q.   This photograph is also taken by Sergeant Murray?
10   A.   That is correct.
11   Q.   And this photograph shows Task Force 51 troops during the
12   Mecca operation; correct?
13   A.   I believe so, correct.  Yes.
14   Q.   And if you look at the description under the photograph,
15   do you see where it reads [as read]:
16            "Soldiers from the 143rd Military Police
17        Company, 49th Military Police Brigade, California
18        National Guard, serving under Title X status,
19        established a security perimeter in Mecca,
20        California, June 18th, 2025"?
21   A.   Correct.
22   Q.   All right.  And the second request for assistance that you
23   approved while you were the commanding general of Task Force 51
24   that involved a search warrant at a cannabis farm was an
25   operation in Carpinteria, California?
```

A192

SHERMAN - DIRECT / REILLEY

1   **A.**   Correct.

2   **Q.**   And is it correct that you approved the Carpinteria

3   operation while you were still commanding general; but by the

4   time the operation actually took place, you were no longer in

5   command?

6   **A.**   That is correct.

7   **Q.**   During the Carpinteria operation, Task Force 51 troops

8   were tasked with protecting federal agents who had set up

9   traffic control blocks?

10  **A.**   They had set up traffic control points east and west on --

11  for Carpinteria; that is correct.

12  **Q.**   All right.  And Task Force 51 troops were given that

13  assignment because without the troops, the federal agencies

14  involved in the operation would have had to station more of

15  their personnel at the traffic control points; right?

16  **A.**   Correct.

17  **Q.**   And if the federal agencies had had to station more of

18  their personnel at the traffic control points, the operation

19  would have taken longer; correct?

20  **A.**   That's what they told me, that's correct.

21  **Q.**   And the Carpinteria operation involved approximately 100

22  to 120 Task Force 51 troops?

23  **A.**   I believe that's correct.

24  **Q.**   And there were approximately 20 to 25 Task Force 51

25  military vehicles involved in that operation as well?

SHERMAN - DIRECT / REILLEY

1    **A.**   Correct.

2    **Q.**   And those military vehicles were Humvees and 5-ton trucks?

3    **A.**   Correct.

4         (Trial Exhibit 31 received in evidence.)

5    **BY MS. REILLEY:**

6    **Q.**   Could you please turn to Tab 31 of your binder.  This has

7    been previously admitted as Exhibit 31, and we're going to show

8    a page of that document that's labeled 3519 on the screen.

9              **THE COURT:**  What page?

10             **MS. REILLEY:**  We'll be publishing 3519.

11             **THE COURT:**  Thank you.

12   **BY MS. REILLEY:**

13   **Q.**   Major General Sherman, you recognize this document;

14   correct?

15   **A.**   I do.

16   **Q.**   This is a brief that battalion staff prepared in advance

17   of the Carpinteria operation?

18   **A.**   That is correct.

19   **Q.**   And directing you to page 3519, which is shown on the

20   screen in front of you, do you see where it reads "Risk of

21   inaction low"?

22   **A.**   Yes.

23   **Q.**   Could you please read the section that immediately follows

24   that statement "Risk of inaction low"?

25   **A.**   [As read]:

SHERMAN - DIRECT / REILLEY

```
1              "The Assessment:  No indication that failure to
2         act would result in loss of life or significant
3         property damage to federal personnel at both traffic
4         control points given the volume of HSI" -- so
5         Homeland Security Investigations -- "personnel on
6         scene."
7              (Trial Exhibit 79 received in evidence.)
8    BY MS. REILLEY:
9    Q.   Could you please turn to Tab 79 of your binder.  This has
10   been previously admitted as Exhibit 79.
11            Major General Sherman, you recognize this photograph;
12   correct?
13   A.   You showed it to me at my deposition, yes.
14   Q.   And this is a photograph that was taken by Monica
15   Solorzano, who's the vice mayor of Carpinteria, during the
16   Carpinteria operation.  And you recall during your deposition
17   that I asked you to label this photograph?
18   A.   Yes.
19   Q.   And at your deposition you labeled the individual who was
20   wearing sunglasses and a mask as a federal agent?
21   A.   That is correct.
22   Q.   And you also labeled the individuals who were wearing
23   camouflage uniforms and hats as Task Force 51 soldiers?
24   A.   They all appear to be, yes.
25            (Trial Exhibit 80 received in evidence.)
```

SHERMAN - DIRECT / REILLEY

1          **MS. REILLEY:**  All right.  At this time, I'm going to

2     show you a video that's been previously admitted as Exhibit 80.

3          And for the record, this is a video that was taken by

4     Vice Mayor Solorzano during the Carpinteria operation.

5          **THE COURTROOM DEPUTY:**  One moment, Judge.

6                    (Pause in proceedings.)

7               (Video was played but not reported.)

8          **MS. REILLEY:**  Your Honor, were you able to see the

9     entire video, or did that start partway through?

10         **THE COURT:**  Do you want to reshow it?

11         **MS. REILLEY:**  Could we?  Thank you.  I just want to

12    make sure we see the entire video.

13                   (Video was played but not reported.)

14    **BY MS. REILLEY:**

15    **Q.**   Major General Sherman, you've seen this video before;

16    right?

17    **A.**   I have.

18    **Q.**   And the two individuals who are wearing camouflage

19    uniforms in that video are Task Force 51 soldiers; correct?

20    **A.**   They are.

21    **Q.**   In fact, all the individuals who are wearing camouflage

22    uniforms in that video are Task Force 51 soldiers; correct?

23    **A.**   Yes.

24    **Q.**   And you don't have any information indicating that the

25    woman in this video who is holding the megaphone threatened

SHERMAN - DIRECT / REILLEY

```
 1   anyone, including any federal agents; right?
 2   A.    No, I don't have the context of this.
 3   Q.    Thank you.
 4         If you could please turn to Tab 70 --
 5              THE COURT:  Wait.  Before we do that, could you go
 6   back on this for a minute?
 7              MS. REILLEY:  Yes.
 8              THE COURT:  Okay.  Maybe show it again.  I want to ask
 9   the general a question.
10                  (Video was played but not reported.)
11              THE COURT:  Freeze it there.  Freeze it there.  Stop
12   it.
13         Okay.  So I see three law en- -- what I'll call law
14   enforcement people; that is, people either in military gear or
15   in other gear.  And my question is:  The military people, the
16   people in camouflage, they are part of Task Force 51; is that
17   correct?
18              THE WITNESS:  That's correct, Your Honor.
19              THE COURT:  Okay.  There's a third person there.  And
20   do you have any information as to who that person -- what force
21   that person belongs to?
22              THE WITNESS:  I can't tell off the video.  I can't --
23   I'm not close enough to see the badge.  They do have "Police"
24   on there, and there's usually "Federal Police" on their
25   uniform.  It says that too, Your Honor, but I can't tell.  But
```

SHERMAN - DIRECT / REILLEY

1   there is a "Police" -- it says "Police" on the left-hand side

2   there.

3            THE COURT:  Okay.  So you don't know whether that's

4   federal or state?

5            THE WITNESS:  It would be federal, Your Honor.

6            THE COURT:  It would be federal?

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.  My question is:  I assume the Task

9   Force camouflage-dressed officers have identification on them;

10  is that correct?

11           THE WITNESS:  That is correct.

12           THE COURT:  So it's Army regulation that they have

13  their name above their lapel or at some place prominently

14  displayed on their uniform?

15           THE WITNESS:  It is correct -- that's correct,

16  Your Honor.  It is blocked here by the body armor that they're

17  wearing.  You can see the rank.  Like this is a sergeant right

18  here who's got the glasses, facing right here.  She's -- you

19  can tell that it's an Army patch she has on, but her name --

20  her name is covered by the body armor.

21           THE COURT:  Okay.  So she is -- for intents and

22  purposes, she's anonymous in terms of whether an individual who

23  is not part of the operation can identify that particular

24  person; is that correct?

25           THE WITNESS:  That's correct, Your Honor.  They can

SHERMAN - DIRECT / REILLEY

1  tell what unit she's in by the unit patch.

2         THE COURT:  Her rank?

3         THE WITNESS:  And her rank, yes, sergeant E5.

4         THE COURT:  Right.  Now, the person who you believe to

5  be a federal law enforcement officer but not sure what branch

6  they belong to or what department they belong to, that person

7  is wearing a mask; is that correct?

8         THE WITNESS:  That is correct.

9         THE COURT:  Okay.  So nobody could -- it would be

10  difficult to identify who that person is by virtue of the fact

11  that the person is wearing a mask.  Is that person identified

12  in any other way?

13       That is to say, if somebody was standing there, would they

14  be able, after the fact, to say, "Officer X," identifying

15  Officer X, who's masked, can make that identification?

16         THE WITNESS:  Your Honor, they could tell that it's

17  police.  And now that I look at it, it says "HSI" under the

18  "Police."  They can tell.

19         THE COURT:  HSI?

20         THE WITNESS:  Yes.  It says it.  That's a "Police" --

21  that the body vest that he's wearing, which is body armor, says

22  "Police" and it says "HSI" under it.

23         THE COURT:  And HSI is?

24         THE WITNESS:  I think Homeland Security Investigations

25  I believe, Your Honor.

SHERMAN - DIRECT / REILLEY

```
 1              THE COURT:  Okay.  All right.  Thank you so much.

 2              THE WITNESS:  Yes, Your Honor.

 3   BY MS. REILLEY:

 4   Q.   Major General Sherman, you stated a moment ago that even

 5   though you can't see the soldier's name, you would be able to

 6   tell she was a sergeant; is that right?

 7   A.   That is correct.

 8   Q.   And you would know that from the chevrons on her hat?

 9   A.   Both on her hat and right there right above her body

10   armor, right there it says -- it shows her rank too.  Same

11   thing.

12   Q.   But if you were not familiar with military insignia, you

13   would not know that those two chevrons denoted a sergeant;

14   correct?

15   A.   Those three.  There are actually three, but that's

16   correct.

17        (Trial Exhibit 75 received in evidence.)

18   BY MS. REILLEY:

19   Q.   If you could please turn to Tab 75 of your binder.  This

20   has been previously admitted as Exhibit 75, and we will publish

21   this to the screen now.

22        This is another photograph that was published on the DVIDS

23   website, again taken by Sergeant Murray.  You recognize this

24   photograph; correct?

25   A.   I do.
```

SHERMAN - DIRECT / REILLEY

1  Q.   At least some of the individuals in this photograph who

2  are wearing camouflage are Task Force 51 troops; correct?

3  A.   Yes, with a lot of federal agents in there -- mixed in

4  there too.

5  Q.   And below the picture, do you see where it reads [as

6  read]:

7           "Soldiers assigned to the 870th Military Police

8       Company, 185th Military Police Battalion,

9       49th Military Police Brigade, California National

10      Guard, serving under Title X status, provide a

11      security perimeter for federal personnel conducting

12      law enforcement activities in Carpinteria,

13      California, July 10th, 2025"?

14  A.   I do.

15      (Trial Exhibit 76 received in evidence.)

16  BY MS. REILLEY:

17  Q.   If you could please turn to Tab 76 of your binder.  This

18  has been previously admitted as Exhibit 76, and it's being

19  published to the screen now.

20      Showing you another photograph that was published on the

21  DVIDS website, taken by Sergeant Murray during the Carpinteria

22  operation, you recognize this photograph; correct?

23  A.   I do.

24  Q.   At least some of the individuals in this photograph who

25  are wearing camouflage are Task Force 51 troops?

**SHERMAN - DIRECT / REILLEY**

```
 1   A.   Yes.
 2   Q.   And beneath this photograph is the same description as the
 3   previous photograph; correct?
 4   A.   That is correct.
 5   Q.   While you were commanding general, there was also an
 6   occasion where a mobile response force of Task Force 51 troops
 7   assisted in a federal law enforcement operation at a cannabis
 8   farm in Camarillo, California; correct?
 9   A.   That was after I left, correct.
10   Q.   Okay.  But you do have knowledge of Task Force 51's
11   involvement in that operation?
12   A.   I have knowledge from what I read from General Nell's
13   report and talking to General Nell, but that would be it.
14   Q.   So you don't have any knowledge about what specifically
15   took place during the Camarillo operation; correct?
16   A.   I do have knowledge that about 48 hours ahead of time
17   before the operation, they canceled -- the CVP canceled the
18   request for assistance.  So there would not be any soldiers on
19   that mission with federal law enforcement.
20   Q.   All right.  So that's -- to my question, that's a "yes"?
21   You don't -- because you were no longer commanding general, you
22   don't know specifically what took place during the Camarillo
23   operation; right?
24   A.   I don't.  I was actually flying at the time this happened.
25        (Trial Exhibit 83 received in evidence.)
```

SHERMAN - DIRECT / REILLEY

```
 1   BY MS. REILLEY:
 2   Q.   Okay.  If you could please turn to Tab 83 of your binder.
 3   And this has been previously admitted as Exhibit 83, and we'll
 4   publish that to the screen now.
 5        And for the record, this is a photograph of the Camarillo
 6   operation that was taken by Genevieve Flores-Haro of the
 7   Mixteco/Indigena Community Organizing Project.
 8        Major General Sherman, you've seen this photograph before;
 9   correct?
10   A.   I have.
11   Q.   And the eight individuals in this photograph who are
12   wearing face shields are Task Force 51 soldiers; right?
13   A.   The ones that are wearing clear face shields -- I don't
14   know that federal agent that's there in the middle, if that's a
15   face shield.  I can't tell.  But it appears, yes, the ones that
16   are wearing clear face shields are soldiers, members of,
17   I believe, Task Force 51.  I can't see the patches, but I
18   assume so.
19   Q.   And you don't know what the soldiers in this photograph
20   are doing; correct?
21   A.   I do not.
22        (Trial Exhibit 86 received in evidence.)
23   BY MS. REILLEY:
24   Q.   If you could please turn to Tab 86 of your binder, and
25   we'll publish this.  This is Exhibit 86, another photograph
```

SHERMAN - DIRECT / REILLEY

```
 1   taken by Ms. Flores-Haro during the Camarillo operation.
 2        You've seen this photograph before; correct?
 3   A.   I have.
 4   Q.   And the four individuals in this photograph who are
 5   wearing clear face shields and shin guards are Task Force 51
 6   soldiers; correct?
 7   A.   Yes.  I can't see the patches, but this is gear that they
 8   were issued, yes.
 9   Q.   And you can't explain what the soldiers are doing in this
10   paragraph; correct?
11   A.   I cannot.
12        (Trial Exhibit 87 received in evidence.)
13   BY MS. REILLEY:
14   Q.   If you could please turn to Tab 87, which we will publish
15   now.  This is another photograph taken by Ms. Flores-Haro
16   during the Camarillo operation.
17        You've seen this photograph before; correct?
18   A.   Yes, I have.
19   Q.   And the five individuals in this photograph who are
20   wearing face shields -- clear face shields and shin guards are
21   Task Force 51 soldiers; right?
22   A.   They are Task Force 51 soldiers behind the federal agent
23   there, that's correct.
24   Q.   And you can't explain what the soldiers in this photo are
25   doing; correct?
```

**SHERMAN - DIRECT / REILLEY**

1    **A.**   I cannot.

2        (Trial Exhibit 92 received in evidence.)

3    **BY MS. REILLEY:**

4    **Q.**   If you could please turn to Tab ninety- -- turn to Tab 92,

5    which is Exhibit 92.  We'll publish this now.

6        You've seen this photograph before; correct?

7    **A.**   I have.

8    **Q.**   And the three individuals in this photograph who are

9    wearing face shields and shin guards are Task Force 51

10   soldiers; correct?

11   **A.**   I see -- well, there's two that are cut off that have,

12   appears to be, face shields and then two more of that face

13   shields; and then the other ones are not 51, Task Force 51,

14   that's correct.

15   **Q.**   So the two individuals on the left-hand side of the

16   photograph who are wearing shin guards and holding batons,

17   those are Task Force 51 soldiers; right?

18   **A.**   They appear so, yes.

19   **Q.**   And you can't explain what the soldiers in this photograph

20   are doing; right?

21   **A.**   I cannot.

22       (Trial Exhibit 94 received in evidence.)

23   **BY MS. REILLEY:**

24   **Q.**   If you could please turn to Tab 94.  This is Exhibit 94,

25   another photograph taken by Ms. Flores-Haro during the

**SHERMAN - DIRECT / REILLEY**

1    Camarillo operation.

2         You've seen this photograph before; correct?

3    **A.**    I have.

4    **Q.**    And we're zooming in on the photograph now.

5         The individuals in this photograph who are standing next

6    to the field and holding shields are Task Force 51 soldiers;

7    right?

8    **A.**    They are.

9    **Q.**    And you don't know what the soldiers in this photograph

10   are doing; correct?

11   **A.**    I do not.

12        (Trial Exhibit 95 received in evidence.)

13            **MS. REILLEY:**   At this time, I'm going to show you a

14   video that's been admitted as Exhibit 95.  This was also taken

15   by Ms. Flores-Haro during the Camarillo operation.

16             (Video was played but not reported.)

17   **BY MS. REILLEY:**

18   **Q.**    You've seen that video before; correct?

19   **A.**    I have.

20   **Q.**    And the individuals in this video who are wearing the

21   clear face shields and holding shields are Task Force 51

22   soldiers; right?

23   **A.**    That is correct.

24   **Q.**    And you don't know what the soldiers in this video are

25   doing?

SHERMAN - DIRECT / REILLEY

```
 1   A.   No.  I could make -- I wasn't there, so I'm not going to
 2   make a decision but -- or make a statement on that.  No, I do
 3   not.  I don't have context.
 4        (Trial Exhibit 96 received in evidence.)
 5             MS. REILLEY:  All right.  Now I'm going to show you a
 6   video that's been admitted as Exhibit 96.  Again, this was
 7   taken by Ms. Flores-Haro during the Camarillo operation.
 8             (Video was played but not reported.)
 9   BY MS. REILLEY:
10   Q.   You've seen this video before; correct?
11   A.   I have.
12   Q.   And the individuals in this video who are wearing
13   camouflage uniforce -- uniforms and gas masks are Task Force 51
14   troops?
15   A.   Not necessarily.
16   Q.   When the video panned to the right and it showed
17   individuals in camouflage uniforms who are wearing gas masks
18   and clear face shields, those are Task Force 51 soldiers;
19   correct?
20   A.   Yes, but there are also federal agents wearing gas masks
21   on that one too.
22   Q.   But the federal agents are wearing solid green, not
23   camouflage; correct?
24   A.   I believe so.  I'd have to take a better look.  I don't --
25   I don't know.
```

**SHERMAN - DIRECT / REILLEY**

1   Q.   We could replay the video if you'd like.

2   A.   Sure.

3                (Video was played but not reported.)

4   BY MS. REILLEY:

5   Q.   Having seen the video for a second time, it's correct that

6   the individuals wearing camouflage are Task Force 51 soldiers;

7   correct?

8   A.   Correct.  Behind the federal agents, that's correct.

9   Q.   And you can't explain what these soldiers in this video

10  are doing; correct?

11  A.   Well, with the crowd there, it appears like they're doing

12  a traffic control point, holding people back, but I don't have

13  any other information.

14  Q.   And you were not present for this operation; correct?

15  A.   I was not.

16  Q.   And you were not commanding general at the time this

17  operation took place; correct?

18  A.   Which operation is this one?

19  Q.   Camarillo.

20  A.   Oh, no, I was not.

21  Q.   All right.  Task Force 51 soldiers also participated in a

22  law enforcement operation at MacArthur Park on July 7th, 2025;

23  correct?

24  A.   Correct.

25  Q.   And the original request for assistance that related to

SHERMAN - DIRECT / REILLEY

1    the MacArthur Park operation called for the operation to take

2    place on Father's Day?

3    A.    That is correct.

4    Q.    And it also called for Task Force 51 military vehicles to

5    be on the section of Wilshire Boulevard that runs through

6    MacArthur Park; correct?

7    A.    It did.  It had them going through the middle, yes.

8    Q.    You objected to that original request for assistance

9    related to the MacArthur Park operation; correct?

10   A.    That is correct.

11   Q.    And Chief Gregory Bovino of the Department of Homeland

12   Security criticized you for objecting to that request; correct?

13   A.    He did.  He did.

14   Q.    And specifically Chief Bovino questioned your loyalty to

15   the country for objecting to that original MacArthur Park

16   operation?

17   A.    He did.

18              MS. LIN:  Objection.  Relevance.

19              THE COURT:  Sorry?  The objection.

20              MS. LIN:  Objecting to relevance of this line of

21   questioning of the conversations that counsel is --

22              THE COURT:  Why is it irrelevant?  I mean, if somebody

23   is making decisions and then people who are part of the

24   decision-making process turn to the person who makes a decision

25   based upon his judgment and calls him disloyal, why is that

SHERMAN - DIRECT / REILLEY

```
 1   irrelevant?
 2           MS. LIN:  The only question before the Court today is
 3   the scope of the Posse Comitatus Act.
 4           THE COURT:  Yes.  We're talking about -- it's in an
 5   operation; isn't it?  Isn't this related to the MacArthur Park?
 6           MS. LIN:  Yes, yes, it is, but the discussion about
 7   loyalty or disloyal, that's not part of --
 8           THE COURT:  But wasn't that -- I'm sorry.  Was that
 9   not part of the discussion?  Are you saying that wasn't part of
10   the discussion, Counsel?
11           MS. LIN:  It was, but --
12           THE COURT:  Well, so if it's part of the discussion,
13   why isn't it then related to the decision that was made in that
14   context?  Why isn't it?
15       I'm actually asking you these questions because you're the
16   one objecting, so you have to explain it to me.
17           MS. LIN:  Yes, Your Honor.  The scope --
18           THE COURT:  Why don't you come up to the microphone so
19   I can hear you.
20           MS. LIN:  The scope of the issue before the Court is
21   simply about whether there have been violations of the Posse
22   Comitatus Act.  What a law enforcement agency's view about the
23   military's loyalty or disloyalty is not relevant, in our view,
24   to that narrow question of whether a violation --
25           THE COURT:  But why isn't it relevant?
```

SHERMAN - DIRECT / REILLEY

1   **MS. LIN:**  -- of law has occurred.

2   **THE COURT:**  If, in fact, a person is making a

3   decision, who's a military officer, who's had 33 years of

4   experience and I assume -- we haven't gone through the

5   decorations, but I assume there was least one decoration over

6   your career -- is told by civilian authorities that he is

7   disloyal to the United States of America, why isn't that

8   relevant to whatever decisions are made in connection with this

9   officer, the general?

10      I'm just trying to understand your objection.  You say

11  it's not -- it's not relevant because of what?

12      **MS. LIN:**  Because that question of loyalty does not

13  directly go to the issue of whether violations of the Posse

14  Comitatus Act has occurred and is --

15      **THE COURT:**  Well, maybe it goes to his state of mind.

16  Maybe it goes to the fact he's now being -- he's exercising his

17  military judgment in connection with the Posse Comitatus Act;

18  and in doing so, in doing so, he is told that he is disloyal to

19  the United States of America.

20      Why is it any different from turning, as an example, to an

21  attorney who makes an argument and then you say to the arguer,

22  "You can't make that argument.  You're disloyal"?  Why isn't it

23  relevant?

24      **MS. LIN:**  Your Honor has ruled.

25      **THE COURT:**  Okay.

A211

SHERMAN - DIRECT / REILLEY

```
 1              MS. LIN:  My objection remains the same.
 2              THE COURT:  Thank you.  Overruled.
 3         Okay.  Go ahead.
 4    BY MS. REILLEY:
 5    Q.   Major General Sherman, your answer to my last question
 6    was, yes, Chief Bovino did question your loyalty to the
 7    United States of America; correct?
 8    A.   Yes.
 9    Q.   You did not ultimately approve the MacArthur Park
10    operation that took place on July 7th; right?
11    A.   That's correct.
12    Q.   That request for assistance was actually approved by the
13    Secretary of Defense?
14    A.   It was not approved by the Secretary of Defense.  Or I
15    don't really understand your question.
16    Q.   So my question relates to the operation that, in fact,
17    took place on July 7th.
18    A.   Oh, okay, yes.
19    Q.   Was -- that operation was pursuant to a request for
20    assistance; correct?
21    A.   It was.  It was the third time we have -- we had planned
22    MacArthur Park.  Because of the high risk, it went to the
23    commander of U.S. Northern Command for his approval; and from
24    there, it did go to the Secretary of Defense for the approval.
25    Q.   And when you say "high risk," you are referring to the
```

**SHERMAN - DIRECT / REILLEY**

1  high risk it posed to your Task Force 51 troops; correct?

2  A.   It could be Task Force 51 troops.  It could also be

3  federal law enforcement.  It was both a risk just to the

4  operation.

5  Q.   And there were approximately 120 to 150 Task Force 51

6  soldiers involved in the MacArthur Park operation?

7  A.   I believe that's too high.  I believe it's more like 90

8  that were there on the site.  We had some Mobile Response Force

9  people that were outside if they needed to respond, but I think

10  there was about 90 on the ground right there.

11  Q.   Do you recall at your deposition when you testified that

12  there were approximately 120 to 150 Task Force 51 soldiers?

13  A.   I think if you're including the MRP, that's probably -- or

14  the Mobile Response Force, that's a correct number.

15  Q.   And the Mobile Response Force was stationed near

16  MacArthur Park during the operation; correct?

17  A.   They were at -- we had them at Roybal, at Wilshire, and

18  Los Angeles Air Force base.

19  Q.   All right.  And there were approximately 40 Task Force 51

20  military vehicles that were involved in the MacArthur Park

21  operation?

22  A.   I believe that's correct, yes.

23  Q.   And those military vehicles included Humvees; right?

24  A.   They did.

25  Q.   It also included transport vehicles?

A213

SHERMAN - DIRECT / REILLEY

1  **A.**  It did.  It had LMTVs and I also believe there were some

2  JLTVs involved in that too.

3  **Q.**  It included 5-ton trucks as well; right?

4  **A.**  Yes.  Those are the LMTVs, that's correct.

5  **Q.**  If you could please turn to Tab 28 of your binder.  This

6  has been previously admitted as Exhibit 28.  And of this

7  document, we are going to publish page 2892.

8       Major General Sherman, you recognize this document;

9  correct?

10 **A.**  I do.  I don't know the date of which when this was

11 published, but, yes, I do.

12 **Q.**  And this relates to the MacArthur Park operation; correct?

13 **A.**  I assume so, yes.

14 **Q.**  Operation Excalibur --

15 **A.**  Yes.

16 **Q.**  -- refers to MacArthur Park?

17 **A.**  Yes, you're right.  That's correct.

18 **Q.**  And this relates to the July 7th operation; correct?

19 **A.**  If these are a full slide set, I could tell you by looking

20 at one.

21      (Witness examines document.)  Yes, that's correct.

22 **Q.**  If you could please turn to page 2892.

23      Do you see where it reads "Risk of inaction low"?

24 **A.**  Yes.

25 **Q.**  And can you please read aloud the section that immediately

SHERMAN - DIRECT / REILLEY

```
 1   follows that header?
 2   A.   Yes.  [As read]:
 3        "So risk of inaction low assessment.  Current
 4        intelligence does not indicate a high-volume or
 5        high-value target to federal function at this
 6        location.  No indication that failure to act would
 7        result in loss of life or significant property
 8        damage.  Expected law enforcement action is limited
 9        in scale, with few detainees anticipated and no
10        high-risk warrants involved.  Operation not informed
11        by time-sensitive intelligence or part of an
12        integrated targeting cycle."
13   Q.   And the MacArthur Park operation took place on July 7th,
14   which was a Monday morning; correct?
15   A.   Correct.
16   Q.   And given that it took place on a Monday morning, that
17   summary you just read is an accurate assessment of the risk
18   presented by the MacArthur Park operation; correct?
19   A.   That is correct.  It was changed because of the -- of an
20   operation that did take place on Monday, the 7th, after the
21   Fourth of July holiday.
22   Q.   All right.  So even if Task Force 51 troops had not been
23   involved in the MacArthur Park operation on July 7th, the risk
24   to the federal law enforcement officers would have been low;
25   correct?
```

SHERMAN - DIRECT / REILLEY

1   A.   That was our assessment.

2   Q.   Do you have any current involvement with the Los Angeles

3   deployment?

4   A.   I do not.

5   Q.   In fact, you have not had any involvement with the

6   deployment since July 10th; correct?

7   A.   That is correct.

8   Q.   You are aware, though, that there are 300 federalized

9   California National Guard soldiers who are still deployed;

10  right?

11  A.   I am.

12  Q.   And 300 soldiers is a full battalion?

13  A.   No, it's not.  It's like three-quarters of a battalion.

14  Q.   All right.

15  A.   It depends on the type of battalion that you're talking

16  about.  If this is an MP battalion, it's about three-quarters

17  of it.

18  Q.   And to your knowledge, those 300 federalized California

19  National Guard troops are still providing assistance to federal

20  law enforcement agencies; correct?

21  A.   They are conducting four requests for assistance as of

22  last night.

23  Q.   And what are those four requests for assistance?  What

24  operations are you assisting?

25  A.   They have personnel at the Roybal building in case it

SHERMAN - DIRECT / REILLEY

```
 1    needs defended, they have personnel at the Paramount facility
 2    in case that needs defended, and then two Mobile Response
 3    Forces.
 4    Q.   And the Mobile Response Forces can be called upon to
 5    engage in field operations; correct?
 6    A.   Yes, they could.
 7    Q.   Are you aware that this morning, Secretary of Defense
 8    Hegseth announced the deployment of National Guard troops in
 9    Washington, D.C.?
10    A.   I read it on the news.
11    Q.   Did you watch any news coverage of Secretary Hegseth's
12    announcement?
13    A.   I did not.
14    Q.   Are you aware that Secretary Hegseth said in his
15    announcement that the D.C. National Guard will, quote, "stand
16    with their enforcement partners," closed quote, and that,
17    quote, "We did the same thing in Los Angeles"?
18    A.   I do not -- I did not read that.  That's what he said.  I
19    did not see that.
20              MS. REILLEY:  At this time, Your Honor, we would like
21    to play that footage given that this is the party opponent
22    representative and the Secretary's statement is a party
23    opponent statement.
24              THE COURT:  Okay.  You may proceed.
25              MS. REILLEY:  Thank you, Your Honor.
```

SHERMAN - DIRECT / REILLEY

1          MS. LIN:  Your Honor, objection from us.  This is not
2     on the exhibit list.  This is not --
3          THE COURT:  You actually have to -- it's important we
4     have a record, so that's why you should come forward.
5         And also --
6          MS. LIN:  Apologies, Your Honor.
7          THE COURT:  -- I must tell you -- don't apologize.
8     It's perfectly all right.
9          MS. LIN:  I thought --
10         THE COURT:  I have a hard time hearing you when you're
11    at counsel table.  So I do want to hear what you have to say.
12         MS. LIN:  Okay.  That this particular, I believe it
13    was characterized as a press statement or video, is not part of
14    the exhibits list.  It's not part of the evidence of this case.
15    We were not informed that they were going to use this, even as
16    of this morning.
17         THE COURT:  Okay.  So how could it have been part of
18    the exhibit list when it occurred today?
19         MS. LIN:  We were not informed this morning either.
20         THE COURT:  Okay.  Well, now you're informed, and it
21    comes in subject to a motion to strike.
22         MS. LIN:  And, Your Honor, is it being offered for the
23    truth of the matter?
24         THE COURT:  It's being offered as a statement by a
25    party opponent.  The Secretary of Defense is a party opponent,

SHERMAN - DIRECT / REILLEY

```
 1    isn't he?
 2              MS. LIN:  Yes.  Understood.
 3              THE COURT:  Okay.  Thank you.
 4         It may be played --
 5              THE COURTROOM DEPUTY:  The exhibit number?
 6              THE COURT:  -- subject to a motion to strike.
 7              MS. REILLEY:  This will be the next exhibit in order,
 8    which I believe is 114.  Thank you.
 9         (Trial Exhibit 114 marked for identification.)
10                        (Pause in proceedings.)
11              THE COURT:  Do we have an estimate as to how long this
12    is going to take?
13              MS. REILLEY:  Your Honor, I was going to propose we
14    could try to download it if we took a recess.
15              THE COURT:  Yes, let's do that.
16         Well, do you have any other questions other than this?
17              MS. REILLEY:  No.  This will be my last one.
18              THE COURT:  Okay.  So let's do this:  Let's take our
19    noon recess, and we will resume at 1 o'clock sharp, and you may
20    play this at 1 o'clock sharp.
21              MS. REILLEY:  Thank you, Your Honor.
22              THE COURT:  And you may step down.  Thank you,
23    General.
24              THE WITNESS:  Thank you, Your Honor.
25              THE COURT:  Okay.  We're in recess till 1:00.
```

SHERMAN - DIRECT / REILLEY

```
 1                    (Luncheon recess taken at 12:27 p.m.)
 2    Afternoon Session                                  1:02 p.m.
 3            THE COURT:  Let the record show all parties are
 4    present.  The witness has returned to the witness stand.
 5        You may proceed.
 6            MS. REILLEY:  Thank you, Your Honor.
 7        (Trial Exhibit 114 received in evidence.)
 8            MS. REILLEY:  At this time, we are going to play
 9    what's been admitted as Exhibit 114, which is the Secretary of
10    Defense Hegseth's statement from this morning.
11            THE COURT:  Okay.  You may proceed.
12                (Video was played but not reported.)
13    BY MS. REILLEY:
14    Q.  Major General Sherman, you have not seen that video clip
15    before just now; correct?
16    A.  That's correct.
17    Q.  And you were not aware that Secretary of Defense Hegseth
18    made those statements before just now?
19    A.  That's correct.
20            MS. REILLEY:  At this time, the plaintiffs have no
21    further questions for Major General Sherman.
22            THE COURT:  Thank you.
23        Any examination?
24                    (Pause in proceedings.)
25            THE COURT:  Why don't you come over here.
```

SHERMAN - CROSS / LIN

```
1              MS. LIN:  Oh.

2              THE COURT:  It will be easier.

3                      CROSS-EXAMINATION

4    BY MS. LIN:

5    Q.   Good afternoon, General Sherman.

6    A.   Good afternoon.

7    Q.   Earlier today you were asked to look at several

8    photographs that were published by DVIDS.  Do you recall that?

9    A.   I do.

10             MS. LIN:  So if we could have maybe the same

11   photograph -- at least one of the photographs, 64, that was

12   discussed this morning, Exhibit 64.

13   BY MS. LIN:

14   Q.   And then there were others as well that you were asked

15   questions about.  And just for the record, if I got them

16   correctly, the DVIDS photos included Exhibit 66, 68, 75, and

17   76, and these were represented as being taken by Sergeant Chase

18   Murray?

19             MS. REILLEY:  Objection.  Leading.

20             THE COURT:  Overruled.

21             MS. LIN:  I'm sorry.  I didn't hear, Your Honor.

22             THE COURT:  I said overruled.

23   BY MS. LIN:

24   Q.   And just to get an understanding of these photos, I think

25   you testified that you were not there and you did not know what
```

SHERMAN - CROSS / LIN

1    the circumstances were when the photos were taken?

2    **A.**    Correct.

3    **Q.**    Okay.  As the commander of Task Force 51, do you have an

4    understanding of what Sergeant Chase Murray's responsibility

5    was in taking these photographs?

6    **A.**    Sure.  So Sergeant Chase Murray was attached to

7    Task Force 51 in our public affairs section.  By him taking

8    photos and for him posting on DVIDS, his whole purpose was to

9    show the Army, the military side of the operation.  He was a

10   member of Task Force 51, so he was able to be inside the actual

11   interior lines, if you will, taking pictures.  And his focus

12   was really taking pictures of soldiers or Marines, highlighting

13   what DOD was doing for the operation.

14   **Q.**    So was there any guidance to photographers, such as

15   Sergeant Chase Murray, about whether they were to also include

16   federal law enforcement personnel if they were there?

17   **A.**    It was much -- it was because federal personnel were

18   starting to get doxed.  They were starting to have real issues

19   there.  His guidance, given by our head public affairs officer,

20   is to avoid as much as possible taking any pictures of federal

21   law enforcement that were any kind of facial recognition or

22   names could be used in those -- those federal law enforcement

23   being doxed.

24   **Q.**    And so do you believe that the photos that were -- that

25   you were asked questions about from DVIDS fall within that

SHERMAN - CROSS / LIN

1   general guidance that was given to photographers attached to

2   Task Force 51?

3   **A.**   They were.

4          **MS. REILLEY:**  Objection.  Calls for speculation.

5          **THE COURT:**  I'll allow it.

6          **THE WITNESS:**  There are some photos in here, not all,

7   but there are some where he's gotten into position where he

8   makes sure that he hasn't taken pictures of federal law

9   enforcement; he's taken pictures of DOD personnel.

10  **BY MS. LIN:**

11  **Q.**   And if I could focus your attention on the first

12  photograph that I mentioned, Exhibit 64.

13  **A.**   Correct.

14  **Q.**   I think you were asked questions about this particular

15  photograph.

16      Do you see there's a yellow caution tape in front of

17  the -- I think you said the Task Force -- Task Force 51

18  soldiers?

19  **A.**   That's correct.

20  **Q.**   Is this yellow caution tape the type of equipment standard

21  issued for Task Force 51 troops?

22  **A.**   No.  Only federal law enforcement had that type of tape.

23  **Q.**   What other equipment were the Task Force 51 troops issued

24  for part of -- for this federal protection mission?

25  **A.**   So they had -- they had -- so for the civil disturbance,

**SHERMAN - CROSS / LIN**

1  beyond their typical uniform, which was just a standard

2  uniform, was boots, camouflage uniform.  They did have on their

3  armored vests -- they're what we call IOTV, but they're vests

4  that carried their armor plates -- and their ballistic helmet.

5  And then part of it was their civil disturbance kit, which

6  included kneepads, a body shield, a face shield, and a baton.

7  And then they also had their personal weapon that was slung

8  across their back.

9  **Q.**   To your knowledge, was any Task Force 51 soldiers used the

10  issued batons during the federal protection mission?

11  **A.**   I do not know of any instance where they actually used it

12  to hit anybody.  That never happened.

13  **Q.**   And does your knowledge extend beyond -- I think you

14  discussed earlier you left California on July 10th.

15  **A.**   Correct.

16  **Q.**   Do you have knowledge, after you left on July 10th, as to

17  what -- whether that was -- whether any soldiers used a

18  baton --

19  **A.**   No.  I was --

20  **Q.**   -- during their mission?

21  **A.**   I was still on the distribution for the nightly reports,

22  and I did not see any reports where batons were ever used.

23  **Q.**   When you mentioned that you were on the distribution, this

24  is the distribution from, I believe you testified,

25  General Nell?

**SHERMAN - CROSS / LIN**

1    **A.**   Correct.  General Nell would send her usual -- same thing

2    I did, send a nightly report to General Pepin and to

3    General Guillot, the commander of U.S. Northern Command.

4    **Q.**   And when you talk about the civil disturbance equipment,

5    did it include non-lethal munition?

6    **A.**   It did not include non-lethal munitions.  We considered

7    that a law enforcement action, so only civilian law enforcement

8    had any of that equipment.

9    **Q.**   And you mentioned that you were asked questions about the

10   personal weapons.  Can you let us know whether any soldiers,

11   pursuant to Task Force 51's federal protection mission, used

12   their personal weapons?

13   **A.**   They did not.  No -- no rounds were ever -- well, a term

14   we use -- "lock and loaded," which was putting a round into the

15   chamber.  They did have -- they did have magazines that were

16   loaded, but they never -- nobody ever chambered a round, never

17   were in a position that they thought that their life was in

18   jeopardy that they needed to do that.

19   **Q.**   And why is it that they were able to carry lethal weapons

20   but not non-lethal munitions?

21   **A.**   So strictly for self-defense.  If they thought their life

22   was in peril, that was the only time they were allowed to use

23   their personal weapon, is strictly for self-defense or defense

24   of another soldier or any lethal protection or any -- if they

25   saw some lethal force put against a federal law enforcement.

SHERMAN - CROSS / LIN

```
1    Q.   Thank you.
2         And if I can direct your attention to the discussion
3    earlier about Exhibit 38 that was -- you were asked questions
4    about it.
5    A.   Yes.
6    Q.   Do you have it in front of you on the screen?
7    A.   I don't see it on the screen, but I have it in front of
8    me.
9    Q.   I believe you were asked questions -- or I'm sorry.
10        I believe you were asked to read the last paragraph of the
11   "Patrol Narrative" section?
12   A.   I was.
13   Q.   Can I direct your attention to the third paragraph that
14   began with "National Guard soldiers establish their blocking
15   positions at approximately 0600," and the sentence continued?
16   A.   Yes.
17   Q.   Were National Guard soldiers attached to Task Force 51
18   permitted to establish blocking positions as part of the
19   federal protection mission?
20   A.   No.  It had to be -- because we considered that a law
21   enforcement action.  They could establish a blocking position
22   perimeter, if you will, if there was -- any time that they
23   thought law enforcement -- there was -- either preventing them
24   from doing their job or some kind of -- they saw as an imminent
25   threat of anything on that.  But in this --
```

SHERMAN - CROSS / LIN

1   Q.   So --

2   A.   Oh, I'm sorry.

3   Q.   So the reference here about National Guard soldiers

4   establishing their blocking positions, is that contrary to what

5   they were trained to do?  Or I guess I'm trying to get an

6   understanding of --

7   A.   Well, so --

8   Q.   -- why is it they established --

9        MS. REILLEY:  Objection.

10       THE COURT:  Well, wait, wait, wait.

11   What is your question?  You started asking two questions

12   at the same time.

13       MS. LIN:  Okay.  My apologies, Your Honor.

14   BY MS. LIN:

15   Q.   So I'm asking whether you can explain to me if what you're

16   saying is that they are not permitted to establish blocking

17   positions, but the paragraph here is talking about National

18   Guard soldiers establishing their blocking positions.

19       MS. REILLEY:  Objection.  Calls for speculation.

20       THE COURT:  I'll allow it.

21       THE WITNESS:  So on the previous paragraph, where it

22   talks about -- where it started with "National Guard, DEA, and

23   FBI arrived at the objective.  Blockades were established and

24   each blockade was accompanied by a marked Los Angeles Sheriff's

25   vehicle."

SHERMAN - CROSS / LIN

```
 1          The sheriffs were used in this operation because this
 2     person had already been -- saw that they had -- had caused
 3     significant -- they'd hurt a federal agent.  So, actually, this
 4     was a time when Los Angeles Sheriff's Department was allowed;
 5     they were actually part of this operation.  So not only were
 6     they there on the checkpoint -- they call it blockade in this
 7     case.  I don't like his wording here, but this is a very young,
 8     22-year-old officer here.
 9          But both blockades were also accompanied by DEA SWAT, so
10     Drug Enforcement Agency SWAT teams that were also at those
11     blockades, which are traffic control points, with less than
12     lethal munitions.  So it was law enforcement in the lead, with
13     our soldiers behind them.
14     BY MS. LIN:
15     Q.   So pursuant to the federal protection mission, are the
16     soldiers permitted to be establishing blocking positions if the
17     law enforcement personnel were the lead at that operation?
18     A.   They're allowed to be behind the federal law enforcement
19     or, in this case, L.A. County Sheriff were the ones
20     establishing the traffic control point, the blocking position,
21     and our soldiers were behind them strictly to protect them if
22     there was any threat.
23     Q.   So I think you testified that you were not at this
24     operation.  So I guess my question to you then is:  What are
25     the soldiers trained to do with respect to blocking positions
```

SHERMAN - CROSS / LIN

1   as part of the federal protection mission?

2   **A.**   So this is my number one priority -- or my number two

3   priority.  My number one priority was always the welfare and

4   safety of soldiers and Marines, but Number 2 was to ensure that

5   they followed the standing rules on the use of force exactly as

6   was written.

7       And for these operations, when battalion commanders and

8   their staffs would brief me on the operations, that was the

9   first question I asked:  What's your mission?  What are you

10  allowed to do?  What are you not allowed to do?  And what are

11  you doing?

12      It's standard, but it's something -- especially when

13  you're talking something as early as the first week of this

14  operation, the 13th, it was making sure they fully understood

15  because these are soldiers that had done previous riot

16  operations in a Title 32 state active duty status, which is

17  different, I wanted to make sure they fully understood under

18  Title X what they were allowed to do.

19      And then part of this was they weren't allowed to do any

20  law enforcement actions.  Law enforcement had to do it

21  themselves.  This is, we were strictly there to protect federal

22  law enforcement, allowing them to do their law enforcement job.

23  **Q.**   Okay.  And so, to your knowledge, no Task Force 51

24  soldiers acting pursuant to the federal protection mission

25  established blocking positions that were just by themselves,

SHERMAN - CROSS / LIN

 1    not connected with law enforcement personnel on the scene?

 2    A.    That's correct.  The only time they got out in front and

 3    established a blocking position is if there was some kind of

 4    risk posed to the federal law enforcement, not allowing them to

 5    do their job.

 6    Q.    And I think you mentioned earlier about the risk posed and

 7    the feeling of the commander, if I'm remembering your testimony

 8    correctly.  I think you mentioned that if the commander felt

 9    threatened.

10          Can you explain a little bit more when you are describing

11    if a commander felt threatened?  What is that -- what does that

12    entail, as far as you know, as the commander --

13    A.    Well, we use a --

14    Q.    -- of Task Force 51?

15    A.    Sure.  We use a thing in the military called mission

16    command.  That means the commander knows what their left and

17    right boundaries are.  They understand the mission.  They

18    understand the reason they were there:  either they were at a

19    facility to protect a federal facility or they were out on a

20    mission to protect federal law enforcement, allowing them to do

21    their job.

22          They have the ability on the ground to make decisions,

23    depending on how they sense how things are going.  And that's a

24    sense if they're feeling a threat, do they feel like the crowd

25    is hostile, do they feel like the law enforcement is prevented

SHERMAN - CROSS / LIN

 1    from doing their job, or that it could be a dangerous enough --

 2    something could be happening that they could actually hurt or

 3    endanger the law enforcement, then they had the ability to

 4    react.

 5    **Q.**   Okay.  So this is, from your description, you're

 6    talking -- am I correct to say that you're talking about they

 7    can conduct a risk assessment on the ground?

 8            **MS. REILLEY:**  Objection.  Leading.

 9            **THE COURT:**  Sustained.

10            **MS. LIN:**  Let me ask the question differently.

11    **BY MS. LIN:**

12    **Q.**   So when you say they felt threatened, I think you gave me

13    some explanation as to what that meant.  My question is:  Did

14    that -- what did it entail if you have to identify them?

15    **A.**    It was them on the ground, gauging from their own sense,

16    doing assessment, if you will, of how they felt the crowd was

17    reacting.  If they thought it was endangering the federal

18    agents, one, or preventing them from doing their job, then they

19    could act.

20    **Q.**   And did it actually -- did it have to be an actual threat

21    or was it -- that's my question.  Did it have to be an actual

22    threat?

23    **A.**    No.  It could be -- there could be a crowd that's pushing

24    up against the federal law enforcement, not allowing them to do

25    their job.  It's a preventive measure too.

SHERMAN - CROSS / LIN

1   **Q.**   Preventive measure?

2   **A.**   Sure.

3   **Q.**   So when you say "preventive measure," does that mean that

4   if there were no crowd, would it still be permissible?

5   **A.**   No.

6   **Q.**   -- as a preventive measure?

7   **A.**   So if there was no crowd, they wouldn't be going forward.

8   They'd be -- still the federal law enforcement have their

9   traffic control point.  There would be no reason.  They'd just

10   be standing behind them.  Very similar to some of the pictures

11   we saw.

12   **Q.**   I see.  So they would still be permitted to be standing

13   next to or behind -- I'm sorry -- standing behind law

14   enforcement?

15   **A.**   Correct.  Somewhere within a -- you know, a distance where

16   they could react quickly if the situation -- if something

17   happened and they deemed it necessary, they needed to react.

18        **THE COURT:**  I'm sorry.  I want to make sure I

19   understand that.

20        If there's no threat and there was never an expectation of

21   a threat, is it your testimony you could still have military

22   out on the operation?  If there was no threat.

23        **THE WITNESS:**  Well, the only -- Your Honor, the threat

24   we had, so that -- like those threat assessments that were put

25   up there as --

A232

SHERMAN - CROSS / LIN

```
 1          THE COURT:  So let's say you got a threat assessment
 2   which said it was low or non-existent.
 3          THE WITNESS:  Sure.
 4          THE COURT:  Can you send out military?
 5          THE WITNESS:  Absolutely, Your Honor, because that's
 6   just an assessment of what we thought would happen on the
 7   ground, but it could -- it could get much worse.
 8          THE COURT:  So it's your testimony that whenever there
 9   is local law enforcement carrying out an operation, and even if
10   there is no threat, you can send the military out?
11          THE WITNESS:  Yes, sir, that's correct.  With this
12   mission, with the federal law enforcement -- because it was
13   just an assessment that they didn't think anything would
14   happen; but if something did happen, take, for instance, they
15   had a low -- a low assessment, there was one time we didn't --
16   we didn't have any force there, we actually had to respond.
17   They had a low threat assessment.  There was -- they didn't
18   think anything was going to happen, but they started to -- they
19   went to a house to -- to act on a warrant, and there was
20   actually a construction site across the street and that crowd,
21   actually the people from the construction site, came down and
22   started harassing the federal law enforcement officers.
23          THE COURT:  So that's a case in which a threat
24   developed.
25          THE WITNESS:  Yes, sir.
```

A233

SHERMAN - CROSS / LIN

1          THE COURT:  Okay.  But my question is a different

2     question.  My -- and maybe it was anticipated that that's a

3     possibility, but if it's not -- if it's not seen as a situation

4     in which there is a threat, then is it your testimony you can

5     still deploy the military because there may be a threat in

6     carrying out the operation?

7          THE WITNESS:  That's correct, Your Honor.

8          THE COURT:  So, in other words, if you have -- let's

9     say you are executing the laws of the immigration -- the

10    immigration laws, which are, in certain circumstances,

11    unpopular, in certain contexts, unpopular --

12         THE WITNESS:  Right.

13         THE COURT:  -- but you have no evidence that there's a

14    threat or that people would constitute a threat.  Is it your

15    testimony you can send out the military on that operation?

16         THE WITNESS:  Yes, and we did, Your Honor.

17         THE COURT:  Okay.  Now, let's say you had cases

18    involving low compliance with the tax laws and you have a

19    person who is a tax protestor but there's no evidence that that

20    person constitutes a dangerous situation -- constitutes a

21    dangerous situation.  Send out military in that?

22         THE WITNESS:  Well, we never had a situation like

23    that, Your Honor.  We never supported the IRS on any type of

24    operation as far as going and anybody who was evading taxes.

25         THE COURT:  But it's a federal law.  I'm just trying

SHERMAN - CROSS / LIN

1    to figure out, if you are enforcing -- if there is a federal

2    law, such as the tax law or the immigration law or the drug

3    laws, which are co-terminus federal and state, if you're

4    enforcing these laws and there's some indication that the law

5    is unpopular among the public or among the group that is the

6    subject of the enforcement, is it your view you can send out

7    the military in the -- that you can send out the military to

8    support the operation?

9        THE WITNESS:  Your Honor, if it was -- if it was in

10   line with the direction that we've gotten with both

11   the President's memo and the Secretary's memo and it was

12   supporting federal agencies or federal law enforcement beyond

13   DHS, that was performing functions and it was legally reviewed

14   and they deemed it a valid mission, we could do that.

15       THE COURT:  Well, I'm actually not asking you whether

16   the lawyers looked at it.

17       THE WITNESS:  Right.

18       THE COURT:  But maybe they would.  I assume that.

19       But I'm trying to figure out really what boundaries there

20   are established by the Posse Comitatus Act.

21       And I looked through the file, and I saw a very helpful

22   slide presentation of:  You can't do this.  You can't do that.

23   You can't do a third thing.  You can't do a fourth thing.

24   So -- and there are a number of things you can't do.

25       And essentially I'm trying to figure out whether you can

SHERMAN - CROSS / LIN

```
1   do any of those things when what the -- what the law

2   enforcement -- not the military -- the law enforcement is

3   trying to enforce an unpopular law.  Can you then, because it's

4   an unpopular law, use the Posse Comitatus -- I mean, use

5   federal forces?

6           THE WITNESS:  Well, I'm not a lawyer.

7           THE COURT:  Well, your judgment.  You're the one who's

8   telling me --

9           THE WITNESS:  Well, in my judgment, if it's -- if it's

10  in line and it also fits, according to the brief that you saw,

11  our standing rules on the use of force brief, which actually

12  had constitutional exceptions in there that's showing that

13  we're protecting federal property and enforcing federal law or

14  allowing personnel to enforce law, then we deemed it that it

15  was legally appropriate.

16          THE COURT:  Do you draw any distinction between

17  enforcing federal law and protecting federal property?

18          THE WITNESS:  No.  The -- well, so federal property

19  was -- part of that, Your Honor, was to protect federal

20  property from defacement, from being damaged, and to allow the

21  federal employees that were there, allow them to do their job.

22          THE COURT:  Well, but my question is a little

23  different.  I understand -- at the Roybal building, I

24  understand.  You know, I understand what -- this building.  I

25  understand federal property.
```

A236

SHERMAN - CROSS / LIN

```
 1              THE WITNESS:  Right.
 2              THE COURT:  And I understand that there is -- there
 3    may be a particular role in protecting federal property, but
 4    I'm not talking about federal property.  I'm now talking about
 5    federal law, which, in some cases, obviously, involve federal
 6    property, but I'm talking about those cases in which it's not
 7    involved, MacArthur Park or some marijuana farm somewhere.
 8    Though there may be federal laws that are implicated, there's
 9    not federal property.
10         So if there are federal laws that are implicated and those
11    laws are unpopular laws and there is no threat, known threat,
12    to the military that there's going to be force used in
13    connection with the implementation of the law, is it your view
14    that you can send out the military?
15              THE WITNESS:  Yes, Your Honor, we could because it was
16    our view, because it was just an assessment that we had of the
17    situation on the ground, it could turn out to be differently,
18    happen very different.
19              THE COURT:  And that's true, isn't it, always the
20    case?  In other words, it's always the case you have an
21    assessment, a preincident assessment, and then you have the
22    reality of what happened.
23         Now, it doesn't -- the reality doesn't tell us what the
24    alternatives are, and I appreciate that.  But assessments that
25    are preincident or predeployment are done in advance, aren't
```

SHERMAN - CROSS / LIN

1    they?

2            THE WITNESS:  They are, Your Honor.

3            THE COURT:  They may turn out to be inaccurate in the

4    sense that actually circumstances develop different from what

5    the assessment would have been.

6            THE WITNESS:  Absolutely, Your Honor.  Could I further

7    explain on that?

8            THE COURT:  You sure can.  You go right ahead.

9            THE WITNESS:  So in the military --

10           THE COURT:  I don't want to cut you off.

11           THE WITNESS:  In the military, we develop plans.  We

12   tell very comprehensive plans.  You can see inside these books.

13   These are -- these -- all of these detailed plans, these were

14   all done by military planners because it's kind of the detail

15   planning that we need because we're very much -- we're very

16   much an NFL team, if you will.  We make sure that we plan in

17   detail both offense and defense, that we fully understand the

18   situation on the ground and that we're able to react.

19       In this case, we know that a plan only is good enough

20   until you actually -- it actually commences because we always

21   say the opposition has a vote.  Some things happen; and while I

22   wasn't there, we saw that at Camarillo.  We had had an

23   operation planned in RFA and two days before it happened, the

24   Border Patrol or CBP had canceled that RFA because the

25   assessment was that there wasn't going to be military needed at

SHERMAN - CROSS / LIN

```
 1   that location.
 2        Well, after the -- after the operation that happened at
 3   Carpinteria and all that being on the -- on the news and with
 4   the helicopters there, that's when a lot of people showed up.
 5   And then there was one instance where they actually -- well, at
 6   that instance at Camarillo, they actually had more illegal
 7   aliens than they originally thought was going to be there.  It
 8   was actually 300, which overwhelmed them right then.  And then
 9   they started having large crowds come to their traffic control
10   points; and right from there, that's when they -- yeah, they
11   had large crowds that came to their traffic control points.
12   And then from there, they knew they had a situation that they
13   needed extra help, and that's when they called Task Force 51 to
14   bring personnel in from our Mobile Response Force to help them
15   with the situation on the ground.  Because they knew they had a
16   very -- they had a crowd that was very upset, somewhat hostile,
17   and they needed help because they got overwhelmed.
18        THE COURT:  But they were called in when there was a
19   demonstrable threat.
20        THE WITNESS:  Correct.
21        THE COURT:  Okay.
22        THE WITNESS:  That's correct, Your Honor.
23        THE COURT:  Thank you.
24        THE WITNESS:  Yes.
25        THE COURT:  Thank you very much.
```

131

SHERMAN - CROSS / LIN

1   BY MS. LIN:

2   **Q.**   General Sherman, I think the judge posed the question

3   about if a law is unpopular, how does that factor into your

4   decision as the commander of Task Force 51.

5        My question to you is:  Who makes the law enforcement

6   determination as to whether the law is unpopular or whether

7   that law enforcement operation is a valid law enforcement

8   operation?

9   **A.**   So that's happened at the IEC.  We don't have any part in

10  that part of it.  The actual law enforcement operation, that

11  was decided at the interagency coordination cell, along with

12  the Attorney General that's there for that district, along with

13  the FBI, along with all the federal agencies, they go through

14  the process.

15       With our mission that we were given, we were there to go

16  on the federal -- on their law enforcement missions to protect

17  them when and if needed.

18  **Q.**   So you're not concerned, as part of your federal

19  protection mission, as to whether the law is popular or

20  unpopular?  That's not part of your consideration; is that

21  correct?

22  **A.**   It was not.

23            **MS. REILLEY:**  Objection.  Leading.

24            **THE COURT:**  Sorry?

25            **MS. REILLEY:**  I objected to the question as leading.

SHERMAN - CROSS / LIN

1          THE COURT:  I'll allow it.

2      Go ahead.

3          THE WITNESS:  No, that wasn't with our mission.  That

4  wasn't a part of -- we certainly don't do federal law

5  enforcement functions.  It's not our -- it is not our place to

6  make any determination.  That's federal law enforcement.  On

7  whether a law is popular or unpopular, they're enforcing

8  federal law.  It was our mission in this case to go along with

9  them, to partner with them, to be there to protect them if they

10  did encounter any hostile crowds or actions.

11  BY MS. LIN:

12  Q.  And the judge asked you earlier about the list of

13  activities, and you also -- in response, you mentioned the

14  standard -- standing rules for the use of force, and I believe

15  counsel also asked you about that.

16      Can I have you look at that exhibit, which has already

17  been admitted into evidence and is Exhibit Number 10?

18          THE COURT:  And the page is?

19  BY MS. LIN:

20  Q.  And the page number on that, if I could direct your

21  attention to page 1101; or to be more accurate, DEFS 00001101.

22      Do you see the section that's entitled "Constitutional

23  Exceptions"?

24  A.  I do.

25  Q.  Do you see if one of these items listed here -- and

SHERMAN - CROSS / LIN

1  there's one, two, three, four, five -- whether that describes

2  what you believe to be your current federal protection mission?

3  A.   Well, number two is from the protection of federal

4  property functions and personnel.

5  Q.   So in carrying out this -- in trying to protect federal

6  property functions and personnel, is it your view that you are

7  conducting law enforcement activities?

8  A.   No, not conducting law enforcement; protecting federal

9  property, functions, and personnel, allowing them to -- federal

10  personnel to do their job.

11  Q.   So just so I'm understanding your answer correctly, when

12  you're protecting federal personnel, does that involve the

13  federal personnel being on law enforcement missions that's

14  not -- that's at large?

15  A.   No.  They could be -- actually be federal personnel not on

16  mission.  That would be at the federal property, doing their

17  job.  But certainly, yes, if they were doing their federal law

18  enforcement job, it's protecting them, allowing them to do

19  their function, to do their federal law enforcement job, and to

20  protect them.

21  Q.   And so the judge asked you questions about the threat

22  assessment.  I think you gave one example or two examples.  One

23  was a search warrant and the other one was the Camarillo.

24      Is this the type of anticipated threat or actual threat

25  that is part of your consideration as whether to grant a

SHERMAN - CROSS / LIN

```
 1   request for assistance?  Or is it --
 2   A.   No.  No.  So I --
 3            THE COURT:  I'm sorry.  I don't understand the
 4   question.
 5            MS. LIN:  Let me rephrase it.  That was --
 6            THE COURT:  Is the existence of a search warrant part
 7   of the witness's consideration?  Is that your question?
 8            MS. LIN:  No, I'm sorry.  Your Honor, let me strike my
 9   question.
10            THE COURT:  Okay.
11            MS. LIN:  I'll ask a better question.
12   BY MS. LIN:
13   Q.   So we were talking earlier about the example of a search
14   warrant being carried out and also the Camarillo situation.
15        In both instances, I gather from your testimony was that
16   you didn't anticipate that there was going to be any threat,
17   but threat developed during the operation.  Am I correct?
18   A.   That's correct.
19   Q.   And so I think the judge's question to you was if there
20   were no such -- if you had no knowledge whether any threat was
21   going to occur, how does that factor into your decision whether
22   to grant the request for assistance?
23   A.   It really didn't.  It -- it came to -- it was really
24   determined that threat assessment that we did, those were
25   actually our staff that did that, that was what we thought was
```

SHERMAN - CROSS / LIN

```
 1    going to happen at the operation.
 2         It -- it played into -- especially with high risk, if
 3    that's where we -- that's where it needed to go up higher than
 4    me.  I approved everything moderate and below.  But anything of
 5    high risk or extremely high risk, it went to a higher commander
 6    just because we thought it was either a very risky operation to
 7    either federal law enforcement and/or our soldiers in this
 8    case, if it was an operation outside the federal facilities.
 9         But those -- that assessment was strictly our own.  It
10    played into just our risk we thought the operation was.  What
11    didn't play in, if we were going to protect them for an
12    operation.  They had the request.  They believed -- federal law
13    enforcement believed they wanted to have law enforcement -- or
14    they wanted to have military there to protect them in case.  It
15    was their belief that something could happen there.  So it
16    was -- and the operation totally abided by the law, as we saw
17    it, and that it was legal, then we went ahead and -- went ahead
18    and approved the operation.
19         THE COURT:  Well, General, let's take your example.
20    You said that there was a risk assessment which showed that it
21    was low, and that it didn't -- that the information that you
22    had, which was developed internally or developed by your forces
23    or the people who advise you --
24         THE WITNESS:  Correct.
25         THE COURT:  -- your staff, they said there's a low
```

SHERMAN - CROSS / LIN

```
1   risk of force or violence.  That's what you're told.  And
2   I think you gave two examples of it, or maybe one.  It escapes
3   me at the present time.  Forgive me.  But that you were told by
4   somebody that the forces should be employed, notwithstanding
5   the risk assessment that you were given.  As I understand,
6   that's your testimony.
7              THE WITNESS:  Yeah.  As part of the risk --
8              THE COURT:  Okay.
9              THE WITNESS:  -- the request for assistance, the law
10  enforcement still would like military.
11             THE COURT:  And who told you -- who told you, in those
12  cases?  Who said to you, "General, I know you're the commander
13  of Task" -- what is it? -- "Task Force 51.  I know you're the
14  commander and I know you've received an assessment of no
15  danger, but I'm advising you that I want you, nevertheless, to
16  employ troops"?  Who told you that?
17             THE WITNESS:  Nobody talked to me directly if you say
18  it that way, for most operations, Your Honor, because it was a
19  request that they sent up.  They had gone through the
20  interagency coordination cell, through our personnel there and
21  had come to Task Force 51.  The law enforcement was asking for
22  military support.
23             THE COURT:  I understand, but the Task -- you say the
24  law enforcement.  The law enforcement is local; is that right?
25  When I say "local" --
```

SHERMAN - CROSS / LIN

```
 1              THE WITNESS:  No.
 2              THE COURT:  Pardon me.  The law enforcement is
 3      non-military that you're referring to?
 4              THE WITNESS:  Correct.  That's correct.
 5              THE COURT:  So non-military -- non-military people
 6      told you that they wanted your -- the military force to be
 7      present, notwithstanding the information you got from the
 8      military people?
 9              THE WITNESS:  Correct.  That -- well, they were
10      requesting.  They didn't tell me.  They requested.  They were
11      asking for military support.  Even if our assessment was low,
12      they had a belief or even if -- even if they thought it was
13      low, it was -- it was a safety measure for them to ensure that
14      if something did happen at that location, they had protection.
15              THE COURT:  And, General, wouldn't that always be the
16      case?  Whenever -- if it's even a low risk, if the civilian --
17      what I'm calling the civilian as distinct from the military --
18              THE WITNESS:  Yes, sir.
19              THE COURT:  -- the civilian may tell you, "You know,
20      we want military just in case" --
21              THE WITNESS:  Absolutely.
22              THE COURT:  -- "something happens."
23              THE WITNESS:  Absolutely, Your Honor.  They always
24      wanted military there, and we had plenty of capacity to do
25      that.
```

SHERMAN - CROSS / LIN

```
 1              THE COURT:  All right.  Okay.  I think that answers
 2    the question.  Thank you, General.
 3              THE WITNESS:  Yes, Your Honor.  Thank you.
 4              THE COURT:  Anything further?
 5              MS. LIN:  Yes, Your Honor.
 6              THE COURT:  Go ahead.
 7              MS. LIN:  Just a couple more points in relation to
 8    what was discussed earlier.
 9    BY MS. LIN:
10    Q.   I think if I could turn your attention to Exhibit 41 that
11    you were asked questions about.
12         Do you have it?
13    A.   I do.
14    Q.   I believe you were asked to read the last paragraph
15    earlier by counsel, and in this paragraph it mentions
16    establishing outer cordon.  Do you see that?
17    A.   I do.
18    Q.   Were Task Force 51 troops permitted to establish outer
19    cordon?
20    A.   Well, so you see there where the "End State.  Joint
21    federal and military companies," why -- I think it's poorly
22    written, poorly worded.  But joint federal and military
23    companies, when they say "federal," they meant joint federal
24    law enforcement and military companies.
25         In this case, military police companies established the
```

SHERMAN - CROSS / LIN

1    outer cordons, secured designated sites, enabling safe entry

2    for DEA personnel.

3    **Q.**    And you do not recall this particular operation or did

4    you?

5    **A.**    Oh, no, I know this operation.  This is the -- this is the

6    Mecca operation, yes.

7    **Q.**    So to be clear, what were the soldiers trained to do with

8    respect to the ability to establish outer cordons?

9    **A.**    So they were there -- so I think -- so there was a large

10   irrigation ditch, canal, outside this grow operation.  So they

11   were actually outside, lined up along the road there, and they

12   got out of their vehicle to watch the operation that was

13   happening inside the -- inside the grow area that was there.

14        There was only one place that they had a traffic control

15   point, and that was actually a bridge that crossed from the

16   canal over into the grow area.  We had soldiers there, but it

17   was run by federal law enforcement.  I don't know if it was DEA

18   or not.  But federal law enforcement ran that traffic control

19   point.

20        There was a news crew there.  There wasn't any -- they

21   didn't -- they didn't encounter any resistance at all or

22   anything.  It was one news crew because they had seen all the

23   vehicles coming down the road because they had come in from

24   March Air Reserve Base.  So it was about an hour and a half

25   drive, so there was plenty of people to see them and call.

SHERMAN - CROSS / LIN

1  Q.   I see.  But as far as you know, do you whether law

2  enforcement -- sorry -- whether Task Force 51 troops conducted

3  any law enforcement activities?

4  A.   They did not.  They didn't -- they just stayed on the

5  outside.  They were not needed.  They were there to first

6  protect the traffic control point; but if they did encounter --

7  federal law enforcement encountered resistance inside of this

8  large grow operation, their job was to go in to help them,

9  protect them, break contact, if you will, if they were

10 receiving any kind of fire, and break contact and get them out

11 safely.

12 Q.   So, in your view, their activities were consistent with

13 what they were charged to do, which is the federal protection

14 mission?

15 A.   That's correct, yeah.  They were there to -- they were

16 there strictly to protect federal law enforcement as they did

17 their law enforcement jobs.

18 Q.   And just one last question also about the photographs that

19 we were talking about earlier.  If I can refer you to

20 Exhibit 69.  This is another picture that you were asked

21 questions about.

22 A.   Yes.

23 Q.   And just -- and this is another photograph I believe --

24 A.   I don't think it's up on the screen yet, but...

25 Q.   Oh.

141

SHERMAN - CROSS / LIN

1   A.   Yes.

2   Q.   So you were asked to -- or you were read to -- the caption

3   was read to you, and the second sentence of this caption

4   references establishing a security perimeter in Mecca,

5   California?

6   A.   Correct.

7   Q.   Is this reference to a security perimeter in Mecca,

8   California, consistent with the federal protection mission that

9   the Task Force 51 troops were charged with carrying out?

10  A.   No.  Is it a perimeter?  It's a perimeter because they

11  have their vehicles lined up right there because they're

12  actually down -- they're lined up on a road that actually --

13  you see right there in front of them is actually a canal.  You

14  can see that little part, which that means nobody could get

15  across -- anybody coming out of the grow operation couldn't get

16  across that canal unless they were swimming.

17       But they were there, lined up, just watching what was

18  going on inside the actual grow operation itself.  They had the

19  vehicles lined up.  If they did need to drive in from there, it

20  was just a lot of vehicles.  I think over 40 -- 40, 50

21  vehicles.  It was -- you know, precisely it was 314 soldiers.

22  So it was a lot of vehicles, a lot of soldiers there that were

23  lined up on both sides of the traffic control point there.

24  They were outside their vehicles, on alert.

25       There's another photo in here where you see them talking

SHERMAN - CROSS / LIN

1  on -- there's some leaders talking on a radio.  So they were

2  all in contact finding -- you know, just keeping up-to-date

3  what was happening inside the grow operation.

4       You're talking about, as I understand it, it was -- it was

5  a land that was about 800 acres.  It was a very large

6  operation.  And, you know, they heard everything going on the

7  radios.  There was contact.  All the company commanders and

8  above did have radios, so they could hear what law enforcement

9  was talking about.

10      But -- and we did have intelligence -- I wouldn't call it

11 intelligence.  They just had -- law enforcement told us that

12 they had -- they thought that there were people inside this

13 operation, human smuggling, enslavement, if you will.  They

14 found I believe it was about 87 Chinese nationals that were

15 handcuffed inside -- inside buildings that were there not on

16 their own free will.

17 **Q.**   Okay.  So, to your knowledge, though, looking at this

18 photograph, it does not -- does it indicate to you whether this

19 is consistent with the federal protection mission?

20 **A.**   Yeah, with what this operation was because there was just

21 one small little area they could actually get across the canal

22 into the grow operation.  Yes, this was consistent.

23      Were they doing a cordon here?  No.  They were lined up,

24 ready to go if they needed to get called in.  They just

25 happened to be lined up that way.

SHERMAN - REDIRECT / REILLEY

1      **MS. LIN:**  I have no further questions, Your Honor, but

2  we do have General Sherman as our case-in-chief tomorrow.

3      **THE COURT:**  Yes.  However, I assume the testimony he

4  will give tomorrow will not be cumulative to what he gave

5  today.

6      **MS. LIN:**  We'll certainly attempt to do that other

7  than to bring in the topic or the background.

8      **THE COURT:**  I'll aid you in that endeavor, I promise.

9      **MS. LIN:**  We appreciate that, Your Honor.

10      **THE COURT:**  Okay.  All right.

11  You may cross.

12      **MS. REILLEY:**  Thank you, Your Honor.

13                    <u>REDIRECT EXAMINATION</u>

14  BY MS. REILLEY:

15  **Q.**   Major General Sherman, you were not present when

16  Sergeant Murray took any of the photographs that were published

17  to the DVIDS website; correct?

18  **A.**   I was not.

19  **Q.**   All right.  And so you don't have any information about

20  where Sergeant Murray was standing relative to the troops when

21  he took those photographs?

22  **A.**   No, I wouldn't say that.  Did I know his directions that

23  he was given by the public affairs officer of Task Force 51 to

24  make sure that he got soldiers -- or he got pictures of

25  soldiers?  I know that for a fact because I was -- I was, like,

SHERMAN - REDIRECT / REILLEY

1  "Where are the pictures of soldiers?  We need pictures of them
2  doing their duty."
3  **Q.**  So you know what the instructions he was given were, but
4  you don't know physically where he was standing when he took
5  the photographs; correct?
6  **A.**  No, I don't.  I could make an assumption, but I don't
7  know.
8  **Q.**  You testified a moment ago that Task Force 51 troops never
9  used their batons to hit during the deployment, but you were
10  not present during any of the field operations; correct?
11  **A.**  That's correct.
12  **Q.**  And you do not know if batons were used for any other
13  purpose, such as to block pedestrian foot traffic; correct?
14  **A.**  There was no report ever brought up to me on that.
15  **Q.**  All right.  Again, you weren't present on those
16  operations, so unless a report was brought to you, you would
17  not have heard about it; correct?
18  **A.**  Correct.
19  **Q.**  You testified a moment ago about Exhibit 38, which was the
20  briefing from the Long Beach operation, and you testified that
21  law enforcement was in the lead on that operation.  Do you
22  recall that testimony?
23  **A.**  I do.
24  **Q.**  You were not present at that operation; correct?
25  **A.**  I was not.

1  Q.   And you testified earlier today that you did not receive
2  any briefing after that operation; correct?
3  A.   I did not.
4  Q.   So you do not know for a fact that the troops did actually
5  stay behind federal law enforcement agents during that
6  operation; correct?
7  A.   That is correct.
8  Q.   And you also don't know for a fact that the individual who
9  drafted that report is 23 years of age; correct?
10 A.   He's a young second lieutenant, so he could be -- I don't
11 know his exact age, but he's young.  I remember him.  He's a
12 very young officer.
13 Q.   And you testified with Ms. Lin a moment ago that there are
14 constitutional exceptions to the Posse Comitatus Act; is that
15 your understanding?
16 A.   That's what we've been trained, yes, with the standard
17 rules on the use of force briefing, correct.
18 Q.   And, again, you're not a lawyer; correct?
19 A.   That is correct, I'm not a lawyer.
20 Q.   So you could not point me to the portion of the
21 Constitution that sets forth the exception you've been
22 testifying about today; correct?
23 A.   I cannot.
24 Q.   And you testified about the training slides that
25 Task Force 51 reviewed.  That was Exhibit 10.  Those slides

SHERMAN - REDIRECT / REILLEY

1   were drafted by the staff judge advocate for Task Force 51;

2   correct?

3   **A.**   For, I believe, Army North.  Army North did the slides.

4   **Q.**   And that individual who drafted the slides, the staff

5   judge advocate is a lawyer; correct?

6   **A.**   Correct.

7           **MS. REILLEY:**  Plaintiffs do not have any further

8   questions at this time.

9           **THE COURT:**  Thank you.

10      Anything further?

11          **MS. LIN:**  No, Your Honor.

12          **THE COURT:**  Okay.  Thank you very much, General, and

13   you're excused from this portion, but you may remain in the

14   courtroom.

15          **THE WITNESS:**  Thank you, Your Honor.

16                        (Witness excused.)

17          **THE COURT:**  All right.  Call your next witness.

18          **MS. LOPEZ:**  Good afternoon, Your Honor.  Lorraine

19   Lopez, Deputy Attorney General, for the plaintiffs.

20      We would like to call Ernesto Santacruz Jr. as our next

21   witness.

22          **THE COURT:**  Okay.  And let's see.  Yes, please would

23   you bring him in?

24                        (Pause in proceedings.)

25          **THE COURT:**  And is this your third and final witness,

SANTACRUZ - DIRECT / LOPEZ

```
 1   or do you have four?
 2              MS. LOPEZ:  Yes, Your Honor.
 3              THE COURT:  Okay.  Thank you.
 4                     (Pause in proceedings.)
 5    (Witness enters the courtroom and steps forward to be sworn.)
 6                     ERNESTO SANTACRUZ,
 7   called as a witness for the Plaintiffs, having been duly sworn,
 8   testified as follows:
 9              THE WITNESS:  Yes.
10              THE COURTROOM DEPUTY:  Thank you.  You may be seated.
11      Please state your full name for the record and spell your
12   last name.
13              THE WITNESS:  Ernesto Santacruz.  Last name
14   S-a-n-t-a-c-r-u-z.
15              MS. LOPEZ:  Thank you.
16                     DIRECT EXAMINATION
17   BY MS. LOPEZ:
18   Q.   And nice to see you again, Mr. Santacruz.
19        You are currently employed by U.S. Immigration and
20   Customs Enforcement; correct?
21   A.   That is correct.
22   Q.   And you are employed in Enforcement and Removal Operations
23   specifically; correct?
24   A.   Yes, that is correct.
25   Q.   And that is sometimes referred to as ERO; correct?
```

SANTACRUZ - DIRECT / LOPEZ

1    A.    That is correct.

2    Q.    And ICE is a U.S. federal law enforcement agency; correct?

3    A.    That is correct.

4    Q.    And it is overseen by the Department of Homeland Security?

5    A.    That is correct.

6    Q.    You previously provided two separate declarations in

7    support of the defendants' case; correct?

8    A.    I provided three.  You're talking about for this specific

9    case?

10   Q.    For this specific case.

11   A.    I believe it was three.

12   Q.    And when you say "three," do you mean your two

13   declarations and a deposition?

14   A.    I provided the initial declaration and I believe it was

15   two supplementals.

16   Q.    Okay.  And you also had a deposition in this case;

17   correct?

18   A.    That is correct.

19   Q.    Okay.  And that occurred on July 24th, 2025?

20   A.    I don't recall exactly the date.  I'm sorry.

21   Q.    It's okay.  However, since then, you have had an

22   opportunity to review your testimony; correct?

23   A.    Yes, I have.

24   Q.    Okay.  And, to your knowledge, no changes have been made

25   to the substance of your testimony; correct?

**SANTACRUZ - DIRECT / LOPEZ**

1  A.   I think there were just a few minor changes that were made

2  on there, if I remember correctly.

3  Q.   Thank you.

4       And you are currently the field office director for

5  Enforcement and Removal Operations in Los Angeles; correct?

6  A.   That is correct.

7  Q.   And you've been in this position since April 6, 2025?

8  A.   That is correct.

9  Q.   You've held several other positions at ICE and its

10  predecessor, Immigration and Naturalization Services, since

11  2002; correct?

12  A.   Yes, that is correct.

13  Q.   Okay.  And you were previously the deputy field office

14  director for Enforcement and Removal Operations in L.A.?

15  A.   Yes.

16  Q.   You were the assistant or acting assistant field office

17  director for Enforcement and Removal Operations?

18  A.   Yes.

19  Q.   You were also a supervisory detention and deportation

20  officer?

21  A.   Yes.

22  Q.   And you were also a deportation officer in Los Angeles?

23  A.   Yes.

24  Q.   And you were an immigration enforcement agency [sic] also

25  in Los Angeles?

SANTACRUZ - DIRECT / LOPEZ

1   A.   Can you repeat that?  I'm sorry.

2   Q.   You were also an immigration enforcement agent in

3   Los Angeles?

4   A.   Yes.

5   Q.   And you were a detention enforcement officer for INS?

6   A.   Yes.

7   Q.   So overall, you've had approximately how many years of

8   experience?

9   A.   With?

10  Q.   With ICE.

11  A.   This current agency?

12  Q.   Yes.

13  A.   With this current agency, along with legacy Immigration

14  and Naturalization Service, slightly over 23 years.

15  Q.   And you have served in the military; correct?

16  A.   That is correct.

17  Q.   And you served in the U.S. Army?

18  A.   That is correct.

19  Q.   How long did you serve for?

20  A.   Three years.

21  Q.   And what was the highest rank you held?

22  A.   E4, specialist.

23  Q.   All right.  Enforcement and Removal Operations is a unit

24  of U.S. Immigration and Customs Enforcement; correct?

25  A.   Correct.

**SANTACRUZ - DIRECT / LOPEZ**

1   Q.   And you are familiar with Homeland Security

2   Investigations, also referred to as HSI; correct?

3   A.   That is correct.

4   Q.   Okay.  Are they also a unit of Immigration and Customs

5   Enforcement?

6   A.   Yes.

7   Q.   Homeland Security Investigations also engages in

8   immigration-related law enforcement?

9   A.   Yes.

10   Q.   Los Angeles Enforcement and Removal Operations is

11   responsible for immigration enforcement within a specific

12   region; correct?

13   A.   That is correct.

14   Q.   And that is referred to as Enforcement and Removal

15   Operations area of responsibility; correct?

16   A.   Can you repeat that one more time, please.

17   Q.   This is referred to as Enforcement and Removal Operations

18   area of responsibility?

19   A.   Area of responsibility is just an area that a specific

20   field office covers.  Enforcement and Removal Operations is an

21   agency that deals with enforcing the immigration laws within

22   the interior of the United States.

23   Q.   So the area of responsibility for your office encompasses

24   the Central District of California; correct?

25   A.   Yes, that is correct.

SANTACRUZ - DIRECT / LOPEZ

1   Q.   And that is an area of 36,000 square miles?

2   A.   Approximately, yes.

3   Q.   And it includes seven counties; correct?

4   A.   That is correct.

5   Q.   It includes San Luis Obispo County?

6   A.   Yes.

7   Q.   Ventura County?

8   A.   Yes.

9   Q.   Santa Barbara County?

10  A.   Yes.

11  Q.   San Bernardino County?

12  A.   Yes.

13  Q.   Riverside County?

14  A.   Yes.

15  Q.   Los Angeles County?

16  A.   Yes.

17  Q.   And Orange County; correct?

18  A.   Correct.

19  Q.   Okay.  You also oversee suboffices in San Bernardino,

20  Camarillo, and Santa Ana; correct?

21  A.   Correct.

22  Q.   And you oversee just over 500 personnel?

23  A.   No.  It's approximately --

24  Q.   Oh, sorry.  Just under 500 personnel?

25  A.   Yes.

**SANTACRUZ - DIRECT / LOPEZ**

1    **Q.**   And you oversee two detention centers as well?

2    **A.**   Correct.

3    **Q.**   And both of those are in Adelanto?

4    **A.**   That is correct.

5    **Q.**   As part of your responsibilities as Los Angeles field

6    office director, you oversee all Enforcement and Removal

7    Operations immigration enforcement actions that take place in

8    the area of responsibility; correct?

9    **A.**   In the Central District, yes, that is correct.

10   **Q.**   And your office is in Los Angeles?

11   **A.**   Yes.

12   **Q.**   As the field office director, you are kept informed of all

13   Enforcement and Removal Operations immigration enforcement

14   operations taking place in the area of responsibility; correct?

15   **A.**   Correct.

16   **Q.**   And that includes being informed of joint operations with

17   other federal law enforcement agencies even if Enforcement and

18   Removal Operations isn't the lead agency; correct?

19   **A.**   I have some knowledge to it, yes.

20   **Q.**   You were first told on the morning of June 8th, 2025, that

21   the federalized National Guard and Marines would be deployed to

22   Los Angeles; correct?

23   **A.**   That is correct.

24   **Q.**   Okay.  And you were first informed by Homeland Security

25   Investigations' counterpart, named John Pasciucco, over

SANTACRUZ - DIRECT / LOPEZ

```
 1   telephone; correct?
 2   A.   That is correct.
 3   Q.   You understood that the deployed troops were there to
 4   protect federal property or to protect federal officers in the
 5   event something went wrong; correct?
 6   A.   That is correct.
 7   Q.   The information that you received is that the federalized
 8   National Guard and Marines were in Los Angeles to protect
 9   federal property and to protect personnel and that was it;
10   correct?
11   A.   Initially it was just the National Guard when I was
12   informed.
13   Q.   And the Department of Defense did not explain what
14   "protect" means?
15   A.   Protect?
16   Q.   Yes.
17   A.   They did not specify as far as what protection.  I know
18   that they mentioned that they were there to protect federal
19   property and federal personnel.
20   Q.   And you were not told what the Department of Defense can
21   and cannot do to protect Enforcement and Removal Operations
22   officers; correct?
23   A.   Not to my knowledge.
24   Q.   And you do not know what the federalized troops did to
25   protect federal officers related to that request; correct?
```

**SANTACRUZ - DIRECT / LOPEZ**

1   A.   That is correct.

2   Q.   And you did not witness what the federalized troops

3   actually did to protect federal officers; correct?

4   A.   Not personally.  I wasn't on the ground to oversee that.

5   Q.   ICE Enforcement and Removal Operations request assistance

6   from the federalized National Guard through a request for

7   assistance, known as an RFA; correct?

8   A.   Correct.

9   Q.   There is required information you must include in these

10  requests; correct?

11  A.   That is correct.

12  Q.   You had to include the purpose and the need for the

13  protection -- I'm sorry -- for the request?

14  A.   Correct.

15  Q.   And those requests are submitted to a Department of

16  Defense liaison?

17  A.   That is correct.

18  Q.   If a request was denied, are you provided with an

19  explanation?

20  A.   I have never received any denials from any requests that I

21  personally made.

22  Q.   And you personally only submitted two requests for

23  assistance; correct?

24  A.   I provided, yes, that is correct, two and then just

25  follow-ups.

A264

**SANTACRUZ - DIRECT / LOPEZ**

1    **Q.**   Okay.  And you would be made aware of any request for

2    assistance originating from Enforcement and Removal Operations

3    even if you were not the person submitting the request for

4    assistance; correct?

5    **A.**   Correct.

6    **Q.**   And you do not know how many requests for assistance were

7    submitted by Enforcement and Removal Operations; correct?

8    **A.**   I do not have the number of that.

9    **Q.**   You do not know how many requests for assistance by

10    Enforcement and Removal Operations were granted in total;

11    correct?

12    **A.**   My understanding is the requests that we made -- I'm not

13    sure exactly how many were -- were all granted.  I've never

14    received any information of any being denied.

15    **Q.**   Okay.  But you don't know the exact number; correct?

16    **A.**   I do not.

17    **Q.**   As the field officer -- sorry -- field director for ICE

18    Enforcement and Removal Operations for this region, you oversee

19    the personnel making the request for assistance; correct?

20    **A.**   Correct.

21    **Q.**   And you also oversee the planning and operations for

22    immigration operations conducted by your office; correct?

23    **A.**   Regarding for ERO?  Correct.

24    **Q.**   Yes.

25    On or about June 8th, 2025, you submitted a request for

SANTACRUZ - DIRECT / LOPEZ

```
 1   assistance to the Department of Defense; correct?
 2   A.   I don't recall exactly what the date was, but I do recall
 3   making requests.
 4   Q.   Would it refresh your recollection if you took a look at
 5   your deposition transcript?
 6   A.   Yes.
 7   Q.   Okay.  So I'm going to -- there is a binder and it's the
 8   third one at the bottom there.
 9   A.   This one?
10   Q.   Yes.  And that is Volume 7 -- I'm sorry -- Volume 5,
11   Exhibit 99.  So turn -- once you're ready, let me know.
12   A.   Can you repeat what --
13   Q.   Sure.  So you're going to turn to Tab 99.
14             THE COURT:  What page?
15             MS. LOPEZ:  The very first page, Your Honor, of
16   Tab 99.
17   BY MS. LOPEZ:
18   Q.   All right.  So, again, you took this deposition on
19   July 24th.  And when you took the deposition, you took an oath;
20   correct?
21   A.   Yes.
22   Q.   And you took an oath to tell the truth; correct?
23   A.   Correct.
24   Q.   And since taking your deposition, you reviewed the
25   transcript; correct?
```

**SANTACRUZ - DIRECT / LOPEZ**

```
 1   A.   Correct.

 2   Q.   And you signed it to show you approved of what was in it;

 3   correct?

 4   A.   Say that one more time.

 5   Q.   You -- I'm sorry.

 6        You reviewed the transcript and signed it to show that you

 7   approved of what was in it; correct?

 8   A.   Correct.

 9   Q.   All right.  Okay.  So now if you can turn -- apologies.

10        Okay.  If you can turn to page 27.  All right.  And

11   starting at line 3, I ask [as read]:

12             "You are" --

13        Sorry.  You say [as read]:

14        "ANSWER:  You are asking specifically for me on what I

15        requested?

16        "QUESTION:  Correct, yes.  What kind of assistance would

17        ICE be requesting?  What would be that process?"

18        So the question is [as read]:

19        "QUESTION:  Correct, yes.  What kind of assistance would

20        ICE be requesting?  What would be that process?"

21             THE COURT:  What is your question?

22             MS. LOPEZ:  I'm sorry, Your Honor.  I think I have the

23   wrong page on here.

24        Actually, strike that, Your Honor.  That is the wrong

25   citation and wrong page.
```

SANTACRUZ - DIRECT / LOPEZ

1        Actually, turn to page 149.

2             **THE COURT:**  149?

3             **MS. LOPEZ:**  Yes.

4             **THE COURT:**  Okay.

5             **MS. LOPEZ:**  Apologies for that.

6   BY MS. LOPEZ:

7   **Q.**   Are you on page 149?

8   **A.**   I'm getting there.

9   **Q.**   Okay.  Let me know when you get there.

10  **A.**   (Witness examines document.)  Okay.

11  **Q.**   Okay.  So if we go to line 7, the question reads [as

12  read]:

13       **"QUESTION:**  Now, as far as the request that you do

14       remember making, you said it was early on.  How early on

15       was it?"

16       And the answer is [as read]:

17       **"ANSWER:**  Shortly after June 8.  If not on June 8, shortly

18       after that."

19       Is what I read accurate?

20  **A.**   That is correct.

21  **Q.**   Okay.  Does that refresh your recollection?

22  **A.**   Yes.

23  **Q.**   Okay.  So the request for federalized National Guard

24  personnel to protect federal officers conduct -- is for

25  protecting federal officers conducting at-large operations;

SANTACRUZ - DIRECT / LOPEZ

1    correct?

2    A.    Correct.

3    Q.    And "at-large operations" means Enforcement and Removal

4    Operations everyday routine arrests in the field; correct?

5    A.    Correct.

6    Q.    This includes immigration raids and arrests of individuals

7    who are not the targets but are apprehended during an

8    operation; correct?

9    A.    Well, we don't do immigration raids.  We do at-large

10   operations.

11   Q.    Does at-large operations sometimes include joint

12   operations with other federal law enforcement agencies?

13   A.    Yes.

14        THE COURT:  What do you mean "at-large operations"?

15        THE WITNESS:  Your Honor, at-large operations means

16   that we are conducting and going after criminal aliens or any

17   individual that has violated immigration law out into the

18   field.

19        THE COURT:  So the distinction you draw between an

20   immigration raid, which you say you don't do, and an at-large

21   operation, which you say you do --

22        THE WITNESS:  Right.

23        THE COURT:  -- is what exactly?

24        THE WITNESS:  So a raid would be, in my opinion,

25   somewhere where you would go and just start raiding a certain

**SANTACRUZ - DIRECT / LOPEZ**

1    location versus you're going after different individuals that

2    you are having some known or idea or intelligence that they are

3    in the country illegal or maybe a certain target.  So it's

4    targeted operations where we go after a specific individual.

5            **THE COURT:**  So the defining line between the two types

6    of operations are, in an immigration raid, you don't have

7    information that any individuals who would be subject to that

8    operation are illegal or undocumented aliens, whereas an

9    at-large operation, you have received information of some kind

10   that individuals are undocumented?  Is that the -- I'm just

11   trying to figure out the distinction because you said you don't

12   do one; you do another.  So I want to make sure I understand

13   what it is that defines the difference between the two.

14           **THE WITNESS:**  No, I understand, Your Honor.

15       So at-large operations, whether it be targeted enforcement

16   operations, is someone that we do have information on that's

17   either in the country illegally or has a final order of

18   deportation or is in some type of process that an immigration

19   judge has already deemed them unfit to be in the country.

20           **THE COURT:**  Specific information.

21           **THE WITNESS:**  Specific information.

22       As far as raids, we don't conduct raids.  What raids, in

23   my opinion, would be something along the lines if we were just

24   to go to a specific area and just raid a -- let's say, for

25   example, like a worksite enforcement ERO.

SANTACRUZ - DIRECT / LOPEZ

1        THE COURT:  Pardon me?

2        THE WITNESS:  A worksite enforcement, for example,

3   would not be a -- something that ERO does, Enforcement and

4   Removal Operations, because we typically just deal with

5   targeted or at-large operations, is what we've known it to be.

6        THE COURT:  Okay.  Thank you.

7   BY MS. LOPEZ:

8   Q.   So just to be clear, ERO does not conduct raids; correct?

9   A.   That is correct.

10  Q.   Who does conduct those?

11  A.   I don't know anyone who actually conducts raids.

12  Q.   And going back to your June 8th request, was that request

13  accepted?

14  A.   The one that I personally made, yes.

15  Q.   And the same day that the request you made on June 8th was

16  approved, was there a meeting?

17  A.   Just so -- to clarify, I'm not exactly sure if it happened

18  on June 8th or shortly after June 8th, but the ones that I did

19  make shortly after were approved.  And I didn't get the last

20  part of the question.  I'm sorry.

21  Q.   Was there a meeting after the one that you believe to have

22  been requested on June 8th?  There was a meeting; correct?

23       MR. HARTLIEB:  Objection.  Vague as to whether there

24  was a meeting.

25       THE COURT:  I'm sorry.  You say the term "meeting" is

SANTACRUZ - DIRECT / LOPEZ

```
 1   vague?
 2            MR. HARTLIEB:  Yes, Your Honor.
 3            THE COURT:  Okay.  So can you clarify -- fine.
 4       Can you clarify what you mean by "meeting" in the
 5   question?  Just be more specific.
 6            MS. LOPEZ:  Yes.
 7   BY MS. LOPEZ:
 8   Q.   There was a follow-up meeting about the request; correct?
 9   A.   I don't believe there was a follow-up meeting right there
10   and then.  I'm sure there may have been a follow-up meeting the
11   very next day.  I can't -- I would defer to DOD if they had any
12   internal meetings on that.
13   Q.   So let's go back to your deposition transcript then.  So
14   if you can go to page 26, and let me know when you get there.
15   A.   (Witness examines document.)  Okay.
16   Q.   All right.  And I'm going to bring your attention to
17   line 7.  The question posed was [as read]:
18        "QUESTION:  When did you find out the purpose of the
19        deployment to Los Angeles?"
20        And on line --
21            MR. HARTLIEB:  Your Honor, if I may just interject.
22   I'm not sure that we are working on the same deposition
23   transcript.  My line 7 on page 26 does not contain that
24   language.
25            THE COURT:  Mine does.  Well, let's clarify.  I mean,
```

SANTACRUZ - DIRECT / LOPEZ

1    counsel is entitled to --

2            MS. LOPEZ:  Yes, Your Honor.

3            THE COURT:  -- to have the correct version.  Is there

4    another version of the deposition?

5            MS. LOPEZ:  So there was a corrected version,

6    Your Honor, and it is labeled --

7            THE COURT:  Okay.  Let's just take a moment.

8    Everybody get on the same page.  And if you'd like, Counsel,

9    you can just stand right next to her and look at it.  That's

10   fine.

11       So it's Exhibit -- Exhibit 99?

12           MS. LOPEZ:  Exhibit 99.

13           THE COURT:  Page 26, line 7.

14           THE WITNESS:  Your Honor?  Can I get some water,

15   Your Honor?

16           THE COURT:  Pardon me?

17           THE WITNESS:  Can I get some water?

18           THE COURT:  Oh, absolutely.  Help yourself.

19           THE WITNESS:  Thank you.

20           THE COURT:  It's Hetch Hetchy.  It's very good water

21   we have in San Francisco.

22           MR. HARTLIEB:  Thank you, Your Honor.

23           THE COURT:  It's designer water.

24           MR. HARTLIEB:  Thank you for the indulgence.  I'm on

25   track.

SANTACRUZ - DIRECT / LOPEZ

```
 1              THE COURT:  Okay.  Question, line 7 [as read]:
 2         "QUESTION:  When did you find out the purpose of
 3         deployment to Los Angeles?"
 4         You were about to give the answer.
 5              MS. LOPEZ:  Yes.
 6    BY MS. LOPEZ:
 7    Q.   And the answer was [as read]:
 8         "ANSWER:  I think after the morning, they showed up.  In a
 9         meeting, we were told that they were going to be here to
10         protect and assist Federal Protective Service and the
11         security of federal property."
12         What I read, is that accurate?
13    A.   Yes.
14    Q.   Okay.  Thank you.
15         So at that meeting, you were told the purpose of the
16    deployment; correct?
17    A.   Correct.
18    Q.   But you were not given full information as to the
19    activities that the National -- the federalized National Guard
20    could engage in to fulfill the request; correct?
21    A.   For what specific reason?
22    Q.   For -- you were not given information as to the activities
23    that the federalized National Guard could engage in to fulfill
24    your request?
25    A.   My personal request for at-large operations?
```

**SANTACRUZ - DIRECT / LOPEZ**

1  Q.   Correct.

2  A.   Yes.  They were told that they were there to provide

3  protection for the federal officers that were conducting

4  at-large operations.

5  Q.   But you were not provided any other information aside from

6  that; correct?

7  A.   That is correct.

8  Q.   Okay.  And troops accompanied your ERO officers on the

9  majority of operations; correct?

10  A.   That is correct.

11  Q.   Roughly about 75 percent; correct?

12  A.   That was an approximate estimate that I gave during my

13  deposition, yes.

14  Q.   Thank you.

15       This was the case up until about four weeks ago; correct?

16  A.   In terms of what?

17  Q.   In terms of having federalized National Guard troops

18  accompany your ERO officers?

19  A.   Approximately, yes.

20  Q.   Okay.  And at that time, their participation started to

21  decrease in Enforcement and Removal Operations, at-large

22  operations; correct?

23  A.   Regarding the National Guard of --

24  Q.   The federalized National Guard.

25  A.   Yes.

SANTACRUZ - DIRECT / LOPEZ

1    Q.   So your request for assistance, did that cover all

2    Enforcement and Removal Operations, at-large operations, from

3    the date you made the request up until the time their

4    participation started to decrease?

5    A.   No.

6    Q.   What time period did the request for assistance cover?

7    A.   I'm not sure exactly what period it covered.  There was a

8    period there where I took leave; and upon my return from leave,

9    it had already scaled down.

10   Q.   To your knowledge, was your personal request for

11   assistance still ongoing before you went on leave?

12   A.   Yes, I believe so.

13   Q.   And requests for assistance are typically made in advance

14   of each non-at-large Enforcement and Removal Operations

15   operation; correct?

16   A.   So just to clarify, any request that I made was for an

17   ongoing period.  Any other requests that needed to be made,

18   please keep in mind that there's other federal law enforcement

19   agencies that made their own requests, and I would defer to

20   those specific agencies.

21   Q.   And just for continuing questions, I will only be asking

22   you about Enforcement and Removal Operations --

23   A.   Okay.  Understood.

24   Q.   -- requests.  Okay?

25        So going back to your request for assistance for at-large

**SANTACRUZ - DIRECT / LOPEZ**

1  operations, you do not know what the federalized National Guard

2  did during those operations to provide protection; correct?

3  **A.**   I don't have that firsthand knowledge as I was not on the

4  ground during those daily at-large operations.

5  **Q.**   And you do not know what activities the federalized

6  National Guard engaged in on the ground to protect Enforcement

7  and Removal Operations agents; correct?

8  **A.**   I do not know specifically how they did it.

9  **Q.**   Okay.  And you also made a request for assistance for the

10 Adelanto facility; correct?

11 **A.**   That is correct.

12 **Q.**   Okay.  And this request was in response to reports of

13 potential protests at the Adelanto facility; correct?

14 **A.**   That is correct.

15 **Q.**   And that request was approved as well?

16 **A.**   Yes, it was.

17 **Q.**   And the protesters didn't yield as expected at the

18 Adelanto facility; correct?

19 **A.**   We did have protesters, but not to the scale where we

20 anticipated.

21 **Q.**   And you don't know what the federalized National Guard

22 troops actually did in response to that request; correct?

23 **A.**   I do not know what they actually did there.  I would defer

24 to DOD or FPS, who oversees that portion of protecting federal

25 properties.

**SANTACRUZ - DIRECT / LOPEZ**

1   Q.   And you're going to have an opportunity to add anything

2   else you'd like during direct, but for my questions, a lot of

3   this is going to be "yes" or "no."  Okay?

4   A.   Okay.

5   Q.   You have not received any information regarding Department

6   of Defense staff intervening and protecting Enforcement and

7   Removal Operations agents during any request for assistance;

8   correct?

9   A.   Intervening?

10  Q.   Yes.

11  A.   Is that how I understood it?

12       Okay.  I have no reports or any knowledge to that.

13  Q.   The federalized troops provide a safety blanket for

14  Enforcement and Removal Operations officers conducting

15  operations; correct?

16  A.   Correct.

17  Q.   And the federalized National Guard troops served as a

18  quick reaction force during immigration enforcement operations;

19  correct?

20  A.   Correct.

21  Q.   Prior to the federalized National Guard deployment, a

22  quick reaction force to provide protections for Enforcement and

23  Removal Operations agents was staffed with your own personnel;

24  correct?

25  A.   It depends on what type of operation we were conducting.

**SANTACRUZ - DIRECT / LOPEZ**

1  Q.   And it also depended on whether you had the capacity;

2  correct?

3  A.   Correct, depending on the specific operation that we were

4  conducting.

5  Q.   In that case, a quick reaction force could be anybody;

6  correct?

7  A.   It can be anybody, yes.

8  Q.   And you do not know what the quick reaction force engages

9  in because you were not on the ground during enforcement

10  operations during the National Guard deployment; correct?

11  A.   Specifically to National Guard?

12  Q.   Yes.

13  A.   They were there to protect federal officers and federal

14  property.

15  Q.   But you do not know the specifics of what they were doing

16  during those deployments; correct?

17  A.   No.  As I mentioned before, I was not on the ground.

18  Q.   Having the federalized National Guard serve in this role

19  was helpful to Enforcement and Removal Operations; correct?

20  A.   Correct.

21  Q.   And it helped to ensure that Enforcement and Removal

22  Operations were not impeded by the public or protests; correct?

23  A.   Correct.

24  Q.   And it helped your Enforcement and Removal Operations

25  officers to be able to conduct -- or make arrests without

SANTACRUZ - DIRECT / LOPEZ

1   having the public or anyone else hinder or impede or assault

2   them during at-large operations; correct?

3   A.   That is correct.

4   Q.   Okay.  And having their presence out there in the event of

5   something happening, allowing your officers to safely conduct

6   their work without having to worry about protesters, violent

7   protesters, that might impede their ability to effect an arrest

8   while conducting at-large operations; correct?

9   A.   That is correct.

10  Q.   Having the federalized National Guard present during

11  operations at large was a huge deterrent to the public;

12  correct?

13  A.   Yes.

14  Q.   The mere presence of the federalized National Guard could

15  be a deterrent to members of the public considering hindering

16  an arrest; correct?

17  A.   Correct.

18  Q.   At this time, I would like to reintroduce what has been

19  previously admitted and marked as Exhibit 53.  So if you can go

20  to Volume 3 of the binders.

21          THE COURT:   53?

22          MS. LOPEZ:   Yes, Your Honor.

23                  (Pause in proceedings.)

24          MS. LOPEZ:   And we will be displaying that document

25  shortly.

SANTACRUZ - DIRECT / LOPEZ

1  BY MS. LOPEZ:

2  Q.  So you're going to go to Tab 53.

3  A.  (Witness examines document.)

4  Q.  Okay.  And you see the photo on the page there?

5  A.  Yes.

6  Q.  You've seen this photograph before; correct?

7  A.  Yes.

8  Q.  In the photo on the right side of the two individuals in

9  camouflage, they look like they're protecting the officers

10 conducting the arrest; correct?

11 A.  Based on this photo that I have in front of me, it looks

12 like they're standing and looking at something that is out of

13 my view, to the right side.

14 Q.  But they do look like they're protecting the officers

15 conducting the arrest; right?

16 A.  I would say so, yes.

17 Q.  And based on what you see, the way these two individuals

18 were standing in front of that officer, that would be

19 considered a contingent perimeter; correct?

20 A.  A contingent perimeter?  It's hard to say what it is just

21 based on this photo.  I have a very narrow scope of what I have

22 in front of me.  It's hard to see what's to the left or to the

23 right.  If they're just -- if there's no one on the right side

24 of them in front of them, then they would just be kind of just

25 posting versus if there was a group of folks that were looking,

**SANTACRUZ - DIRECT / LOPEZ**

1  then at that point then it would be some type of protection

2  from those folks from intervening or any potential bad actors.

3  **Q.**  So, again, we did discuss this at your deposition, so

4  let's go back to Exhibit 99.

5  **A.**  Tab 99?

6  **Q.**  Tab 99, yes.

7        **THE COURT:**  Page?

8        **MS. LOPEZ:**  Page 73.  Thank you, Your Honor.

9        **THE COURT:**  73?

10        **MS. LOPEZ:**  Page 73.

11  **BY MS. LOPEZ:**

12  **Q.**  Let me know when you get there.

13  **A.**  Is that in the other book?

14  **Q.**  Yes.  That's in Volume 5.

15  **A.**  What page again?  I'm sorry.

16  **Q.**  Page 73.

17  **A.**  (Witness examines document.)  Okay.

18  **Q.**  All right.  So I'm going to take you down to line --

19        **THE COURT:**  I think this testimony is consistent with

20  what he said on the stand, isn't it?

21        **MS. LOPEZ:**  It is somewhat consistent, Your Honor.

22        **THE COURT:**  I don't think it's inconsistent.

23  Okay.  Move on.

24        **MS. LOPEZ:**  We'll move on then, Your Honor.

25  Thank you.

SANTACRUZ - DIRECT / LOPEZ

1    BY MS. LOPEZ:

2    Q.    And as you just mentioned, if there was a threat on the

3    other side of the camouflaged individuals, you would expect

4    these camouflaged individuals to protect the ICE officers;

5    correct?

6    A.    That is correct.

7    Q.    And you have not received any reports from your

8    Enforcement and Removal Operations officers about instances

9    where the federalized National Guard intervened to protect

10   them; correct?

11   A.    No, I did not.

12   Q.    Enforcement and Removal Operations agents wear uniforms;

13   correct?

14   A.    Repeat that one more time.  I'm sorry.

15   Q.    Enforcement and Removal Operations agents wear uniforms;

16   correct?

17   A.    Not necessarily.

18   Q.    What do you mean by "not necessarily"?

19   A.    So the only uniforms that we do have involve our special

20   response team.  All of our other agents -- excuse me -- are

21   plainclothes, plainclothes agents.

22   Q.    And the special response team, these agents wear

23   camouflage uniforms?

24   A.    That is correct.

25   Q.    And the special response team for Enforcement and Removal

**SANTACRUZ - DIRECT / LOPEZ**

1    Operations are not the only law enforcement agency with a

2    camouflage uniform; correct?

3    A.   That is correct.

4    Q.   Other federal law enforcement agencies also have

5    camouflage uniforms; correct?

6    A.   Correct.

7    Q.   And these camouflage uniforms are similar to the

8    camouflage for military uniforms; correct?

9    A.   Correct.

10   Q.   Enforcement and Removal Operations special response team

11   wears a brownish-greenish camouflage uniform; correct?

12   A.   Correct.

13   Q.   And the military wears a green or a multicamouflage

14   uniform; correct?

15   A.   Correct.

16   Q.   And you have knowledge of the different types of uniforms

17   as well because of your previous military service; correct?

18   A.   Correct.

19   Q.   So you know what identifying features to look for on a

20   military uniform; correct?

21   A.   Correct.

22   Q.   For example, you know how to look for patches; correct?

23   A.   Correct.

24   Q.   And someone without knowledge of the different types of

25   military and law enforcement uniforms wouldn't be able to

**SANTACRUZ - DIRECT / LOPEZ**

1   differentiate between the two; correct?

2   **A.**   I could only speculate, but I know what I know as far as

3   how to be able to identify that.

4   **Q.**   How -- or even for someone like you, who has experience,

5   it's not easy to tell who is military and who isn't without

6   being up close and personal to see patches; correct?

7   **A.**   That is correct.

8   **Q.**   So at this time, I'd like to reintroduce Exhibit 54, which

9   has previously been admitted as Exhibit 54.  So you're going to

10  go back to Volume 3.

11  **A.**   (Witness examines document.)

12  **Q.**   Ready?

13  **A.**   Yes.

14  **Q.**   Tab 54.

15       Okay.  And for the record, again, this is a photo from the

16  U.S. Immigration and Custom Enforcement's X account dated

17  June 10th, 2025, at 11:56 a.m.

18       You've seen this photo before; correct?

19  **A.**   That is correct.

20  **Q.**   And from this photo, given that they have similar

21  uniforms, you cannot tell who is military and who is federal

22  law enforcement; correct?

23  **A.**   Well, I can tell that this person right in front of us --

24  or in front of the picture is DEA.  It's hard to make out the

25  person in the back, who that actually is.

**SANTACRUZ - DIRECT / LOPEZ**

1   Q.   And the person in the back, just for the record, is

2   wearing camouflage; correct?

3   A.   Based on this, in the book picture, yes.

4   Q.   And based on that camouflage uniform and in that photo,

5   you cannot tell if that is military or federal law enforcement;

6   correct?

7   A.   I cannot.

8   Q.   Okay.

9        All right.  So we're going to stick with Volume 3, and if

10  you can go to Tab 92.  And this has been previously admitted as

11  Exhibit 92, and this is a photo from Camarillo.

12  A.   Okay.

13  Q.   You've seen this photo before as well; correct?

14  A.   That is correct.

15  Q.   Okay.  And from this photo, you cannot tell who is

16  military and who is federal law enforcement; correct?

17  A.   I can tell who's federal law enforcement on one specific

18  person.

19  Q.   And which person is that?

20  A.   The person in the center of this photograph.

21  Q.   How about the individuals in the back?

22  A.   It's hard to tell.  I think I mentioned this before.  The

23  picture is kind of grainy, and the distance is kind of pushed

24  back, so it's hard to tell who that actually is.

25  Q.   And you can't identify any of the patches on those

**SANTACRUZ - DIRECT / LOPEZ**

1    uniforms; correct?

2    **A.**    I can identify the individual in the front just based on

3    my experience and knowledge that -- who that agency is.

4    **Q.**    But for the individuals in the back, you can't identify

5    any of the patches; correct?

6    **A.**    I can't make them out, no.

7    **Q.**    Okay.  And based on this photo, the individuals in the

8    camouflage in the back, they are forming a perimeter; correct?

9    **A.**    It looks like they're standing in a line behind this

10   federal officer, and it looks like a loose perimeter, in my

11   perception, based on my experience.

12   **Q.**    Thank you.

13         And you heard about the cannabis farm raids in Camarillo

14   and Carpinteria; correct?

15   **A.**    Correct.

16   **Q.**    And Enforcement and Removal Operations was not the lead

17   agency on that operation; correct?

18   **A.**    That is correct.

19   **Q.**    And Enforcement and Removal Operations, although not the

20   lead agency, was one of several federal agencies participating

21   in the operation; correct?

22   **A.**    That is correct.

23   **Q.**    Okay.  And in your 23 years of experience with ICE, has

24   the military ever accompanied ICE in a security function on

25   non-border immigration enforcement operations?

SANTACRUZ - CROSS / HARTLIEB

```
 1  A.    Not that I can recall.
 2          MS. LOPEZ:  At this time, I have no more questions,
 3  Your Honor.
 4          THE COURT:  Cross or whatever.
 5                     CROSS-EXAMINATION
 6  BY MR. HARTLIEB:
 7  Q.    Good afternoon.  Garry Hartlieb for the defendants.  And
 8  good afternoon to you, Mr. Santacruz.
 9          I would like to follow up on certain topics that you
10  discussed with opposing counsel just now.
11          And before we delve into some of those specifics, I'd like
12  to better understand the scope of responsibilities that you
13  held as field office director.
14          Can you describe what you did and how you kept yourself
15  informed of ERO's personnel and their activities?
16  A.    During this specific time?
17  Q.    In general, as field office director, how do you supervise
18  490 personnel?
19  A.    Well, our chain of command structure encompasses me as the
20  field office director.  I have two deputy field office
21  directors that work right below me.  I also have a chief of
22  staff and approximately 12 assistant field office directors.
23  Those assistant field office directors have various
24  responsibilities or portfolios that cover every facet that ERO,
25  Enforcement and Removal Operations, enforces.
```

SANTACRUZ - CROSS / HARTLIEB

1    I also have approximately -- each of those assistant field

2  office directors have about six or seven first-line supervisors

3  who then oversee the various programs within ERO that cover the

4  seven counties within the Central District of California.

5    On top of the two detention populations or detention

6  centers that I have regarding detainees, we have two different

7  portfolios that two deputy field office directors oversee,

8  which is -- one portfolio is the enforcement portfolio, and the

9  other portfolio is the detention portfolio.

10 **Q.**   How do you stay apprised of all of the activities

11 encompassed by those portfolios?

12 **A.**   Well, we do have countless meetings.  We have daily

13 meetings with my core management staff.  We do have weekly

14 meetings.  Then we do have -- every month we do have an

15 assistant field office director meeting where everyone comes

16 together and discuss the various topics.

17    We do have ad hoc meetings where any information or

18 pertinent information that needs to be relayed that comes from

19 the very top or any pivot changes or mission changes, we have

20 discussions, whether it be MS Teams, whether it be phone calls,

21 or whether it be in-person meetings.

22 **Q.**   You mentioned pertinent information.  What is the type of

23 pertinent information that comes up to your attention?

24 **A.**   There's various types of information that we receive.

25 Anything from a use-of-force incident, anything from an officer

SANTACRUZ - CROSS / HARTLIEB

1    assault incident, employees getting injured, detainees being

2    injured, the health and welfare of detainees that may go to the

3    hospital.  Any -- any type of serious misconduct, various

4    information that we receive, to include any pivot changes or

5    mission changes that may come from our headquarters' component.

6    Q.   Do you receive that information only in meetings or also

7    in written reports?

8    A.   Written reports.  We do have situational reports that we

9    do have.  We also have significant incident reports any time,

10   for example, there is an officer assault, any use-of-force

11   incidents, any time a detainee or a law enforcement officer has

12   to go to the hospital for whatever reason, but there's various

13   reports and different type of formats that we receive those in.

14   Q.   Did anything about your responsibilities in day-to-day

15   work change after the National Guard was federalized?

16   A.   Yes.

17   Q.   How did it change?

18   A.   It changed more now that we have -- the DOD representative

19   now is something that we had to encompass in terms of making

20   sure that everyone was on the same page, whether it be just

21   coordinating or having discussions regarding the day-to-day

22   activities.

23   Q.   You mentioned the DOD representative.  Did you work with

24   that representative in a particular place?

25   A.   Yes.

SANTACRUZ - CROSS / HARTLIEB

1    Q.    What was that place?

2    A.    It was at the Federal Command Center, the Incident Command

3    Center.  It has a lot of terms; right?  Incident Command

4    Center, Federal Command Center, and then the Interagency

5    Command Center, but that's where all the different federal

6    heads sat, to include DOD representatives.

7    Q.    What is your understanding of what the function of the

8    Interagency Command Center was?

9    A.    Well, it's basically a funnel point with all the federal

10   partners that are working together on Immigration Title 8

11   at-large operations.  That's where all the information and

12   that's where all the federal heads sit to discuss any ongoing

13   or any potential operations that come up.  And it's -- all the

14   information gets relayed from each component, and from there it

15   gets filtered out to each headquarters component from that

16   point.

17   Q.    How specifically did you work with Task Force 51

18   representatives in the Interagency Command Center?

19   A.    Well, as I mentioned previously, I have worked closely

20   with them in the sense of me, personally, I had to make a

21   couple of requests for assistance, and that was for protection

22   of federal property or federal personnel.

23   Q.    How would you submit those requests for assistance?

24   A.    The ones that I personally made were in person.  Since

25   they're in the same room as we were in the command center, I

SANTACRUZ - CROSS / HARTLIEB

1  would have a conversation with the DOD representative and
2  pretty much provide the specifics on what we needed.
3  **Q.**  What type of information would you provide when making
4  requests for assistance?
5  **A.**  So it was basically the who, where, what, and why type of
6  situation.  They needed to know what the -- what type of assets
7  were going to be required, what location, when, why.  And we
8  would provide that information, and then they ran it up their
9  chain of command.
10  **Q.**  When you made a request for assistance, did you ever
11  request the specific function that members of Task Force 51
12  were to perform?
13  **A.**  No.  It was a general request.  It was a request -- for
14  example, when I made the request to provide additional support
15  at the Adelanto facility, we requested personnel to go out
16  there to assist in the protection of that federal property.
17  **Q.**  Now, you said that you didn't make a specific request
18  about the function that Task Force 51 members were to perform.
19  Was there a reason that you didn't specify what those members
20  should be doing?
21  **A.**  Well, from the very beginning, their purpose there was to
22  protect federal property and federal personnel.  As far as the
23  policies and procedures regarding that, I would defer to DOD as
24  I am not sure how or what instructions they would be receiving
25  from their chain of command.

SANTACRUZ - CROSS / HARTLIEB

1   Q.   Did you ever request that Task Force 51 or the National

2   Guard help assist in the performance of ERO's law enforcement

3   functions?

4   A.   No.

5   Q.   Why not?

6   A.   Like I mentioned before, DOD is only there to protect

7   federal personnel or protect federal property.

8   Q.   How did you learn that DOD was only protecting personnel

9   or property?

10  A.   Early on, that was the discussion that we had in our

11  meeting, is that they were here to protect federal property and

12  federal personnel.

13  Q.   And who is the "we" in that last sentence?

14  A.   Everyone in that Interagency Command Center.

15  Q.   And who was it that communicated that DOD's role would be

16  restricted to protecting federal personnel and property?

17  A.   I can't remember exactly who that was.  I mean, there were

18  various DOD representatives.  It's a -- initially it was a

19  24-hour operation where there was different folks there.

20  Q.   But it was -- is it fair to say that it was a DOD employee

21  that communicated the restriction that DOD was there --

22  A.   That's correct.

23  Q.   -- to protect?

24       Okay.  What would happen after you submitted a request for

25  assistance?

SANTACRUZ - CROSS / HARTLIEB

1   A.   I could only assume that they -- the DOD would send it up

2   their chain of command.

3   Q.   Do you have any visibility into how DOD evaluated your

4   request?

5   A.   I do not.

6   Q.   I want to talk about a couple of the specific requests

7   that were discussed that you made.  How many requests did you

8   personally make to Task Force 51?

9   A.   I believe I made two requests that also required follow-up

10  requests.

11  Q.   What was the first request that you made?

12  A.   I believe the first one that I made was for additional

13  personnel to be assigned to at-large teams that were conducting

14  field operations for protection of federal officers due to the

15  increase in, spike of officer assaults.

16  Q.   And what was the second request?

17  A.   The second request was when we received information that

18  they were -- there was going to be a potential large protest at

19  one of our detention facilities, at the Adelanto detention

20  facility.  We requested additional DOD personnel to assist and

21  protect the federal property.

22  Q.   With respect to at-large operations, did you ever request

23  that DOD execute arrests on behalf ERO?

24  A.   No, I did not.

25  Q.   With respect to at-large missions, did you ever request

SANTACRUZ - CROSS / HARTLIEB

1   that DOD assist with detentions?

2   A.   No, I did not.

3   Q.   With respect to at-large missions, did you ever request

4   that DOD execute search warrants?

5   A.   No, I did not.

6   Q.   Do you have a general understanding of what Task Force was

7   doing to assist on at-large operations?

8   A.   I was not there, present on the ground.  As a field office

9   director, I was in the command center.  So I have no knowledge

10  of how each team operated independently within those specific

11  DOD teams that were assigned to them.

12  Q.   Well, let me ask it this way:  Do you know if DHS and

13  Task Force 51 were performing the same functions with respect

14  to your requests for assistance?

15  A.   They were not performing the same functions.

16  Q.   How were they different?

17  A.   Well, the federal officers that have Title 8 authority

18  have arrest powers to arrest individuals that are here,

19  you know, breaking the immigration laws or having some type of

20  immigration order.  DOD is only here to protect federal

21  property and only to protect federal personnel.

22  Q.   In terms of these at-large operations, would DHS and

23  Task Force 51 personnel ride in the same vehicles?

24  A.   No, they do not.

25  Q.   Do you recall prior questioning by plaintiffs' counsel

**SANTACRUZ - CROSS / HARTLIEB**

1    about deterrence?

2    **A.**    Can you repeat that one more time?  I'm sorry.

3    **Q.**    Do you recall a question about the presence of the

4    National Guard having a deterrent effect?

5    **A.**    Yes.

6    **Q.**    When you made the statement that having the National Guard

7    provided a deterrent effect, who was being deterred?

8    **A.**    I would say any potential bad actors out there that

9    previously, prior to them showing up, ended up becoming violent

10   in the sense where they started assaulting federal officers by,

11   you know, throwing projectiles to our folks that were there to

12   protect the buildings.

13   **Q.**    When you submitted your requests for assistance, did you

14   ever have an intent that Task Force 51 would deter lawful

15   actors and citizens and members of the public from lawful

16   activity?

17   **A.**    What I was looking for was for -- to protect our -- my

18   officers that were out conducting operations, because due to

19   the increase of vehicle -- officer assaults that we were -- the

20   frequency was so high at that time, and we needed to protect

21   our workforce to continue to do their, you know, ERO mission.

22   So my whole purpose was to protect -- provide protection for

23   the folks that are conducting that work.

24   **Q.**    You mentioned officer assaults.  How frequently would you

25   receive reports of officer assaults on at-large missions in

SANTACRUZ - CROSS / HARTLIEB

1    early June 2025, prior to the federalization of the National

2    Guard?

3    A.   Daily, multiple times a day, we would receive officer

4    assault reports.

5    Q.   Did the frequency with which you received those reports of

6    officer assaults change after Task Force 51 began providing

7    protection on at-large missions?

8    A.   We still had officer assault situations, but they did

9    reduce drastically after DOD were assigned to our teams.

10   Q.   Now, in lieu of these officer assaults in early June 2025,

11   did you believe ERO was able to carry out its federal functions

12   at an acceptable level?

13   A.   They were carrying out their functions, but I would not

14   say that it was at an acceptable level due to the increase of

15   violence towards our federal workforce.  We had to pretty much

16   pivot to combat that.

17   Q.   Can you give an example of how an at-large operation was

18   interrupted by officer assaults?

19   A.   So one that comes off the top of mind is we do have

20   federal partners that work together, ERO and federal partners,

21   whether it be FBI, DEA, Marshals, any of the other federal

22   partners that have Title 8 authority.

23        We did have an individual that was taken into custody, and

24   the moment the handcuffs were put on him and he was being

25   walked to the vehicle, members of the public, they pretty much

SANTACRUZ - CROSS / HARTLIEB

1   got outnumbered to the point where they ended up pulling the

2   individual from the officers' grasp and they got overran.  They

3   became too dangerous, to where the public ended up helping the

4   individual escape in handcuffs.

5       And the officers, due to the safety factor, had to vacate

6   the scene because there was just an overwhelming presence of

7   folks that were impeding not only their exit to leave in

8   vehicles, but also affecting their ability to make arrests.

9   Q.   Was that interference a factor in your decision to submit

10  a request for assistance?

11  A.   That was one of many instances that, yeah, a decision is

12  that we needed to do something to help our workforce conduct

13  its operations.

14  Q.   Are you aware of any interference with your federal

15  functions at federal property or federal buildings?

16  A.   Yes.

17  Q.   Please describe what comes to mind.

18  A.   Well, early on, prior to DOD or after?

19  Q.   Prior to the deployment of Task Force 51.

20  A.   So prior to their arrival on June 6, for example, after

21  that worksite enforcement that HSI, Homeland Security

22  Investigations, conducted on June 6, that evening, later on at

23  the Roybal Federal Complex, which also encompasses MDCLA,

24  Metropolitan Detention Center there in Los Angeles, with the

25  Federal Bureau of Prisons and the Federal Building, 300 North

SANTACRUZ - CROSS / HARTLIEB

```
 1   Los Angeles, it's a three-building complex there where we had
 2   approximately 1500 protesters that late afternoon, and it
 3   became violent and they became -- they started assaulting the
 4   Federal Protective Service there.
 5        That impeded our ability to be able to go in and out of
 6   that federal complex.  And keep in mind it's not just ICE, ERO
 7   that's in that.  You're talking about a federal building that
 8   has over 29 tenants there that could not safely vacate that
 9   premises on a Friday.
10   Q.   So prior to the federalization of the National Guard, did
11   you ever develop plans on how to address your concerns of
12   officer safety?
13   A.   In regards to?
14   Q.   In general, did you ever take any action to try to address
15   concerns about officer assaults or officer safety with respect
16   to at-large missions before the National Guard was federalized?
17   A.   So, yes.  So we had to pivot and we had to pretty much
18   condense teams to have a larger footprint, but that impacted
19   obviously our ability to conduct our missions.
20   Q.   How did it impact your ability to conduct missions?
21   A.   Well, because we had to condense teams, collapse teams
22   into other teams to have a larger footprint due to the spike of
23   assaults on federal officers.
24        So that meant that if we had a certain amount of locations
25   that we were conducting at-large operations, that it had to be
```

A299

SANTACRUZ - CROSS / HARTLIEB

```
 1   minimized or scaled down just so we wouldn't sacrifice officer
 2   safety.
 3   Q.   After the National Guard was federalized in California,
 4   did you pursue other plans to address your concerns of officer
 5   safety?
 6   A.   Other plans?  So, I mean, yeah, when they got federalized,
 7   that's when I made that request.  In a sense, we had that
 8   additional resources.  I requested to have the National Guard
 9   assigned to our at-large teams to help out as a QRF, as a Quick
10   Reaction Force, in the event of any potential assaults on
11   federal officers.
12   Q.   So now thinking of after the National Guard has been
13   federalized and at-large missions, are you aware of any safety
14   threats to DHS personnel after that time period?
15   A.   After that time period, it minimized it just because we
16   knew -- or the officers also knew that they had a force
17   multiplier out there; and just having their mere -- their mere
18   presence out there, it was definitely a deterring factor for
19   any potential bad actors that maybe in the past did act in a
20   violent way but would definitely think twice having that
21   additional support.
22        But not only that, it also was a huge relief for our
23   workforce, knowing that they're not going to get blindsided if
24   they are effecting an arrest and have someone, you know,
25   necessarily intervene or try to assault them or impede their
```

SANTACRUZ - CROSS / HARTLIEB

1  ability to take someone into custody.

2  **Q.**  I want to focus your attention specifically on the

3  Camarillo operation.  Are you familiar with that operation?

4  **A.**  Yes, I am.

5  **Q.**  Do you have a belief about whether there were any safety

6  threats to officers on that operation?

7  **A.**  There was actually some safety threats that I obviously --

8  a lot of that was televised live.  Even though I was not on the

9  ground personally, but I did see some threats towards federal

10 officers.

11 **Q.**  What did you see?

12        **MS. LOPEZ:**  Objection.  Speculation.

13        **THE COURT:**  Let's take a break now.  My court reporter

14 has asked for it.  So we will resume at 3:15.  Resume at ten

15 after 3:00.

16                    (Recess taken at 2:53 p.m.)

17                    (Proceedings resumed at 3:10 p.m.)

18        **THE COURT:**  Let the record show all parties are

19 present.

20      You may continue.

21        **MR. HARTLIEB:**  Thank you, Your Honor.  Again, Garry

22 Hartlieb on behalf of the Department of Justice, United States

23 Department of Justice.

24 **BY MR. HARTLIEB:**

25 **Q.**  So, Mr. Santacruz, before we took a break, we were

**A301**

SANTACRUZ - CROSS / HARTLIEB

1   beginning to talk about Camarillo.  Are you familiar with the

2   DHS operation in Camarillo, California?

3   A.   Yes.

4   Q.   Were you personally present at that operation?

5   A.   I was not.

6   Q.   How did you learn about the Camarillo operation?

7   A.   We had discussions about it.

8   Q.   Were those discussions before or afterwards?

9   A.   Before.

10  Q.   Did you receive any reports afterwards that described the

11  Camarillo operation?

12  A.   Yes.

13  Q.   Was there any other way in which you learned about the

14  Camarillo operation outside of your conversations and your

15  reports?

16  A.   No.  It would be just basically after-action reports that

17  were generated after the fact.  We also did discuss it in

18  meetings as well after.

19  Q.   Did you watch anything about the operation on the

20  television?

21  A.   Yes.

22  Q.   So that would be an additional way in which you --

23  A.   An additional way, yes.

24  Q.   -- you learned about it?

25       Do you have a belief about whether there were any safety

SANTACRUZ - CROSS / HARTLIEB

1    threats to officers of DHS and ERO at that operation?

2    **A.**    There was.

3           **MS. LOPEZ:**    Objection.    Speculation.

4           **THE COURT:**    Overruled.

5           **MR. HARTLIEB:**    So I'll reask that question.

6    **BY MR. HARTLIEB:**

7    **Q.**    Do you have a belief about whether there were any safety

8    threats to officers at that operation?

9    **A.**    There was.

10   **Q.**    And to confirm, was ERO present at the Camarillo

11   operation?

12   **A.**    So we did have ERO presence there.

13   **Q.**    What was the nature of the safety threats that were

14   present at that operation?

15   **A.**    So once the crowd started forming around the area of the

16   operation, we had members of the public who were there and

17   became violent.    We had a lot of officers that were out there,

18   especially transportation vans, that were assaulted by members

19   of the public with projectiles, rocks, to include vans that

20   actually carried detainees; and they were smashing the windows,

21   throwing rocks at the security element that was there, to

22   include -- we did witness, because we were watching it live

23   from the command center, that was what was happening on the

24   ground, where individuals were pretty much conducting deadly

25   force situations on our federal officers.

SANTACRUZ - CROSS / HARTLIEB

1    Q.   What do you mean by conducting deadly force situations on

2    your officers?

3    A.   So there was an individual there that actually had a

4    weapon that appeared to look like he was shooting in the

5    direction of our officers.

6    Q.   How would gunshots during an operation impact your

7    officers' ability to carry out their federal functions?

8    A.   Well, you're talking about deadly force at that point;

9    right?  That's the worst possible threat that you can think of

10   as a law enforcement officer, is being shot by someone.  So it

11   weighs heavily on the security of officer safety and the

12   security of the operation.

13   Q.   Notwithstanding the existence of these safety threats at

14   Camarillo, are you aware of the National Guard ever taking any

15   law enforcement activities in response?

16   A.   I was not there on the ground to know exactly what the

17   National Guard did.  I would defer to the DOD.  I know that

18   they were there simply to -- they were assigned as a QRF, Quick

19   Reaction Force, for that specific deployment, but I would defer

20   to HSI.

21   Q.   Now, you said that they were assigned as a QRF.  Does that

22   mean that they were assigned as security and intended to be at

23   the operation in advance?

24   A.   All I know is that they were assigned to play the role of

25   a QRF.  I would -- like I said, I would defer to DOD and HSI.

SANTACRUZ - CROSS / HARTLIEB

1  I was not part of those discussions, as far as specific roles,

2  other than the QRF.

3  Q.  Is the assignment of a QRF different from general

4  provision of protection on the at-large missions?

5  A.  So almost the same concept in the sense that if something

6  were to go in the wrong way, assaults on our officers or

7  whatnot, but their role was there to protect federal officers.

8  Q.  Staying on the topic of Camarillo, you were asked some

9  questions about whether certain photographs looked like they

10  depicted a perimeter.  Do you recall that?

11  A.  Yes.

12  Q.  When you answered those questions generally, was that

13  based on your personal knowledge and opinion or something else?

14  A.  My personal knowledge and opinion.

15  Q.  Do you know how Task Force 51 understands or defines the

16  term "perimeter"?

17  A.  I do not.  I don't know their policies and procedures.  I

18  would defer to the DOD.

19  Q.  With respect to the photographs at Camarillo that you were

20  shown, do you know what was happening outside of the frames of

21  any of the photographs that you looked at?

22  A.  I do not.  I've been -- I was shown various photos

23  regarding that -- that operation, and it was hard to -- I only

24  had a snapshot of what was in front of me, so it's hard to tell

25  without seeing the whole scope or the layout of what was

**SANTACRUZ - CROSS / HARTLIEB**

1    actually going on.

2    **Q.**   With respect to those pictures that appeared to show

3    certain people in uniform in a line, do you know what any of

4    those uniformed personnel were doing?

5    **A.**   I was shown various pictures.  To be specific as far as

6    what they were doing, it's hard to tell.  If they were standing

7    in a line, that could have been a loose perimeter.  But without

8    seeing the whole scope and seeing what's in front or behind

9    them, what's taking place, what does the perimeter consist of,

10   it's hard to tell.

11   **Q.**   Do you know why Task Force 51 members of the National

12   Guard were present at Camarillo?

13   **A.**   Well, like I said, I was not there on the ground to know

14   why or how they ended up at -- if they were there, but I know

15   that they were a Quick Reaction Force and called upon if

16   needed.

17   **Q.**   Do you recall a question earlier about the percent of

18   at-large operations for ERO that had Task Force 51 support?

19   **A.**   Yes.

20   **Q.**   So when you testified that the National Guard assisted on

21   75 percent of at-large operations, was that opinion based on

22   specific facts and data, or how did you come up with it?

23   **A.**   It was a -- because if I remember that question, I said

24   I'd be widely guessing, you know, what that percentage was.

25   And I believe they -- plaintiffs' counsel said, "Would

SANTACRUZ - CROSS / HARTLIEB

1   75 percent sound accurate?"  And based on everything in my

2   experience and the amount of folks that were assigned to some

3   of the at-large teams, which wasn't all of them, 75 percent

4   seemed about accurate.

5   **Q.**   Has that number changed since you testified that the

6   National Guard was assisting on 75 percent of ERO's at-large

7   operations?

8   **A.**   Yes, it has.

9   **Q.**   What is that number today?

10  **A.**   It's zero.

11  **Q.**   When did that number change?

12  **A.**   That number had to have -- it's hard to say when that

13  number changed.  I know -- like I mentioned earlier, I was on

14  annual leave, and that number had to change somewhere between

15  that time frame where I was on annual leave.

16  **Q.**   When were you on annual leave?

17  **A.**   I took annual leave from June 28th until July 7th.  So

18  when I returned, that number had already decreased.

19  **Q.**   So by July 7th, the 75 percent number was already

20  decreasing?

21  **A.**   Yes.

22  **Q.**   Now, I asked you questions earlier about the specifics of

23  your requests for support on the front end.  What I want to ask

24  about now is, thinking to all of the at-large operations where

25  ERO received Task Force 51 support, did you ever receive

A307

SANTACRUZ - CROSS / HARTLIEB

1   after-action reports of what actually happened on those

2   at-large missions?

3   **A.**   Not for every at-large mission.  Keep in mind that we have

4   quite a few at-large missions going on at the same time,

5   multiple teams out there.  Each team has multiple locations

6   that they were targeting.  The only thing that I would get

7   were, like, anything that needed to be reported up.

8   **Q.**   And can you clarify what types of things would need to be

9   reported up?

10  **A.**   So, for example, and I think I mentioned this earlier, on

11  daily reports that show up would be the amount of teams that

12  are currently out in the field, how many arrests were

13  conducted, what federal agencies assisted or were involved, to

14  include DOD and the number of personnel for each specific team.

15  **Q.**   Of those reports that you reviewed, did you ever come to

16  know that Task Force 51 was carrying out any of ERO's law

17  enforcement operations?

18  **A.**   They were not carrying out our operations.  They were just

19  assigned.

20  **Q.**   Based on those reports that you reviewed, did you ever see

21  any indication that Task Force 51 members committed arrests?

22  **A.**   No, they did not.

23  **Q.**   Based on those reports that you reviewed, did you ever see

24  that Task Force 51 members had committed any searches or

25  seizures?

SANTACRUZ - CROSS / HARTLIEB

1    **A.**   No, I did not.

2    **Q.**   Mr. Santacruz, you are testifying here today based on your

3    personal knowledge and the information that you've learned in

4    connection with your role; correct?

5    **A.**   That is correct.

6    **Q.**   Are you presently employed by the military?

7    **A.**   No, I'm not.

8    **Q.**   Do you have any awareness of what the military's

9    restrictions are on Task Force 51 members who assist DHS

10   operations?

11   **A.**   I don't know the specifics of those, what their orders

12   are.  I know that they're just here to protect federal property

13   and to protect federal personnel.

14   **Q.**   So do you have any specific knowledge of what instructions

15   Task Force 51 members may have received about what they can and

16   cannot do?

17   **A.**   No, I have no knowledge of what their chain of command

18   instructed them to do.

19   **Q.**   Do you have any knowledge of what the Posse Comitatus Act

20   allows or prohibits?

21   **A.**   I do not.

22   **Q.**   Do you know what DOD has instructed military members with

23   respect to the Posse Comitatus Act?

24   **A.**   I do not.

25   **Q.**   Thinking of your entire involvement now with

SANTACRUZ - CROSS / HARTLIEB

1    Task Force 51, who had the authority to decide what activities

2    DOD would permit its forces to conduct on a prospective

3    operation?

4    A.   I can't speak for DOD as far as what they were told.  Like

5    I stated before, the only information that we received, federal

6    partners, they're there to protect federal personnel and

7    federal property.

8    Q.   Thinking to your entire involvement with Task Force 51,

9    did DHS or DOD control the activities of what DOD forces

10   actually did in assistance of at-large operations?

11   A.   No.

12   Q.   Let me rephrase the question.  Which entity -- between DHS

13   and DOD or some other entity, which entity controlled the

14   activities of Task Force 51?

15   A.   Well, the only ones -- I could speak for ERO.  I'm the

16   only one and some of my folks that may have made requests for

17   the assistance of the at-large teams, for them to go out as a

18   QRF, to include the federal property.  So that was the only

19   general ask that we made.

20       Now, as far as how their chain of command relayed that

21   information to its soldiers, I would not have any knowledge of

22   that.

23   Q.   So I wanted to clarify that a little bit.

24       ERO did or did not control the activities of

25   Task Force 51?

**PROCEEDINGS**

1   A.   Well, to a certain point we only controlled the ask that

2   we -- the general ask to have them come out with our specific

3   teams and to protect federal property, the only instances that

4   I -- the only one that I made, which was at the Adelanto

5   facility.  Beyond that, how they do it and how they were

6   directed to do it is not within my scope.

7   Q.   Whose scope would it be within?

8   A.   That would be under DOD.

9           MR. HARTLIEB:  No further questions.  Thank you,

10  Mr. Santacruz.

11          THE COURT:  Anything further?

12          MS. LOPEZ:  Nothing further, Your Honor.

13          THE COURT:  Okay.  Thank you.  You're excused.

14          THE WITNESS:  Thank you very much.

15                         (Witness excused.)

16          THE COURT:  Okay.  Anything further from the

17  plaintiff?

18          MS. STRONG:  Nothing further, Your Honor.

19          THE COURT:  Plaintiff rests?

20          MS. STRONG:  Yes, Your Honor, the plaintiff rests.

21          THE COURT:  Okay.  So we will proceed tomorrow

22  morning.  You have one witness; is that right, who's already

23  testified in this matter?

24          MR. HAMILTON:  Yes, Your Honor.

25          THE COURT:  Okay.  Do you have an estimate as to how

PROCEEDINGS

 1   long now, in light of the testimony that he's given and which

 2   won't be repeated, his testimony will be?

 3        MS. LIN:  Your Honor, we are hoping to be very

 4   efficient and two to two and a half hours at the maximum.

 5        THE COURT:  How long?

 6        MS. LIN:  Two to two and a half hours maximum, but we

 7   are going to go through and make sure that we avoid duplicates.

 8   So after tonight, maybe the estimate will change.

 9        THE COURT:  Okay.  All right.  Well, that would be

10   useful.

11        So what I want to do is, at the conclusion of your

12   witness's testimony, and assuming you rest at that point, then

13   go into an argument as to the evidentiary aspects of the case.

14   I want to do that tomorrow, reserving till Wednesday morning

15   the legal issues that you've asserted.  Okay?

16        MS. LIN:  Understood, Your Honor, but can we clarify

17   with plaintiffs that the two witnesses that have already

18   testified today, whether they could be released.  That would be

19   Mr. Santacruz and Mr. Harrington.

20        THE COURT:  Well, that's up to them.  They can -- you

21   can have a discussion as to that.  I mean, I -- it may be --

22   they may or may not want to have an issue as to rebuttal.  I

23   have no idea.  They haven't heard -- they haven't heard the

24   testimony -- the new testimony of the general.  So you can have

25   a discussion.  It's whatever you agree to is fine with me, if

A312

**PROCEEDINGS**

```
 1    you can agree.
 2         And then I will just see you tomorrow morning.  We'll
 3    start -- let's see.  Let's start at 9:30.  Yes.
 4              MS. STRONG:  Your Honor, I just want to clarify --
 5              THE COURT:  Sure.
 6              MS. STRONG:  -- to make sure we understand what
 7    Your Honor is expecting for tomorrow afternoon versus
 8    Wednesday.
 9         So is it Your Honor's expectation that the parties give
10    closing arguments on the evidence presented so far tomorrow
11    afternoon and that then we would then present arguments on the
12    four legal issues you discussed this morning on Wednesday, or
13    is it the reverse?
14              THE COURT:  Exactly.
15              MS. STRONG:  Okay.
16              THE COURT:  That's exactly my --
17              MS. STRONG:  Thank you.
18              THE COURT:  The only thing is when you say "tomorrow
19    afternoon," we don't know how long the general's testimony is
20    going to be; and once its concluded, I want to move right into
21    the argument.  So that means tonight you should prepare
22    whatever you want to say about the evidentiary features of the
23    case.
24              MS. LIN:  So, Your Honor, the reason I mentioned
25    Mr. Harrington and Mr. Santacruz is that if there's expectation
```

PROCEEDINGS

```
 1   that would go longer, so the timing would be affected by that.
 2   That's my only point.
 3          THE COURT:  Well, obviously, if they testify, if
 4   they're called back for some rebuttal, if they are, then that
 5   changes the timetable.
 6      But, I mean, actually, this is all sort of simple, isn't
 7   it?  There's nothing complicated about what I've said, is it?
 8          MS. LIN:  No.
 9          MS. STRONG:  No, Your Honor.
10          THE COURT:  Great.
11          MS. STRONG:  I just wanted to clarify:  Evidentiary
12   argument first; legal argument to follow.  That's how you
13   prefer our process.
14          THE COURT:  Exactly.
15          MS. STRONG:  Thank you, Your Honor.
16          THE COURT:  Okay.  Anybody here didn't get that?
17          MS. LIN:  We got it, Your Honor, but we'd also like to
18   be heard just a few more minutes today if that's possible.
19          THE COURT:  Oh, sure.  I've got time.  Everybody's got
20   time.  Sure.
21      Okay.  Well, anyway, that's where we are right now; and
22   then if somebody wants to say something, please do.
23          MR. HAMILTON:  Thanks, Your Honor.
24      I'm mindful of the fact that the Court --
25          THE COURT:  You have to identify yourself for the
```

PROCEEDINGS

```
 1   record.
 2           MR. HAMILTON:  I'm sorry, Your Honor.  Eric Hamilton
 3   for defendants.
 4           THE COURT:  Sure.
 5           MR. HAMILTON:  -- mindful of the fact that the Court
 6   has set aside time on Wednesday for legal arguments.  For the
 7   record, we just want to move for judgment as a matter of law
 8   under Rule 52(c) now that plaintiffs have closed their case
 9   based on the fact that plaintiffs have failed to prove a
10   violation of the Posse Comitatus Act, as well as for all of the
11   threshold defects that we argued in our opposition to the
12   original motion for a preliminary injunction, as well as the
13   supplemental opposition brief that we filed.
14           THE COURT:  Great.  I'll take that under submission.
15           MS. STRONG:  I'm happy to respond to it, Your Honor,
16   but I don't need to if you don't feel the need for a response.
17           THE COURT:  Well, I think the federal government is
18   right to raise it, and -- but I'm not going to decide it until
19   we move ahead and see where we are, though it has to be decided
20   on the record that's been adduced so far.  In other words, the
21   plaintiff put in their case, so it either succeeds or fails on
22   that motion as of the conclusion of their case.  And anything
23   you do after doesn't affect that particular motion; right?
24           MR. HAMILTON:  Yes.  Yes, Your Honor.
25           THE COURT:  That also is not complicated.  Okay.
```

**PROCEEDINGS**

```
 1    There we go.

 2        Anything else?

 3            MS. STRONG:  Not from me, Your Honor.

 4            THE COURT:  So we're hopeful that the IT will all work

 5    tomorrow.

 6            MS. STRONG:  I think --

 7            THE COURT:  Hopeful.  That's sort of an aspirational

 8    view.

 9            MS. STRONG:  I think we owe thanks to your IT

10    Department for that, Your Honor.  So thank you for that.

11            THE COURT:  Oh, our IT Department is crack.  Crack.

12        Okay.  Great.  See you all tomorrow.  Thank you so much.

13                (Proceedings adjourned at 3:31 p.m.)

14                        ---oOo---

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:  Monday, August 11, 2025

7

8

9

10

11   _____

12          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13        CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, et al., | Case No.  25-cv-04870-CRB |
| Plaintiffs, | |
| v. | **OPINION GRANTING INJUNCTIVE RELIEF** |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

Congress spoke clearly in 1878 when it passed the Posse Comitatus Act, prohibiting the use of the U.S. military to execute domestic law.  Nearly 140 years later, Defendants—President Trump, Secretary of Defense Hegseth, and the Department of Defense—deployed the National Guard and Marines to Los Angeles, ostensibly to quell a rebellion and ensure that federal immigration law was enforced.  There were indeed protests in Los Angeles, and some individuals engaged in violence.  Yet there was no rebellion, nor was civilian law enforcement unable to respond to the protests and enforce the law.

Nevertheless, at Defendants' orders and contrary to Congress's explicit instruction, federal troops executed the laws.  The evidence at trial established that Defendants systematically used armed soldiers (whose identity was often obscured by protective armor) and military vehicles to set up protective perimeters and traffic blockades, engage in crowd control, and otherwise demonstrate a military presence in and around Los Angeles.  In short, Defendants violated the Posse Comitatus Act.

Almost three months after Defendants first deployed the National Guard to Los Angeles, 300 National Guard members remain stationed there.  Moreover, President Trump and Secretary Hegseth have stated their intention to call National Guard troops into

(350 of 401), Page 350 of 401
Case: 25-5553, 09/03/2025, DktEntry: 5.1, Page 350 of 401
Case 3:25-cv-04870-CRB     Document 176     Filed 09/02/25     Page 2 of 52

federal service in other cities across the country—including Oakland and San Francisco, here in the Northern District of California—thus creating a national police force with the President as its chief. Because there is an ongoing risk that Defendants will act unlawfully and thereby injure Plaintiffs, Governor Newsom and the State of California, the Court **ENJOINS** Defendants from violating the Posse Comitatus Act as detailed below.

## I.     PROCEDURAL HISTORY

On June 9, 2025, Plaintiffs filed this case, bringing three causes of action against Defendants: (1) an ultra vires claim against all Defendants, (2) a Tenth Amendment claim against all Defendants, and (3) an Administrative Procedures Act claim against Secretary Hegseth and the Department of Defense. Compl. (dkt. 1). The next day, Plaintiffs moved for a temporary restraining order. TRO Mot. (dkt. 9). After expedited briefing and a hearing, the Court granted Plaintiffs' motion, holding that Defendants had acted ultra vires and violated the Tenth Amendment when they federalized the California National Guard without satisfying the statutory criteria of 10 U.S.C.§ 12406. See TRO (dkt. 64). Though Plaintiffs also sought a temporary restraining order based on the Posse Comitatus Act, the Court held that Plaintiffs had not shown that Defendants had violated or were likely to violate the Act. Id. at 26–29. The Court therefore entered an injunction requiring Defendants not to deploy the California National Guard in Los Angeles and to return control of the California National Guard to Governor Newsom. Id. at 35–36.

Defendants appealed the Court's entry of a temporary restraining order, and the Ninth Circuit administratively stayed the order. See Newsom v. Trump, 141 F.4th 1032, 1039 (9th Cir. 2025) (per curiam). The Ninth Circuit heard expedited argument and then issued an order staying the temporary restraining order pending appeal, concluding that it was likely that President Trump lawfully federalized the California National Guard under § 12406(3). Id. at 1040. The Ninth Circuit explained that § 12406 affords the President significant discretion such that courts can review only whether the president had a colorable, good-faith basis for invoking that statute. Id. at 1049–51. The Ninth Circuit declined to weigh in on Plaintiffs' Posse Comitatus Act arguments. Id. at 1055.

With Plaintiffs' motion for a preliminary injunction (dkt. 77) still pending, this Court advanced the trial on the merits as to Plaintiffs' Posse Comitatus Act claim pursuant to Federal Rule of Civil Procedure 65(a)(2). Sched. Order (dkt. 109). The Court presided over the trial from August 11 to August 13, 2025. See Dkts. 155–57. The Court's findings of fact and conclusions of law follow. See Fed. R. Civ. P. 52(a).

## II.    FINDINGS OF FACT

### A.    ICE Activities in LA

In early June 2025, Immigration and Customs Enforcement initiated a series of immigration enforcement actions in Los Angeles, California. Olmstead Decl. (dkt. 8-2) ¶ 6. ICE targeted "several locations in downtown LA and its immediate surroundings" that are "known to have significant migrant populations and labour-intensive industries." Espíritu Decl. (dkt. 8-1) Ex. G. On June 6, the first day of the enforcement actions, ICE detained between 70 and 80 people and arrested 44. Id. The next day, Customs and Border Protection officers arrived from San Diego to assist with immigration enforcement operations. Santacruz Decl. (dkt. 22-1) ¶ 18.

Public protests quickly followed. At the site of one of the June 6 enforcement actions, a group of people gathered and tried to prevent ICE from leaving. Id. ¶ 7; Espíritu Decl. Ex. D. That evening, crowds of people in downtown Los Angeles protested against ICE's enforcement actions. Espíritu Decl. Ex. D; Santacruz Decl. ¶¶ 9, 10. At the Roybal Federal Complex—which houses the Metropolitan Detention Center—some protestors threw "concrete chunks, bottles of liquid, and other objects" at Federal Protective Service officers guarding a parking garage gate, while others tried "to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate." Santacruz Decl. ¶ 11; Trial Tr. Vol. I (dkt. 162) at 189:20–190:9. Protests continued downtown and in several nearby cities on June 7. At protests in Paramount and Compton, some protestors threw rocks and other objects (including mangos, fireworks, and a Molotov cocktail), burned a vehicle, barricaded a street with shopping carts, briefly trapped an ICE agent in a car, and vandalized property. Santacruz Decl. ¶ 20.

The Los Angeles Police Department and Los Angeles Sheriff's Department responded to these protests and maintained control of the situation. Even before the protests downtown on the evening of June 6, LAPD had reassigned additional officers to the area. Olmstead Decl. ¶ 6. When some protestors acted violently at the Roybal Complex, LAPD officers successfully pushed the crowd away. Santacruz Decl. ¶¶ 13, 15. Shortly thereafter, LAPD declared an unlawful assembly, and most protestors departed the area by 11:00 p.m. Id. ¶¶ 16–17. As for the June 7 protests, LASD dispatched 200 deputies to Paramount and Compton, including a team with specialized training in handling civil unrest, and LAPD was "fairly in control" of the protests downtown. Olmstead Decl. ¶¶ 7, 9.

As a result of the protests on June 6 and 7, two federal buildings were vandalized and sustained minor damage, and a DHS fence and three government vehicles were also damaged. Santacruz Decl. ¶¶ 17, 21. These protests led to one recorded injury to a law enforcement officer—a CBP officer whose wrist was struck by a thrown object. Id. ¶¶ 7–22. LAPD made 29 arrests on June 7. Olmstead Supp. Decl. (dkt. 39-3) ¶ 14.

**B.    Deployment of the National Guard**

On June 7, President Trump issued a memorandum to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security in which he called the National Guard into federal service. June 7 Presidential Memo (Trial Ex. 17). President Trump's memorandum cited 10 U.S.C. § 12406 as his legal authority for federalizing the National Guard and stated as a factual basis that:

> Numerous incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement (ICE) and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws. In addition, violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property.

Id. at 1. President Trump did not invoke the Insurrection Act, 10 U.S.C. §§ 251–255.

President Trump's memorandum called the National Guard into federal service "to

temporarily protect ICE and other United States Government personnel who are
performing Federal functions, including the enforcement of Federal law, and to protect
Federal property, at locations where protests against these functions are occurring or are
likely to occur." June 7 Presidential Memo at 1. President Trump also authorized the
Secretary of Defense to "employ any other members of the regular Armed Forces as
necessary to augment and support the protection of Federal functions and property." Id. at
1–2. He purported to authorize the military to "perform those military protective activities
that the Secretary of Defense determines are reasonably necessary to ensure the protection
and safety of Federal personnel and property." Id. at 2. The memorandum never
specifically mentioned Los Angeles or California; to the contrary, it instructed the
Secretary of Defense "to coordinate with the Governors of the States and the National
Guard Bureau in identifying and ordering into Federal service the appropriate members
and units of the National Guard." Id. at 1.

　　　The same night, Secretary Hegseth issued a memorandum in which he implemented
President Trump's direction. June 7 DOD Memo (Trial Ex. 18). Secretary Hegseth called
2,000 members of the California National Guard into federal service and instructed that
they be placed under the command and control of U.S. Northern Command. Id. Two days
later, Secretary Hegseth issued another memorandum in which he federalized an additional
2,000 California National Guard members, June 9 DOD Memo (Trial Ex. 3), and posted on
social media that "approximately 700 active-duty U.S. Marines from Camp Pendleton are
being deployed to Los Angeles to restore order" and "defend federal law enforcement
officers," Eck Decl. (dkt. 8-3) ¶ 18. The 4,000 federalized National Guard troops, as well
as the approximately 700 U.S. Marines, were placed under the control of Task Force 51,
U.S. Army North's deployable contingency command post. Trial Tr. Vol. I at 15:12–16:4.

　　　On June 7, a briefing took place at U.S. Army North with the Army North
commanding general, chief of staff, operations officer, and deputy chief of staff William
Harrington present. Id. at 18:17–19, 20:17–21:2. Mr. Harrington has over two years of
experience in his role at Task Force 51, id. at 17:9–11, and he previously worked for two

years as an instructor for U.S. Northern Command teaching a course titled "Defense Support to Civil Authorities," which included material on the Posse Comitatus Act, id. at 17:18–18:16. At the June 7 briefing, Mr. Harrington stated—based on his experience and training within the Department of Defense—that "if any National Guard troops were federalized as part of the deployment, they would lose the ability to conduct law enforcement activities because of the Posse Comitatus Act." Id. at 21:15–22:13. Everyone at the briefing agreed with Mr. Harrington's assessment, id. at 22:19–23, and the commanding general assured him that "federalized National Guard troops involved in the mission would not be performing law enforcement functions," id. at 22:14–18, 23:23–24:2. To Mr. Harrington's knowledge, everyone in U.S. Northern Command knew that the Posse Comitatus Act applied, and no one expressed a contrary view. Id. at 24:3–15.

### C.    Task Force 51's Training

Task Force 51 troops—both the federalized National Guard troops and the U.S. Marines deployed to Los Angeles—received training on the permitted scope of their activities under the Posse Comitatus Act. Id. at 24:17–20, 60:6–8 ("[T]he standing rules on the use of force brief that was given by our legal personnel [] was given to every soldier and Marine that went on the mission."); Task Force 51 Training Slides (Trial Ex. 10). The training materials for Task Force 51 provided that "active-duty military personnel may not provide 'direct, active assistance to civilian law enforcement authorities by performing law enforcement functions,' unless a Constitutional or an Act of Congress exception specifically permits it." Task Force 51 Training Slides at 5 (emphasis in original).

Major General Scott Sherman, the deputy commanding general support for U.S. Army North and commander of Task Force 51, oversaw the training of Task Force 51. Trial Tr. Vol. I at 50:14–17, 51:11–14. He testified that his number two priority (after troops' welfare and safety) was "to ensure that they followed the standing rules on the use of force exactly as was written." Id. at 120:2–6. Accordingly, he ensured that Task Force 51 troops knew that "they weren't allowed to do any law enforcement actions. Law enforcement had to do it themselves." Id. at 120:19–21. Among other instructions, Task

Force 51 troops were told that they could not impede vehicle or pedestrian traffic or block public roads, because these are law enforcement functions.  Id. at 27:16–28:1.

But Major General Sherman's instructions were not absolute.  For instance, the Task Force 51 training materials specified the law enforcement functions prohibited by the Posse Comitatus Act:



**Prohibited Law Enforcement Functions**

- ➢ PCA Prohibits Active, Direct:
  - ➢ Pursuit
  - ➢ Arrests
  - ➢ Apprehension
  - ➢ Search
  - ➢ Seizure
  - ➢ Security patrols
  - ➢ Traffic control
  - ➢ Crowd control
  - ➢ Riot control
  - ➢ Evidence collection
  - ➢ Interrogation
  - ➢ Informant

Additionally, the PCA prohibits any other activity where civilians are subjected to military authority that is regulatory, proscriptive, or compulsory.

USARNORTH
Title.date

Task Force 51 Training Slides at 6.  Although the training materials list twelve prohibited functions, Task Force 51 troops were orally instructed that the four functions listed in red—security patrols, traffic control, crowd control, and riot control—were subject to a so-called constitutional exception to the Posse Comitatus Act.  Id.; Trial Tr. Vol. II (dkt. 163) at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.  This instruction came "all the way from the top of [the Department of Defense] down to Task Force 51."[1]  Trial Tr.

---

[1] Defendants objected to this testimony as privileged.  Trial Tr. Vol. II at 280:12–13.  By introducing evidence regarding legal advice given by Department of Defense lawyers,

Vol. II at 283:1–3.  The Department of Defense instructed U.S. Northern Command and Task Force 51 that the President and Secretary's June 7 memoranda created a constitutional exception to the Posse Comitatus Act and thereby authorized Task Force 51 to engage in the four functions listed in red.  Id. at 235:17–236:14; 237:8–17.

This instruction was initially not put in writing.  Id. at 283:7–11.  Eventually, Secretary Hegseth issued a memorandum that explained the scope of the alleged constitutional exception to the Posse Comitatus Act.  June 23 DOD Memo (Trial Ex. 2); Trial Tr. Vol. II at 275:5–276:5; see also Task Force 51 Training Slides at 7 (highlighting an exception for "Protection of Federal property, functions, and personnel").  Secretary Hegseth's memorandum, issued to U.S. Northern Command, directed Task Force 51 to:

- Deploy to Federal Government properties, including Federal buildings and monuments.  When deployed to Federal Government properties, Service members will support Federal law enforcement and may take reasonable measures to prevent the destruction or defacement of Federal Government property including crowd control, temporary detention, cursory search (such as safety-related searches for weapons incident to temporary detention), measures to ensure the safety of persons on the property, and the establishment of security perimeters reasonably necessary to protect the property.

- Deploy to support Federal law enforcement to protect Federal functions and to protect Federal personnel from harm or threat of bodily injury, including Federal law enforcement officers and other Federal Government officials and employees.  This may include measures for temporary detention, cursory search, and the steps necessary to ensure the safety of Federal personnel.  For example, while other Federal personnel execute their duties, [Department of Defense] Service members may provide perimeter protection against third parties and such crowd control measures as are reasonably necessary to ensure the execution of Federal functions and the safety of Federal personnel.

June 23 DOD Memo.  This memorandum—in particular, the second bullet point—asserts that wherever federal personnel go, Task Force 51 troops can accompany them and establish perimeter control, engage in crowd control, and otherwise perform any functions "necessary to ensure the execution of Federal functions and the safety of Federal personnel."  Id.

---

however, Defendants waived any assertion of privilege.  E.g., id. at 244:19–245:12; see Weil v. Inv./Indicators, Rsch. & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir. 1981).

Defendants took the position at trial that there did not even need to be an actual threat to federal property, personnel, or functions to deploy Task Force 51.  Trial Tr. Vol. I at 122:20–23.  In fact, Defendants contend that the potential for unexpected threats to develop would be sufficient to deploy Task Force 51, even where the military's own assessment is that an operation is low- or no-risk.  Id. at 124:1–22.  Defendants go still further, proposing that even where there is no threat to the safety or security of federal personnel or property, the mere possibility that federal law enforcement agents might not be able to do their job could justify deployment of Task Force 51 as "a preventative measure."  Id. at 122:23–25.

Task Force 51 troops were trained to report violations of the Standing Rules for Use of Force, including violations of the Posse Comitatus Act.  Trial Tr. Vol. II at 242:8–23; Task Force 51 Training Slides at 42, 44.  There are no known reports by Task Force 51 troops of violations of the Standing Rules for Use of Force.  Trial Tr. Vol. II at 242:24–243:7.  That said, in spite of troops' training to report violations, Task Force 51 troops were openly instructed that they could, consistent with the Posse Comitatus Act, engage in some law enforcement actions as long as they were doing so to protect federal property, personnel, or functions.  Task Force 51 Training Slides at 7; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.

**D.    Task Force 51's Operations**

The first federalized Task Force 51 troops deployed to Los Angeles on June 8.  In these early days of their deployment, "it was not clear what role they were to play."  Espíritu Decl. Ex. R.  Task Force 51 troops were initially stationed at the Roybal Complex—specifically at the Metropolitan Detention Center—while protests against ICE activity continued in downtown Los Angeles.  Olmstead Decl. ¶ 12.

On June 10, several days after the first Task Force 51 troops arrived in Los Angeles, a representative of U.S. Army North sent an email "coach[ing]" federal law enforcement agencies as to what language to use when submitting requests for assistance (which are how federal agencies requested support from Task Force 51 troops).  RFA Email Thread

(Trial Ex. 39); Trial Tr. Vol. I at 155:5–8. Specifically, law enforcement agencies were instructed to "[s]ubstitute 'protection' for 'security'" and "detect, monitor, and report" for "surveillance." RFA Email Thread. "If the requested activity cannot be converted to a 'protection' term," the email stated, "then we cannot perform it." Id. The Department of Defense did not explain what "protection" meant, nor did it clarify for federal agencies which functions troops could lawfully perform. Trial Tr. Vol. I at 154:13–23. Pursuant to the email instructions, though, federal law enforcement agencies' requests for assistance included requests for "protection" of federal property and for "force protection" of federal law enforcement agents who were conducting search warrant operations. Id. at 31:14–25.

While on the ground in and around Los Angeles, Task Force 51 troops wore military uniforms, which were green or multicamouflage. Id. at 88:15–18, 175:13–15. At least some ICE agents wore camouflage uniforms too. Id. at 174:22–175:11. It is difficult, even for someone familiar with military uniforms and insignia, to differentiate between the uniforms from a distance or where there is a lot of commotion.[2] Id. at 175:16–176:7. Indeed, Major General Sherman and Ernesto Santacruz—the Los Angeles field office director for ICE's Enforcement and Removal Operations and a veteran himself—were both unable to determine whether multiple individuals in photographs of ICE enforcement actions were Task Force 51 troops or federal law enforcement personnel. See id. at 72:3–6, 176:20–177:7, 177:15–178:6. Task Force 51 troops were also armed, carrying weapons with live ammunition. Id. at 32:5–8.

Task Force 51 responded to 64 requests for assistance in and outside of Los Angeles County. Id. at 31:3–13. These requests for assistance came from various federal law enforcement agencies, many (but not all) within the Department of Homeland Security. Id.

---

[2] Department of Defense regulations require federal troops to have their name displayed on their uniform. Army Reg. 670-1 § 2-7, Dep't of the Army Pamphlet 670-1 § 21-25. Yet some Task Force 51 troops wore body armor that obscured their names. Trial Tr. Vol. I at 89:12–20. Federal law enforcement personnel in Los Angeles did not display their names on their uniforms. Id. at 90:4–25. In fact, many wore plain clothes instead of a uniform that would identify them as law enforcement at all. Id. at 98:22–25, 174:15–21.

1.      **Operations in Los Angeles County**

Task Force 51 troops accompanied ICE officers on approximately 75% of their enforcement and removal operations in and around Los Angeles through mid-July.  Id. at 166:8–19; see also, e.g., ICE Twitter Posts (Trial Exs. 53, 54) (photographs of Task Force 51 troops standing next to ICE agents while the agents detained individuals).  The presence of Task Force 51 deterred engagement by the public, especially by those who might have attempted to hinder or protest an arrest by ICE agents.  Trial Tr. Vol. I at 170:24–171:17.

The Marines who were part of Task Force 51 were tasked only with protecting federal property in Los Angeles.  Trial Tr. Vol. II at 214:25–215:7.  One such facility was the Wilshire Federal Building, which houses the Veterans Affairs office.  Trial Tr. Vol. I at 64:6–10.  On June 12, a Marine briefly detained a veteran who twice attempted to enter the building but who did not stop when asked, provide identification, or state his business.  Id. at 64:11–13, 65:10–18.  The Marine restrained the veteran's hands in flex cuffs and detained him for approximately 25 minutes, after which point federal law enforcement arrived and took custody of him.  Id. at 68:13–20.  The Marine did not question the veteran or otherwise engage with him.  Id. at 68:21–69:4.

Not all of Task Force 51's deployments in Los Angeles were related to ICE or other DHS agencies.  For example, on the morning of June 13, Task Force 51 troops accompanied DEA and FBI officers on a joint DEA–FBI operation at a private residence in Long Beach.  June 13 Mission Debrief (Trial Ex. 38).  Task Force 51 troops and military vehicles, in conjunction with DEA SWAT teams, cordoned off Long Beach Boulevard in two directions from the residence while DEA and FBI agents approached the residence to look for an individual who had thrown rocks during one of the June 7 protests.  Id. ("National Guard soldiers established their blocking positions at approximately 0600."); see also Trial Tr. Vol. I at 119:9–13 ("[I]t was law enforcement in the lead, with our soldiers behind them.").  The record is unclear as to whether Task Force 51's blockades prevented any civilians from using Long Beach Boulevard, a public road, while the operation was ongoing.  Trial Tr. Vol I at 77:14–17.

Nor was Task Force 51 deployed only in support of federal enforcement actions. On July 7, approximately 80 Task Force 51 troops participated in a DHS operation, titled Operation Excalibur,[3] at MacArthur Park in Los Angeles.  Id. at 35:3–24, 99:21–24; Operation Excalibur Slides (Trial Ex. 28).  This was DHS's third attempt at the operation, and Secretary Hegseth himself approved it.[4]  Trial Tr. Vol. I at 35:8–14, 103:19–24; Trial Tr. Vol. II at 261:24–262:3.  Operation Excalibur involved federal law enforcement officials marching across MacArthur Park while Task Force 51 remained stationed on the outside of the park in military vehicles—Humvees and tactical vehicles—including at two traffic control points to prevent vehicular traffic along a stretch of Wilshire Boulevard. Operation Excalibur Slides at 5; Trial Tr. Vol. I at 35:25–36:1.  DHS's mission in executing Operation Excalibur was "to demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles Joint Operations Area."  Operation Excalibur Slides at 4.  And the operation's purpose was to "enable and protect the execution of joint federal law enforcement missions in a high-visibility urban environment, while preserving public safety and demonstrating federal reach and presence."  Id.

Operation Excalibur was rated high-risk for DHS agents due to (among other things) likely crowds and concerns about an international gang presence.  Id. at 21. So Task Force 51 conducted "numerous rehearsals," which were "very large" and involved "all of the key leaders of the operation."  Trial Tr. Vol. II at 265:9–17.  Despite the risks

---

[3]  Excalibur is, of course, a reference to the legendary sword of King Arthur, which symbolizes his divine sovereignty as king.

[4]  Initially, Operation Excalibur was planned to take place on Father's Day and to have Task Force 51 military vehicles stationed on the section of Wilshire Boulevard that runs through MacArthur Park.  Trial Tr. Vol. I at 99:25–100:7.  Major General Sherman objected to that request for assistance, expressing concern that (1) there would be a large number of people in the park for Father's Day, (2) Wilshire Boulevard was in the middle of the Park (the operation's law enforcement area), and (3) the initial proposal to use helicopters would attract large crowds in opposition to the operation.  Id. at 100:8–10; Trial Tr. Vol. II at 263:22–264:15.  Chief Bovino of the Department of Homeland Security criticized Major General Sherman for his opposition to the initial plan, questioning Sherman's loyalty to the country.  Trial Tr. Vol. I at 103:5–8.  This is relevant because Chief Bovino's accusations of disloyalty go to the state of mind of decisionmakers who are tasked with ensuring that the Posse Comitatus Act is followed.

associated with Operation Excalibur and the numerous rehearsals, DHS planned to give
LAPD only two hours' notice of the operation.  Operation Excalibur Slides at 4.  Further,
the risk of inaction—that is, the risk of not performing the operation at all—was low due to
the lack of any high-value targets or threats to federal functions at MacArthur Park.  Id. at
21.  The only identified risk to inaction was the hypothetical concern that "it could weaken
the public's perception of federal responsiveness and reduce deterrence in other areas if the
federal presence seems limited or absent."  Id.  Ultimately, federal law enforcement faced
no resistance at MacArthur Park, and Task Force 51 did not need to provide any force
protection.  Trial Tr. Vol. I at 39:18–25.

### 2.    Operations Outside Los Angeles County

Task Force 51's assistance to federal law enforcement operations in southern
California expanded beyond Los Angeles.  The evidence at trial showed that federal troops
were deployed three times in support of federal law enforcement operations targeting
marijuana farms: once in Mecca (Riverside County), once in Carpinteria (Santa Barbara
County), and once in Camarillo (Ventura County).

**Mecca.**  On June 18, over 300 Task Force 51 troops were deployed to support a
DEA operation with only about 200 federal law enforcement agents at a marijuana farm in
Mecca, California—over 140 miles from downtown Los Angeles.  Trial Tr. Vol. I at 32:9–
33:4, 80:19–23.  There was no specific threat or risk of riot in Mecca.  Id. at 80:13–18.

The troops were stationed several hundred yards outside the farm itself, where they
established a security perimeter with riot shields and military vehicles.  Id. at 44:22–45:10;
DVIDS Mecca Photos (Trial Exs. 69–73).  The underlying DEA operation "target[ed]
illegal narcotics activity," and the operation "resulted in the seizure of narcotics,
approximately 87 suspected human trafficking victims, and disruption of illegal marijuana
cultivation tied to organized criminal activity."  Mecca Storyboard (Trial Ex. 41).

**Carpinteria.**  On July 10, between 100 and 120 Task Force 51 troops were
deployed to a cannabis farm in Carpinteria, California—over 80 miles from downtown Los
Angeles.  Trial Tr. Vol. I at 83:22–84:1, 84:21–23.  There was no specific threat or risk of

riot in Carpinteria, and DHS notified California Highway Patrol and the Santa Barbara County Sheriff's Office only at the time of the operation. Carpinteria Slides (Trial Ex. 31) at 2, 3, 11. Homeland Security Investigations requested Task Force 51 to help set traffic control points because without the troops, federal law enforcement agencies would have had to station more personnel at traffic control points, which would have slowed down the operation. Trial Tr. Vol. I at 84:7–20. The risk of inaction was low "given the volume of [HSI] personnel on scene." Carpinteria Slides at 11.

Task Force 51 troops and federal law enforcement officers together blocked traffic on Casitas Pass Road on the outskirts of Carpinteria. DVIDS Carpinteria Photos (Trial Exs. 75–76); Solorzano Photo (Trial Ex. 79); Solorzano Video (Trial Ex. 80); Trial Tr. Vol. I at 86:19–24. In a photo taken by Carpinteria's vice mayor, Monica Solorzano, troops stand several feet behind a federal law enforcement officer (whose clothing does not indicate which agency he is affiliated with). See Solorzano Photo. In a photo published by the Department of Defense, a Task Force 51 member is standing on a military vehicle on Casitas Pass Road. See DVIDS Carpinteria Photo (Trial Ex. 75). And as shown in a video taken by Ms. Solorzano, Task Force 51 troops physically turned away a woman with a megaphone as she approached the traffic blockade. See Solorzano Video.

**Camarillo.** Also on July 10, approximately 80 Task Force 51 troops were deployed to a cannabis farm in Camarillo, California—approximately 50 miles from downtown Los Angeles. Trial Tr. Vol. I at 34:18–21. Though there was initially a request for assistance from Task Force 51 in Camarillo, the lead agency canceled the request two days before the operation. Id. at 34:4–11, 45:24–46:3, 129:22–130:1.

Once federal law enforcement began the operation in Camarillo, however, they determined that they needed assistance from Task Force 51 to respond to crowds that had gathered on the roads near the facility and that were throwing rocks and damaging federal vehicles, including with a makeshift spike strip. Id. at 46:4–16; 130:2–17; 194:15–25. Federal law enforcement agents were also overwhelmed by the number of undocumented

immigrants at the cannabis farm.[5]  Id. at 130:6–8.  Task Force 51 troops were deployed and assisted with forming a perimeter to prevent individuals and vehicles from traveling on roads near the law enforcement operation.  Id. at 99:9–13; 178:7–11; Flores-Haro Photos (Trial Exs. 82–94); Flores-Haro Videos (Trial Exs. 95–96).

### E.    The Future of the National Guard in California

As of August 11, 300 federalized California National Guard members remain part of Task Force 51.  Trial Tr. Vol. I 107:8–11.  Those 300 troops are responding to four requests for assistance: two requests for protection of federal property and two requests for protection of federal personnel and functions.  Id. at 107:18–108:6.  Secretary Hegseth extended the deployment of these troops in Los Angeles by 90 days.  Aug. 5 Activation Order (Trial Ex. 97).

Los Angeles was the first U.S. city where President Trump and Secretary Hegseth deployed troops, but not the last.  Following criticisms by President Trump of the crime rate in Washington, D.C., Secretary Hegseth announced that National Guard troops would be deployed there to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles.  August 11 Hegseth Video (Trial Ex. 114).[6]  President Trump has since raised similar criticisms about Oakland, Baltimore, Chicago, and San Francisco, insinuating that he intends to send the National Guard or military to those cities.  August 11 Trump Video (Trial Ex. 115); S. DiNatale, Trump Adds San Francisco to List of Cities Where He Wants to Send Troops, S.F. Chronicle (Aug. 22, 2025), https://perma.cc/6Z8A-R2QH ("'Look at what the Democrats have done to San Francisco,' Trump told reporters.  'They've destroyed it.  We could clean that up, too.  We'll clean that one up, too.'").

---

[5]  In fact, a farmworker, Jaime Alanís, died after falling off the roof of a greenhouse during the operation.  O. Rodriguez, California Farmworker Who Fell from Greenhouse Roof During Chaotic ICE Raid Dies, AP News (July 13, 2025), https://perma.cc/GV83-L8Y2.
[6]  Defendants objected to the relevance of Secretary Hegseth's August 11 statements. These statements go directly to the propriety of injunctive relief.

III.   **CONCLUSIONS OF LAW**

The Court begins with a discussion of the historical context in which the Posse Comitatus Act was passed. Then, the Court addresses two of Defendants' threshold arguments—their challenge to Plaintiffs' standing and their contention that the Posse Comitatus Act does not apply to National Guard troops federalized under 10 U.S.C. § 12406(3)—before evaluating whether Defendants violated the Posse Comitatus Act. Finally, the Court considers the propriety of injunctive, ultra vires relief. Before turning to the history and the parties' arguments, though, some observations are in order.

First, "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Without question this principle applies to cases, like this one, where the Executive is accused of overstepping bounds set out by the Legislature. "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." Trump v. United States, 603 U.S. 593, 608 (2024) (citation omitted). Especially where the foundation of our constitutional system is at issue, "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 194 (2012) (quoting Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821)); cf. Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) (discussing "[t]he allocation of power among Congress, the President, and the courts in such fashion as to preserve the equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department' can effectively be resisted" (quoting The Federalist, No. 51 (J. Madison))).

Second, though courts have not yet squarely faced the issue of a President using the military domestically in violation of federal law, the Supreme Court has clarified that the courts are not powerless to stop such executive overreach. After the assassination of Dr. Martin Luther King, Jr., President Johnson ordered federal troops to assist local authorities with domestic surveillance pursuant to the Insurrection Act. Laird v. Tatum, 408 U.S. 1, 3–5 (1972). A group of citizens concerned about this surveillance brought a class action

seeking declaratory and injunctive relief.  Id. at 2.  The Court found that the plaintiffs had

not alleged injury in fact and therefore lacked standing, rejecting the plaintiffs' argument

under the First Amendment that the government's surveillance chilled their speech.  See

id. at 12–15.  Though the Court could have ended there, it did not; it went on to explain:

> The concerns of the Executive and Legislative Branches in
> response to disclosure of the Army surveillance activities—and
> indeed the claims alleged in the complaint—reflect a traditional
> and strong resistance of Americans to any military intrusion into
> civilian affairs.  That tradition has deep roots in our history and
> found early expression, for example, in the Third Amendment's
> explicit prohibition against quartering soldiers in private homes
> without consent and in the constitutional provisions for civilian
> control of the military.  Those prohibitions are not directly
> presented by this case, but their philosophical underpinnings
> explain our traditional insistence on limitations on military
> operations in peacetime.  Indeed, when presented with claims of
> judicially cognizable injury resulting from military intrusion
> into the civilian sector, federal courts are fully empowered to
> consider claims of those asserting such injury; there is nothing
> in our Nation's history or in this Court's decided cases,
> including our holding today, that can properly be seen as giving
> any indication that actual or threatened injury by reason of
> unlawful activities of the military would go unnoticed or
> unremedied.

Id. at 15–16 (emphasis added).  The Supreme Court thus emphatically rejected the notion

that the federal courts lack authority to respond to the President's unlawful domestic use of

the military.

### A.  History of the Posse Comitatus Act

In 1878, Congress passed the Posse Comitatus Act, which as amended states that:

> Whoever, except in cases and under circumstances expressly
> authorized by the Constitution or Act of Congress, willfully uses
> any part of the Army, the Navy, the Marine Corps, the Air Force,
> or the Space Force as a posse comitatus or otherwise to execute
> the laws shall be fined under this title or imprisoned not more
> than two years, or both.

10 U.S.C. § 1385.  To fully grasp the Posse Comitatus Act and its role in our constitutional

system of government requires a historical perspective.

### 1.  Founding Era

The presence and role of British troops in the colonies gave rise to some of the first

American criticisms of the domestic use of military troops in peacetime.  For instance,

British troops were stationed in Boston "as a force of uniformed peace-keepers, or policemen." J. Elsea, Cong. Rsch. Serv., RL 42659, <u>The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law</u> 4 n.17 (2018) (citing H. Zobel, <u>The Boston Massacre</u> 135 (1987)). "Public resentment of the use of the troops in such a manner sparked the [Boston Massacre], which led in turn to further heightened resentment." <u>Id.</u> at 4. Indeed, resentment of Britain's use of military troops as a police force was manifested in the Declaration of Independence, where one of the American colonists' grievances was that the King had "affected to render the Military independent of and superior to the Civil power." The Declaration of Independence para. 14 (U.S. 1776).[7]

Concerns about the domestic role of the military persisted into the drafting and ratification of the Constitution, where they came into tension with pragmatic realities surrounding the founding of a new Nation. On the one hand, many of the Founders recognized the dangers imposed by a centralized military force, and some advocated for significant (if not total) reliance on militias rather than federal troops. M. Bahar, <u>The Presidential Intervention Principle: The Domestic Use of the Military and the Power of the Several States</u>, 5 Harv. Nat'l Sec. J. 537, 545–46 (2014); 3 J. Elliot, <u>The Debates in the Several State Conventions on the Adoption of the Federal Constitution</u> 401 (1836) (quoting Edmund Randolph at the Virginia ratification convention: "With respect to a standing army, I believe there was not a member in the federal Convention, who did not feel indignation at such an institution."). On the other hand, some Founders recognized that a standing army would be necessary to the security of the young United States. <u>See</u> Bahar, <u>The Presidential Intervention Principle</u>, <u>supra</u>, at 546; <u>see also, e.g.</u>, The Federalist No. 24 (A. Hamilton) (arguing in favor of a standing army as a security force against Britain, Spain, and indigenous nations); The Federalist No. 41 (J. Madison) ("A standing force, therefore, is a dangerous, at the same time that it may be a necessary, provision.").

---

[7] Other grievances related to Britain's use of troops in the colonies were that the King had "kept among us, in times of peace, Standing Armies without the Consent of our legislatures" and "Quarter[ed] large bodies of armed troops among us." <u>Id.</u> paras. 13, 16.

The structure of the Constitution reflects these debates. The Constitution granted to the federal government significant authority over the military, but it split that authority between the Executive and the Legislature. The Constitution provided that the President "shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1. But the Constitution gave to Congress—not the President—the bulk of the federal authority over the military, including the power to "declare War," id. art. I, § 8, cl. 11; to "raise and support Armies," id. art. I, § 8, cl. 12; to "provide for calling forth the Militia to execute the Laws of the Union, suppress insurrections and repel Invasions," id. art. I, § 8, cl. 15; and to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States," id. art. I, § 8, cl. 16. Alexander Hamilton explained: "the whole power of raising armies was lodged in the LEGISLATURE, not in the EXECUTIVE," and "this legislature was to be a popular body, consisting of the representatives of the people periodically elected." The Federalist No. 24.

Focusing in on the Militia Clause's language permitting Congress to "provide for calling forth the Militia to execute the Laws of the Union"—language that evokes the principles at issue in the Posse Comitatus Act—reveals uncertainty in the Nation's early years regarding whether and how the federal military (including the federalized militia) could engage in federal law enforcement. To start, this language was a subject of some debate during the ratification process for the Constitution: Patrick Henry, for example, worried that Congress would regularly use this provision to enforce federal law. 3 Elliot, Debates, supra, at 387. George Nicholas, a member of the Virginia House of Delegates, responded that Congress's power to call forth the militia to execute the laws would be exercised only if "found absolutely necessary." Id. at 392. James Madison explained that the use of the militia for this purpose "would never be put in practice" where civil authorities were able to execute the laws on their own. Id. at 384. Hamilton, too, specifically rejected the idea that the Militia Clause would permit the militia to serve as a

posse comitatus to enforce domestic law unless necessary. In response to criticisms that the Constitution provided no authority for the federal government to call out a posse comitatus to enforce the laws, Hamilton explained that <u>Congress's</u> right "to pass all laws NECESSARY AND PROPER to execute its declared powers" would necessarily "include that of requiring the assistance of the <u>citizens</u> to the officers who may be intrusted with the execution of those laws." The Federalist No. 29 (A. Hamilton) (emphasis added). He went on to explain why that the militia could not serve as a posse comitatus: "It being therefore evident that the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of color, it will follow, that the conclusion which has been drawn from it, in its application to the federal government over the militia, is as uncandid as it is illogical." <u>Id.</u>

The Founders thus coalesced around a narrow interpretation of the Militia Clause— one which granted power to Congress, not the President.

### 2.    Reconstruction Era

Almost exactly 100 years after the original thirteen states ratified the Constitution, Congress passed the Posse Comitatus Act. The historical context of Reconstruction is as important to interpreting the Act as the constitutional framework described above.

In the aftermath of the Civil War, federal troops remained stationed in southern states and continued to enforce federal law. Elsea, <u>The Posse Comitatus Act and Related Matters</u>, <u>supra</u>, at 21. This included federal voting law and the Reconstruction Amendments: in the 1876 presidential election, federal troops were stationed near polling places in Florida, South Carolina, and Louisiana to ensure that newly enfranchised former slaves could vote. S. Harman-Heath, <u>The Quasi-Army Law Enforcement, Value Judgments & the Posse Comitatus Act</u>, 11 Cal. L. Rev. Online 367, 375 (2020); U. Grant, Special Message to the House of Representatives (Jan. 23, 1877), <u>in</u> 7 J. Richardson, <u>A Compilation of the Messages and Papers of the Presidents 1789-1907</u>, at 421 (1897). When the election results came in with President Hayes (a Republican from Ohio) winning by a slim margin—and in dubious circumstances, following disputed wins in the three

states where federal troops were stationed—Southern Democrats promptly sought to remove federal troops from their states.  A. Buttaro, <u>The Posse Comitatus Act of 1878 and the End of Reconstruction</u>, 47 St. Mary's L.J. 135, 161 (2015); Elsea, <u>The Posse Comitatus Act and Related Matters</u>, <u>supra</u>, at 21.

In May 1878, Representative William Kimmel of Maryland introduced the Posse Comitatus Act in the House of Representatives.  7 Cong. Rec. 3579 (1878).  He began his support for the Act by stating:

> I have the deepest conviction that upon a proper adjustment of it depends the peace and, I fear, the liberties of the people.  I confess that the more deeply I inquire into the steady growth of the standing Army and the uses to which it has been applied, the stronger my conviction becomes that the highest patriotism demands the wisest precautionary measures.

<u>Id.</u>  Kimmel went on to discuss English, Roman, and early U.S. history, citing various Founders in support of his position.  <u>Id.</u> at 3579–81, 3583–84.  He then turned to the concern that deploying the military domestically to execute the laws would enlarge the power of the Executive:

> Governors, sheriffs, and other State and local officers, and United States district attorneys, assistant marshals, marshals, collectors of revenue, and other revenue officers, requested these generals, and these generals at the requests of these officers precipitated these troops upon the people.  If this may be done in one district may it not be done in all the districts?  If so, and the interest of a President demands, may he not use this power for his own purposes?  May he not by this means subject every reluctant commander to the order of any political miscreant he may choose to make an assistant collector of revenue, until the whole Army is under his control, and then provoke the resistance he seeks for the employment of force and in the name of order substitute his will for law?

<u>Id.</u> at 3782.  To be sure, Kimmel's high-minded principles were not Southern Democrats' only (or even their primary) motivation for passing the Posse Comitatus Act; the Act was in many ways a referendum on whether Black Americans would be able to vote in Southern states.  Buttaro, <u>The End of Reconstruction</u>, <u>supra</u>, at 174–81 (describing debates in the House and Senate).  But whatever political motivations lay behind Congress's vote on the Posse Comitatus Act, the fact remains that the Act was a response to systemic

federal military involvement in domestic law enforcement.

### B.    Standing

With the background of the Posse Comitatus Act in mind, the Court now turns to the question of Plaintiffs' standing to sue.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95, 102 (1998).  Article III of the Constitution requires that a plaintiff "have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  Moreover, an injury in fact must be "legally and judicially cognizable."  United States v. Texas, 599 U.S. 670, 676 (2023) (citation omitted).

The parties focus on whether California (rather than Governor Newsom) has standing to pursue this action against Defendants.  That is sufficient for Article III purposes.  Id. (citing Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).  Defendants challenge (1) whether an injury exists and (2) whether any such injury is cognizable.  Supp. Opp. (dkt. 136) at 11–12.  Plaintiffs identify three potential injuries: (1) an injury to California's role in the federal system, (2) a fiscal injury to the state economy, and (3) an injury to the health and well-being of California citizens.  Supp. Reply (dkt. 140) at 4–7.  The Court considers these three proposed injuries to determine whether they are cognizable, redressable injuries.

### 1.    Federal–State Relations

States have "an interest in securing observance of the terms under which [they] participate[] in the federal system."  Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 607–08 (1982).  So states have standing "when they believe that the federal government has intruded upon areas traditionally within states' control."  Kentucky v. Biden, 23 F.4th 585, 598 (6th Cir. 2022); see also Texas v. United States, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates may have standing based on [] federal assertions of authority to regulate matters they believe they control.'"  (cleaned up) (citations omitted)).

In this case, Plaintiffs alleged that Defendants have violated the Posse Comitatus Act and, in so doing, infringed on California's police power. Supp. Reply at 6–7. The police power is the quintessential power that the Constitution reserves to the states. See United States v. Morrison, 529 U.S. 598, 618 (2000) (observing that the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation."). Because Defendants' alleged violations of the Posse Comitatus Act include allegations that Task Force 51 troops have engaged in law enforcement—a domain traditionally within the state's control—California has suffered an injury that gives it standing to challenge those violations.[8]

Next is the question whether California's injury is legally and judicially cognizable—that is, whether the "dispute is traditionally thought to be capable of resolution through the judicial process." Texas, 599 U.S. at 676 (citation omitted). Defendants argue that there is no historical example of a litigant "obtaining a prospective injunction requiring federal governmental compliance with a federal criminal statute, with a willfulness requirement, that the Executive Branch is charged with enforcing." Supp. Opp. at 11–12. To the extent that this is a question of standing, as opposed to a merits question about whether injunctive relief is appropriate or available here,[9] it specifically

---

[8]  The Court earlier explained why Defendants' use of 10 U.S.C. § 12406 to federalize the California National Guard likely violated the Tenth Amendment. See TRO at 29–31. That analysis is different from the analysis here, which is whether—even if Defendants' federalization of the National Guard was lawful—Defendants separately injured California in an Article III sense by violating the Posse Comitatus Act. Thus, this analysis is not affected by the Ninth Circuit's review of Plaintiffs' standalone Tenth Amendment claim.
[9]  Defendants get out over their skis in proposing that the Court parse the question more finely at the standing stage and ask now whether, in a one-of-a-kind scenario, a specific remedy can be had against a specific party. That issue is better addressed after a thorough analysis of Plaintiffs' claims when determining what remedy, if any, is appropriate. The Court will address Defendants' arguments about the propriety of injunctive relief at that point in its order. This approach is perfectly consistent with United States v. Texas, where the Court found that a wholly novel form of relief was fundamentally at odds with well-established doctrines of prosecutorial and enforcement discretion and was not redressable as a matter of law. 599 U.S. at 677.

A340

implicates redressability. <u>See Texas</u>, 599 U.S. at 676 (asking whether "the asserted injury is traditionally <u>redressable</u> in federal court" (emphasis added)). No one disputes that injunctive relief is available against the federal government and its agencies. <u>See Armstrong v. Exceptional Child Ctr., Inc.</u>, 575 U.S. 320, 326–27 (2015). And an injunction preventing Task Force 51 troops from engaging in law enforcement activities traditionally reserved to the states is likely to redress some of the harms discussed above. Thus, for purposes of establishing standing, Plaintiffs have suffered a cognizable injury.

### 2. State Economy

States have "a quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." <u>Alfred L. Snapp & Son</u>, 458 U.S. at 607; <u>see also Biden</u>, 600 U.S. at 490 (recognizing economic harm as an injury in fact). Plaintiffs assert that the State and its residents have suffered various forms of fiscal harm due to Defendants' alleged Posse Comitatus Acts violations.

As to the state's financial losses, Plaintiffs explain that the presence of the National Guard in Los Angeles has led to increased state law enforcement expenses. Supp. Reply at 5. The problem with this argument is that California's alleged fiscal injury is not traceable to a Posse Comitatus Act violation but to the National Guard's presence in Los Angeles in general. For instance, Plaintiffs state that their "largest expenditures" in response to federal officers' and troops' presence in Los Angeles came on June 9, 10, and 11, <u>id.</u>, but their first specific example of a Posse Comitatus Act violation occurred on June 12, when Marines briefly detained a veteran at the Wilshire Federal Building. Because Plaintiffs do not connect their increased expenditures to any Posse Comitatus Act violations, their fiscal harms do not give them standing.

The same is true of the asserted economic harms to California residents. <u>See</u> Supp. Reply at 5–6. ICE and Task Force 51's activity in Los Angeles has certainly sent economic shockwaves through southern California. <u>See, e.g.</u>, J. Cowan & M. Dwyer, <u>Federal Agents March Through L.A. Park, Spurring Local Outrage</u>, N.Y. Times (July 7, 2025), https://perma.cc/ZJQ8-B349; L. Sumagaysay & L. Hepler, <u>From San Diego to the</u>

Bay Area, California Residents Are On Edge over Immigration Raids, CalMatters (Jun 19, 2025), https://perma.cc/KVV7-MWX4 (describing the impact across industries).  But it is not apparent on this factual record which of these economic harms are traceable to alleged Posse Comitatus Act violations, or even the presence of Task Force 51 troops; it instead appears as though ICE operations generally have caused most of the economic impact to California residents.  Once again, the alleged economic harm is not traceable to the conduct being complained of, so it is not sufficient for standing purposes.[10]

### 3.    Citizens' Health and Welfare

As explained above, states have a quasi-sovereign interest in the physical and economic health and well-being of their residents.  Alfred L. Snapp & Son, 458 U.S. at 607; accord Pennsylvania v. West Virginia, 262 U.S. 553, 591–92 (1923) (state can sue to ensure natural gas is available to residents).  At the same time, a state cannot assert an action purely on behalf of its citizens.  Alfred L. Snapp & Son, 458 U.S. at 607.  The Supreme Court has declined to draw clear lines as to how large a population must be affected for a state's claim to be quasi-sovereign and not simply derivative of its citizens' claims, but it has instructed that "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as parens patriae is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  Id.

Plaintiffs claim that Defendants' alleged violations of the Posse Comitatus Act have "escalat[ed] tensions within the city of Los Angeles" and "sow[n] chaos and fear daily throughout Southern California."  Supp. Reply at 4–5.  This purported injury is not merely

---

[10]  The Court recognizes that the consolidation of Plaintiffs' motion for a preliminary injunction with a trial on the merits expedited the timeline such that both parties had a limited opportunity to engage in discovery, including into issues of standing.  See Joint Resp. to Consol. (dkt. 115) at 2.  It may be that, given time for more thorough discovery and fact development, Plaintiffs could identify harms that are traceable to alleged Posse Comitatus Act violations.  Given the Court's determination that Plaintiffs have standing on other grounds, though, the Court concludes that Plaintiffs were not prejudiced by consolidation.  See Glacier Park Found. v. Watt, 663 F.2d 882, 886 (9th Cir. 1981) (consolidation proper "so long as the procedures do not result in prejudice to either party").

derivative of California citizens' own potential claims; California as a state has an interest in ensuring that its citizens have a productive, rather than a fearful, relationship with law enforcement.  To that end, California (like many states) has passed legislation regulating peace officers' use of force to achieve this end.  See Cal. Gov't Code § 7286.  That said, Plaintiffs' generalized references to "tensions," "chaos," and "fear" are intangible harms that are not concrete enough to establish Article III standing.  See Spokeo, Inc. v. Robins, 578 U.S. 330, 340–41 (2016).  The same goes for a few isolated references in the record to the deterrent effect of Task Force 51's presence in and around Los Angeles, as it is not clear who and what is being deterred.

Accordingly, the Court concludes that Plaintiffs have established standing for injuries to federal–state relations but not for their own economic injuries or for injuries to California residents' physical and economic health and welfare.

### C.     10 U.S.C. § 12406(3)

With Plaintiffs' standing secure, one more preliminary question remains before addressing whether Defendants have violated the Posse Comitatus Act.  Recall that President Trump federalized the National Guard under 10 U.S.C. § 12406(3), which provides that the President can do so "[w]henever … the President is unable with the regular forces to execute the laws of the United States."  See also Newsom, 141 F.4th at 1052 (concluding that the President likely acted properly under § 12406(3)).  Defendants argue that § 12406(3) is an exception the Posse Comitatus Act, so the Act does not even apply to the federalized National Guard.  Supp. Opp. at 12–15; see also 10 U.S.C. § 1385 (providing an exception for "cases and [] circumstances expressly authorized by the Constitution or Act of Congress").  The Court now addresses that contention.

To start, the Court is unaware of any person—government lawyer, military or civilian official, court, or commentator—who has made this argument other than Defendants' lawyers in this case.  The Department of Defense has not taken this position in its publications on the Posse Comitatus Act.  See Dep't of Def. Instruction No. 3025.21, encl. 3 ¶ 1.b(5) (Feb. 27, 2023) (listing statutory exceptions to the Posse Comitatus Act);

Ctr. for L. & Mil. Opers., <u>Domestic Operational Law: 2024 Handbook for Legal Personnel</u> 96–97 (2024) (same), available at https://perma.cc/E7BC-JKUZ.  Mr. Harrington and Major General Sherman, both of whom have extensive experience and training in contexts that involve domestic military operations, explained that they understood the Posse Comitatus Act to apply to National Guard troops federalized under 10 U.S.C. § 12406. Trial Tr. at 21:15–22:13, 52:25–53:4.  As Mr. Harrington put it, "everyone knew that the Posse Comitatus Act applied."  <u>Id.</u> at 24:8–9.  Defendants, however, advocate for this novel reading of § 12406(3) and Posse Comitatus Act that would represent a marked shift in the balance of power between the Executive and the Legislature.

The impact of Defendants' argument is largely due to the Ninth Circuit's reading of § 12406(3) in its order staying this Court's temporary restraining order pending appeal.  In that order, the Ninth Circuit held that courts can review the President's invocation of § 12406 only to determine (1) if it has a colorable basis and (2) if it is made in good faith. <u>Newsom</u>, 141 F.4th at 1050–51.[11]  The Ninth Circuit did not clarify these standards further.  For example, it did not explain how a plaintiff could challenge—or how a district court could evaluate, especially on an expedited basis in proceedings for preliminary injunctive relief—a presidential invocation of § 12406 for lack of a colorable basis or good faith.  Nor does the Ninth Circuit suggest that courts are well positioned to evaluate whether the President acted in good faith, rather than as pretext for federalizing the

---

[11]  This standard purportedly comes from the Supreme Court's decision in <u>Sterling v. Constantin</u>.  <u>Id.</u> (citing 287 U.S. 378, 399–400 (1932)).  In <u>Sterling</u>, the Court determined that the governor of Texas had acted lawfully when he restricted oil production across the state.  287 U.S. at 387.  Though the Court found that the governor had acted in good faith, it did not set forth any actual test for evaluating executive discretion.  <u>Id.</u> at 399–400. Rather, it relied on earlier cases holding that the Executive has inherent discretion by virtue of his role as Commander-in-Chief and his obligation to "take care that the laws be faithfully executed."  <u>Id.</u> (citing <u>Martin v. Mott</u>, 25 U.S. (12 Wheat.) 19, 29–32 (1827), and <u>Luther v. Borden</u>, 48 U.S. (7 How.) 1, 44–45 (1849)).  Neither of those cases instructed courts to evaluate whether the Executive had a colorable basis for his actions or whether he acted in good faith.  <u>Martin</u>, 25 U.S. at 31; <u>Luther</u>, 48 U.S. at 43–44.  Furthermore, as explained below, <u>Martin</u>, <u>Luther</u>, and <u>Sterling</u>'s reliance on the Commander-in-Chief and Take Care Clauses conflicts with the Supreme Court's more recent interpretation of those Clauses in <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952).

(376 of 401), Page 376 of 401
Case: 25-5553, 09/03/2025, DktEntry: 5.1, Page 376 of 401
Case 3:25-cv-04870-CRB   Document 176   Filed 09/02/25   Page 28 of 52

National Guard.[12]  The Ninth Circuit also suggested that the President can invoke § 12406(3) if his ability to execute federal law has been "significantly impeded," rather than the stricter statutory requirement that he be "unable with the regular forces to execute the laws."  Id. at 1052.  Thus, under the Ninth Circuit's test, the President could federalize the National Guard in any number of cases:

- The President, relying upon IRS data showing that a sizeable percentage of corporations and individuals are using tax shelters to avoid paying taxes, could claim that he is unable to execute the tax laws.[13]

- The President, relying upon EPA studies showing that pollution in a river cannot definitively be traced back to a specific manufacturing plant, could claim that he is unable to execute the Clean Water Act.

- The President, relying upon health data showing the number of individuals who present to hospitals with narcotic-related symptoms, could claim that he is unable to execute the federal drug laws.

- The President, relying upon anecdotes from state election officials that voting machines are glitching, or that fraud exists, could claim that he is unable to execute the election laws.

In each instance above, the President would have asserted a colorable, good-faith claim. Under the Ninth Circuit's test, that is all he would need in order to call the National Guard into federal service—and then, under Defendants' urged interpretation of § 12406(3), use those troops to execute domestic law.  Though Defendants initially did not disclose the implications of reading § 12406(3) as a grant of significant presidential discretion (those

---

[12]  For instance, the Ninth Circuit's test would likely enable a President to use federal law enforcement agents to stoke tensions and then use any resistance as justification to call forth the National Guard.  As long as the President actually believed that the resistance significantly impeded his ability to execute federal law, it is hard to see how a court could find that he acted in bad faith, especially under the Ninth Circuit's deferential standard of review.  See Good Faith, Black's Law Dictionary (12th ed. 2024).

[13]  Incidentally, when Congress debated the Militia Act of 1792—a distant predecessor to § 12406—Representative Abraham Clark posited in opposition that the law would make it "so that if an old woman was to strike an excise officer with her broomstick, forsooth the military is to be called out to suppress an insurrection."  3 Annal of Cong. at 575 (1792).

implications being Defendants' current position that § 12406(3) is an exception to the Posse Comitatus Act), they have now fully fleshed out their views. In doing so, they make plain the consequences of the Ninth Circuit's highly deferential reading of the statute.

It is unclear from Defendants' briefs and oral argument whether they believe that § 12406(3) allows federalized National Guard troops to execute <u>any</u> laws or just those that the President found he could not enforce under § 12406(3). The former interpretation is certainly extreme: Could the President, for instance, assert that he is unable to enforce obscure tax or drug laws and then use the federalized National Guard to execute the election laws? But the latter interpretation is equally flawed. Consider the context in which Congress passed the Posse Comitatus Act. There is little question that, without the support of federal troops in southern states, the voting laws that enfranchised newly freed Black men would not be enforced. Buttaro, <u>A History of the Posse Comitatus Act</u>, <u>supra</u>, at 178 (citing W.E.B. Du Bois, <u>Black Reconstruction in America</u> 391 (1935)). So, in Defendants' view, the federal government would have been authorized to invoke the predecessor statute to § 12406 and circumvent the Posse Comitatus Act. This reading would have rendered the Posse Comitatus Act effectively useless at the time it was passed. Courts should avoid statutory interpretation that leads to such absurd results. <u>Abramski v. United States</u>, 573 U.S. 169, 181–82 (2014) (rejecting interpretation that would render the statute "utterly ineffectual"); <u>see also</u> <u>United States v. Castleman</u>, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part and concurring in the judgment) ("Congress presumably does not enact useless laws."); A. Scalia & B. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 63 (2012) ("The presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered."). Relatedly, Congress does not "hide elephants [e.g., a sweeping grant of authority to use the military for domestic law enforcement] in mouseholes [e.g., one subsection of a procedural statute]." <u>Whitman v. Am. Trucking Ass'ns</u>, 531 U.S. 457, 468 (2001). The Court will not take Defendants' invitation to create a brand-new exception to the Posse Comitatus Act that nullifies the Act itself.

Moreover, a close look at the recognized statutory exceptions to the Posse Comitatus Act counsels against, rather than in favor of, Defendants' position.  Many of these statutes apply only in very specific circumstances.  See, e.g., 16 U.S.C. § 23 (authorizing the Secretary of the Army to use troops to prevent trespassers or intruders in national parks); 25 U.S.C. § 180 (authorizing the President to use military force to remove persons unlawfully present on "any lands belonging, secured, or granted by treaty with the United States to any Indian tribe"); 42 U.S.C. § 97 (authorizing the Secretary of Health and Human Services to use military officers to enforce quarantines).  These exceptions are narrow; unlike Defendants' proposed exception, they do not undermine the whole act.

Nor does the Insurrection Act, 10 U.S.C. §§ 251–255,[14] support Defendants' position here.  To be sure, the Insurrection Act is a recognized exception to the Posse Comitatus Act.  Dep't of Def. Instruction No. 3025.21, encl. 3 ¶ 1.b(4).  Yet the Insurrection Act, which provides three avenues for the President to deploy the National Guard (or other branches of the military), imposes meaningful guardrails on the President's authority.  The President can invoke the Insurrection Act only if (1) the state legislature or governor so requests it, 10 U.S.C. § 251; (2) he determines that "unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings," id. § 252 (emphasis added); (3) he determines that "any insurrection, domestic violence, unlawful combination, or conspiracy … so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law" and that "the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection" to the State's citizens, id. § 253.

Under the Insurrection Act, then, the President's authority is restricted in some

---

[14]  The Insurrection Act was, until recently, codified at 10 U.S.C. §§ 331–335.

way—either by a request by a state legislature or governor, by findings of the courts,[15] or by the inability or unwillingness of local officials to act. In other words, the Insurrection Act sets a default presumption that state and local officers will be able and willing to protect a right, privilege, or immunity secured to the people. But President Trump did not rely on the Insurrection Act when he federalized the California National Guard. See June 7 Presidential Memo. Defendants again disclaimed reliance on the Insurrection Act at trial. Trial Tr. Vol. III (dkt. 164) at 369:15–16. This is, perhaps, a tacit admission that President Trump would be unable to make the showing, required under the Insurrection Act, to rebut the presumption that state and local officials in Los Angeles were unable or unwilling to act. (Of course, neither the California Legislature nor Governor Newsom requested troops, and there is no court order to enforce here, so those provisions of the Insurrection Act do not apply.)

The Ninth Circuit's interpretation of § 12406(3) provides no similar limiting principle. While a straightforward reading of § 12406(3), which references "the regular forces," might suggest that it would apply only if civilian officials are unable or unwilling to execute federal law,[16] the Ninth Circuit indicated that it would not adopt such a view. Newsom, 141 F.4th at 1051–52. The Ninth Circuit's expansive view of presidential discretion to invoke § 12406(3) affects the viability of Defendants' argument that the statute operates as an exception to the Posse Comitatus Act. Their argument, when

---

[15] The earliest predecessor statute to 10 U.S.C. § 252 required that, before the President could invoke his statutory authority to call forth the militia, a court must make a finding that federal law could not be enforced by the ordinary course of judicial proceedings. Militia Act of 1792, ch. 28, § 2, 1 Stat. 264. Though Congress later removed the requirement that courts make an ex ante finding, it is still clear that Congress understands this to be an area where the courts can exercise oversight as to the Executive's discretion. Cf. Exec. Order No. 10,730, Fed. Reg. 7628 (Sept. 24, 1957) (executive order by President Eisenhower invoking the Insurrection Act to authorize the Army to enforce federal court orders requiring the desegregation of the Little Rock School District).

[16] Such a reading of § 12406(3) would be most consistent with the Supreme Court's federalism jurisprudence, which counsels against "obliterat[ing] the distinction between what is national and what is local and creat[ing] a completely centralized government." United States v. Lopez, 514 U.S. 549, 557 (1995) (citation omitted). It would also respect the submissions of local law enforcement agencies that they were capable of handling the immigration-related protests without military assistance. See Amicus Br. of County of Los Angeles (dkt. 86-1) at 2–4; Supp. Amicus Br. of City of Los Angeles (dkt. 78-1) at 3–4.

combined with the Ninth Circuit's reading of § 12406(3), would create a loophole in the Posse Comitatus Act that would swallow the entire Act—and the Insurrection Act along with it, as § 12406(3) would place no meaningful guardrails on the federalization and use of National Guard troops and would thereby render the Insurrection Act redundant.

The Court therefore concludes that § 12406(3) is not an exception to the Posse Comitatus Act. If the President wants to avoid the Act's restrictions, he must invoke a valid exception—like the Insurrection Act, along with its requisite showing that state and local law enforcement are unable or unwilling to act.

### D.    Posse Comitatus Act Violations

Having determined that the Posse Comitatus Act applies to Task Force 51, the Court now turns to the troops' conduct in Los Angeles to determine whether the Posse Comitatus Act has been followed. Once again, the Posse Comitatus Act states that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

10 U.S.C. § 1385. The Court approaches this issue in three steps: first by stating the test for evaluating an alleged Posse Comitatus Act violation; second by determining whether the Posse Comitatus Act's prohibition on using the military to execute domestic law permits the so-called constitutional exceptions to protect federal property, personnel, and functions; and third by reviewing Task Force 51's conduct.

### 1.    Posse Comitatus Act Test

Few courts have addressed the Posse Comitatus Act directly, but those that have tend to coalesce around several formulations of the same basic test for determining whether the Act has been followed. Under the Posse Comitatus Act, the military may not engage in activities that "constitute the exercise of regulatory, proscriptive, or compulsory military power," that "amount to direct active involvement in the execution of the laws," or that "pervade the activities of civilian authorities." United States v. Dreyer, 804 F.3d

1266, 1275 (9th Cir. 2015) (en banc) (quoting United States v. Kahn, 35 F.3d 426, 431 (9th Cir. 1994)). Though framed as three separate inquiries, the test is at its core the same: whether the military has executed domestic law or actively assisted with the execution of domestic law, which would violate the Act, or whether the military's involvement is so indirect as to not violate the Act. Id.

The facts of earlier cases provide some guidance on the Court's inquiry here. In Dreyer, for example, the NCIS initiated an operation to search for individuals sharing child pornography, and the officer's investigation formed the basis for a search warrant. Id. The Ninth Circuit found that the officer's activities "pervaded the actions of civilian law enforcement" and thereby violated the Posse Comitatus Act. Id. at 1275–76. In United States v. Yunis, by contrast, the Navy housed and transported a criminal defendant while he was in FBI custody; the D.C. Circuit found that this was "passive" involvement that did not exercise "regulatory, proscriptive, or compulsory military power," and accordingly did not violate the Posse Comitatus Act. 924 F.2d 1086, 1094 (D.C. Cir. 1991); see also Kahn, 35 F.3d at 432 (use of Navy ships and backup support not a Posse Comitatus Act violation); United States v. Hartley, 796 F.2d 112, 115 (5th Cir. 1986) (Air Force did not violate Posse Comitatus Act when it conveyed information to civilian authorities regarding unidentified aircraft); United States v. Bacon, 851 F.2d 1312, 1313 (11th Cir. 1988) (per curiam) (participation by a single army officer in a drug investigation did not "pervade the activities of civilian officials" and thus did not violate Posse Comitatus Act). This limited case law—though a helpful starting point for what it means to "execute the laws"—does not provide clear answers for President Trump's unprecedented deployment of the military in Los Angeles.

### 2. Constitutional Exceptions

Defendants contend that the Posse Comitatus Act harbors an exception beyond the framework that the case law establishes. Supp. Opp. at 18; Trial Tr. Vol. II at 321:23–25. Under this "constitutional exception," as Defendants call it, the President has inherent constitutional authority to protect federal property, federal personnel, and federal

functions, so any actions that can be construed as such "protection" are lawful in spite of the Posse Comitatus Act. This assertion is not grounded in the history of the Act, Supreme Court jurisprudence on executive authority, or common sense.

Starting with history, there is little support in the Founding Era for an inherent constitutional authority for the President to call forth the militia, or to use the military generally, to execute the laws. As discussed above, the Founders did not intend that the Militia Clause be used to deploy the military to execute domestic law unless absolutely necessary. In the early nineteenth century, Congress did, on occasion, expressly grant the President the authority to use the militia: in 1807, for example, Congress passed the Enforcement Act, which allowed President Jefferson to use the militia to enforce a trade embargo. Bahar, The Presidential Intervention Principle, supra, at 585–86. But such authority came from Congress, not Article II of the Constitution. As President Jackson wrote during the Nullification Controversy, "until some act of force is committed or there is some assemblage of an armed force … to resist the execution of the laws of the United States, the Executive of the United States has no legal [and] constitutional power to order the militia into the field to suppress it." Letter from A. Jackson to J. Poinsett (Feb. 7, 1833), in The Statesmanship of Andrew Jackson as Told in His Writings and Speeches 25–26 (Thorpe, ed. 1909).

President Fillmore was the first to expressly assert an inherent constitutional power for the Executive to use the military to enforce federal law. Id. at 595. In the context of deploying the military to enforce the Fugitive Slave Act, President Fillmore explained: "[T]he power of the President under the Constitution, as Commander of the Army and Navy, is general, and his duty to see the laws faithfully executed is general and positive." Presidential Message to the Senate (Feb. 19, 1851), available at https://perma.cc/2KPW-N2ZY. Though President Fillmore did not identify a specific constitutional provision providing for this inherent power, he appears to have drawn it from the Take Care Clause. See U.S. Const. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed.").

Defendants likewise rely on the Take Care Clause as the basis for their supposed

constitutional exception to the Posse Comitatus Act.  Supp. Opp. at 18.  They contend that, because the Constitution tasks the President with taking care that the laws are faithfully executed, the President has an "inherent" protective power.  Id.  That power, Defendants argue, overrides the Posse Comitatus Act.  Id.

Defendants' argument lacks legal support.  For one, it ignores the actual text of the Posse Comitatus Act, which provides for exceptions only where the Constitution or Congress "expressly authorize[]" them.  10 U.S.C. § 1385 (emphasis added).[17]  For another, it adopts an expansive reading of the Take Care Clause that the Supreme Court confronted and rejected in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

Youngstown is instructive here, both on the facts and on the law.  In 1951, toward the beginning of the Korean War, President Truman ordered the Secretary of Commerce to seize and operate steel mills across the country after a series of strikes paralyzed steel production.  Id. at 582–83.  In taking this action, President Truman relied on his inherent authority stemming from two constitutional provisions—the Commander-in-Chief Clause and the Take Care Clause.  Id. at 587.  The Court rejected both arguments.  As to the Commander-in-Chief Clause, the Court explained that, even during wartime, it could not "with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production.  This is a job for the Nation's lawmakers, not for its military authorities."  Id.  The Court was equally dismissive of President Truman's Take Care Clause argument: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  Id.  President Truman's order did "not direct that a congressional

---

[17]  The word "expressly" was added as a compromise between the House version of the Posse Comitatus Act (which included no constitutional exception) and the Senate version (which included a constitutional exception without the word "expressly").  Elsea, The Posse Comitatus Act and Related Matters, supra, at 28–29.  Though Congress at the time was divided on whether the word "expressly" carried any weight, see id., modern canons of statutory interpretation instruct the Court to construe the statute to give full effect to every word.  See Chickasaw Nation v. United States, 534 U.S. 84, 93 (2001) ("'[E]very clause and word of a statute' should, 'if possible,' be given 'effect.'" (citation omitted)).

policy be executed in a manner prescribed by Congress"; it directed "that a presidential policy be executed in a manner prescribed by the President." Id. at 588.  This, the Court explained, exceeded the President's Article II authority and was unlawful. Id. at 588–89.[18]

Several Justices wrote separately in Youngstown to explain their views as to why President Truman's actions violated Congress's command and, more fundamentally, the Constitution's separation of powers.  Justice Jackson, for instance, carefully explained that the latitude of President's constitutional authority necessarily depends on what, if anything, Congress has said on the matter:

- "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.  …  If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power." Id. at 635–37 (Jackson, J., concurring).

- "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." Id. at 637.

---

[18]  In rejecting President Truman's assertions of inherent executive authority, the Supreme Court undermined the exact precedent that the Ninth Circuit relied on in affording the President significant discretion under § 12406.  In Martin v. Mott, the Supreme Court cited both the Commander-in-Chief and Take Care Clauses to explain why the President "is necessarily constituted the judge of the existence of the exigency in the first instance." 25 U.S. at 31.  So too in Sterling v. Constantin, where the Court wrote: "By virtue of his duty to 'cause the laws to be faithfully executed,' the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen." 287 U.S. at 399.  Youngstown reframed the analysis, requiring that courts first determine whether the President's actions are within the scope of his Article II authority before determining what discretion, if any, he is entitled to.  343 U.S. at 587–89; id. at 635–38 (Jackson, J., concurring); see also Trump, 603 U.S. at 608 ("[O]nce it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." (emphasis added)).

- "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  Id.

Justice Jackson concluded that President Truman's seizure of the steel mills fell into the third category—not because Congress had expressly legislated that he could not engage in such actions, but because Congress had already regulated the field and had not provided the President with the kind of power that President Truman sought to invoke.  Id. at 639.  Justice Jackson also took the opportunity to reject President Truman's argument that the Commander-in-Chief Clause granted him the power he sought, writing:

> It also was expressly left to Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."  Such a limitation on the command power, written at a time when the militia rather than a standing army was contemplated as the military weapon of the Republic, underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy.  Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights.  On the other hand, Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress.

Id. at 644–45 (cleaned up) (emphasis in original).[19]

Defendants' arguments mirror those that President Truman made in 1952, and they cannot be squared with Youngstown.  They contend that the President's implied executive authority to protect federal property, personnel, and functions supersedes a law duly passed by Congress pursuant to Congress's own express constitutional authority.  See U.S. Const. art. I, § 8, cl. 15.  That Defendants characterize this as an "exception" to the statute is mere wordplay; it does not change the fact that they seek to override Congress's legitimate

---

[19]  The Supreme Court has cited Justice Jackson's Youngstown concurrence in dozens of cases—at least twenty majority opinions as well as several high-profile separate opinions. Kristen E. Eichensehr, Courts, Congress, and the Conduct of Foreign Relations, 85 U. Chi. L. Rev. 609, 619 (2018); see, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 10 (2015) ("In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from Youngstown Sheet & Tube Co. v. Sawyer.").

exercise of its own authority.  See Bissonette v. Haig, 776 F.2d 1384, 1388–89 (8th Cir. 1985) ("Congress has acted to establish reasonable limits on the President's use of military forces in emergency situations, and in doing so has circumscribed whatever, if any, inherent power the President may have had absent such legislation.").  Congress was clear about what constitutes an exception to the Posse Comitatus Act: an express provision by either the Constitution or by Congress itself.  In doing so, Congress occupied the field and precluded the President from exercising all but his express constitutional authority.  Id. The President thus cannot declare an exception to the Posse Comitatus Act any more than he can refuse to follow it outright.  "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  Youngstown, 343 U.S. at 638 (Jackson, J., concurring).

Defendants, for their part, point to two nineteenth-century cases in support of their assertion that the President has inherent authority to use the military to execute domestic law, at least within the context of protecting federal property, personnel, and functions. Neither is persuasive reason to cast aside Youngstown—which, of course, postdates both.

Defendants first rely on In re Neagle.  Supp. Opp. at 18 (citing 135 U.S. 1, 69 (1890)).  That case arising from as unique a factual situation as any.  Concerned about threats against sitting U.S. Supreme Court Justice Field, the U.S. Attorney General ordered David Neagle, a deputy marshal, to accompany Justice Field while he rode circuit in California.  Neagle, 135 U.S. at 48–52.  In California, two individuals who had previously threatened Justice Field approached him, and one physically assaulted him.  Id. at 52–53. When the assailant reached into his pocket, Neagle shot and killed him.  Id. at 53.  Neagle was arrested and charged with murder in California state court; he then filed a federal petition for a writ of habeas corpus, which eventually made its way to the Supreme Court. Id. at 53–54.  The Court explained that the Supremacy Clause shielded Neagle from state criminal charges because "it was his duty" to protect Justice Field and he "did no more than what was necessary and proper for him to do" to carry out that duty.  Id. at 75–76.

In reaching this conclusion, the Court asked:

> So, if the president or the postmaster general is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed and the mail carriers assaulted and murdered in any particular region of country, who can doubt the authority of the President or of one of the executive departments under him to make an order for the protection of the mail and of the persons and lives of its carriers, by doing exactly what was done in the case of Mr. Justice Field, namely, providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a posse comitatus properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

Id. at 65. This hypothetical is the sole instance in the Court's seventy-five page decision where it referenced soldiers, the army, the military, the troops, or any possibility of the military executing of federal law. Nor did the Court ever reference or acknowledge the Posse Comitatus Act, which had been passed twelve years prior. That makes good sense, though: Neagle was a U.S. marshal, not a military officer, and the question presented to the Court was whether the Supremacy Clause barred state prosecutions of federal officials acting pursuant to lawful orders. The Neagle Court did not purport to decide whether, when, or how the President could use military forces to execute domestic law.[20]

Defendants next point to In re Debs, which arose out of President Cleveland's response to the 1894 Pullman Strike. Supp. Opp. at 18 (citing 158 U.S. 564 (1895)). That railway strike effectively stalled train traffic (and with it, most interstate commerce) across the western United States. See Nat'l Park Serv., The Strike of 1894 (updated Dec. 29, 2022), https://perma.cc/BQZ4-6YRD; D. Papke, The Pullman Case: The Clash of Labor and Capital in Industrial America 35 (1999); 2 J. Commons et al., History of Labour in the United States 502 (1918). President Cleveland sent federal troops to Indiana, without first consulting the governor, to enforce a court order preventing strikers from obstructing mail

---

[20] Recently, the Supreme Court rejected an expansive reading of Neagle, though in a slightly different context. In Martin v. United States, the Court explained that "In re Neagle does not speak to a situation where, as here, Congress has entered the field and expressly bound the federal government." 145 S. Ct. 1689, 1702 (2025); see also id. at 1702 n.2 ("To date at least, this Court has also generally understood In re Neagle as providing federal officers a shield against only state criminal prosecution.").

delivery.  Bahar, The Presidential Intervention Principle, supra, at 618–19.  The Supreme
Court was not asked to evaluate President Cleveland's deployment of the troops, but
instead to consider two related questions: (1) whether the federal government can prevent
obstructions to interstate commerce and mail delivery and (2) whether the federal courts
have jurisdiction to issue injunctions in aid of such federal authority.  Debs, 158 U.S. at
577.  In other words, the Court's analysis focused on the power of the federal government
writ large, not the power of the Executive.  To that end, the Court concluded that "it is
within the competency of Congress to prescribe by legislation that any interferences with
[interstate commerce and the transportation of the mails] shall be offenses against the
United States, and prosecuted and punished by indictment in the proper courts."  Id. at 581
(emphasis added).  To be sure, the Court went on to say:

> The entire strength of the nation may be used to enforce in any
> part of the land the full and free exercise of all national powers
> and the security of all rights entrusted by the Constitution to its
> care.  The strong arm of the national government may be put
> forth to brush away all obstructions to the freedom of interstate
> commerce or the transportation of the mails.  If the emergency
> arises, the army of the Nation, and all its militia, are at the
> service of the Nation, to compel obedience to its laws.

Id. at 582.  The Court did not, however, indicate who would declare such an emergency,
what such an emergency might look like, whether such a declaration would be reviewable,
or how the military could respond to such an emergency.

No doubt Neagle and Debs, when read together, stand for principles of federal
supremacy.  But the context of these decisions matter: Neagle arose from well-documented
threats against a sitting Supreme Court Justice (one assailant had previously tried to
brandish a knife at Justice Field in a courtroom, 135 U.S. at 45), and Debs involved a
massive strike that effectively halted mail delivery across the country.  When the Court
spoke about the federal military in these cases, it was in response to these circumstances,
not the day-to-day execution of federal law.

Immediately following the Civil War, the Supreme Court provided a clear example
of why context matters in cases like these.  The Court explained with respect to the

imposition of martial law in Indiana:

> [T]here are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, <u>then</u>, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is continued <u>after</u> the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction.

<u>Ex parte Milligan</u>, 71 U.S. (4 Wall.) 2, 127 (1866) (emphasis in original). The Court thus explained that—<u>even during the Civil War itself</u>—martial law was "lawless violence" outside "the locality of actual war." <u>Id.</u> <u>Milligan</u> thus stands for the principle that that the exercise of federal power is always dependent on context.

So too here. It is improper to rely on suggestions of federal authority generally (not authority vested in the Executive specifically) made in response to historic threats[21] to grant the President a perpetual, atextual right to defy Congress if he determines it necessary to protect federal property, personnel, or functions.[22] Such an exception would

---

[21] No doubt the protests in Los Angeles were large, and in some instances violent. Local law enforcement is no stranger to such protests, though. <u>See</u> Amicus Br. of County of Los Angeles at 3–4 (describing LASD responses to the Occupy L.A. movement (which involved hundreds of protestors camped at public parks), Black Lives Matter protests (which closed a major public freeway downtown), and the "sometimes riotous" street parties following the Dodgers' and Lakers' World Series and NBA Championship wins). The June 6 and 7 protests were far more similar to these events than they were to the 1894 Pullman Strike, which crippled interstate commerce across the western United States.

[22] To be sure, troops protecting federal property are unlikely as a descriptive matter to execute federal laws in violation of the Posse Comitatus Act. This is illustrated by an Office of Legal Counsel memorandum from then–Assistant Attorney General Rehnquist addressing whether the President can use the military to prevent Mayday protestors from blocking federal employees from reaching their job posts. <u>Authority to Use Troops</u>, 1 Supp. Op. O.L.C. 343 (1971). Such use, Rehnquist correctly concluded, would not constitute law enforcement. <u>Id.</u> at 343. The Court disagrees with Defendants' implication, Supp. Opp. at 18, that the memorandum describes an inherent protective power that overrides the plain text of the Posse Comitatus Act. If the memorandum suggested such a power, the Court would decline to afford that suggestion any weight. <u>See Crandon v. United States</u>, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment) (OLC opinions not entitled to deference); <u>Ecological Rights Found v. Pac. Gas & Elec. Co.</u>, 874 F.3d 1083, 1097 n.5 (9th Cir. 2017) (same). Law enforcement activities are not insulated from the Posse Comitatus Act just because they can be framed as property protection.

be limitless in principle: it would allow the President to deploy troops to accompany any federal employee whose job puts them at some risk—as do the jobs of many federal employees, from OSHA inspectors to IRS agents to U.S. marshals. There is no question that federal personnel should be able to perform their jobs without fearing for their safety. But to use this as a hook to send military troops alongside federal agents wherever they go proves too much and would frustrate the very purpose of the Posse Comitatus Act.

### 3.    Task Force 51's Conduct

The Court now turns to the actual conduct of Task Force 51 in and around Los Angeles. To start, the Court observes that Task Force 51 was expressly instructed that it could engage in certain law enforcement activities: setting up protective perimeters, traffic blockades, crowd control, and the like. Task Force 51 Training Slides at 6–7; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25. That instruction was incorrect. There is no exception to the Posse Comitatus Act for such conduct, and neither President Trump's June 7 memorandum nor Secretary Hegseth's June 23 memorandum changed that.

The record is replete with evidence that Task Force 51 executed domestic law in these prohibited ways. Task Force 51 set up traffic blockades on roads at a residential enforcement operation in Long Beach, as part of Operation Excalibur at MacArthur Park, and as part of the Carpinteria cannabis farm operation. June 13 Mission Debrief; Trial Tr. Vol. I at 119:9–13; Operation Excalibur Slides at 5; DVIDS Carpinteria Photos; Solorzano Photo; Solorzano Video. Task Force 51 similarly used riot shields and military vehicles to establish a perimeter at the DEA enforcement operation in Mecca. Trial Tr. Vol. I at 44:22–45:10; DVIDS Mecca Photos. Bystanders at multiple locations and even federal officials at trial were unable to distinguish Task Force 51 troops from federal law enforcement agents. Trial Tr. Vol. I at 72:3–6, 176:20–177:7, 177:15–178:6. All this points to Task Force 51 engaging in prohibited activities in Los Angeles.

Indeed, Task Force 51 troops' conduct clearly qualifies as Posse Comitatus Act violations under the tests that courts use to apply the Act. Defendants' presence to bolster

DHS and DEA operations and shows of force exercises regulatory, proscriptive, and compulsory power on the surrounding public, and their participation in operations in numbers that match or outnumber law enforcement agents pervade the activities of those civilian agents.[23] See Dreyer, 804 F.3d at 1275. This was intentional—Defendants instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act.

In fact, these violations were part of a top-down, systemic effort by Defendants to use military troops to execute various sectors of federal law (the drug laws and the immigration laws at least) across hundreds of miles and over the course of several months—and counting. The instructions to train Task Force 51 on the purported constitutional exception and thereby excuse unlawful military conduct came "all the way from the top" of the Department of Defense. Trial Tr. Vol. II at 283:1–3. And as Major General Sherman testified at trial, federal law enforcement agencies "always wanted military there, and we had plenty of capacity to do that." Trial Tr. Vol. I at 137:23–25. Accordingly, Secretary Hegseth himself ordered troops to MacArthur Park as a "show of presence" and to "demonstrat[e] federal reach and presence." Id. at 103:24; Operation Excalibur Slides at 4. Troops drove over a hundred miles to Mecca, where they significantly outnumbered federal law enforcement agents, to support a drug enforcement operation. Trial Tr. Vol. I at 32:9–33:4, 80:19–23; Mecca Storyboard. Troops also drove nearly a hundred miles in a different direction to Carpinteria to set up traffic control points so that federal law enforcement agents could more efficiently execute their search warrant of a cannabis farm. Trial Tr. Vol. I at 84:7–20.[24]

---

[23] By contrast, some individual examples of Task Force 51's conduct, like the detention of a veteran at the Wilshire Federal Building, are too isolated to violate the Posse Comitatus Act. The Marines stationed at the Wilshire Building minimized their interaction with the veteran, turning him over to law enforcement authorities at the first possible occasion. Moreover, the record does not indicate that the military's presence at federal buildings in Los Angeles involved any impermissible law enforcement activity.

[24] Even if there is a "constitutional exception" that authorizes the military to engage in law enforcement anywhere in the field under the label of "protection," these activities would

That sets this case apart from others where courts have so far addressed the Posse Comitatus Act.  Those cases involve military actions that are both passive and isolated in nature.  See, e.g., Yunis, 924 F.2d at 1094 (Navy "housing, transporting, and caring for [a criminal defendant] while he was in the custody of the FBI" not a Posse Comitatus Act violation); Kahn, 35 F.3d at 432 (Navy provision of ships and backup support during a single search of a ship transporting illegal drugs not a Posse Comitatus Act violation); Hartley, 796 F.2d at 115 (Air Force communication of information regarding an unidentified aircraft entering the country not a Posse Comitatus Act violation); Bacon, 851 F.2d at 1313 (participation by a single army officer in a drug investigation not "aggravated or repeated," and thus not a Posse Comitatus Act violation).  Where military conduct is more coordinated and systemic, by contrast, courts have found Posse Comitatus Act violations.  E.g., Dreyer, 804 F.3d at 1275–76 (NCIS investigation was "systemic" and thus violated Posse Comitatus Act); see also Bissonette, 776 F.2d at 1385 (ten-week-long occupation at Wounded Knee violated the Posse Comitatus Act).

Yet another departure from those prior cases is Defendants' complete sidelining of state and local authorities here.  Even though multiple federal agencies and Task Force 51 rehearsed Operation Excalibur several times, Trial Tr. Vol. II at 265:9–17, they provided LAPD and LASD with a mere two hours' notice of the operation, see Operation Excalibur Slides at 4.  Likewise, federal agencies notified local law enforcement of cannabis farm raids only at the time of the raids, not beforehand.  See Carpinteria Slides at 3.  This is not typical.  In those Posse Comitatus Act cases where state and local law enforcement had jurisdiction (i.e., not cases like Kahn, which involved events in international waters), federal troops generally worked alongside state and local officials.  See, e.g., Bacon, 851 F.2d at 1313 (Army investigator worked jointly with local sheriff's office); Hartley, 796 F.2d at 113 (Customs and other non-military officials performed search based on

not fall under such an exception.  Troops do not serve a protective function when they act as a force multiplier at a "show of presence" (as in MacArthur Park), when they outnumber federal personnel by 100 at a remote location with a low risk of resistance (as in Mecca), or when they are deployed merely to speed up federal operations (as in Carpinteria).

(393 of 401), Page 393 of 401
Case: 25-5553, 09/03/2025, DktEntry: 5.1, Page 393 of 401
Case 3:25-cv-04870-CRB    Document 176    Filed 09/02/25    Page 45 of 52

information provided by Air Force officer); <u>Dreyer</u>, 804 F.3d at 1270–71 (NCIS agent shared findings with local police department). Defendants' lack of cooperation with their state and local counterparts raises red flags. It also highlights the lack of any showing by Defendants that state and local officials were unable or unwilling to execute the laws before Defendants deployed troops to engage in typical law enforcement functions.

Moreover, Defendants violated the Posse Comitatus Act willfully. <u>See</u> 10 U.S.C. § 1385 (imposing a willfulness requirement); <u>Aaron v. SEC</u>, 446 U.S. 680, 701 (1980) ("[W]hen scienter is an element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue."). Defendants knowingly contradicted their own training materials, which listed twelve functions that the Posse Comitatus Act bars the military from performing. Task Force 51 Training Slides at 6; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25. They did so while refusing to meaningfully coordinate with state and local officials. Operation Excalibur Slides at 4; Carpinteria Slides at 3. And they "coach[ed]" federal law enforcement agencies as to what language to use when submitting requests for assistance in an attempt to circumvent the Act. RFA Email Thread. These actions demonstrate that Defendants knew that they were ordering troops to execute domestic law beyond their usual authority. Whether they believed that some constitutional or other exception applied does not matter; "ignorance of the law is no excuse." <u>Bryan v. United States</u>, 524 U.S. 184, 195 (1998).[25]

Defendants' systemic use of Task Force 51 troops to execute domestic law in and around Los Angeles violated the Posse Comitatus Act.

---

[25] "The word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." <u>Bryan</u>, 524 U.S. at 191 (citation omitted). "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose'"—or, "[i]n other words," "knowledge that his conduct was unlawful." <u>Id.</u> at 191–92 (citations omitted). That definition fits here, as the constitutional concerns that sometimes demand a stricter reading of the statute are not applicable where the statute is straightforward and criminal enforcement is not at issue. <u>See id.</u> at 194–95 (a stricter definition of willfulness applies where "highly technical statutes," such as the Internal Revenue Code, is at issue); <u>Ratzlaf v. United States</u>, 510 U.S. 135, 147–49 (1994) (ambiguous statutes construed in favor of a <u>criminal</u> defendant).

### E.    Injunctive Relief

The Court now addresses what relief, if any, is appropriate for the Court to award in response to Defendants' Posse Comitatus Act violations.  Defendants argue that the Court cannot impose injunctive relief for three reasons: (1) Plaintiffs lack a historical analogue for enjoining the federal government to comply with a criminal statute like the Posse Comitatus Act, Supp. Opp. at 6–8; (2) Plaintiffs cannot pursue an ultra vires theory of relief, id. at 8–11; and (3) the equities weigh against injunctive relief, id. at 25.

#### 1.    Historical Analogue

Defendants first assert that the Court's equitable power does not extend to enjoining them from violating the Posse Comitatus Act because there is no historical analogue for a court to enter an injunction against the federal government based on a criminal statute. Their argument principally relies on the Supreme Court's recent decision in Trump v. CASA, Inc., 145 S. Ct. 2540 (2025).  In CASA, the Court explained that the Judiciary Act of 1789, which "endowed federal courts with jurisdiction over 'all suits in equity,'" is limited to "only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception."  Id. at 2551 (citation omitted) (cleaned up). Accordingly, the Court found that universal (or nationwide) injunctions lack a sufficient historical analogue and therefore cannot be maintained in federal court.  Id.  The Court's holding in CASA does not require "an exact historical match," though, only a "founding-era antecedent."  Id. at 2554.

Defendants' position, which focuses on the nature of the Posse Comitatus Act as a criminal statute rather than the nature of the injunction that Plaintiffs seek, misapplies CASA's historical inquiry and demands too exact of a match.  CASA requires the Court to ask whether the form of its injunction—here, an injunction prohibiting the Secretary of Defense and Department of Defense from violating a federal statute—has a historical analogue.  Id. at 2551 (evaluating "form[s] of relief"); see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 322 (1999) ("We do not question the proposition that equity is flexible; but in the federal system, at least, that flexibility is

confined within the broad boundaries of traditional equitable relief.  To accord <u>a type of relief</u> that has never been available before … is to invoke a 'default rule' not of flexibility but of omnipotence." (emphasis added)).  It does not require the Court to analyze the underlying statute to determine whether that statute permits equitable relief.

 <u>CASA</u> itself explained that there is a historical analogue for an injunction against government officials: "Historically, a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct."  <u>Id.</u> at 2254 n.9 (favorably citing <u>Ex parte Young</u>, 209 U.S. 123 (1908), as an example of equitable relief supported by "a long line of cases" even though there was no exact remedy at English common law).  The Supreme Court has also explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  <u>Armstrong</u>, 575 U.S. at 327.  In fact, even in eighteenth-century England, though "personal injury from the king to a subject [was] presumed to be impossible," the courts "furnishe[d] various methods of detecting the errors and misconduct of those agents."  <u>Marbury</u>, 5 U.S. at 165 (citing 3 William Blackstone, Commentaries *255).  Surely any historical inquiry would recognize that the Founders did not break off from England to constrain the available judicial remedies against the Executive.  Precedent also recognizes the feasibility of injunctions against military departments and officials.  <u>See, e.g.</u>, <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008).

 Nor is Defendants' contention that injunctions cannot issue based on criminal statutes as absolute as they suggest.  Though "injunctions against criminalized conduct have historically been disfavored[,] … in keeping with the characteristic flexibility of equitable remedies, they have never been absolutely prohibited."  <u>FTC v. Accusearch Inc.</u>, 570 F.3d 1187, 1202 (10th Cir. 2009).  Where a plaintiff can show "some separate injury to private interest," as California has shown here with respect to federal–state relations, an injunction prohibiting criminalized conduct can properly lie.  <u>United States v. Dixon</u>, 509 U.S. 688, 695 (1993).  This is especially true where "the party aggrieved has no other

adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights." Debs, 158 U.S. at 593–94 (citation omitted).  That is the case here: without injunctive relief, California would lack any remedy against Defendants' unlawful use of the U.S. military in a way that infringes on California's police power and risks economic and other harms to California's residents.

To the extent that there remains any question as to the equitable power of the Court to enjoin Defendants from violating the Posse Comitatus Act, the history and purpose of the Act strongly weigh in favor of the availability of injunctive relief.  Recall that Congress passed the Posse Comitatus Act to prevent the federal government from deploying troops into the South to police polling places and thereby ensure that federal voting law was followed.  Buttaro, The End of Reconstruction, supra, at 161–62; Elsea, The Posse Comitatus Act and Related Matters, supra, at 21.  President Grant himself ordered federal troops into the three states that swung the 1876 for the Republicans.  See Grant, Special Message, supra.  It is ahistorical and illogical to think that Congress reacted to this by passing a statute that had as its sole enforcement mechanism federal prosecution of individual troops by the same federal government that would have ordered the troops to engage in domestic law enforcement.

Thus, the injunctive relief that Plaintiffs seek in this case is proper.

### 2.  Ultra Vires Relief

Defendants next contend that ultra vires relief—the vehicle by which Plaintiffs assert their claim for violations of the Posse Comitatus Act—is unavailable in this case.[26] An ultra vires theory of relief succeeds only if a plaintiff can show that "an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute."  NRC v. Texas, 605 U.S. 665, 681 (2025) (emphasis in original) (citation omitted).  "Ultra vires review is also unavailable if … a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial

---

[26]  No one disputes that the Posse Comitatus Act does not provide a cause of action for civil damages.  Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 40 (D.D.C. 2021).

review,' or if a statutory review scheme forecloses all other forms of judicial review." Id. (citation omitted).

Defendants make much of how limited ultra vires review is. To be sure, as then-Judge Kavanaugh put it, ultra vires review is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009). But emphasizing the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within that theory. As explained above, Plaintiffs have proven that Defendants—by improperly training Task Force 51 troops on the scope of the Posse Comitatus Act and then ordering them to engage in law enforcement activities in violation of the Act—exceeded the authority delegated to them by Congress and directly violated the Posse Comitatus Act's specific prohibition against domestic military law enforcement.[27] See Youngstown, 343 U.S. at 644–45 (Jackson, J., concurring) ("[T]he Constitution's policy [is] that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. … Congress has forbidden [the President] to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress." (emphasis in original)). Defendants point to no other statute that provides Plaintiffs a meaningful and adequate opportunity for relief, nor is there any statute precluding judicial review of Posse Comitatus Act violations. See NRC, 605 U.S. at 681. If anything, given the lack of other avenues for Plaintiffs to seek to remedy their injuries and the Supreme Court's prior statements on the role of the Judiciary in addressing presidential overreach, this case presents a classic situation for an ultra vires claim. See Laird, 408 U.S. at 15–16 ("[W]hen presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of

---

[27] Defendants appear to argue that, because any Posse Comitatus Act violations were committed by individual troops and not the Department of Defense writ large, an ultra vires claim cannot lie. Supp. Opp. at 10. That misconstrues the nature of the Posse Comitatus Act violations in this case. The violations were not one-off acts by individual servicemembers but were rather the function of systematic and willful orders to troops to execute domestic law.

those asserting such injury."). As Chief Justice Marshall wrote: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." Marbury, 5 U.S. at 163.[28]

Defendants again point to the fact that the Posse Comitatus Act is a criminal statute and argue that ultra vires claims typically involve civil violations. Supp. Opp. at 6–7, 9. It is counterintuitive, though, to think that the exceptional remedy of ultra vires relief is available where Congress has imposed civil penalties but not where it has taken the more severe step of imposing criminal penalties. In any case, Defendants' proposition that the Posse Comitatus Act can only be enforced by federal criminal prosecution is remarkable, as the same federal government that the Act limits would be tasked with enforcing it. More specifically, the same branch of the federal government that the Act limits—the Executive—would be tasked with enforcing the Act against itself. This raises obvious concerns about conflicts of interest. See Morrison, 487 U.S. at 677. Surely the Act must provide for some other enforcement mechanism, otherwise it would have been ineffective when passed and would remain so today.

### 3.     Balancing the Equities

Defendants' final argument is that the equities—specifically, the harm threatened to federal property and personnel—weigh against an injunction. Supp. Opp. at 25. This does not survive scrutiny given the scope of the issues presented. An injunction prohibiting Task Force 51 troops from engaging in law enforcement activities would have no bearing whatsoever on their ability to protect federal property. Nor is "protection," whether of federal property or personnel, the talismanic word that Defendants seem to believe it is. No doubt Defendants have an inherent interest in the safety of federal personnel, but they can and must ensure this safety in a lawful manner—such as, for example, by coordinating with state and local law enforcement. Defendants have no legitimate interest in violating

---

[28] The outcome in Marbury (dismissal for lack of jurisdiction) does not detract from the Supreme Court's holding that Marbury had a legal remedy for his claim. Id. at 168.

the Posse Comitatus Act, for protection or for any other reason.  See Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

Defendants mention that only 300 National Guard troops remain stationed in Los Angeles, suggesting that injunctive relief is unwarranted because their footprint is smaller than it was in early June.  Their point is not well taken.  Those 300 National Guard troops are set to remain deployed through November, see Aug. 5 Activation Order, and they have already been improperly trained as to what activities they can and cannot engage in under the Posse Comitatus Act.  Further, President Trump's recent executive orders and public statements regarding the National Guard raise serious concerns as to whether he intends to order troops to violate the Posse Comitatus Act elsewhere in California.  See, e.g., Exec. Order No. 14,339, § 2(d)(ii), 90 Fed. Reg. 42121 (Aug. 25, 2025) (ordering the Secretary of Defense to ensure that state National Guard units are trained "in quelling civil disturbances and ensuring the public safety and order whenever the circumstances necessitate"); C-SPAN, President Trump Holds Cabinet Meeting at 3:12:29–40 (Aug. 27, 2025), available at https://tinyurl.com/bb6sa5bp (regarding deployment and use of the National Guard in Chicago: "I have the right to do anything I want to do.  I'm the President of the United States.  If I think our country is in danger, and it is in danger in these cities, I can do it.").  Injunctive relief is therefore appropriate.  See West Virginia v. EPA, 597 U.S. 697, 719–20 (2022) ("'[V]oluntary cessation does not moot a case' unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (citation omitted)).

Finally, the Court's injunctive relief in this case is narrowly tailored to address Defendants' statutory violations.  The injunction applies only to Defendants' use of the National Guard in California, not nationally.  Defendants are not required to withdraw the 300 National Guard troops currently stationed in Los Angeles, nor are they barred from using troops consistent with the Posse Comitatus Act.  In fact, the Court essentially just orders Defendants to follow the (unedited) training materials that they introduced in this

A368

trial. <u>See</u> Task Force 51 Training Slides at 6. Thus, for example, federal troops can continue to protect federal property in a manner consistent with the Posse Comitatus Act.

**IV.    CONCLUSION**

For the foregoing reasons, the Court **ORDERS** that Defendants[29] are enjoined from deploying, ordering, instructing, training, or using the National Guard currently deployed in California, and any military troops heretofore deployed in California, to execute the laws, including but not limited to engaging in arrests, apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants, unless and until Defendants satisfy the requirements of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus Act. The Court **STAYS** this injunction until 12:00 noon on Friday, September 12, 2025.

**IT IS SO ORDERED.**

Dated: September 2, 2025

_____
CHARLES R. BREYER
United States District Judge

---

[29] The Court may lack jurisdiction to enjoin President Trump in the performance of his official duties. <u>See</u> <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 802–03 (1992) (plurality opinion); <u>Mississippi v. Johnson</u>, 71 U.S. (4 Wall.) 475, 501 (1866). So this injunction applies only against Secretary Hegseth and the Department of Defense, which is sufficient to redress Plaintiffs' injuries.

1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8   GAVIN NEWSOM, et al.,                    Case No.  25-cv-04870-CRB

9                  Plaintiffs,

10        v.                                 **PARTIAL JUDGMENT**

11   DONALD J. TRUMP, et al.,

12                  Defendants.

13        The Court, having heard evidence at a bench trial on the merits and issued findings

14   of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), hereby

15   enters judgment for Plaintiffs and against Defendants on Plaintiffs' Posse Comitatus Act

16   claims in accordance with the Court's September 2, 2025 order granting injunctive relief

17   (dkt. 176).  The Court determines that, because Plaintiffs' other claims are stayed while on

18   interlocutory appeal before the Ninth Circuit, there is no just cause to delay entry of partial

19   judgment on Plaintiffs' Posse Comitatus Act claims.  See Fed. R. Civ. P. 54(b).[1]

20        **IT IS SO ORDERED.**

21        Dated: September 2, 2025

22                                           _____
                                             CHARLES R. BREYER
23                                           United States District Judge

24
25
26
27

28   _____

[1]  This entry of partial judgment amends the Court's prior entry of judgment, dkt. 182.

**A370**

*United States District Court*
*Northern District of California*