No. 25-5553

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

GAVIN NEWSOM, *et al.*,
*Plaintiffs-Appellees*,

V.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants.*

———————————

**On Appeal from the United States District Court
for the Northern District of California**
No. 3:25-cv-04870
The Honorable Charles R. Breyer

———————————

## OPPOSITION TO MOTION FOR STAY PENDING APPEAL

———————————

ROB BONTA
*Attorney General of California*
HELEN H. HONG
*Acting Solicitor General*
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
*Senior Assistant Attorneys General*
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
*Supervising Deputy
  Attorneys General*

SAMUEL T. HARBOURT*
CHRISTOPHER D. HU
*Deputy Solicitors General*
MEGHAN H. STRONG
JANE REILLEY
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy
  Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3919
Samuel.Harbourt@doj.ca.gov
*Attorneys for Plaintiffs-Appellees*

September 15, 2025

## TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Statement ................................................................................... 3

Argument ................................................................................... 5

I.     Defendants are not likely to succeed on the merits ............................ 6

     A.     Plaintiffs have standing and a cause of action ......................... 6

     B.     Defendants violated the PCA ...................................... 11

     C.     Defendants have not identified any exceptions to the PCA that would excuse their violations .......................................... 17

II.     The equitable factors do not support issuance of a stay ................... 22

Conclusion ................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Arizona v. Yellen*
34 F.4th 841 (9th Cir. 2022) ........................................................ 6

*Bissonette v. Haig*
776 F.2d 1384 (8th Cir. 1985) ................................... 12, 23, 24

*Bryan v. United States*
524 U.S. 184 (1998) ...................................................................... 16

*Canadian Com. Corp. v. Dep't of Air Force*
514 F.3d 37 (D.C. Cir. 2008) ................................................... 10

*Chrysler Corp. v. Brown*
441 U.S. 281 (1979) .............................................................. 9, 10

*Diamond Alt. Energy v. EPA*
145 S. Ct. 2121 (2025) .................................................................. 7

*FDA v. All. for Hippocratic Med.*
602 U.S. 367 (2024) ........................................................................ 6

*Fischer v. United States*
603 U.S. 480 (2024) ..................................................................... 15

*Gilbert v. United States*
165 F.3d 470 (6th Cir. 1999) ...................................................... 4

*In re Debs*
158 U.S. 564 (1895) ..................................................................... 21

*In re Neagle*
135 U.S. 1 (1890) ......................................................................... 21

*Kentucky v. Biden*
23 F.4th 585 (6th Cir. 2022) ....................................................... 7

## TABLE OF AUTHORITIES
### (continued)

Page

*Laird v. Tatum*
  408 U.S. 1 (1972)................................................................1, 8

*Lorillard v. Pons*
  434 U.S. 575 (1978)................................................................19

*Murphy Co. v. Biden*
  65 F.4th 1122 (9th Cir. 2023) ..............................................8, 10

*NFIB v. Dep't of Lab.*
  595 U.S. 109 (2022)................................................................19

*Nken v. Holder*
  556 U.S. 418 (2009)..................................................................5

*NRC v. Texas*
  605 U.S. 665 (2025)................................................................10

*Perpich v. Dep't of Def.*
  496 U.S. 334 (1990)..................................................................6

*Rodriguez v. Robbins*
  715 F.3d 1127 (9th Cir. 2013) ..............................................22

*Trump v. CASA, Inc.*
  145 S. Ct. 2540 (2025)............................................................10

*United States v. Dreyer*
  804 F.3d 1266 (9th Cir. 2015) (en banc) ...........1, 4, 8, 9, 11-17

*United States v. Khan*
  35 F.3d 426 (9th Cir. 1994) ..................................................14

*United States v. Klimavicius-Viloria*
  144 F.3d 1249 (9th Cir. 1998) ..............................................14

*United States v. Walden*
  490 F.2d 372 (4th Cir. 1974) ..................................................4

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) .......................................................8, 20, 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*
    576 U.S. 1 (2015) ....................................................................21

**STATUTES**

10 U.S.C. § 15 (1925) ....................................................................9

10 U.S.C. § 375 ...........................................................................15

10 U.S.C. § 12405 ........................................................................18

10 U.S.C. § 12406 .................................................................*passim*

18 U.S.C. § 1385 ..........................................................4, 15, 17, 20

20 Stat. 145 (1878) ........................................................................9

70A Stat. 1 (1956) .........................................................................9

122 Stat. 3 (2008) ........................................................................19

135 Stat. 1541 (2021) ...................................................................19

**OTHER AUTHORITIES**

16 Op. Att'y Gen. 162 (1878) .......................................................18

Coakley, *The Role of Federal Military Forces in Domestic*
    *Disorders, 1789-1878* (1988) .................................................3, 4

DoDI 3025.21......................................................................11, 13, 17

DoDI 5525.5 (Jan. 15, 1986) ........................................................18

Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act &*
    *Related Matters* (2018) .......................................................3, 9, 15

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

Kealy, *Reexamining the Posse Comitatus Act*, 21 Yale L. & Pol'y
Rev. 383 (2003) ......................................................................4, 15

Mirasola, *Sovereignty, Article II, and the Military During
Domestic Unrest*, 15 Harv. Nat'l Sec. J. 199 (2023) ..................20

Nevitt, *Unintended Consequences: The Posse Comitatus Act in
the Modern Era*, 36 Cardozo L. Rev. 119 (2014)........................15

Stelloh, *Pete Hegseth Orders the Removal of 2,000 National
Guard Troops*, NBC News (July 15, 2025),
https://tinyurl.com/4m883yks ...................................................22

Taft, *Our Chief Magistrate & His Powers* (1916)..........................21

The Federalist No. 45 (James Madison) ...........................................3

## INTRODUCTION

The Posse Comitatus Act (PCA) "reflect[s] a traditional and strong resistance . . . [to] military intrusion into civilian affairs." *Laird v. Tatum,* 408 U.S. 1, 15 (1972). Indeed, "[t]he PCA [has] . . . constitutional underpinnings." *United States v. Dreyer*, 804 F.3d 1266, 1279 (9th Cir. 2015) (en banc). Our Nation's Framers were keenly aware from their experience under British rule that reliance on the military to enforce civil laws leads to the suppression of liberty, a tendency for arbitrary governance, and the accumulation of excessive power. To prevent those harms, the Framers designed the federal government as one of limited powers and denied it general authority to employ the military for civilian law enforcement.

Over the last several months, the federal government has violated that original understanding in unprecedented ways. As the district court found after holding a multi-day bench trial, President Trump and Defense Secretary Hegseth have deployed heavily armed troops as a "force multiplier" (A300) for civilian immigration agents carrying out dozens of law-enforcement missions across Southern California. They have also commanded soldiers to cordon off city streets in support of FBI operations and sent hundreds of troops to "set[ ] up protective perimeters, traffic blockades, crowd control, and the like" on DEA raids. A359. And as part of "Operation Excalibur," they deployed 80 troops in Humvees and tactical vehicles to Los Angeles' MacArthur Park for a "show of presence"—that

1

is, to "demonstrat[e] federal reach" in a "high-visibility urban environment." A329. In other words, defendants used the military to scare people at a public park in a densely populated neighborhood in America's second largest city.

As troubling as that conduct has been, the legal theories that defendants now advance in support of that conduct are more troubling still. In defendants' view, the only people who can enforce the PCA's restrictions are federal prosecutors who work for the same department now defending the federal government. Defendants also assert that, once they have shown a "colorable basis" for federalizing troops under 10 U.S.C. § 12406, *see* Stay Order 33 (No. 25-3727), the military has carte blanche to engage in *any* form of civilian law enforcement, including arrests, searches, seizures, and interrogations. At a minimum, defendants believe that the PCA allows them to deploy unlimited numbers of troops to provide security in the field for any type of civilian law-enforcement action.

If that were true, it would transform the role of the military in our society. It would mean, for example, that the FBI could station heavily armed Marines alongside agents conducting interrogations; that USDA could bring troops for security and a "show of presence" (A329) on inspections of factories and other businesses; that ATF could enlist the Army or Marines for support when executing search warrants and carrying out gun-trafficking investigations; and especially

2

relevant here, that ICE and the DEA could rely on the military to quell protests and control crowds at the sites of raids and other enforcement actions.

No doubt, federal agencies would often find that kind of military support helpful or convenient. It is much easier to coerce compliance and execute the laws with armed soldiers. No wonder, then, that "federal law enforcement agencies 'always wanted military there'" once defendants started giving them the opportunity to request that form of assistance. A360. But that is not the federal government of "few and defined" powers that the States agreed to when ratifying the Constitution. The Federalist No. 45 (James Madison). The district court properly issued a permanent injunction to protect that original understanding and enforce the PCA's longstanding restrictions on militarized law enforcement.

## STATEMENT

"Opposition to the use of military force in the enforcement of civil law is deeply imbedded in American tradition." Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789-1878*, at 3 (1988). "The image of hated Redcoats shooting down innocent citizens in the Boston Massacre of 1771 was a vivid one, easily transferable to any soldier employed as an instrument of internal control by a central government." *Id.* Many Founding-Era leaders feared that the new federal government would gain excessive powers vis-à-vis the States if it were empowered to use the military for civil law enforcement. *See, e.g.*, *id.* at 7-19.

3

"[I]f the framers had even suggested that standing armies might be used to control domestic violence or enforce federal law," it would have been quite "dangerous to the ratification of the Constitution." *Id.* at 14-15; *see* Kealy, *Reexamining the Posse Comitatus Act*, 21 Yale L. & Pol'y Rev. 383, 390-392 (2003).

Enacted in 1878, the PCA builds on these concerns. "In the congressional debate on the [PCA], several senators expressed the opinion that the Act was no more than an expression of constitutional limitations on the use of military force to enforce civil laws." *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974). Today, the provision appears at 18 U.S.C. § 1385 and bars several forms of "military involvement in civilian law enforcement." *Dreyer*, 804 F.3d at 1275.

The National Guard is subject to the PCA when it is federalized but not when it is under state control. *See* Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act & Related Matters* 61-62 (2018). In practice, that means the governor of a State may direct Guard troops to participate in state and local law-enforcement missions. *See, e.g.*, *Gilbert v. United States*, 165 F.3d 470, 473 (6th Cir. 1999). Or the President may request that a governor provide assistance to federal agencies through a "Title 32" arrangement, whereby the Guard remains under state control but the mission is federally funded. *See* Supplemental Addendum (SA) 6. Once the President federalizes the Guard, however, troops become part of the regular military forces and are subject to the PCA.

4

In this case, President Trump and Secretary Hegseth chose federalization. A321-322. Their stated motivation was that "incidents of violence and disorder [had] occurred" in Los Angeles on June 6-7. A321. Some 4,000 federalized Guard troops, as well as about 700 active-duty Marines, "were placed under the control of Task Force 51" and deployed to the Los Angeles area. A322. Governor Newsom and California sought a temporary restraining order against the federalization on the ground that it violated 10 U.S.C. § 12406. A319. The district court granted that relief, but this Court stayed the order pending appeal. *Id.* In its stay order, the Court "express[ed] no opinion" on plaintiffs' PCA claims. Stay Order 40. Following a bench trial, the district court concluded that defendants have violated the PCA on a widespread basis. A359-362. The court permanently enjoined further violations. A367-369.

## ARGUMENT

A party seeking a stay pending appeal must show that it is likely to succeed on the merits, that it will be irreparably injured, and that the balance of the equities favors a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Defendants cannot satisfy those requirements. They fail in each of their attempts to insulate plaintiffs' PCA claims from judicial review. And they provide no persuasive basis for second-guessing the district court's extensive findings of fact, which reveal an unprecedented effort to entangle the military in civilian law enforcement.

5

Defendants also fail to demonstrate irreparable harm—and certainly identify no harm that outweighs the substantial public interest in the PCA's enforcement.

## I.   DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiffs Have Standing and a Cause of Action

1. Article III "requires a plaintiff to first answer a basic question: 'what's it to you?'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Here, plaintiffs have a ready answer: States and their governors "have standing 'when they believe that the federal government has intruded upon areas traditionally within states' control.'" A339. If Congress had enacted a statute providing that "the National Guard may be deployed as a posse comitatus *if but only if* the State approves," a State and its governor would plainly have standing to seek enforcement of the statute. *Cf. Perpich v. Dep't of Def.*, 496 U.S. 334, 336 (1990). In all relevant respects, that is precisely the legal regime that already exists. As discussed above, *supra* p. 4, Congress has given States the authority to decide when their National Guards can engage in civilian law-enforcement activities.

Plaintiffs' claims also implicate California's sovereign rights within our federal system. That consideration weighs heavily in favor of standing. *See, e.g.*, *Arizona v. Yellen*, 34 F.4th 841, 851 (9th Cir. 2022). The PCA gives force to the States' understanding when they ratified the Constitution: that the new federal government would not amass untold or unchecked power by wielding the coercive

6

authority of the military against civilians. *Supra* pp. 3-4. By safeguarding that original understanding, enforcement of the PCA preserves the constitutional balance of power among the States and the federal government.

Plaintiffs have standing for other reasons as well. Beyond harming California's "quasi-sovereign interest in the health and 'economic well-being' of [its] populace[]," *Kentucky v. Biden*, 23 F.4th 585, 599 (6th Cir. 2022); *see* A81, defendants' violations of the PCA threaten to prolong the Guard's deployment and divert troops away from important work at the state level, *see, e.g.*, SA-13-15. Defendants' principal motivation for calling up the Guard has been to deploy troops for activities prohibited by the Posse Comitatus Act. *See infra* pp. 11-17. It stands to reason that, if defendants are enjoined from those activities, they would end the deployment sooner and return troops to state control. Defendants' actions also threaten to demoralize members of the Guard and make it harder for the State to retain and recruit troops. "[C]ommonsense inferences" can suffice to establish standing. *Diamond Alt. Energy v. EPA*, 145 S. Ct. 2121, 2136 (2025). And it is common sense that ordering members of the military to violate the PCA—a crime—threatens to undermine troop morale and recruitment. *See* Br. of Former Army & Navy Secretaries & Admirals & Generals, D.Ct. Dkt. 124-1 at 3, 14.

2. Plaintiffs also have a cause of action. "[A]ctions by subordinate Executive Branch officials that extend beyond delegated statutory authority—i.e., *ultra vires*

actions—are reviewable," especially where they "implicate constitutional concerns." *Murphy Co. v. Biden*, 65 F.4th 1122, 1129, 1131 (9th Cir. 2023). The PCA certainly has "constitutional underpinnings." *Dreyer*, 804 F.3d at 1279; *see supra* pp. 3-4. And the Supreme Court has recognized that "federal courts are fully empowered to consider" "claims of judicially cognizable injury resulting from military intrusion into the civilian sector." *Laird*, 408 U.S. at 15-16. Indeed, plaintiffs' PCA challenge is similar to the claim in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in that it seeks to block the executive branch from "turn[ing] inward" "the instruments of national force" more appropriately used "against the outside world for the security of our society," *id.* at 645 (Jackson, J., concurring); *see id.* at 645 n.13 (citing the PCA).

Defendants argue (Mot. 12-13) that Congress intended to bar civil actions under the PCA by placing it in Title 18 and authorizing criminal penalties. But it is "illogical to think that Congress . . . pass[ed] a statute that had as its sole enforcement mechanism federal prosecution . . . by the same federal government that would have ordered [the military] to engage in domestic law enforcement." A365. Text, history, and precedent support that common-sense understanding.

As originally enacted, the PCA contained expansive language signaling that Congress did not intend to leave enforcement solely in the hands of federal prosecutors. It provided that "it shall not be lawful to employ any part of the Army

8

. . . as a posse comitatus, or otherwise, for the purpose of executing the laws[.]" 20 Stat. 145, 152 (1878). And when the PCA was first incorporated into the U.S. Code, it appeared in Title 10, as a general regulation of the armed forces, not Title 18. *See* 10 U.S.C. § 15 (1925). Although Congress later adjusted the provision's text and moved it to Title 18 as part of a reorganization effort, *see* 70A Stat. 1, 626 (1956), it made clear that "the legislative purpose [was] to restate [existing law] without substantive change," *id.* at 640.

As to precedent, this Court has strongly suggested that the PCA may be enforced by litigants other than federal prosecutors. In *Dreyer*, 804 F.3d at 1275-1279, the en banc Court extensively addressed the merits of a PCA claim—and deemed the government's conduct unlawful—in the context of a criminal defendant's suppression motion. More generally, the Supreme Court has recognized that enforcement of criminal statutes through "private right[s] of action" can be appropriate if "'necessary to make effective the congressional purpose.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 316-317 (1979). That is the case here: No one has been prosecuted for violating the PCA since 1879. *See* Elsea, *supra*, at 66. And if federal prosecutors alone could enforce the PCA, that would render the statute ineffective by giving the federal government a veto over any actions seeking to hold it accountable. A367.

9

Defendants contend (Mot. 10-13) that *NRC v. Texas*, 605 U.S. 665 (2025), and *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), foreclose relief. They do not. *NRC* merely reaffirmed the high bar to relief on a non-constitutional ultra vires claim where a statute—there, the Hobbs Act—expressly precluded review. *See* 605 U.S. at 681-683. Because plaintiffs' PCA claim implicates constitutional concerns, *supra* pp. 3-4, and no statute expressly precludes review, the relevant standard remains the one established in *Murphy*, 65 F.4th at 1129-1131.[1] In *CASA*, 145 S. Ct. at 2554, the Court held that injunctions must have "a sufficient historical analogue" in longstanding equity practice. As relevant here, there is a well-established tradition of courts enjoining ultra vires conduct by the executive branch, especially if there is a constitutional dimension to the violation. A363-365. The Supreme Court has also allowed civil enforcement of criminal statutes through the APA. *See Chrysler*, 441 U.S. at 317-318. As a result, there are many cases in which courts have "enjoined the government from violating a criminal law." Mot. 11; *see, e.g.*, *Canadian Com. Corp. v. Dep't of Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008). Defendants provide no basis to depart from that approach and categorically bar civil enforcement of criminal laws through ultra vires actions.

---

[1] Even if *NRC* governs, plaintiffs' claim satisfies the *NRC* standard for the reasons provided by the district court. A366-367.

## B.  Defendants Violated the PCA

This Court has construed the PCA to prohibit three types of activities:  "direct active involvement" in "civilian law enforcement activities," actions that "'pervade the activities of civilian authorities,'" and "regulatory, proscriptive, or compulsory military power."  *Dreyer*, 804 F.3d at 1275.  If any "one of these tests is met," the PCA is violated.  *Id.*  In applying those tests, the Court consults guidance promulgated by the Defense Department.  *Id.*  The current version of that guidance provides that PCA-prohibited activities include "search or seizure," "arrest," "interrogations," "brandishing a weapon," "security functions," and among other things, "crowd and traffic control."  DoDI 3025.21, Encl. 3 § 1.c(1).

Here, the district court correctly concluded that defendants violated each of the tests recognized in *Dreyer*.  A359-362.  The trial record is "replete with evidence that Task Force 51" (A359) engaged in "direct active involvement" in law-enforcement missions and "'pervade[d] the activities of civilian authorities.'"  *Dreyer*, 804 F.3d at 1275.  In the Los Angeles area alone, troops accompanied immigration agents and other officials, including FBI and DEA agents, on dozens of actions in the field.  A327-A328.  Civilian law-enforcement agencies "'always wanted military there, and [Task Force 51] had plenty of capacity to do that.'"  A360.  Indeed, Guard troops served as a "force multiplier" (A300) on approximately 75% of ICE enforcement and removal operations in the Los

11

Angeles area through mid-July. A275. Troops also accompanied DEA agents on operations far beyond Los Angeles, A330-332, and were deployed to MacArthur Park as part of a "show of presence" designed to "demonstrat[e] federal reach," A329-330. Typically, "law enforcement personnel were side by side with the soldiers or very near them." SA-93. At times, soldiers were deployed "in numbers that match[ed] or outnumber[ed]" civilian agents. A360. And military forces were often so intertwined with civilian agents that "[b]ystanders at multiple locations and even federal officials at trial were unable to distinguish Task Force 51 troops from federal law enforcement agents." A359.

In many instances, Task Force 51 also exercised "regulatory, proscriptive, or compulsory military power." *Dreyer*, 804 F.3d at 1275. Troops were "expressly instructed to"—and did—"set[] up protective perimeters [and] traffic blockades" and engage in "crowd control, and the like." A359; *see, e.g.*, A325, A328-A332 A359-360. These activities were "'regulatory, proscriptive, or compulsory,' in the sense that [they] directly restrained [civilians'] freedom of movement." *Bissonette v. Haig*, 776 F.2d 1384, 1391 (8th Cir. 1985). These activities also brought troops into direct contact with civilians and "deterred engagement by the public." A328. Defendants are simply wrong in asserting that "the military did not 'interact[] with any civilians.'" Mot. 16. A video played at trial, for example, showed one instance in which "troops physically turned away a woman with a megaphone as

12

she approached [a] traffic blockage." A331. And plaintiffs introduced photos and videos showing troops standing directly across from or within a few feet of civilians. *See, e.g.*, SA-55; SA-57; SA-58; SA-59.

Defendants' principal response is that troops were merely "protecting federal officials who [were] executing the laws." Mot. 17. Defendants appear to view that as a permissible "indirect" form of law-enforcement activity. *Dreyer*, 804 F.3d at 1275. That characterization is inaccurate. *See* DoDI 3025.21, Encl. 3 § 1.c(1) (defining "direct civilian law enforcement assistance" to include "security functions" and "crowd and traffic control"). But even accepting that characterization would not allow defendants to avoid a PCA violation. As discussed above, assistance provided by the military "must not 'amount to direct active involvement in the execution of the laws,' *and* must not 'pervade the activities of civilian authorities'" or constitute "regulatory, proscriptive, or compulsory" action. *Dreyer*, 804 F.3d at 1275 (emphasis added).

Defendants' contrary view would usher in a vast and unprecedented shift in the military's role. If the PCA allowed soldiers to accompany ICE and DEA agents on raids and arrests in the manner that has unfolded across Southern California, there would be no logical basis to preclude members of the Armed Forces from accompanying other law-enforcement agents when performing their duties. Virtually every federal agency has an investigative or enforcement arm.

13

And many might welcome armed support from the military. Providing that support would greatly expand government officials' ability to coerce and control individuals subject to their jurisdiction. The PCA was designed to safeguard against that kind of erosion of individual liberty—and that type of expansion of the federal government's powers. *Supra* p. 4.

According to defendants, this Court has already held that the military may "provid[e] security for law enforcement operations." Mot. 18. But the two cases invoked by defendants were not remotely similar. In each, the Navy provided limited "subsidiary support" to Coast Guard drug smuggling-related operations in the middle of the ocean. *Dreyer*, 804 F.3d at 1275; *see United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998); *United States v. Khan*, 35 F.3d 426, 431-432 (9th Cir. 1994). That support was not—as here—"pervasive of the activities of civilian authorities." *E.g.*, *Khan*, 35 F.3d at 432. And it would make no sense to rely on a brief discussion of naval operations on the high seas when establishing the PCA standard for deployments on American soil in a highly urbanized environment. As one military expert has explained, "[t]he early civil libertarian concerns that originated with the birth of the republic and at the time of the PCA's passage" are "fundamentally distinguishable from [any concerns with the] navy" when it "operates on the high seas, far . . . removed from [the]

14

citizenry." Nevitt, *Unintended Consequences: The Posse Comitatus Act in the Modern Era*, 36 Cardozo L. Rev. 119, 119 (2014).

Defendants also wonder why the PCA would prohibit "the protection of federal personnel" but not the protection of federal property, Mot. 19, or "deliver[ing] mail," *id.* at 15. In defendants' view, each of those activities involves "execution of the laws." *Id.* But the PCA does not forbid all forms of "execut[ing] . . . the laws." While the phrase "otherwise . . . execute the laws" in 18 U.S.C. § 1385 may "seem[] sweeping" in isolation, Elsea, *supra*, at 56, courts typically avoid "untethering an 'otherwise' provision from the rest of a criminal statute," *Fischer v. United States*, 603 U.S. 480, 488 (2024). "Execute the laws" thus refers to law-enforcement activities akin to those historically performed "as a posse comitatus": the forms of assistance historically provided to local sheriffs to prevent civil disorder. *See Dreyer*, 804 F.3d at 1272. For example, Congress has long understood the PCA to cover "search, seizure, arrest, or other similar activity." *Id.* (quoting 10 U.S.C. § 375). "[T]he closer the role of the military . . . comes to that of a police officer on the beat, the greater the likelihood that the [PCA] is being violated." Kealy, *supra*, at 404 (internal quotation marks omitted).

Construed in that common-sense manner, the PCA would not prohibit mail delivery. And although protection of federal buildings arguably poses a closer question, *see* A358 n.22, plaintiffs have not sought—and the district court did not

15

grant—injunctive relief against that practice here, *see* SA-161-162. The mere protection of federal buildings certainly does not give rise to the same extraordinary risks of harm threatened by providing defendants with unchecked authority to deploy soldiers alongside civilian law-enforcement agents in the field. *Supra* pp. 2-3; *see* SA-256 (Breyer, J.) ("there are practical . . . limitations and distinctions between federal personnel and federal property"); *id.* ("federal employees working out in the field are everywhere").

Finally, defendants argue that they did not act "willfully"—a "predicate for any PCA violation"—because they "believed they were acting *lawfully*." Mot. 20. But defendants fundamentally misunderstand the scope and relevance of the PCA's willfulness requirement. For one thing, a "willfulness requirement . . . does not carve out an exception to the traditional rule that ignorance of the law is no excuse." *Bryan v. United States*, 524 U.S. 184, 196 (1998). For another, the district court was not holding defendants *retrospectively* liable. It was assessing whether there was a sufficient likelihood of future violations to justify *prospective* relief. A367-368. Now that the court has clarified the PCA's scope, defendants are on notice and any future violations would plainly be "willful." In that respect, this case is much like *Dreyer*, 804 F.3d at 1275-1277, where the Court deemed the federal government's conduct violative of the PCA without assessing willfulness. That approach made good sense because the Court refrained from suppressing

16

evidence based on past violations, *see id.* at 1278-1281, while making clear that the government "must conform its [future] practices to the law" as clarified by the Court, *id.* at 1280. Just as in this case, any future violations would necessarily be willful. *See id.* at 1278-1281.

### C. Defendants Have Not Identified Any Exceptions to the PCA That Would Excuse Their Violations

Defendants also argue that Task Force 51's activities are "expressly authorized by the Constitution or Act of Congress" and thus exempted from the PCA. Mot. 14 (quoting 18 U.S.C. § 1385). Defendants point to Section 12406(3), which authorizes the President to federalize National Guard troops when he is "unable with the regular forces to execute the laws," *see* Mot. 13-15, and a theory of "inherent protective authority" under the Constitution, *id.* at 18. Neither "expressly authorize[s]" PCA-prohibited activities.

1. As to Section 12406, the district court emphasized that it was "unaware of any person—government lawyer, military or civilian official, court, or commentator—who has made this argument other than Defendants' lawyers in this case." A343. The Department of Defense has long maintained guidance on statutory exceptions to the PCA. *See, e.g.*, *id.* (citing DoDI 3025.21). To plaintiffs' knowledge, that guidance has never listed Section 12406 or its predecessor enacted in 1903. And high-ranking military leaders testified at trial that, in the military's view, the PCA applies "to National Guard troops federalized

17

under [Section] 12406." A344; *see, e.g.*, A133 ("everyone [in Task Force 51] knew that the Posse Comitatus Act applied").

The military is right, and the federal government's lawyers in this case are wrong. Section 12406 nowhere authorizes the *specific type* of law enforcement prohibited by the PCA. As discussed above, *supra* p. 15, the PCA prohibits the military from engaging in policing activities akin to the functions traditionally performed by the posse comitatus in support of local law-enforcement officials. Congress knows how to enact statutes that expressly authorize those activities when it wishes to do so. *See* A347 (collecting examples). And a neighboring provision of Section 12406 makes clear that "[m]embers of the National Guard called into Federal service" under the statute are "subject to the laws and regulations governing the Army or the Air Force[.]" 10 U.S.C. § 12405. The PCA, of course, is such a law.

Nor does the Insurrection Act support defendants' position. A347. As a matter of first principles, it is debatable whether the Insurrection Act "expressly authorize[s]" the activities prohibited by the PCA. In the 19th century, however, the executive branch took the position that the Insurrection Act operates as an exception. 16 Op. Att'y Gen. 162 (1878). It has consistently adhered to that view, *see, e.g.*, DoDI 5525.5, Encl. 4 (Jan. 15, 1986), and Congress has never abrogated it in the many amendments of the PCA and Insurrection Act, *see, e.g.*, 135 Stat.

18

1541, 1904-1905 (2021); 122 Stat. 3, 325-326 (2008). It is thus reasonable to presume that Congress was "aware of [this] administrative . . . interpretation" and intended "to adopt [it]." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). The same cannot be said of defendants' novel understanding of Section 12406.

Defendants' interpretation would also produce untenable consequences that Congress would not have intended. In defendants' view, once the President determines that he is "unable with the regular forces to execute the laws," 10 U.S.C. § 12406(3), military forces can undertake *any* type of civilian law enforcement in support of "'those laws,'" Mot. 15. For example, defendants would have free rein to deploy the military to conduct arrests, interrogations, surveillance, and enforcement raids. The Court should not lightly conclude that Congress intended to allow the executive branch to wield so sweeping a power. *Cf. NFIB v. Dep't of Lab.*, 595 U.S. 109, 118 (2022) (refusing to "significantly expand [an agency's] regulatory authority without clear congressional authorization").

At the very least, before embracing that novel understanding, the Court would need to revisit the "highly deferential standard of review" applied in its June 19 stay order. Stay Order 33. Under that standard, the President need only identify a "colorable basis" for invoking Section 12406. *Id.* Although plaintiffs have warned about the profound risks of abuse under that deferential approach, *see* C.A. Dkt. 48.1 at 6-9 (No. 25-3727), this Court's stay order at least held out the promise that

19

the PCA would serve as a second-line defense against attempts to militarize civilian law enforcement, *supra* p. 5. Without the PCA, there will be little, if anything, left to prevent some of our Founders' worst fears from becoming reality.

2. Defendants' reliance on the "protective power" is also unavailing. The "protective power" is a theory of unilateral authority devised by executive-branch lawyers but never squarely endorsed by the judiciary. *See* Mirasola, *Sovereignty, Article II, and the Military During Domestic Unrest*, 15 Harv. Nat'l Sec. J. 199, 207-208, 219-223 (2023). Even assuming that theory is valid as a general matter, *but see id.* at 219-223, 254-256 (raising serious questions about its validity and scope), it does not provide "express[] authoriz[ation]" for soldiers to engage in civilian law enforcement, 18 U.S.C. § 1385. Nor does it provide a basis for defendants to override the PCA's plain terms. *See generally Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the . . . will of Congress, his power is at its lowest ebb.").

Any credible theory of inherent "protective power" would also need to account for the full range of constitutional considerations—not just the perceived need of "the Executive Branch . . . to use the military to protect federal personnel," Mot. 18, but also the Framers' serious concerns about overreliance on the military for civilian law enforcement, *supra* pp. 3-4. Defendants provide no basis to focus on the former and disregard the latter. "The purpose of the Constitution was not

only to grant power, but to keep it from getting out of hand." *Youngstown*, 343

U.S. at 640 (Jackson, J., concurring); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576

U.S. 1, 19-21 (2015) (balancing multiple competing constitutional concerns when

determining scope of executive power). A more balanced view of "protective

power" would allow the executive to use military force for protective functions, at

most, where the risks of entanglement of the military in civilian affairs are low.

That is far from the case here. *Supra* pp. 2-3, 13-14.

The two nineteenth-century cases invoked by defendants (Mot. 18-19) do not

support their far-reaching theory. Neither *In re Neagle*, 135 U.S. 1 (1890), nor *In

re Debs*, 158 U.S. 564 (1895), addressed the federal government's compliance with

the PCA. In the former, the Court merely upheld the authority of the U.S.

Marshals Service—not the military—to provide protective services to a Supreme

Court justice. *See* 135 U.S. at 60-61. In the latter, the Court recognized the

authority of the federal government to maintain the orderly administration of the

U.S. postal system. *See* 158 U.S. at 582. Mail delivery does not fall within the

PCA's scope. *Supra* p. 15. And although both cases contain dicta about the

executive branch's authority to engage the military for protective functions, *see*

Mot. 19, neither purports to endorse the far-reaching, one-sided claims of

executive power advanced by defendants here. *See, e.g.*, Taft, *Our Chief

Magistrate & His Powers* 140 (1916) ("there is nothing in the *Neagle* case . . .

21

warranting . . . an inference" that there is an "undefined residuum of power which [the President] can exercise because it seems to him to be in the public interest").

## II. THE EQUITABLE FACTORS DO NOT SUPPORT ISSUANCE OF A STAY

Defendants also fail to show that the remaining equitable factors support a stay. The sole argument they raise as to irreparable injury is that the district court's injunction threatens "to expose federal personnel to violence and to impede federal officials' ability to enforce federal law." Mot. 22. But defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And the record contradicts defendants' assertion that federal personnel will be exposed to violence in the absence of military escorts in the field.

The sporadic episodes of civil unrest that occurred in early June have long since abated. Acknowledging this reality, *see* Stelloh, *Pete Hegseth Orders the Removal of 2,000 National Guard Troops*, NBC News (July 15, 2025), https://tinyurl.com/4m883yks, defendants have returned all but 300 National Guard soldiers to state control. And the remaining troops have assisted on "zero" ICE field operations since August 11, A307, even while the federal government has made over 500 immigration-related arrests in the Los Angeles area since then, *compare* SA-300 *with* SA-307. The record also shows that, long before early August, troops participated in routine law-enforcement operations that presented

22

no elevated or extraordinary danger to federal personnel. Those operations included the Mecca operation, where 300 troops were deployed to a remote cannabis farm over 140 miles away from Los Angeles, and the Carpinteria operation, in which troops were involved only because it would have taken federal agents longer to complete the operation without them. A330-331.

By contrast, a stay would threaten irreparable harm to the State. Defendants' PCA violations were "the function of systematic and willful orders to troops to execute domestic law." A366 n.27. Although defendants have not deployed troops on field operations in recent weeks, A307, there are powerful indications that further PCA violations are imminent. Defendants have issued public statements and an executive order threatening to use the military for civilian law-enforcement purposes in California and across the Nation. A332, A368. And the 300 troops that remain deployed include "two Mobile Response Forces" that "can be called upon to engage in field operations." A216-217. Those troops have not been properly trained on the PCA's scope. A368. And contrary to defendants' suggestion, *see* Mot. 22, 300 soldiers are more than enough to violate the PCA. That is the same number of troops that participated in the Mecca operation and nearly four times the number that took part in Operation Excalibur. A144, 189.

A stay would also harm the public interest. "Civilian rule is basic to our system of government," *Bissonette*, 776 F.2d at 1387, not only because it helps to

preserve the balance of state and federal powers, *supra* pp. 3-4, but also because "military enforcement of the civil law leaves the protection of vital [constitutional] rights in the hands of persons who are not trained to uphold these rights," *Bissonette*, 776 F.2d at 1387. Indeed, militarized law enforcement threatens to "chill the exercise of fundamental rights, such as the rights to speak freely and to vote." *Id.* That threat is of central concern to the State because defendants' deployment in Los Angeles is set to last through Election Day. To prevent interference with Californians' right to vote and other important freedoms, the district court properly enjoined the commission of further PCA violations.

## CONCLUSION

The motion for a stay pending appeal should be denied.

Dated:  September 15, 2025

Respectfully submitted,

_s/ Samuel T. Harbourt_

ROB BONTA
  _Attorney General of California_
HELEN H. HONG
  _Acting Solicitor General_
THOMAS S. PATTERSON
MICHAEL L. NEWMAN
  _Senior Assistant Attorneys General_
SAMUEL T. HARBOURT
CHRISTOPHER D. HU
  _Deputy Solicitors General_
ANYA BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
  _Supervising Deputy Attorneys General_
MEGHAN H. STRONG
JANE REILLEY
  _Deputy Attorneys General_
HALEY AMSTER
  _Associate Deputy Solicitor General_

  _Attorneys for Plaintiffs-Appellees_

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,600 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

**SUPPLEMENTAL ADDENDUM**

# TABLE OF CONTENTS

Declaration of Paul S. Eck, D.Ct. Dkt. 8-3 (June 10, 2025) ..................... SA-1

Supplemental Declaration of Paul S. Eck, D.Ct. Dkt. 39-2
    (June 12, 2025) .............................................................................. SA-12

Plaintiffs' Motion for Preliminary Injunction, D.Ct. Dkt. 77
    (June 16, 2025) .............................................................................. SA-16

Trial Exhibit 75, D.Ct. Dkt. 127-2 (July 30, 2025) ................................. SA-55

Trial Exhibit 79, D.Ct. Dkt. 127-4 (July 30, 2025) ................................. SA-57

Trial Exhibit 92, D.Ct. Dkt. 127-6 (July 30, 2025) ................................. SA-58

Trial Exhibit 93, D.Ct. Dkt. 127-6 (July 30, 2025) ................................. SA-59

Transcript of Bench Trial Proceedings Volume 2
    (August 12, 2025) .......................................................................... SA-60

Transcript of Bench Trial Proceedings Volume 3
    (August 13, 2025) .......................................................................... SA-203

Exhibits (1-18) to Declaration of Brendan Hamme in Support of
    Plaintiffs' Motion for Preliminary Injunction, D.Ct. Dkt. 183-2
    (September 2, 2025) ....................................................................... SA-264

1   ROB BONTA
    Attorney General of California
2   MARISSA MALOUFF
    JAMES E. STANLEY
3   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
4   LUKE FREEDMAN
    ROBIN GOLDFADEN
5   BRENDAN M. HAMME
    LORRAINE LOPEZ
6   KENDAL MICKLETHWAITE
    MEGAN RICHARDS
7   Deputy Attorneys General
    LAURA L. FAER
8   Acting Senior Assistant Attorney General
    1515 Clay St.
9   Oakland, CA 94612
    Telephone: (510) 879-3304
10  E-mail: Laura.Faer@doj.ca.gov
    *Attorneys for Plaintiffs*

11                  IN THE UNITED STATES DISTRICT COURT

12                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **GAVIN NEWSOM, IN HIS OFFICIAL**
    **CAPACITY AS GOVERNOR OF THE**          **DECLARATION OF PAUL S. ECK**
17  **STATE OF CALIFORNIA; STATE OF**
    **CALIFORNIA,**
18                                            Date:
                        Plaintiffs,           Time:
19                                            Courtroom:
              v.                              Judge: Charles R. Breyer
20                                            Trial Date:
                                              Action Filed: 6/9/2025
21  **DONALD TRUMP, IN HIS OFFICIAL**
    **CAPACITY AS PRESIDENT OF THE**
22  **UNITED STATES; PETE HEGSETH, IN**
    **HIS OFFICIAL CAPACITY AS SECRETARY**
23  **OF THE DEPARTMENT OF DEFENSE;**
    **U.S. DEPARTMENT OF DEFENSE,**
24

25  Defendants.

26

27

28
                                  1

# DECLARATION OF PAUL S. ECK

I, Paul S. Eck, declare under penalty of perjury that the following is true and correct:

1.     I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

1.   I am a Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018.

2.   As Deputy General Counsel for the California Military Department, I lead a blended team of California and National Guard attorneys. I provide direct legal support to the Executive Staff and other senior leaders on complex matters at the intersection of military operations, state governance, and national security. I am regularly consulted on the operational needs, objectives, movements, and orders impacting the CMD.

3.   I began my service career as a Sergeant in the United States Marine Corps. I served in the United States Marine Corps. from 1980 to 1984 before being honorably discharged.

4.   I completed college and law school following my service in the United States Marine Corps. and worked in private practice from 1991 to 2012.

5.   From 2008 to 2012, I also worked for the San Diego Sheriff's Department as a Search and Rescue Reserve. In this capacity I provided communications and logistical support to San Diego Sheriff's Department during search and rescue operations for missing and lost persons, evidence recovery, emergency and disaster operations, and mutual aid events among other duties.

2

6.   From 2010 to 2022, I served as a Colonel (CA) and Judge Advocate in the CMD, advising a wide array of units including the 40th Infantry Division, 3-140th Aviation Regiment, 49th Military Police Brigade, and Joint Forces Headquarters. In this capacity, I advised on both administrative law and critical operational legal support.

7.   From 2012 to 2014, I worked as an attorney III for the California Department of Forestry and Fire Protection (Cal Fire).

8.   From 2014 to 2018, I served as a Peace Officer with Cal Fire, ultimately rising to Chief of Investigations. In this role, I led critical investigative and law enforcement operations supporting both Cal Fire and the Office of the State Fire Marshal. I concurrently served as Bomb Squad Commander and Terrorism Liaison Officer.

9.   I am certified by POST at the Basic, Intermediate, Supervisor, and Instructor levels and also hold specialized credentials, including a Post-Blast Explosives Investigator Certificate from the FBI and the FBI Certified Explosives Investigator designation.

10. I have been a National Guard Bureau Intelligence Oversight Monitor for the State of California since I joined CMD in 2018, maintaining annual certifications and ensuring strict compliance with intelligence oversight standards.

11. I have also been a Domestic Operational Law Legal Advisor since 2018, activated to support major domestic missions such as the Oroville Dam crisis and the Camp Fire response. I am trained in State Disaster Management, Advanced ICS Command, Military Resources in Emergency Management, USSOCOM OPSEC, and Army Counterintelligence.

**June 7, 2025**

12. I am aware of and have reviewed the Memorandum issued by President Trump on June 7, 2025 (Trump Memo) calling into federal service members and units of the National Guard.

3

1      13. I am also aware and have reviewed the June 7, 2025, Memorandum from

2   Secretary of Defense Peter Hegseth (DOD June 7 Order) to the Adjutant General of

3   California, ordering 2,000 California National Guard members into federal service.

4      14. I am aware that all 2,000 of the National Guard members deployed as a

5   result of the DOD June 7 Order are members of the 79th Infantry Brigade Combat

6   Team, which include a large number of guard members who serve in Taskforce

7   Rattlesnake, the State's specialized fire combat unit. These service members have

8   specialized training in wildland fire mitigation and prevention and direct fire

9   suppression, and would be highly difficult for the State to replace.

10      15. The 79th Infantry Brigade also contains Counterdrug Taskforce members

11   that specialize in providing support to stop the trafficking of fentanyl at the U.S.-

12   Mexico Border.

13      16. As further described below, these deployments will impair the California

14   National Guard's ability to perform critical functions for the State of California,

15   including providing urgent responses to natural disasters and wildfires and drug

16   interdiction, among other imperative missions.

17   **June 9, 2025**

18      17. I have reviewed the June 9, 2025, Memorandum from Secretary Hegseth

19   order federalizing an additional 2,000 California National Guard members into

20   federal service (DOD June 9 Order).

21      18. I have also reviewed a post by Secretary Hegseth on the X social media

22   platform, posted at 3:24 p.m. Pacific time on June 9, 2025, stating that

23   "approximately 700 active-duty U.S. Marines from Camp Pendleton are being

24   deployed to Los Angeles to restore order" and "to defend federal law enforcement

25   officers." (https://x.com/SecDef/status/1932202105361612994.)

26      19. Consistent with those public statements by Secretary Hegseth, on June 9

27   and 10, 2025, I became aware that CMD was informed of DOD's plans to issue

28   change orders to the DOD June 7 Order and DOD June 9 Order (collectively, DOD

4

1   Orders). CMD was informed that those change orders would advise that beginning

2   June 10, mobilized federalized California National Guard units would be providing

3   support for counter-immigration operations across Los Angeles, in communities

4   during immigration enforcement operations and not only at federal buildings.

5   CMD was informed that such support activities would include holding a secure

6   perimeter in communities around areas where immigration enforcement activities

7   would take place, and securing routes over public streets where immigration

8   enforcement officers would travel.

9          **California's National Guard**

10         20. The California Army National Guard and the California Air National

11  Guard are part of the organized militia of the State of California and are federally

12  recognized units and organizations of the reserve components of the United States

13  military. For the purposes of this declaration, I will refer to the California Army

14  National Guard and the California Air National Guard together as the "California

15  National Guard."

16         21. Soldiers and airmen of the California National Guard serve important

17  functions for California under the authority of the Governor of California while

18  simultaneously training to perform their federal missions.

19         22. The California National Guard's purpose is to organize, train, equip,

20  deploy, and employ California's Airmen, Soldiers, and Sailors, to deliver integrated

21  staff, enhanced federal readiness, civil support, and historical contribution

22  capabilities to the California Military Department, interagency partners, and the

23  Governor.

24         23. The California National Guard is part of the CMD, a state agency that

25  includes the California State Guard, which cannot be federalized and remains at the

26  command and control of the Governor. CMD works under the Executive authority

27  of the Governor of California and performs numerous functions to effectively

28

5

1    operate the California National Guard, including planning and organizing
2    deployments, and trainings.

3        24. There are three duty status categories for the National Guard: State
4    Active Duty, Title 10, or Title 32 status. In general, these statuses determine who
5    funds an operation and whether they are under the command and control of the
6    Governor or the President in their respective capacities as Commander-in-Chief.

7        25. In State Active Duty, the California National Guard is fully paid for by
8    the California budget and federal funds are not obligated for any personnel or units.
9    Service members in State Active Duty serve under the command and control of the
10   Governor of California.

11       26. California National Guard members may serve in Title 32 status. In this
12   hybrid status, they are under the command and control of the Governor, but the
13   mission is paid for by federal funds. The federal government may request the
14   Governor provide the California National Guard's assistance under Title 32 for
15   federal missions. As an example, the California National Guard is in Title 32 status
16   when it is deployed at the southern border to provide operational support to federal
17   law enforcement for drug interdiction.

18       27. The National Guard may be called into federal service under Title 10 of
19   the United States Code. When members of the California National Guard are called
20   to federal service under Title 10, they become components of the Army and federal
21   National Guard. In Title 10 status, the National Guard is paid for by the federal
22   government and under the command and control of the President.

23       28. There are approximately 18,733 members of the California National
24   Guard. Most of the California National Guard members serve as reserve forces,
25   meaning that their role in the California National Guard is part-time, and they are
26   generally employed in civilian roles separate from their work as service members.
27   There are currently approximately 12,212 available members of the California
28   National Guard.

6

1    29. There are approximately 717 California National Guard servicemembers

2    who work full time on State Active Duty. There are 1,109 Army National Guard

3    and 1,170 Air National Guard members who are in a full time Title 32 status and

4    support the readiness of their guard units. These individuals serve full time for fixed

5    terms, which are often renewed.

6    30. As the largest National Guard in the country, the California National

7    Guard provides mission ready forces for the State and the Nation, supporting

8    missions all over the world. Each service member plays a critical role, and many

9    have years of specialized training. Pulling those members away from these

10   assignments may imperil the State's ability to protect its residents.

11   **Use of the National Guard in Service of the State**

12   31. As Commander-in-Chief of the State's militia, the Governor of California

13   calls members of the California National Guard into active duty to serve the needs

14   of California. The California National Guard is vital for various State functions

15   including emergency and natural disaster response, cybersecurity, and drug

16   interdiction. The California National Guard acts to protect people and property in

17   many ways and the State relies on the National Guard to be ready to intervene in

18   emergent situations to help protect Californians.

19   32. On average, in the years 2020 through 2025, 3,937 servicemembers were

20   activated for Emergency State Active-Duty each year. CMD has identified and

21   committed 4,600 service members to achieve state specific missions, which is 38%

22   of the available strength.

23   33. The needs of the State are variable depending on emergent

24   circumstances. For example, in 2020, 12,601 services members were deployed for

25   488,051 duty days, representing nearly three times more than the assigned strength

26   for the State. In 2025, there have already been 3,332 services members activated for

27   89,061 duty days, indicating the state will need every available service member to

28   meet the State's operational needs. These numbers exclude specialized taskforces

1    such as Operation Rattlesnake and the State Counterdrug teams, discussed further

2    below, which contribute collectivity over 600 additional personnel dedicated to

3    state missions.

4        34. Presently only 6.15% of the assigned strength of CMD is not subject to

5    Title 10 activation, meaning if there is a large federal activation the State will fall

6    far short of the anticipated annual state requirements, even without considering

7    specialized skills and capabilities to accomplish those missions.

8        35. The January 2025 Los Angeles Fires are a recent example of one of these

9    state missions. On January 7, 2025, a devastating wildfire broke out in Los Angeles

10   County. Governor Newsom immediately proclaimed a state of emergency and

11   deployed the California National Guard to manage the emergency. Over the course

12   of 24 days 2,500 service members were deployed to assist with the firefighting and

13   emergency response efforts sprawling across 37,000 acres of fire-impacted land.

14       36. The California National Guard's support included firefighting brigades,

15   aerial firefighters who provided critical fire suppression assistance, military police

16   forces stationed at traffic control points to ensure the safety of the surrounding

17   community and those with specialized skills in removing hazardous waste.

18       37. There are also a number of specialized units and missions.

19       38. For example, the California National Guard operates FireGuard, a

20   wildfire satellite detection mission. During the last 18 months, FireGuard activated

21   at least five Emergency State Active-Duty Force Packages, consisting of 360

22   personnel total, in support of the Bridge Fire, Line Fire, and Park Fire in California.

23   One hundred-forty additional Emergency State Active-Duty Military Police

24   Soldiers were also activated to operate and augment Traffic Control Points at the

25   Line Fire and Bridge Fire.

26       39. The California National Guard also operates Joint Task Force

27   Rattlesnake, a joint taskforce with CalFire to mitigate and prevent wildland fires

28   through fuels mitigation projects and direct fire suppression. Task Force

8

1    Rattlesnake provides 14 full-time, year-round Type I Hand Crews to reduce fuels
2    and respond to fire incidents and other emergencies across the State. Each Task
3    Force Rattlesnake crewmember is trained to Firefighter 1C standards, which require
4    at least 540 hours of training. Each of California's 14 Crews are staffed with a
5    minimum of 22 California National Guard personnel and maintain a minimum of
6    22 Firefighter 1C trained crewmembers (308 personnel in total).

7        40. Over the past 18 months, Task Force Rattlesnake responded to at least
8    738 wildland firefighting response missions, covering 10,243 acres of land.

9        41. The California National Guard also participates in drug interdiction
10   activities in conjunction with local and federal law enforcement agencies. The
11   CMD Counterdrug Task Force includes both state funded and Title 32
12   servicemembers operating year-round and includes specialized training for analysts
13   and reconnaissance personnel.

14       42. The State Counterdrug Task Force is funded by the State's General Fund,
15   and currently includes 118 service members assigned as analysts in drug demand
16   reduction at the southern border. California has invested over $60 million over four
17   years to expand California National Guard's work to prevent drug trafficking.

18       43. California National Guard servicemembers who perform this crucial
19   work are criminal analysts, reconnaissance support personnel, and drug demand
20   reduction outreach specialists—all positions that entail specialized training. State
21   funding for fiscal year 2025 and beyond enables the Counterdrug Task Force to
22   maintain and enhance support to federal, state and local partners in the ability to
23   assist in seizures of firearms, currency, and cryptocurrency from drug trafficking
24   organizations.

25       44. CMD also has 700 soldiers and 100 Air Guardsmen who are in Military
26   Police companies. These units receive training in apprehensions, detentions, less
27   lethal weapons options, and de-escalation, and they have unique capabilities in
28   crowd control and management. They provide critical site security to "high value

1    areas" such as residence buildings or state assets. Units can provide area security as

2    well as conducting traffic control points in an emergency. California relies on these

3    units as a part of its "Quick Reaction Force" (NGRF), which is used to rapidly

4    respond and support the needs of Californians in an emergency.

5         45. The California National Guard also provides critical cybersecurity

6    support for the State, including providing staffing to CalOES's operation of the Cal

7    CSIC (Cyber Security Integration Center). Cal CSIC aids in identifying and

8    tracking cyber-attacks and coordinating response efforts to combat those attacks.

9         46. The California National Guard operates the Cyber Network Defense

10    Team (CND-T), which supports cyber vulnerability inspections of state agencies,

11    state schools, and, by request, local education agencies and city and county

12    governments. These state agency vulnerability assessments are mandated by

13    California Government Code section 11549.3, which also authorizes CND-T to

14    conduct vulnerability assessments, known as Independent Security Assessments

15    (ISAs) of state agencies and state schools as coordinated through the California

16    Department of Technology.

17    **Impact of Federalization**

18         47. As recounted above, the DOD June 7 Order federalized 2,000 members

19    of the 79th Infantry Brigade Combat Team, which included a large number of guard

20    members who serve in CMD's Taskforce Rattlesnake and Counterdrug Taskforce.

21         48. This deployment is pulling California National Guard members away

22    from their critical drug interdiction work. This will undermine the State's critical

23    investment in this area.

24         49. This deployment is also pulling away highly trained fire mitigation and

25    prevention and direct fire suppression CMD specialists at the start of California's

26    wildfire season.

27         50. Most critically, diverting members of the National Guard impairs the

28    Governor's ability to respond to emergencies. As set forth above, California

1   National Guard resources are limited, and the State does not have an excess of

2   National Guard servicemembers to carry out emergency functions, even without

3   taking into account specialized training.

4       I declare under penalty of perjury under the laws of the United States that the

5   foregoing is true and correct.

6       Executed on June 10, 2025, at Sacramento, California.

_____
Declaration of Paul S. Eck

11

1  **ROB BONTA**
   ATTORNEY GENERAL OF CALIFORNIA
2  LAURA L. FAER
   ACTING SENIOR ASSISTANT ATTORNEY
3  GENERAL
   MARISSA MALOUFF
4  JAMES E. STANLEY
   SUPERVISING DEPUTY ATTORNEYS GENERAL
5  NORMA FRANKLIN
   ROBIN GOLDFADEN
6  NICHOLAS GREEN
   BRENDAN M. HAMME
7  STEVEN KERNS
   LORRAINE LOPEZ
8  KENDAL MICKLETHWAITE
   MEGAN RICHARDS
9  MEGHAN STRONG
   CHRISTOPHER TENORIO
10 NICHOLAS ESPÍRITU
    DEPUTY ATTORNEYS GENERAL
11 1515 CLAY ST.
   OAKLAND, CA  94612
12 TELEPHONE: (510) 879-3908
   E-MAIL:  NICHOLAS.ESPIRITU@DOJ.CA.GOV
13 *ATTORNEYS FOR PLAINTIFFS*

14              IN THE UNITED STATES DISTRICT COURT
15           FOR THE NORTHERN DISTRICT OF CALIFORNIA
16
17
18

| | |
|---|---|
| 19 **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,** | **SUPPLEMENTAL DECLARATION OF PAUL S. ECK** |
| 20 | |
| 21 Plaintiffs, | Date: |
| 22 v. | Time: Courtroom: |
| 23 | Judge: Trial Date: |
| 24 **DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,** | Action Filed: |
| 25 | |
| 26 | |
| 27 | |
| 28 Defendants. | |

1

# DECLARATION OF PAUL S. ECK

I, Paul S. Eck, declare under penalty of perjury that the following is true and correct:

1.  I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

1.  I am the Deputy General Counsel in the California Military Department (CMD). I have served in this role since August 2018.

2.  On June 10, 2025, I submitted a declaration in support of the State's request for a temporary restraining order. *See* ECF 8, Ex. 3.

## Increasing Impacts on the California National Guard

3.  The federalization of 4,000 California National Guard service members has already resulted in a significant impact to California's ability to combat wildfires, conduct drug interdiction, and provide services for Californians.

4.  The federalization of 4,000 service members amounts to a reduced strength of 32.75% of the California National Guards approximate total 12, 212 available members.

5.  Federalization has especially impacted the CMD's specialized units.

6.  Task Force Rattlesnake, California's highly trained fire mitigation and prevention and direct fire suppression unit, lost 190 out of its total 340 members to the Title 10 federal activation. A reduction of 55.88% of California National Guard's fire prevention and fighting force.

7.  The negative impacts of the reduction in force to Task Force Rattlesnake are imminent.

1     8.   Prior to the Title 10 Federal activation of California National Guard

2     forces, Task Force Rattlesnake (Rattlesnake) maintained Fourteen (14) Type 1

3     Wildfire Handcrews. Post the mobilization, Rattlesnake has been whittled down to

4     Nine (9) Type 1 crews.

5     9.   The reduction in the number of Rattlesnake Type 1 crews has limited the

6     CMD's, and consequently Cal Fire's, ability to conduct ground fuels reduction

7     missions, and more importantly, it has negatively impacted CMD's ability to

8     respond to wildfires.

9     10. The consequences may be felt soon. As of June 11 there are 13 fires over

10    10 acres burning in California, including the Ranch Fire in San Bernardino which

11    has consumed over 4,200 acres. If it continues to grow at its current rate of spread,

12    it would necessitate the use of Rattlesnake.

13    11. The CMD Counterdrug Task Force lost 139 out of 446 service members

14    to the federalization. That is a 31% reduction in strength that will negatively impact

15    the State's critical drug interdiction work and investment in this area.

16    12. The CMD also operates many youth programs, administered through its

17    Youth and Community Programs Task Force (YCP). These programs support youth

18    development, leadership skills, and civic engagement. They include, among others,

19    the Grizzly Youth Academy, a program offering a structured environment for

20    students at risk of dropping out; the California Cadet Corps, which focuses on

21    school-based leadership and education; and the Star Base, a STEM based program

22    for 5th graders in the cities of Sacramento and Los Alamitos.

23    13. The CMD lost 58 out of its total 280 military academy instructors to the

24    Title 10 federalization. That is a strength reduction of 20% of instructors, which

25    will curtail or negatively impact the State's ability to serve California's youth.

26    14. This reduction in YCP's number of instructors has the greater

27    ramification of potentially causing CMD to breach its agreements with multiple

28    school districts that host YCP programs. CMD's military academy agreements

3

1  require CMD to maintain a 25:1 student to teacher ratio. The current Federalization

2  of 58 instructors has caused CMD to breach its agreement regarding the Sunburst

3  Youth Academy and may cause the same regarding the Discovery Challenge

4  Academy.

5       15. The negative impact of the 60-day federalization of over 30% of the

6  California National Guard will significantly undermine the State's ability to

7  respond to State emergencies, including wildfires, combat drug trafficking, serve

8  our youth, and provide many of the other support services to our city, county, and

9  other state department partners.

10

11

12       I declare under penalty of perjury under the laws of the United States that the

13  foregoing is true and correct.

14       Executed on June 11, 2025, at Sacramento, California.

15

16                                          Declaration of Paul S. Eck

17

18

19

20

21

22

23

24

25

26

27

28

1   **ROB BONTA**
    Attorney General of California
2   THOMAS S. PATTERSON
    Senior Assistant Attorney General
3   ANYA BINSACCA
    JOHN D. ECHEVERRIA
4   MARISSA MALOUFF
    JAMES E. STANLEY
5   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
6   STEVEN KERNS
    JANE REILLEY
7   MEGAN RICHARDS
    MEGHAN H. STRONG
8   Deputy Attorneys General
      455 Golden Gate Avenue
9     San Francisco, CA 94102
      Telephone: (415) 510-3877
10     E-mail: Meghan.Strong@doj.ca.gov
    *Attorneys for Plaintiffs*

11

12                  IN THE UNITED STATES DISTRICT COURT

13                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17  **GAVIN NEWSOM, IN HIS OFFICIAL
    CAPACITY AS PRESIDENT OF THE STATE OF
    CALIFORNIA; STATE OF CALIFORNIA,**         NO. 3:25-cv-04870-CRB
18
                                    Plaintiffs,   **PLAINTIFFS' MOTION FOR
19                                                PRELIMINARY INJUNCTION**
                v.
20                                               Date:      June 20, 2025
                                                 Time:      10:00 a.m.
21  **DONALD TRUMP, IN HIS OFFICIAL              Courtroom: 6
    CAPACITY AS PRESIDENT OF THE UNITED          Judge:     Charles R. Breyer
22  STATES; PETE HEGSETH, IN HIS OFFICIAL        Trial Date: Not set
    CAPACITY AS SECRETARY OF THE                 Action Filed: June 9, 2025
23  DEPARTMENT OF DEFENSE; U.S.
    DEPARTMENT OF DEFENSE,**
24
                                    Defendants.
25

26

27

28

                                    1

## MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that, on June 20, 2025, at 10:00 a.m., Plaintiffs GAVIN NEWSOM, in his official capacity as Governor of the State of California, and the STATE OF CALIFORNIA (together, Plaintiffs) hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants DONALD TRUMP, in his official capacity as President of the United States, PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, Defendants), and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction enjoining Defendants from effectuating President Trump's June 7 memorandum and Secretary Hegseth's June 7 and June 9 orders federalizing and deploying members of California's National Guard; ordering Defendants to return control of the federalized units of the California National Guard to Governor Newsom; and enjoining Defendants Hegseth and the Department of Defense (collectively, DOD Defendants) from ordering or permitting U.S. military forces deployed in Los Angeles or elsewhere in California to execute or assist in the execution of any federal agent or officer's enforcement of federal law or any civilian law enforcement functions, including but not limited to execution of warrants, arrests, searches, checkpoints, cordons, or patrolling communities, beyond the immediate vicinity of federal buildings or other real property owned or leased by the federal government.  This motion is based on this Motion, the Complaint for Declaratory and Injunctive Relief (ECF No. 1), the accompanying Memorandum of Points and Authorities, the accompanying Proposed Order, the accompanying supporting declarations, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

Dated:  June 16, 2025

Respectfully submitted,

**ROB BONTA**
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANYA BINSACCA
JOHN D. ECHEVERRIA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
STEVEN KERNS
JANE REILLEY
MEGAN RICHARDS

*/s/ Meghan H. Strong*

MEGHAN H. STRONG
Deputy Attorney General
 455 Golden Gate Avenue
 San Francisco, CA 94102
 Telephone: (415) 510-3877
 E-mail:  Meghan.Strong@doj.ca.gov

*Attorneys for Plaintiffs*

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

SA-018

1

**TABLE OF CONTENTS**

2

3  Introduction ....................................................................................................... 1

4  Statement Of Facts ........................................................................................... 2

5  I.    ICE Begins Federal Immigration Enforcement Actions in Los Angeles. ............... 2

   II.   Local Authorities Respond and Manage Conditions. ............................................ 3

6  III.  The President, Without the Governor's Consent, Federalizes 4,000
         California National Guard Soldiers and Mobilizes Additional U.S.
7        Marines. ...................................................................................................... 4

8  IV.   The Military's Presence in Los Angeles—and Alongside ICE During
         Enforcement Activities—Escalates Tensions. ...................................................... 6

9  V.    The California National Guard Is Vital to Critical State Functions. ...................... 8

10 Procedural History ............................................................................................ 9

   Legal Standard ................................................................................................. 10
11
   Argument ......................................................................................................... 10
12 I.    Plaintiffs Are Likely to Succeed on the Merits ..................................................... 10

13       A.    The Section 12406 Federalization Orders Are Unlawful ........................... 10

14             1. The Predicate Conditions Required to Invoke Section 12406
                  Did Not and Do Not Exist…………………………………………………..12

15             2. The Federalization Orders Were Not Issued Through the Governor….15

16             3. The Claim That Defendants Exceeded the Authority Granted by
                  Congress in Section 12406 is Subject to Judicial
17                Review……………………………………………………………...…17

18       B.    Defendants Are Violating the Posse Comitatus Act .................................. 19

19       C.    Defendants Are Violating the Tenth Amendment .................................... 24

   II.   Plaintiffs Will Suffer Grave, Irreparable Harm Absent an Injunction ................. 26
20
   III.  The Balance of Harms and Equities Favors Injunctive Relief ............................. 28
21 Conclusion ....................................................................................................... 30

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF AUTHORITIES**

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
901 F.3d 1166 (9th Cir. 2018) .................................................................. 10

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) .................................................................. 29

*Baker v. Carr*
369 U.S. 186 (1962) ...................................................................... 17, 18

*Bissonette v. Haig*
776 F.2d 1384 (8th Cir. 1985) .................................................................. 20

*Bondi v. VanDerStok*
604 U.S. ___ (2025) .......................................................................... 21

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*
408 F. Supp. 3d 1057 (N.D. Cal. 2019) ........................................................ 26

*Deakins v. Monaghan*
484 U.S. 193 (1988) .......................................................................... 17

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) .................................................................. 10

*Hibbs v. Winn*
542 U.S. 88 (2004) ............................................................................ 16

*In re Saldana*
122 F.4th 333 (9th Cir. 2024) ................................................................ 16

*J.A.V. v. Trump*
___ F. Supp. 3d ____ (S.D. Tex. May 1, 2025) ................................................ 18

*J.G.G. v. Trump*
2025 WL 914682 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) .......................... 18

*M.R. v. Dreyfus*
697 F3d 706 (9th Cir. 2012) .................................................................. 26

*Marbury v. Madison*
5 U.S. (1 Cranch) 137 (1803) ............................................................ 17, 19

*Michigan v. U.S. Army Corps of Eng'rs*
667 F3d 765 (7th Cir. 2011) .................................................................. 26

*Murphy Co. v. Biden*
65 F.4th 1122 (9th Cir. 2023) ................................................................ 20

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Newsom v. Trump*
    No. 25-3727 (9th Cir. June 16, 2025), Dkt. 23.1 ................................................... 22

*Patterson v. Kentucky*
    97 U.S. 501 (1878) ................................................................................................. 24

*Printz v. United States*
    521 U.S. 898 (1997) ......................................................................................... 16, 24

*R.I.L-R v. Johnson*
    80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................... 28

*Sierra Club v. Trump*
    929 F.3d 670 (9th Cir. 2019) .................................................................................. 17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*
    393 U.S. 503 (1969) ................................................................................................ 13

*Trump v. J.G.G.*
    145 S. Ct. 1003 (2025) ........................................................................................... 18

*United States v. Benish*
    5 F.3d 20 (3rd Cir. 1993) ....................................................................................... 20

*United States v. Chon*
    210 F.3d 990 (9th Cir. 2000) .................................................................................. 20

*United States v. Dreyer*
    804 F.3d 1266 (9th Cir. 2015) (en banc) ................................................... 19, 20, 21

*United States v. Hutchings*
    127 F.3d 1255 (10th Cir. 1997) .............................................................................. 20

*United States v. Khan*
    35 F.3d 426 (9th Cir. 1994) .................................................................................... 23

*United States v. McArthur*
    419 F.Supp. 186 (D.N.D. 1975) ....................................................................... 20, 24

*United States v. Morrison*
    529 U.S. 598 (2000) ................................................................................................ 24

*United States v. Yunis*
    924 F.2d 1086 (D.C. Cir. 1991) ..................................................................... 21, 23, 24

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ....................................................................................... 10, 26, 28

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) ................................................................................................ 11

iii

*Zivotofsky ex rel. Zivotofsky v. Clinton*
   566 U.S. 189 (2012) ............................................................................ 17, 18

**STATUTES**

10 U.S.C.
   § 374(b)(2) ......................................................................................... 23
   § 10106 ............................................................................................... 20
   § 12406 ......................................................................................... *passim*
   § 12406(2) .......................................................................................... 12
   § 12406(3) .......................................................................................... 13

18 U.S.C. § 1385 ........................................................................................ 19

Alien Enemies Act ..................................................................................... 18

Cal. Mil. & Vet. Code § 163 ..................................................................... 16

Immigration and Nationality Act § 287(g) .............................................. 7, 8

Militia Act of 1903 .................................................................................... 12

Militia Act of 1908, Chapter 204, 35 Stat. 399 (1908) ............................ 16

Posse Comitatus Act ............................................................................ *passim*

Pub.L. 117-81, Div. A, Title X, § 1045(a), Dec. 27, 2021, 135 Stat. 1904 ................. 20

**CONSTITUTIONAL PROVISIONS**

Cal. Const. Article V, § 7 ............................................................................ 8

U.S. Const.

   Article I, § 8, cls. 15-16 ..................................................................... 11
   Article I, § 9, cl. 2 ............................................................................. 13
   First Amendment .......................................................................... 13, 30
   Fourth Amendment ............................................................................ 20
   Fifth Amendment ............................................................................... 20
   Tenth Amendment ....................................................................... *passim*

**OTHER AUTHORITIES**

32 C.F.R. § 213.10(a)(3) (1982) .................................................................. 8

Defense Support of Civil Authorities, Joint Publication 3-28, p. III-I (2018) ............ 21

The Examination of Doctor Benjamin Franklin, Before an August Assembly,
   Relating to the Repeal of the Stamp Act, &c. (Feb. 13, 1766) ............... 27

iv

Exec. Order No. 11519 (1970 WL 123093) .......................................................... 15

*Great Postal Strike*, 133 The Postal Record 14, 19 (2020) ......................................... 15

*LAPD Chief Responds to Protests Amid ICE Raids*," ABC 7 Eyewitness News
     (June 8, 2025) ......................................................................................... 3

*Rebellion*, Am. Dictionary of the English Language (1900) ................................... 12

*Rebellion*, Black's Law Dictionary (1st ed. 1891) ................................................ 12

*Rebellion*, Black's Law Dictionary (12th ed. 2024) ............................................. 12

*Rebellion*, The Cyclopedic Dictionary of Law (1901) ........................................... 12

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

SA-023

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The actions of the President and the Secretary of Defense amount to an unprecedented and dangerous assertion of executive power that is sweeping in scope and upends centuries of settled practice and American tradition. The President asserts that 10 U.S.C. § 12406 authorizes him to federalize State National Guard units and deploy armed soldiers into the streets of American cities and towns whenever he perceives "opposition" or "disobedience of a legal command" even in response to local protests and civil disobedience no different from what communities nationwide regularly experience. He then asserts that *no court* can review that decision, assigning himself virtually unchecked power. As the Court correctly held in granting Plaintiffs' request for a TRO, the President is wrong on both accounts. Section 12406 grants the President the power to call forth the militia only in specific, narrow circumstances, and Congress directed that the President "shall" issue such orders only "through the governor[]" when he does so.

Section 12406's provisions are not suggestions that the President can ignore. They are Congressional directives that, if not followed, render the President's actions *ultra vires*. Because the President did not comply with Section 12406 in federalizing units of the California National Guard, Defendants' actions and orders are unlawful, and the Court should extend the relief it granted in a TRO to a preliminary injunction that orders Defendants to return control of these 4,000 soldiers to the Governor of California.

But the President and Secretary of State did not stop there, and neither should the Court. The troops Defendants deployed to Los Angeles are currently engaged in civilian law enforcement activities that the Posse Comitatus Act categorically forbids. Defendants cannot cast their activities under a broad umbrella of "protecting federal personnel" to justify a military occupation of the Nation's second-largest city. The tradition of civilian, rather than military, law enforcement is a core Founding principle, and Defendants' defiance of that tradition violates the Posse Comitatus Act and the Tenth Amendment. The Court should enjoin Defendants from ordering any federal troops to patrol the streets, to assist U.S. Immigration and Customs Enforcement ("ICE") in the field, or to engage in other law enforcement activities in Los Angeles.

1

**STATEMENT OF FACTS**

**I.     ICE BEGINS FEDERAL IMMIGRATION ENFORCEMENT ACTIONS IN LOS ANGELES.**

On Friday, June 6, 2025, ICE agents carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles.  ECF No. 8-2, Declaration of Brian Olmstead ("Olmstead Decl.") ¶ 6.  In addition to executing search warrants, ICE reportedly also carried out enforcement activities that departed from its usual practice of pursuing noncitizens with criminal convictions and those with final removal orders, and instead extended to places where members of immigrant communities work and conduct daily business, including a doughnut shop in Los Angeles and several Home Depot parking lots in the Westlake District, Huntington Park, and Whittier.  ECF No. 8-1, Declaration of Nicholas Espíritu in Support of Ex Parte Motion for Temporary Restraining Order ("Espíritu Decl."), Ex. F.

During these operations, ICE agents reportedly took actions that inflamed tensions and provoked protest.  In some instances, ICE agents reportedly engaged in "military-style" detention and arrest operations that sparked panic in the community.  ECF No. 8-1, Espíritu Decl., Ex. F at 1 (Los Angeles Mayor Karen Bass stating "the [ICE] activity was meant to 'sow terror' in the nation's second-largest city"); *id.*, Ex. G (legal observers and advocacy groups reported that "federal agents involved in the operations were heavily armed and dressed in tactical gear").  In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and the detention of 70 to 80 individuals.  *Id.*, Ex. H (noting 44 individuals were arrested) and Ex. G (noting that "between 70 and 80 people had been detained").

That same day, members of the public gathered at the Edward R. Roybal Federal Building and U.S. Courthouse in Los Angeles—where individuals detained during the ICE operations reportedly were being held—to protest the escalation in force and scope of immigration enforcement activities.  ECF No. 8-1, Espíritu Decl., Ex. I.  Protesters also gathered at other locations where ICE operations were reportedly happening, including in the cities of Paramount and Compton.  ECF No. 8-2, Olmstead Decl. ¶ 7.

The Los Angeles protests continued over the weekend of June 7 and 8, 2025.  *Id.* ¶¶ 6-14.

2

1   A small number of individuals engaged in violence, and state and local law enforcement agencies

2   effectively contained those instances of unlawful behavior.  *See id.* ¶¶ 9-10.  Governor Newsom

3   and other state and local officials unequivocally condemned all violence and criminal activity.

4   *See, e.g.*, ECF No. 8-1, Espíritu Decl., Ex. Q (statement from Governor Newsom on June 7, 2025:

5   "Never use violence.  Speak out peacefully"); *id.*, Ex. N at 6 (statement from LAPD Chief Jim

6   McDonnell on June 9, 2025: "There is no tolerance for criminal activity under the guise of

7   protest"); *id.*, Ex. L (Mayor Karen Bass (@MayorofLA) posted on X, on June, 7, 2025 at 6:06

8   pm: "Everyone has the right to peacefully protest, but let me be clear: violence and destruction

9   are unacceptable, and those responsible will be held accountable").

10  **II.    LOCAL AUTHORITIES RESPOND AND MANAGE CONDITIONS.**

11          State and local law enforcement agencies have responded promptly and effectively to

12  instances of unlawful activity that have occurred since the Los Angeles protests began.  Initially,

13  the Los Angeles Police Department (LAPD) and Los Angeles County Sheriff's Department

14  (LASD) quickly responded to the protests, consistent with their extensive training and experience

15  responding to both large-scale peaceful protests and civil disturbances.  ECF No. 8-2, Olmstead

16  Decl. ¶¶ 6-9, 11-12, 14; *see also* "*LAPD Chief Responds to Protests Amid ICE Raids*," ABC 7

17  Eyewitness News (June 8, 2025), *available at* https://tinyurl.com/3spkejdt (LAPD responded to

18  protests within 38 minutes).  Law enforcement officers from neighboring jurisdictions then

19  reinforced LAPD and LASD's response to the protests, as is standard practice under the

20  established mutual aid system.  ECF No. 39-3, Supplemental Declaration of Brian Olmstead

21  ("Supp. Olmstead Decl.") ¶¶ 5-8.  The California Highway Patrol also sent Special Response

22  Teams to Los Angeles, assigning approximately 800 uniformed personnel to the protests each

23  day.  *Id.;* Declaration of Joseph Zizi ("Zizi Decl.) ¶ 7.  As of June 15, local and state law

24  enforcement agencies made at least 561 arrests related to the Los Angeles protests. Declaration of

25  Meghan H. Strong ("Strong Decl."), Ex. 34.

26          Moreover, the Los Angeles protests have not, at any time since they began, prevented ICE

27  from conducting enforcement actions.  ECF No. 39, Declaration of Nicholas Espíritu in Support

28  of Reply in Support of Ex Parte Motion for Temporary Restraining Order ("Espíritu Reply

3

1  Decl."), Ex. 1 (ICE's social media posts announcing arrests in Los Angeles on June 7). The

2  White House confirmed as much on June 11, when it announced that ICE had arrested 330

3  individuals in Los Angeles in the course of its immigration enforcement actions since the protests

4  began. Strong Decl., Exs. 14-22 (detailing continuing ICE arrests from June 7-12). This is a 38%

5  increase from the 239 arrests ICE made in Los Angeles in early May 2025. *Id.*, Ex. 3. Secretary

6  of Homeland Security Kristi Noem personally attended an ICE raid on June 12. *Id.*, Ex. 26. The

7  U.S. Marshals and other federal agents began aiding ICE operations as part of a "whole of

8  government approach." *Id.*, Exs. 24-25.

9  **III.  THE PRESIDENT, WITHOUT THE GOVERNOR'S CONSENT, FEDERALIZES 4,000
        CALIFORNIA NATIONAL GUARD SOLDIERS AND MOBILIZES ADDITIONAL U.S.**

10  **MARINES.**

11          On the evening of Saturday, June 7, the President issued a memorandum ("Presidential

12  Memorandum"), which, without naming any particular locale, declared that "[n]umerous

13  incidents of violence and disorder" had "recently occurred and threaten to continue in response"

14  to enforcement of federal immigration laws. ECF No. 8-1, Espíritu Decl., Ex. E. The

15  Presidential Memorandum was addressed to the Secretary of Defense, the Attorney General, and

16  the Secretary of Homeland Security. *Id.* Asserting "credible threats of continued violence," the

17  Presidential Memorandum purported to "call into Federal service members and units of the

18  National Guard under 10 U.S.C. 12406" to "temporarily protect" federal government personnel

19  and federal property. *Id.* The Presidential Memorandum then directed the Secretary of Defense

20  "to coordinate with the Governors of the States and the National Guard Bureau in identifying and

21  ordering into Federal service the appropriate members and units of the National Guard under this

22  authority" which "shall," regardless, "be at least 2,000 National Guard personnel and the duration

23  of duty shall be for 60 days or at the discretion of the Secretary of Defense." *Id.* It further

24  instructed the Secretary of Defense to take measures "reasonably necessary to ensure the

25  protection and safety of Federal personnel and property" where protests were occurring or

26  "likely" to occur. *Id.*

27          At no time prior to issuing the Presidential Memorandum did the President or Department

28  of Defense ("DOD") notify or consult with Governor Newsom regarding their intent to utilize or

4

1  "mobilize" California's National Guard.  ECF No. 8-1, Espíritu Decl., Ex. K at 2 (June 8, 2025

2  letter from the Governor's office to the U.S. Secretary of Defense, informing the Secretary that

3  "the Department of Defense did not transmit this directive to the Office of the Governor, nor was

4  it approved or ordered by the Governor of California").  The Governor himself has publicly

5  confirmed as much.  Strong Decl., Ex. 8.

6        Later in the evening of June 7, Secretary Hegseth sent an order ("June 7 DOD Order")

7  addressed to the Adjutant General of California, who serves in dual roles as the leader of the

8  California National Guard and as a reservist in the U.S. Army.  ECF No. 8-1, Espíritu Decl., Ex.

9  O.  The June 7 DOD Order attached the Trump Memo and called into federal service 2,000

10  members of the California National Guard for a period of 60 days and ordered the Chief of the

11  National Guard Bureau to coordinate the details of the mobilization with the Adjutant General of

12  the California National Guard.  *Id.*  The Governor never consented to the mobilization of the

13  National Guard, nor was the Governor given an opportunity to provide input on the mobilization;

14  the Governor only learned of the June 7 DOD Order from the Adjutant General after it was

15  received from DOD.  *See* ECF No. 8-1, Espíritu Decl., Ex. K at 1-2 (June 8, 2025 letter from the

16  Governor's office to the U.S. Secretary of Defense noting that the Adjutant General of California,

17  but not the Governor of California, received the June 7 DOD Order).  The Adjutant General

18  relinquished command of the 79th Infantry Brigade Combat Team to General Michael Guillot,

19  commander of U.S. Northern Command, which has issued all orders to that federalized unit since

20  that time.  *See* ECF No. 8-1, Espíritu Decl. Ex. J (June 8, 2025 Press Release from

21  USNORTHCOM noting its command over federalized California National Guard units deployed

22  in the greater Los Angeles area).  The President then stated over media channels that DOD and

23  other federal agencies must take all action necessary to  "liberate Los Angeles from the Migrant

24  Invasion" and that "[w]e're going to have troops everywhere."  ECF No. 8-1, Espíritu Decl., Ex.

25  M.

26        On June 9, 2025, at 3:24 p.m., Secretary Hegseth posted on X that "approximately 700

27  active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore

28  order" and "to defend federal law enforcement officers."  ECF No. 8-3, Declaration of Paul S.

1    Eck ("Eck Decl.") ¶ 18.  The same day, Secretary Hegseth issued a second memorandum ("June 9

2    DOD Order," and collectively with the June 7 DOD Order, the "DOD Orders") ordering the

3    federalization of 2,000 additional California National Guard members, again without providing

4    any opportunity for Governor Newsom to review or consent to that mobilization.  ECF No. 8-1,

5    Espíritu Decl., Ex. S at 1 (June 10, 2025 letter from the Governor's office to the U.S. Secretary of

6    Defense noting that "the Governor of California was given no opportunity to provide or withhold

7    his consent, nor, at a minimum, to consult with the President or [the Secretary of Defense] as to

8    which service members and in what number should be called, and for what purposes and what

9    period of time").

10   **IV.    THE MILITARY'S PRESENCE IN LOS ANGELES—AND ALONGSIDE ICE DURING
11          ENFORCEMENT ACTIVITIES—ESCALATES TENSIONS.**

12          When the first California National Guard soldiers and armored vehicles arrived in Los

13   Angeles on the morning of Sunday, June 8, the city was quiet.  *See* ECF No. 8-1, Espíritu Decl.,

14   Ex. R.  But the arrival of the National Guard in Los Angeles reignited the protests.  "Many of the

15   protestors appeared angry that the National Guard had been federalized and was now present in

16   their city," and "[t]he presence of the National Guard seemed to only inflame the protesters

17   further."  ECF No. 8-2, Olmstead Decl. ¶ 12; ECF No. 8-1, Espíritu Decl., Ex. M (New York

18   Times reporting that the "aggressive federal response . . . in turn sparked new protests across the

19   city").  However, the protests remained largely peaceful and civilian law enforcement ably

20   responded to the disturbances and violence that did occur.  *See* ECF No. 8-1, Espíritu Decl., Ex.

21   R.  Accordingly, on June 8, Governor Newsom's office sent a letter to Secretary Hegseth

22   objecting to the federalization and deployment of California National Guard soldiers to Los

23   Angeles and requesting that DOD rescind the June 7 DOD Order.  ECF No. 8-1, Espíritu Decl.,

24   Ex. K.

25          Instead, on Monday, June 9, Secretary Hegseth announced that mobilized federalized

26   California National Guard units would provide for immigration enforcement operations beyond

27   federal buildings, including by "holding a secure perimeter in communities around areas where

28   immigration enforcement activities would take place, and securing routes over public streets

6

1    where immigration enforcement officers would travel." Eck Decl. ¶ 19.

2        Since Secretary Hegseth's announcement, military forces have joined ICE agents in the

3    field as they carry out enforcement actions.  The federal government has issued public statements

4    confirming that "[t]roops on the ground in Los Angeles are providing perimeter and personnel

5    protection for [ICE] facilities and officers who are out on daily enforcement operations."  Strong

6    Decl., Ex. 10.  ICE has posted photographs on social media that show heavily armed federalized

7    troops accompanying ICE agents during arrests.  ECF No. 39, Espíritu Reply Decl., Exs. 2, 3.

8    United States National Guard Major General Scott Sherman announced that approximately 500

9    federalized National Guard soldiers have thus far been trained to help ICE agents carry out

10   immigration operations.  Strong Decl., Ex. 12.  And there has been at least one instance of armed

11   Marines detaining a civilian, although that detention was reportedly brief and on the grounds of a

12   federal building.  *Id*., Ex. 29.  Federal officials have expressed their approval of such actions and

13   indicated that even more expansive involvement by military forces is forthcoming.  *Id.*, Ex. 9

14   (Secretary of Homeland Security Noem's request that Defense Secretary Hegseth order the

15   military "to either detain . . . or arrest" "lawbreakers"); *id.*, Ex. 13 (Attorney General Bondi

16   statement that "[b]y bringing in the National Guard, by bringing in the Marines, right now, to

17   back them up, to protect our federal buildings, to protect highways, to protect the citizens."); *id.*

18   ("We're not scared to go further. We're not frightened to do something else if we need to.").  On

19   June 12, Secretary Noem confirmed that the operation, including the "military," will continue

20   until they have "liberate[d]" Los Angeles from the leadership of the democratically elected

21   Governor and Mayor.  Strong Decl., Ex. 28.  And just yesterday, the President expressed his

22   intention to have federal agencies, including the "Pentagon," "expand efforts to detain and deport

23   Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York," and

24   "other such Cities" that "are the core of the Democrat Power Center."  *Id*., Ex. 33.

25        Indeed, even before the Los Angeles protests began, the federal government expressed its

26   intention to actively involve the military in immigration enforcement activities.  For example, the

27   federal government has sought to enter into agreements with states under section 287(g) of the

28   Immigration and Nationality Act, under which the state National Guard soldiers, operating under

7

1    the command of their governors in Title 32 status, perform the duties of immigration officers

2    (California has not entered into any such section 287(g) agreement).  Strong Decl. Ex. 38.  DHS

3    also has a pending request with the Pentagon for 20,000 National Guard soldiers to assist in

4    immigration enforcement. *Id*., Ex. 4.  The federal government's long-held plans to use the

5    military for ICE enforcement activities are coming to fruition in Los Angeles.

6         The presence of the military has only exacerbated tensions in Los Angeles.  As noted

7    above, the arrival of the National Guard in Los Angeles on June 8 caused a new wave of protests,

8    after the initial June 6 and June 7 protests had largely subsided.  ECF No. 8-2, Olmstead Decl. ¶

9    12; ECF No. 8-1, Espíritu Decl., Ex. M (New York Times reporting that the "aggressive federal

10   response . . . in turn sparked new protests across the city").  And although the protests have

11   largely been peaceful, there has been an increase in unlawful activity in Los Angeles since the

12   National Guard was deployed.  Based on data available through June 12, nearly 95% of the

13   arrests made by LAPD related to the protests that occurred *after* federalized National Guard

14   members arrived in Los Angeles on the morning of June 8.  Strong Decl., Ex. 32 (Wall Street

15   Journal report showing that 510 out of 539 arrests by LAPD occurred on or after June 8, with the

16   greatest number occurring on June 10); ECF No. 39-3, Supp. Olmstead Decl. ¶ 14 ("After

17   deployment of the National Guard on June 8 the number of arrests increased day-by-day."); Zizi

18   Decl., ¶ 12.  Similarly, the California Highway Patrol's expenditures related to its response to the

19   Los Angeles protests increased significantly after the National Guard's arrival.  Zizi Decl. ¶ 8.

20   **V.    THE CALIFORNIA NATIONAL GUARD IS VITAL TO CRITICAL STATE FUNCTIONS.**

21        The California National Guard is ordinarily under the command of the Governor, Cal.

22   Const. art. V, § 7, and it is "vital" to carrying out state functions such as "emergency and natural

23   disaster response, cybersecurity, and drug interdiction."  ECF No. 8-3, Eck Decl. ¶¶ 20, 31.  For

24   example, National Guard soldiers play a crucial role in responding to wildfires; 2,500 National

25   Guard members were activated in response to the devastating fires in Los Angeles County in

26   January 2025, and guardsmen serve on Taskforce Rattlesnake, California's specialized fire

27   combat unit.  ECF No. 8-3, Eck Decl. ¶¶ 14, 35-40.  Members of the National Guard also serve

28   on the State's Counterdrug Taskforce, which specializes in stopping fentanyl trafficking at the

8

1   southern border.  ECF No. 8-3, Eck Decl. ¶¶ 15, 42-43.  Each member of California's National

2   Guard plays a "critical role," and "[p]ulling those members away from [their] assignments may

3   imperil the State's ability to protect its residents."  *Id.* ¶ 30.

4        Thus, the federalization and deployment of California's National Guard has impaired—

5   and continues to impair—the National Guard's ability to perform these vital functions for the

6   State of California.  *Id.* ¶ 16.  Thousands of California National Guard members—constituting

7   nearly one-third of the Guard's available strength—have been diverted to Los Angeles.  ECF No.

8   39-2, Supplemental Declaration of Paul S. Eck ("Supp. Eck Decl.") ¶ 4.  Over half of the

9   members of Task Force Rattlesnake have been moved to Los Angeles, just as "[t]he likelihood of

10  above-normal significant fire potential is projected to increase in Southern California from late

11  spring into summer," Strong Decl., Ex. 30, and the State braces for a summer with "a higher

12  probability of more large wildfires than usual."  *Id.*, Ex. 36.

13                              **PROCEDURAL HISTORY**

14       Plaintiffs filed this lawsuit on June 9, 2025.  ECF No. 1.  Plaintiffs moved for a temporary

15  restraining order the following day to prevent irreparable harm from the use of the federalized

16  National Guard and Marines to enforce civil laws in the nation's second-largest city.  ECF No. 8.

17       After affording Defendants the opportunity to oppose Plaintiffs' motion and holding a

18  hearing, the Court granted Plaintiffs' motion for a temporary restraining order on June 12, 2025.

19  ECF No. 64.  Specifically, the Court held that President Trump's actions in deploying

20  California's National Guard "were illegal—both exceeding the scope of his statutory authority

21  and violating the Tenth Amendment to the United States Constitution."  ECF No. 64 at 1.  The

22  Court further held that "Plaintiffs have demonstrated that the balance of equities tips in their favor

23  and that an injunction restraining the President's use of military force in Los Angeles is in the

24  public interest."  *Id.* at 35.  Accordingly, the Court temporarily enjoined Defendants from

25  deploying federalized members of the California National Guard in Los Angeles and ordered

26  Defendants to return control of the California National Guard to the Governor of California.  *Id.*

27  The Court further ordered Defendants to show cause why a preliminary injunction should not

28  issue, setting a preliminary injunction briefing schedule and a hearing for June 20, 2025.  *Id.* at

9

36.

Defendants immediately appealed this Court's order to the Ninth Circuit and filed an emergency motion for a stay pending the appeal. The Ninth Circuit granted a temporary administrative stay and will hear oral argument on Defendants' motion for a stay pending appeal on June 17, 2025.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

## ARGUMENT

The Court rightly found at the TRO stage that Plaintiffs are likely to succeed on the merits of their claims, that Plaintiffs will suffer irreparable harm absent injunctive relief, and that the balance of harms and equities favors Plaintiffs. The same is true now at the preliminary injunction stage. Plaintiffs are likely to succeed on the merits of their claims, both as to Defendants' unlawful federalization of the State National Guard under 10 U.S.C. § 12406 and Defendants' violation of the Posse Comitatus Act and the Tenth Amendment. Plaintiffs are still suffering irreparable harm, and the balance of the harms and equities supports granting a preliminary injunction.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The Section 12406 Federalization Orders Are Unlawful

The Constitution gives Congress, not the President, the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," as well as the power "[t]o provide for organizing, arming, and disciplining, the Militia, and for

10

governing such Part of them as may be employed in the Service of the United States."  U.S.

Const. art. I, § 8, cls. 15-16 (the "Militia Clauses").  The President therefore may only call forth

the militia as permitted by Congress.

Congress exercised that power by authorizing the President to deploy the National Guard

domestically, but only in limited circumstances set forth in statute.  One of these statutes is 10

U.S.C. § 12406, which provides that:

> Whenever—
>
> > (1) the United States, or any of the Commonwealths or possessions, is
> > invaded or is in danger of invasion by a foreign nation;
> >
> > (2) there is a rebellion or danger of a rebellion against the authority of the
> > Government of the United States; or
> >
> > (3) the President is unable with the regular forces to execute the laws of the
> > United States;
>
> the President may call into Federal service members and units of the National
> Guard of any State in such numbers as he considers necessary to repel the
> invasion, suppress the rebellion, or execute those laws.  Orders for these purposes
> shall be issued through the governors of the States or, in the case of the District of
> Columbia, through the commanding general of the National Guard of the District
> of Columbia.

10 U.S.C. § 12406.  Congress thus imposed two requirements that must be satisfied for the

President to lawfully federalize units or members of a State's National Guard under Section

12406.  First, one or more of the three predicate conditions in subsections (1) through (3) must

exist.  Second, the federalization order must be "issued through the governor[]" of the State.  *Id.*

Neither requirement was satisfied here.  Because the President did not act in compliance with

Congress's statute when he federalized the guard on June 7, his actions were unlawful.  *See*

*generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

concurring in the judgment) (the President's "power is at its lowest ebb" when he takes actions

incompatible with the express terms of a statute).

Section 12406's text sets forth mandatory conditions that must be satisfied and which the

Court must review when the Executive's reliance on the statute is challenged.

1.  **The Predicate Conditions Required to Invoke Section 12406 Did Not and Do Not Exist**

Section 12406 authorizes the President to federalize the National Guard in just three situations: (1) a foreign invasion; (2) a rebellion or danger of rebellion; or (3) when "the President is unable with the regular forces to execute the laws of the United States." Defendants do not contend that the first condition, a foreign invasion, is present here. Instead, Defendants rely exclusively on subparts (2) and (3) of Section 12406, but neither predicate is supported by the facts on the ground in Los Angeles. There was and is no rebellion nor any danger of rebellion. And the federal government was and is still able to execute the laws. Indeed, ICE has continued to make arrests throughout the duration of the events at issue and at a higher rate than it did before the protests began. Strong Decl., Exs. 14-22 (detailing operations that led ICE to arrest 330 immigrants).

*Rebellion or danger of rebellion.* Defendants cannot show that the record establishes "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The ordinary meaning of "rebellion" is "[o]pen, organized, and armed resistance to an established government or ruler" or "an organized attempt to change the government or leader of a country, usu[ally] through violence." *Rebellion*, Black's Law Dictionary (12th ed. 2024). Historical definitions, including those from the time period when Congress passed the Militia Act of 1903, accord with this definition. *E.g.*, *Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject."); *Rebellion*, Am. Dictionary of the English Language (1900) ("An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed.").

Together, these definitions make clear that a "rebellion" must be violent, armed, organized, and open defiance of the government as a whole, not merely isolated incidents of

12

1  disruption.  That is why the term "rebellion" is often used alongside the related term "invasion,"

2  as in Section 12406 itself.  *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 (specifying that the writ of habeas

3  corpus "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety

4  may require it").  "Rebellion" is not a synonym for protest, civil disobedience, civil unrest, or

5  riots.  *See* ECF No. 25 at 18-19.  The events in Los Angeles come nowhere close to a "rebellion"

6  or a "danger of rebellion."  As the Court properly found at the TRO stage, "there can be no debate

7  that most protesters demonstrated peacefully."  ECF No. 64 at 19.  Plaintiffs acknowledge that

8  bad actors engaged in instances of violence and destruction, and the Governor, the State Attorney

9  General, and local elected officials have repeatedly and unequivocally condemned violence and

10  illegality.  But these incidents do not rise to the level of rebellion.  Indeed, they are not

11  categorically different from other periods of protest and civil unrest that have occurred in recent

12  years and were handled effectively by local law enforcement, without the need to involve federal

13  troops.  Strong Decl., Exs. 1, 2 (detailing local unrest following Dodger and Laker wins).

14       Defendants offer no authority to the contrary.  Instead, they insist that burned cars,

15  blocked roads, and a crowd's refusal to comply with local authorities' orders *must* be a rebellion,

16  but they do not explain how these acts—which are, in fact, the picture of *dis*organization, not

17  organized resistance—meet the definition of rebellion.  Nor do Defendants offer any evidence or

18  meaningful argument to explain how any of these acts establish a *danger* of rebellion.

19       Moreover, Defendants' suggestion that any measure of protest or expression of resistance

20  to the President's agenda or government action creates a rebellion (or the danger of one) raises

21  serious concerns under the First Amendment, as the Court rightly noted in its TRO Order, ECF

22  No. 64 at 20.  Protest and the right to speak out against the government is a core civil liberty,

23  protected by the First Amendment.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,

24  508 (1969).  A finding here that incidents of violence alongside protests can constitute a rebellion

25  or a danger thereof would seriously inhibit or chill the lawful exercise of the right to free speech.

26       *Unable with the regular forces to execute the laws.*  Nor do the recent events in Los

27  Angeles render President Trump "unable with the regular forces to execute the laws of the United

28  States."  10 U.S.C. § 12406(3).  At oral argument on Plaintiffs' TRO, Defendants took the

13

1    position that "regular forces" in this context means "everything other than the State National

2    Guard."  TRO Hrg. Tr. 24:2-5.  There can be no meaningful dispute that the law can be executed

3    by and through the vast array of local, state, and federal law enforcement available to respond to

4    any violence in Los Angeles, without the need to federalize California's National Guard.  Nor

5    have Defendants shown that even just federal law enforcement agencies—those subject to the

6    President's direct command—are so insufficient as to render the President *unable* to execute the

7    laws.  Indeed, ICE has since relied on U.S. Marshals to aid them to continue successfully

8    enforcing the law.  Strong Decl., Exs. 26, 27.

9         To begin, the evidence shows that nothing happening in Los Angeles has prevented the

10   President from enforcing immigration laws on June 6 or since.  On Friday, June 6, when the

11   protests began, ICE officers carried out enforcement actions at multiple locations within Los

12   Angeles County and the City of Los Angeles.  ECF No. 8-1, Ex. G.  In all, the Department of

13   Homeland Security reported that its enforcement activities that day resulted in the arrest of

14   approximately 44 individuals and 70-80 people detained.  *Id.*  In the week since, ICE's activities

15   have continued.  Since June 6, ICE arrested 330 immigrants in Los Angeles.  Strong Decl., Ex.

16   14.  Far from being impeded by the protests in Los Angeles, this represents an *increase* in ICE's

17   arrest rate as compared with last month.  *Id.*, Ex. 3 (reporting just 239 arrests made in a week-

18   long operation in May 2025).  Moreover, ICE has engaged in successful law-enforcement efforts

19   without the presence of military personnel.  *Id.*, Ex. 35.  And on June 12, Secretary Noem deemed

20   conditions safe enough that she accompanied agents on a raid and arrest, without support from

21   federalized military personnel.  *Id.*, Ex. 26.

22        Defendants do not dispute that they are still able to enforce immigration laws.  Instead,

23   they maintain (1) that these successful arrests came with a "risk of danger" and (2) that they could

24   have increased their activities absent the unrest in Los Angeles.  ECF No. 25 at 15.  But whether

25   they can conduct their work absent risk of danger or can be more productive with the assistance

26   of federalized troops is hardly enough; neither of these arguments establishes that ICE, let alone

27   the President more broadly, was "unable" to execute the laws.  Nor does the Defendants' risk of

28   danger argument establish that even if additional law enforcement were required to protect ICE

14

1  from incidents of violence, such resources could not be found in available local, state, and federal

2  law enforcement, without resorting to federalizing the National Guard.  Indeed, Defendants put

3  nothing in the record confirming that they requested assistance from other federal law

4  enforcement that was unable to assist on June 6 and Defendants' own declaration at the TRO

5  stage confirmed that LAPD and LASD have been adequately responding to and handling

6  incidents as they arise.  *E.g.*, ECF No. 25-1, Santacruz Decl. ¶¶ 11-13 (LAPD responded to

7  incident at Roybal Courthouse and federal employees were able to "h[o]ld the line" until LAPD

8  arrived); *id.* ¶¶ 18-22, 25-26, 32 (LASD and LAPD responded to incidents and declared them

9  unlawful assemblies); *id.* ¶ 24 (when protesters confronted federal agents outside Los Angeles

10  City Hall, LAPD issued a dispersal order and made arrests); *id.* ¶ 30 (mobilization of additional

11  LAPD officers).  And since June 6, "thousands of officers from LAPD, LASD, CHP, and local

12  law enforcement agencies from Los Angeles and neighboring counties have responded to the

13  incidents," and made hundreds of arrests.  ECF No. 39-3,  Espíritu Reply Decl. ¶¶ 8, 14.

14       The only other time in our Nation's history that a President relied on the exclusive

15  authority of Section 12406 to federalize the National Guard is a far better illustration of a time

16  when a President was truly "unable with the regular forces to execute the laws."  When President

17  Nixon called the National Guard into service to deliver the mail in 1970, it was in response to a

18  postal strike involving over 210,000 postal workers at over 670 locations nationwide.[1]  In other

19  words, hundreds of thousands of federal personnel who otherwise executed the relevant function

20  were unavailable due to being on strike.  Here, those personnel remain available, on the job, and

21  executing the laws.

22       **2.  The Federalization Orders Were Not Issued Through the Governor**

23       The President's invocation of Section 12406 is unlawful for the additional and

24  independent reason that the federalization orders were not "issued through the governor[]" of

25  California, as required by Congress.  10 U.S.C. § 12406.  As originally enacted, Section 12406

26  _____

27       [1] *The Great Postal Strike*, 133 The Postal Record 14, 19 (2020),
https://tinyurl.com/29a8dw38; *see also* Exec. Order No. 11519 (1970 WL 123093) (order issued
by President Nixon invoking section 12406's predecessor).

28

1  did not contain those words.  Congress amended the statute to add them in 1908, *see* Militia Act

2  of 1908, ch. 204, 35 Stat. 399 (1908), and that "significant change in language" must be

3  "presumed to entail a change in meaning," *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024)

4  (quoting Scalia & Garner, Reading Law 256-60 (2012)).  At an absolute minimum, the text

5  contemplates a procedure by which a governor is consulted about an order, receives it, and then

6  issues the order to the relevant guard units.  That did not happen here.  ECF No. 8-1, Espíritu

7  Decl., Exs. K, S.

8    Defendants contend that the federalization orders here satisfied the "issued through the

9  governor" requirement because the June 7 and 9 DOD Orders from Secretary Hegseth "bore the

10  label 'THROUGH: THE GOVERNOR OF CALIFORNIA.'"  ECF No. 25 at 16.  But it "strains

11  credibility" for Defendants to contend that merely stamping those words "at the top of a

12  document that the President never sends to the governor" satisfies the process demanded by

13  Congress.  ECF No. 64 at 25.

14    Indeed, that interpretation would contravene multiple canons of statutory construction.  It

15  would render the "issued through the governor" requirement "inoperative[,] superfluous, void

16  [and] insignificant."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  And it would needlessly present

17  constitutional concerns:  to allow the President to federalize a State's National Guard in a public

18  document that was never received by the Governor but purports to be issued "through" the

19  Governor would "diminish the accountability of state [and] federal officials."  *Printz v. United*

20  *States*, 521 U.S. 898, 930 (1997).

21    Finally, Defendants contend that this requirement is satisfied because Secretary Hegseth's

22  June 7 DOD Order was issued to California's Adjutant General, who is authorized under state law

23  to issue orders in the name of the governor.  ECF No. 25 at 16; Cal. Mil. & Vet. Code § 163

24  (Adjutant General "shall issue all orders in the name of the Governor").  But whatever the

25  Adjutant General's authority is under state law, Congress allowed the President to give direct

26  orders to a commanding general *only* for the District of Columbia:  Orders "shall be issued

27  through the governors of the States or, *in the case of the District of Columbia*, through the

28  *commanding general* of the National Guard of the District of Columbia."  10 U.S.C. § 12406

16

(emphasis added).  Congress knew how to identify a National Guard general as the official whom orders must be "issued through."  When it came to sovereign States like California, however, Congress chose to require a role for the governor.  It did not leave room for the President to circumvent this requirement by issuing the orders through someone else.  TRO Hrg. Tr. 14:22-15:11 (noting that, unlike the adjutant general, the Governor is elected as a representative of the people).

Accordingly, the President's invocation of Section 12406 is unlawful for the additional reason that he failed to follow Congress's command that any orders be issued "through the governor[]."

### 3. The Claim That Defendants Exceeded the Authority Granted by Congress in Section 12406 is Subject to Judicial Review

In opposing Plaintiffs' TRO, Defendants took the extraordinary position that the Court has no ability to review the President's invocation of Section 12406.  ECF No. 25 at 9.  The Court correctly rejected this position in granting Plaintiffs' TRO.  Federal courts have a "'virtually unflagging obligation' to exercise [their] jurisdiction" given them, *e.g.*, *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (citation omitted), and to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  And the ability to bring an *ultra vires* action to "enjoin unconstitutional actions by state and federal officers . . . reflects a long history of judicial review of illegal executive action."  *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (citation omitted).

The political-question doctrine provides only "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012).  Political questions have "several formulations which vary slightly according to the settings in which the questions arise" and include, for example, "a textually demonstrable constitutional commitment of the issue to a coordinate political department."  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground

1  of a political question's presence." *Id.*  The political-question doctrine "is one of 'political

2  questions,' not one of 'political cases.'" *Id.*

3        The modern trend has been to treat cases as justiciable even where they implicate questions

4  of foreign affairs or national security.  *See, e.g.*, *Zivotofsky*, 566 U.S. at 201.  In recent months,

5  for example, courts have repeatedly rejected the President's request to treat questions under the

6  Alien Enemies Act—in particular, whether there has been an "invasion"—as non-justiciable.  *See,*

7  *e.g.*, *J.A.V. v. Trump*, ___ F. Supp. 3d ____, 2025 WL 1257450, at *7-*11 (S.D. Tex. May 1,

8  2025); *J.G.G. v. Trump*, 2025 WL 914682, at *5-*7 (D.C. Cir. Mar. 26, 2025) (Henderson, J.,

9  concurring); *cf. Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

10        Here, Plaintiffs' *ultra vires* claim based on Section 12406 does not raise an unreviewable

11  political question because there is no "textually demonstrable constitutional commitment" of this

12  issue to the President's discretion.  Defendants have suggested that invocation of Section 12406 is

13  committed entirely to the President's discretion because it authorizes the President to activate the

14  National Guard "in such numbers as he considers necessary."[2]  ECF No. 25 at 9.  But the phrase

15  "as he considers necessary" is a textual commitment of discretion only with respect to the

16  President's decision about the "numbers" of members of the Guard called into service.  10 U.S.C.

17  § 12406.  Congress pointedly did not include that language when describing the predicate

18  conditions that must be satisfied *before* federalization of the National Guard is authorized under

19  Section 12406.  That provision of the statute states only "Whenever"—clearly indicating that

20  Section 12406's authority may be invoked only when one of the three predicate requirements is

21  met as a matter of fact.  Nor is any discretionary language incorporated into the requirement that

22  orders be issued through the Governor.  Indeed, that provision of the statute uses the mandatory

23  "shall" to *command* the President to issue orders through the Governor.  Here, Plaintiffs are not

24  seeking review of the President's determination regarding the *number* of members of the National

25  Guard to call into service.  Rather, Plaintiffs challenge whether one of the three predicate

---

26        [2] At the TRO hearing, Defendants went a step further, arguing that, apparently with these
words alone, Congress granted the President authority so broad that even if there was no evidence

27  to support a finding that Section 12406's predicate conditions were met—even if the President
made no such finding *at all*—the Court still could not review the challenge because it would be

28  categorically barred from looking at the basis for those findings.  TRO Hrg. Tr. 25:23-28:4.

1  conditions was satisfied in the first place, and whether the resulting order was "issued through the

2  governor[]."  There is no textual indication that those questions are committed to the President's

3  discretion and thus beyond judicial review.[3]

4         Section 12406 contains clear and explicit limitations on the President's authority.  As it

5  did in granting Plaintiffs' TRO, the Court should reject Defendants' expansive view of executive

6  authority and exercise its "duty . . . to say what the law is" here.  *Marbury*, 5 U.S. (1 Cranch) at

7  177.

8         **B.    Defendants Are Violating the Posse Comitatus Act**

9         Pursuant to the orders they are acting under, federalized National Guard servicemembers

10  and the Marines are engaging in civilian law enforcement in Los Angeles in violation of the Posse

11  Comitatus Act (PCA).  This is contrary to our Nation's history and laws, which reflect "a

12  traditional and strong resistance of Americans to any military intrusion into civilian affairs."

13  *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc) (quoting *Laird v. Tatum*,

14  408 U.S. 1, 15 (1972); *see also* ECF No. 31-1, Amicus Br. of Former U.S. Army & Navy

15  Secretaries & Retired Four-Star Admirals & Generals, at 4, 8-10.  The PCA preserves that

16  tradition by barring the military from engaging in "direct active involvement in the execution of

17  the laws" or other conduct that "pervade[s] the activities of civilian authorities."  *Dreyer*, 804

18  F.3d at 1275 (citation omitted).  First enacted in 1878, the PCA now provides:

19                 Whoever, except in cases and under circumstances expressly
20                 authorized by the Constitution or Act of Congress, willfully uses
                   any part of the Army, the Navy, the Marine Corps, the Air Force, or
21                 the Space Force as a posse comitatus or otherwise to execute the
                   laws shall be fined under this this title or imprisoned not more than
22                 two years, or both.

23  18 U.S.C. § 1385.

24         Use of military forces for law enforcement threatens democratic norms:  "The use of

25  military forces to seize civilians can expose civilian government to the threat of military rule and

26  the suspension of constitutional liberties," and "military enforcement of the civil law leaves the

---

27         [3] Nor do the cases Defendants cited in their opposition to the TRO suggest that the
    interpretation of Section 12406 presents a political question.  *See* ECF No. 38 at 9-10
28  (distinguishing Defendants' cited cases).

1  protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained

2  to uphold these rights." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985) (holding that

3  plaintiffs stated a cause of action for unreasonable seizure in violation of the Fourth Amendment

4  where the military's confinement of plaintiffs within an armed perimeter violated the PCA).

5  Military execution of laws may also "chill the exercise of fundamental rights, such as the rights to

6  speak freely and to vote, and create the atmosphere of fear and hostility which exists in territories

7  occupied by enemy forces." *Id.* "It is the nature of their primary mission that military personnel

8  must be trained to operate under circumstances where the protection of constitutional freedoms

9  cannot receive the consideration needed in order to assure their preservation.  The posse

10  comitatus statute is intended to meet that danger." *United States v. McArthur*, 419 F.Supp. 186,

11  194 (D.N.D. 1975).

12      As a general matter, the PCA applies both to National Guard troops federalized under

13  Section 12406 and the Marine Corps.  In 2021, Congress revised the PCA to provide that the

14  law's prohibitions apply to all of the United States armed forces, including the Marine Corps.

15  Pub.L. 117-81, Div. A, Title X, § 1045(a), Dec. 27, 2021, 135 Stat. 1904.  The PCA also applies

16  to the National Guard when it is federalized under Title 10, because, once federalized, National

17  Guard soldiers become a component of the regular armed forces.  *See e.g.* 10 U.S.C. § 10106

18  ("The Army National Guard while in the service of the United States is a component of the

19  Army.").  Accordingly, courts have uniformly found that the PCA applies to National Guard

20  soldiers in Title 10 status.  *United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir.

21  1997); *United States v. Benish*, 5 F.3d 20, 25-26 (3rd Cir. 1993); see also *United States v. Chon*,

22  210 F.3d 990, 993 (9th Cir. 2000) (recognizing the naval policies exempt National Guard

23  members "when not" in Federal Service), *cited in Dreyer*, 804 F.3d at 1273.

24      The National Guard was not lawfully deployed under Section 12406, but even if it were,

25  Section 12406 does not expressly authorize members of the National Guard to engage in civilian

26  law enforcement.  *See, e.g.*, ECF No. 8 at 13 (collecting authorities recognizing that section

27  12406 does not operate as an exception to the PCA).  Accordingly, Defendants remain subject to

28  a claim for acting *ultra vires* of the confines of the PCA.  *See Murphy Co. v. Biden*, 65 F.4th

20

1122, 1131 (9th Cir. 2023) ("plaintiffs advancing *ultra vires* claims must plead 'plausible factual

allegations identifying an aspect of the designation that exceeds the President's statutory

authority'" (citation omitted)).

Three tests determine if military assistance to civilian law enforcement violates the

PCA. *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991). If any one of the three tests

is met, the activity is prohibited by the PCA. *Id.* First, the military activity must not "constitute[]

the exercise of regulatory, proscriptive, or compulsory military power.'" Second, it must not

"amount to 'direct active involvement in the execution of the laws." *Id.* (citation omitted). Direct

forms of involvement include: interdiction of a vehicle; a search or seizure; an arrest, stop and

frisk, or similar activity; and use of military personnel for surveillance or pursuit of individuals,

or as informants, undercover agents, investigators, or interrogators. *Dreyer*, 804 F.3d at 1272-73

(citing 32 C.F.R. § 213.10(a)(3) (1982)).[4] And third, the activity must not "pervade the activities

of civilian authorities." *Yunis*, 924 F.2d at 1094.

The military, including the federalized National Guard, is already engaging in law

enforcement activities that violate the PCA. Indeed, the President's June 7 memorandum, and the

subsequent DOD Orders by the Secretary Hegseth, call for these forces to be integrated with ICE

personnel in such a way that entanglement into law enforcement functions is unavoidable by

requiring them to protect "ICE and other United States Government personnel who are

performing Federal functions, including enforcement of Federal law, and to protect Federal

property, at locations where protests against these functions are occurring or are likely to occur."

ECF No. 8-1, Espíritu Decl. Ex. E; *see also* ECF No. 64 at 4-5; ECF No. 25-4, Knell Decl. ¶ 6

("ARNORTH published Operational Order (OPORD) 01-23 and Fragmentary Order

---

[4] Further examples of prohibited activities can be found in 2018 guidance from the Joint Chiefs of Staff on implementing the PCA, which lists prohibited "direct civilian law enforcement activities" to include "search, seizure, arrest, apprehension, stop and frisk, surveillance, pursuit, interrogation, investigation, evidence collection, security functions, [and] traffic or crowd control. Defense Support of Civil Authorities, Joint Publication 3-28, p. III-I (2018), https://irp.fas.org/doddir/dod/jp3_28.pdf (last visited June 16, 2025). "[W]hile 'courts must exercise independent judgment in determining the meaning of statutory provisions,' the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning." *Bondi v. VanDerStok*, 604 U.S. ___, 145 S.Ct. 857, 874 (2025), citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

1  (FRAGORD) 25-501.000 to direct federalized members of the California National Guard and

2  members of the 2/7 USMC to temporarily protect federal property, as well as ICE and other US

3  Government personnel who are performing federal functions, where protests are occurring in Los

4  Angeles County, California"); ECF No. 25-2 (June 7 DOD Order calling up 2,000 soldiers); ECF

5  No. 25-3 (June 9 DOD Order calling up an additional 2,000 soldiers for the same purpose);

6  Strong Decl., Ex. 7 (USNORTHCOM communication, June 9, 2025).  Federal officials who are

7  leading the deployment of the 4,700 troops have stated that 500 National Guard troops have been

8  trained to support immigration operations, with many receiving instruction to accompany federal

9  agents on enforcement missions.  *See e.g.*, Strong Decl., Ex. 11.  These memorandums,

10  statements by the administration, and records of the Defendants' use of the federalized troops

11  embedded with ICE over the last week show that Defendants' use of the military as a show of

12  force to augment and reinforce its federal agents has violated the PCA.

13         The federal government has confirmed that soldiers are providing the intended perimeter

14  and personnel protection while ICE carries out immigration enforcement.  ECF No. 25-4, Knell

15  Decl. ¶¶ 7-8 (describing the services as "protecting federal personnel performing official

16  functions as well as property at designated locations through security patrols, observation posts,

17  and outer cordon security perimeter of buildings" and listing assignments, including "continu[ing]

18  to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal

19  Bureau of Investigations Special Agents performing official functions so that such federal

20  personnel may carry out their assigned duties").[5]  In an ICE social media post, federalized Guard

21  soldiers can be seen standing guard while civilian law enforcement agencies detain three different

22  suspects.  ECF No. 39-1, Espíritu Decl., Exs. 2, 3; Strong Decl., Ex. 23.  These pictures are

23  consistent with the Department of Defense's statement that it intended to use the federalized units

24  for support for holding a secure perimeter in communities around areas where immigration

---

[5] In a declaration that Defendants submitted for the first time on appeal, filed with the
Ninth Circuit earlier today, but have not yet submitted to this Court, Defendants asserted that "the
guards have assisted on most operations that ICE and its federal partners conducted this week.
The guards are acting as a security element, accompanying federal officers and agents during
operations to ensure the safety of all involved." *Newsom v. Trump*, No. 25-3727 (9th Cir. June 16,
2025), Dkt. 23.1, Santacruz Decl. ¶ 7.

1   enforcement activities would take place and securing routes over public streets where

2   immigration enforcement officers would travel.  ECF No. 8-3, Eck Decl. ¶ 18; Strong Decl., Ex.

3   23.  Providing perimeter and personnel protection to augment ICE's operations in a civilian-

4   populated area, "constitute[s] the exercise of regulatory, proscriptive, or compulsory military

5   power." *See Yunis*, 924 F.2d at 1094.[6]  As is clear from Defendants' orders and the images of

6   actions implementing such orders, soldiers are not being used merely to erect a protective barrier

7   around federal real property, but are being deployed alongside civil enforcement agents to control

8   the actions of civilians.  This is "regulatory, proscriptive, and compulsory" because it subjects

9   civilians in the vicinity of any planned immigration enforcement to mandatory and proscriptive

10  control of their right to move freely, under threat of military force.

11      Defendants cannot cast their activities under a broad umbrella of "protecting federal

12  personnel," even if there were such an atextual exception from the PCA.  Assisting federal

13  officers who are feet away making arrests or securing perimeters in an urban environment

14  constitute direct law enforcement activities, even if done with the purpose of protecting federal

15  personnel.  These activities, which otherwise would be performed by the federal law enforcement

16  agents themselves, *see* ECF No. 8-1, Espíritu Decl., Ex G at 53 (describing ICE military-style

17  actions), are an integral part of the law enforcement operation.  Involving the military in the

18  operation in this way necessarily entangles military with civilian enforcement, subjecting

19  civilians to "compulsory military power."  *Yunis*, 924 F.2d at 1094.  It is difficult to see how this

20  would not also lead to the military "pervad[ing] the activities of civilian authorities."  *Id.*  Indeed,

21  maintaining a perimeter in urban areas and providing security for officers performing their duties

22      [6] In *United States v. Khan*, 35 F.3d 426, 431-32 (9th Cir. 1994), the Court held that the
Navy did not violate the PCA when, acting under the supervision of civilian law enforcement, it
23  intercepted a ship in international waters.  The Navy "provid[ed] ships, communication on the
[intercepted ship's] position, aerial reconnaissance and interception."  *Id.  Khan* is distinguishable
24  from the situation here because 10 U.S.C. § 374(b)(2) expressly provides that Department of
Defense may participate in civilian law enforcement by detecting, monitoring, and
25  communicating the movement of sea traffic, by providing aerial reconnaissance, and by
intercepting vessels.  Citing *Yunis*, the court also found that "where the Navy provides backup
26  support in a Coast Guard operation and does not participate in the search of the ship or the arrest
or interrogation of the suspects, the military assistance is not direct, not an exercise of military
27  power, and not pervasive of the activities of civilian authorities." *Id.* at 432.  Here, military
forces are controlling the movement of civilians in an urban area, facts not addressed in *Khan*.

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    necessarily involves participating in law enforcement operations planning, conducting

2    surveillance, apprehending civilians, controlling crowds, and threatening or using force against

3    civilians.  Marines have already briefly detained at least one civilian.  Strong Decl., Ex. 29.  This

4    stands in stark contrast to actions like "borrowing of highly skilled personnel, like pilots and

5    highly technical equipment like aircraft and cameras, for a specific, limited temporary purpose,"

6    which were found to not violate the PCA.  *United States v. McArthur*, 419 F.Supp. 186, 194

7    (D.N.D. 1975), *aff'd sub nom. United States v. Casper*, 542 F.2d 1275 (8th Cir. 1976).  These

8    activities, in short, will amount to direct active law enforcement and will also necessarily

9    "pervade the activities of civilian authorities."  *Yunis*, 924 F.2d at 1094.

10        Because the military personnel Defendants have ordered to Los Angeles are currently

11   engaged in law enforcement activities in violation of the Posse Comitatus Act, the Court can

12   enjoin the activities of the National Guard for this additional reason, and it should additionally

13   extend relief to bar law-enforcement activities by the Marines as well.

14        **C.    Defendants Are Violating the Tenth Amendment**

15        The Defendants' use of federal soldiers also intrudes on the State's police power,

16   constituting an independent violation of the Tenth Amendment.  "It is incontestible that the

17   Constitution established a system of 'dual sovereignty.'"  *Printz v. United* States, 521 U.S. 898,

18   918 (1997).  Under our system of federalism, policing and crime control remain one of the most

19   basic rights reserved to the States.  *United States v. Morrison*, 529 U.S. 598 (2000) ("Indeed, we

20   can think of no better example of the police power, which the Founders denied the National

21   Government and reposed in the States, than the suppression of violent crime and vindication of its

22   victims."); *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878) ("[T]he power to establish the

23   ordinary regulations of police has been left with the individual States, and cannot be assumed by

24   the national government.") (internal citation omitted).

25        The President, Secretary of Defense, Secretary of Homeland Security, and Attorney

26   General have made no secret of their intent to exploit federalization under Title 10 to usurp state

27   authority, including by "liberat[ing]" cities from their elected leaders.  *See* Strong Decl., Ex. 28.

28   Deploying over 4,000 federal soldiers absent proper invocation of Section 12406 to quell a protest

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   or prevent future protests despite the lack of evidence that local law enforcement was incapable of

2   asserting control and ensuring public safety during such protests represents the exact type of

3   intrusion on State power that is at the heart of the Tenth Amendment.  *See* Strong Decl., Ex. 27

4   (Former LAPD Chief explaining LAPD's capabilities and the harm that 1992 military

5   deployment had on policing efforts due to military's distinct role).

6        The Constitution generally reserves to the States the authority to exercise police power

7   with respect to local protests and unrest, and for good reason.  States and their local officials are

8   closer to the people, more aware of local customs and practices, and in the case of elected

9   officials, more directly accountable to the people impacted by law enforcement decisions.  And

10  here, the record shows that local law enforcement had and have sufficient resources to police the

11  demonstrations and isolated incidence of property damage and violence that occurred.  ECF No.

12  8-2, Olmstead Decl. ¶¶ 6-10; Zizi Decl. ¶¶ 9-13.  These resources include law enforcement teams

13  with specialized training in and experience with handling civil unrest.  ECF No. 8-2, Olmstead

14  Decl. ¶ 7; ECF No. 51-1, Amicus Br. of Los Angeles, at 3; Strong Decl., Ex. 27; Zizi Decl., ¶¶ 9-

15  11.

16       Where federalization of these National Guard soldiers has no constitutional or statutory

17  authorization, and where the troops have been used to usurp and disrupt California's own ability

18  to ensure the safety and welfare of its people, the State has shown a Tenth Amendment violation.

19                          *   *   *

20       Considered individually, defendants' legal arguments are meritless.  Considered in the

21  aggregate, they are terrifying.  Defendants' interpretation of Section 12406 would empower the

22  President to commandeer a State's National Guard based merely on evidence that some civilians

23  opposed his authority, disobeyed his commands, or presented operational difficulties for civil

24  law-enforcement officials—and without any input from (or even notice to) the Governor.  Courts

25  would be powerless to enforce the limits Congress imposed on the President's exercise of that

26  authority.  And, as defendants see things, the Posse Comitatus Act would "not apply" to any of

27  the troops federalized via the President's unreviewable exercise of his Section 12406 authority, a

28  position no court has ever endorsed.  That unchecked power could be deployed in any context—

                                     25

1  not just where civilians are protesting immigration enforcement, but also where they are

2  protesting other policies of a federal administration, or protesting in advance of a hotly contested

3  federal election.  Collectively, defendants' arguments would sideline the Judiciary, ignore

4  Congress's limitations, and trample over the States' sovereign interest in their own militias.  This

5  Court should again reject those arguments.

6  **II.    PLAINTIFFS WILL SUFFER GRAVE, IRREPARABLE HARM ABSENT AN INJUNCTION**

7          Plaintiffs have already suffered significant injuries as a result of Defendants' conduct, and

8  those injuries will only continue without an injunction.  A party seeking preliminary injunctive

9  relief must "demonstrate that irreparable harm is likely in the absence of an injunction," *Winter*,

10  555 U.S. at 22, but need not show that such irreparable harm is certain to occur, *Michigan v. U.S.*

11  *Army Corps of Eng'rs*, 667 F3d 765, 788 (7th Cir. 2011).  Nor must Plaintiffs show that

12  Defendants' conduct is the exclusive cause of Plaintiffs' injury.  *M.R. v. Dreyfus*, 697 F3d 706,

13  728-29 (9th Cir. 2012).  Instead, Plaintiffs may show a "sufficient causal connection" between

14  Defendants' conduct and Plaintiffs' injury that can only be addressed by an immediate injunction.

15  *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.,* 408 F. Supp. 3d 1057, 1121

16  (N.D. Cal. 2019) (citing, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 819

17  (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 981-82 (9th Cir. 2011)).

18          In granting Plaintiffs' motion for a temporary restraining order, the Court correctly found

19  that Plaintiffs are likely to suffer at least two forms of serious harm in the absence of injunctive

20  relief: (1) the continued presence of the military in Los Angeles that "risks worsening, not

21  improving, tensions on the ground"; and (2) the diversion of California National Guard members

22  from their vital roles within the State, which impedes California's ability to respond to

23  emergencies and other pressing concerns.  ECF No. 64 at 31-33.  Plaintiffs also risk continued

24  injury to their sovereign interests, through an unlawful commandeering of the state militia. These

25  harms are no less grave now, nor are they any less likely to occur absent further injunctive relief.

26          As to the first harm, Plaintiffs have established that the deployment of the National Guard

27  in Los Angeles "seemed only to inflame the protests further" and caused local law enforcement

28  arrests to increase exponentially.  ECF No. 8-2, Olmstead Decl. ¶¶ 12-14.  Indeed, as recently as

26

1   Saturday, June 14, local law enforcement was required to use force to disperse a large protest in

2   Downtown Los Angeles that was, at least in large part, a reaction to the military's presence within

3   the city. Strong Decl., Ex. 31. Thus, Defendants' actions have already caused significant civil

4   unrest and are likely to continue to increase civil unrest in the future. And as the Court aptly

5   noted in granting Plaintiffs' motion for a temporary restraining order, the risk of future civil

6   disturbance is consistent not only with the factual record, but with "common sense." ECF No. 64

7   at 32 (quoting Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343

8   U.S. 579, 651-52, for proposition that "emergency powers are consistent with free government

9   only when their control is lodged elsewhere than the Executive who exercises them."); *see also*

10  The Examination of Doctor Benjamin Franklin, Before an August Assembly, Relating to the

11  Repeal of the Stamp Act, &c. (Feb. 13, 1766)  ("Suppose a military force sent into America . . .

12  They will not find a rebellion; they may indeed make one."), *available at*

13  https://tinyurl.com/577emuzh.  A preliminary injunction is necessary to ensure that Defendants'

14  actions do not cause any further escalation of tensions within Los Angeles.

15          As to the second harm, as outlined above, Defendants' unauthorized requisitioning of

16  California's National Guard severely impacts the State's use of those forces. *See* ECF No. 8-3,

17  Eck Decl. ¶¶ 13-16.  Four thousand soldiers constitutes a large portion of California's total

18  available militia force. *Id.* ¶¶ 32-33.  Furthermore, the troops federalized from California's

19  National Guard include a large number of members who have specialized training in wildland fire

20  mitigation and suppression, and serve in the State's specialized fire combat unit. *See* ECF No. 8-

21  3, Eck Decl. ¶¶ 13-16.  While this diversion of resources would gravely injure California at any

22  time, it especially does so now, at the outset of fire season in a year when Southern California

23  faces a "likelihood of above-normal significant fire potential." Strong Decl., Ex. 30; ECF No. 39-

24  2, Supp. Eck Decl. ¶ 10 (13 fires over 10 acres, including one that has consumed over 4,200

25  acres, have already occurred in California in June); Declaration of Paul S. Eck in Support of

26  Plaintiffs' Preliminary Injunction Motion ("Eck PI Decl.") ¶¶ 3-9 (forecasts are for "above

27  normal significant fire danger for California for the next several months" and the "most critical

28  work is done before any fire ignites").  Without a significant segment of its National Guard, the

27

1   State cannot reliably protect itself from these, and other, emergencies. Eck PI Decl. ¶ 11; ECF

2   No. 39-2, Supp. Eck Decl. ¶ 15. Moreover, with the 60-day federalization, the State has also lost a

3   significant part of its Counterdrug Taskforce, which specializes in providing support to stop

4   trafficking of fentanyl at the U.S.-Mexico Border. ECF No. 39-2, Supp. Eck Decl. ¶ 15. The

5   federal deployment impairs the California National Guard's ability to perform these critical

6   functions. ECF No. 8-3, Eck Decl. ¶¶ 16, 31-33, 47-50. It also impairs California's ability to be

7   ready to address any new emergencies. And, as the Governor made clear in a letter to Secretary

8   Hegseth after his *second* order federalizing another 2,000 National Guard soldiers, Defendants'

9   order was "even more egregious given that [the Secretary] had not even committed at least 1600

10  of the 2000 service members [he] unlawfully federalized only two days earlier." *See* No. 8-1,

11  Espíritu Decl., Ex S at 129.

12          Thus, Plaintiffs have satisfied the second *Winter* factor.

13  **III.    THE BALANCE OF HARMS AND EQUITIES FAVORS INJUNCTIVE RELIEF**

14          The remaining *Winter* factors weigh heavily in favor of granting further injunctive relief.

15  A preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the

16  applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. "In exercising

17  their sound discretion, courts of equity should pay particular regard for the public consequences

18  in employing the extraordinary remedy of injunction." *Winter*, 555. U.S. at 20 (quoting

19  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Moreover, the federal government

20  "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as

21  required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C.

22  2015).

23          Here, the balance of equities tips sharply in Plaintiffs' favor. As outlined above, Plaintiffs

24  have already suffered serious harm in the form of escalated tensions, heightened civil unrest, and

25  the diversion of critical state resources, and these injuries will continue absent an injunction. By

26  contrast, Defendants will suffer no cognizable harm if the Court enjoins their conduct. First,

27  Defendants have not shown that local law enforcement is incapable of responding to the Los

28  Angeles protests. To the contrary, local law enforcement is better equipped than the military to

28

1    address the situation in Los Angeles, given their specialized training and experience.  Strong

2    Decl., Ex. 27; Zizi Decl., ¶ 9-11.

3         At the TRO stage, Defendants described certain episodes of unlawful conduct

4    characteristic of the kind of civil unrest that occurs periodically in this country—such as

5    vandalism, individuals throwing objects, and a vehicle being set on fire.  But the evidence shows

6    that state and local law enforcement have responded effectively to that misconduct—and remain

7    on the scene in substantial numbers today to enforce the law and prevent further violence.  *E.g.*,

8    ECF No. 22-1, Santacruz Decl. ¶¶ 11-13 (federal security agents "held the line" at the federal

9    building until LAPD arrived on scene to control the crowd); Strong Decl., Ex. 13 (LAPD

10   dispersed the crowd within four hours); ECF No. 22-1, Santacruz Decl. ¶ 24 ("LAPD issued a

11   dispersal order and made multiple arrests"); Zizi Decl. ¶¶ 5, 12, 14 (describing operations on June

12   6-8); *Id*.  ¶¶ 5, 7, 12, 15 (describing work of thousands of state and local officers, including

13   hundreds of arrests); Zizi Decl. ¶ 13.

14        Second, as the Court noted in its prior order, Defendants "may continue to enforce the

15   immigration law, even without the assistance of the National Guard."  ECF No. 64 at 35.  To the

16   extent Defendants feel they need more personnel to achieve their immigration enforcement goals,

17   they have additional agents and resources at their disposal that can address these needs, without

18   the military's involvement.  And to the extent Defendants assert an interest in protecting federal

19   agents and property, that interest "may actually well be served by de-militarization and a

20   concurring de-escalation of the situation."  *Id*.; Strong Decl., Ex. 27.  Finally, Defendants cannot

21   be harmed by an order requiring them to cease unlawful activity, and Plaintiffs have established a

22   likelihood of prevailing on their claims that President Trump's federalization of California's

23   National Guard was unlawful.

24        Additionally, entering an injunction would serve the public interest.  When, as here,

25   Plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs

26   have also established that both the public interest and the balance of the equities favor [injunctive

27   relief]."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).  Moreover, as the

28   Court previously noted, the fact that the federal government responded to largely peaceful

1  protests in Los Angeles by deploying the military "threaten[s] to chill legitimate First

2  Amendment expression."  ECF No. 64 at 35.[7]  Enjoining the continued militarization of Los

3  Angeles would restore the public's confidence in their fundamental First Amendment right to

4  peacefully protest, without fearing that the government will deploy the military in response.

5        Accordingly, the balance of the equities favors injunctive relief.

6                          **CONCLUSION**

7        The Court should grant Plaintiffs' motion and issue a preliminary injunction.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

25        [7] That chilling effect has already started to have an impact.  For example, the Mexican
American Bar Association, in planning the route for its march this past weekend, deviated from
26  its usual practice of passing by the federal building downtown because of the presence of military
at the federal building and fears that the presence of the military "could result in participants in
27  our march, including children, being exposed to unnecessary risk arrest and/or injury" or "subject
to arrest for the lawful exercise of their First Amendment rights."  Declaration of Diego
28  Alejandro Arp ¶¶ 10-11

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1   Dated:  June 16, 2025                              Respectfully submitted,

2                                                      ROB BONTA
                                                       Attorney General of California
3                                                      THOMAS S. PATTERSON
                                                       Senior Assistant Attorney General
4                                                      ANYA BINSACCA
                                                       JOHN D. ECHEVERRIA
5                                                      MARISSA MALOUFF
                                                       JAMES E. STANLEY
6                                                      Supervising Deputy Attorneys General
                                                       NICHOLAS ESPÍRITU
7                                                      STEVEN KERNS
                                                       JANE REILLEY
8                                                      MEGAN RICHARDS

9                                                      */s/ Meghan H. Strong*

10                                                     MEGHAN H. STRONG
                                                       Deputy Attorney General
11                                                       455 Golden Gate Avenue
                                                         San Francisco, CA 94102
12                                                       Telephone: (415) 510-3877
                                                         E-mail:  Meghan.Strong@doj.ca.gov
13
                                                       *Attorneys for Plaintiffs*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

SA-054



Search DVIDS...

# Soldiers support federal operation in Southern California [Image 2 of 5]



**CARPINTERIA, CALIFORNIA, UNITED STATES**
**07.10.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

| Subscribe | 5 |
|---|---|

Soldiers assigned to 870th Military Police Company, 185th Military Police Battalion, 49th Military Police Brigade, California National Guard, serving under Title 10 status, provide a security perimeter for federal personnel conducting law enforcement activities at Carpinteria, Calif., July 10, 2025. U.S. Northern

SA-055

Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 07.10.2025 |
| Date Posted: | 07.14.2025 16:02 |
| Photo ID: | 9177507 |
| VIRIN: | 250710-A-OX940-1588 |
| Resolution: | 3474x2316 |
| Size: | 5.33 MB |
| Location: | CARPINTERIA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 145 |
| Downloads: | 2 |

**PUBLIC DOMAIN**  

This work, *Soldiers support federal operation in Southern California [Image 5 of 5]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS









```
                              Volume 2

                          Pages 208 - 349

                 UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GAVIN NEWSOM, in his official      )
capacity as Governor of the State of )
California; STATE OF  CALIFORNIA,  )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )  NO. 3:25-CV-04870 CRB
                                   )
DONALD TRUMP, in his official      )
capacity as President of the United )
States; PETE HEGSETH, in his official )
capacity as Secretary of the       )
Department of Defense; UNITED STATES )
DEPARTMENT OF DEFENSE,             )
                                   )
          Defendants.              )
_____)
```

San Francisco, California
Tuesday, August 12, 2025

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Room 11000
San Francisco, California 94102
BY: **JANE E. REILLEY**
**MEGHAN STRONG**
**KENDAL MICKLETHWAITE**
**DEPUTY ATTORNEYS GENERAL**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

| | |
|---|---|
| 1 | **APPEARANCES**: (CONTINUED) |
| 2 | For Plaintiffs: |
| 3 | CALIFORNIA DEPARTMENT OF JUSTICE<br>OFFICE OF THE ATTORNEY GENERAL<br>455 Golden Gate Avenue, Room 11000 |
| 4 | San Francisco, California 94102 |
| | BY: **ANYA M. BINSACCA** |
| 5 | **MARISSA MALOUFF**<br>**SUPERVISING DEPUTY ATTORNEYS GENERAL** |
| 6 | |
| | CALIFORNIA DEPARTMENT OF JUSTICE |
| 7 | OFFICE OF THE ATTORNEY GENERAL<br>300 South Spring Street |
| 8 | Los Angeles, California 90013 |
| | BY: **BRENDAN M. HAMME** |
| 9 | **BARBARA S. HORNE-PETERSDORF**<br>**DEPUTY ATTORNEYS GENERAL** |
| 10 | |
| 11 | For Defendants: |
| 12 | UNITED STATES DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch<br>1100 L Street, NW |
| 13 | Washington, D.C. 20005 |
| | BY: **GARRY D. HARTLIEB, TRIAL ATTORNEY** |
| 14 | **JODY D. LOWENSTEIN, TRIAL ATTORNEY**<br>**JEAN LIN, SPECIAL LITIGATION COUNSEL** |
| 15 | **BENJAMIN S. KURLAND, TRIAL ATTORNEY**<br>**ANDREW BERNIE, TRIAL ATTORNEY** |
| 16 | **ABIGAIL STOUT, TRIAL ATTORNEY** |
| 17 | |
| | UNITED STATES DEPARTMENT OF JUSTICE |
| 18 | Civil Division<br>950 Pennsylvania Avenue NW |
| 19 | Washington, D.C. 20530 |
| | BY: **ERIC J. HAMILTON** |
| 20 | **JOHN BAILEY**<br>**DEPUTY ASSISTANT ATTORNEYS GENERAL** |
| 21 | |
| 22 | Also Present: |
| | **Kimberly Knight, Paralegal** |
| 23 | **Noel Garcia, Legal Analyst**<br>**Major General Scott Sherman** |
| 24 | |
| 25 | |

210

```
1                        I N D E X

2

3    Tuesday, August 12, 2025 - Volume 2

4

5                                            PAGE    VOL.

6    Defense Rests                            290      2
     Closing Argument by Ms. Strong           290      2
7    Closing Argument by Mr. Hamilton         310      2
     Rebuttal Argument by Ms. Strong          344      2
8

9

10   DEFENDANTS' WITNESSES                    PAGE    VOL.

11   SHERMAN, SCOTT MARSHALL (RECALLED)
     (PREVIOUSLY SWORN)                       213      2
12   Direct Examination by Ms. Lin           213      2
     Cross-Examination by Ms. Reilley        275      2
13

14                       E X H I B I T S

15   TRIAL EXHIBITS                    IDEN  EVID    VOL.

16      2                                    218      2

17      3                                    224      2

18      7                                    257      2

19     37                                    247      2

20     40                                    249      2

21     42                                    252      2

22    115                                    286      2

23

24

25
```

SA-062

PROCEEDINGS

<u>Tuesday - August 12, 2025</u>                                    <u>9:30 a.m.</u>

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:**  Calling Civil Action C 25-4870, Newsom vs. Trump.

Counsel, please state your appearances.

**MS. STRONG:**  Good morning, Your Honor. Deputy Attorney General Meghan Strong from the Department of Justice, California, on behalf of plaintiffs.  With me at counsel table today are Jane Reilley, Anya Binsacca, Marissa Malouff, Kendal Micklethwaite, Barbara Horne-Petersdorf, and Brendan Hamme.

**THE COURT:**  Good morning.

**MR. HAMILTON:**  Good morning, Your Honor. Eric Hamilton, Deputy Assistant Attorney General, U.S. Department of Justice, for defendants.  With me at counsel table today is Andrew Bernie, Garry Hartlieb, Jody Lowenstein, Jean Lin, Ben Kurland, John Bailey, and Abby Stout.

**THE COURT:**  Okay.  Good morning.

**MR. HAMILTON:**  Good morning.

**THE COURT:**  So we are at the point in these proceedings the plaintiff has rested.

Turning to the Government, my understanding is you wish to call a witness.

**MS. STRONG:**  Your Honor, just before --

PROCEEDINGS

1          THE COURT:  Yes.  Go ahead.

2          MS. STRONG:  -- defendants call their first witness,

3    we just have one item to correct.

4       In this morning's minute order that was entered, ECF 155,

5    Exhibit 114 was listed as a joint exhibit, and that's actually

6    a plaintiffs' exhibit only.

7          THE COURT:  Okay.  And it'll be so redesignated.

8          MS. STRONG:  Thank you.

9          THE COURT:  All right.  And that is -- 114 is the --

10   is the press release.  Not a release.  It was the press

11   conference that occurred yesterday -- is that correct?

12         MS. STRONG:  Yes, Your Honor.

13         THE COURT:  -- from the President and the Secretary of

14   Defense, the Attorney General, the Director of the FBI, and the

15   acting United States Attorney for the District of Columbia, if

16   I recall the *dramatis personae*.

17         MS. STRONG:  That's right, Your Honor.

18         THE COURT:  Okay.  So, yes, you may proceed.

19      Yes.  Good morning, Ms. Lin.

20         MS. LIN:  The defendants call Major General Scott

21   Sherman as our witness.

22         THE COURT:  All right.

23             (Witness steps forward to be sworn.)

24         THE COURT:  Good morning, General.  You've already

25   been sworn in these proceedings, so you may continue.

SHERMAN - DIRECT / LIN

1    **SCOTT MARSHALL SHERMAN**,

2    called as a witness for the Defendants, having been previously

3    duly sworn, testified further as follows:

4                    **DIRECT EXAMINATION**

5    BY MS. LIN:

6    **Q.**   General Sherman, can you remind the Court what your

7    position is within the Department of Defense?

8    **A.**   Sure.  I'm the deputy commanding general support for

9    Army North and also the commander of Task Force 51, the

10   contingency command post.

11   **Q.**   Can you explain what U.S. Army North is?

12   **A.**   So U.S. Army North is the Army service component command

13   for U.S. Northern Command.  So it is the Army component to U.S.

14   Northern Command.

15   **Q.**   And what is U.S. Northern Command?

16   **A.**   So U.S. Northern Command is the -- is the combatant

17   command, so the joint command for the homeland.  It has

18   responsibility from the North Pole through Alaska, Canada,

19   through the homeland, down to Mexico and Puerto Rico, Bahamas

20   in the Caribbean.

21   **Q.**   And you mentioned that you are the commanding general for

22   Task Force 51.  Can you just describe briefly what

23   Task Force 51 does?

24   **A.**   Sure.  Task Force 51 is the contingency command post.  So

25   it's the forward command post that goes forward for any

**SHERMAN - DIRECT / LIN**

1　homeland defense mission or defense support of civil

2　authority's mission.  That could be like we saw in L.A. with

3　federal law enforcement, but more than -- most of the time used

4　to support FEMA or states for some kind of domestic emergency.

5　**Q.**　You testified yesterday that the Marines were part of

6　Task Force 51 deployed to California.  My question is:  What

7　were their specific assignments as part of the federal

8　protection mission?

9　**A.**　Well, they were put under the command of, first, U.S.

10　Northern Command.  Then was -- as the joint force land

11　component command, which Army North does as part of our mission

12　because they're ground forces, they were brought under the

13　command of Army North and then subsequent delegated to

14　Task Force 51 as the contingency command post on the ground.

15　　　So it is -- they came under the command of the

16　Task Force 51 and from there, then we decided what their

17　mission would be.

18　**Q.**　And did they have any specific assignments?  I'm referring

19　to the Marines.

20　**A.**　Not initially.  I mean, it was decided because of their

21　mission's -- the Marines, that because of their mission, that

22　they protect embassies around the world, that they were better

23　prepared, better trained, more aware of how to protect a

24　government facility, that that would be a better job for them.

25　**Q.**　So do they -- as part of their federal protection mission,

SHERMAN - DIRECT / LIN

1  they were only protecting federal properties; is that your

2  testimony?

3  **A.**   That is correct.  That was decided when they -- when they

4  came under Task Force 51 and Army North, when that was

5  delegated to under our command, we had met with their command

6  and decided that that was the best mission for the Marines, to

7  guard facilities.

8  **Q.**   So they did not, as part of the federal protection

9  mission, go out to support law enforcement agencies' at-large

10  missions?

11          **MS. REILLEY:**  Objection.  Leading.

12          **MS. LIN:**  Let me rephrase.

13  **BY MS. LIN:**

14  **Q.**   Did they go out on at-large law enforcement missions with

15  law enforcement agencies --

16  **A.**   They did not.

17  **Q.**   -- during the federal protection mission?

18  **A.**   They did not.  They were -- they still supported federal

19  law enforcement, but predominantly the federal protection

20  services.  They guarded and protected federal facilities,

21  allowing the federal employees that are there to do their jobs.

22  **Q.**   Do you also have a role in the National Guard?

23  **A.**   I do.  I am a -- I am a National Guard general officer on

24  Title X orders, active duty orders, working at Army North.

25  **Q.**   By Title X orders, what do you mean?

**SHERMAN - DIRECT / LIN**

1  **A.**   That I was brought on active duty to be a deputy

2  commanding general for Army North and also the commander of

3  Task Force 51.

4  **Q.**   Okay.  And Title X, you are referring to Title X of

5  U.S. Code?

6  **A.**   I am.  Title X U.S. Code active duty, so active duty

7  forces.  I'm brought under active duty for that, yes.

8  **Q.**   And so by "active duty," would that include National Guard

9  members who were federalized as part of this federal protection

10  mission?

11  **A.**   Yes.  When they were federalized under Title X orders, in

12  this case 12406, that's Title X, bringing them under Title X

13  command and, yes, that is correct.

14  **Q.**   Have you received any military awards or decorations in

15  your 33-year career?

16  **A.**   Yes.  I've received a lot of awards.

17  **Q.**   Can you give us just a couple of examples?

18  **A.**   Sure.  Bronze Star medal for service in Iraq, Legion of

19  Merit for brigade command of a field artillery brigade, and

20  numerous meritorious service medals for serving as either

21  deputy commander or executive officer of brigades and

22  battalions.

23  **Q.**   You testified yesterday that you arrived in California on

24  June 9th.  Can you tell us generally what your responsibilities

25  were while you were deployed to California as part of

SHERMAN - DIRECT / LIN

1   Task Force 51's commanding general?

2   **A.**   Sure.   So when I -- when I first got there, it was to

3   organize the contingency command post, receive personnel from

4   Army North that were still flowing in to Los Angeles, and then

5   also take command or take control of, at that time, early on,

6   was the 79th Infantry Brigade Combat Team, which was brought

7   under Title X orders.   And then also start the movement --

8   coordinate and start the movement of Second Battalion 7th

9   Marines out of -- that were coming out of Southern California

10   there, to bring them into the joint operations area; and then a

11   day later finding out that the 49th Military Police Brigade was

12   also being mobilized, so also coordinating with both the

13   California National Guard to bring them on Title X.

14       And then start the actual muster of those forces at

15   their -- at their armories and starting the coordination of

16   bringing those personnel on Title X orders and movement of

17   their personnel and equipment down to Los Angeles.

18   **Q.**   You testified yesterday that you left California on

19   July 10th and General Nell assumed the responsibility of the

20   commanding general; is that right?

21   **A.**   That is correct.

22           **MS. REILLEY:**   Objection.   Leading.

23           **THE COURT:**   Sorry?   What?

24           **MS. REILLEY:**   I objected to the question as leading.

25           **THE COURT:**   Overruled.   Go ahead.

SHERMAN - DIRECT / LIN

1   BY MS. LIN:

2   Q.   So does General Nell still have command -- is still the

3   commanding general for Task Force 51?

4   A.   She --

5   Q.   Is she still the -- sorry.  Let me rephrase the question.

6        Is General Nell still the commanding general for

7   Task Force 51?

8   A.   She is not.  She was the acting commander from 10 July to

9   4 August when -- that's when Task Force 51 started movement

10  back to Fort Sam Houston in San Antonio, Texas.

11  Q.   And who has command and control over, then, the National

12  Guard troops that are still in California as part of the

13  federal protection mission?

14  A.   So it's still Army North.  So the unit that's -- the

15  formation that's on the ground that's really doing the

16  coordination on the ground is the defense coordinating element

17  for FEMA Region 9.

18  Q.   Did the Secretary of Defense provide any parameters of the

19  federal protection mission?

20  A.   Yes.  Through his memo that he issued to the commander of

21  U.S. Northern Command.

22       (Trial Exhibit 2 received in evidence.)

23  BY MS. LIN:

24  Q.   Can I refer you, then, to Exhibit 2 in the binder.

25       MS. STRONG:  I think the binders are just in the

SHERMAN - DIRECT / LIN

1    corner there.

2             THE WITNESS:  Yeah, I don't have the binders here.

3    They're in the corner.

4             MS. LIN:  Sorry about that.

5             THE COURT:  Are you referring --

6             MS. LIN:  Can I have Exhibit 2 on the screen?

7             THE COURT:  Okay.  Exhibit 2.

8             THE WITNESS:  Okay.  I see it now.

9    BY MS. LIN:

10   Q.   Do you recognize this document?

11   A.   I do.

12   Q.   What is it?

13   A.   So it's the memorandum to the commander of U.S. Northern

14   Command from the Secretary of Defense, giving -- really the

15   subject is the execution, telling the commander of

16   U.S. Northern Command of what they want the mission in

17   Los Angeles to do.

18   Q.   Can I direct your attention to the first bullet point

19   that's in the middle of this paragraph.

20   A.   Yes.

21   Q.   Would you please read that bullet point?

22   A.   [As read]:

23            "Deploy to Federal Government properties,

24        including Federal buildings and monuments.  When

25        deployed to Federal Government properties, Service

SHERMAN - DIRECT / LIN

1      members will support Federal law enforcement and may

2      take reasonable measures to prevent the destruction

3      or defacement of Federal Government property,

4      including crowd control, temporary detention, cursory

5      search (such as safety-related searches for weapons

6      incident to temporary detention) measures to ensure

7      the safety of persons on the property, and the

8      establishment of security perimeters reasonably

9      necessary to protect the property."

10  Q.   Does this bullet point comport with your understanding of

11  what Task Force 51 troops are permitted to do while engaged in

12  the federal protection mission?

13  A.   It's exactly what the troops on the federal mission did.

14  Q.   Can I direct your attention, then, to the second bullet

15  point, which is -- which addresses a different topic, so if you

16  would please read that into the record.

17  A.   [As read]:

18       "Deploy to support Federal law enforcement to

19      protect Federal functions and to protect Federal

20      personnel from harm or threat of bodily injury,

21      including Federal law enforcement officers and other

22      Federal Government officials and employees.  This may

23      include measures for temporary detention, cursory

24      search, and the steps necessary to ensure the safety

25      of Federal personnel.  For example, while other

SHERMAN - DIRECT / LIN

1    Federal personnel execute their duties, DOD Service

2    members may provide perimeter protection against

3    third parties and such crowd control measures as are

4    reasonably necessary to ensure the execution of

5    Federal functions and the safety of Federal

6    personnel."

7    **Q.**   Does this bullet point comport with your understanding of

8    the scope of the parameters of the federal protection mission

9    as to the protection of law enforcement personnel and

10   functions?

11   **A.**   Yes, it does.  This is exactly the guidance that I gave in

12   our orders to all -- all of the Title X -- or the National

13   Guard troops that were put on Title X and Marines.

14   **Q.**   And can I direct your attention, then, to the last

15   paragraph.  If you could read the first sentence of that last

16   paragraph.

17   **A.**   [As read]:

18         "In performing these duties, Service members are

19         to follow the Standing Rules for the Use of Force."

20   **Q.**   And we'll get to the standing rules for the use of force

21   later, but can you describe generally, what are the standing

22   rules for the use of force?

23   **A.**   It is -- the standing rules on the use of force are the --

24   are the rules that bind soldiers and Marines, in this case,

25   they're -- what they are allowed to do for the protection of

SHERMAN - DIRECT / LIN

1   the service members and, in this case, also the federal

2   employees and federal law enforcement that they were

3   protecting.

4   **Q.**   And do these rules include rules relating to the Posse

5   Comitatus Act?

6   **A.**   It is not on -- for the briefing that they had gotten, the

7   part of the training that they had gotten for the standing

8   rules of the use of force, parts -- the Posse Comitatus Act was

9   addressed at their level, but these are -- the standing rules

10  on the use of force are 12 rules that, in this case, soldiers

11  and Marines abide by for these missions.

12  **Q.**   And if I can direct you to the second sentence of the last

13  paragraph, if you could read that into the record.

14  **A.**   [As read]:

15        "Service members may not perform direct law

16        enforcement activities such as searches, seizures,

17        evidence collection, or arrest."

18  **Q.**   And to your knowledge, did any Task Force 51 troops

19  violate this prohibition?

20  **A.**   They did not.

21  **Q.**   And, finally, the last question about this page, if you

22  could read the third sentence, the last paragraph.

23  **A.**   [As read]:

24        "Any temporary detention undertaken by Service

25        members" -- example given is "to stop an assault of,

SHERMAN - DIRECT / LIN

1          to prevent harm to, or to prevent interference with

2          Federal personnel) will end when detained persons can

3          be turned over safely to the custody of appropriate

4          civilian law enforcement personnel."

5     Q.   Does this memo -- I think we talked about this.  Just to

6     confirm, does this memo define, in your view, the parameters of

7     the federal protection mission?

8     A.   It does.

9     Q.   And do the commanders on the ground for Task Force 51

10    understand that this is -- that the topics here are the

11    parameters of the federal protection mission?

12    A.   They completely understood that this was their mission and

13    that they were to follow this -- to follow this -- even in the

14    orders and with the training they received, to follow this

15    exactly.

16    Q.   And to your knowledge, did any Task Force 51 troops

17    deployed to California exceed the parameters of the Secretary's

18    instruction in this memorandum?

19    A.   They did not.

20    Q.   And if I could direct your attention to the upper

21    right-hand corner that provided the date of this document.

22    A.   Yes.

23    Q.   You see that it says it's dated June 23rd?

24    A.   Yes.

25    Q.   Did you understand that the federal protection mission

1    discussed in this memo was the mission when it began on

2    June 9th, when you arrived in California?

3    A.    Yes.  This is the June 23rd, 2025, memo.  There was a memo

4    on -- I believe it's June 8th, somewhere around there, that was

5    another memo from the Secretary of Defense, pretty similar to

6    this, I believe, if not exactly the same.

7    Q.    So there were other orders that specified the federal

8    protection mission?

9    A.    Correct.

10         (Trial Exhibit 3 received in evidence.)

11   BY MS. LIN:

12   Q.    Can I direct your attention, then, to Exhibit 3.

13   A.    (Witness examines document.)

14   Q.    There are four pages to this exhibit if you want to just

15   take a quick look at them.

16   A.    (Witness examines document.)  Yes.

17   Q.    So the first page is dated June 9th, 2025; right?

18   A.    That's correct.

19   Q.    Is this one of the Secretary of Defense's memos that you

20   were discussing just now?

21   A.    It is.  It's the memo provided to the Adjutant General of

22   California, National Guard, and it says "Through the Governor

23   of California."  It's a memo telling them that they were going

24   to mobilize 2,000 members of the California National Guard.

25   Q.    And there was another document on the last page of this

SHERMAN - DIRECT / LIN

1    exhibit that's Bates stamped DEFS 00000009.  What is this

2    document?

3    A.    This is a similar document.  I think there are probably

4    some -- the one was revised.  So I believe, now looking at

5    these, that the one dated 7 June was the initial call-up of

6    2,000 National Guard members, which was the 79th Infantry

7    Brigade Combat Team of the California Army National Guard.

8         And then looking at this now, the one on the 9th is the

9    call-up of the additional 2,000 members.  Yep, right here, the

10   second paragraph, this further implements the President's

11   direction and an additional 2,000 members will be called in,

12   which was the 49th Military Police Brigade.

13   Q.    Okay.  If I could direct your attention to the last page

14   of this exhibit that's Bates stamped 9 at the end of that long

15   Bates number.

16   A.    Yes.

17   Q.    Can I have you read to yourself the first paragraph and

18   tell us whether this is your understanding of the scope of the

19   federal protection mission?

20   A.    Yes, that is my understanding.

21   Q.    And if I could direct your attention to the language that

22   discusses -- let me put it differently.

23        What is Task Force 51 charged to protect --

24   A.    Well --

25   Q.    -- based on this paragraph?

1    **A.**    -- to temporarily protect U.S. Immigration and Customs

2    Enforcement and other U.S. government personnel who are

3    performing federal functions, including the enforcement of

4    federal law, to protect federal property at locations where

5    protests against those actions are happening, you know, based

6    on current threats and assessments and planned operations.

7    **Q.**    Does it also include language, though, that function --

8    protests against these functions occurring or are likely to

9    occur based on current threat assessments and planned

10   operations?

11   **A.**    That's correct.

12   **Q.**    Am I reading that correctly?

13   **A.**    Yeah, that's okay.  It says "at locations where protests

14   against these functions are occurring or are likely to occur

15   based on current threat assessments."

16   **Q.**    And that's the same instruction contained -- is that the

17   same -- does that same instruction appear also on the June 9th

18   Secretary of Defense memo?

19   **A.**    That is correct.  In the first paragraph in the middle, it

20   does say the same thing.

21   **Q.**    Besides the two Secretary of Defense memos and the

22   June 23rd memo we were just discussing, are you aware that

23   there were other instructions and orders, whether from

24   the President or anyone else, about the federal protection

25   mission?

**SHERMAN - DIRECT / LIN**

1    **A.**    Yeah, absolutely.  I had read the President's memo to the

2    Secretary of Defense, the Secretary of Homeland Security, and

3    the Attorney General, I believe.  That was his directions, his

4    memo directions to them about mobilizing National Guard forces.

5    **Q.**    Is that memo contained in this document that you can see,

6    which is Bates stamped 7 at the bottom?

7    **A.**    Yes, this is the President's memorandum.

8    **Q.**    In the second paragraph of this memo, does it also contain

9    the same language we've been talking about, which is to protect

10   federal law enforcement and federal property at locations where

11   protests against these functions are occurring or likely to

12   occur based on current threat assessments and planned

13   operations?

14   **A.**    So, yes.  Yes.  So as the President says here [as read]:

15            "I hereby call into federal service members and

16        units of the National Guard under Title X, U.S. Code

17        12406, to temporarily protect ICE and other U.S.

18        government personnel who are performing federal

19        functions, including the enforcement of federal law

20        and to protect federal property at locations where

21        protests against these functions are occurring or are

22        likely to occur based on current threat assessments

23        and planned operations."

24   **Q.**    And that's your understanding of the order and the mission

25   that you were charged to carry out?

SHERMAN - DIRECT / LIN

1    **A.**    That is correct.

2    **Q.**    Can I direct your attention to the first paragraph of this

3    presidential memo dated June 9th.

4    **A.**    Yes.

5            **THE COURT:**  Dated what?  I'm sorry, dated?

6            **MS. LIN:**  June 9th.

7            **THE WITNESS:**  June 7th.

8            **MS. LIN:**  7th.  I'm sorry.

9            **THE COURT:**  June 7th.

10           **MS. LIN:**  Yes.  My apologies.

11           **THE COURT:**  No, that's all right.

12   **BY MS. LIN:**

13   **Q.**   So if I could have you read that first paragraph to

14   yourself and then focusing on the last sentence of that

15   paragraph, when you get there.

16   **A.**   (Witness examines document.)  Yes.

17   **Q.**   And can you read the last sentence of this paragraph into

18   the record?

19   **A.**   [As read]:

20           "To the extent that protests or acts of violence

21       directly inhibit the execution of the laws, they

22       constitute a form of rebellion against the authority

23       of the government of the United States."

24   **Q.**   Do you recall being asked about whether there was --

25   whether you were aware that there was any rebellion yesterday?

SHERMAN - DIRECT / LIN

1   A.   Yes, and -- yes.  I'll clarify this.

2       So did I know about the President's memorandum exactly

3   here, about that the President viewed that the extent of

4   protests or acts of violence directly inhibit the execution of

5   laws and they constitute a form of rebellion?  Absolutely.  And

6   did our soldiers and our leaders know that and our Marines?

7   Yes.  That is part of the debriefing certainly as they've

8   gotten.

9       In our orders, we followed the Secretary of Defense's

10  guidance to the commander of U.S. Northern Command, really

11  focused on, first, protection of federal property and

12  protection of federal law enforcement and federal personnel,

13  allowing them to do their federal duties and to also enforce

14  federal law, doing federal law enforcement actions.

15  Q.   Thank you.

16       Can I direct your attention to Exhibit 5.  And it's Bates

17  stamped DEFS 0000012 through '14.

18       Do you recognize this document?

19  A.   I do.

20  Q.   Is this one of the orders that you also were talking about

21  earlier?

22  A.   Yes.  So this came a little bit later in the week, but

23  this is General Order Number 1, which establishes the baseline

24  personal conduct of soldiers and Marines that were on the

25  mission.

SHERMAN - DIRECT / LIN

1  Q.   Can I have you look at paragraph 4 of this document?  And

2  if you could read that into the record.

3  A.   [As read]:

4        "We have been called on to rapidly provide

5       protection for U.S. Immigration and

6       Customs Enforcement (ICE), and United States

7       government personnel who are performing federal

8       functions and to protect federal property.  This

9       requires discipline and a clear focus on our mission,

10      both when actively providing protection and when in

11      staging areas.  Our ability to achieve success is

12      inherently tied to our conduct; therefore, these

13      rules are put in place to ensure that all personnel

14      understand the baseline standards expected of them.

15      Public trust is inextricably tied to our level of

16      personal, professional, and mission-focused

17      discipline.  We serve the people of the

18      United States, and, as such, we will uphold that duty

19      with the utmost care and professionalism."

20  Q.   As the commanding general of Title IV's Task Force 51, was

21  this your mindset when you were carrying out your federal

22  protection mission?

23  A.   Absolutely.

24  Q.   And why is it important to have the public's trust in

25  carrying out this mission?

**SHERMAN - DIRECT / LIN**

**A.** It's to ensure to the public that we are doing exactly what we were told to do, exactly in line with federal law, that we were not conducting law enforcement operations, and that we were there to serve the people of the United States and to ensure that, first, their government buildings, the people of the United States were protected from defacement and from any people that were going to damage the property, and to ensure that federal personnel could do their jobs in that facility, and also protect federal law enforcement to ensure that they could enforce federal law.

**Q.** Is this instruction different from when the troops are deployed overseas versus the homeland?

**A.** There's a General Order 1 always when you're deployed. There are some differences, of course, but something similar. I mean, we're there to serve the people of the United States again, but in a different capacity; to fight a conflict, to fight a war. It's different than this.

But in the homeland, we're there, we are -- it is -- it is a difficult place for us to operate. We understand and we fully support civilian control of the military. We are there to uphold the law of the United States, and as such we did that on this duty.

And it's certainly making sure that they under- -- all the public understood that we took our duty very seriously and note that care and professionalism were always exhibited and that we

SHERMAN - DIRECT / LIN

1    were doing exactly our duties that were in accordance with

2    Title -- or with federal law.

3    Q.    And is that consistent with the instructions you gave to

4    Title IV's 51 troops?

5    A.    On a daily basis, absolutely.

6    Q.    Can I direct your attention to, then, paragraph 5(b).  And

7    if you could read that sentence for us.

8    A.    [As read]:

9              "Responsibilities:  Individuals will follow and

10        adhere to the standing rules for the use of force and

11        any supplements that are published."

12   Q.    So is it fair to say that the reference to "follow and

13   adhere to the standing rules for the use of force" is

14   throughout your mission and consistent in all of your

15   documents?

16   A.    Absolutely.

17   Q.    So we talked a little bit about the standing rules for

18   the -- standing rules for the use of force.  Did the

19   Task Force 51 troops deployed to California receive trainings

20   on those rules?

21   A.    They did.  They could not go -- they could not be involved

22   in any missions without receiving standard rules on the use of

23   force training and also civil disturbance training, but

24   definitely the standard rules on the use of force.

25   Q.    So the training for the standing rules for the use of

SHERMAN - DIRECT / LIN

1   force was mandatory, then?

2   **A.**   Absolutely.  For them to be involved in any -- anything

3   outside joint force training base Los Alamitos, to be outside

4   the fence line there, doing any kind of protection of federal

5   property or protection of federal law enforcement as they did

6   their jobs, absolutely.

7   **Q.**   And how do you know every soldier had been trained on

8   these rules?

9   **A.**   Yeah, so every brigade had to have sign-in sheets, had to

10  track every soldier by name on a spreadsheet that were reviewed

11  at every level to make sure that every soldier received that

12  training, and Marine.

13  **Q.**   Can I direct your attention to Exhibit 10.

14  **A.**   Yes.

15  **Q.**   Do you recognize this document?

16  **A.**   I do.

17  **Q.**   And what is it?

18  **A.**   So this is the slide set that our legal people in each

19  brigade and battalion used to train our military personnel, our

20  soldiers and Marines, on the standard rules on the use of

21  force.

22  **Q.**   And that's for the Task Force 51 troops --

23  **A.**   That is correct.

24  **Q.**   -- deployed to California?

25  **A.**   The whole Task Force 51 troops, everyone, including the

1    headquarters.

2    **Q.**   And I think you might have explained this earlier.  This

3    contains training on the Posse Comitatus Act?

4    **A.**   It does have a few slides on the Posse Comitatus Act.

5    **Q.**   Okay.  And would that be -- can you point us to the pages

6    for that?

7    **A.**   So for this one, DEFS 00001099 is really the first one,

8    Slide 5 of this slide set.  It's after the cover page.  It says

9    "Posse Comitatus Act."

10   **Q.**   Okay.  Can I direct your attention, then, to the page

11   marked as DEFS 00001100.

12   **A.**   Yes.

13   **Q.**   And this page, at the top it says, "PCA prohibits active,

14   direct," and there's a list of activities there.  Do you see

15   that?

16   **A.**   That is correct.

17   **Q.**   Do you know why the four items -- there are four items

18   that are in a different color?

19   **A.**   Yes.  With -- in accordance with the instructions

20   received, first, through the Secretary of Defense to the

21   commander of U.S. Northern Command, and then through

22   U.S. North Com General Admin Order and Army North Op Order on

23   this operation, that there -- the directions they were given.

24        And it does list on the next page that there was a

25   constitutional exception that -- both from the memorandum from

SHERMAN - DIRECT / LIN

1    the President and from the memorandum to -- from the Secretary

2    of Defense, that said with our missions, protecting federal

3    property and federal law enforcement as they did their law

4    enforcement job, that these were four areas that, according

5    with their memorandums and with their direction, that we could

6    do to protect either federal property or federal personnel.

7         THE COURT:  Could you explain?  You used this term

8    "there is a constitutional exception."

9         THE WITNESS:  Yes, Your Honor.

10        THE COURT:  Okay.  Well, I don't know that it's in

11   the -- is it something in the Constitution?  Is there an

12   article or a section that I should take a look at?

13        THE WITNESS:  I'm not -- I'm not a lawyer, Your Honor,

14   but certainly --

15        THE COURT:  That may be to your credit.

16                       (Laughter.)

17        THE COURT:  But at any rate, I just wonder.  You used

18   the word "constitutional," and I'm unaware that there's

19   something in the Constitution.  Now, maybe you use that word

20   because you were told that that is the case.

21        THE WITNESS:  So the legal advice that we --

22        THE COURT:  Yes.

23        THE WITNESS:  -- that I was given all the way from

24   Department of Defense, all the way through U.S. North Com,

25   U.S. Army North, that this was the advice that I was given, as

1    that we were allowed to do these four -- these four things

2    because it was in line with the -- what the President was

3    directing, what the Secretary of Defense was directing; and for

4    these -- you know, was in line with the constitutional

5    exceptions that are listed here, one that's highlighted on the

6    next page.

7            THE COURT:  So your understanding, that those things

8    in red are what?  Are authorized by the Constitution of the

9    United States?

10           THE WITNESS:  They were -- they were authorized by --

11   because of what the President and the Secretary of Defense had

12   given in their memos and that there was a -- there was a reason

13   that they could order us to do that because of the protection

14   of federal property functions and personnel.

15           MS. LIN:  So if I could --

16           THE COURT:  Okay.  Wait.  I want to just make sure I

17   understand the witness's testimony.

18       What is listed on 1100, the exhibit that we're now

19   discussing, there are a number of things which are prohibited

20   law enforcement functions.

21           THE WITNESS:  Correct.

22           THE COURT:  I mean, that's -- as I read it, it says

23   it's prohibited.  That means you can't do it; right?

24           THE WITNESS:  Right.

25           THE COURT:  Okay.  And there are four things that are

SHERMAN - DIRECT / LIN

1  in red:  Security patrols, traffic control, crowd control, riot

2  control.

3          THE WITNESS:  Correct.

4          THE COURT:  Those are four things, as I read this

5  document, and perhaps I read it incorrectly, but as I read it,

6  it says it's prohibited.

7          THE WITNESS:  Yes, Your Honor.

8          THE COURT:  It's prohibited.  The military can't do

9  it.  Under this -- under this page, it says you can't do

10  security patrols, traffic control, crowd control, riot control.

11  Is that -- is that an incorrect reading?

12          THE WITNESS:  Well, these are highlighted because

13  there are -- because this was a discussion that was brought up,

14  that because of the order given by the President and by the

15  Secretary of Defense, which was in line with the constitutional

16  exception of protection -- protecting federal property,

17  functions, and personnel.

18          THE COURT:  So it's your understanding that -- I'm not

19  going to put words in your mouth, and you should tell me if I'm

20  incorrect --

21          THE WITNESS:  Right.

22          THE COURT:  -- in articulating your understanding.

23      Your understanding is that the four things in red that

24  we've identified, while they are on a list of those things that

25  are prohibited functions, that notwithstanding that, you can do

1  those things under certain circumstances and that's why they're

2  listed in red?

3        **THE WITNESS:**  That is -- that is correct.  That is my

4  understanding and that is the legal advice that I received.

5        **THE COURT:**  Okay.  And that the President has the

6  authority to make that decision?

7        **THE WITNESS:**  The President has the authority, as I

8  was -- as I was legally advised, has the authority to protect

9  federal property, functions, and personnel; and with that,

10  you're allowed to do these four:  The security patrols, the

11  traffic control, the crowd control, and riot control.

12        **THE COURT:**  Okay.  Thank you.

13        **MS. LIN:**  Your Honor, it might be also -- my

14  apologies.

15  **BY MS. LIN:**

16  **Q.**  So maybe I can help explain this a little bit or get your

17  explanation on this a little bit.

18        So at the top of this page, that's 1100, it talks about

19  PCA prohibits active, direct, and then here's a -- there's a

20  list, including the four that are included in red.

21        Do you -- when you perform the federal protection mission,

22  is it your understanding that you were directly providing

23  security patrols, directly doing traffic control, crowd

24  control, or riot control, or were there limitations on those

25  activities when performed by Task Force 51 soldiers?

SHERMAN - DIRECT / LIN

1          **MS. REILLEY:**  Objection.  Leading.  Argumentative.

2    Compound.

3          **THE COURT:**  Sustained.

4    **BY MS. LIN:**

5    **Q.**   Let me rephrase the question.  So when the document says

6    "direct" -- "PCA prohibits active direct" and then there's

7    four --

8          **THE COURT:**  Why don't you do this, because you're

9    going to ask a leading question.

10         Take traffic control.  Is it your understanding that the

11   traffic control services that were rendered by the military

12   were not direct?

13         **THE WITNESS:**  So any of our actions --

14         **THE COURT:**  In any of these operations that we've

15   discussed, that the traffic control was not directly done by

16   the military?

17         **THE WITNESS:**  It was not, Your Honor.  It was not

18   active and direct.  It was only done if there was a direct

19   threat or that they -- the law -- the federal law enforcement

20   felt there was a direct threat to them, then a traffic control

21   point, more of a perimeter, was done to protect the federal law

22   enforcement, allowing them to do their job.

23         **THE COURT:**  So, in other words, while direct -- while

24   traffic control was done directly, it was within an exception

25   of this act because it was in aid of protecting federal

 1    officers or federal property; is that correct?

 2        THE WITNESS:  That is correct.  It was not done --

 3    active and direct was done by federal law enforcement.  If at

 4    any time they felt there was a threat to them, either to the

 5    property or to them doing their federal law enforcement

 6    actions, enforcing federal law, then, in this case, if they

 7    were outside federal property, soldiers were allowed to do

 8    what, here, is a traffic control point.  It was -- we thought

 9    of it as more of a perimeter to protect federal agents.

10        THE COURT:  So it's your view that if -- we'll not

11    talk about federal property.  We'll just talk about law

12    enforcement, federal law enforcement.  Federal laws being

13    enforced by federal agents --

14        THE WITNESS:  Correct.

15        THE COURT:  -- but not by the military.

16        THE WITNESS:  That's correct, Your Honor.

17        THE COURT:  Okay.  If there was some impediment,

18    obstruction of the federal -- of federal employees executing

19    federal laws, it's your understanding that the military, then,

20    can provide the services that are outlined in the red -- the

21    red portion of the prohibition.

22        THE WITNESS:  Yes, Your Honor, as long as it was in

23    line with protecting the federal personnel and their enforcing

24    federal law of -- and federal functions.

25        THE COURT:  Well, what if it's just in line with

1   protecting or enhancing or enabling federal officers in

2   execution of federal laws as distinct from that the officers

3   are threatened?

4           **THE WITNESS:**  No.  It was -- they were strictly there

5   and strictly did any action for the protection of federal law

6   enforcement.  The law enforcement actions had to be conducted

7   by federal law enforcement.  If they were -- if they were

8   making an arrest, if they were doing a warrant, that's a

9   federal law enforcement action.  Our soldiers were never

10  involved in that.  They were strictly on the outside, strictly

11  there to protect federal law enforcement.

12          **THE COURT:**  Thank you.

13  **BY MS. LIN:**

14  **Q.**  So just to conclude this topic, is it your understanding

15  that these items highlighted in red were conducted only to the

16  extent that there were law enforcement personnel conducting

17  those activities as well?

18  **A.**  Correct.  And for all these activities, law enforcement

19  personnel were side by side with the soldiers or very near

20  them.  For active -- for any kind of active direct -- let's

21  just say traffic control point.  Active direct traffic control

22  point was done by federal law enforcement.

23      In this case, we're outside federal property.  Our

24  soldiers were behind them and were only -- they only came up

25  either right even with them or in front of them that there was

SHERMAN - DIRECT / LIN

1    a direct threat.  If there was a threat to that federal law

2    enforcement official, they're to protect them.  It was also to

3    protect the rest of the federal law enforcement that were

4    actually doing their federal law enforcement duties, actions

5    on -- it could be an illegal grow farm.  It could be a

6    marijuana farm.  It could have been an arrest at a house.

7    Whatever.

8    Q.   Do the standing rules for the use of force contain any

9    rules about reporting violations of these rules?

10   A.   They do.

11   Q.   Is that -- what rule is that one?

12   A.   So it's really the PCA prohibits -- well, if they rule or

13   they observe -- any soldier or Marine observes a violation of

14   the PCA, of the Posse Comitatus Act, then they are to report

15   that through their chain of command to their judge advocate,

16   which is their lawyer in the battalion or higher, or their

17   chaplain or directly to their commander.

18   Q.   Can I direct your attention to, in this same exhibit,

19   Bates Number DEFS 00001133.

20   A.   (Witness examines document.)

21   Q.   Is this the rule that you were just describing?

22   A.   Yeah, this is Rule 12, report of violations of the

23   standing rules on the use of force.

24   Q.   As the commander of Task Force 51 troops deployed at

25   California, did you receive any reports of violation of the

SHERMAN - DIRECT / LIN

1  standing rules for use of force as part of the federal

2  protection mission?

3  **A.**  I did not.

4  **Q.**  And after you left California, did you receive any reports

5  of any such violation?

6  **A.**  I did not see any report of that or from any report that

7  General Nell provided.

8  **Q.**  Okay.  You would have received the report if there was

9  such a violation even after you left California?

10  **A.**  Well, General Nell was in command, but it would have been

11  in her report to the Army North commander or

12  U.S. Northern Command commander.

13  **Q.**  Can I direct your attention, then, to the pages marked

14  11 -- sorry -- DEFS 00001135 to 1137.

15      Do you recognize those pages?

16  **A.**  I do.

17  **Q.**  And what are they?

18  **A.**  So this is a standard rules on the use of force card.

19  This is one of two pages that lists the 12 rules, and this is

20  what soldiers and Marines carried on themselves.  We also

21  provide a QR code in this briefing that they can have it on

22  their phones.

23  **Q.**  They were required to carry these rules on their persons?

24  **A.**  They were.

25  **Q.**  And you mentioned the QR code.  Can I reference -- direct

1    you -- your attention to the page marked 1138 at the end of the

2    Bates number?

3         Is that the QR code that you're referencing?

4    A.   Yes, it is.

5    Q.   And what does this do, this QR code, again?

6    A.   It brings up a document with the standard rules on the use

7    of force.

8    Q.   So the soldiers could bring up the rules with their

9    iPhones and other mobile devices anywhere they are?

10   A.   Absolutely.  They could bring it up.  They could have it

11   saved on their page for reference.  You know, with our young

12   generation of soldiers and Marines, they operate on their cell

13   phone.  That's -- you know, that's -- that's their inherent

14   technology.  You know, they're technology natives, as we call

15   it.  They love to have it right on their phone so they can

16   reference it immediately.

17   Q.   At any time when they are deployed?

18   A.   Absolutely.

19   Q.   Okay.  Can I turn your attention, then, to the pages DEFS

20   00001144 to '1162.  Do you recognize these pages?

21   A.   I do.

22   Q.   And what are they?

23   A.   So they're vignettes that the -- that the lawyers and the

24   personnel -- the lawyers that were giving the class would

25   provide that developed discussion.  We like to have these

1    trainings at the company level or lower, smaller group, people

2    that soldiers and Marines work with on a daily basis, they feel

3    comfortable with, where they can do a vignette and they can

4    have open discussion from the lowest soldiers through the

5    company commander discussing the situation on the ground and

6    discuss how they would react, how they would do anything

7    following the standing rules on the use of force.

8    Q.    And every soldier was trained in these type of vignette --

9    A.    Every --

10   Q.    -- exercises?

11   A.    Every soldier and Marine was trained on vignettes, that's

12   correct.

13   Q.    You mentioned a moment ago that there was also crowd

14   control training or civil disturbance training.  Did I get that

15   right?

16   A.    There was.

17   Q.    And what does that entail?

18   A.    So that's training to using their -- their equipment

19   they're issued; their knee pads, their body shield, their face

20   shield, their baton.  It's a type -- it's a training that all

21   the soldiers received, the ones that were actually going to be

22   using it.  How to -- if they encountered a group of people that

23   was threatening, that they could use -- especially if they were

24   pushing on the people, they use that equipment to hold the

25   rioting people back or to prevent them from, you know, gaining

1    access to federal facilities or -- or a -- let's say a traffic

2    control point, if they're -- if they're threatening federal law

3    enforcement.

4    **Q.**  So is it fair to characterize your description of the

5    training as defensive training?

6    **A.**  Absolutely.  It's all about defensive training,

7    proportionality, how to -- and also how to take that situation

8    and, you know, bring it down a notch, if you will.  How to move

9    the crowd out, how to try -- anything proportional, it had to

10   be exactly with what the crowd was doing just to control the

11   crowd.

12   **Q.**  Are there reporting requirements for events or significant

13   events that occurred during the federal protection mission?

14   **A.**  Yes.  There were commander -- there were CCIRs, so

15   commanders critical information requirements, or serious --

16   serious incident reports.

17   **Q.**  So if a violation of the PCA has occurred, would it be

18   documented in the CCIR?

19   **A.**  It would be immediately sent up first by voice to the Task

20   Force 51 joint Operations Center, through their battalion or

21   brigade staffs, and then I'd expect a call from battalion or

22   brigade commander directly to me that this event happened; this

23   is the actions they're taking to remedy the situation

24   immediately.

25   **Q.**  So by CCIR, again, you were talking about the commanders

SHERMAN - DIRECT / LIN

```
1   critical information requirement reporting procedures?

2   A.   Correct.

3        (Trial Exhibit 37 received in evidence.)

4   BY MS. LIN:

5   Q.   Can I direct your attention, then, to Exhibit 37.

6             THE COURT:  Exhibit 37?

7             MS. LIN:  37.

8             THE COURT:  Thank you.

9   BY MS. LIN:

10  Q.   And it's Bates stamped DEFS 00005932 to '593 -- oh, wait

11  I'm sorry.  Oh, yeah.  '5934.

12            THE COURT:  May I have those numbers again?

13            MS. LIN:  My apologies, Your Honor.  It's

14  DEFS 00005932 through '5934.

15  BY MS. LIN:

16  Q.   General Sherman, do you have it?

17  A.   I do.

18  Q.   Do you recognize this document?

19  A.   I do.

20  Q.   What is it?

21  A.   So this is -- this is part of an email for a -- first

22  originally by sergeant -- sergeant first class --

23  Q.   We may not be talking about the same exhibit.  Are you

24  looking at 37?

25  A.   I'm looking at 37, DEFS 00005932.
```

SHERMAN - DIRECT / LIN

1  **Q.**  Oh, yes.  My apologies.

2  **A.**  Okay.

3  **Q.**  Okay.  So maybe can you read the top?  At the top of the

4  document, what is the subject that's --

5  **A.**  Sure.

6  **Q.**  -- the heading?

7  **A.**  This is a cut-and-paste from our -- we call it JFLCC CCIR

8  out of our -- our TACSOP, our tactical SOP.  This is -- this is

9  a cut-and-paste from our CC -- from our TACSOP, really talking

10 about the reporting procedures for any commander's critical

11 information requirements.

12 **Q.**  And at the bottom of the page, the first page, 5932, do

13 you see there's a reference to 5W format?

14 **A.**  I do.

15 **Q.**  Can you explain what that entails?

16 **A.**  Sure.  So the first -- it's really bottom-line, up-front

17 bluff.  So really providing the details of the situation as

18 happened on the ground, and then including that was who, what,

19 when, and where.

20 **Q.**  I think you testified a moment ago that any violation of

21 the PCA would have been reported through the CCIR.  Would the

22 CCIR reporting requirement include events even when there were

23 no violations?

24 **A.**  Of a PCA?  Would there be other CCIR reports?

25 **Q.**  No.  I'm sorry.

1    Would -- would the CCIR reporting procedures include

2   events that do not rise to a violation?

3   **A.**   Of a PCA?

4   **Q.**   Right.

5   **A.**   Absolutely.  It could be -- there's a whole list of them,

6   events or anything that happens within -- within an operation

7   that need to be reported.

8        (Trial Exhibit 40 received in evidence.)

9   **BY MS. LIN:**

10  **Q.**   Okay.  Can I direct your attention, then, to Exhibit 40.

11  And that is Bates stamped 00008251 to 8255.

12       Do you recognize this document?

13  **A.**   I do.

14  **Q.**   And what is it?

15  **A.**   So this is -- this is an email from -- well, originally

16  from Lieutenant Colonel Pospisal.  It's really giving the CCIR,

17  the 5Ws, of the person -- when the person was temporarily

18  apprehended by the U.S. Marine at Wilshire federal building.

19  **Q.**   And who received the CCIR report?

20  **A.**   So initially it comes up through the -- in this case, from

21  two 7 Marines -- from Second Battalion 7th Marines to our joint

22  Operations Center.  And then it's sent to Army North's joint

23  Operations Center in San Antonio and then up to

24  U.S. Northern Command.

25  **Q.**   You were asked about the incident involving the Marine

SHERMAN - DIRECT / LIN

1  yesterday.  I just want to go over a couple of quick points

2  about this.

3      If you could look at the document that's in front of you

4  that's -- well, Exhibit 40.  Does it talk about -- it provided

5  the -- did it provide the when and -- let me strike the

6  question.

7      Directing your attention to the page that's marked 8252.

8  **A.**  Yes.

9  **Q.**  And does it describe the -- what is it doing, the RFI-1?

10 **A.**  So RFI-1 right here is -- it's answering a question from

11 Major West from U.S. Army North that asked the Task Force 51,

12 and responded -- and it was responded by Colonel Pospisal, when

13 it was asked how long was the individual detained -- and

14 detained by the service member before he was turned over to

15 civilian law enforcement, and --

16 **Q.**  And what -- oh.

17 **A.**  Oh, I was just going to add so Colonel Pospisal's response

18 was [as read]:

19          "Approximately 25 minutes.  The site OIC

20      contacted" --

21     So it's the National Guard site OIC.  I don't know what

22 "NG" says here because this was a Marine thing.  So it should

23 be [as read]:

24          "The site OIC contacted multiple agencies before

25      DHS showed up to take custody of the individual."

SHERMAN - DIRECT / LIN

1    Q.    And do you know why it took as long as 25 minutes for law

2    enforcement to arrive to take custody?

3    A.    I think it was at 12:45, right around that time.  There

4    was lunch traffic coming back into Wilshire building, for the

5    federal building.  So there was a federal law enforcement

6    official right there, checking IDs, had Marines behind him at

7    that traffic control point.

8        The same thing for the point where the people can come in,

9    which is another -- they can come in both at the traffic

10   control point or there's just a civilian walk-in point too,

11   another point.

12       Both those officers are busy doing their actions there, so

13   they had to make a call up to the building.  There was also a

14   long line at the screening area, where people that come in,

15   when they get to the building, they're screened through --

16   through an X-ray machine.  But they had to call up higher into

17   the building and actually get that person down.

18   Q.    So there were law enforcement officials nearby but they

19   were busy; is that your testimony?

20   A.    That is correct.

21   Q.    Do you believe the Marines' activity on that day violated

22   the SROF?

23   A.    I do not.

24   Q.    And do you know whether Army North believed that the

25   Marines' action violated the SROF?

SHERMAN - DIRECT / LIN

1    **A.**    They do not.

2    **Q.**    And by "SROF," just to be clear, I meant the standing rule

3    for the use of force.

4    **A.**    That's correct.

5    **Q.**    Yesterday you discussed briefly requests for assistance

6    from law enforcement agencies with counsel.  Do you recall

7    that?

8    **A.**    I do.

9          (Trial Exhibit 42 received in evidence.)

10   **BY MS. LIN:**

11   **Q.**    Can I direct your attention to Exhibit 42.  And the

12   document's Bates stamped DEFS 00013354 through 13363.

13          Do you recognize this document?

14   **A.**    I do.

15   **Q.**    And what is it?

16   **A.**    So this is an information brief for the operation

17   happening in Los Angeles, the federal protection mission.

18   **Q.**    And can I direct your attention to the page marked 13358.

19   **A.**    (Witness examines document.)

20   **Q.**    Can you describe what that page does?

21   **A.**    Yeah.  This is a graphical depiction of the federal

22   protection mission request for assistance process.

23   **Q.**    Can you describe the steps that need to take place in

24   order for there to be a -- strike the question.

25          What is the RFA process based -- from what you can tell

1  from this document?

2  **A.**   So it's a step process.  You see here where we have the --

3  we Step 1, receive the initial request for assistance.  That's

4  the initiation.  We receive that from the law enforcement

5  agency.

6      Then Step 2, it's received at the interagency coordination

7  cell.  DOD LNO that receives it there, the liaison officer

8  that's in IAC receives the RFA, does an initial check to make

9  sure that it's in line with how we're doing our operations

10  there, and submits that RFA data to our RFA tracker that's

11  online that's on a shared document.

12  **Q.**   If I could ask, so on the Step 2 box here, it talks about

13  DOD LNO.  Is that the liaison that you're referencing?

14  **A.**   That's correct.

15  **Q.**   An IAC --

16  **A.**   That's the department -- I'm sorry?

17  **Q.**   Go ahead.

18  **A.**   Oh, so DOD, it's Department of Defense, liaison officer.

19  That's people.  We had many, but one of the personnel, there's

20  mainly one person that receives the R -- the request for

21  assistance, and the IAC is the interagency coordination cell.

22  **Q.**   And the next step, can you go on to -- please describe the

23  next step in this process.

24  **A.**   So Step 3 is a legal review.  It's done with the

25  Task Force 51 lawyers that do a legal review, ensuring that

1  it's in accordance with what we've been directed to do through

2  our command, through our chain of command, including the

3  Secretary of Defense and the President.

4      And then from there, it's submitted to me to get initial

5  approval from me that we will support this request for

6  assistance.

7  **Q.**  So the legal review determines whether it's consistent

8  with the mission.  Does it determine anything else, to your

9  knowledge?

10 **A.**  It does not.  It really just ensures that it's in

11 accordance with the mission that we've been given.

12 **Q.**  And does that mission include compliance with the standing

13 rules for the use of force?

14 **A.**  Absolutely.  That's the main concern.

15 **Q.**  And that also includes the Posse Comitatus Act?

16 **A.**  It does.  It makes sure that it's in line with standing

17 rules of use of force and it does not -- it does not violate

18 the Posse Comitatus Act.

19 **Q.**  So once that legal review is completed, then it goes to

20 you, as the commanding general, based on Step 4 that you were

21 describing?

22 **A.**  It does.  It goes to me.  They bring it to me personally.

23 It was always done in person.  I didn't review online.  But it

24 was reviewed to me, explaining the operation, why it's in

25 accordance with the mission that we've been given, and it does

SHERMAN - DIRECT / LIN

1    not violate the standing rules of use of force or Posse

2    Comitatus Act.

3    **Q.**   And what's the next step then?

4    **A.**   So the next step is it actually gets assigned to brigade

5    and notification that this RFA is being assigned to them.  And

6    then from there, the brigade commander delegates it down to a

7    battalion level, depending on the size of the unit, battalion

8    down to company level.  And then we inform the IAC which unit

9    is going to be performing -- or going to be supporting that

10   request for assistance.

11   **Q.**   So in Step 4 here, there's a reference to developing a

12   CONOP for approval.  Can you explain what that means?

13   **A.**   In Step 4?

14   **Q.**   Step 5?

15   **A.**   Oh, I'm sorry.

16   **Q.**   Apologies.

17   **A.**   Step 5.  So, yeah, so that is -- a CONOP is a concept of

18   operation brief that's due to -- and it's really a brief,

19   depending on the risk of this operation.  Anything medium to

20   high had to be briefed to me 72 hours ahead of time from

21   execution on exactly what our forces were going to be doing to

22   support that -- the law enforcement agency.

23   **Q.**   And do you have to approve the CONOP?

24   **A.**   Absolutely.

25   **Q.**   So what happens after there's a CONOP for a mission?

SHERMAN - DIRECT / LIN

1    A.   Well, from there, that's when a rehearsal is done with the

2    law enforcement agency.  I should say in here, that's -- once

3    the unit is informed, that gives them the ability to directly

4    coordinate with the law enforcement officer that's in charge of

5    that particular operation, the RFA they're supporting, and they

6    start the coordinated planning for that operation, and that's

7    what develops the CONOP.

8         Then that's briefed to me that -- and I approve.

9    Depending.  If it was medium to high, I approve it.  Anything

10   lower than that would go to brigade battal- -- or brigade

11   commander could approve those.

12        And then once approved, that we approved of the operation,

13   and that included another legal review to make sure that our

14   personnel were not in the law enforcement area, if you were,

15   and were not conducting -- we're not going to be anywhere near

16   where the law enforcement action was actually happening.  That

17   was part of it.

18        And then from there it was approved so that they could go

19   on and start the briefing -- or they could start briefings to

20   their unit and start planning, and that included a rehearsal.

21   Q.   So is it typical to then have a rehearsal to carry out any

22   kind of RFA-requested mission?

23   A.   It was.

24   Q.   So does this document accurately describe what -- or

25   generally describes what the RFA process is in terms of the

SHERMAN - DIRECT / LIN

1   Task Force 51's deployment to California?

2   **A.**   It does, including the risk part of this part here, with

3   Step 6; and then Step 7, the execution and support; and Step 8,

4   post-mission activities, that's correct.

5   **Q.**   Okay.  And what do you consider when you are deciding

6   whether to approve the request for assistance, which it seems,

7   based on your testimony, occurs at two different points?

8   **A.**   Yeah.  First one, so the first thing is that the RFA has

9   been legally reviewed and it does not violate the standing

10  rules of the use of force or the Posse Comitatus Act.

11       And then the second review is that I approve the way

12  they're going to be conducting the operation, that I agree that

13  it's conducted in a way that is protecting our soldiers or

14  Marines and that it is not inflicting any additional harm to

15  them, that they are -- that it's a mission that they can

16  perform.  It's not asking them to do anything that they're not

17  trained to do.

18       And that anything -- any action that they're doing,

19  they're strictly there to protect federal law enforcement as

20  they conduct their law enforcement job.

21       (Trial Exhibit 7 received in evidence.)

22       **MS. LIN:**  Can I direct your attention, then, to

23  Exhibit 7.

24       **THE COURT:**  Maybe we should take a break now.  Is that

25  all right?

1          **MS. LIN:**  Sure, Your Honor.

2          **THE COURT:**  Okay.  Ladies and gentlemen, we're going

3   to take a break now.  We will resume at five to 11:00.

4   Thank you.

5                  (Recess taken at 10:40 a.m.)

6              (Proceedings resumed at 10:57 a.m.)

7          **THE COURT:**  Let the record show all parties are

8   present.

9       You may proceed.

10          **MS. LIN:**  Should I proceed, Your Honor?

11          **THE COURT:**  Yes.  Please.  Thank you.

12  **BY MS. LIN:**

13  Q.   General Sherman, can I direct your attention to Exhibit 7.

14          **THE COURT:**  What exhibit?

15          **MS. LIN:**  Exhibit 7, and the Bates numbers

16  are 00000249 to '252.

17  Q.   Do you recognize this document?

18  A.   I do.

19  Q.   And what is it?

20  A.   So this is the Task Force 51 concept of operation process

21  for the Los Angeles joint operations area.

22  Q.   Shortly before the break, we were talking about the

23  process for requests for assistance.  How does -- do you know

24  how that compares to this document?

25  A.   So this is the written version of the process that was

1    depicted in the slide.  The only difference here would be the

2    back brief to the risk-owning commander.  You know, it was

3    determined that low risk would go to the brigade commander.

4    Anything medium to high would come to me.

5    **Q.**   Okay.  So this is just a written version of the RFA but

6    with more detail; is that your testimony?

7    **A.**   Yeah, exactly.  It is more detailed.  It actually talks

8    the units through the entire process -- actually, our entire

9    staff -- to ensure that the process is followed.

10   **Q.**   And to your knowledge, this process was followed when

11   Task Force 51 was deployed to California?

12   **A.**   This is exactly the process that was followed.

13   **Q.**   Can I direct your attention, then, to the last page of

14   this document, with 252 at the end of that Bates number.

15        If you could -- if you could read paragraph 8(a) into the

16   record, beginning with 8.

17   **A.**   Sure.  It says [as read]:

18            "DOD is not conducting tactical operations" --

19        which in parentheses is -- "traffic control points

20        blocking positions -- "rather, DOD is protecting law

21        enforcement officers conducting those operations.

22        DOD may not conduct tactical operations outside of

23        protecting federal property and personnel.  Law

24        enforcement must be co-located with DOD to achieve

25        those tactical effects."

SHERMAN - DIRECT / LIN

1  Q.  So as to the last sentence of that paragraph, I know this

2  morning we discussed what supporting activities that

3  Task Force 51 could do.  Can you explain to us whether this

4  last -- how this last sentence is relevant to Task Force 51

5  troops' activities?

6  A.  Well, any -- to do any kind of operation, and this one, a

7  tactical operation protecting federal property and personnel,

8  it still needed to have law enforcement co-located with them

9  because it was still protecting them; but it was also ensuring

10  that it was, you know, any kind of law enforcement -- it's

11  still a law enforcement action.  They had to be in the lead.

12  Q.  And by "co-located," can you explain to us what that

13  means?

14  A.  It means located very nearby or right next to each other.

15  Q.  And is that true for both protecting federal property and

16  at-large law enforcement missions?

17  A.  Federal property was a little bit different because we're

18  talking about very large areas, and certainly not as large

19  numbers of federal law enforcement that could be located

20  everywhere.

21      So on federal property, we had military members that were

22  located farther away.  They were either just on the boundary,

23  just patrolling the boundary of the property, or at a -- or at

24  a gate where anybody who had a valid ID badge could get in

25  because they could open the gate themselves.

SHERMAN - DIRECT / LIN

1      But, otherwise, where there was any gate where the

2   population -- or the civilian population could come in, there

3   was law enforcement there.

4   Q.   And how -- how does that differ from an at-large law

5   enforcement mission in terms of co-located -- co-location?

6   A.   Well, co-located because it was a law enforcement action

7   taking place, we would like the law enforcement right there

8   because they're the ones that also had direct communications

9   directly with the law enforcement personnel that were actually

10  doing the law enforcement action.

11  Q.   As far as you know, is every mission conducted by

12  Task Force 51 troops consistent with the requirement identified

13  here in terms of being co-located?

14  A.   Absolutely.  That was -- that was a requirement for the

15  operation.

16  Q.   Yesterday you were asked questions about an operation that

17  took place on -- at MacArthur Park.

18  A.   Correct.

19  Q.   And do you recall that operation?

20  A.   I do.

21  Q.   And there was a -- there was a request for assistance for

22  that operation?

23  A.   There was.

24  Q.   Did you approve that request?

25  A.   Because it was a high-risk operation, it actually went

SHERMAN - DIRECT / LIN

1    above me.  It went up to the commander of U.S. Northern Command

2    and then eventually to the Secretary of Defense for his

3    approval.

4    **Q.**  Was the request for --

5              THE COURT:  I think the question is whether you

6    approved it.  Did you approve it?

7              THE WITNESS:  I cannot.

8              THE COURT:  Pardon?

9              THE WITNESS:  I could not.

10             THE COURT:  Oh, you could not approve it.

11             THE WITNESS:  I could not because of the high risk;

12   and in some -- one area we assessed as extremely high risk, it

13   had to go up to the U.S. -- the commander of

14   U.S. Northern Command for his approval.

15             THE COURT:  I see.  So even though you're in the chain

16   of command, obviously, it's not -- it's not within your

17   authority -- as you understood it, it's not within your

18   authority to approve it --

19             THE WITNESS:  It's my authority --

20             THE COURT:  -- under these circumstances?

21             THE WITNESS:  Because of the high risk -- assessed

22   high risk, Your Honor, it was my -- it was my authority to

23   recommend to or give an assessment to the commander of

24   U.S. Northern Command of what I felt about the operation.

25             THE COURT:  So there's a difference, and I understand

1    you're drawing a distinction, as I understand it, between a

2    recommendation and actual approval or disapproval.

3         THE WITNESS:  That's correct, Your Honor.

4         THE COURT:  Okay.  So what -- then what was your

5    recommendation with respect to MacArthur Park?

6         THE WITNESS:  Because of the operation, the way it was

7    revised, the operation that actually took place on 7 July,

8    where our soldiers were strictly there to protect federal law

9    enforcement as they did their traffic control points and their

10   blocking positions, and that our vehicles were not in the park

11   because we consider that a law enforcement area, I recommend

12   approval.

13        THE COURT:  Okay.

14   BY MS. LIN:

15   Q.   So you mentioned that the request for assistance was

16   revised.  Do you recall the initial request for assistance?

17   A.   I do not everything, not all of it, but I do.

18   Q.   And what were -- and why were these -- why were the -- the

19   requests for assistance -- I'm sorry.  Let me strike.

20        Was the request for assistance that was initially posed to

21   DOD rejected?

22   A.   There were concerns that I brought up that, one, it had

23   our vehicles in the park on Wilshire Boulevard, which actually

24   divides the center of the park.  I had concerns about that just

25   because of -- it was -- I considered that the law enforcement

SHERMAN - DIRECT / LIN

1  area part of the operation.  I also had concerns about the

2  date.

3  **Q.**  What was the concern about the date?

4  **A.**  It was scheduled -- initial operation was scheduled for

5  Father's Day.

6  **Q.**  And why would that have been a problem?

7  **A.**  There was just going to be a very large amount of people.

8  We assessed that there could be a very large amount of people

9  in the park, which could quickly overwhelm Border Patrol in

10  this case.

11      Also, because that operation -- because of the initial use

12  of helicopters, it would have been noticed by a very large

13  group of the surrounding community and could have large crowds

14  that show up that could, you know, become very dangerous for

15  the law enforcement there.

16  **Q.**  Were those concerns subsequently addressed?

17  **A.**  They were.

18  **Q.**  So it came -- so it came a time when the request for

19  assistance was modified?

20  **A.**  That's correct.  It came with discussions between us,

21  Border Patrol, certainly with the U.S. Northern Command

22  commander, and then with the Secretary of Defense, and the

23  Secretary of Homeland Security.

24  **Q.**  And what made you comfortable about the request for

25  assistance that was ultimately approved?

1    A.    Well, it kept our soldiers, in this case soldiers and our

2    vehicles, outside the actual park property.  They were strictly

3    there to protect federal law enforcement as they did their

4    blocking positions and traffic control points.

5         And the actual day that it was -- that it happened, the

6    Monday after the July 4th holiday, our assessment was that

7    there was not going to be a lot of people in the park.

8    Q.    Were there rehearsals about this operation?

9    A.    There were.  There were numerous rehearsals.  There was

10   very large, twice, leaders rehearsal, which is a large -- what

11   we call a terrain board.  It was a depiction in a large theater

12   area with all of the key leaders of the operation, where we

13   talked the operation through both times.  First time, when it

14   was originally scheduled 3 July, so I think it was about 2 July

15   when we did that one; and then when the operation actually

16   happened on, I believe, 6 July, we did it -- we did it again on

17   that Sunday.

18        So we did that and then we also did two full dress

19   rehearsals.

20   Q.    Were you at any of these rehearsals?

21   A.    I was at all of them.

22   Q.    And what were the troops told during these rehearsals as

23   to what specific actions that they could take in support of the

24   federal protection mission?

25   A.    So for this mission, for the full dress rehearsal, because

1    the soldiers were on the full dress rehearsal, and then also

2    the orders they were provided by their chain of command, that

3    they were there to protect the law enforcement agents that were

4    manning the traffic control points and the blocking positions.

5    They would be behind them in their military vehicles.  They

6    would not exit their vehicles unless there was a threat

7    directly to the law enforcement officials that were manning

8    those traffic control points or blocking positions.

9    Q.   Do you know whether the soldiers ultimately exited the

10   vehicles on the day that the operation took place?

11   A.   They did not.

12   Q.   Do you recall how long the operation lasted?

13   A.   Well, when they got there to the park, because we had

14   rehearsed it so much, it took a total of 20 minutes.

15   Q.   Can I direct your attention to Exhibit 28.  And it's Bates

16   Numbers DEF S00002872 through 2895.

17   A.   Correct.

18   Q.   Do you know what this document is?

19   A.   Yes.  This is the very long -- this is the PowerPoint show

20   of the actual operation, our concept of operation, if you will,

21   but very detailed.

22   Q.   So this is the type of CONOP that we discussed earlier, in

23   the chart, having to do with the RFA process?

24   A.   Yeah.  This is for a high-risk, very detailed operation.

25   This is a plan developed both with the Border Patrol tactical

1    unit planners, so Border Patrol, and our military planners.

2    **Q.**    If I could direct your attention to the page 2875.

3    **A.**    (Witness examines document.)

4    **Q.**    Are you there?

5    **A.**    I am.

6    **Q.**    Do you see there's a section on the right-hand column that

7    says "Key Tasks"?

8    **A.**    I do.

9    **Q.**    What are these key tasks in relation to the -- to the

10   CONOP?

11   **A.**    So, generally, a key task is the main tasks that need to

12   be completed for a successful operation.

13   **Q.**    And can you read to us what these key tasks are?

14   **A.**    Sure.  So number one is secure key terrain.  That's a

15   military term.  That's protect DHS security points and blocking

16   positions.

17         Provide -- Number 2 is provide area security, which is

18   safeguard federal personnel and designated federal property.

19         Three is enable civil freedom of movement, which was do

20   not restrict pedestrian movement.

21         Four was support law enforcement.  Do not conduct law

22   enforcement activities.  Detain individuals only in response to

23   an imminent threat and transfer to law enforcement as soon as

24   practical.

25         And number five was comply with the rules for the use of

SHERMAN - DIRECT / LIN

1   force.  Operate in accordance with standing rules for the use

2   of force.  Use force only when authorized and necessary.

3   **Q.**   Were Task Force 51 troops conducting the MacArthur Park

4   operation told about these key tasks?

5   **A.**   Absolutely.  It's part of any mission brief.

6   **Q.**   Can I direct your attention, then, to page 2873 of that

7   document.

8       On the right-hand column, there's a heading that says

9   "Threat Situation."  Do you see that?

10  **A.**   I do.

11  **Q.**   Can you read the paragraph underneath the photograph -- or

12  the map?  Sorry.

13  **A.**   It says [as read]:

14          "Overall threat assessment high."

15      And "high" is in red.

16      [As read]:

17          "Due to the current situation in Los Angeles,

18      California, the overall threat to DOD personnel

19      operating in the area is high.  Potential for

20      protests to arrive on site and transition to riots.

21      Criminal elements likely conducting FTO" -- don't

22      know exactly -- it's MS-13, so I think -- oh, foreign

23      terrorist organization -- "MS-13 consider the park

24      their home turf and could escalate to lethal

25      violence.  DOD personnel may be at higher risk due to

SHERMAN - DIRECT / LIN

```
1            the general sentiment of the civilian populace
2            towards government personnel.  The most likely threat
3            faced by DOD personnel are crimes of opportunity such
4            as assault, theft, and vandalism."
5     Q.   Is that consistent with your understanding of the threat
6     situation prior to the MacArthur Park operation?
7     A.   Are you asking about this particular area on the park?
8     Q.   He paragraph --
9     A.   Oh, absolutely.
10    Q.   -- that you just read.
11    A.   Yes, that is correct.
12    Q.   And at the bottom half of that right-hand column, there
13    are -- there is a section that's described as "Threat
14    Activity."  Can I direct your attention to the third item
15    listed there.  I'm sorry, the second -- second point, "Recent
16    activities in similar environments."
17           Can you read that point for us?
18    A.   Sure.  It says [as read]:
19              "Recent activities in similar environments.
20           Federal agents experience routine violent response to
21           similar operations up to and including the firing of
22           small arms at federal agents."
23    Q.   And that is consistent with your understanding of the
24    threat situation for the MacArthur Park operation prior to the
25    operation taking place?
```

SHERMAN - DIRECT / LIN

1  A.  Correct.

2  Q.  And can you read the next point as well?

3  A.  [As read]:

4      "Known or likely defensive positions or

5      fortified structures.  In addition to alleys ringing

6      the park, MS-13 likely maintains access to multiple

7      eight- to ten-story residential apartment buildings

8      immediately adjacent to the park."

9  Q.  And that too is your understanding of the likely threat

10  from MS-13 prior to the operation taking place?

11  A.  That is correct.

12  Q.  And, finally, the last paragraph or last bullet -- last

13  point, could you read that to us?

14  A.  [As read]:

15      "Estimated resistance levels and lethality

16      potential.  Most likely resistance is large-scale

17      protest with improvised weapons.  Most dangerous

18      resistance is organized use of small arms to attempt

19      to kill or seriously injure federal personnel with

20      shots of opportunity from large structures ringing

21      the park."

22  Q.  And is that too consistent with your understanding of the

23  threat situation as to the MacArthur Park operation prior to

24  the operation?

25  A.  It is.

SHERMAN - DIRECT / LIN

1  **Q.**   Do you recall an operation in Carpinteria that

2  Task Force 51 troops supported?

3  **A.**   I do.

4  **Q.**   What do you recall about that operation?

5  **A.**   Well, it was an operation that was our first operation

6  that had been brought to us that was going to be north of L.A.,

7  northwest of L.A.

8      It had been an operation that was first planned and was

9  delayed, just due to other events taking place, other

10 operations, and ability for federal law enforcement to gather,

11 that much federal law enforcement, had the ability to bring

12 them together, because it was a large grow operation.

13 **Q.**   Around did you approve that request for assistance

14 yourself?

15 **A.**   I did, twice.

16 **Q.**   Did you request any modifications to that request for

17 assistance prior to approving?

18 **A.**   No.  It was first briefed to me, and I don't know the

19 original date that it was originally scheduled.  So it was

20 briefed at least 96 hours ahead of time with the CONOP.  Well,

21 the RFA first, but then the CONOP was briefed to me well ahead

22 of time.  Medium risk, I believe.

23 **Q.**   Can I direct your attention, then, to Exhibit 31.  And

24 it's Bates numbered DEFS 00003509 through '3522.

25     Do you recognize this document?

1   **A.**   I do.

2   **Q.**   Is this the -- what is this document?

3   **A.**   So this is the concept of operation briefing that would be

4   given to me.

5   **Q.**   Can I direct your attention to the page 3511.

6       On the right-hand side of the column, on the right-hand

7   column, under the "Carpinteria Executive Summary," do you see a

8   section on key tasks as well?

9   **A.**   I do.

10   **Q.**   Are these key tasks similar to other CONOPs that you've

11   had?

12   **A.**   Yes.

13   **Q.**   And directing your attention, then, to points four and

14   five of the key tasks, can you describe to us what they are?

15   **A.**   So for Key Task Number 4 is [as read]:

16       "Support law enforcement.  Do not conduct law

17       enforcement activities.  Detain individuals only in

18       response to an imminent threat and transfer to law

19       enforcement as soon as practical."

20   Number -- Number 5 is [as read]:

21       "Comply with the rules of use of force.  Operate

22       in accordance with the standing rules in the use of

23       force.  Use force only when authorized and

24       necessary."

25   **Q.**   To your knowledge, were the soldiers conducting the

SHERMAN - DIRECT / LIN

1    Carpinteria operation complying with these key tasks?

2         **MS. REILLEY:**  Objection.  Calls for speculation.  Lack

3    of foundation.

4         **THE COURT:**  Well, I think he can answer whether --

5    I think he can answer the question whether he knows of any acts

6    of non-compliance.

7         In other words, do you understand what I've just --

8         **THE WITNESS:**  There were no acts of non-compliance.

9         **THE COURT:**  That were reported to you?

10        **THE WITNESS:**  That were reported to me, that's

11   correct.

12        **THE COURT:**  Okay.  All right.

13   **BY MS. LIN:**

14   **Q.**   Would you have received a report if there were

15   non-compliance with these key task requirements?

16   **A.**   Absolutely.

17   **Q.**   And why is that when you're no longer at -- in California?

18   **A.**   Because it's Rule Number 12 on the standing rules of the

19   use of force; in this case, soldiers knew that if there was a

20   violation on the standing rules of the use of force that need

21   to be reported to chain -- through the chain of command

22   immediately.

23   **Q.**   And you were in that chain of command?

24   **A.**   I was not on the day that this actually happened.  This

25   happened, I believe, on 10 July.

**SHERMAN - DIRECT / LIN**

1  Q.  But the reporting requirements would have -- let -- can

2  you explain to us how you would under- -- how you would receive

3  such a report if there were such reports of violations?

4  A.  Absolutely.  Yeah, it would be reported through the chain

5  of command, go from -- in this case, from the platoon that did

6  this operation to the company to the battalion to the brigade

7  to Task Force 51, and part of the CCIR.  Because it was a

8  violation of the standing rules of use of force, I expect

9  battalion and brigade commander to call me directly.

10  Q.  They would call you even though you have left California?

11  A.  No.  They would -- in this case, when the operation

12  happened, they would call General Nell.

13  Q.  And how -- and would you then receive a report from

14  General Nell?

15  A.  Well, I was in the air, actually, when this operation

16  happened, but she would report that up to Army North and to

17  U.S. North Com.

18  Q.  So you would have received that report?

19  A.  I would have seen it in her nightly report, but I was -- I

20  would not be in the chain because I was no longer in the chain.

21  She was the acting commander at that point.  I was on my way to

22  a school.

23          MS. LIN:  I have no further questions, Your Honor.

24          THE COURT:  Thank you.

25      Cross.

SHERMAN - CROSS / REILLEY

<u>CROSS-EXAMINATION</u>

**BY MS. REILLEY:**

**Q.**   Good morning, Major General Sherman.

**A.**   Good morning.

**Q.**   If I could please have you turn to Exhibit 2, which you
were discussing with Ms. Lin earlier today.  We'll publish that
to the screen.

You testified this morning that this document sets forth
the constitutional exception that you believe applied to the
Task Force 51 troops during the deployment; is that correct?

**A.**   This is a document that we used that was the memorandum of
the commander of U.S. Northern Command, the rules that we
needed to abide by for protection of federal government
property and protection of federal law enforcement as they did
their law enforcement actions.

**Q.**   So that's a "yes" to my question; correct, General?

**A.**   No, I don't believe this is -- this is part of the
direction that we were given that is in a line with the
standing rules of the use of force as it was briefed to us in a
legal review.

**Q.**   So it's your testimony -- are you changing your earlier
testimony that this document does not set forth the exception
that you believe applied to the Task Force 51 troops?

**A.**   It's we're in line with what the President and the
Secretary of Defense directed that had allowed us to protect

SHERMAN - CROSS / REILLEY

1    federal property and federal law enforcement, which, in our

2    briefing on the standing rules of the use of force, said that

3    the President could direct a constitutional exception with

4    protecting federal property and protecting federal personnel,

5    allowing them to do their job.

6    Q.   All right.  So you followed the directives that are set

7    forth in this memorandum with respect to the deployment to

8    Los Angeles; correct?

9    A.   Correct.

10   Q.   All right.  And according to this memorandum, the troops

11   can perform security functions, set perimeters, engage in crowd

12   control, and conduct temporary detentions; that's correct?

13   A.   Only necessary to ensure the execution of federal

14   functions, that is correct.

15   Q.   So if any of those activities took place during the

16   deployment, those would not have been reported; correct?

17        THE COURT:  Sorry.  What is the question?

18   BY MS. REILLEY:

19   Q.   The question is:  If any of those activities that are

20   permitted by this memorandum were conducted during the

21   deployment, those would not have been reported through the

22   chain of command; correct?

23   A.   No.  They would have been reported because they actually

24   were doing something beyond -- whenever they had to act,

25   whenever there was a crowd that was demonstrating or any kind

SHERMAN - CROSS / REILLEY

1  of threat towards federal law enforcement or federal property,

2  that was reported immediately.

3  Q.   So even though this memorandum says that those activities

4  are permissible, they, nonetheless, would have been reported;

5  is that your testimony?

6  A.   Absolutely.  It is a standard update that actions that are

7  happening on the ground, absolutely.

8  Q.   And any requests for assistance from federal law

9  enforcement that asked that these activities be conducted would

10 have cleared Task Force 51's legal review; correct?

11 A.   The way it would come up in our request for assistance was

12 to -- strictly to support them, to protect them as they were

13 doing their law enforcement job.

14 Q.   So if there was a request for assistance that called for

15 troops to perform security functions to protect federal troops,

16 that request would have cleared legal review; correct?

17 A.   Yes, but they already knew that that was our mission.

18 That was part of it.  That's why they were there.

19 Q.   And if there was a request for assistance that called for

20 Task Force 51 troops to set perimeters to protect federal law

21 enforcement agents, that would have cleared legal review;

22 correct?

23 A.   No, it wouldn't have, because if they were asking us to do

24 something, if it wasn't protecting law enforcement, if there

25 wasn't an imminent threat, they could not do that.

**SHERMAN - CROSS / REILLEY**

1    Q.   So it's your testimony that unless there was an imminent

2    threat, Task Force 51 could not set security perimeters?

3    A.   In accordance with the mission, they were known they were

4    there to protect federal law enforcement that were doing the

5    law enforcement action.  So if they were -- if there was an

6    imminent threat, either federal law enforcement or the

7    commander on the ground also confirmed that there was an

8    imminent threat, whether it be a crowd, vehicles, whatever,

9    then they were allowed to set up a perimeter.

10   Q.   All right.  So it's your testimony that if there is a

11   request for assistance that called for a perimeter that did not

12   identify an imminent threat, you would have denied that

13   request; correct?

14   A.   Yes.  It would never have gone past our legal review,

15   that's correct.

16   Q.   And if there was a request for assistance that called for

17   Task Force 51 troops to engage in crowd control and there was

18   an imminent threat to law enforcement, that would have cleared

19   legal review; correct?

20   A.   There was never a request for assistance where it would

21   say crowd control.  A request for assistance was to -- if

22   you're talking off federal installations here, if you're

23   talking about what was referred to earlier as an at-large

24   operation out in the community, it was strictly -- it was in

25   the line with protecting federal law enforcement as they did

SHERMAN - CROSS / REILLEY

1    their law enforcement actions.

2    **Q.**   So it's correct, then, that the commander on the ground

3    could order Task Force 51 troops to engage in crowd control if

4    they felt there was a threat; correct?

5    **A.**   If there was a threat directly to law enforcement or to

6    them, that is correct.

7    **Q.**   And you testified earlier that no troops violated the

8    parameters of the Secretary of Defense's order during the

9    deployment.  You recall that testimony?

10   **A.**   There was nothing reported to me, that is correct.

11   **Q.**   So there may have been violations that were not reported

12   to you; correct?

13   **A.**   I don't know that to be fact.

14   **Q.**   And you were not personally present for any of the field

15   operations that Task Force 51 troops supported; correct?

16   **A.**   I was not.

17   **Q.**   So you do not have any firsthand knowledge of the specific

18   actions that the troops engaged in on any of those operations;

19   correct?

20   **A.**   I was not.

21   **Q.**   That's a "yes" to my question?

22   **A.**   That is a "yes," that's correct.

23   **Q.**   Thank you.

24        If I could please have you turn to Exhibit 10, which --

25   and we will publish page 1100 of that document to the screen.

SHERMAN - CROSS / REILLEY

1     Do you recall telling Ms. Lin a moment ago that you were

2  legally advised regarding the red highlighted sections on this

3  page?

4  **A.**   Yes.

5  **Q.**   And you said that you were legally advised that

6  Task Force 51 troops could engage in those activities

7  highlighted in red under certain circumstances?

8  **A.**   When there was a threat to federal law enforcement, yes.

9  **Q.**   Did you ever receive any legal advice from anyone that if

10  Task Force 51 engaged in the activities highlighted in red,

11  that it would constitute a Posse Comitatus Act violation?

12        **MS. LIN:**  Objection.  This is calling for privileged

13  information.

14        **THE COURT:**  Privilege?  What privilege are we talking

15  about here?

16        **MS. LIN:**  The question posed --

17        **THE COURTROOM DEPUTY:**  Can you use your microphone?

18  Thank you.

19        **MS. LIN:**  Can we have the court reporter read back the

20  question?  Because as I heard it, it was --

21        **THE COURT:**  Sure.  Okay.  Yeah, that's enough of a

22  request.

23     Can you read back the question?

24     (Record read as follows:

25        "QUESTION:  Did you ever receive any legal

SHERMAN - CROSS / REILLEY

```
1        advice from anyone that if Task Force 51 engaged in

2        the activities highlighted in red, that it would

3        constitute a Posse Comitatus Act violation?")

4            THE COURT:  And your objection?

5            MS. LIN:  The objection is that it's calling for

6    privileged -- attorney-client privilege information, legal

7    advice.

8            THE COURT:  I've listened two days, two days now,

9    introduced by you, by the Government, about the role of the

10   law, about the legal advice they received.  Are you seriously

11   contending there is a -- that this is privileged?

12       In other words, none of it was priv- -- it was all waived

13   as to everything the General was told; but if he was told that

14   there was a violation of the Posse Comitatus Act by lawyers,

15   that's privileged?  Now, is that your position?  Is that the

16   position of the federal government?

17           MS. LIN:  I believe the question -- the scope of the

18   question is broader.  I'll withdraw my objection to the extent

19   it's limited to the Task Force 51's federal protection mission.

20           THE COURT:  Thank you.

21           MS. REILLEY:  The question is so limited, Your Honor.

22           THE COURT:  Thank you.  Go ahead.

23   BY MS. REILLEY:

24   Q.  Would you like the question read back, General?

25   A.  Yes, I would, please.
```

1      (Record read as follows:

2          "QUESTION:  Did you ever receive any legal

3      advice from anyone that if Task Force 51 engaged in

4      the activities highlighted in red, that it would

5      constitute a Posse Comitatus Act violation?")

6          **THE WITNESS:**  I'm allowed to answer beyond a "yes" and

7   "no" on this one?

8          **THE COURT:**  Answer any way you want to answer it.

9          **THE WITNESS:**  Okay.  So with the President, in his

10  memo, saying that it was a type of -- what did he say here? --

11  a type of rebellion in his order that -- and personnel were not

12  allowed to do their federal jobs, that triggered the

13  Constitution exception of guarding the facilities and

14  protecting federal law enforcement as they did their job

15  enforcing federal law.

16      And with that, to protect either facilities or to protect

17  federal law enforcement as they were doing their job, and only

18  in those two instances, these were areas in the discussion that

19  you could participate, or we could have soldiers that could

20  help on this to protect either federal facilities or federal

21  law enforcement.

22  **BY MS. REILLEY:**

23  **Q.**   And that's legal advice that you received; correct?

24  **A.**   That's correct.

25  **Q.**   And that was from Task Force 51 attorneys?

SHERMAN - CROSS / REILLEY

1   **A.**   That is from -- all the way from the top of DOD down to

2   Task Force 51.  So three to four different levels, that's

3   correct.

4   **Q.**   Did any attorney from the U.S. Department of Justice ever

5   give you that advice?

6   **A.**   No, because I was in the U.S. Department of Defense.

7   **Q.**   Was the legal advice that you received given to you in

8   writing?

9   **A.**   No.

10  **Q.**   It was given to you orally?

11  **A.**   Yes.

12  **Q.**   And, again, because I don't believe I got an answer to my

13  specific question.  Was there ever anyone during the deployment

14  who advised you that if Task Force 51 engaged in the four

15  activities listed in red, it would be a Posse Comitatus

16  violation even though President Trump had issued his

17  memorandum?

18  **A.**   No, I never received that legal advice.

19  **Q.**   Earlier you testified about a certain training that

20  Task Force 51 soldiers received, and I want to ask a few

21  follow-up questions on that training.

22       It's correct that Task Force 51 officers all receive

23  training on how to write reports; correct?

24  **A.**   No.  That's part of your military training.  That isn't --

25  did we do that training?  No.

SHERMAN - CROSS / REILLEY

1  Q.   All right.  But every Task Force 51 officer who reported

2  to the deployment in Los Angeles would have received training

3  on how to write reports; correct?

4  A.   No.  That's standard military training.  You're asking,

5  for somebody that's a colonel all the way down to a lieutenant,

6  they're trained on how to write reports.  If it's not correct,

7  if it's not done the right way, then it's within the chain of

8  command to correct that.

9  Q.   Okay.  So just to be clear, every officer who was in

10 Los Angeles for the deployment that we've been discussing,

11 before they got to Los Angeles, would have received training on

12 how to write reports; is that correct?

13 A.   No.  I mean, you could have -- you could have somebody

14 report at a different level, that they could be reporting at a

15 platoon level, giving to company command; and it could be

16 reports that, you know, the language wasn't used properly, or

17 maybe it needed grammatical errors that were fixed at a higher

18 level.

19 Q.   So is it your testimony that some of the officers involved

20 in Task Force 51's deployment may have written inaccurate

21 reports?

22 A.   Sure.  It has to do with experience, how much training

23 they've had.  When you're talking new officers, new enlisted

24 personnel, they could have inaccurate reports.

25 Q.   And it's also true that the reports written by

SHERMAN - CROSS / REILLEY

1  Task Force 51 officers may have been incomplete; correct?

2  **A.**  No.  They should have as much -- they should give as much

3  complete information.  It is possible they could have omitted

4  something because they forgot about it, because it could have

5  been a report they'd gotten from somebody else.

6  **Q.**  All right.  So it's your testimony that you cannot confirm

7  that all of the reports generated by Task Force 51 personnel

8  during the deployment are complete and accurate; is that

9  correct?

10 **A.**  No, that's not correct.  Can I confirm that I've gone

11 through the chain of command, that the chain of command has

12 validated that that report is accurate all the way through

13 brigade and battalion commanders?  That is correct.

14 **Q.**  And that was -- every report that was generated during the

15 deployment was vetted in that manner?

16 **A.**  Any report that came through to Task Force 51 was vetted

17 up through the chain of command.  Only brigades report directly

18 to Task Force 51.

19 **Q.**  So if we're talking about Exhibit 38, which was the

20 mission debrief for the Carson operation that we were

21 discussing yesterday, is it your testimony that that mission

22 debrief was vetted by the chain of command in the manner you

23 just described?

24 **A.**  Well, this is -- this is a Blue 2 report at a company

25 level.  So this never got to me.  This is a -- strictly this is

SHERMAN - CROSS / REILLEY

1   three, four levels below me.  This is at a platoon level out of

2   a company tactical standard operating procedure.  So this is a

3   standard report that a platoon leader -- in this case,

4   Third Platoon, Bravo Company 1st, the 160th Infantry --

5   submitted to his company headquarters.  I never saw anything

6   like this.

7   **Q.**   So you don't know if that report that we're discussing,

8   Exhibit 38, is complete; correct?

9   **A.**   I do not.  This would be -- this would be a company

10  commander who would look at that report, ask for more

11  clarification from the platoon leader.  So, no, it would not

12  get to my level.

13  **Q.**   Do you recall that yesterday I asked you questions about

14  statements that Defense Secretary Pete Hegseth made in a press

15  conference?

16  **A.**   Yes.

17  **Q.**   Are you aware that during that same press conference

18  yesterday, President Trump made statements indicating that the

19  National Guard troops may be deployed to Oakland, California?

20  **A.**   I do not.

21       **MS. REILLEY:**  At this time, Your Honor, plaintiffs

22  would move to admit that portion of the press conference as

23  Exhibit 115 given that it is a party opponent statement.

24       **THE COURT:**  Admitted.

25       (Trial Exhibit 115 received in evidence.)

1    **MS. REILLEY:**  All right.  We're going to play that

2    portion for you now.

3                        (Video was played but not reported.)

4         **THE COURT:**  Would you have a quote?  I don't know that

5    we're going to be able to hear it.  Have we not located it, or

6    is there some technological problem?

7         **MS. REILLEY:**  Your Honor, we have the clip and it has

8    been provided to defense counsel.  I believe it's a

9    technological issue.

10        **THE COURT:**  Well, is there -- how long a clip is it?

11        **MS. REILLEY:**  I believe it's only about 30 seconds

12   long.

13        **THE COURT:**  Okay.  Do you have a -- has it been

14   reduced to writing?

15        **MS. REILLEY:**  It has not been, at least from -- on the

16   plaintiffs' side.  We could -- if you would give me permission

17   to approach, I could show it to the witness on the laptop,

18   I believe.  I think it's a projection issue.

19        **THE COURT:**  Okay.  Why don't you show it to the

20   witness.

21       And does the Government have it?

22        **MS. LIN:**  I don't have it, but maybe one of my team

23   members.

24        **THE COURT:**  Well, somebody's indicating they have it.

25        **MS. LIN:**  I'd like to see it as well.

SHERMAN - CROSS / REILLEY

1          **THE COURT:**  They're looking at their iPhone.

2          **MS. LIN:**  And trying to get it.

3          **THE COURT:**  Okay.  If you want to stand next to the

4    witness and watch it, you may do so.

5          **MS. LIN:**  Okay.  I will do that.

6          **THE COURT:**  Just show it to the witness.  So the

7    witness hasn't seen it, so he's going to be asked about it, so

8    it's a good idea if you want to have a look.

9          **MS. LIN:**  So, Your Honor, may I approach the

10   witness --

11         **THE COURT:**  Oh, of course.  Of course.

12         **MS. LIN:**  -- and share the screen?

13         **THE COURT:**  Come right up.

14         **MS. REILLEY:**  May I approach as well?

15         **THE COURT:**  We'll eventually get it in the record, but

16   let's not -- let's move ahead in this.

17       Okay.  Go ahead.

18       (Video was showed to the witness but not reported.)

19         **THE COURT:**  Okay.  You've seen it?

20         **THE WITNESS:**  I've seen it now, Your Honor.

21         **THE COURT:**  Good.  Now you've seen it.

22         **THE WITNESS:**  I've seen it now, Your Honor, yes, sir.

23         **THE COURT:**  Okay.  Thank you very much.

24       Okay.  And we'll just -- it's admitted, so it'll be part

25   of the record.

SHERMAN - CROSS / REILLEY

1          And the record should reflect it was played for the

2     witness, and counsel for both sides were present.

3          Okay.  Go ahead.

4               MS. REILLEY:  Thank you, Your Honor.

5     BY MS. REILLEY:

6     Q.    Major General Sherman, you had not seen that video clip

7     before today; is that correct?

8     A.    That is correct.

9     Q.    All right.  And have you received any information

10    indicating that Task Force 51 may be involved in a deployment

11    to Oakland, California?

12    A.    I have not.

13    Q.    How about any other city in California?

14    A.    I have not.

15    Q.    Have you heard that any division of U.S. Army North may be

16    involved in any deployment to any California city in the

17    future?

18    A.    No.  No, I've not.  No reports.

19               MS. REILLEY:  No further questions at this time,

20    Your Honor.

21               THE COURT:  Okay.  Anything further?

22               MS. LIN:  Nothing further, Your Honor.

23               THE COURT:  Okay.  Thank you.

24          You are excused.

25               THE WITNESS:  Thank you, Your Honor.

```
 1                    (Witness excused.)

 2          THE COURT:  Anything further from the defense?

 3          MS. LIN:  Nothing further.

 4          THE COURT:  Okay.  So the defense has rested.

 5      Any rebuttal?

 6          MS. STRONG:  No rebuttal, Your Honor.

 7          THE COURT:  Okay.  So the evidentiary portion of this

 8  trial has concluded.

 9      We will return at 1 o'clock for argument on the evidence

10  that has been produced.  All right?

11      Okay.  Thank you very much.  We're in recess.

12                    (Luncheon recess taken at 11:44 a.m.)

13  Afternoon Session                              1:00 p.m.

14          THE COURT:  Let the record show all parties are

15  present, and I'm ready to proceed.

16      Are you ready to proceed, whoever is arguing?

17          MS. STRONG:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MS. STRONG:  We prepared some slides, so I'm just

20  going to make sure my co-counsel is all set with this.

21      May I proceed?

22          THE COURT:  Oh, please do, yeah.

23                      CLOSING ARGUMENT

24          MS. STRONG:  Your Honor, there has been a standing

25  Army in our nation's second-largest city for two months.  That
```

**CLOSING ARGUMENT / STRONG**

1   act by the federal government has no precedent in our nation's

2   history.

3        Since King George deployed troops to occupy the colonies

4   and Thomas Jefferson criticized the king for keeping among us,

5   in times of peace, standing armies without the consent of our

6   legislatures, America has embraced a deep-rooted policy against

7   military involvement in civilian life.

8        President Trump, Secretary of Defense Hegseth, and the

9   Department of Defense think they can disregard that policy on a

10  whim, but the Constitution and federal law do not permit

11  anyone, not even the President, to use the military in civilian

12  law enforcement, but that's exactly what we have happening

13  here.

14       Your Honor, as you know, this story began on June 6th,

15  when ICE began executing search warrants and arrests across

16  Los Angeles.  In response, residents of Los Angeles exercised

17  their First Amendment rights to protest the federal

18  administration's immigration enforcement agenda and activities.

19  While these protests were largely peaceful, some protesters

20  engaged in unlawful behavior and even violence.

21       Governor Newsom and other state and local officials

22  condemned these acts of violence and responded quickly,

23  including by deploying additional local and state law

24  enforcement to respond and contain the situation.

25       But that wasn't enough for President Trump.  Instead of

CLOSING ARGUMENT / STRONG

1   letting local law enforcement do their jobs, the President took

2   a page directly out of Project 2025 and issued a sweeping order

3   with neither temporal nor geographical limitations, ordering

4   the federalization of state National Guard troops.

5       Secretary of Defense Hegseth responded by federalizing

6   4,000 members of the California National Guard and sending

7   them, together with 700 Marines, to Southern California.

8   That's nearly 5,000 soldiers.  To put that number in

9   perspective for Your Honor, that's larger than the entire force

10   sent to Afghanistan in the three months after the 911 attacks

11   in 2001.

12       But even as these troops were descending upon Los Angeles,

13   the Department of Defense quickly realized they had a problem.

14   Under the Posse Comitatus Act, every member of the military

15   force they had just deployed was severely limited in the

16   actions they could take.

17       Task Force 51 Deputy Chief of Staff Harrington testified

18   that in the very first briefing he attended about the federal

19   protection mission, he raised this issue to the commanding

20   general, and all in that meeting agreed that as soon as

21   California's National Guard troops were called into federal

22   service, they would be subject to the Posse Comitatus Act.

23       DOD reaffirmed this in a June 16th action memo that stated

24   that the use of military personnel in the Title X duty status

25   to enforce the law would be inconsistent with the Posse

1   Comitatus Act.  So defendants started looking for a way around

2   the law.  They coached federal law enforcement agencies to

3   substitute the word "protection" for "security" when submitting

4   requests for assistance in an attempt to legitimize their

5   violations.

6       But for all the pretense and wordsmithing defendants have

7   tried to employ, the facts are inescapable.  The activities

8   defendants have ordered Task Force 51 troops to engage in

9   across Southern California violate the Posse Comitatus Act.

10      In the two months since they deployed troops to L.A.,

11  defendants have ordered those troops to provide armed security

12  for federal agents, to set up roadblocks and perimeters that

13  restrict civilian movement and block access to public streets,

14  and to engage in a militaristic display of force in a public

15  park.

16      Federalized National Guard members have accompanied ICE on

17  as many as 75 percent of ICE's daily operations.  In

18  Southern California, residents have been forced to endure the

19  anxiety and fear caused by the pervasive presence of this

20  standing Army.

21      Your Honor, before I get too far into the specifics of

22  defendants' violations, I think it may be helpful to take a

23  step back and consider the historical context for the Posse

24  Comitatus Act.

25      The Eighth Circuit has called the Posse Comitatus Act the

1    embodiment of a long tradition of suspicion and hostility

2    towards the use of military force for domestic purpose.  That

3    tradition dates back to the Declaration of Independence, when

4    Thomas Jefferson criticized the king for deploying standing

5    armies to occupy the colonies.

6        At the constitutional convention, Luther Martin of

7    Maryland said that when a government wishes to deprive its

8    citizens of freedom and reduce them to slavery, it generally

9    makes use of a standing army.  And when the founders drafted

10    the Constitution, they reserved for Congress the authority to

11    call forth the militia.

12        In 1878, Congress passed the Posse Comitatus Act to

13    explicitly prohibit the use of the military in enforcing the

14    law.  This was in the aftermath of the Civil War, at a time

15    when using the military to quell riots and rebellion had become

16    commonplace and drew immense concern from Congress.

17        Congress was worried that military personnel were not

18    trained for or especially concerned with upholding the

19    constitutional rights of civilians, and citizens were concerned

20    too.  Federal troops were being used to police state elections,

21    and there were allegations that troops had even altered the

22    outcome of those state elections.

23        Congress wished to bring all of these activities to a

24    halt, so it passed the Posse Comitatus Act and, in doing so,

25    created a bright-line rule against military involvement in

1  civilian law enforcement.

2      Thus, for nearly 150 years, it has been illegal to use the

3  military to execute the laws absent an express authorization

4  from Congress or the Constitution.  And in those 150 years, the

5  military has largely respected those limits, setting clear

6  boundaries to ensure that no one crosses the line.

7      In 1981, Congress ordered the Secretary of Defense to

8  issue regulations prohibiting direct participation by military

9  personnel in a civilian search, seizure, arrest, or similar

10  activity, and the Secretary of Defense did so in due course.

11  Today the current version of those regulations can be found in

12  DOD Instruction 3025.21, which provides a clear list of what is

13  prohibited.

14      Under that regulation, the military may not engage in

15  search, seizure, arrests, apprehension, stop and frisk,

16  interviews, interrogations, canvassing, potential --

17  questioning potential witnesses or suspects, using force or

18  physical violence except in self-defense, evidence collection,

19  security functions, crowd control, traffic control,

20  checkpoints, surveillance, and forensic investigations.

21      So the question in this trial, Your Honor, is whether,

22  given this history and the PCA's limitations, defendants'

23  activities in Southern California have violated the law.

24      As Your Honor knows, the courts consider three tests to

25  determine whether a PCA violation has occurred.  One, whether

1    civilian law enforcement agents made direct, active use of

2    military personnel to execute the laws; two, whether use of any

3    part of the military pervaded the activities of civilian law

4    enforcement agents; and, three, whether military personnel

5    subjected citizens to the exercise of military power which was

6    regulatory, proscriptive, or compulsory in nature.  Now, it

7    only takes satisfaction of one test to establish a violation,

8    but defendants' conduct meets all three.

9         First, defendants have made direct, active use of the

10   military to execute the laws.  Here I think the simplest way to

11   think about this test is as follows:  If defendants are engaged

12   in one of the prohibited activities listed in DOD Instruction

13   3025.21 or in the standing rules for the use of force, then by

14   their own definitions, they are engaged in direct, active law

15   enforcement.

16        And the evidence shows that defendants have engaged in at

17   least three categories of direct, active use.  First, security

18   functions; second, forming armed perimeters and blockades; and,

19   third, apprehending and detaining civilians.  I know Your Honor

20   is by now familiar with these three categories from our

21   briefing, but I'll briefly walk through the evidence supporting

22   each one.

23        So beginning with security functions, defendants have

24   repeatedly stated that the military is there in Los Angeles to

25   protect federal personnel and property.  What they really mean,

 1    indeed what Mr. Santacruz admitted on the stand yesterday, is

 2    that they are using the military to operate as a force

 3    multiplier for federal law enforcement and to provide armed

 4    security that other federal law enforcement officers would

 5    provide if the military wasn't there.

 6        A prime example of this is in the Carpinteria operation.

 7    General Sherman testified yesterday that the military was

 8    involved in that operation because without the military,

 9    federal law enforcement would have needed to station more of

10    their own personnel at the traffic control points, meaning the

11    operation would have taken longer.

12        In addition, these security functions have included

13    general crowd control, conducting surveillance and security for

14    Homeland Security Investigations, and providing security to ICE

15    agents.  But defendants' own regulations and guidance make

16    clear that the military may not serve security functions.

17    What's more, defendants know they have been providing illegal

18    security functions, as evidenced by their direction to coach

19    federal law enforcement agencies to substitute the word

20    "protection" for "security."

21        And we saw it again yesterday when General Sherman not

22    once but twice suggested that documents were poorly worded or

23    poorly written as an excuse when confronted with documents that

24    indicated the military was engaged in prohibited activities.

25        But General Sherman doesn't know that.  As he said

1   multiple times, he wasn't there.  He didn't see what actually

2   happened on the ground.  Indeed, he said he'd never even seen

3   one of the reports we showed him of activities in Los Angeles.

4   And he doesn't know that those descriptions are wrong or poorly

5   worded.  He just doesn't know what happened.

6        To be clear, defendants could have called the officer who

7   wrote that report to testify as to the inaccuracy of his own

8   report, but they didn't.

9        Defendants cannot now wordsmith their way around their own

10  reports or the law.  Calling "security" by another word does

11  not make it any less illegal.

12       And to the extent General Sherman wants to call the

13  credibility of his officers' reports into question, that cuts

14  both ways.  The reports are either accurate or they're not.

15  Defendants can't cherrypick what parts they choose to believe

16  are accurate.

17       Next, we've seen numerous photos and even video of the

18  military creating perimeters and blockades to stop civilians

19  from entering public roads and spaces where ICE is conducting

20  raids and arrests.  Troops have formed these perimeters in

21  Mecca, in Carpinteria, and in Camarillo.

22       Again, defendants have tried to claim these are not, in

23  fact, perimeters.  But the Court can see for itself what is

24  happening here.  There is only one reason to have troops stand

25  in a line like this with their shields up, and that's to block

CLOSING ARGUMENT / STRONG

1  people from passing the line.

2      Finally, the military has apprehended or detained at least

3  two civilians.  First, on June 13th, a Marine detained and

4  restrained with flex cuffs a veteran who was attempting to

5  access the VA in a federal building.  General Sherman testified

6  this morning that there were federal law enforcement nearby at

7  the time, but they were busy because it was lunchtime.

8      And, second, on July 10th, National Guard troops

9  apprehended a protestor in Carpinteria.  We did play this video

10 for Your Honor yesterday, but I'm going to see if we can

11 successfully play it for Your Honor again.

12          (Video was played but not reported.)

13     **MS. STRONG:**  As Your Honor can see in this video and

14 the screen captures we've taken, this civilian is standing

15 peacefully, with her hands up, posing no threat to law

16 enforcement officers, and the federalized guards are

17 restraining her movement toward a public street and attempting

18 to physically move her away from the perimeter they have

19 constructed.

20     Each of these activities -- security, perimeters, and the

21 apprehension of citizens -- satisfies the first test regarding

22 direct, active law enforcement and constitutes the PCA

23 violation.

24     Turning, then, to the second test, defendants' military

25 conduct pervades the activities of law enforcement.  Defendants

CLOSING ARGUMENT / STRONG

1    have tried to reframe their activities as indirect support and

2    protection of law enforcement rather than direct and active law

3    enforcement.  And while the evidence I just discussed makes

4    clear that's not true, even if it were, these activities would

5    still satisfy this second test because they are pervasive.

6         The military in Southern California are so intertwined

7    with ICE and other civilian law enforcement agencies that they

8    are practically indistinguishable.  Indeed, the military and

9    law enforcement even look the same, often wearing uniforms so

10   similar that it is nearly impossible for civilians to tell them

11   apart.  Even Mr. Santacruz, a seasoned ICE agent with military

12   experience and knowledge, admitted that he struggled at times

13   to distinguish between federal law enforcement and military

14   personnel in the pictures he was shown.

15        And General Sherman testified that unless a civilian

16   happened to have familiarity with military insignia, they may

17   not be able to identify federalized National Guardsmen as

18   soldiers.

19        Together federal law enforcement and the military operates

20   as a single force.  If a team of ICE agents goes into the

21   community to conduct arrests, the military goes with them.

22   Until a few weeks ago, the federalized National Guard were

23   involved in as many as 75 percent of ICE's daily operations.

24        And the military's involvement in federal law enforcement

25   operations is not limited only to the high-risk situations that

**CLOSING ARGUMENT / STRONG**

1   defendants claim necessitated the federalization and deployment

2   in the first instance.

3         Soldiers are not just called upon to assist ICE agents in

4   risky situations. They are embedded with the agents

5   themselves. The reason for this could not be clearer. The

6   federal government wants a display of military force so great

7   that any lawful opposition to their agenda is effectively

8   silenced.

9         The best example of this is in the military display in

10   MacArthur Park on July 7th. On that day, defendants engaged in

11   an operation they named Excalibur, a name inspired by the sword

12   of King Arthur, a symbol for Arthur's kingship and his divine

13   right to rule.

14         In operation Excalibur, defendants deployed both ICE and

15   military personnel, including armed vehicles, to MacArthur Park

16   in Los Angeles. The evidence shows that the mission of this

17   operation was not to protect federal personnel or property or

18   even to engage in immigration enforcement. Rather, the mission

19   was to demonstrate, through a show of presence, the capacity

20   and freedom of maneuver of federal law enforcement within the

21   Los Angeles joint operations area.

22         This morning General Sherman insisted repeatedly that this

23   was a high-risk operation; but if we look more closely at the

24   documents, it's clear the risk was to the soldiers. The risk

25   of inaction was low and there was no threat to federal

1  functions.

2      So defendants knowingly exposed soldiers to a high risk

3  even though it wasn't necessary to protect federal functions.

4  And so why was that worth the risk?  Because defendants wanted

5  to show the world that they had a military force that could

6  march across the streets of Los Angeles any time they wanted.

7  They wanted to scare people, and they did.

8      But they also showed, in deploying the military as part of

9  that display of federal law enforcement presence, that their

10 use of the military was pervading the activities of that law

11 enforcement, and that pervasion violates the Posse Comitatus

12 Act.

13     Moving to the third test then, defendants are using the

14 military to subject citizens to regulatory, prescriptive, or

15 compulsory military power.  As you can see in the videos and

16 photos we've been looking at, the military has restricted

17 civilians' freedom of movement via perimeters and apprehensions

18 like the ones shown in the video of Carpinteria.  But more

19 broadly, the evidence shows that defendants' actions, by

20 design, have had a proscriptive effect on the civilian

21 population of Los Angeles and beyond.

22     Mr. Santacruz admitted that the military was meant to

23 serve as a deterrent to the public, and both the MacArthur Park

24 and Carpinteria documents similarly report an interest in

25 supporting this deterrence effect.

CLOSING ARGUMENT / STRONG

1        There can be no question that the occupation of a civilian

2    city by nearly 5,000 troops for 60 days will have and has had a

3    proscriptive effect on that population.  That is exactly the

4    kind of standing army the Founding Fathers feared.

5        Each of these incidents on its own is a PCA violation, but

6    the gravest and perhaps clearest PCA violation is their

7    cumulative effect.  On their own, these activities, while

8    unlawful, might be viewed as isolated incidents; but together,

9    they exhibit a pattern and practice by defendants dead set on

10   occupying Southern California, intimidating Californians, and

11   using the military to both expedite their agenda and deter any

12   opposition to it no matter the law.

13       Together a picture emerges of military activity so

14   pervasive that, to the average citizen, law enforcement

15   officers and the military become indistinguishable.  Peaceful

16   protests may be met with a military response, and daily life is

17   marked by the presence of tanks and uniformed soldiers.

18       Now, defendants, throughout this trial, have tried to

19   justify their activities by arguing that they are necessary to

20   protect federal property and personnel.

21       We heard a lot from General Sherman about a mysterious

22   constitutional exception; but every time General Sherman

23   referred to that constitutional exception, he referred to what

24   the President and the Secretary of Defense have done.  But

25   neither the President nor the Secretary of Defense can create

1  an exception to the Posse Comitatus Act; only Congress or the

2  Constitution can do that.

3     That means that all of the directives and training we've

4  seen the past two days are wrong and what they told soldiers to

5  do was illegal.

6     The Secretary of Defense's memo directs the troops to

7  engage in crowd control, temporary detentions, cursory search,

8  and security perimeters.  And the training on the standing

9  rules for the use of force says the same, but those directives

10  are based on an alleged constitutional exception that doesn't

11  exist.  General Sherman couldn't tell you where it came from.

12     And defendants themselves, in their briefing, have never

13  offered a constitutional basis for this theory.  They haven't

14  pointed to any express constitutional or congressional

15  authorization to support that such an exception to the Posse

16  Comitatus Act exists.  But even if they could, it wouldn't

17  matter because the evidence shows that's not actually what they

18  are doing.

19     The evidence shows that for many of the operations

20  soldiers were ordered to participate in, there was no risk to

21  either federal property or personnel.  DOD's assessment of the

22  Carpinteria operation showed that there was no indication that

23  failure to act would result in loss of life or significant

24  property damage, but federalized troops were ordered there

25  anyway.  Even the probability of spontaneous protests was

 1  deemed to be low, but federalized troops were ordered there

 2  anyway.

 3      And at MacArthur Park, defendants' intelligence showed no

 4  indication of a threat to federal functions at that location.

 5  Protection wasn't even part of the mission, but federalized

 6  troops were ordered there anyway.

 7      Now, the evidence shows that's actually by design.

 8  Yesterday we heard from General Sherman, in which he stated

 9  that even if there is no risk -- excuse me -- no threat or risk

10  of threat at all, the military may still deploy troops to aid

11  federal law enforcement.

12      Defendants claim that even when a risk assessment is low

13  or non-existent, a threat still could develop; but the fact is,

14  that is always the case in law enforcement actions.  If the

15  military may jump to the aid of federal law enforcement any

16  time and any place there is the remotest risk that an issue may

17  develop, especially without even first showing that the

18  existing federal law enforcement resources are insufficient to

19  protect the officers in executing their federal functions, then

20  there would be no meaningful difference between the military

21  and the law enforcement they purport to protect.

22      And, again, General Sherman agreed with that.  He said

23  yesterday they always wanted military there, and we had plenty

24  of capacity to do that.

25      If nothing else, Your Honor, that is just more evidence of

1  the extent to which the military has pervaded the activities of

2  law enforcement.

3      The fact is that neither the law nor the evidence supports

4  even defendants' own justifications for their actions because

5  there is no justification.  Defendants' conduct violates the

6  law, it's illegal, and it has to be stopped.

7      Your Honor should issue injunctive relief to ensure that

8  defendants do not continue to violate the law for even one day

9  more.  Defendants have made clear, for the duration of this

10  case, that they have no intention of changing or curtailing

11  their activities.  They insist there are no limits on what the

12  military can do so long as they can say their actions have even

13  a remote connection to the protection of federal property and

14  personnel.

15      What's more, even as they acknowledge that any pressing

16  threat in Los Angeles has passed, defendants have now ordered

17  troops to deploy to Los Angeles for an additional 90 days,

18  ensuring that this occupation will continue through election

19  day in November.

20      And General Sherman confirmed those remaining forces

21  include two Mobile Response Forces, which are at the ready to

22  be deployed on at-large law enforcement operations at a

23  moment's notice.

24      And defendants have not stopped with Los Angeles.  On the

25  very morning this trial began, defendants deployed the National

**CLOSING ARGUMENT / STRONG**

1    Guard to Washington, D.C.  In doing so, Secretary of Defense

2    Hegseth said that this is nothing new for DOD and in

3    Los Angeles, we did the same thing.

4        To defendants, Los Angeles is just the beginning.

5    President Trump has hinted at sending troops even farther,

6    invoking places like Baltimore and even Oakland, here in the

7    Bay Area, as his next potential targets.

8        President Trump seems to see the military as his own

9    personal army to use to further his agenda and enforce domestic

10   law.  But that is exactly what the Posse Comitatus Act

11   prohibits, and that's why it's so important to issue

12   prospective relief going forward.

13       Especially concerning here, Your Honor, is defendants' own

14   refusal to draw clear boundaries and abide by them.  DOD

15   leaders all agree that the Posse Comitatus Act applies to the

16   federalized National Guard; but in this action, counsel has

17   insisted it does not.

18       DOD issued regulations prohibiting certain activities, but

19   they now insist there's an as-of-yet unidentifiable

20   constitutional exception that permits military commanders to

21   order troops to engage in prohibited activities if they have a

22   feeling that such action is necessary.

23       But the boundaries of the law cannot be determined by

24   individual feelings.  That is why injunctive relief here is so

25   important to set clear boundaries the defendants are required

CLOSING ARGUMENT / STRONG

1    to follow.

2        The importance of injunctive relief is also sharpened by

3    the alarming testimony Your Honor heard yesterday about when

4    General Sherman raised concerns about requests that violated

5    the Posse Comitatus Act and, in response, he was accused of

6    disloyalty to the United States of America.  That sort of

7    reaction makes clear that the federal government is not

8    concerned with abiding by the law.  They are concerned only

9    with finding a loophole that allows them to dispatch the

10   military to do their will.

11       Finally, Your Honor, I want to draw your attention to how

12   frequently the witnesses you heard from the past two days

13   disclaimed any firsthand knowledge of the facts on the ground.

14   Mr. Harrington, General Sherman, and Mr. Santacruz are key

15   decision-makers in the top of this chain of command, but they

16   cannot even tell you what actions these soldiers took.

17       Despite Mr. Santacruz's many attestations to this Court

18   and the Court of Appeals about how critical the federalized

19   troops' actions were to protecting federal officers, he could

20   not state a single specific action they took.  And while

21   General Sherman insists troops did not engage in unlawful

22   enforcement conduct, he admits he wasn't there and hasn't even

23   seen all of the reports.

24       Certainly they cannot assure the Court or the public that

25   the soldiers they are sending out into the community are

1   abiding by the law.  Only through injunctive relief can we be

2   assured that boundaries are set and defendants respect them.

3        In constructing the right injunctive relief to enjoin

4   future violations, I point Your Honor back to the proposed

5   order we filed with our temporary restraining order back in

6   June.  There we outlined what we think are lawful and

7   administrable boundaries on defendants' use of the military.

8        First, DOD defendants should be enjoined from ordering or

9   deploying the military to enforce or aid in enforcing federal

10  law.

11       Second, DOD should be enjoined from ordering or permitting

12  the military to execute or assist in the execution of any

13  federal agents' enforcement of federal law, including execution

14  of warrants, arrests, searches, checkpoints, cordons,

15  blockades, perimeters, or similar activities.

16       And, third, DOD defendants should be enjoined from

17  ordering or permitting the military to patrol communities or

18  otherwise engage in general law enforcement activities beyond

19  the immediate vicinity of federal buildings or other real

20  property owned or leased by the federal government.

21       In broad strokes, Your Honor, under our proposed

22  injunction, DOD can use the military to protect federal

23  property, such as stationing them at the federal courthouse or

24  at ICE facilities; but because any perimeters, blockades,

25  arrests, or any other activity DOD has been ordering the

1  military to engage in when they accompany law enforcement on

2  arrests and operations in the community are all activities that

3  violate the Posse Comitatus Act, DOD should be enjoined from

4  continuing with those operations.

5      So, Your Honor, I'll conclude where I began.  There has

6  been a standing army in Los Angeles for two months.  Defendants

7  have used that army to pervade the activities of civilian law

8  enforcement and strike fear into the hearts of Californians.

9  In doing so, defendants have disregarded America's deep-rooted

10  policy against military execution of the laws and the Posse

11  Comitatus Act's prohibitions.

12      Plaintiffs ask that the Court issue a permanent injunction

13  and bring a halt to defendants' unlawful military crusade

14  across this state.

15      Thank you.

16      **THE COURT:**  Thank you.

17  Government?

18                     **<u>CLOSING ARGUMENT</u>**

19      **MR. HAMILTON:**  Good afternoon, Your Honor.  Eric

20  Hamilton for defendants.

21      **THE COURT:**  Good afternoon, Mr. Hamilton.

22      Before we get underway, let me ask a question that is

23  being suggested by the State here.

24      As I understand the argument, in part, it is that there

25  appears to be no limiting factor in the use of the military

1    with respect to the protection of federal employees or federal

2    agents.

3         For example, while there may be -- we have ample evidence

4    of different kinds of threats, levels of threats, and so forth,

5    which we can discuss; but even with those threats or whether

6    they are high or whether they're low, is there any limitation

7    to use of the military in an operation which is being conducted

8    by federal agents?

9         For example, one, does there have to be a threat?  That's

10   one thing.

11        Two, does there have to be some evaluation of the threat

12   in terms of the consequences of the threat?

13        Three, is there anything, and I haven't seen any evidence

14   in this case, as to the adequacy or the inadequacy of local law

15   enforcement addressing that threat?

16        Can you answer those questions?

17        **MR. HAMILTON:**  I can, Your Honor.  There isn't

18   anything in the Posse Comitatus Act that requires some

19   preoperation threat assessment or says that the threat has to

20   be at a particular level.

21        California National Guard was federalized in early June

22   because of violent protests in the Los Angeles area, and we've

23   seen at trial evidence of violence that persisted into July.

24   In fact, we developed evidence from Camarillo where there was

25   no National Guard sent with the federal law enforcement

1   officers initially, and it was only after there was violence,

2   with individuals throwing down spike strips, popping car tires,

3   and things of the sort, that the National Guard arrived.  So

4   that shows the weakness in any sort of inquiry that would hinge

5   on a preoperational security assessment.

6       And the limiting principle here is the fact that

7   the presidential memorandum, Secretary Hegseth's memoranda, as

8   well as the other documents that we've presented at trial, all

9   authorize use of military service members for a purely

10   protective function, and that's distinct from the actual law

11   enforcement functions that federal law enforcement agents carry

12   out.

13       **THE COURT:**  Okay.  So let's turn to that for a minute.

14   It's Exhibit 2, I think is one of them, and the second bullet

15   point and it reads as follows [as read]:

16        "For example" --

17       And this is from -- I assume it's from the Department of

18   Defense.  Why don't you have it in front of you so we can

19   follow.

20       I assume it was from the Secretary of Defense, but I'm not

21   sure.  I think it is.  Is that the initials?  I don't -- I

22   can't read them.

23       **MR. HAMILTON:**  I have Exhibit 2 now.

24       **THE COURT:**  Pardon?

25       **MR. HAMILTON:**  I have Exhibit 2.

CLOSING ARGUMENT / HAMILTON

1     **THE COURT:**  Exhibit 2 is from the Secretary of

2  Defense; is that right?

3     **MR. HAMILTON:**  Yes, it is.

4     **THE COURT:**  Okay.  So on the first page, which is

5  Number 3, 000003, it is a command from the Secretary of

6  Defense, and in the second bullet point it reads as follows

7  [as read]:

8          "For example, while other federal personnel

9      execute their duties, DOD service members" -- and I

10      assume that means the military -- "DOD service

11      members may provide perimeter protection against

12      third parties."

13      And I think that's what we saw in the MacArthur Park

14  incident.  I thought I saw some sort of perimeter.

15     **MR. HAMILTON:**  I'd actually disagree with that,

16  Your Honor, because the testimony that General Sherman provided

17  today was that the military service members who went to

18  MacArthur Park never even left their vehicles and that they

19  were there for only about 20 minutes of time.

20     **THE COURT:**  Okay.  So they -- but they were in a --

21  they were -- were the vehicles visible?

22     **MR. HAMILTON:**  I presume they were visible.  I don't

23  know how they were organized, though.

24     **THE COURT:**  Well, but seeing a lot of military

25  vehicles -- visible military vehicles, I would assume, has some

CLOSING ARGUMENT / HAMILTON

1  legitimate impact on a deterrence for misconduct.  I mean, I

2  don't know why you -- isn't that the case?  I mean, they all

3  come out.  It's a show of force.

4      MR. HAMILTON:  The military vehicles that went to

5  MacArthur Park were there for a protective function.

6  MacArthur Park, the security assessment was a high risk.

7      THE COURT:  I don't doubt that.  I'm not quarreling

8  with that.  I'm just saying -- and I'm not quarreling

9  whether -- I'm not getting into a question of whether it was a

10  legitimate use of force.  But, I mean, I think that there has

11  to be some agreement, and maybe there isn't, as to what the

12  force was.

13      I thought that by sending out -- how many vehicles?  I

14  forget how many there were, there were quite a few vehicles --

15  and that they were visible, as distinct from being in a

16  warehouse or off-site 2 miles away or in an armory somewhere,

17  they were visible and that there was a law enforcement goal or

18  objective in having visible vehicles at the scene or visibly

19  at -- visible to the people who are at the scene at the time.

20      I assume that's why the military sends out people or why

21  the police send out people.  They send out a lot of police cars

22  so people see that if they misbehave, there are a lot of police

23  cars and ostensibly a lot of police officers who can then

24  respond to the scene, and it has a deterrent effect.

25      I don't know whether you're agreeing with me or

CLOSING ARGUMENT / HAMILTON

1    disagreeing with me, but are you disagreeing with me?

2          **MR. HAMILTON:**  Well, yes.  The --

3          **THE COURT:**  Okay.  That's fine.  You can -- by the

4    way, you can certainly disagree with me, that's okay, but I

5    need to get some -- I need to understand exactly what your

6    argument here is on the MacArthur Park.

7          Maybe we ought to take another example where they did set

8    up a perimeter.  They did so in what?  Carpinteria or where was

9    the other perimeter of police force?

10         **MR. HAMILTON:**  There were photos of military members

11   standing in a line in --

12         **THE COURT:**  Was it Camarillo or was it the other,

13   Carpinteria?

14         **MR. HAMILTON:**  Carpinteria.

15         **THE COURT:**  Carpinteria.  Anyway --

16         **MR. HAMILTON:**  Carpinteria was the video with the

17   woman.

18         **THE COURT:**  What I'm -- but I'm not actually asking

19   that question.  The question I'm trying to ask is:  Is there

20   any inquiry or -- is there any inquiry or determination made as

21   to whether local law enforcement, as we understand it to be,

22   including a National Guard under the State control, whether

23   those forces are adequate to address the particular security

24   concern that exists in a particular area?  Is there any inquiry

25   into that?

1    **MR. HAMILTON:**  I'm not aware of that, but the --

2    **THE COURT:**  There's been no evidence of that.

3    **MR. HAMILTON:**  I agree.

4    **THE COURT:**  So what I'm trying to figure out is, you

5    bring in the Marines, but maybe it's entirely possible that the

6    SWAT teams of the LAPD or the National Guard under the control

7    of the governor of the State of California or the Sheriff's

8    Office in Los Angeles County, all of whom have been trained in

9    riot control, crowd management, traffic stops, all the things

10   that are listed on the prohibited list, that these people have

11   the ability to protect the federal employees in the execution

12   of their job.  Because there's no evidence in the record, that

13   I'm aware of, that that inquiry was made or that that evidence

14   exists.

15       And what I think the federal government's position is --

16   and you're the federal government; you can tell me your

17   position -- is:  We don't need to do that.  Isn't that correct?

18       **MR. HAMILTON:**  Yes.

19       **THE COURT:**  Right.  You don't need to do that.

20       So then I try to figure out, if you don't need to do that,

21   and that seems -- and that is the position of the federal

22   government, is there any limiting restriction on using the

23   federal troops in these situations?

24       Because after all, when Little Rock occurred and the

25   National Guard was acting contrary to the enforcement of the

1  civil rights legislation, the President of the United States

2  sent in the 101st Airborne, because he sent in the 101st

3  because local law enforcement wasn't going to follow the law.

4  They weren't going to protect the nine children who were trying

5  to get into Central High School.  That's what General

6  Eisenhower did, a military person, I think we'll all agree.

7  Right?

8      And so I'm trying to figure out:  Where are the limits?

9  Where are the limits?  Because Congress, in 1878, decided that

10  the federal government shouldn't enforce the civil rights

11  legislation as it was drawn at that time, shouldn't ensure that

12  then black citizens could vote, and so they pulled out of the

13  South because, in fact, in fact, it was an irritant to the

14  people there to have federal forces.  And then -- and as --

15  they pulled out because the Posse Comitatus Act directed them

16  to do so.

17      So I'm looking at this case and trying to figure out:  Is

18  there any limitation to the use of federal forces?  Because it

19  is a common occurrence, in our experience, that law enforcement

20  at every level constitutes -- is a dangerous profession, and it

21  carries with it dangers; and law enforcement, whether they be

22  ICE officers or FBI agents or beat cops, run the risk of some

23  type of threat to their safety.

24      And the question, when there's a threat to their safety,

25  seems to me to be whether and to what extent different forces

1   can be employed to address those safety concerns.

2       And unless the military is the first line of defense

3   where -- and that would be -- that would be a novel argument,

4   but I'm sort of hearing that -- unless it's the first line of

5   defense, it's usually local law enforcement that's the first

6   line of defense.

7       But there's no evidence in the record that somehow they,

8   in these situations -- Carpinteria, MacArthur Park, other

9   examples -- that they were unable or unwilling, unable or

10  unwilling, to enforce the law or, to put it another way, to

11  protect the lives of agents who were dedicated to executing the

12  laws.

13      Now, is that a correct analysis?  There's no evidence of

14  that at all, and it doesn't make any difference?

15      **MR. HAMILTON:**  No, Your Honor, I'd respectfully

16  disagree.  I think Mr. Santacruz testified yesterday to the

17  fact that there was substantial violence in multiple locations

18  in the Los Angeles area in early June that local law

19  enforcement were not able to contain.  Federal law enforcement

20  officers were injured, federal property was vandalized, and the

21  local law enforcement response was not sufficient to prevent

22  that from happening.

23      **THE COURT:**  Well, so we all know that what happens in

24  riot situations or in lawless situations is that you have a --

25  you have the riots, you have the violence; and then over some

CLOSING ARGUMENT / HAMILTON

1  period of time, it either accelerates, goes out of control, or

2  it comes within control or it tamps down.

3       So, you know, it's an individualized -- is it not an

4  individualized determination?  Like MacArthur Park, is it a

5  determination that there was really a threat to -- of

6  lawlessness at that time, that determination was made, and that

7  local law enforcement couldn't address it?

8       **MR. HAMILTON:**  So the Posse Comitatus Act is a

9  criminal statute.  It has a willfulness requirement in it.

10  There isn't anything in its text that requires some sort of a

11  threat determination before a military service member can

12  perform a purely protective function in protecting federal law

13  enforcement officers.

14       And we have a record here of testimony of violence against

15  military service -- or against -- against federal law

16  enforcement officers in the Los Angeles area, both before and

17  after the National Guard deployed.

18       The Camarillo incident, again, is an example where a

19  judgment was made not to request the National Guard to provide

20  protection, and that proved to be a mistake because there was

21  significant violence in Camarillo.

22       And President Trump, he provided protection.  That's what

23  the order in question does, and it's an order that California

24  is now arguing effectuated a crime because the Posse Comitatus

25  Act is a criminal statute.

CLOSING ARGUMENT / HAMILTON

1    I'm going to start my presentation with the Posse

2    Comitatus Act.  It's a single sentence, and we see in its text

3    three elements.

4    First is willfulness.  There's a state of mind element in

5    the sentence.

6    And the second element is use.  So there has to be a

7    willful use of military service members.

8    The third element is that that willful use has to be as a

9    posse comitatus or otherwise to execute the laws.

10   This is a statute that the Ninth Circuit has repeatedly

11   interpreted and applied to fact scenarios.  Our brief cites at

12   least three Ninth Circuit cases that mention backup security.

13   The first two cases involved allegations that Navy service

14   members violated the Posse Comitatus Act; and in both cases,

15   the Ninth Circuit recognized that providing backup security by

16   itself would not constitute a Posse Comitatus Act violation.

17   And none of these cases are in the context of

18   the President's inherent protective power under the

19   Constitution that has been discussed in trial.  These cases

20   instead recognize that providing backup security is distinct

21   from providing a law enforcement purpose.

22   In the *Dreyer* case, it's a more recent Ninth Circuit case

23   that recognized, in discussing *Khan* and *Klimavicius-Viloria*,

24   that those cases involved no violation where the Navy merely

25   supplied equipment, logistical support, and backup security.

CLOSING ARGUMENT / HAMILTON

1    As I noted, there's been discussion in this trial

2  the President's inherent constitutional protective power.  The

3  slides that Your Honor saw, of course, were designed to be seen

4  by members of the lay, non-lawyers, including very junior

5  military service members.

6    But the President's constitutional protective power is

7  discussed in our brief.  We cite two 19th century cases.  This

8  one is *In re Neagle*, which talked about a situation where mail

9  carriers could come under attack, and the U.S. Supreme Court

10 recognized, asking:  Who can doubt the authority of

11 the President to make an order for the protection of the mail

12 and of the persons and lives of its carriers?

13    And that's the power that the slides that are at

14 Exhibit 10 mentioned in placing in red, under constitutional

15 exceptions, protection of federal property, functions, and

16 personnel.

17    It's distinct from the fact that by providing a protective

18 power by itself, there isn't even a PCA violation in the first

19 place because of that purpose, but the bottom line is the same

20 here.  The context matters.  If the purpose is the protection

21 of law enforcement officers, it isn't law enforcement, in the

22 first place.  It's, instead, protection.

23    Then on top of that there's the fact that a constitutional

24 inherent protective power is at work that is itself an

25 exception to the Posse Comitatus Act.

CLOSING ARGUMENT / HAMILTON

1    **THE COURT:**  And where it says "personnel," you're

2  relying on "personnel"?

3    **MR. HAMILTON:**  And property.

4    **THE COURT:**  Protection of federal property, functions,

5  and personnel.

6    **MR. HAMILTON:**  Yes.

7    **THE COURT:**  And so whenever federal personnel are

8  used -- are used in connection with their official duties, they

9  then could be accompanied by a member of the military?

10    **MR. HAMILTON:**  Well, certainly in a situation here,

11  where the President federalized guardsmen and also deployed the

12  Marines after multiple days of violent attacks on federal law

13  enforcement officers and federal property, the deployment was a

14  response to that violence and a recognition that federal law

15  enforcement officers and federal buildings needed additional

16  protection.

17    But setting aside that legal landscape, the testimony that

18  the Court heard was that service members never went out in the

19  field alone.  They were instead always co-located with federal

20  law enforcement officers who were the individuals themselves

21  doing any traffic control or performing law enforcement

22  functions.

23    And that explains why the record developed in this trial

24  doesn't come close to showing anything like a direct and active

25  use of military service members for law enforcement.

1    This is another slide from the same slide deck that, in

2  the highlighted text, also recognized the fact that military

3  service members can provide lawful support under the protective

4  authority mentioned on the previous slide.

5    And so then turning to the very first document in this

6  story, which is the June 7th presidential memorandum that

7  federalized members of the California National Guard, this is

8  Exhibit 3.  And consistent with the fact that using military

9  service members to provide protection is itself not a violation

10 of the PCA, the presidential memorandum specified what military

11 service members would be able to do.  They'd be able to

12 temporarily protect ICE and other United States government

13 personnel, and they'd be able to protect federal property.

14    That same --

15    **THE COURT:**  Are you saying that because the President

16 says it, therefore, it is?  In other words, if the President

17 says, "I don't -- you can do X, you can do X," well, does that

18 mean because the President has said it, that's sufficient to

19 take it out of the Posse Comitatus Act?

20    **MR. HAMILTON:**  No, Your Honor.  This was a document

21 that exercised authorities vested in the President of the

22 United States.  This is the document that federalized members

23 of the California --

24    **THE COURT:**  That's not my question.  I know exactly

25 what the document did.  But you're saying, "Look at what was

CLOSING ARGUMENT / HAMILTON

1  said in the document."  It was said [as read]:

2          "To the extent that protests or acts of violence

3      directly inhibit the execution of laws, they

4      constitute a form of rebellion against the authority

5      of the Government of the United States."

6      So he says they are a rebellion.  Does that make it a

7  rebellion if he says it's a rebellion?

8          MR. HAMILTON:  Well --

9          THE COURT:  Is it a rebellion because the President

10 says it's a rebellion?  That's my question.  Yes?  No?  I

11 assume it's his opinion.  I'm not arguing that it's not his

12 opinion.  I'm just saying:  Does it make it one?

13         MR. HAMILTON:  It's his judgment as the President of

14 the United States.

15         THE COURT:  Yes, it's his judgment, it's his opinion,

16 it's his thought, it's his way of looking at it, but does it

17 make it a rebellion to call it something?  Does it make it?

18         MR. HAMILTON:  I think people could debate that

19 question.

20         THE COURT:  I'm not asking whether there's a debate.

21 I'm asking you:  Is it your position that because he called it

22 a rebellion, it is a rebellion?

23         MR. HAMILTON:  I mean, it doesn't make it a rebellion,

24 but the President is the Commander in Chief.  This is an

25 authority vested in him.  And as the Ninth Circuit's decision

1  recognized, he's entitled to deference in that judgment in

2  exercising the authority vested in him.

3       **THE COURT:**  So in giving him great deference, extreme

4  deference to his -- to his authority and to his opinions, does

5  that deference entail or encompass the fact that if he calls

6  something a rebellion, it is a rebellion?

7       **MR. HAMILTON:**  It would not -- it would not make it a

8  rebellion, but it's his exercise of his judgment vested in him

9  through the Constitution, as well as laws, to make this

10  decision.  It's his decision to make whether the conditions

11  exist to federalize guardsmen under Section 12406.

12       The next document was created that same day.  It's a

13  memorandum signed by the Secretary of Defense, sent to the

14  California National Guard Adjutant General consistent with the

15  President's judgment and the President's direction, setting

16  parameters for the mission in California.

17       Secretary Hegseth's memo, likewise, repeated that the

18  purpose of the mission was to temporarily protect ICE and other

19  United States government personnel and to protect federal

20  property.

21       The Court also saw a second document from the Secretary of

22  Defense from later in June.  This document was directed to the

23  head of the United States Northern Command, the commander for

24  that unit.  And consistent with the previous documents,

25  consistent with the fact that military service members

CLOSING ARGUMENT / HAMILTON

1   protecting federal law enforcement officers is not itself a PCA

2   violation, this document stated that members of the California

3   National Guard were called into federal service to temporarily

4   protect ICE and other personnel and to protect federal

5   property.

6       Later in the memo, the document has two bullets specifying

7   exactly what service members can do consistent with the overall

8   federal protective mission.

9       This bullet details protective measures that can be taken

10  at federal property.  The next bullet specifically identified

11  what military service members can do to protect federal law

12  enforcement officers.

13      **THE COURT:**  Right.  And it says that -- in its

14  example, it says et cetera, et cetera, et cetera.  And then it

15  says [as read]:

16          "The military may provide such crowd control

17      measures as are reasonably necessary to ensure the

18      execution of federal functions and the safety of

19      federal personnel."

20      Right?

21      **MR. HAMILTON:**  Yes.  Yes.

22      **THE COURT:**  My question is:  As to that, when you say

23  "necessary," are you including within it the inability or

24  unwillingness of the State to act in that capacity?  That's my

25  question.  Yes or no?

CLOSING ARGUMENT / HAMILTON

1     **MR. HAMILTON:**  I'm not aware of evidence on that at

2     trial.  It strikes me as a possibility that that could have

3     been a consideration in some circumstances.

4         **THE COURT:**  Usually anything's possible but, I mean --

5     but you're not -- you're not relying on that?

6         **MR. HAMILTON:**  Well, we do know that there was

7     coordination with the L.A. sheriffs in at least one instance

8     that -- and I'll get to it later in the slide deck, but it's

9     that document with the big blue block on top.  So there was

10    some level of coordination.

11        **THE COURT:**  But there was no evidence presented by the

12    defense in this case that the State of California, that is, the

13    Sheriff's Office, the Police Department, were unable or

14    unwilling to provide protection.  There's no evidence in the

15    record of that, is there?

16        **MR. HAMILTON:**  We respectfully disagree, Your Honor.

17    We think that Mr. Santacruz testified to the vast violence in

18    early June in the Los Angeles area at federal property and

19    against federal law enforcement.

20        **THE COURT:**  And you're saying that demonstrates an

21    unwillingness or an inability of local law enforcement to

22    address the issue?  That's your point?

23        **MR. HAMILTON:**  It does.

24        **THE COURT:**  Okay.  All right.  Thank you.

25        **MR. HAMILTON:**  And so returning to the June 23rd

CLOSING ARGUMENT / HAMILTON

1  memorandum of the Secretary of Defense, after those two bullets

2  explaining what federal military personnel could do, there's a

3  line about what they cannot do.  It says directly [as read]:

4          "Service members may not perform direct law

5      enforcement activities, such as searches, seizures,

6      evidence collection, or arrest."

7      Another order, this one's from earlier in June, is

8  directed to the men and women on the ground, those actually

9  implementing these orders.  It set standards for baseline

10  personal conduct.  It highlighted the importance of the task at

11  hand and the need to show sensitivity to boundaries around what

12  could and could not happen.

13      It said that [as read]:

14          "The mission required discipline and a clear

15      focus on our mission.  Rules are put in place to

16      ensure that all personnel understand the baseline

17      standards expected of them.  We will uphold that duty

18      with the utmost care and professionalism."

19      So I next want to review the evidence that was adduced at

20  trial that plaintiffs allege amounts to a violation of this

21  criminal statute, the Posse Comitatus Act.

22      Plaintiffs say they are proceeding under an equitable

23  *ultra vires* claim, and the standard for any such claim is very

24  high.  As the *Federal Express Corporation* case recognizes, the

25  Supreme Court has understood that in *ultra vires* cases, agency

CLOSING ARGUMENT / HAMILTON

1    action has to go beyond mere legal or factual error and amount

2    to a clear departure by the agency from its statutory mandate

3    or be blatantly lawless agency action.

4         On top of that, there's the fact that the Posse Comitatus

5    Act's single sentence has a state of mind requirement.  It's a

6    willfulness requirement.  And so for plaintiffs to succeed on

7    their *ultra vires* claim, they not only have to show blatantly

8    lawless activity but they would have to show willful action,

9    and willfulness requires proof that the defendant acted with

10   knowledge that his conduct was unlawful.

11        And so next I'd like to review some of the specific items

12   that plaintiffs have discussed at trial and explain how

13   plaintiffs have not come close to meeting either the

14   *ultra vires* standard or establishing a willful use of the

15   military in violation of the PCA.

16        You heard testimony about an incident early in the mission

17   at the Wilshire building.  There was a temporary detention.  It

18   lasted for about 25 minutes.  An individual was temporarily

19   detained while waiting for law enforcement to arrive, and

20   General Sherman testified about what happened.  He explained

21   that when the person approached the boundary set to secure the

22   Wilshire building, the individual didn't stop.  He didn't

23   provide identification.  He didn't say why he was there at the

24   Wilshire building.  Instead, he barreled right through the

25   checkpoint, and that's why he was stopped.

CLOSING ARGUMENT / HAMILTON

1    That is consistent with the protection of a federal

2  building.  In fact, downstairs in this building, there is a

3  checkpoint.  No one can just barrel through into the doors of

4  this building.  Instead, people need to be stopped.  And

5  passing through without stopping in this building would warrant

6  stopping that individual and -- for the same reasons the person

7  here was stopped, without having gone through the proper

8  process to enter the building.

9    And I should also note, especially since I heard my friend

10  on the other side discuss the order that they are asking

11  the Court to enter, my friend suggested that the Court go back

12  to the proposed temporary restraining order that they had

13  suggested.  But later in the case, the plaintiffs proposed an

14  order that wouldn't have even covered this.

15    The proposed order that accompanies the motion for a

16  preliminary injunction doesn't limit anything about conduct at

17  federal buildings.  The proposed order with the motion for a

18  preliminary injunction that the parties provided supplemental

19  briefing on is limited to conduct beyond federal buildings.

20    So plaintiffs have even shifted themselves on what they

21  think happened at the -- or, rather, the lawfulness of the

22  situation like what has been described at the Wilshire

23  building.

24    And what happened at the Wilshire building is also

25  consistent with the standing rules for the use of force.

1    Rule 10 explains that a soldier may temporarily detain an

2    individual who has gained unauthorized access inside perimeters

3    or other restricted areas.

4         Turning next to Carpinteria, the Court saw a video of an

5    incident at Carpinteria.  The plaintiffs call this an

6    apprehension.  It was not.  Instead what we saw was a woman

7    attempting to bump up against a secured area and not being

8    permitted to move that way.  She wasn't apprehended.  She

9    remained free to move outside the secure area.  She was not

10   detained either.

11        Carpinteria also came up in a discussion about the risk

12   assessment there.  Plaintiffs had General Sherman read a bullet

13   for the risk of inaction, and I'll just take a moment to pull

14   this up.

15        The text is a little smaller than I expected, but the risk

16   of inaction says low, but then in parentheses is the word

17   "assumed."  And there's a big highlighted box at the bottom

18   that provides major qualifying and caveating language about

19   that risk of inaction assessment.  It says [as read]:

20             "Conclusion:  DOD personnel are not currently

21        equipped with sufficient information to gauge the

22        risk of inaction given the lack of specific

23        information regarding the posture of the local

24        community in relation to DHS."

25             THE COURT:  I'm not sure that I really appreciate the

CLOSING ARGUMENT / HAMILTON

1    difference between the "risk assumed with a lack of action" and

2    the "risk assumed, a lack of inaction."  What's your

3    understanding -- "inaction" means we don't do it.  And a risk

4    of inaction is if we don't do it, what then will follow?  Is

5    that -- is that -- is that what it is essentially?

6            MR. HAMILTON:  Candidly, Your Honor, I don't have

7    additional context beyond what the Court heard.

8            THE COURT:  Well, what's your take on it?

9            MR. HAMILTON:  I wouldn't want to speculate after a

10   record --

11           THE COURT:  Well, we listened to two days about these

12   assessments, and I neglected to ask the General what exactly is

13   meant by "inaction" and what is meant by "action."

14       I assume that inaction is we don't do anything.  And if we

15   don't do anything, what then -- what then would follow?  What

16   is the risk of something adverse happening if we don't do

17   anything?

18       And so when it says "Risk of inaction low," it suggests to

19   me that what that means is:  If we don't do anything,

20   nothing -- no bad things will necessarily occur or the risk of

21   something bad occurring is slight or low.

22       On the other hand, risk of action -- is that what it says?

23   Risk to the mission.  Risk to the mission.

24           MR. HAMILTON:  And there's risk to the force.

25           THE COURT:  And risk to the force.

CLOSING ARGUMENT / HAMILTON

1      **MR. HAMILTON:**  And those are medium-level risks.

2      **THE COURT:**  Okay.

3      **MR. HAMILTON:**  So it's unclear exactly what this

4  document says about the understanding of the risk.  And even

5  the language that plaintiffs highlighted, they had Major

6  General Sherman read that bullet, and of course it's our

7  position that nothing about the Posse Comitatus Act turns on

8  what a document like this would say.

9      The point is that the bullet tells only part of the story

10  about what this subpart of the slide even says.

11      **THE COURT:**  Well, but this is the military's -- the

12  people who are employed by the military, it's their assessment

13  of certain risks.  I mean, it's not like it's meaningless.  I

14  assume if it's meaningless, why even have it?

15      But it's not meaningless.  It's been referred to.  And it

16  is an assessment because an assessment is done in these cases

17  before the activity itself is done.  And the assessment is done

18  to aid the decider, the decision-maker, as to whether or not a

19  particular action is warranted in a particular case.

20      They do it based, in part, on what the risk assessment is

21  of, one, doing nothing; and, two, doing something.  So I think

22  it's integral to the decision-making process, but I guess what

23  you're saying is it's not -- it's not that probative.  That is

24  to say, it doesn't really necessarily dictate the propriety of

25  the action.

CLOSING ARGUMENT / HAMILTON

1    **MR. HAMILTON:**  So there certainly was testimony about

2    the planning that goes into any sort of time that military

3    service members are going to co-locate with federal law

4    enforcement officers out in the field.

5        Your Honor asked:  Is this document meaningless?  It's not

6    meaningless for the careful preparation that precedes

7    operations that the military participates in; but for purposes

8    of the Posse Comitatus Act, it has no significance.  It is

9    meaningless.  And it isn't even clear from this particular

10   document what the risk assessment was for Carpinteria.

11       Another item discussed in this trial was the concept of

12   perimeters, and this is something that plaintiffs have focused

13   on while citing an Eighth Circuit decision from 40 years ago.

14   It's called *Bissonette against Haig*, and the fact pattern there

15   is very different from anything that the Court heard about in

16   this trial.

17       There was a ten-week standoff with a perimeter created

18   surrounding a village in South Dakota called Wounded Knee.  The

19   litigation arose over a claim for money damages.  And everyone

20   agrees in this case there are no money damages available for a

21   PCA claim.

22       This was a claim for money damages under the

23   Fourth Amendment for an unreasonable seizure.  The argument was

24   that defendants' actions seized, confined, and made prisoners

25   for plaintiffs against their will by surrounding this community

1  for ten weeks of time.

2      The Court didn't see any evidence, anything like that.  We

3  saw photographs of military service members standing together,

4  but there was no evidence of any soldiers preventing anyone

5  from leaving from within the perimeter as was discussed in the

6  *Bissonette* case from 40 years ago.

7      The Court also heard testimony about Camarillo, and I

8  mentioned this earlier in my presentation.  This was an

9  incident that the National Guard initially did not accompany

10  federal law enforcement officers on.  DHS canceled its request

11  for assistance.  And this incident took place on July 10th,

12  more than a month after the initial federalization of

13  guardsmen.

14      Mr. Harrington testified about this.  He testified that

15  crowds formed and engaged in violence.  They threw rocks at

16  agents.  They threw rocks at vehicles.  They damaged vehicles.

17  They had built a spike strip by taking sections of garden hose

18  and running nails through them.  They popped tires of federal

19  law enforcement vehicles.  It was an unruly crowd, he

20  testified.

21      Mr. Santacruz also testified about this incident.  He

22  testified that there was shooting in the direction of federal

23  law enforcement officers.  Task Force 51 responded later, and

24  Mr. Harrington testified that they did not engage in law

25  enforcement operations.

1    The Court also heard testimony about MacArthur Park, which

2   took place on July 7th.  Mr. Harrington testified there were no

3   interactions with civilians.  The operation took 20 minutes in

4   total.  In fact, Mr. Harrington explained that it actually took

5   more time for the guardsmen to get to MacArthur Park than they

6   were at MacArthur Park.  He further testified they didn't

7   engage in any law enforcement in MacArthur Park.

8    This came up earlier today in Major General Sherman's

9   testimony.  He testified that the National Guard stayed out of

10  the park while federal law enforcement officers went in the

11  park, and he explained that National Guardsmen didn't even

12  leave their vehicles.

13   The Court also saw a risk assessment document from

14  MacArthur Park.  The plaintiffs had Mr. Harrington read from a

15  page that contained language stating the risk of inaction as

16  low, but a different page in the same document specified the

17  overall threat assessment and it was high.

18   It explains that the potential for protests to arrive on

19  site and transition to riots exists.  Criminal elements, likely

20  including MS-13, consider the park their home turf and could

21  escalate to lethal violence.  Major General Sherman read that

22  earlier today.

23   The Court also heard testimony about a June 13th mission.

24  General Sherman testified about this, and this is different

25  from some of the other missions in that it wasn't an

1   immigration mission.  The FBI and DEA went out on this mission.

2   And the reason was because an individual who had injured

3   federal law enforcement officers was identified, and federal

4   law enforcement was sent out to arrest that individual.

5       No one established at trial that there were any blocking

6   positions unconnected to a law enforcement officer.  And Major

7   General Sherman testified about this, explaining that he

8   disagreed with blocking language that the author of the

9   document used.  Major General Sherman further added that the

10  author of the document was quite young, estimating the

11  individual's age to be about 22 years old.  The patrol

12  narrative in the document also adds that each blockade was

13  accompanied by a marked Los Angeles Sheriff's vehicle.

14      Next is Mecca.  The Court heard testimony about Mecca.

15  Mr. Harrington testified that guardsmen were sent to provide

16  force protection for federal agents.  He testified that the

17  guardsmen engaged in no activity other than standing several

18  hundred yards away while a canal separated soldiers from the

19  facility, and that they did not engage in law enforcement.

20      The trial also left California and we discussed very

21  recent events in the District of Columbia.  There is no

22  relevance to this case of the presidential memorandum that was

23  signed yesterday.  The presidential memorandum is different

24  from the presidential memorandum signed in June because of the

25  position of the President.

CLOSING ARGUMENT / HAMILTON

1      The statute on the left is taken from the California Code,

2   and it identifies the Governor of California as the Commander

3   in Chief of the militia.

4      **THE COURT:**  I think the relevance that was urged was

5   not that they were similarly situated.  I didn't take that from

6   that because, after all, District of Columbia is a special

7   case.  There's home rule statutes and so forth.

8      I think it was the reference to Oakland, California, that

9   now the National Guard maybe should be employed in Oakland,

10  California, the same way that it is employed in the District of

11  Columbia.  That, I thought, was the point they were trying to

12  make.

13     But let's assume that is the point that they were trying

14  to make.  Are you saying that that's not relevant?

15     **MR. HAMILTON:**  I heard that statement for the first

16  time today, when the plaintiffs played it on the phone up at

17  the witness stand.

18     **THE COURT:**  Right.

19     **MR. HAMILTON:**  So I don't have any additional context

20  for that beyond what I heard the plaintiffs play.

21     But I do think it's important to highlight that the

22  presidential memorandum signed on Monday that underlies the use

23  of the National Guard in the District of Columbia is quite

24  different because the President, under D.C. Code, is actually

25  the --

CLOSING ARGUMENT / HAMILTON

1          **THE COURT:**  I think I said that.

2          **MR. HAMILTON:**  Yes.  Yes.

3          **THE COURT:**  I mean, you can say it again, but I'm

4    not -- I certainly agree with you.  They're different.

5          **MR. HAMILTON:**  Yes.

6          **THE COURT:**  They have a different set of laws and so

7    forth.

8          But, again, I go back to the fact that, notwithstanding

9    the difference, the assertion is that the President of the

10   United States mentioned Oakland, California, as being a city in

11   which it may be appropriate to use the National Guard in the

12   same way.  That's what he said.  I mean, that's what I heard

13   him say.  And your position is you don't have a position on

14   that because you don't have the context?

15         **MR. HAMILTON:**  Yes.

16         **THE COURT:**  Okay.  Go ahead.

17         **MR. HAMILTON:**  So that is the evidence that plaintiffs

18   presented in their case-in-chief.

19         This came after significant discovery that defendants

20   provided to the plaintiffs.  We produced 3400 documents, making

21   up 19,000 pages of discovery.  There were multiple depositions,

22   depositions of a two-star general, a deputy chief of staff

23   within the Army, and the deposition of a DHS, ICE, ERO field

24   office head, the head for the Los Angeles area.

25         And this is it.  The incidents that plaintiffs think,

1  individually or collectively, violate the Posse Comitatus

2  Act -- it's a criminal statute -- doesn't come close to meeting

3  the relevant standard.

4      There's no testimony from anyone who claims to have been

5  harmed by some sort --

6      **THE COURT:** I had a question on that. There were --

7  the evidence in this case highlighted three or four -- three or

8  four -- maybe three, maybe four -- incidents which the

9  plaintiff claims were violations of the Posse Comitatus Act.

10     In order to put it in context, is there evidence in the

11 record or are you aware of how many times the military, once

12 they were nationalized -- the National Guard, once they were --

13 or the Marines, for that matter, when the troops came in, how

14 many times did they render assistance in operations from the

15 time they came in to the present time?

16     **MR. HAMILTON:** I don't know that, standing here right

17 now, but I will see if I can get an answer tomorrow when we

18 have legal arguments.

19     **THE COURT:** Okay. I'd like that from both sides if

20 there's some agreement. I mean, I, for some reason, believe

21 that the General testified that there were X number of requests

22 for assistance. I don't know whether that's the key to

23 determining how many operations there were in using the

24 military. It strikes me as of some significance. If it's 3

25 out of 6 or 3 out of 60, that's a difference. Even I can see

1    that's a difference.

2        And the question is:  Is it a difference that makes a

3    difference or not?  But I don't have the -- I don't have the

4    denominator.  I have the numerator.

5        **MR. HAMILTON:**  One fact I can recall that might be

6    relevant is Mr. Santacruz did testify to the proportions of

7    DHS, ICE, ERO operations where guardsmen co-located with the

8    ERO agents.  He explained that earlier in June, I think he

9    described it as a wild guess, as being about 75 percent, that

10   by July that number had decreased, and that he testified

11   yesterday that on that day, it had fallen to zero percent.

12       **THE COURT:**  I think that is my recollection as well.

13   But I -- again, it's a percentage number as distinct from a

14   denominator.

15       **MR. HAMILTON:**  So to just recap, there's testimony by

16   both Mr. Santacruz and General Sherman in this trial about the

17   fact that there were no law enforcement operations implemented

18   by the military service members.

19       General Sherman testified that military service members

20   understood their mission.  They understood the reason they were

21   there.  Either they were at a facility to protect a federal

22   facility or they were out on a mission to protect federal law

23   enforcement, allowing them to do their job.

24       And so I return to the standard for an *ultra vires* claim

25   because that governs this claim, and plaintiffs did not satisfy

1   it with the evidence that they presented.  There was no

2   evidence of blatantly lawless agency action, no evidence of a

3   clear departure by the agency from its statutory mandate.

4        There's still one more evidentiary issue in the case,

5   which is standing.  Because this case went to trial, the

6   plaintiffs bear the burden to prove the facts underlying their

7   standing to sue on this claim.

8        As the U.S. Supreme Court recognized in *Lujan against*

9   *Defenders of Wildlife*, at the final stage, once a case goes to

10  trial, the facts, if controverted, must be supported adequately

11  by the evidence adduced at trial.

12       Plaintiffs' supplemental preliminary injunction brief

13  identifies three alleged injuries for their standing:  Physical

14  and economic health and well-being of citizens, fiscal harm,

15  and federalism.

16       The plaintiffs presented no evidence of any of these

17  injuries.  Plaintiffs could have identified as many witnesses

18  as they wished to have testify to their fiscal harm.  They

19  could have identified witnesses to testify to some physical and

20  economic health and well-being of citizens or a federalism

21  injury.  They chose not to do so.  That is a separate and

22  distinct failure of proof by the plaintiffs.

23       For these reasons, we ask that the Court would deny the

24  plaintiffs' motion for a preliminary injunction and enter

25  judgment on this claim in defendants' favor.

CLOSING ARGUMENT / HAMILTON

1      **THE COURT:**  Thank you.

2      I think the last two arguments are arguments that I

3  anticipate having some further discussion tomorrow, and, again,

4  you can certainly raise them.

5      **MR. HAMILTON:**  Yes.

6      **THE COURT:**  But those are the legal -- in a sense, the

7  legal arguments.

8      **MR. HAMILTON:**  Yes.  I only raised them today because

9  of the evidentiary piece.

10      **THE COURT:**  I appreciate that, and I think that's the

11  right thing to do.

12      **MR. HAMILTON:**  Thank you, Your Honor.

13      **THE COURT:**  Okay.  Thank you.

14      Does the State wish to respond?

15      Do you want to take a recess?

16      The court reporter will need a recess.  See, they tell me

17  what to do, and I follow that because the court reporter and

18  the courtroom deputy are the most important people in this

19  courtroom.  So we're going to take a recess till a quarter of

20  3:00.

21              (Recess taken at 2:29 p.m.)

22          (Proceedings resumed at 2:49 p.m.)

23      **THE COURT:**  Let the record show the parties are

24  present.

25      You may proceed.

1      **MS. STRONG:**  Thank you, Your Honor.

2                  **REBUTTAL ARGUMENT**.

3      **MS. STRONG:**  Just a few points in rebuttal.

4      I first want to address the broad theory that defendants

5  are invoking here that they call it an inherent protective

6  power that President Trump possesses, and I just simply want to

7  make the point for Your Honor that inherent protective power is

8  the opposite of the express authorization that the Posse

9  Comitatus Act, on its face, requires in either the Constitution

10 or an act of Congress.

11     But even if there were some sort of protective power or

12 justification for deploying troops in order to protect federal

13 property and personnel, that still wouldn't matter because the

14 evidence shows that what the military is doing is not

15 protecting federal property and personnel.

16     That argument is belied by defendants' own risk

17 assessments, which I've asked my colleague to put up on the

18 screen again here if we can.  And I want to specifically

19 address Your Honor's question of what these risk assessments

20 mean and what the "risk of mission" means versus the "risk of

21 inaction."  Because I think it's actually relatively plain on

22 the language what those two different items mean, and so I'll

23 give my colleague a moment and we'll take a look at those.

24     And so here, the Carpinteria risk assessment, we have risk

25 to mission labeled as medium.  Now, that, I think, Your Honor,

**REBUTTAL ARGUMENT / STRONG**

1    if you read the hazards and mitigations below the risk to

2    mission runs to the risks that are likely to arise if the

3    military follows through with the mission.  There may be

4    potential hazards to the officers involved, and there may be

5    potential ways to mitigate that.

6         But if we look down to the risk of inaction, which is

7    labeled as low, the language there is, in fact, very clear.

8    There is no indication that failure to act would result in loss

9    of life or significant property damage to federal personnel.

10   That means that if the military fails to act, if they don't go

11   on this operation, there's no indication that the property and

12   personnel they are claiming to protect will, in fact, be

13   harmed.  They're not even fulfilling that alleged protective

14   mission.

15        And if we go to the next risk assessment, this one is for

16   Operation Excalibur, the MacArthur Park operation.  And, again,

17   we're looking at a risk to the mission, crowd volatility that

18   might develop as a result of the presence of law enforcement

19   and the military; the risks that may arise if the mission goes

20   forward versus the risk of inaction, which is the risk that's

21   posed if the military does not go on this operation.  And,

22   again, there is no indication that failure to act would result

23   in loss of life or significant property damage.

24        These operations simply weren't necessary to protect

25   federal property and personnel even if that mission were

1    justified by the law, and it's not.

2        Finally, Your Honor, I just want to make sure it's clear

3    that we focused on four events in this trial to give Your Honor

4    real examples to sink your teeth into, but we've also shown you

5    photos and evidence from across Los Angeles.  It's not limited

6    to just these four incidents.

7        In fact, the military has a pervasive presence across all

8    of Southern California, which is itself a violation of the

9    Posse Comitatus Act under that second test we've been

10   discussing.

11       And so it's not a matter of four separate violations, but

12   a pervasive violation because at the end of the day, this is a

13   pattern and practice by the military.  Every order and every

14   operation the military has engaged in in Southern California

15   runs from the orders that have come from the very top; the

16   Secretary of Defense, in that memo we've been looking at that's

17   in Exhibit 2, which itself says direct the troops to engage in

18   PCA prohibited activities.

19       So every action that has run from those illegal orders is

20   itself a Posse Comitatus Act violation, and that's why

21   Your Honor should award the injunctive relief we've requested.

22       Thank you.

23           **THE COURT:**  Thank you.

24   Would you like to respond?

25           **MR. HAMILTON:**  Just one small thing.  We tried to use

**PROCEEDINGS**

1  our break time to get back to Your Honor on the question about

2  the number of RFAs.

3        **THE COURT:**  Yes.

4        **MR. HAMILTON:**  We don't think that the fact of the

5  number of RFAs is in the trial record.

6        **THE COURT:**  Is what?

7        **MR. HAMILTON:**  It is not in the trial record, as far

8  as we understand.

9        **THE COURT:**  It's not in the trial record.  Okay.

10  All right.

11        **MS. STRONG:**  Your Honor, just for the record --

12        **THE COURT:**  Sure.

13        **MS. STRONG:**  -- I think we think it may be in the

14  trial record.

15      We're still looking to confirm.  And so we just ask leave

16  to provide an update on that tomorrow if we confirm.

17        **THE COURT:**  Okay.  Well, you can tell me tomorrow if

18  it is.  If it isn't --

19        **MS. STRONG:**  Thank you, Your Honor.

20        **THE COURT:**  -- that's fine.

21      So tomorrow I would anticipate that we will have argument

22  on what I call the legal issues, some of which have been

23  addressed this evening or this afternoon.  In particular, the

24  *ultra vires* aspect of it, that was addressed.

25      I think whether -- as a criminal statute, what would be

**PROCEEDINGS**

1   the remedy?  Does a cause of action actually arise out of

2   the -- out of it that can be brought by the State of California

3   or by some -- somebody in connection -- in a civil proceeding?

4        And I think there were several others that -- oh, whether

5   12406 provides a statutory exemption to the Posse Comitatus

6   Act.

7        There's a fourth one that I mentioned earlier today.

8        I think I also -- I want to make sure that I understand

9   the government -- the federal government has said there's no

10   evidence of willfulness and you need evidence of willfulness in

11   the commission of a criminal act in this context.

12        And "willfully" means that you acted knowing that it was

13   unlawful.  I think that's the way the language is written in

14   one of the cases, and I would like the government to -- the

15   state government to respond to that particular argument.

16        I'm interested in the federal government's argument that

17   if, in fact, there is no cause of action under -- that the

18   state can bring in connection with the violation of a Posse

19   Comitatus Act, what is the vehicle that can be used to

20   challenge a decision -- challenge the conduct of the military

21   when it is alleged that they have violated the Posse Comitatus

22   Act?

23        Is that question clear?

24        **MR. HAMILTON:**  It is, Your Honor.

25        **THE COURT:**  Okay.  Let's see if there's anything else.

**PROCEEDINGS**

```
 1                    (Pause in proceedings.)

 2         THE COURT:  Is there a case that holds that 12406 --

 3    is that the statute?  12 -- I always get the number wrong.  Is

 4    it 12406, the --

 5         MR. HAMILTON:  It is.

 6         THE COURT:  It is.  I got it right.

 7         Whether -- is there a case that holds that that's an

 8    exception to the Posse Comitatus Act?  I mean, there are a

 9    number of cases addressing 12406.  Do any of them hold that

10    it's an express exception to the Posse Comitatus Act?

11         Okay.  And we will start at 9:00 a.m. tomorrow.  We will

12    definitely conclude tomorrow morning.

13         And so there's no suspense, I'm going to take it under

14    submission.  Not that there would be suspense anyway but maybe

15    there would.  I don't know.

16         Anyway, thank you very much.  See you in the morning.

17                    (Proceedings adjourned at 2:58 p.m.)

18                          ---o0o---

19

20

21

22

23

24

25
```

1

2 **CERTIFICATE OF REPORTER**

3       I certify that the foregoing is a correct transcript

4 from the record of proceedings in the above-entitled matter.

5

6 DATE:  Tuesday, August 12, 2025

7

8

9

10                            *Ana Dub*

11           _____

12         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13       CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**Volume 3**

**Pages 350 - 409**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
GAVIN NEWSOM, in his official capacity )
as Governor of the State of California;)
STATE OF  CALIFORNIA,                  )
                                       )
          Plaintiffs,                  )
                                       )
  VS.                                  ) NO. 3:25-CV-04870 CRB
                                       )
DONALD TRUMP, in his official capacity )
as President of the United States;     )
PETE HEGSETH, in his official capacity )
as Secretary of the Department of      )
Defense; UNITED STATES DEPARTMENT OF   )
DEFENSE,                               )
                                       )
          Defendants.                  )
_____)
```

San Francisco, California
Wednesday, August 13, 2025

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        CALIFORNIA DEPARTMENT OF JUSTICE
        OFFICE OF THE ATTORNEY GENERAL
        455 Golden Gate Avenue, Room 11000
        San Francisco, California 94102
      BY: **JANE E. REILLEY**
          **MEGHAN STRONG**
          **KENDAL MICKLETHWAITE**
          **DEPUTY ATTORNEYS GENERAL**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:

                     CALIFORNIA DEPARTMENT OF JUSTICE
 3                   OFFICE OF THE ATTORNEY GENERAL
                     1515 Clay Street, Suite 2000
 4                   Oakland, California 94612
               BY:  NICHOLAS D. ESPIRITU
 5                   DEPUTY ATTORNEY GENERAL

 6                   CALIFORNIA DEPARTMENT OF JUSTICE
                     OFFICE OF THE ATTORNEY GENERAL
 7                   455 Golden Gate Avenue, Room 11000
                     San Francisco, California 94102
 8             BY:  ANYA M. BINSACCA
                     MARISSA MALOUFF
 9                   SUPERVISING DEPUTY ATTORNEYS GENERAL

10                   CALIFORNIA DEPARTMENT OF JUSTICE
                     OFFICE OF THE ATTORNEY GENERAL
11                   300 South Spring Street
                     Los Angeles, California 90013
12             BY:  BRENDAN M. HAMME
                     BARBARA S. HORNE-PETERSDORF
13                   DEPUTY ATTORNEYS GENERAL

14   For Defendants:

15                   UNITED STATES DEPARTMENT OF JUSTICE
                     Civil Division, Federal Programs Branch
16                   1100 L Street, NW
                     Washington, D.C. 20005
17             BY:  GARRY D. HARTLIEB, TRIAL ATTORNEY
                     JODY D. LOWENSTEIN, TRIAL ATTORNEY
18                   JEAN LIN, SPECIAL LITIGATION COUNSEL
                     BENJAMIN S. KURLAND, TRIAL ATTORNEY
19                   ANDREW BERNIE, TRIAL ATTORNEY
                     ABIGAIL STOUT, TRIAL ATTORNEY
20
                     UNITED STATES DEPARTMENT OF JUSTICE
21                   Civil Division
                     950 Pennsylvania Avenue NW
22                   Washington, D.C. 20530
               BY:  ERIC J. HAMILTON
23                   JOHN BAILEY
                     DEPUTY ASSISTANT ATTORNEYS GENERAL
24   Also Present:

                     Kimberly Knight, Paralegal
25                   Major General Scott Sherman
```

1           **I N D E X**

2

3    Wednesday, August 13, 2025 - Volume 3

4
                                                        **PAGE**    **VOL.**
5
Closing Argument by Mr. Hamilton                        355       3
6    Closing Argument by Ms. Strong                          379       3
     Rebuttal Argument by Mr. Hamilton                       396       3
7    Rebuttal Argument by Ms. Strong                         408       3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

**Wednesday - August 13, 2025**                              **9:03 a.m.**

P R O C E E D I N G S

---o0o---

THE COURT:  Okay.  Let the record reflect all parties are present.

THE COURTROOM DEPUTY:  Just one moment.

THE COURT:  One moment for the video or the audio.

(Pause in proceedings.)

THE COURT:  Okay.  Thank you.

Good morning, ladies and gentlemen.

This morning is devoted to argument, legal argument essentially, but I don't want to foreclose you.  If you have something that you want to -- that in the middle of the night, when you were all in your deep REM sleep, occurred to you that "Gee, I forgot to say this" or "I forgot to say that," please do so.  I mean, don't feel -- don't feel constrained by these procedures.  The important thing is essentially for you to voice your position in the way that you feel appropriate and for me to come to the right decision.  So anything that you say that you think would be helpful in that regard, I want you to feel free to do it.

And also, while I am optimistic that this won't take more than a few hours, I'm realistic in the sense that if it takes a bit longer, it takes a bit longer, and I want you to feel that you can address it.

PROCEEDINGS

1       And also, while I'm starting first with the defense

2   because they are raising these legal challenges, I want to make

3   sure that the parties know that they will have an opportunity

4   to respond to arguments that come up later in the discussion.

5       So with that, let me turn to the Government.

6           MR. HAMILTON:  Thank you, Your Honor.  Eric Hamilton.

7           THE COURT:  I think it's better if you stand here,

8   just from the point of view of my --

9           MR. HAMILTON:  Over here?

10          THE COURT:  Yes.

11      -- ability to make sure I hear you.

12          MR. HAMILTON:  Thank you, Your Honor.

13      Eric Hamilton, Deputy Assistant Attorney General,

14  U.S. Department of Justice, for defendants.

15      A couple of preliminary things before getting into the

16  argument.

17      We looked again at Your Honor's question about RFAs and

18  the record developed at trial.  I think at page 31 from the

19  first day's proceedings, lines 10 to 13, Mr. Harrington

20  testified that there was 64 RFAs from federal law enforcement;

21  and then on the next page, lines 1 to 4, Mr. Harrington

22  testified that Task Force 51 approved and responded to the

23  majority of those RFAs.

24      The second preliminary matter before getting to argument,

25  I wanted to raise the subject of post-trial briefing, request

1    the opportunity for both sides to submit post-trial briefing.

2         **THE COURT:**  I may or may not grant that.  It really

3    depends on whether I feel that I have some unanswered

4    questions -- that there are some unanswered questions.

5         There's been pretrial briefing; there's been -- I don't

6    know what -- six hours of evidence or something, about a day of

7    evidence; and then there's also been argument on the evidence

8    so far.  Now we have argument on the law.  And at some point,

9    it's out there.  It's out there.

10        If something new has been raised for the first time and

11   you've had no chance to address it, of course I want you to

12   have that opportunity, but I would not think that it's

13   necessary at this point to have post-trial briefing.

14        Thank you.

15        **MR. HAMILTON:**  Thank you, Your Honor.

16                       **CLOSING ARGUMENT**

17        **MR. HAMILTON:**  California is asking this Court to do

18   something that no Court has ever done before.  There is no

19   precedent for an *ultra vires* claim enforcing a criminal statute

20   like the Posse Comitatus Act, and California's theory of the

21   law would make no sense of Section 12406, sub (3).  That

22   statute authorizes the President to deploy guardsmen to execute

23   the laws; but under plaintiffs' interpretation, doing so would

24   be a violation of the Posse Comitatus Act.

25        There are three threshold problems in plaintiffs'

CLOSING ARGUMENT / HAMILTON

1    argument.  One, there is no equitable cause of action for an

2    *ultra vires* claim under the Posse Comitatus Act; second, the

3    Posse Comitatus Act doesn't apply to deployments under

4    Section 12406; and, third, plaintiffs did not carry their

5    burden of establishing their standing to sue on this cause of

6    action.

7         Returning to the absence of an equitable *ultra vires* cause

8    of action under the Posse Comitatus Act, I want to start with

9    some areas where I think there's agreement between both sides.

10        One, everyone agrees the PCA doesn't permit a claim for

11   money damages.  There's also agreement that the PCA itself

12   doesn't provide an equitable remedy.  Plaintiffs also don't

13   dispute that the U.S. Supreme Court in the last term held, in

14   *Trump against CASA*, that equitable remedies need to have some

15   analog in English Chancery Court practice, the tradition that

16   preceded our tradition in the United States.

17        And there's also agreement on both sides that no one has

18   been able to locate a previous equitable *ultra vires* cause of

19   action under the Posse Comitatus Act.

20        In fact, we're not only --

21        **THE COURT:**  When you say there's no equitable -- do we

22   have to look back to -- I don't know -- common law or British

23   practices at the time that the Constitution was drafted?  Do we

24   look back to 1789 and that?

25        And there was no -- there was no equitable action, an

 1    equitable action in British law, similar to what they've asked

 2    here.  That's your argument; is that right?

 3         **MR. HAMILTON:**  Yes.  And --

 4         **THE COURT:**  Okay.  So then I'd ask you:  What is the

 5    likelihood that in England, in 1776, there would be an action

 6    or a law or a remedy to restrain the King of England?  I mean,

 7    would that be -- is that at all possible?  I thought the King

 8    of England was pretty absolute in his reign, in his powers.

 9         So the thought that in 1776 there wasn't an equitable

10    relief against the King, is that instructional?  Do I say, "Oh,

11    no, they couldn't restrain King -- the King, so we can't

12    restrain the President"?  Is that the way I should look at it?

13         **MR. HAMILTON:**  I don't think so, Your Honor, because

14    England did have criminal statutes, and the Posse Comitatus Act

15    is a criminal statute; and making plaintiffs' cause action --

16         **THE COURT:**  But you're asking about the remedy,

17    basically.  You're going -- you're telling me -- as I

18    understand it, you're saying to me, "Look, in terms of the

19    remedy under criminal statute, you couldn't go after the King."

20    That's -- or you can't go after the President.  When I say "go

21    after," I mean he cannot be the subject of equitable relief

22    issued by a district court or by a court of competent

23    jurisdiction.

24         Okay.  That's your argument.  But what I'm trying to do

25    is -- and it's a historical argument.  So when you talk about

CLOSING ARGUMENT / HAMILTON

1   history, you have to be careful that, because it's history,

2   it's not the present, by definition.  So we look back 250 years

3   ago for some guidance, and we see -- we see that there weren't

4   restraints on the King.

5        I mean, it almost suggests to me, it's like what

6   Justice Scalia said, where there was some sort of case

7   involving -- I don't know.  What are those? -- eight-track

8   tapes or maybe the Internet or something like that and the

9   question is:  Well, what would Madison have done about these

10   DVDs?  I don't know.  They didn't have DVDs then.  And I don't

11   know -- looking back at the King of England, I don't know that

12   he was so restrained.  They didn't do that then.

13        So I think you get into -- and, by the way, we've had a

14   Revolution and we've had a Constitution and we've had a process

15   in response to the lack of particular activities and particular

16   judgments and orders and so forth.

17        So I'm a little bit leery of -- I'm not leery of your

18   argument.  I understand your argument, "Well, there aren't

19   cases out there saying you can do it."  But to look back at

20   1776 and try to figure out what was happening then, you sort of

21   lose me on that one.  You understand?

22           **MR. HAMILTON:**  Yes.

23        So the President is one of three defendants in this case.

24   Secretary Hegseth is a defendant as well as the Department of

25   Defense.

1    Our supplemental opposition brief noted that the Court

2 would lack jurisdiction to enter any sort of injunction against

3 the President, and I don't think plaintiffs even established a

4 record that the presidential memorandum signed on June 7th

5 violated the Posse Comitatus Act.  And plaintiffs' reply brief,

6 their supplemental reply brief, didn't dispute our argument

7 that the Court would lack jurisdiction to issue an injunction

8 against the President.

9    But aside from the fact that neither side has identified

10 historical precedent for an equitable *ultra vires* claim seeking

11 to enforce a criminal statute -- and a criminal statute that

12 contains a willfulness state of mind requirement -- the fact

13 that Congress specified a remedy implicitly precludes the

14 *ultra vires* cause of action.

15    This is something the U.S. Supreme Court analyzed this

16 last term in *NRC against Texas*.  In that case, a different

17 state, the State of Texas, sought to litigate an equitable

18 *ultra vires* claim against the NRC.  The Supreme Court looked at

19 the statute that governed litigation over the permit that Texas

20 was attempting to challenge, and it recognized that the

21 Congress contemplated remedial issues and it limited the --

22    **THE COURT:**  So then what is the remedy?  I'm going

23 back.  What is the remedy?  Let's assume that the President

24 violated -- and this is an allegation, and it's -- I use it

25 only by way of trying to clarify your argument in terms of what

1   are remedies.

2       Let's assume that he violates the terms of the

3   Posse Comitatus Act.  What then is the remedy for the

4   violation?  Or is there a remedy?  Let's start with that.  Is

5   there a remedy?

6           **MR. HAMILTON:**  Well, there is no --

7           **THE COURT:**  Let's say the facts aren't in dispute.

8   They are in this case, but let's say the facts actually aren't

9   in dispute.  There's no question, he sends out the troops and

10  he says to the troops, "This is what I want you to do.  I want

11  you to conduct law enforcement activities in -- there's no --

12  I'm directing you to do it.  You, the military, you go out and

13  do it."  And so everybody says, "Well, this actually is

14  contrary to the language in the Posse Comitatus Act."  What

15  then is the remedy?

16          **MR. HAMILTON:**  Well, there is no civil remedy, and

17  that's --

18          **THE COURT:**  Okay.  So there's a criminal remedy.  In

19  other words, you're saying that the President of the

20  United States could be prosecuted by -- I guess the Justice

21  Department -- prosecuted for this criminal offense?  And you

22  say that in light of the recent Supreme Court decision, the

23  *Trump* decision?  I mean, how could he be prosecuted?  Isn't he

24  immune?

25          **MR. HAMILTON:**  I agree that a prosecution against

1 the President would implicate immunity issues.  But the point

2 is, whoever the defendant is, there's no civil enforcement

3 remedy, and that's been --

4     **THE COURT:**  So there's no remedy?  You're saying,

5 "There's no civil remedy, period.  And, by the way, criminal

6 remedy, well, we'd have to take a look and see whether the

7 actors in the criminal remedy are otherwise immunized."

8     And we've all read that opinion.  At least there's an

9 argument to be made that there is immunity under the

10 Supreme Court's decision.

11     So that's it.  Too bad.  So sad.  It's over and that's the

12 end of the case, even though it's a violation, allegedly, of

13 the Posse Comitatus Act.  What you're saying is:  Here is a

14 statute that basically, under the present jurisprudence that we

15 have today, to which there would be no remedy.

16     Okay.  I understand that argument.

17     Let's have another argument.  Let's --

18     **MR. HAMILTON:**  Before I leave that subject, I think

19 this is actually something that plaintiffs agree with us on

20 because, again, our supplemental opposition brief noted that

21 courts don't have jurisdiction to enter injunctions against

22 the President, and plaintiffs' supplemental reply brief took no

23 issue with that proposition.

24     So the status quo under the Posse Comitatus Act, which has

25 been on the books for 147 years, is that there's no civil

CLOSING ARGUMENT / HAMILTON

1    enforcement of that statute.

2        And plaintiffs suggest that this act is some cornerstone

3    of democracy that was inherent in the founding era, but that's

4    not true.  The Posse Comitatus Act was enacted in 1873, decades

5    after the founding, and Congress thought about the need for a

6    remedy and it specified what the remedy would be in the --

7        **THE COURT:**  I think their argument isn't quite that.

8    I thought their argument was:  Look, the Posse Comitatus Act is

9    1877, 1878 -- I forget, wasn't there -- but the concept of a

10   posse comitatus, that easily -- that goes back to King John.

11   It goes back to the Magna Carta.  It goes back -- there's a

12   wealth of jurisprudential and historical history behind the

13   posse comitatus, and as there is about -- about why you don't

14   want a national police force; why you want police enforcement

15   of laws to be localized as distinct from nationalized,

16   notwithstanding the fact that there are national laws.

17       So there's -- I just think you're just picking this piece

18   of history and that piece in terms of what is there at any

19   given time.  And I'm saying, I think it's a lot broader.  If

20   you want me to take the historical view of the whole thing, I

21   can do so, or at least I can try.

22       But go ahead.

23       **MR. HAMILTON:**  Thank you.

24       The history of the statute that the plaintiffs are

25   attempting to enforce is not nearly as maximalist as they

1  describe it to be, though.  In fact, the Posse Comitatus Act

2  didn't even cover the Marines until recent years.  So, again,

3  the first hundred years of the country, Posse Comitatus Act

4  wasn't even a statute, and it hasn't even covered all of

5  military forces.

6       **THE COURT:**  A key about that, did you actually --

7  well, it didn't cover the Space Force either.  Now it does.

8       But isn't the concept the military, in whatever form?

9  It's the Marines.  It's now the Space Force.  It's the Army.

10  It's the Navy.  I don't know.  Do you think the Coast Guard

11  isn't part of it?  I don't know.  Are they not part of it?

12       **MR. HAMILTON:**  I don't think the Coast Guard is

13  listed, but I believe the Marines weren't added until 2021.

14       But, in any event, returning to the implicit preclusion

15  argument under *NRC against Texas* and *Armstrong against*

16  *Exceptional Child Center*, the fact that the Posse Comitatus

17  Act's single sentence contemplates the need for a remedy,

18  decides what the remedy is, specifies that it is a fine,

19  imprisonment or both, that implicitly precludes an equitable

20  *ultra vires* claim.

21       The final point on the absence of an equitable cause of

22  action is that even if this *ultra vires* cause of action

23  existed, the standard is an exceedingly high one.

24       As I noted yesterday, the standard is that agency action

25  must go beyond mere legal or factual error and amount to a

 1    clear departure by the agency from its statutory mandate or

 2    blatantly lawless agency action.  The *NRC against Texas* case I

 3    cited calls an *ultra vires* cause of action a Hail Mary pass and

 4    one that rarely succeeds.

 5            **THE COURT:**  So sending in -- sending in 4,000 troops,

 6    or thereabouts, nationalizing, sending them in, you say that

 7    that's not large enough, without reference to what they did,

 8    without reference to what they did?  Or are you saying:  Look,

 9    that, sure, 4,000 troops is basically taking over law

10    enforcement in a particular area, whatever that 4,000 troops

11    represents or has within its ambit, I guess geographically,

12    essentially, but that the incidence of the -- the purported

13    incidence of the Posse Comitatus -- of the violation of the

14    Posse Comitatus Act were such that they were of a minor

15    variety, sort of isolated one-offs, two-offs; and, therefore,

16    it's not -- it doesn't fall within the larger *ultra vires*

17    exception?  Is that the argument?  Am I making any sense to

18    you?

19            I'm trying to figure out whether it's -- what you're

20    really focusing on when you say it has to be pretty blatant

21    under the law for it to be recognized as a legitimate concern

22    of the courts and when I want -- I want a further definition of

23    what you really mean by "blatant."

24            Does the improper -- so-called improper conduct have to be

25    pretty blatant?  Or is it simply enough that what they've done

1  is they've sent in -- and this is their argument in part --

2  they've sent in the national police force now where -- in which

3  the presence of the police force -- of this national police

4  force will -- is violative of the Posse Comitatus Act?  That

5  their very presence, their very existence, they are used for

6  show purposes.

7      And I don't mean it in a bad way.  I don't mean show

8  purposes like it's a parade.  I mean, show purposes in the

9  purpose -- in the context of a presence set out to discourage

10  unlawful conduct that could potentially occur.

11     I mean, obviously, if you put in 4,000 Marines or 4,000

12  National Guard or 10,000 or 20,000, it will have, one could

13  say, a prophylactic effect; but it will have an effect of,

14  quote, "intimidation."  That is, by its presence alone and as a

15  visible -- visibly used in connection with law enforcement, it

16  then will have an effect on individuals who are subject to it.

17     And I think that, in a way, is their argument.  That's

18  what I understand, in part, their argument to be; that this

19  large force, this new national police force is going to

20  intimidate -- I don't know whether that's the right word, but

21  it's going to have a presence basically of the federal

22  government, the federal government, as distinct from the state

23  government or the police department, and so forth, of bringing

24  about certain types of behavior.

25     And that's what's violative.  That's the whole purpose.

1    When you go back to the Posse Comitatus Act, the idea of a

2    Posse Comitatus Act was to get the federal government out of

3    states.  That's what it was designed.

4       I mean, let's face it, through ironies of ironies, the

5    Posse Comitatus -- what was going on in the South was the

6    enforcement of the reconstruction laws allowing -- making sure

7    that African Americans could exercise their new-won freedom

8    under the Emancipation Proclamation and vote and participate in

9    all sorts of legitimate government civic opportunities.

10       And the South -- well, I don't know I would call it South

11    writ large, but I'm saying there were a series of states that

12    found the presence of the -- of troops, national troops, to be

13    offensive.  So the Posse Comitatus Act was enacted, saying,

14    "Out.  Out.  Out of our state."

15       Now, what's happened here is, they're coming in; the

16    troops are coming in; 4,000 troops came in.

17       So I'm trying to figure out, from a basic argumentative

18    point of view -- and I'm not saying Posse Comitatus Act is a

19    great act or a bad act and so forth.  I have to follow the act.

20    That's the law.  I took an oath to follow the law.

21       So I'm trying to figure out, from a purpose point of view,

22    why isn't -- why isn't what the purpose of the Posse Comitatus

23    Act basically been violated here?

24       Go ahead.

25       **MR. HAMILTON:**  Thank you.

CLOSING ARGUMENT / HAMILTON

1  A few points, Your Honor.  One, plaintiffs didn't adduce

2  any evidence at trial of anyone who claims to have been

3  intimidated by guardsmen or Marines protecting federal law

4  enforcement officers.  Instead, what the evidence showed was

5  that law enforcement officers in the Los Angeles area came

6  under attack, and it was a sustained attack that first caused

7  the President to deploy guardsmen and Marines.

8  And it persisted into July, places like Camarillo, where

9  federal law enforcement officers went out on their own without

10  protection; and when the situation became violent, the Guard

11  needed to come in late to provide needed protection.

12  But even if there had been any testimony about federal

13  military service members having intimidated anyone, there isn't

14  anything in the Posse Comitatus Act that turns on the feelings

15  of persons in the area about the work that federal military

16  service members are doing.  Instead, Posse Comitatus Act

17  criminalizes the willful use of military service members as a

18  posse comitatus or to otherwise execute the laws.

19  The second threshold problem in plaintiffs' case is that

20  the Posse Comitatus Act does not apply to Section 12406

21  deployments.  Posse Comitatus Act, as I just noted,

22  criminalizes the willful use of military service members as a

23  posse comitatus or to otherwise execute the laws.

24  And that "execute the laws" language reappears in

25  Section 12406, sub (3).  It's the statute that authorizes

1    the President to federalize the Guard where the President is

2    unable, with the regular forces, to execute the laws of the

3    United States, and the statute adds that he may do so in such

4    numbers as he considers necessary to execute those laws.

5         The plaintiffs' interpretation of these statutes,

6    Posse Comitatus Act swallows Section 12406, sub (3).  It makes

7    the statute totally null.  There's nothing that could be done

8    if the Posse Comitatus Act truly applies to Section 12406,

9    sub (3).

10        And the answer is that the Posse Comitatus Act's text

11   contemplates that it's going to co-exist with other statutes

12   and that there will be exceptions.  And that's why the PCA's

13   single sentence acknowledges its inapplicability where a

14   constitutional or statutory exception applies.  And plaintiffs

15   have never reconciled this.

16        **THE COURT:**  Well, all right.  So it certainly does

17   contemplate, it certainly does contemplate that there could be

18   exceptions; right?  I mean, it says without -- without -- I

19   don't have it in front of me, but the first thing is about the

20   Constitution.  The Constitution allows it and then it says "or

21   expressly stated by Congress."

22        So there is a case, there's laws that Congress has

23   enacted, and I direct your attention to Title X of

24   Sections 331, 332, 333, because those -- those sections deal

25   with the use of the military in order to enforce laws, but they

1    are in the context of something called an insurrection.

2        Now, is it the Government's position that what was

3    occurring in the state of California, based upon the evidence

4    that was adduced or existed at the time, that there was an

5    insurrection?

6        MR. HAMILTON:  We've not made that argument, and this

7    trial, of course --

8        THE COURT:  Well, those -- so those exceptions to the

9    Posse Comitatus Act, which allowed the President to do the

10   things that occurred here, at least in one viewing of it, was

11   not done in light of a threat of an insurrection.  And so those

12   statutes would not be appropriate in terms of giving the

13   federal government the authority to do what it did; is that

14   correct?

15       MR. HAMILTON:  Yes.  We have not invoked the

16   Insurrection Act.  Instead, the President federalized the Guard

17   under Section 12406, sub (2) and sub (3).  In an earlier stage

18   in the case, the Ninth Circuit recognized that defendants are

19   likely to succeed on the argument that the President lawfully

20   federalized guardsmen under Section 12406, sub (3) and

21   plaintiffs have never explained what it is that the National

22   Guard would be able to do under 12406, sub (3).

23       THE COURT:  What the President said was that there

24   was -- that the conduct of people in the state of California

25   that gave rise to his action was a rebellion.  Is there a

 1    difference -- by the way, what is the difference between a

 2    rebellion and an insurrection?  Do you have any sense of the

 3    difference?

 4         **MR. HAMILTON:**  Candidly, it's not something I've given

 5    much consideration to, since this trial was limited instead to

 6    the Posse Comitatus Act.

 7         **THE COURT:**  Okay.  But you're citing the presidential

 8    order.  This was the presidential order.  It's Exhibit

 9    Number 3.  And the President says [as read]:

10         "To the extent that protests or acts of violence

11         directly inhibit the execution of the laws, they

12         constitute a form of rebellion against the authority

13         of the Government of the United States."

14    So I'm trying to think of whether this is a rebellion, and

15    if it's a rebellion but it's not an insurrection.  Well, I

16    didn't have a course in rebellions versus insurrections.  I

17    don't know that there's a difference.  I don't know what the

18    difference is.  But is it your -- is it your view that

19    the Government isn't urging, as a justification for

20    the President's actions, that there was a rebellion?

21         **MR. HAMILTON:**  No, there was a rebellion, and that is

22    an alternative reason why Section 12406 was properly invoked.

23         **THE COURT:**  Does a rebellion occur when, for example,

24    an individual decides to resist the enforcement of a federal

25    law?  Is that a rebellion?  Or does it take more than one?  Or

CLOSING ARGUMENT / HAMILTON

1   does it take a whole group of people disagreeing and resisting

2   a particular law?  And if it takes that, a whole group of

3   people resisting an individual law, is that -- does that then

4   justify the nationalization -- the use of force against these

5   people?

6       Or put another way, there are all sorts of federal laws

7   out there -- immigration laws, tax laws, EPA laws,

8   environmental laws -- that if you go through the laws and you

9   go through the experience that the federal government has in

10  enforcing these laws, you get very different results.  You

11  get -- you get the result of maybe tax laws are 60, 70, I mean,

12  I make it up, but I think we all know there are laws that

13  are -- that have basic strict compliance.  There are laws less

14  so.

15      So isn't the context that one has to look at when you look

16  at the question of whether or not the President is unable to

17  enforce the law, the ordinary course of enforcement of the law

18  or compliance with the law?  Isn't that really the test?

19      Because if one tax protester doesn't pay his or her taxes,

20  well, can the President say, "Oh, I'm unable to execute the

21  law.  He's not paying.  She's not paying.  Send in the

22  Marines"?

23      I mean, you can't -- it can't be -- it has to be in a

24  context, is what I'm saying.  And isn't the context, the

25  context of what the ordinary enforcement practices are and

1    compliance practices are as a matter of the present, of

2    history -- or of the present times, rather?  Isn't that the

3    test?

4         And if that's the test, has there been any showing at all

5    that -- I don't know -- that going into MacArthur Park or going

6    into Carpinteria or going into someplace where there's a

7    marijuana grow, has there been any showing that these laws

8    can't be enforced greater than -- I mean, isn't it just, "Ah,

9    these people are violating the law; therefore, it's not -- I

10   can't enforce it"?  Is that the -- is that what is being done

11   here?

12        **MR. HAMILTON:**  So there was testimony by Mr. Santacruz

13   that DHS, ICE, ERO was not able to enforce the law to the

14   extent that it had intended to when they were coming under

15   attack by violent -- violent protesters and that the presence

16   of the Guard, which provided protection, was able to allow DHS

17   to implement the immigration laws.

18        And to answer the Court's question about a rebellion,

19   there was a rebellion.  That was an alternative basis

20   underlying the President's invocation of Section 12406.  The

21   presidential memorandum explains that because the protests or

22   acts of violence directly inhibited the execution of the laws,

23   a rebellion was in place.

24        But the question of whether there was a rebellion or was

25   not a rebellion isn't relevant to this trial on a

CLOSING ARGUMENT / HAMILTON

```
 1   Posse Comitatus Act alleged violation because the Ninth Circuit
 2   has already recognized that the President properly invoked
 3   Section 12406, sub (3), the subsection that follows the
 4   rebellion subsection; and that national --
 5            THE COURT:  On the theory that he could not enforce
 6   the laws, unable to enforce the laws?
 7            MR. HAMILTON:  Which was an additional --
 8            THE COURT:  Unable to enforce the laws?
 9            MR. HAMILTON:  Yes.
10            THE COURT:  And then the question is:  What evidence
11   in the record is there that he's unable to enforce the laws?
12       I know, in a given situation, my taxpayer is not paying.
13   I understand that.  So, yes, there's evidence of the taxpayer
14   didn't pay.  But there's a big difference between a violation
15   of the law and an inability to address the violation of the law
16   by law enforcement purposes.
17       After all, that's exactly what police officers do every
18   day.  They walk the streets, they see violations of the law,
19   and then they take whatever is appropriate action that they can
20   take.  That's what local law enforcement does day in and day
21   out.
22       Is there any evidence in the record that a local law
23   enforcement officer, that the SWAT teams, or any local law
24   enforcement -- by "local," I mean sheriff's office, police
25   departments -- were unable to enforce the law?
```

CLOSING ARGUMENT / HAMILTON

1          **MR. HAMILTON:** So a few points, Your Honor.

2          **THE COURT:** Go ahead.

3          **MR. HAMILTON:** One, we are talking right now about

4  Section 12406, sub (3), and it's an issue that is separate from

5  the question of whether there was a Posse Comitatus Act

6  violation in the sense that we're talking right now about

7  whether that authority was properly invoked, and the

8  Ninth Circuit already recognized that it was.

9     And so the argument right now is that with that fact

10  established, the Posse Comitatus Act becomes inapplicable

11  because Section 12406, sub (3), necessarily is invoked when

12  there is an inability to execute the laws, which is language

13  repeated --

14          **THE COURT:** Posse Comitatus Act -- your argument here

15  is that the Posse Comitatus Act is not applicable; okay. Is

16  that correct?

17          **MR. HAMILTON:** Exactly. When Section 12406 --

18          **THE COURT:** All right.

19          **MR. HAMILTON:** -- is invoked --

20          **THE COURT:** Okay. I -- well, I mean, if you're right,

21  you're right. I mean, if you're right, if it's inapplicable,

22  that will lead to a certain conclusion in this case, which

23  you're urging.

24          **MR. HAMILTON:** I am.

25          **THE COURT:** Right. Okay. Got it.

CLOSING ARGUMENT / HAMILTON

1    **MR. HAMILTON:**  But an additional point about local law

2    enforcement, local law enforcement do not enforce federal

3    crimes.  And violence against federal law enforcement officers,

4    violence against federal buildings, those are federal crimes,

5    and so the protection that the guardsmen were providing, the

6    protection that Marines were providing were to federal law

7    enforcement.

8        **THE COURT:**  You're saying that if somebody -- if

9    somebody throws a brick at this wonderful building that we're

10   in and damages the property, that's not a state crime?

11       **MR. HAMILTON:**  It may be both a federal and a state

12   crime.

13       **THE COURT:**  Right.  And, I mean, I've seen a lot of

14   police officers, especially in this neighborhood, enforcing all

15   sorts of laws that are both state and federal.

16       **MR. HAMILTON:**  Sure.  But the point is that the

17   National Guard and the Marines were present in

18   Southern California to provide protection for federal property

19   and federal personnel where a record had already been

20   established of violations of federal statutes by violent

21   protesters in Southern California.

22       An additional defect in plaintiffs' case is that they have

23   not established their standing to sue.  As I noted yesterday,

24   the *Lujan against Defenders of Wildlife* case, a

25   U.S. Supreme Court decision, establishes that once a case

CLOSING ARGUMENT / HAMILTON

1    proceeds to trial, the plaintiffs have to carry their burden of

2    proof on the facts that underlie their allegations of standing.

3              THE COURT:  Would anybody have standing in this case?

4    Could anybody bring this case in terms of standing?

5              MR. HAMILTON:  So just to be clear on the answer I'm

6    giving, and of course it's our position that there is never any

7    civil enforcement remedy under this --

8              THE COURT:  Right.  But from a standing issue.  From a

9    standing issue.

10             MR. HAMILTON:  Well, I mean, just thinking aloud, I

11   would think that, you know, individuals who actually, you know,

12   may have interacted with guardsmen would have a stronger

13   standing case.  I don't know that they would ultimately have

14   standing.

15        But the plaintiffs have not put forward any evidence that

16   these plaintiffs, the State of California as well as its

17   governor, have a standing to sue.  They suggest there are three

18   injury-in-facts that are fairly traceable and redressable, but

19   each fail.

20        The first is an allegation that they have standing because

21   of the physical and economic health and well-being of their

22   citizens.  No one testified to substantiate that sort of a

23   theory of an injury-in-fact.

24        California alleges that the National Guard escalated

25   tensions and reignited protests, but they didn't trace any of

CLOSING ARGUMENT / HAMILTON

1   that to any Posse Comitatus Act violation, nor did they

2   establish a record of any tensions escalated or any protest

3   reignited.

4        And, of course, a protest isn't even an injury-in-fact in

5   the first place.  A peaceful protest is a First Amendment

6   protected act and is not an injury to the State.  It certainly

7   isn't the law that a state has standing to sue any time an

8   individual or a collection of individuals within a state's

9   borders chooses to peacefully protest.

10       California then argues that it suffered a fiscal harm.

11  Again, it doesn't trace any of its alleged fiscal harms to a

12  Posse Comitatus Act violation, nor did the Court hear any

13  testimony at trial of any fiscal harm.  Its brief cites

14  inadmissible, out-of-court declarations that are not part of

15  the trial record.

16       And the final injury that the plaintiffs allege is a

17  federalism injury; but as I noted earlier in the presentation,

18  service members are in Southern California to protect federal

19  law enforcement officers and federal property from violent

20  attacks that violate federal crimes -- that constitute federal

21  crimes.

22       There isn't any infringement on the State of California's

23  federalism interest through the National Guard's work, and

24  certainly nothing that's traceable to a Posse Comitatus Act

25  violation.

CLOSING ARGUMENT / HAMILTON

1    And, finally, again, even if the Court were to reach the

2    question of whether if any of these three threshold defects in

3    plaintiffs' claim were not present and actually applied the

4    PCA's text to the record developed at trial, there is nothing

5    approaching the very high standard that is inherent in any

6    equitable *ultra vires* claim.

7    And the Ninth Circuit has repeatedly recognized, in the

8    cases I identified yesterday -- *Klimavicius-Viloria*, *Khan*, and,

9    again, in the more recent *Dreyer* case -- providing backup

10    security is not inconsistent with the Posse Comitatus Act.  The

11    reply brief that plaintiffs filed takes no dispute with that,

12    does not respond to *Klimavicius-Viloria* or *Khan*.

13    Finally, if the Court is inclined to enter any sort of

14    equitable relief or enter judgment on this claim against the

15    defendants, we'd ask that the Court would stay any injunction

16    or judgment pending any appeal authorized by the Solicitor

17    General; and, at a minimum, stay any injunction or judgment

18    administratively for a period of seven days.

19    And we'd ask that the Court note --

20    **THE COURT:**  I think all you need is, like, two and a

21    half hours, but I understand that.  I understand that request.

22    **MR. HAMILTON:**  Unless the Court has further

23    questions --

24    **THE COURT:**  Thank you very much, no.

25    **MR. HAMILTON:**  Okay.  Thank you, Your Honor.

### CLOSING ARGUMENT

1

2      **MS. STRONG:**  Good morning, Your Honor.  Deputy

3   Attorney General Meghan Strong for plaintiffs.

4      Unless Your Honor wants me to start in a specific place,

5   I'm inclined to begin with *ultra vires*, where my friend on the

6   other side began.

7      **THE COURT:**  I think it's a good idea, actually.

8   Thank you for asking.  I think it's a very good idea for you to

9   address directly the points that were raised by your colleague.

10     You can start *ultra vires* or equitable relief, wherever

11  you want to start, but I think it's important to go through his

12  argument and advise me where you think I should come out on the

13  arguments that he's raised.  Okay.

14     **MS. STRONG:**  Yes, Your Honor, that's my intention.  So

15  I'll start with the *ultra vires* action that we bring.

16     And I first want to begin with a grounding principle that

17  it's our position it lacks basic common sense to assert that a

18  state that is being occupied by a standing army that is engaged

19  in unlawful conduct within the state's borders, the idea that

20  that state has no legal recourse to challenge the unlawful

21  conduct of those troops.

22     That defies basic principles of federalism, and it ignores

23  Congress's clear intent in the Posse Comitatus Act to create a

24  categorical prohibition on use of the military in civilian law

25  enforcement activities.

1  And the Supreme Court has recognized for decades that this

2  is the type of action that, if the federal government were ever

3  to take steps like this, that it should not go unreviewed.  In

4  *Laird vs. Tatum*, which is at 408 U.S. 1, the Supreme Court said

5  that [as read]:

6      "Nothing in our nation's history can properly be

7      seen as giving any indication that actual or

8      threatened injury by reason of unlawful activities of

9      the military would go unnoticed or unremedied.  When

10     presented with claims of judicially cognizable injury

11     resulting from military intrusion into the civilian

12     sector, federal courts are fully empowered to

13     consider claims of those asserting such injury."

14  And that's what we have here.

15  Now, Your Honor asked, earlier, my colleague on the other

16 side about what James Madison would have done if we're looking

17 at the history; and my answer to that, Your Honor, is that what

18 James Madison would have done, and what he did, was to draft a

19 Constitution that made sure that the President could never

20 employ standing armies to control civilian life as the King had

21 in 1776.

22  And the Posse Comitatus Act is merely a statutory

23 embodiment of a long-standing historical principle and policy

24 in our nation against the use of the military in the way the

25 federal government is using the military here in L.A.

1    Defendants also seek to impose a very high standard on

2 plaintiffs for invoking this *ultra vires* action, and we think

3 they're using the wrong standard.  The standard the Court

4 should be following here was defined in *Murphy Company vs.*

5 *Biden* at 65 F.4th 1122 where the Ninth Circuit said that

6 [as read]:

7         "Plaintiffs advancing *ultra vires* claims must

8         plead plausible factual allegations identifying an

9         aspect of the designation that exceeds the federal

10         government's statutory authority."

11    And so here, we've done exactly that.  We've established

12 and pled that defendants here are exceeding their statutory

13 authority by ordering troops to violate the Posse Comitatus Act

14 to engage in law enforcement activities that are clearly

15 prohibited by Congress.

16    I'd also like to flag that those constitutional

17 underpinnings that make this claim the subject of an

18 *ultra vires* action have been recognized again as recently as

19 2015 by the Ninth Circuit in *United States vs. Dreyer*, which is

20 a PCA case, in which the Court recognized that the

21 Posse Comitatus Act has constitutional underpinnings that are

22 tied to and reflect a traditional and strong resistance of

23 Americans to any military intrusion into civilian affairs.

24    And so I think the fundamental problem with defendants'

25 position here is exactly the one Your Honor hit on earlier,

CLOSING ARGUMENT / STRONG

1    that this would leave an inability to challenge clearly

2    unlawful conduct.

3        Defendants have taken the position that even if

4    the President and the Secretary of Defense are, in fact,

5    violating the Posse Comitatus Act, that there is no cause of

6    action, no legal recourse, no means to ever challenge that

7    action.  They contend that there should be a criminal

8    prosecution instead; but as Your Honor identifies, there may

9    well be immunity concerns when it comes to the President.

10       But even stepping beyond that, we would be asking the

11   U.S. Department of Justice to prosecute that violation when the

12   U.S. Department of Justice is here, in this trial, taking the

13   position that that action could never violate the

14   Posse Comitatus Act.  We're asking the federal government to

15   police themselves, and that, again, raises federalism problems.

16       I want to move next to the assertion that -- unless

17   Your Honor has more questions about that subject, I'll move

18   next to the assertion that Section 12406, subsection (3),

19   creates a blanket exception to the Posse Comitatus Act.

20       I want to first draw a distinction here because I think

21   we've been talking about two different exceptions during this

22   trial, and so I want to be really clear about what we're

23   talking about now.

24       During trial, we heard on Monday and Tuesday the

25   invocation of an inherent protective power; and witnesses

1    repeatedly testified that if they were taking actions to

2    protect federal personnel and property, that they could take

3    those actions outside of the Posse Comitatus Act.

4         But separately here, as I understand it, the federal

5    government is taking the position that outside of that,

6    Section 12406, subsection (3), creates a blanket exception that

7    the Posse Comitatus Act just never applies in the first place

8    to federalized troops.

9         First, I want to be clear.  This only extends to

10   federalized National Guard troops.  The Marines are not called

11   forth under Section 12406, so they would still be bound by the

12   Posse Comitatus Act even if we were wrong about the application

13   of 12406.

14        But then looking at Section 12406 and its application to

15   the federalized National Guard, defendants here look only to

16   one of the three subsections of Section 12406.  They ask

17   the Court to read just three words out of that statute and read

18   into that a broad authorization to ignore the Posse Comitatus

19   Act when the Posse Comitatus Act itself requires an express

20   authorization and not just generally but in specific cases and

21   circumstances.  Those words "cases and circumstances" are also

22   found in the Posse Comitatus Act.

23        And it just doesn't comport with statutory interpretation

24   to read those three words, "execute the laws," out of context

25   of the rest of the statute.  The rest of 12406 makes clear that

CLOSING ARGUMENT / STRONG

1   there is no contemplation, no express authorization to remove

2   these federalized National Guard troops from the

3   Posse Comitatus Act.

4        And I want to --

5        **THE COURT:**  It's hard for me to see how you'd have a

6   case where -- I want to ask the Government, the federal

7   government this question -- that if you read "or otherwise

8   execute the laws," that phrase, then that would be in every

9   case.

10       I mean, it seems like the "or execute the laws" is the

11  exception that swallows the entire statute.  Because the

12  federal government's not going to come in -- I mean, I believe

13  that the federal government would not come into a state to do

14  anything other than, in this context, execute the laws.

15  Execute the laws.  I mean, they're not going to -- I think

16  that's what the rationale would be in any given situation.  And

17  if that's the rationale in any given situation, and I believe

18  it would be, then the exception swallows the statute.

19       **MS. STRONG:**  I think that's exactly right, Your Honor.

20       **THE COURT:**  Then why have a statute?  Why have a

21  statute?  Why don't we simply have a statute that says the

22  federal government has the right to come in and enforce all

23  federal laws?  And so why not have that?

24       Well, you don't have that because there's this thing

25  called the Posse Comitatus Act, which was designed to take the

1    federal government out of the business of executing the laws.

2    The laws in the South, the laws against poll -- I don't know

3    whether it's a poll tax or whatever, the laws to enforce the

4    reconstruction era, which were put into place by Congress after

5    the Civil War and then Congress acted in the particular way it

6    did in 1878, many years or 10 years after the Civil War, 12,

7    15 years after the Civil War.  And in reaction to the sentiment

8    of a number of citizens in southern states, they pulled out the

9    military, and they pulled out the military not because the laws

10   were being perfectly executed in the South; they pulled the

11   military out because they didn't want them to execute the laws.

12        So I'm trying to figure out, maybe there could be --

13   sorry.  It's really a fair question.  Maybe it's not a fair

14   question to you.  It's a fair question to the Government, and

15   they can respond to that after you're finished.  But that -- as

16   I listen to this, that's what's concerning me a bit.

17        So go ahead.

18        **MS. STRONG:**  I think that's exactly right, Your Honor,

19   and I want to add to that.  So we have, on the one hand,

20   defendants' position, which would essentially allow

21   Section 12406, subsection (3), to swallow the Posse Comitatus

22   Act; and we have, on the other hand, plaintiffs' position,

23   which allows the two acts to be read and reconciled together.

24        I heard my friend on the other side say that under our

25   interpretation, there is nothing that the military could do

1    when federalized under Section 12406, subsection (3), and

2    that's simply not true.  We've made clear in our brief that we

3    think there is conduct that they could engage in that would

4    support the execution of the laws under Section 12406,

5    subsection (3), while still acting consistently with the

6    Posse Comitatus Act.

7        As one example, they could ensure that federal buildings

8    are protected and safe.  As another example, to hit on an

9    example that defendants, I think, have invoked in their briefs

10   repeatedly, they could deliver the mail.  That's what happened

11   in 1970, when President Nixon federalized the National Guard to

12   deliver the mail.

13       The act of delivering the mail does not violate the

14   Posse Comitatus Act.  It's not law enforcement activity, but it

15   still was activity by the National Guard that was consistent

16   with the Posse Comitatus Act but also executed the laws

17   consistent with Section 12406, subsection (3).

18       I want to next briefly address standing.  And here, again,

19   I think we have a fundamental problem that there's this idea

20   that the very state where the standing army has been deployed

21   and where defendants are violating the law, this idea that that

22   state is somehow not harmed and not able to bring this claim is

23   simply implausible because of course the state has harm -- has

24   suffered harm and has been injured.

25       All of the testimony we've heard for the past two days has

CLOSING ARGUMENT / STRONG

```
 1   made clear that there's a severe injury to the State by the
 2   mere pervasive presence of the military across
 3   Southern California.
 4       And so specifically we've argued that defendants' actions
 5   harm both the State's quasi-sovereign interest in the health
 6   and well-being of its citizens and the State's quasi-sovereign
 7   interest in not being discriminatorily denied its right --
 8   rightful status within the federal system.
 9       And so as to the health and well-being of California
10   residents, in particular, shows of force, like that in
11   MacArthur Park, are clearly designed to have that -- this
12   effect of striking fear into civilians so that they will obey
13   and comply with federal law enforcement and military commands
14   alike.  We know that that's why the federal government ordered
15   troops to MacArthur Park.  Their own mission says it was for a
16   show of force, of presence.
17       And the videos and pictures we've seen have shown
18   distressed civilians as a result of this.  You've seen a video
19   now, I think at least twice, Your Honor, in which a civilian
20   has her hands up and is being restrained by national guardsmen,
21   federalized national guardsmen.
22       And we have also had -- my friend on the other side said
23   that there's been no testimony or evidence about the escalation
24   of tensions and threats in Southern California and that's, in
25   fact, not true.  On Monday, General Sherman testified that the
```

 1   reason so many people protested the operation at Camarillo was

 2   because they saw what happened in Carpinteria and came out to

 3   respond to that unlawful conduct, and that testimony is at

 4   page 130, lines 2 to 4.

 5       So we, in fact, have testimony establishing that the

 6   operations that the federal government and the military were

 7   engaging in escalated tensions and caused further harm to the

 8   State and its civilians.

 9       Moving then to the federalism interests that are invoked

10   here by the State, California is a proper plaintiff to seek

11   redress for federalism-related harms.  And here, defendants'

12   violations pose a threat to the State's police power guaranteed

13   by the Tenth Amendment.

14       So the Posse Comitatus Act was passed with the intention

15   of keeping the military out of civilian life, and that aligns

16   with the reservation of police powers to the state.  So when

17   the federal government uses the military to intrude on civilian

18   life, as it's doing here, it also intrudes on the State's

19   traditional police powers and the Tenth Amendment.

20       Defendants have directly usurped the State's traditional

21   law enforcement activity and even taken the State's own

22   soldiers and directed them to violate the law.  So just as the

23   State's sovereign interests and traditional prerogatives in

24   regulating public health in vaccinations was sufficient to

25   establish standing in *Kentucky vs. Biden*, the State of

 1    California's sovereign and traditional interests in exercising

 2    its police power and excluding the federal military from use

 3    against its civilians establishes standing here.

 4         Finally, Your Honor, I want to address briefly the fiscal

 5    and economic harms to California.

 6         But I first want to flag for Your Honor that defendants

 7    raised a challenge to plaintiffs' standing on its

 8    Posse Comitatus Act claim for the first time in their

 9    supplemental opposition, which was filed after the close of

10    discovery and after the parties had already exchanged their

11    witness lists for this trial as ordered by the Court.  So that

12    delay prejudiced plaintiffs in their ability to develop and

13    present direct evidence of their economic and fiscal harms

14    during this trial.

15         And so while we submit to Your Honor that Your Honor can

16    find that plaintiffs have standing based on the evidence and

17    law that I've already discussed just now, if the Court

18    ultimately concludes that it would require more evidence to

19    find plaintiffs have standing on particularly their economic

20    harms, plaintiffs would request leave to develop and present

21    that evidence in a supplemental hearing or reopening of our

22    trial.

23         As just a few examples of things that we could have

24    potentially presented if not prejudiced by the delay and the

25    extreme schedule here, we could have presented direct evidence

CLOSING ARGUMENT / STRONG

1  of the increased expenditures by State CHP; the chilling of

2  economic activity in Los Angeles, including the closure of

3  restaurants, the cancellation of events, and people staying

4  home for fear of the military; and the chilling of speech

5  across Los Angeles.

6      Again, we think that the Court can conclude that we have

7  standing without hearing any of those -- that evidence, but I

8  do want the Court to know that we could make that available if

9  given the opportunity to do so.

10     Finally, Your Honor, I didn't hear my friend on the other

11 side address this, but I know Your Honor specifically asked us

12 to address this yesterday in your concluding remarks, and

13 that's the element of willfulness that goes to the

14 Posse Comitatus Act requirement of a willful violation.

15     And I know that defendants asserted yesterday that

16 specific intent, specifically knowledge that their conduct was

17 illegal and that they were violating the law, a very high

18 standard of intent is required here to meet the Posse Comitatus

19 Act's willful language and requirement, and that's just not

20 correct as a matter of law.

21     The Supreme Court has observed that "willful" is a word of

22 many meanings, and its construction is often influenced by

23 context.

24     Here, Your Honor, the Ninth Circuit's criminal jury

25 instructions on the definition of "willfully" are instructive

1  and acknowledge that, depending on the statute, different

2  definitions of "willful" may be at play.

3      And that higher standard that defendants invoked in the

4  *Ratzlaf* case, that high standard is typically reserved for tax

5  law cases or other similar contexts, such as the one involved

6  in *Ratzlaf*, which involved highly technical banking statutes.

7  That's a standard that's reserved for statutes that present the

8  danger of ensnaring individuals engaged in apparently innocent

9  conduct.

10     And that's just not what we have here in a nation that has

11 a founding principle and policy against the use of the military

12 for domestic purposes.  And where defendants themselves

13 acknowledge that they are bound by the Posse Comitatus Act,

14 there can be no real question that defendants could not

15 accidentally or innocently violate the bar against military

16 involvement.

17     So we think the correct standard here is a lower standard

18 as discussed in *Bryan vs. United States*, 524 U.S. 184, which

19 considers a standard of a simple bad purpose; and we think

20 there's plentiful evidence in the record that satisfies that

21 bad purpose standard and, indeed, would even satisfy a higher

22 standard.

23     First, all of the Department of Defense's leaders,

24 including the ones you heard from in the past few days,

25 Your Honor, agree that the Posse Comitatus Act applies to the

```
 1   Task Force 51 troops that were deployed in Los Angeles.

 2        Exhibit 39 is a document that shows defendants coached law

 3   enforcement to substitute the word "protection" for "security"

 4   because they knew providing security would violate the

 5   Posse Comitatus Act, but the fact that they had law enforcement

 6   swap out the words doesn't change that it was unlawful.  It

 7   simply shows they knew it was unlawful.

 8        And then we have a series of exhibits that illustrate an

 9   attempt by defendants to justify their activity after the fact,

10   which itself reveals a knowledge and awareness of their

11   violations.

12        So the original orders that defendants issued, including

13   General Order Number 1, which is Exhibit 5 in the record,

14   General Sherman testified that that was the baseline conduct

15   for the mission, but that General Order makes no mention of the

16   types of activities -- engaging in the types of activities that

17   the Posse Comitatus Act prohibits.

18        It wasn't until June 23, more than two weeks later, when

19   the Secretary of Defense issued his memorandum, which is

20   Exhibit Number 2, purporting to invoke what defendants now

21   argue is a constitutional exception to the Posse Comitatus Act

22   and affirmatively instructing soldiers to engage in

23   Posse Comitatus Act-prohibited activities.

24        But by that point, soldiers had already been engaging in

25   those activities for more than two weeks.  The Mecca operation
```

1    that we've discussed in this case happened on June 17th, before

2    that memo was issued.

3        So we see here a pattern and practice of Posse Comitatus

4    Act violations that is not justified until much later because

5    defendants realized they needed to justify it; they realized --

6    they knew they had been committing [sic] the law; and they were

7    trying to create an after-the-fact justification.

8        And, finally, Your Honor, I think it's telling here that

9    defendants are violating their own regulations in their

10   activities in Los Angeles; and that, again, we think, satisfies

11   the bad purpose and intent standard here because in

12   DODI 3025.21, which is Exhibit 112, that instruction is a DOD

13   instruction, a DOD regulation setting forth prohibited

14   activities that troops may not engage in in support of civil

15   defense authorities; and here, defendants have engaged in those

16   activities.  They have themselves prohibited them and then

17   engaged in them.  That certainly violates a willful standard.

18       Unless Your Honor has questions for me on that or anything

19   else --

20           THE COURT:  I'd like you to address the question of

21   equity, of how can this Court -- in a statute that's a criminal

22   statute with a criminal sanction, how can I award or even

23   consider awarding or being asked to award equitable relief when

24   historically there are no cases of equitable relief?

25       And as a matter of fact, I think if you look through the

1    jurisprudence of the Posse Comitatus Act, at least in the

2    Ninth -- well, I think it's nationwide -- it's usually raised

3    in the context by an individual defendant who complains about,

4    in one case, I think, it was of the Navy provided a boat to aid

5    the operation of local law enforcement in connection with the

6    apprehension of a criminal.

7         And you take a look case by case.  *Wounded Knee* is perhaps

8    a bit different than the cases that I cite; but, nevertheless,

9    it raises the same question which, of course, counsel raised.

10   He said, "Look, there just isn't any equitable relief that

11   this Court has the power to grant."  That's what he's saying.

12   So I'd like you to address that.

13        **MS. STRONG:**  Yes, Your Honor.

14        So I want to begin with addressing, at a high level, the

15   fact that there is no case addressing this exact scenario or

16   granting this exact equitable relief is a result of the fact

17   that the federal government has never before attempted to use

18   the military in this manner in such an egregious violation and

19   disregard for the law.  So I think that to use the absence of a

20   case offering this exact relief would be a miscarriage of

21   justice because it is, in fact, the federal government who is

22   engaged in unprecedented conduct.

23        But specifically addressing the question Your Honor just

24   phrased, I would first direct Your Honor to the *Bissonette* case

25   that I think Your Honor is referencing, the *Wounded Knee* case,

CLOSING ARGUMENT / STRONG

1   where we have seen at least one civil context where the

2   Eighth Circuit considered PCA violations against individuals.

3       But I would also, again, direct Your Honor back to the

4   Supreme Court's articulation in *Laird v. Tatum* of the fact that

5   when presented with claims of judicially cognizable injury

6   resulting from military intrusion into the civilian sector,

7   federal courts are fully empowered to consider claims of those

8   asserting such injury.

9       And, in addition, Your Honor, I understand the argument of

10  this is a criminal statute, so it must only be invoked in the

11  criminal context, but I think the history of the

12  Posse Comitatus Act makes very clear that it was not Congress's

13  intention to limit the Posse Comitatus Act's provision -- or

14  prohibitions to the criminal context here.

15      The Posse Comitatus Act is a criminal statute only by

16  reference to its statutory placement.  Its historical context,

17  its legislative history makes clear that it is a categorical

18  provision regardless of the context in which it arises, and

19  this is exactly why *ultra vires* actions exist, for cases like

20  this where unlawful conduct might otherwise go unreviewed.

21      But when we look at the *ultra vires* standard, it simply

22  asks whether or not the federal government is violating the

23  law, is disregarding a statutory prohibition, and that's what

24  they're doing here, and so we need show nothing more than that.

25          **THE COURT:**  Thank you very much.

REBUTTAL ARGUMENT / HAMILTON

```
 1        Let's take a recess until 10:30, and then I'll hear from
 2   the federal government.  Thank you.
 3                  (Recess taken at 10:13 a.m.)
 4             (Proceedings resumed at 10:33 a.m.)
 5        THE COURT:  Let the record show all parties are
 6   present.
 7        You may proceed.
 8                      REBUTTAL ARGUMENT
 9        MR. HAMILTON:  Thank you, Your Honor.  A few points on
10   rebuttal.
11        My friend on the other side discussed the standard
12   applicable to an equitable *ultra vires* cause of action, and the
13   plaintiffs cited the *Murphy* case.  The *NRC against Texas* case
14   that I cited is a more recent U.S. Supreme Court decision.  So
15   to the extent there is any inconsistency in the two, with *NRC*
16   calling an equitable *ultra vires* claim a Hail Mary --
17        THE COURT:  Well, the question is, I think, that the
18   case that you cited, the recent case that you cited, the
19   question is whether or not they addressed squarely the issue as
20   to what the standard is.
21        I mean, there was a -- what I understand counsel to say is
22   the earlier case delineates what the standard is; the recent
23   case does not.  It may use all sorts of language, but it
24   doesn't address it squarely and, therefore, the earlier
25   standard is the one that I should apply.
```

1    And you -- your argument, as I understand it, is:  No, no,

2    it's the recent case because the recent case does address the

3    standard and does define the standard.  And I understand that

4    that's something that I have to work my way through.

5        MR. HAMILTON:  Yes, and we have other cases that

6    explain that the standard is something approaching blatantly

7    lawlessness as opposed to just a simple showing of a violation

8    of law.

9        And on the point about the *ultra vires* claim, the Court

10   asked about the size of the force and whether the numbers of

11   service members who have been serving in Southern California is

12   relevant to that standard, and the answer is no.

13       The answer instead would be, the question is whether the

14   conduct was itself blatantly lawless, and what the record

15   showed is that the Department of Defense was sensitive to the

16   Posse Comitatus Act, provided training and direction to stay

17   within the confines of that and other laws.

18       THE COURT:  So let me ask you.  In July -- or is it

19   June? -- June.  Pardon me.

20       In June there was evidence of violence in Los Angeles in

21   response to particular actions, and so in came the National

22   Guard and successfully addressed that issue.

23       Then subsequent, they went -- there were operations

24   outside of downtown Los Angeles.  There were operations in

25   marijuana grows.  There was a -- take those operations or one

REBUTTAL ARGUMENT / HAMILTON

1    of the operations or maybe take both of them; and there they

2    were not enforcing, as I understand it, the immigration laws.

3    Though there may have been a violation of the immigration laws,

4    they were enforcing other laws.

5         So, again, I go back to the thing that I'm really troubled

6    by, is what limiting factors are there to the use of this

7    force?  Once you have a force in place, and maybe legitimately

8    do so, and the threat of that -- the threat that gave rise to

9    the force in that place subsides or is no longer of serious

10   concern, what then, what then -- how does one look at this

11   national police force which goes out of where the threat was

12   and starts executing other laws?

13        And in particular, what's to prevent a national police

14   force, if properly in place as a result of certain things that

15   happened on Day 1, to go out on Day 10, Day 20, Day 30,

16   Month 2, Month 3, Month 4, and assist in some, we'll say

17   legitimate way, the execution of other laws for other crimes?

18   Is there any limiting factor at all?

19        And, by the way, why is the National Guard still around?

20   I mean, when I say why it is, I mean, look, thank goodness for

21   the National Guard.  No, I'm not criticizing the National

22   Guard.  But I'm thinking:  Why is the federalized National

23   Guard, even though it's been drawn down, still in place?  Are

24   they still in place as a federal force?  They are.

25        **MR. HAMILTON:**  They are.  And the Court --

REBUTTAL ARGUMENT / HAMILTON

1    **THE COURT:** But why?  What's the threat today?  What

2  was the threat yesterday?  What was the threat last week or

3  two weeks ago that gave -- that allowed it?

4       It's the absence of any limits to a national police force,

5  that's what's -- that's what I'm sitting here trying to figure

6  out.

7       And then to say, "Well, Judge, you know, once 12406 is

8  invoked, the Posse Comitatus Act is by the by" -- that's

9  another position you've taken.  Maybe I'm being more colloquial

10  than you choose to be -- "but it's not to be considered."

11       I wonder, why did this excellent major general, who saw as

12  his second duty and, the testimony is, insurance that the

13  Posse Comitatus Act was followed?  Why did I spend a day

14  looking at slide after slide and regulation after regulation

15  and reports after reports on conduct of the soldiers to ensure

16  that they were in compliance with the Posse Comitatus Act if

17  the Posse Comitatus Act is irrelevant?  Why did that happen?

18       The federal government -- General Sherman says, "We wanted

19  to follow the Posse Comitatus Act.  We thought that was

20  important.  We trained our troops.  We've got our slides.

21  We've got our after-action reports.  We have our chain of

22  command.  We have our whole procedure, the military's whole

23  procedure."

24       And, by the way, the military has procedures, and it's

25  geared to ensuring compliance with the Posse Comitatus Act when

REBUTTAL ARGUMENT / HAMILTON

1    the United States government comes up and says, "By the way,

2    it's irrelevant.  It's been superseded.  It has no

3    applicability."

4        I just sort of don't get it.  I mean, it's like, gee,

5    maybe you should tell your client that they don't have to

6    follow the Posse Comitatus Act if that's your view.  And

7    I guess it's your view, but they certainly attempted to follow

8    the Posse Comitatus Act.  They spent hours.

9        Do you have an explanation for that?

10       **MR. HAMILTON:**  Yes, Your Honor.  So consistent with

11   the arguments we've made throughout this litigation, National

12   Guard, Marines, were serving a purely protective function and a

13   protective function is not something that the Posse Comitatus

14   Act proscribes.

15       The slides Your Honor saw highlighted that fact and are

16   consistent with the bottom-line conclusion that when military

17   service members protect federal law enforcement officers, that

18   is not a violation of the Posse Comitatus Act.

19       **THE COURT:**  So it's a position of the government, and

20   I think the testimony is consistent with that, that whenever

21   federal officers, such as ICE, such as IRS agents or INS or ICE

22   or, I don't know, EPA enforcers, whenever they are employed and

23   the Government believes that protection is warranted, they

24   provide it; state police officials, the police department, they

25   don't.

1    So in every operation, I could see where there is a risk

2  of danger.  And, by the way, my view of law enforcement,

3  because they are a first line of defense in communities, they

4  are almost always at risk, especially as described in

5  situations that exist in this country.  They're always at risk

6  and at terrible risk.

7    It's not that I'm sitting here insensitive to the risk of

8  federal employees.  I think they have some -- for 26 years I've

9  seen federal employees put their lives on the line in order to

10  ensure the safety of communities.  So I've seen it.  I

11  understand it and I'm sympathetic to it, and I think it's a

12  noble cause what they do.

13    But they are at risk, and I'm trying to see whether there

14  are any limits, any limits to the use of a federal force in

15  order to ameliorate that risk.

16    And I don't -- can you suggest a limitation?

17    **MR. HAMILTON:**  Well, we have.  We've explained that

18  the protective function is itself not a violation of the

19  Posse Comitatus Act.

20    **THE COURT:**  Okay.  So then -- so, in other words -- in

21  other words -- in other words, we're going to see police --

22  federal officers everywhere if the President determines that

23  there is some threat to the safety of a federal agent.  That's

24  his determination, and it's up to -- it's his determination,

25  not mine.  It's his.  But that's what you're saying; that's

1     what the law is.

2          **MR. HAMILTON:**  I don't think that's quite what I'm

3     saying, and Mr. Santacruz testified earlier about the number

4     of -- you know, how -- how the numbers were changing as far as

5     guardsmen co-locating with federal law enforcement officers as

6     time went on.  He explained that in June, the number was

7     something in the neighborhood of 75 percent.  By July, it was

8     lower.  Now it's zero percent.

9          And as Your Honor heard earlier in the trial, the number

10    of guardsmen in the Southern California area has now been

11    reduced to 300 from what used to be 4,000, and that's in

12    addition to the several hundred Marines who were deployed.

13         In addition, we've never suggested, and the record does

14    not show, that guardsmen or Marines were enforcing federal law.

15    They were instead providing protection for the federal law

16    enforcement officers who did that.

17         The second point on rebuttal, I think the plaintiffs made

18    a very helpful concession during their argument in explaining

19    that it would be entirely lawful for the guardsmen and Marines

20    to provide protection for federal buildings.

21         Yesterday, Major General Sherman testified that the

22    Marines never left federal buildings, that they provided

23    protection only at that location.  So I think with that, the

24    case has at least been narrowed only to the guardsmen, and

25    there's no argument that the Marines' service at federal

1    buildings somehow violated the Posse Comitatus Act.

2        But that concession raises another question, which is:

3    What is the distinction between protecting federal property and

4    protecting federal law enforcement officers working out in the

5    field?

6        **THE COURT:**  One distinction is that federal employees

7    working out in the field are everywhere, are everywhere.  They

8    can be anywhere in the -- and I know federal property can too

9    but it's not.  I mean, I walk out of this building, I look at a

10   lot of property that's not federal property.  And for it to

11   become federal property, a building has to be constructed, act

12   of Congress, and so forth and so on.

13       I mean, there are practical, practical limitations and

14   distinctions between federal personnel and federal property.

15   Federal personnel, of course, can go everywhere, everywhere

16   that they believe that there's some need for them to be there:

17   enforcement of a law, whatever it is.

18       But I think they're a distinction.  I don't think -- I

19   don't think because you concede that it's proper to have the

20   Marines or federal law enforcement officers guarding a federal

21   building is the same thing -- is a concession to since you can

22   do that, you can do the other.  I don't think that's the

23   argument that they're making, do you?

24       **MR. HAMILTON:**  Well, I think the problem is this is an

25   *ultra vires* claim under the Posse Comitatus Act.  There isn't

**REBUTTAL ARGUMENT / HAMILTON**

1    anything that embraces this distinction that the plaintiffs are

2    attempting to make between the protection of federal property

3    and federal law enforcement officers.

4         There's no evidence that military service members were

5    sent to co-locate with every federal employee everywhere in

6    Southern California.  Again, Mr. Santacruz testified that the

7    height was something like 75 percent in June, shortly after

8    hundreds and hundreds of people had violently protested around

9    federal buildings and where there were federal law enforcement

10   officers.

11        Mr. Santacruz also explained how that threat persisted

12   into July and how there was at least one instance where a

13   mistake was made in a decision to not send guardsmen to

14   Camarillo.  Federal law enforcement officers went to Camarillo

15   to carry out a law enforcement mission and came under attack.

16   A gun went off.  Spike strips were laid.  Tires were popped.

17   Rocks were thrown at vehicles.

18        And so the threat in the field remained persistent; but as

19   I noted, the force has been substantially drawn down by more

20   than 90 percent, and today there are only 300 guardsmen that

21   remain in Southern California.

22        Standing is another defect in the plaintiffs' case.

23   Standing, of course, is not subject to forfeiture.  At least

24   arguments against standing are not subject to forfeiture.  And

25   plaintiffs bore the burden to establish the facts underlying

1   standing.  They could have identified witnesses to testify to

2   the facts that they claim support their standing, and they did

3   not do so.

4       Additionally, we -- my friend on the other side noted the

5   willfulness language in the Posse Comitatus Act and

6   willfulness, again, is an indispensable evidence --

7   indispensable element of any violation of the Posse Comitatus

8   Act.

9       The evidence that my friend on the other side cites for

10  willfulness is Exhibit 39.  This is a document that plaintiffs

11  never used with any of the witnesses that testified in this

12  trial, and it talks about a distinction between protection and

13  security.  It talks about "protection" as being the word that

14  more conforms to the authorities, and I think that is a

15  reference to the presidential memorandum, June 7th presidential

16  memorandum, that federalized guardsmen, recognizing over and

17  over the need for protection.

18      And this is a document that was created by a mid-level

19  official in the Department of Defense, and there's no

20  meaningful distinction between "protection" and "security" for

21  the Posse Comitatus Act.  In fact, "security" is the word that

22  the Ninth Circuit has used over and over in explaining that

23  backup security is consistent with the Posse Comitatus Act.

24      My final point about Section 12406 and how it interacts

25  with the Posse Comitatus Act, my friend on the other side

1    suggested that our interpretation of Section 12406 would

2    swallow the Posse Comitatus Act, but that doesn't make any

3    sense because it's the Posse Comitatus Act that contains

4    language recognizing its inapplicability where statutory

5    exceptions apply.

6        There isn't any language like that in Section 12406, and

7    so --

8            THE COURT:  I think what they're saying is that your

9    interpretation of the exception to the Posse Comitatus Act,

10   which is contained in the Posse Comitatus Act, would actually

11   nullify the Posse Comitatus Act.  Of course, an exception to an

12   act always is at odds with the -- not at odds -- always reduces

13   the scope of the act, of the effect of the application of the

14   act.

15       What they're saying is you take the words that you're

16   using and, in that case, if that's correct, the act is a

17   nullity because they're saying in every case -- I can't

18   conceive of one that's not.  I mean, I guess I could think

19   about it -- you're there to otherwise execute the laws.

20       That's what -- that's what the President of the

21   United States took the oath of office to do.  It's right in the

22   Constitution.  It's right in the oath of office, to faithfully

23   execute the laws.  And if he's unable to faithfully execute the

24   laws, then that's an issue.

25       But if you look at the exception to the Posse Comitatus

1    Act, one, and it's "or otherwise execute the laws" and that's,

2    therefore, an exception and that obviates the necessity of the

3    application of the Posse Comitatus Act, therefore nullifying

4    that in this particular situation, then it becomes a nullity.

5         And they also say historically, the reason that the --

6    that the military was excluded from the South is that they were

7    executing the laws.  They were there to try to make sure that

8    African Americans, at that time newly emancipated people, would

9    have the opportunities that this country offers white people,

10   and they were taken out of -- they were taken out of the South.

11   That's what it was.

12        So you can't forget the history.  You can't just look at

13   words and say, "Well, because words mean whatever" -- sort of

14   like *Alice in Wonderland*, "The words mean whatever I want them

15   to mean," you can't do that.  You have to -- it's grounded to

16   common understandings, understandings that give effect to the

17   statute, not that obviate the statute, not that nullify the

18   statute.

19        Now, I know -- and I look at the history and I look at the

20   language and I look at common sense.  I know that perhaps my

21   approach to statutory construction is at odds with other

22   people's approach to it; but at least when I write something in

23   this case, I'll make it as clear as I can make it how I

24   approach the statute because I think it's important to explain

25   what the statute means as I understand it to mean.  And in that

 1   regard, I'll certainly take into account your concerns and your

 2   issues.

 3        Anything else?

 4            **MR. HAMILTON:**  No, Your Honor.  Thank you.

 5            **THE COURT:**  Okay.  Thank you.

 6        Anything from the State?

 7            **MS. STRONG:**  Just briefly, Your Honor.

 8            **THE COURT:**  Okay.

 9                        **REBUTTAL ARGUMENT**

10            **MS. STRONG:**  I'd first like to address, I think my

11   friend on the other side, both in his opening remarks and in

12   his rebuttal, referenced Mr. Santacruz's testimony and

13   suggested that Mr. Santacruz had testified that federal

14   officers were unable to carry out their mission without the

15   military.

16        And during the break, we took the chance to pull a couple

17   of record cites for Your Honor, and I just want to draw your

18   attention to the fact that that's not, in fact, correct.

19        Mr. Santacruz testified at page 180, lines 13 to 17, that,

20   in fact, they were carrying out their missions; "they"

21   referring to ICE.

22        And then, again, he explained at page 190, lines 17 to 23,

23   so they were carrying out their functions; they just had to

24   pivot and condense some teams; but, in fact, they were able to

25   carry out those functions.

1    So I think my friend on the other side's representation of

2  that testimony is potentially at odds with those lines there.

3    And, in addition, Your Honor, my friend on the other side

4  is emphasizing that the drawdown here, that there are only 300

5  soldiers that remain -- and I think putting the word "only" in

6  front of 300 fails to comprehend that 300 soldiers is a

7  significant number of soldiers -- that's how many soldiers were

8  at the Mecca operation that we focused on in the trial so far.

9  That is certainly more than enough soldiers to constitute a

10  Posse Comitatus Act violation.

11    And so these violations are ongoing through today and,

12  unless the Court acts, through Election Day in November.

13    I have nothing further than that.

14    **THE COURT:**  Thank you very much.

15  Anything further?

16    **MR. HAMILTON:**  No, Your Honor.

17    **THE COURT:**  All right.  So the matter is submitted.

18  I want to thank the parties for their presentation.  I

19  thought it was excellent on both sides, and I will decide the

20  case as soon as I can decide the case, and I will also furnish

21  my reasons for whatever I do.

22  Okay.  Thank you very much.  We're in recess.

23    (Proceedings adjourned at 10:57 a.m.)

24    ---o0o---

25

1

2                 **CERTIFICATE OF REPORTER**

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Wednesday, August 13, 2025

7

8

9

10

11    _____

12            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13         CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 1

**To Declaration of Brendan Hamme in Support of Plaintiff's Motion for Preliminary Injunction**

U.S. NEWS

# Pete Hegseth orders the removal of 2,000 National Guard troops from Los Angeles

The troops were deployed after protests over immigration raids last month. California opposed the deployment, calling it a military overreach by the Trump administration.



July 15, 2025, 4:03 PM PDT / Updated July 15, 2025, 6:00 PM PDT

**By Tim Stelloh**

Secretary of Defense Pete Hegseth ordered the removal of 2,000 National Guard troops who were mobilized in response to protests in Los Angeles last month over immigration raids, a Pentagon official said Tuesday.

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 300 of 428
Case 3:25-cv-04870- Pete Hegseth orders the number of 2,000 National Guard troops from Los Angeles 131

"Thanks to our troops who stepped up to answer the call, the lawlessness in Los Angeles is subsiding," chief Pentagon spokesman Sean Parnell said in a statement.



ADVERTISING

The deployment of 4,000 National Guard troops came after a series of raids by immigration authorities in Los Angeles prompted sometimes-violent protests in parts of the city that were quelled with arrests and the use of "less lethal" weapons.

The Trump administration's decision to deploy the troops drew fierce criticism from California Gov. Gavin Newsom, who called it an "assault" on Democracy and invoked "authoritarian regimes" who "begin by targeting people who are least able to defend themselves."

SA-266

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 301 of 428
Case 3:25-cv-04870-Charles R. Breyer Document 22-6 USDC Page 4 of 131



California National Guard stand on the steps of the Federal Building in Los Angeles on June 10, 2025.
Patrick T. Fallon / AFP - Getty Images file

Los Angeles Mayor Mayor Bass has also been vocal about her opposition to the deployment of National Guard troops, calling it an unnecessary overreach.

In a statement Tuesday, she said the troops' removal "happened because the people of Los Angeles stood united and stood strong. We organized peaceful protests, we came together at rallies, we took the Trump administration to court – all of this led to today's retreat."

The state sued over the mobilization, which state Attorney General Rob Bonta said was unlawful and infringed on the governor's role as commander-in-chief.

An appeals panel ruled against the state's challenge, writing in a decision last month that President Donald Trump "exercised his statutory authority" when he activated the troops.

The deployment marked the first time a president had federalized National Guard troops without a governor's permission since 1965.

Half of the troops will remain in the area, for now, along with the roughly 700 Marines who Hegseth deployed.

The troops are authorized to detain people who pose a threat to federal personnel or property, but only until police can arrest them. Military officials are not allowed to carry out arrests themselves.

---

Tim Stelloh

Tim Stelloh is a breaking news reporter for NBC News Digital.

---

Reuters contributed.

---

# EXHIBIT 2

# CAPITAL & MAIN

**FEATURED VIDEO**

# Federal Officers Continue Arresting Anti-ICE Protesters During 24/7 Demonstrations

As Los Angeles protesters continue to organize against ICE operations, they said they are met with aggression from both DHS and L.A. police.

Published on August 13, 2025
By **Maison Tran**

  

SIGN UP F
OUR NEWSL

ENTER YOUR EN

SUBSCRIB

CAPITAL & I

**Federal officials** have arrested more than a dozen protesters outside an immigration detention center in downtown L.A., including several who have staged a nearly monthlong wave of round-the-clock demonstrations since early July.

The demonstration is part of Occupy ICE, a nationwide series of protests against U.S. Immigration and Customs Enforcement and President Donald Trump's immigration policies. Protesters have gathered and camped in front of the Metropolitan Detention Center in Los Angeles, where people detained in federal immigration raids are held.

The Federal Protective Service, which is part of the Departm

Join Our Community of Fact-Based News Readers

Sign up for our newsletter for exclusive investigative series, live events, and special stories.

Subscribe Now

No thanks, I don't want to join

# CAPITAL & MAIN

Protesters said they are being targeted for arrest because they are exercising their free speech rights in that location. They said the arrests are unwarranted because they have done nothing illegal.

"We're here to make sure that this is being seen. We don't want this happening in the cover of darkness," said Sully, a protest organizer who asked to be identified only by her first name because she feared retaliation from law enforcement.

Protesters who have been present at the demonstration since it began told Capital & Main that more than a dozen people have been arrested and later released since people started camping out in front of the detention center.

The ACLU Foundation of Southern California filed a lawsuit on June 18 in the U.S. District Court for the Central District of California accusing DHS officers of using excessive force and violating people's First Amendment rights during previous months' protests, seeking to stop what it alleged are federal officers' aggressive crowd control tactics. The lawsuit is pending.

"They're not restoring order. They're creating chaos and inflicting violence," said Peter Eliasberg, an attorney and chief counsel for the ACLU Foundation of Southern California.

Los Angeles police officers, meanwhile, have shot pepper balls at protesters and cited a city ordinance that bans unhoused people from many parts of the city in order to sweep ICE protester camps outside the detention center, L.A. TACO reported. The Los Angeles Police Department did not respond to multiple requests for comment.

ICE operations continued despite a ruling by the 9th U.S. Circuit Court of Appeals upholding a temporary restraining order against ICE patrols. Protesters said they don't plan on stopping, either.

---

*Copyright 2025 Capital & Main*

RELATED TOPICS:  #DEPARTMENT OF HOMELAND SECURITY  #DEPORTATION
#IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)  #LOS ANGELES

# Top Stories






### Join Our Community of Fact-Based News Readers

Sign up for our newsletter for exclusive investigative series, live events, and special stories.

LATEST NEWS    SECTIONS    VIDEOS                **CAPITAL & MAIN**                    EXPOSÉS 2025

   

**LATEST NEWS** / August 6, 2025

**ICE Is Pressuring People in Custody to Self-Deport. Many Are Giving Up.**

**WORKED OVER** / August 25, 2025

**Forest Service Cuts Leave Firefighters Mowing Lawns While Morale Craters**

**WORKED OVER** / August 25, 2025

**Trump's Policies Are Adding Up to a Hostile Work Environment**

**THE SLICK** / August 19, 2025

**There's a 'Lake' of Oil Under L to-Close Refinery. Who's Goin Up?**

About Capital & Main          Awards          Videos          Careers

Our Staff                     Columns         Donate          Subscribe

Board of Directors            Special Series  Exposés Gala 2025  Contact Us

Advisory Board

Donor Transparency Policy | Donor Disclosure | Editorial Independence Policy

Copyright © CAPITAL & MAIN 2025 | Fact-based reporting, not opinion.

**CAPITAL &**

## Join Our Community of Fact-Based News Readers

Sign up for our newsletter for exclusive investigative series, live events, and special stories.

# EXHIBIT 3

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 308 of 428
Case 3:25-cv-04870-CRB    Document 122    Filed 09/03/25    Page 11 of 131



NEWS

# At least 71 people faced criminal charges after LA protests over ICE raids

*One woman died in custody after pleading not guilty to 14 counts enhanced by prior convictions.*

by Elizabeth Chou
08/18/2025 1:48 pm



A woman outside LA City Hall holds a sign reading "Families Belong Together" at a protest Sunday, June 8 against federal immigration law enforcement raids across the region. Photo by Martín Macías, Jr. Credit: Martín Macías, Jr. / LA Public Press

The Los Angeles County District Attorneys Office and the Los Angeles City Attorney's Office charged at least 71 people with crimes allegedly committed during recent protests against federal immigration enforcement.

*LA Public Press* analyzed 52 cases corresponding to charges against 62 people. All but one person pleaded not guilty at the start of their cases. Many could see their lives upended because of the charges.

The cases stem from downtown Los Angeles protests almost all in June, with one case in July, where 75 people are accused of throwing rocks, fireworks, beer cans and water bottles at officers, driving motorcycles into police lines, and spray-painting "Fuck ICE" on a building. Others face allegations of looting stores during the demonstrations. Charges range from failing to disperse to assault on police officers.

Three people were charged with animal cruelty, all related to alleged scuffles with horses, including those ridden by Los Angeles Sheriff's Department deputies and other law enforcement.

At least fifty people, including two juveniles, have been charged with felonies by District Attorney Nathan Hochman's office and at least 21 with misdemeanors by Los Angeles City Attorney Hydee Feldstein-Soto's Office. *LA Public Press* could not analyze the cases involving juveniles, because juvenile court records are sealed. Feldstein-Soto's Office only provided information on the cases of 14 of the 21 people. Of the 62 adults whose cases *LA Public Press* analyzed, 61 pleaded not guilty at the start of their case. Five of those people later pleaded no contest to some or all of their charges, which means they did not admit guilt but also did not contest the charges. Six people are now participating in some type of diversion program.

Defense attorneys and public defenders representing the dozens of defendants charged say they are working to challenge the allegations by presenting additional evidence and context. Attorneys say that even being charged with a crime can be devastating and life-altering–and they're concerned that people involved in recent protests against ICE raids face particular challenges navigating the legal system.

One woman among those charged died in custody while detained at the Clara Shortridge Foltz Criminal Justice Center, shortly after she attended a hearing on June 17 during which she pleaded not guilty to 14 charges, 10 of which carried enhancements under California's Three Strikes Law for prior felony convictions. During that hearing, she was remanded to custody and had bail set at $1.33 million. Los Angeles County Sheriff's Department Lieutenant Daniel Vizcarra told *LA Public Press* that she was found hanging in a cell lockup, later that day. The coroner pronounced her dead just before 4 a.m. the next morning, on June 18, 2025.

Many defendants remain jailed for weeks or months, unable to work or care for families. Those who can afford bail bonds often face crushing debt.

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 310 of 428
Case 3:25-cv-04870-CRB    Document 33    Filed 09/02/25    Page 13 of 131

"The process is the punishment," said Elizabeth Howell-Egan of the National Lawyers Guild.

The organization's legal observer program deploys volunteer lawyers in neon green hats to document what happens during demonstrations to help people defend themselves against charges. The guild has also been helping people navigate the system and deal with the aftermath of arrests and criminal charges.

Federal raids prompted hundreds of people to protest in defense of neighbors, family and friends against federal immigration officials – who were often masked and unidentified – detaining and arresting immigrants and U.S. citizens at Home Depots and businesses, and taking people from bus benches and parking lots.

For many defendants, this may be their first encounter with many of the "well-known harms of the carceral state that are in play," Howell-Egan said.

"A big thing is remembering that just because someone was charged with something doesn't mean they actually did it or are guilty," Howell-Egan said.

However, prosecutors' allegations against people can be circulated publicly by the mainstream media, and are often repeated "at face value," Howell-Egan said. In reality, prosecutors must prove beyond a reasonable doubt that defendants committed the alleged crimes.

The experience can be "traumatic," Howell-Egan said, particularly for people simultaneously dealing with what she called the "double trauma" of confronting the state as it detains and deports their family members and neighbors.

The LA DA's office declined to comment, citing pending litigation. Spokesperson Greg Risling added that the pretrial conditions are set by a judge.

"To clarify and generally speaking, a judge sets pretrial conditions based on the evidence in each case," he said. "Our office may file motions regarding bail, detention and other matters, but ultimately the decision is left to the judge."

The City Attorney's Office did not respond to requests for information and comment about the cases it filed.

## High bail amounts keep many defendants in custody

Judges may keep some defendants in custody over concerns they might be a "flight risk or a danger to society," according to LA County Assistant Public Defender Haydeh Takasugi.

Without such concerns, Takasugi says her office believes it is unjust for defendants to remain in custody before trial, "when we all know that the charges that are brought against them are simply that – charges, and there hasn't been a determination whether or not they're guilty of anything."

Takasugi said their office believes that keeping people in custody, sometimes for weeks to months, "doesn't serve the community in any way." It prevents their clients, many of whom are "indigent," from being able to continue to live their lives outside as they wait for their cases to move through the system, she said.

Takasugi says her office questions the value of money bail in ensuring defendants return for hearings.

High bail amounts can compromise the fairness of the legal process. Takasugi says defendants should base their decisions on the merits of their case and potential penalties, not on their understandable wish to avoid jail time while awaiting trial.

Alex Trantham, second vice president of the public defender's union, says immigrants and those with undocumented family members face additional challenges. ICE agents have been known to target court houses, typically considered a sanctuary against immigration enforcement, to make arrests. At the time of the interview at the end of July, Trantham and others had said that had not occurred with one of their clients.

But those fears were realized last Wednesday, when men identifying themselves as federal immigration officials were filmed outside the Clara Shortridge Foltz courthouse in downtown LA taking away a client of the Alternate Defender's Office.

Trantham said that people have a better chance of convincing a judge that they can be released if their family members show up to their court hearings to vouch for them. But that can be difficult with clients whose family members may be undocumented, she said

"Right now, a lot of people who went to the protest, they have family or friends that might be undocumented who are terrified right now to leave their house because of what's happening with these ICE raids," Trantham said. "So when a family member then picks up a case, it can be hard to have family support in court because they're terrified of being in court and appearing for them because they don't know if ICE is going to be there."

Many cases also carry sentencing enhancements that increase potential penalties. Trantham says in her experience these enhancements, which often cite prior felony convictions as grounds for increased sentences, have become more common since District Attorney Nathan Hochman took office. The DA's office did not respond to a request for comment on the issue.

8/27/25, 1:27 PM    Case 3:25-cv-04870-CRB    At least 100 people face criminal charges after LA protests over ICE raids 1 of 131

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 312 of 428

Document 101-4    Filed 09/02/25    Page 315 of 131

Based on an analysis by *LA Public Press*, the District Attorney tried to increase penalties in the cases of 13 people, including Three Strikes enhancements for prior convictions, and special allegations of alleged great bodily injury and deadly weapon use.

The District Attorney applied 47 enhancements to the charges of 13 people. Twenty of the enhancements, or just over 40%, applied to the defendant who died in custody. That person had pleaded not guilty to the charges against her during a June 17, 2025 hearing.

The remaining 27 enhancements were applied to 12 other defendants. Some have now had their charges, along with the enhancements dismissed. For example, one person had two weapon-related enhancements dismissed —one through a plea deal, the other after pleading no contest to a firearm possession charge.

"It makes our job a lot harder if the charges are more serious because we're fighting these more serious cases that the judges are just assuming are serious based on the charges, as opposed to if they were charged more appropriately for the conduct that was committed, then it might be easier to keep them out and maintaining their, you know, jobs, school, family life," Trantham said.

Enhanced charges can influence defendants' decisions. Takasugi says judges should consider people with criminal histories within the context of the immigration protests.

Judges need to get a more "nuanced" understanding of defendants' situations, she said, considering the federal immigration enforcement taking place in Los Angeles that prompted people "to express their frustration with a system that they cannot change."

"I hope that people will understand the situation in which the individual found themselves, and the context of the protest and how they feel about what is happening to their communities," she said.

© 2025 Foundation for Los Angeles Journalism

All Rights Reserved

# EXHIBIT 4

# Federal Agents March Through L.A. Park, Spurring Local Outrage

Federal officials said it was an immigration enforcement operation, though it was unclear if anyone had been arrested. "It's the way a city looks before a coup," Mayor Karen Bass said as she condemned the action.

---

 **Listen to this article · 7:19 min**   Learn more

**By Jill Cowan and Mimi Dwyer**

Reporting from Los Angeles

July 7, 2025

It had been a quiet morning in MacArthur Park, a hub in one of Los Angeles's most immigrant-heavy neighborhoods. Children at a summer camp were playing outside, but the park was otherwise largely empty.

Then, dozens of armed federal agents began marching over soccer fields and grass berms, based on footage of the incident. Military-style vehicles blocked the street and a federal helicopter flew overhead.

They wore fatigues, masks and helmets and marched in lines. Some were on horseback. Camera crews followed alongside them.

Los Angeles leaders have grown weary after thousands of National Guard troops and Marines arrived nearly a month ago and immigration raids have become a regular, visible occurrence. But they took particular umbrage at Monday's extraordinary show of force in MacArthur Park and issued a swift and furious rebuke.

8/27/25, 1:28 PM    Federal Agents March Through LA Park, Spurring Local Outrage - The New York Times

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 315 of 428
Case 3:25-cv-04870-CRB    Document 46-10    Filed 07/25/25    Page 18 of 31

"What I saw in the park today looked like a city under siege, under armed occupation," Mayor Karen Bass said in a news conference on Monday afternoon, adding that she had traveled regularly into conflict zones as a member of Congress. "It's the way a city looks before a coup."



Los Angeles Mayor Karen Bass visited MacArthur Park while federal agents were still there on Monday. "What I saw in the park today looked like a city under siege, under armed occupation," she said later.  Damian Dovarganes/Associated Press

Dozens of federal agents were observed in the park, many arriving in armored military vehicles. They were joined by 80 California National Guard troops under the command of President Trump, according to the office of Gov. Gavin Newsom, who criticized the effort and has tried to stop the federalization of Guard members through a lawsuit.

Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, did not respond to specific questions about the purpose of the operation at MacArthur Park or whether anyone had been detained.

"The operation is ongoing," she wrote in an email. "So that should be a message in of itself."

Asked to clarify that message, she responded that it was an immigration enforcement operation and that such efforts "are not in one single location."

Mr. Trump called up National Guard troops on June 7 to quell protests at federal buildings and at immigration raids. All told, he mobilized about 4,000 Guard members and 700 Marines to the region. It has been more than three weeks since the last major demonstration in downtown Los Angeles.

Mr. Newsom and local leaders had expected the troops to return to their regular duties once the protests had died down. But the president has released only 150 Guard troops for firefighting efforts, and Gregory Bovino, a Customs and Border Protection chief in Southern California, indicated Monday that the Trump administration intended to make itself seen across the city.

"Better get used to us now, cause this is going to be normal very soon," Mr. Bovino told a Fox News reporter. "We will go anywhere, anytime we want in Los Angeles."

To many local leaders, the Monday march through MacArthur Park seemed designed to intimidate immigrants and residents, rather than to carry out targeted enforcement. Marqueece Harris-Dawson, the president of the Los Angeles City Council, derided the display as a stunt made for TikTok.

"If you want to film in L.A., you should apply for a film permit like everybody else," he said during an afternoon news conference. "Stop trying to scare the bejesus out of everybody who lives in this great city and disrupt our economy."

Ms. Bass had planned to appear with Mr. Newsom on Monday to talk about the region's recovery six months after the Palisades and Eaton fires devastated the region.

Instead, she told reporters, she heard about the federal action at MacArthur Park and headed there. She met with children who had quickly been ushered inside a recreational facility when the federal personnel arrived. One 8-year-old boy, she

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 317 of 428
Case 3:25-cv-04870-CRB    Document 80-5    Filed 05/22/25    Page 20 of 31

said, told her unprompted that he was afraid of immigration agents.

City leaders and community groups have long tried to address homelessness and drug use in the park about 10 blocks west of downtown Los Angeles. Workers with a St. John's Community Health street medicine clinic that was serving homeless people at the park said that agents had pointed guns at them and instructed them to stop their work and leave on Monday.

Ms. Bass said that once she arrived, she had demanded to speak to the person in charge of the operation at the park. She was handed a phone, through which, she said, Mr. Bovino told her that he would be "getting them out of the park," apparently referring to federal agents.

The agents left the park a short time later, she said.



Federal agents arrived in armored vehicles and stood with guns at MacArthur Park in what the Department of Homeland Security described as an immigration enforcement operation. Damian Dovarganes/Associated Press

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 318 of 428
Case 3:25-cv-04870-CRB   Document 53-21   Filed 07/21/25   Page 21 of 131

Ever since Mr. Trump deployed National Guard troops to Los Angeles last month, state and local leaders have engaged in legal and rhetorical battles with the Trump administration.

Federal officials have accused local leaders of fostering lawlessness and allowing criminals to roam free. Mr. Bovino persisted on Monday, saying on X: "We may well go back to MacArthur Park or other places in and around Los Angeles. Illegal aliens had the opportunity to self deport, now we'll help things along a bit."

The post was punctuated with two American flag emojis.

Local officials have accused the federal government of ripping apart families and terrorizing communities by conducting seemingly random workplace and street raids with masked agents in plainclothes, many of whom don't identify themselves.

The raids have had a chilling effect on the Los Angeles area, where roughly half the population is Latino and an estimated 10 percent is undocumented. Small businesses have struggled as undocumented customers and workers have holed up at home. Public spaces like MacArthur Park have been desolate on days when they would typically be bustling with vendors and celebrating families.

Fernando Rodriguez, who runs a small convenience store on South Alvarado Street near the park, said he had seen about 15 large vehicles pull up on Monday morning, including armored vehicles.

"It was like they were going to war," he said. He and everyone else on the block rushed to close their stores and went home, returning only once the park had cleared, he said.

Mr. Rodriguez said that everyone in the community was afraid of being picked up by immigration agents, including those who have legal status. He said that agents did not seem to care whether people had immigration papers if they were Latino.

Business at his convenience store has been very slow for about a month, since enforcement raids intensified in the community, he said. He said that he worried about his two children, ages 6 and 7, who were with him in the shop.

8/27/25, 1:28 PM    Federal Agents March Through LA Park, Spurring Local Outrage - The New York Times

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 319 of 428
Case 3:25-cv-04870-CRB    Document 50-6    Filed 06/02/25    Page 222 of 431

"The kids turn on the TV, there's news about raids," he said. "That's already traumatic. Psychologically, they make you sick because all you're doing is thinking about what time they'll arrive."

Monday's episode felt like an escalation: National Guard soldiers and Marines had mostly been seen guarding federal buildings or accompanying immigration agents on smaller operations. And Ms. Bass said she didn't know how long to expect the raids to continue.

"Frankly," she said, "we are managing by rumor."

Laurel Rosenhall contributed reporting from Sacramento.

**Jill Cowan** is a Times reporter based in Los Angeles, covering the forces shaping life in Southern California and throughout the state.

A version of this article appears in print on , Section A, Page 15 of the New York edition with the headline: Outrage as Federal Agents Sweep Through Los Angeles Park

# EXHIBIT 5

An official website of the United States government   Here's how you know

HOME > NEWSROOM > PRESS RELEASES

 U.S. NORTHERN COMMAND

≡                                                                              Q

Skip to main content (Press Enter).

**PRESS RELEASE** | July 1, 2025

# Task Force 51 releases 150 members of the California National Guard

At the recommendation of Gen. Gregory M. Guillot, Commander, U.S. Northern Command, and approved by the Secretary of Defense, Task Force 51 will release approximately 150 members of the California National Guard from the Federal Protection mission today. USNORTHCOM and Task Force 51 are still appropriately sourced to conduct our Federal Protection Mission. For more information on the disposition of the released soldiers, please contact the California National Guard.  Task Force 51 is  U.S. Army North's Contingency Command Post under the command of Maj. Gen. Scott M. Sherman. The mission of TF 51 is protecting federal personnel conducting federal functions, as well as federal property.

**–30--**

For additional information, please contact U.S. Northern Command Public Affairs:
Email: n-ncpa.omb@mail.mil
Phone: (719) 554-6889
After duty hours: (719) 217-3716

**Follow U.S. Northern Command:**
Facebook: facebook.com/USNORTHCOM
X (formerly Twitter): x.com/USNorthernCmd
Instagram: instagram.com/usnortherncmd

---


SHARE


PRINT

🏷 federal protection mission   🏷 USNORTHCOM

Skip to main content (Press Enter).

# EXHIBIT 6

 24/7 Live    87°

POLITICS

# 2,000 National Guard troops to be withdrawn from Los Angeles, Pentagon confirms

By Marc Cota-Robles
Tuesday, July 15, 2025



Este artículo se ofrece en Español →



The Pentagon confirmed that 2,000 National Guard members are being withdrawn from their mission in Los Angeles.

LOS ANGELES (KABC) -- The military presence in the Los Angeles area is being reduced by almost half. The Pentagon Tuesday confirmed that 2,000 National Guard members are being withdrawn from their mission in the city.

Roughly 4,000 National Guard soldiers and 700 Marines have been in the city since early June. They were deployed with the mission to protect federal buildings and personnel following protests of U.S. Immigration and Customs Enforcement operations in L.A.

"Thanks to our troops who stepped up to answer the call, the lawlessness in Los Angeles is subsiding. As such, the Secretary has ordered the release of 2,000 California National Guardsmen (79th IBCT) from the federal protection mission," Chief Pentagon Spokesman Sean Parnell said in a statement provided to ABC News.

Some of the Guard members deployed to L.A. received specific training to provide perimeter security during ICE operations and were not carrying out law enforcement duties. They were, however, authorized to temporarily detain individuals if needed and then quickly turn them over to law enforcement personnel.

L.A. Mayor Karen Bass called the troops' withdrawal an important victory.



"This happened because the people of Los Angeles stood united and stood strong. We organized peaceful protests, we came together at rallies, we took the Trump administration to court - all of this led to today's retreat," she said in a statement, adding that "We will not stop making our voices heard until this ends, not just here in LA, but throughout our country."

Both city and state leaders pushed back against the deployments, accusing the Trump administration of overstepping its authority.

That led to a legal showdown between California and the federal government, which is still playing out in the courts.

Last month, an appeals court temporarily sided with Trump by deciding troops can remain in L.A. while the case is under review.

"For more than a month, the National Guard has been pulled away from their families, communities and civilian work to serve as political pawns for the President in Los Angeles," Gov. Gavin Newsom's office said in a statement to Eyewitness News. "While nearly 2,000 of them are starting to demobilize, the remaining guardsmembers continue without a mission, without direction and without any hopes of returning to help their communities.

"We call on Trump and the Department of Defense to end this theater and send everyone home now."

The federal troops' domestic deployment raised multiple legal questions, including whether the administration would seek to employ emergency powers under the Insurrection Act to empower those forces to conduct law enforcement on U.S. soil, which they are not permitted to do except in rare circumstances. The Marines, however, are primarily assigned to protecting federal buildings.

**READ MORE:** **Military requesting to pull 200 troops back from LA protest duty and return them to wildfire unit**

Previously, the top military commander in charge of the troops deployed to L.A. asked Defense Secretary Pete Hegseth if 200 of those forces could be returned to wildfire fighting duty.

Some politicians sounded the alarm, saying National Guard troops who would normally be working on state fire prevention and drug enforcement were deployed to L.A.



Read More

(00:01)                                                        02:00

California has just entered peak wildfire season, and Newsom warned that the Guard was understaffed due to the L.A. protest deployment.

The top military commander of those troops, U.S. Northern Command head Gen. Gregory Guillot, submitted a request to Hegseth to return 200 of the National Guard troops back to Joint Task Force Rattlesnake, which is the California National Guard's wildfire unit, the officials said.

*The Associated Press contributed to this report.*

**Report a correction or typo**

Copyright © 2025 KABC Television, LLC. All rights reserved.

**Related Topics**

POLITICS    LOS ANGELES    LOS ANGELES COUNTY    CALIFORNIA NATIONAL GUARD    NATIONAL GUARD

MARINES    MILITARY    GAVIN NEWSOM    ICE    IMMIGRATION    PROTEST    MIGRANTS



**Emma & Mia Are Retiring — Their Handmade Jewelry Is 80% Off**

Sponsored / Sedona Daily Post

Read More

**Anyone Considering Investing In Gold Should See This**

Sponsored / Goldco

Learn More

**California: Gov Will Cover Your Cost To Install Solar If You Live In These Zip Codes**

Sponsored / SunValue

Learn More

**Warren Buffett, Elon Musk and other moguls all use the 5-hour rule. Here's what I learned from...**

Sponsored / Blinkist Magazine

**The best walking shoes are suitable for men to wear all day.**

Sponsored / Walkergrey

Shop Now

**My Men's Handbag Boutique is Closing - Clearance Sale is Live**

Sponsored / James Andrews

**Cesar Millan Reveals What Honey Does to Your Aging Dog**

Sponsored / Experts In Pet Health

**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored / WalletJump

Learn More

**Topics**

Home

Weather

Traffic

U.S. & World

Politics

Consumer

**Regions**

Los Angeles

Orange County

Inland Empire

Ventura County

California

**More**

Live Video

Apps

ABC7 En Español

Investigations

Shop

**Company**

Submit News Tips

TV Listings

About ABC7

Meet the News Team

Jobs/Internships

ABC7 Merchandise

 

Privacy Policy    Do Not Sell or Share My Personal Information    Children's Privacy Policy    Your US State Privacy Rights    Terms of Use    Interest-Based Ads
Public Inspection File    FCC Applications    Copyright © 2025 KABC Television, LLC. All Rights Reserved.

**SA-296**

# EXHIBIT 7

# Hegseth directs 700 Marines to be pulled from Los Angeles

The 700 Marines deployed to Los Angeles last month amid protests over increased immigration enforcement are being pulled from the city, the Pentagon confirmed Monday.

"With stability returning to Los Angeles, [Defense Secretary Pete Hegseth] has directed the redeployment of the 700 Marines whose presence sent a clear message: lawlessness will not be tolerated," chief Pentagon spokesperson Sean Parnell said in a statement to The Hill's sister outlet NewsNation.

Parnell claimed the Marines' "unmistakable presence" in the city was "instrumental in restoring order and upholding the rule of law," even as few of the service members remained in public view following the initial show of force in June.

The Trump administration continues to scale back its military deployment in Los Angeles after President Trump ordered some 4,100 California National Guard troops and later the 700 Marines to the city to quell protests of raids by Immigration and Customs Enforcement (ICE) agents.

The move was heavily criticized by California state officials for bypassing the consent of Gov. Gavin Newsom (D), who accused Trump of inflaming tensions with deployments he said were unnecessary.

After protests largely died down across the city, service members found themselves with little to do, and last week Hegseth ordered half of some 4,000 remaining guard members to return home. That leaves 2,000 in Los Angeles to continue with their role of protecting ICE agents as they conduct raids.

Another 150 guard members had earlier been allowed to leave the city to help fight wildfires in California.

**Sign up for the Morning Report**
The latest in politics and policy. Direct to your inbox.

> *

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

Newsom has continued to push for all deployed service members to leave the city, saying Trump has used them as "political pawns."

"Thousands of members are still federalized in Los Angeles for no reason and unable to carry out their critical duties across the state," he said in a statement posted to the social platform X on July 15. "End this theater and send everyone home."

Parnell did not say when the Marines would depart the city, but a Defense official told The Washington Post they are set to return to the Twentynine Palms base in the coming days.

In a video posted to X on Monday, Los Angeles Mayor Karen Bass (D) celebrated the Marines' departure, calling their initial deployment "unnecessary."

"The Marines will be able to go back to their families and will be leaving Los Angeles," she said. "I'd like to say that they heard from the people of Los Angeles: This was an unnecessary deployment."

# EXHIBIT 8



U.S. Department of Homeland Security

# Secretary Noem Makes History in First 200 Days in Office

**Release Date:** August 14, 2025

*From securing 16 international agreements to revolutionizing safe travel and securing the U.s. southern border to historic levels, Secretary Noem has been working around the clock to make America safe*

WASHINGTON – In her first 200 days on the job, U.S. Department of Homeland Security (DHS) Secretary Kristi Noem is hard at work delivering on President Trump's promise of making America safe again. Under Secretary Noem's leadership, DHS has secured the border, arrested and removed thousands of criminal aliens, safeguarded U.S. cyber infrastructure, protected America's leaders, deterred terrorism, achieved historic international agreements and kept Americans safe.

Below are just some of Secretary Noem's accomplishments from her 200 Days:

## Secured the Southern Border to Historic Levels

- Daily Southwest Border encounters have **plunged by 93%** since President Trump took office.
- Under President Trump and Secretary Noem's leadership, Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) **has located over 13,000 unaccompanied children.**
- Migrants are **turning BACK** before they even reach our border—migration through Panama's Darien Gap is down 99.98%.
- President Trump and Secretary Noem—with **$46.5 billion** from the Big Beautiful Bill Act—are **finishing the border wall**. DHS already has more than 85 miles either planned or under construction with funding from the prior year, in addition to hundreds of miles that are now planned to be funded by the bill. President Trump's Big Beautiful Bill also includes over **$5 billion for new technology and border surveillance.**
- In June, Customs and Border Protection (CBP) had **the lowest number of nationwide encounters in CBP history at 24,628.**
- The number of nationwide apprehensions in July was **also a historic low of just 6,177.**
  - Notably, on July 20 Border Patrol recorded only 116 apprehensions nationwide—the lowest single-day total in agency history.
- **In May, June and July, U.S. Border Patrol reported zero parole releases**—reinforcing the Administration's commitment to ending catch-and-release policies.
- The **Coast Guard has surged assets** to increase operational presence in key areas and protect America's maritime borders, territorial integrity, and sovereignty-- **including TRIPLING its forces operating on the southern border** and coordinating surface and air presence with partners to detect, deter, and interdict alien and drug smuggling ventures.

## Removed the Worst of the Worst Illegal Aliens

- The Trump Administration empowered our brave men and women in law enforcement to enforce the law and do their jobs.
- DHS returned to using the term "illegal alien" which is the statutory language. President Trump will not allow political correctness to hinder law enforcement.
- The Trump administration arrested **more than 352,000 illegal aliens and removed more than 324,000**.
- **70% of ICE arrests are criminal illegal aliens with criminal charges or convictions in the U.S.**
- DHS has partnered with the State of Florida on **Alligator Alcatraz,** and the State of Indiana on the **Speedway Slammer to expand detention space.** These partnerships give the Trump administration the capability to lock up some of the worst scumbags who entered the country illegally under the previous administration. These new facilities expand facility and bed space by the thousands.
- President Trump and Secretary Noem empowered state and local law enforcement to get these criminal illegal aliens off our streets. **DHS has secured nearly 900 signed agreements with state and local partnerships under 287(g).**
  - Operation Tidal Wave, the first 287(g) enforcement operation coordinated with state and federal law enforcement partners, resulted in over 800 arrests.
- At the direction of President Trump, CBP and ICE began **widescale immigration enforcement operations in sanctuary city Los Angeles and southern California.** In total, since June 6, DHS arrested 4,481 illegal aliens in the Los Angeles area.
- In July, federal law enforcement officers executed criminal warrant operations at marijuana grow sites in Carpinteria and Camarillo. At least 14 migrant children have been **rescued** from potential exploitation, forced labor and human trafficking. Federal officers **also arrested at least 361 illegal aliens** from both sites in Carpinteria and Camarillo.

8/27/25, 1:28 PM    Secretary Noem Makes History in First 200 Days in Office | Homeland Security

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 335 of 428
Case 3:25-cv-04870-CRB    Document 51-4    Filed 08/22/25    Page 38 of 131

- After weeks of delays by activist judges, the Department of Homeland Security **finally deported eight barbaric, violent criminal illegal aliens to South Sudan**.
- **DHS launched Defend the Homeland; a historic nationwide campaign aimed at recruiting Americans to join ICE** and help President Trump and Secretary Noem remove criminal illegal aliens. Since the campaign took off, ICE has received **more than 100,000 applications.**

# Delivering Justice for Victims of Illegal Immigration

- President Trump and Secretary Noem reopened the **Victims of Immigration Crime Engagement (VOICE)** office, which was shuttered by the Biden Administration. President Trump and Secretary Noem are standing up for the victims of illegal alien crime and ensuring they have access to much needed resources and support they deserve.

# Incentivizing Historic Self–Deportations

- **1.6 million** illegal immigrants have left the United States population. This means safer streets, taxpayer savings, pressure off of schools and hospital services, and better job opportunities for Americans.
- President Trump **ended the CBP One app** that allowed more than one million aliens to illegally enter the U.S. The Trump Administration replaced this disastrous program with the **CBP Home app, which has a new self-deportation reporting feature** for aliens illegally in the country.
- President Trump launched Project Homecoming through a presidential EO. **The United States is also offering any illegal alien who uses the CBP Home App a stipend of $1,000 dollars**, paid after their return to their home country has been confirmed through the app.
- In addition to offering CBP Home, DHS announced **illegal aliens who self-deport through the app will receive forgiveness of any civil fines or penalties for failing to depart the United States.** DHS also made CBP Home more user friendly by eliminating certain steps and making it easier than ever for illegal aliens to self-deport.
- DHS and DOJ are enforcing our immigration laws and fining illegal aliens who do not depart when they are supposed to. **So far, nearly 10,000 fine notices have been issued by ICE.**

# Restoring Integrity to America's Legal Immigration System

- President Trump ended the broad abuse of humanitarian parole and returned the program to a case-by-case basis. As part of this effort, Secretary Noem **terminated the Cuba, Haiti, Nicaragua, and Venezuela parole programs**.
  - Under the Biden Administration, this CHNV political scheme allowed hundreds of thousands of unvetted aliens to circumvent the traditional parole process. **Known terrorists, gang members, convicted murderers,** have all entered this country "legally" under this program.
- Following victory at the U.S. Supreme Court, **DHS began sending termination notices in June**, informing the illegal aliens both their parole is terminated, and their parole-based employment authorization is revoked – effective immediately.
- DHS has returned the **Temporary Protected Status** immigration program to its original status: temporary. TPS was never intended to be a de facto asylum program.
  - No longer will this program be abused and exploited by illegal aliens. Secretary Noem ended the TPS designations of the previous administration for Venezuela, Haiti, Nicaragua, Honduras, Nepali Cameroon, and Afghanistan.
- DHS and USCIS initiated an overhaul of the Systematic Alien Verification for Entitlements (SAVE) database to eliminate transaction fees for participating state, local, territorial, and tribal government users, streamline mass alien status checks, and integrate criminal records, immigration timelines, and addresses into results. This will help prevent aliens from exploiting taxpayer-funded public benefits or voting illegally.
- Secretary Noem began terminating Harvard University's Student and Exchange Visitor Program (SEVP) certification—**meaning Harvard would no longer enroll foreign students and existing foreign students must transfer or lose their legal status**—for fostering violence, antisemitism, and coordinating with the Chinese Communist Party.
- It is a privilege, not a right, for universities to enroll foreign students and benefit from higher tuition to help pad their multibillion-dollar endowments. Harvard University repeatedly abused this privilege and even stonewalled DHS's request for information.

# Secured Historic Partnerships with Other Nations to Make America Safer

- In 200 days, **Secretary Noem has signed 16 agreements with other countries that advance President Trump's agenda of making America safe. These agreements include:**
  - Security Alliance for Fugitive Enforcement (SAFE) Memorandum of Cooperation with El Salvador to ensure fugitives are not inadvertently released back into Salvadoran communities.

8/27/25, 1:28 PM    Secretary Noem Makes History: First 200 Days of Office | Homeland Security

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 336 of 428
Case 3:25-cv-04870-CRB    Document 61-2    Filed 06/06/25    Page 39 of 131

- Biometric Data Sharing Partnership (BDSP) Letter of Intent with Colombia to provide a real-time exchange and query of biometric and biographic information against U.S. data holdings.
- Electronic Nationality Verification (ENV) Letter of Intent with Colombia to enable a streamlined process for obtaining travel documents.
- Reaffirmation of the Air Cargo Data Sharing Memorandum of Understanding with Mexico to share air cargo data between CBP and the Mexican National Customs Agency and Mexican Customs Agency.
- Global Entry Joint Letter of Intent with El Salvador to facilitate entry of a foreign country's citizens into the U.S. for tourism and eligible business purposes.
- Repatriation Assistance Pilot Program Memorandum of Understanding extension with Panama to provide an additional $7.2M in support for removals of illegal migrants, especially facilitating support to Panama in managing reverse flows.
- Global Entry Joint Letter of Intent with Costa Rica facilitate entry of a foreign country's citizens into the U.S. for tourism and eligible business purposes.
- Biometric Data Sharing Partnership (BDSP) Letter of Intent with Honduras to provide a real-time exchange and query of biometric and biographic information against U.S. data holdings.
- Joint Security Program (JSP) Memorandum of Understanding with Guatemala to formalize the Joint Security Program in Guatemala which started in February 2024. CBP through the Joint Security Program has worked alongside Guatemalan partners at La Aurora International Airport to strengthen the security of the global travel network by preventing high-risk travelers from boarding U.S.-bound and foreign-to-foreign flights with thorough targeting, threat assessments, and face-to-face interviews.
- 2026 FIFA World Cup Letter of Intent with Qatar to share of lessons learned from prior World Cup between the U.S. government and Qatari government.
- Biometric Data Sharing Partnership (BDSP) Memorandum of Cooperation with Belize to provide a real-time exchange and query of biometric and biographic information against U.S. data holdings.
- Electronic Nationality Verification (ENV) Letter of Intent with Argentina to enable a streamlined process for obtaining travel documents to support repatriation of Argentine nationals from the United States.
- Security Alliance for Fugitive Enforcement (SAFE) Memorandum of Cooperation with Argentina to facilitate the sharing of criminal history information so that fugitives are not inadvertently released back into Argentine communities.
- Visa Waiver Program (VWP) Statement of Intent for Cooperation with Argentina.
- Biometric Identification Transnational Migration Alert Program (BITMAP) Letter of Intent with Chile to Provides temporary legal coverage for the Government of Chile to continue the pilot program with BITMAP enrollments by Ministry of Public Security entities (PDI and Carabineros) as well as expand the program for Ministry of Justice (Prison system). An implementing arrangement is still being negotiated and will need to be signed before April 2026.
- Joint Arrangement to Facilitate the Exchange of Liaison Personnel with Ecuador to enable the assignment of an Ecuadorian National Police liaison at the CBP National Targeting Center in Virginia.

## Initiating a Golden Age in American Air Travel

- Secretary Noem **terminated the politically motivated Quiet Skies Program**, which since its existence has failed to stop a single terrorist attack while costing US taxpayers $200 million a year. The program, under the guise of "national security," was used to target political opponents and benefit political allies.
- **TSA ended the "shoes-off" travel policy,** allowing passengers traveling through domestic airports to keep their shoes on while passing through security screening at TSA checkpoints—while maintaining the same high standard of security. This change will drastically decrease passenger wait times at our TSA checkpoints, leading to a more pleasant and efficient passenger experience.
- **TSA launched specialized security lanes at select airports for military service members and for traveling families.** These initiatives are part of DHS's overall goal to enhance hospitality and security for the American traveler.
- **The Trump administration fully implemented REAL ID enforcement measures nationwide**—a law signed 20 years ago. REAL ID helps ensure that travelers are who they say they are and prevents fraud by criminals, terrorists, and illegal aliens. Most travelers have not even noticed a difference because **nearly 94% of travelers are already REAL ID compliant.**
- Secretary Noem took action to end collective bargaining for the Transportation Security Administration's (TSA) Transportation Security Officers, which constrained TSA's chief mission to safeguard our transportation systems.
  - Prior to Secretary Noem's ending of collective bargaining: 86% of airports had MORE TSOs performing full-time union work than performing security screening.

## Fixing Disaster Relief for the 21st Century

- The Federal Emergency Management Agency is now shifting from bloated, DC-centric dead weight to a **lean, deployable disaster force that empowers state actors to provide relief for their citizens.** The old processes are being replaced because they failed Americans in real emergencies for decades.

- President Trump has established the FEMA Review Council to provide recommendations on how to best conduct disaster relief at the federal level.
  - Under Secretary Noem's leadership, the FEMA Review Council is developing a comprehensive plan for necessary change.
- DHS has empowered state and local governments to lead disaster relief efforts without interference from the federal government.
- DHS has provided FEMA the ability to provide upfront disaster funds to both Texas and New Mexico for disaster recovery efforts speeding up the state's abilities to address debris removal, evacuation and congregate sheltering services, and provide lifesaving and life-sustaining supplies and commodities to the impacted communities.
- DHS accelerated debris removal efforts in California. The majority of properties have now been cleared of debris. **Nearly 92% of debris removal is fully complete while 98% of properties have been cleared.**
- At Secretary Noem's direction, **FEMA has conducted a critical evaluation of all grant programs** and recipients to root out waste, fraud, and abuse and deliver accountability for the American taxpayer.
- Under Secretary Noem's leadership, recipients of FEMA grants will no longer be permitted to use federal funds to house illegal immigrants at luxury hotels, fund climate change pet projects, or empower radical organizations with unseemly ties that don't serve the interest of the American people.

## Provided Rapid and Effective Support to Flood Victims in Texas

- Within moments of the flooding in Texas, DHS assets, including the U.S. Coast Guard (USCG), CBP Border Search, CBP BORSTAR, and FEMA personnel surged into unprecedented action alongside Texas first responders for search and rescue operations.
- The Coast Guard's Rescue Swimmer, Petty Officer Scott Ruskan, in coordination with the air crew from Coast Guard Air Station Corpus Christie saved nearly 200 lives in response to the Texas Floods. Over the past 200 days, the Coast Guard had a total of 8,492 search and rescues, saved or assisted 12,801 lives and saved over $375M in property.
- **FEMA deployed 311 staffers delivering critical intelligence, aerial imagery, and shelter for 171 survivors.**
- Combined state and federal rescue efforts **evacuated and rescued over 1,500 people.**
  - Deployed over 300 Coast Guardsmen.
  - Surged four Coast Guard cutters to support response and recovery operations.
  - Surged response boats from six Coast Guard stations: Washington, Curtis Bay, Annapolis, St. Inigoes, Oxford, and Crisfield.

## Getting the Cybersecurity and Infrastructure Agency Back on Mission

- Under the Biden Administration, the Cybersecurity and Infrastructure Agency (CISA) censored free speech and targeted Americans.
- Under President Trump and Secretary Noem's direction, DHS closed CISA's politically weaponized offices and fired those responsible for abusing their power.
- CISA is now back on-mission: Protecting Americans and critical infrastructure from cyberthreats.
- CISA personnel are deployed across 10 regions in support of all 56 states/territories and is actively working with local, federal, and international partners to identify emerging threats and issue alerts, advisories or provide guidance to mitigate these threats. It has issued 6 major advisories since April that enable operational collaboration.
- CISA works to support cyber defenders with the tools they need to secure their cyber systems. This summer it released the Eviction Strategies Tool (https://www.cisa.gov/eviction-strategies-tool) , a no-cost resource designed to support cyber defenders, and Thorium (https://www.cisa.gov/resources-tools/resources/thorium) , an automated, scalable malware and forensic analysis platform.
- On Aug 1, CISA and FEMA announced the availability (https://www.cisa.gov/news-events/news/dhs-launches-over-100-million-funding-strengthen-communities-cyber-defenses) of over $100 million in cybersecurity grant funding to strengthen state, local and tribal government community cybersecurity.
- Under Secretary Noem's leadership, **CISA has issued more than 700 pre-ransomware notifications,** cataloged 131 known exploited vulnerabilities and partnered with 57 new software companies bringing the number of companies who have pledged to build more secure software to 319.

## Championed Strategic Advancements in Law Enforcement Training to Enhance Border Security and Immigration Enforcement

- **Secured historic funding for law enforcement training**. The One Big Beautiful Bill Act is providing the Federal Law Enforcement Training Centers (FLETC) with **$750 million**, more than doubling its annual resources, to enhance the training and readiness of U.S. Border Patrol (USBP), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel.
- **Expanded nationwide law enforcement collaboration** by facilitating ICE's 287(g) Training Program. To date, 12,024 officers across 39 states have registered and 8,192 have completed the training, strengthening partnerships between federal and local law enforcement agencies.

8/27/25, 1:28 PM
Case 3:25-cv-04870-CRB    Document 41    Secretary Noem Makes History in First 200 Days of Office | Homeland Security

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 338 of 428
Filed 08/27/25    Page 41 of 131

- **Trained** nearly 2,000 newly hired USBP, CBP, and ICE officers and agents since January 20, 2025, ensuring operational readiness and rapid deployment of a trained workforce to critical national security missions.
- **Achieved record-breaking training—the highest attendance levels since 2007—by supporting over 1,000 USBP trainees daily at FLETC in Artesia, New Mexico,** and demonstrating a commitment to scaling operations to meet growing security demands.

# Revitalizing the U.S. Coast Guard

- When President Trump came back into office, the Coast Guard faced its greatest readiness crisis since World War II because the Biden Administration left it underfunded and neglected. President Trump's order to surge Coast Guard assets to our maritime border changed the game.
- Under President Trump and Secretary Noem's leadership, the Coast Guard is being revitalized to meet the various security challenges of the 21st century and keep America's maritime borders secure for decades to come.
- In the first seven months of the Trump Administration, the Coast Guard **seized more than double the cocaine and other illegal drugs than during the entirety of 2024.** The Coast Service removed 289,467 lbs. of cocaine, 31,942 lbs. of marijuana, 5,952 lbs. of other illicit drugs, and detained 261 drug traffickers.
- The Coast Guard enhanced its immigration enforcement mission executing asset deployments and tripled its operationally deployed units along the southern border and maritime approaches. This resulted in following Illegal Alien Statistics.
  - Interdicted 1140
  - Transferred 717
  - Repatriated 423
  - Deterred 126
- For the first time in years, the Coast Guard expects to exceed its recruiting goals. As of August 12, 2025, the Coast Guard recruited over 5,220 new members into the active-duty enlisted workforce.
- In FY 2025, the Coast Guard expects to access nearly 700 more active-duty enlisted members than the previous year.
- For the first time in 25 years, the Coast Guard, under Secretary Noem's leadership has the ability to expand the Nation's high latitude operations and presence in the Arctic.
- Through the acquisition of additional polar icebreakers and fast response cutters (FRC) such as the recently commissioned CGC Storis and FRC Cunningham, the Nation has ensured access to protect U.S. sovereignty and national security. Nearly $8 billion will be dedicated to this mission.
- Under President Trump and Secretary Noem, the Coast Guard is launching "Force Design 2028," a revolutionary new blueprint that will make the Coast Guard more agile, more capable, and more responsive than ever before.
- Force Design 2028 is the Coast Guard's roadmap to become a more agile, capable, and responsive fighting force to best serve the American people. With unprecedented support and momentum from the President, Secretary of Homeland Security, and Congress, we are seizing the opportunity now to renew the Coast Guard for the future.
  - It will drive much needed changes to transform the Service's: (1) Organization; (2) Contracting and Acquisition; (3) Technology; and (4) People.

# Standing up for the American taxpayer

- The United States Coast Guard (USCG) eliminated an ineffective information technology (IT) program, saving nearly $33 million, and is now focusing resources where they're most needed to protect our homeland.
- USCG partially terminated a wasteful Offshore Patrol Cutter (OPC) contract with Eastern Shipbuilding Group (ESG), which has been slow to deliver four OPCs, harming U.S. defense capabilities.
- The Trump Administration stopped aliens on the Terror Watchlist from receiving Medicaid benefits.
- Secretary Noem cancelled CISA's expensive headquarters project, saving taxpayers over half a billion dollars.
- The Coast Guard partially terminated a wasteful Offshore Patrol Cutter (OPC) contract with Eastern Shipbuilding Group (ESG), which has been slow to deliver four OPCs, harming U.S. defense capabilities.
- The Coast Guard made a fiscally responsible move that saves taxpayers $260 million, through the cancellation of the planned eleventh National Security Cutter (NSC-11) acquisition. This decision, driven by budgetary realities, is projected to yield substantial cost savings and allows for potential reallocation of resources to other Coast Guard priorities.
- To stop policies that were magnets for illegal immigration, DHS froze funding to non-governmental organizations that facilitate illegal immigration and announced a partnership with the U.S. Department of Housing and Urban Development to ensure taxpayer dollars do not go to housing illegal aliens.

### #

8/27/25, 1:28 PM
Secretary Noem Makes History in First 200 Days of Office | Homeland Security

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 339 of 428
Case 3:25-cv-04870-Charles R. Breyer Document 11-2 Filed 09/08/25 Page 42 of 131

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)    SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

HOMELAND SECURITY (/KEYWORDS/HOMELAND-SECURITY)    SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)

AIRPORT SECURITY (/KEYWORDS/AIRPORT-SECURITY)    ALIEN (/KEYWORDS/ALIEN)    BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)

CRITICAL INFRASTRUCTURE (/KEYWORDS/CRITICAL-INFRASTRUCTURE)    CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (CISA) (/KEYWORDS/CYBERSECURITY-AND-INFRASTRUCTURE-SECURITY-AGENCY-CISA)

DEPORTATION (/KEYWORDS/DEPORTATION)    DISASTER RELIEF (/KEYWORDS/DISASTER-RELIEF)

ENFORCEMENT AND REMOVAL OPERATIONS (ERO) (/KEYWORDS/ENFORCEMENT-AND-REMOVAL-OPERATIONS-ERO)

FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA) (/KEYWORDS/FEDERAL-EMERGENCY-MANAGEMENT-AGENCY-FEMA)

FEDERAL LAW ENFORCEMENT TRAINING CENTERS (FLETC) (/KEYWORDS/FEDERAL-LAW-ENFORCEMENT-TRAINING-CENTERS-FLETC)    ILLEGAL (/KEYWORDS/ILLEGAL)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)    INTERNATIONAL PARTNERSHIP (/KEYWORDS/INTERNATIONAL-PARTNERSHIP)

LAW ENFORCEMENT PARTNERSHIP (/KEYWORDS/LAW-ENFORCEMENT-PARTNERSHIP)    LAW ENFORCEMENT TRAINING (/KEYWORDS/LAW-ENFORCEMENT-TRAINING)

MAKING AMERICA SAFE AGAIN (/KEYWORDS/MAKING-AMERICA-SAFE-AGAIN)    PARTNERSHIP (/KEYWORDS/PARTNERSHIP)

PRESIDENT TRUMP (/KEYWORDS/PRESIDENT-TRUMP)    REMOVAL (/KEYWORDS/REMOVAL)

TRANSPORTATION SECURITY ADMINISTRATION (TSA) (/KEYWORDS/TRANSPORTATION-SECURITY-ADMINISTRATION-TSA)    TRAVEL (/KEYWORDS/TRAVEL)

U.S. COAST GUARD (USCG) (/KEYWORDS/US-COAST-GUARD-USCG)    VICTIMS OF CRIME (/KEYWORDS/VICTIMS-CRIME)

VICTIMS OF IMMIGRATION CRIME ENGAGEMENT (VOICE) (/KEYWORDS/VICTIMS-IMMIGRATION-CRIME-ENGAGEMENT-VOICE)

HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)

Last Updated: 08/18/2025

# EXHIBIT 9



U.S. Department of Homeland Security

# Despite Riots and Assaults, ICE and Border Patrol Arrest Worst of the Worst Criminal Illegal Aliens Including Rapists, Gang Members, Murderers, and Pedophiles in Los Angeles

**Release Date:** August 27, 2025

*DHS law enforcement has arrested more than 5,000 illegal aliens since operations began in June in the sanctuary city*

WASHINGTON – The U.S. Department of Homeland Security (DHS) today released the following update regarding targeted immigration enforcement operations in Los Angeles, California that resulted in the arrests of criminal illegal aliens including rapists, gang members, murderers, and child sex offenders.

On August 26, Secretary Kristi Noem announced (/news/2025/08/26/secretary-noem-announces-dhs-arrest-5000th-illegal-alien-los-angeles-operations) **U.S. Border Patrol and Immigration and Customs Enforcement (ICE) have made more than 5,000 arrests in Los Angeles, California since June.**

While violent rioters threatened law enforcement officers and attempted to obstruct them from enforcing the law (/news/2025/06/07/dhs-releases-statement-violent-rioters-assaulting-ice-officers-los-angeles-ca-and), DHS law enforcement continued to deliver on President Donald Trump's promise to remove the worst of the worst criminal illegal aliens from American communities.

*"DHS law enforcement has made over 5,000 arrests in Los Angeles. That's more than 5,000 criminal illegal aliens, gang members, child predators, and murderers taken off our streets. Precious lives saved,"* said **Secretary Noem**. *"Families protected. American taxpayers spared the cost of their crimes AND the burden of their benefits. Thank you to our brave law enforcement officers. Make no mistake: if you are here illegally, we will find you, arrest you, and send you back. This is just the beginning."*

Below are just a handful of examples of the criminals DHS law enforcement arrested from Los Angeles streets since targeted operations began in June:



Diego Fernandez-Martinez, a criminal illegal alien from Mexico and confirmed member of the deadly Surenos gang with convictions for **carjacking, vehicle theft, possession of drug paraphernalia, possession of a controlled substance for sales, robbery, and prisoner in possession of a weapon.**



Juan Carlos Marin-Hipolito, a criminal illegal alien from Mexico convicted of **murder** and sentenced to 50 years to life in prison.



Jaime Sarinana-Rodriguez, a criminal illegal alien from Mexico and **registered sex offender** convicted of **continuous sexual abuse of a child** and sentenced to 16 years in prison.



Yohannes Zerai, a criminal illegal alien from Eritrea and **registered sex offender**, convicted of **robbery, battery with serious bodily injury, assault to commit rape, sexual penetration with a foreign object with force, assault with a deadly weapon not firearm, petty theft with priors, and failure to register as a sex offender.**



Justin Chung, a criminal illegal alien from South Korea, who was convicted of **murder and shooting at an inhabited dwelling** and was sentenced to 75 years prison.



Quoc Dung Pham, a criminal illegal alien from Vietnam and **registered sex offender**, convicted of **kidnapping, rape with force, sodomy in concert with force, oral copulation in concert with force, robbery, assault with committing of rape, and possession of a controlled substance** and sentenced to 64 years prison.



Bo Quoc Pham, a criminal illegal alien from Vietnam and **registered sex offender**, convicted of **rape with force, arm/weapon sex offense, rape in concert with force or violence, oral copulation** and sentenced to 118 years prison. Arrested with his brother, Quoc Dung Pham, who has the same criminal convictions.



Hong Jing, a criminal illegal alien from China, convicted of **driving under the influence of alcohol, aiding, abetting and engaging in sex trafficking of an individual, and racketeering.**



Martina Zacarias, a criminal illegal alien from Mexico and **convicted sex offender**, convicted of **lewd or lascivious acts with a child under 14** and sentenced to eight years in prison.



Edgar Isaac Lopez, a criminal illegal alien from Mexico, convicted of **voluntary manslaughter, child cruelty resulting in injury/death, assault by prisoner, unlawful display of fake or fraudulent ID card/permit, and trespassing/injure property.**



Joel Benjamin Reyes, a criminal illegal alien from El Salvador and **registered sex offender**, convicted of **rape in the first degree by forcible compulsion, incest engaged in sexual conduct with related person** and sentenced to five years.



Omar Guzman-Rodriguez, a criminal illegal alien from Mexico and **registered sex offender**, convicted of **burglary, possession of check/money order to defraud, personate to record document, making fictitious checks, petty theft with a prior conviction, taking vehicle without owner consent/vehicle theft and tow owner moving a vehicle without authorization, vehicle theft and possession of stolen vehicle, and lewd acts with a child under 14.**

# # #

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

IMMIGRATION (/KEYWORDS/IMMIGRATION)    IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

ALIEN (/KEYWORDS/ALIEN)    CRIME (/KEYWORDS/CRIME)    CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

ILLEGAL (/KEYWORDS/ILLEGAL)    IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)    LAW ENFORCEMENT (/KEYWORDS/LAW-ENFORCEMENT)

MAKING AMERICA SAFE AGAIN (/KEYWORDS/MAKING-AMERICA-SAFE-AGAIN)    PUBLIC SAFETY (/KEYWORDS/PUBLIC-SAFETY)

SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)    U. S. BORDER PATROL (/KEYWORDS/U-S-BORDER-PATROL)

Last Updated: 08/28/2025

# EXHIBIT 10

California Secretary of State
# Shirley N. Weber, Ph.D.

## Statewide Special Election

**Choose Language**

English ∨

## 2025 Statewide Special Election

- The last day to register to vote for the November 4, 2025, Statewide Special Election is October 20, 2025.

- All California active registered voters will receive a vote-by-mail ballot for the November 4, 2025, Statewide Special Election.

- Your county elections office will begin mailing ballots by October 6, 2025.

- Ballot drop-off locations open on October 7, 2025.

- Vote-by-mail ballots can be returned by mail, at a drop-off location, or your county elections office.

- Vote centers open for early in-person voting in all Voter's Choice Act counties beginning on October 25, 2025.

- Vote-by-mail ballots must be postmarked on or before Election Day and received by November 12, 2025.



# Election Information

**Legislation Calling for the Statewide Special Election (PDF)**

**Key Dates and Deadlines**

**Complete Statewide Special Election Calendar (PDF)**

**Ballot Arguments**

# Voting Resources

**Register to Vote**

**My Voter Status**

**Voting in California**

**Where's My Ballot?**

**Vote By Mail**

**Military & Overseas Voters**

**Poll Worker Information**

**Election Video Resources**

**Election Security**

**County Elections Offices**

**Frequently Asked Questions**

# EXHIBIT 11

**Trending:**  Burning Man  |  AI's job market effect  |  Plan to split California  |  Newsom trolls Trump  |  Joel Engardio recall  |  S.F. swimmer dies  |  T

POLITICS

# Trump adds San Francisco to list of cities where he wants to send troops

By **Sara DiNatale**, Staff Writer
Updated Aug 22, 2025 1:34 p.m.

    



President Donald Trump floated sending troops into San Francisco during a news conference in the Oval Office on Friday.
Jacquelyn Martin/Associated Press

e-Edition        Account

0:00                                                                    2:47

Everlit

President Donald Trump said Friday from the Oval Office that Democrats "destroyed" San Francisco, adding that it was among the American cities he would "clean up" using federal troops.

It's the latest attack the president has made on Democratic-led cities he has characterized as crime-ridden and poorly run. The president already ordered roughly 2,000 National Guard troops to Washington, D.C., all on loan from at least six Republican-led states.

Chicago, the president said, could be next to get the takeover treatment. New York City was also possible, he said. Then Trump took shots at San Francisco.

ADVERTISEMENT
Article continues below this ad

"Look at what the Democrats have done to San Francisco," Trump told reporters. "They've destroyed it. We could clean that up, too. We'll clean that one up, too."

The slam to San Francisco comes after Trump earlier this month named Oakland and other Black-led cities as troubled areas where he'd consider sending federal troops to police.

"President Trump's characterization of Oakland is downright wrong," Oakland Mayor Barbara Lee said at an Aug. 14 news conference held in response to the remarks. "We're not going to back down."

Trump said Friday that Democrats who'd "lost control of their cities" have called asking for the administration's help, but he declined to name any.

"We're going to make our cities very, very safe. Chicago is a mess," Trump said. "We'll straighten that one out, probably next. That will be our next one after this, and it won't even be tough."

ADVERTISEMENT
Article continues below this ad

Crime nationwide has been down in the first half of the year, according to a report by the Council on Criminal Justice. And leaders in cities such as Washington, Oakland and now San Francisco, in response to Trump's rhetoric, have also pointed to stats showing drops in violent crime.

San Francisco Mayor Daniel Lurie has avoided talking about Trump since taking office in January. That strategy continued Friday, even as the president took direct jabs at the city.

"My administration has made safe and clean streets our top priority, and the results are clear: Crime is at its lowest point in decades, visitors are coming back, and San Francisco is on the rise," Lurie said in a statement. "And we're going to keep working every day to build on that progress."

In June, Trump deployed more than 4,000 National Guard troops to Los Angeles as protests broke out into response to immigration raids in Southern California. At that time, Lurie said his priority was "keeping San Franciscans safe" and ensuring that the city would protect free speech during any of its own protests.

Trump's orders to send troops to Los Angeles is still the focus of an ongoing legal challenge, arguing the president wrongly deployed the California guard.

Aug 22, 2025  |  Updated Aug 22, 2025 1:34 p.m.



**Sara DiNatale**
STAFF WRITER



Sara DiNatale covers politics and the impacts of the Trump administration's policies on the Bay Area. She joined the Chronicle in 2025, after a decade reporting across the southern United States.

She was the recipient of a 2024 George Polk Award for her investigation on the Texas residential solar industry as an energy reporter at the San Antonio Express-News. Her investigation led Texas to adopt new state laws to regulate bad actors and scammers. She spent several years covering business, retail, the economy and labor at the Tampa Bay Times and Mississippi Today. Her reporting has been recognized by a series of state-level and national awards, including top honors from the Headliner Foundation, Best of the West and Bill Minor Prize for Investigative Reporting. She's a graduate of the University at Buffalo and a native of Western New York.

**More For You**



POLITICS

## As Newsom touts AI's promise, he's using it to post Trump memes

California Gov. Gavin Newsom has endorsed a targeted approach to AI regulation, but his most public use of it has been posting images mocking President Trump.

CRIME

## Judge quashes San Mateo County sheriff's attempt to halt key hearing

POLITICS

## California says immigration agents continue to profile Latinos

CALIFORNIA WILDFIRES

## Napa Valley wineries at risk as Pickett Fire spreads near Calistoga

RESTAURANTS

## Cockroaches shut down two San Francisco restaurants this week

Let's Play



# EXHIBIT 12

# POLITICO

## Clean Energy + Clean Cars = Healthier Air

When we cut pollution, we cut medical costs.

**LEARN MORE →**

Paid for by the American Lung Association

### Trump says he may send National Guard to Chicago, New York

The president said he is looking to continue sending troops to major cities after deployments in D.C. and Los Angeles.



President Donald Trump speaks in the Oval Office of the White House on Aug. 22. | Jacquelyn Martin/AP

By **AARON PELLISH**
08/22/2025 02:39 PM EDT
Updated: 08/22/2025 04:47 PM EDT

   

CHICAGO — President Donald Trump said he is looking to send in the National Guard to Chicago or New York, seeking to extend the deployment of guardsmen elsewhere after amassing troops in Washington.

Case: 25-5553, 09/15/2025, DktEntry: 10.1, Page 358 of 428
Case 3:25-cv-04870-CRB   Document 65-2   Filed 09/02/25   Page 100 of 131

Trump told reporters Friday he's considering deploying guardsmen to Chicago after ordering troops into the nation's capital and to Los Angeles earlier this year — a move the Trump administration is now being forced to defend in court.

Advertisement

"We're going to make our cities very, very safe. Chicago is a mess," Trump said. "We'll straighten that one out probably next. That will be our next one after this, and it won't even be tough."

Trump later mentioned New York along with Chicago as cities he'd like the National Guard to "help."

The president praised the hundreds of guardsmen currently deployed in Washington and noted he's willing to "bring in the regular military" to help support his campaign to reduce crime in the city.

"I really am honored that the National Guard has done such an incredible job working with the police, and we haven't had to bring in the regular military, which we're willing to do," he said. "After we do this, we'll go to another location, and we'll make it safe also."

Washington's status as a federal territory gives Trump broader authority to deploy the National Guard through the nation's capital, along with his attempt to take over the city's police force. National Guard units outside of D.C. are generally under the command of states' governors, although Trump federalized the California guard to send troops to Los Angeles earlier this year.

But federal law prohibits the use of military personnel for civilian law enforcement except when authorized by the Constitution or another federal law.

Trump's order to send hundreds of troops to Los Angeles is currently the subject of a legal challenge arguing Trump wrongfully federalized and deployed California guardsmen to quell protests.

Chicago Mayor Brandon Johnson said the city hasn't received formal notification of new deployments of federal law enforcement to the city and called the tactic "uncoordinated, uncalled for, and unsound."

"Unlawfully deploying the National Guard to Chicago has the potential to inflame tensions between residents and law enforcement when we know that trust between police and residents is foundational to building safer communities," Johnson said in a statement.

Illinois Gov. JB Pritzker responded to Trump's comments in a social media post, where he labeled "an authoritarian power grab of major cities" as something that "people are not begging for."

New York Gov. Kathy Hochul said in a statement that an attempt by Trump to "invoke military power" by sending the National Guard to New York "undermines the significant work being done at the state level" to reduce crime.

FILED UNDER: NATIONAL GUARD, NEW YORK CITY, CHICAGO, DONALD TRUMP, LOS ANGELES



## West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

\* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service . You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here . This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT



**Kate Middleton Sad News Regarding Prince George**

TipHero



**Donald Trump's Golf Footage Sparks Curiosity About His Legs**

TMSPN



**Barack Obama Admits to "Deep Deficit" in Marriage with Michelle**

TipHero





**Top Cardiologist Begs: Quit Eating Blueberries Before This Happens**

thehealthyfat.com

**Experts Recommend These Two 0% Intro APR Cards Until Nearly 2027**

With no annual fee and no interest until Nearly 2027, these cards are helping...

CompareCredit™

**Every American Should Be Using This Retirement Loophole In 2025**

If You're Not Using This IRS Loophole, You Should Be

Goldco

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do Not Sell or Share My Personal Information and Opt Out of Targeted Advertising

© 2025 POLITICO LLC

# EXHIBIT 13

POLITICS • 6 MIN READ

# Trump aims high in bid to impose ultimate power

AUG 26, 2025

Analysis by  Stephen Collinson



President Donald Trump during a cabinet meeting at the White House in Washington, DC, on ...



In the gospel according to Donald Trump — his book "The Art of the Deal" — the future president laid out his business and life philosophy.

"I aim very high, and then I just keep pushing and pushing and pushing to get what I'm after," Trump wrote. "Sometimes I settle for less than I sought, but in most cases I still end up with what I want."

Once, Trump used this technique to haggle with contractors, to intimidate rival real estate sharks and in endless lawsuits to pursue his business interests.

Twenty-eight years later, he hasn't changed. His pushing and pushing and pushing just takes place on a grander and more consequential stage.

## How Trump beat a presidential curse

The president's relentless attempts to create leverage and wield decisive and uninhibited power on multiple fronts have dominated a summer in which he's been more unrestrained than ever.

August has often been a cruel month for presidents. In 2014, in an odd echo of today, fighting raged in Gaza and Ukraine, intruding on President Barack Obama's vacation and raising questions about his leadership. Chroniclers of the Biden years date the start of the eclipse of the 46th president's administration to August 26, 2021, when a suicide bomber killed 13 Americans at Kabul International Airport.



A member of the National Guard carries a firearm while patrolling the National Mall in Washington, DC, on Tuesday. *(Jose Luis Gonzalez/Reuters)*

Trump motored through this August determined to beat the curse, always testing the boundaries of what is appropriate legal or constitutional conduct in a president.

His pushing culminated this week with threats to **federalize National Guard troops** and send them to Chicago — even when Democratic leaders of the city and the state of Illinois **told him to stay away**.

Emergency conditions prescribed by the US Code that include rebellions, which might make this a clear legal act, do not exist in the city — despite Trump's claims Tuesday that it's in "big trouble" and is a "disaster" because of crime.

But that's not stopping the president, who is also threatening to send federal forces to other cities controlled by Democrats.

"I (have) the right to do anything that I want to do. I'm the president of the United States. If I think our country's in danger — and it is in danger in these cities — I can do it," Trump said during a Cabinet meeting Tuesday.

This is consistent with the president's long-held view that there are few constraints on a president and that his authority is almost absolute.

Illinois Gov. JB Pritzker, a possible 2028 presidential candidate, however, seemed on solid ground when he wrote on X. "No, Donald, you can't do whatever you want."

Time will tell.

## Trump's bid to fire Fed member is one of his biggest power plays yet

Trump is pushing his authority on another front, announcing this week he had **fired Federal Reserve official Lisa Cook**. The Department of Justice is investigating Cook over alleged mortgage transgressions. She has denied wrongdoing and plans to fight her dismissal in the courts.

It's not clear whether Trump has the power to fire Cook. But he's trying it anyway — aiming high and seeing if he can get what he wants.



☰  **CNN** Politics                                    Subscribe  **Sign in**



Lisa Cook testifies during a Senate Banking nominations hearing on June 21, 2023, in Washington, DC. *(Drew Angerer/Getty Images/File)*

"Under the law the president clearly does have the legal authority to fire a member of the Federal Reserve for cause. I think what is a closer question though is whether, the president has at this point what amounts to cause," Tom Dupree, a former deputy assistant attorney general told CNN.

Trump rarely hides his motives. He said Tuesday that if he could dispense with Cook, he was more likely to get a favorable decision on one of his obsessions — **big interest rate cuts**.

"We'll have a majority very shortly, so that'll be great," Trump said. "Once we have a majority, housing is going to swing and it's going to be great. People are paying too high an interest rate."



CNN One Thing
Why Trump's Attempt to Reshape the Fed Could B...

SHARE   SUBSCRIBE   DESCRIPTION

Trump shrugged his shoulders on Tuesday when asked by a reporter about the possibility that Cook could prevail in court. "You always have legal fights. Look, I had a legal fight that went on for years with crooked people, with very horrible people," the president said.

Even if Cook's fate remains in limbo because of the court fight, the president can achieve some of his goals. By attacking one Fed board member, he's imposing indirect pressure on his premier target, **Federal Reserve Chair Jerome Powell**. And he can make life unpleasant for Cook, whom he regards as an adversary who has crossed him.

## How Trump exploits legal delays to chase political goals

Trump is no stranger to using the time it takes for cases to work through the courts to advance his political goals.

For example, by the time dismissed bureaucrats working for USAID were able to **legally challenge him**, Trump had eviscerated their agency.

And as he fought four criminal indictments as a presidential candidate, he filed countless and often frivolous procedural motions to slow court action and run out the accountability clock over his attempt to steal the 2020 election.

Now that he's back in power, his administration is using the legal system to settle scores.

Several of Trump's political enemies have found themselves under investigation over mortgage filings, including **California Sen. Adam Schiff** and **New York Attorney General Letitia James**, who won a civil fraud judgment against Trump, his adult sons and the Trump organization. Neither has been charged, and both deny wrongdoing.



FBI members walk outside the home of the former White House national security adviser John Bolton in Bethesda, Maryland on August 22. *(Tasos Katopodis/Reuters)*

Last week, FBI agents arrived at the home of **John Bolton**, a first-term Trump national security adviser who frequently criticizes the president on television. A search warrant would have been approved by a judge on the grounds that there was probable cause that a crime had been committed.

But it did seem rather a coincidence that yet another Trump adversary was under investigation.

"What the president is trying to do here is very systemic and systematic," Schiff told NBC's "Meet the Press" regarding the search of Bolton's home. "Anyone who stands up to the president, anyone who criticizes the president, anyone who says anything adverse to the president's interests, gets the full weight of the federal government brought down on them."

But who is to stop Trump?

The courts have curtailed some of his policies, although the increasing ranks of judges appointed by the president — and a conservative Supreme Court majority that sometimes **rules in his favor** — are helping his bid to expand presidential power. And the high court fueled Trump's vision of impunity by ruling in a case related to one of his criminal indictments that **presidents have substantial immunity** for official acts.

Congress ought to be another brake. But Republican majorities in the House and Senate are supine to Trump, willingly ceding power to the executive. And the ultimate constitutional curb on his behavior — impeachment — was carried out twice by Democratic House majorities but was thwarted when Republicans in the Senate refused to convict him of high crimes and misdemeanors.

And forget anyone in Trump's handpicked second-term team of uber-loyalists imposing restraint. In a more-than-three-hour Cabinet meeting Tuesday, his subordinates took turns to layer extravagant praise on the president.

Trump's sense of his own omnipotence, impunity, vengeance and ambition grows by the day.

"Any person who defies him is viewed not as an intellectual adversary but as a vicious opponent," Ty Cobb, who served for a time as a White House lawyer in Trump's first term, told CNN's Erin Burnett. "Anything that he can do to wreak vengeance, obviously, makes him very happy, just like expanding his power, makes him very happy."

Cobb added, "I think this is something that Americans need to look at seriously because this cannot be what people in the country voted for in terms of honor, virtue and the rule of law."

But nothing will stop Trump aiming very high — and pushing and pushing and pushing.

---

## Up next


Trump readies crushing autumn power plays as Democrats search for direction
7 MIN READ


Trump's new 'dictator' comment betrays his trick for expanding his power
4 MIN READ


This one word captures the most important division among Democrats
11 MIN READ


Tracking Trump's retaliation
16 MIN READ

## Most read

1   A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was shot in a road rage incident

2   11-year-old fatally shot after 'ding dong ditching' in Houston, police say

**3**    Trump raises fresh questions about Covid-19 vaccines that he says have 'ripped apart' CDC

---

Search CNN...

Subscribe

**Sign in**

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

Labor Day Sales

About CNN

Politics

**FOLLOW CNN POLITICS**



Terms of Use    Privacy Policy    Do Not Sell Or Share My Personal Information    Ad Choices    Accessibility & CC    About

Subscribe    Newsletters    Transcripts    Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 14





**AUGUST 2025**

# The Effects of Recent Federal Immigration Enforcement on California's Private Sector Employment

## SUMMARY

The UC Merced Community and Labor Center analyzed Current Population Survey data for the periods before and following escalations in federal immigration enforcement actions in California. The center examined changes in the number of workers in California and the rest of the US, for the weeks of May 11, June 8 and July 6, 2025, and found that persons reporting private sector work in California decreased by 4.9%—with citizens forming a greater share of the decrease. The state's downturn in work is comparable with the Great Recession and the COVID-19 pandemic, and has profound implications for policymaking.

## KEY FINDINGS

Findings indicate federal immigration enforcement actions have had a disruptive effect on California's economy. Fewer Californians reported private sector work during the week of escalated enforcement actions on June 8 than on the preceding reference week of May 11, 2025—and even fewer reported work the week of July 6. The May-July decline was greater for citizens (414,832) than noncitizens (327,659), though rates of decline were highest among noncitizens. In contrast, in the rest of the US, the number of citizen workers slightly increased while non-citizen workers remained almost the same.

## BACKGROUND

The second Trump presidential administration has been marked by escalated immigration enforcement actions, with profound implications for civil rights and the American economy. In September 2024, while on the campaign trail, Trump claimed that if elected "We're going to have the largest deportation [initiative] in the history of our country" (Alvarez 2024). On January 7, 2025—one day after Trump's election was certified by the US Congress—the US Customs and Border Patrol initiated "Operation Return to Sender," arresting seventy-eight people at worksite raids in Kern County, of which only one had a criminal record (Olmos and Fry 2025).

Operation Return to Sender drew a complaint from the ACLU (with the United Farm Workers of America as a plaintiff) requesting a court order to prevent unconstitutional targeting of farmworkers and day laborers on the basis of race (ACLU Southern California 2025a). Nonetheless, by April 30, President Trump was on track to deport half a million persons in 2025—merely half of the Trump administration's stated goal, and substantially fewer than the 685,000 that President Biden had deported in the final year of his presidency (Chishti and Bush-Joseph 2025).

In response to pressure to increase immigrant deportations, on June 6, 2025, the federal administration escalated enforcement by ordering US Immigration and Customs Enforcement (ICE) officers to carry out indiscriminate workplace raids and arrests in Los Angeles (Hesson and Cooke 2025). The raids were immediately met by largely peaceful protests, though subsequently on June 7 President Trump ordered the deployment of 2,000 National Guard troops to quell the protests (Hernandez and Futterman 2025). As a result of the enforcement actions, many noncitizens avoided work, school, and other public spaces, leading to declines in consumption, business, work and employment (Wick 2025). By July 11, a federal judge granted a temporary restraining order (TRO) against the federal government's use of racial profiling or "roving patrols" to target immigrants (Fry and Olmos 2025). Yet, after agents used a rental truck for an immigration raid in Los Angeles, questions remain about compliance with the order (Solis et al. 2025).

This brief offers an examination of the effects of ongoing immigration enforcement actions on the economy, in June and July 2025 in California—the state with the nation's largest immigrant population and one which has been the site of major public displays of immigration enforcement. Because the federal administration's efforts to enact the nation's largest-ever deportation campaign has been met with questions about its impact on the economy, we examine the impact that recent enforcement efforts appear to have had in California. We ask, "Since escalated federal enforcement actions began on June 6, 2025, how has employment changed among citizen and noncitizen workers in California and the rest of the US?"

## DATA AND METHODS

This brief utilizes the US Census Bureau-Current Population Survey (CPS) Basic Monthly survey. The CPS Basic Monthly is a representative survey with responses from roughly 40,000 American households, of which roughly one of thirteen are from California (United States Census Bureau 2024). The American Community Survey is the largest survey on American social and economic life but is not available until more than a year after data is gathered, while the CPS Basic Monthly is the largest dataset that provides insight into the rapidly changing dynamics of work and employment among Californians, both US citizens and noncitizens.

We utilized the CPS Basic Monthly for May, June and July 2025. The CPS Basic Monthly is collected the week of the month on which the 19th falls and asks about the week of the 12th. In May 2025, the reference week was the week of May 11; in June, it was the week of June 8 (when escalated, immigration enforcement actions had just begun in Los Angeles), and in July it was the week starting July 6 (just before the announcement of the TRO on July 11).

Our analysis included those currently employed (PREMPNOT=1), who reported working one or more hours at one or more jobs (PEHRACTT>0). Since citizenship is generally a requirement for public sector employment, we expect the economic impact of immigration enforcement on noncitizen employment to be greatest in the private sector. In turn, our analysis of "workers" focused on private sector employment—including employment in the private, for-profit sector (PEIO1COW=4) and the private, non-profit sector (PEIO1COW=5)

SA-343

**Table 1. Number of private sector workers, California and rest of the US**

| | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|
| California | 15,220,150 | 14,755,180 | 14,477,658 | -742,492 | -4.9% |
| Rest of the US | 116,356,877 | 116,919,828 | 117,032,005 | 675,128 | 0.6% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Table 2. Mean hours worked, California and rest of the US**

| | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|
| California | 37.6 | 37.5 | 37.9 | 0.3 | 0.7% |
| Rest of the US | 38.2 | 38.1 | 38.0 | -0.3 | -0.7% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Table 3. Number of private sector workers, by citizenship, California and rest of the US**

| | | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|---|
| California | Noncitizen | 2,668,903 | 2,475,475 | 2,341,244 | -327,659 | -12.3% |
| | Citizen | 12,551,246 | 12,279,705 | 12,136,414 | -414,832 | -3.3% |
| Rest of the US | Noncitizen | 11,409,035 | 11,414,396 | 11,383,642 | -25,393 | -0.2% |
| | Citizen | 104,947,842 | 105,505,433 | 105,648,363 | 700,522 | 0.7% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

**Table 4. Number of private sector workers, by citizenship and sex, California and rest of the US**

| | | | May | June | July | May-July Change | % Change |
|---|---|---|---|---|---|---|---|
| California | Noncitizen | Male | 1,720,419 | 1,608,809 | 1,494,235 | -226,184 | -13.1% |
| | | Female | 948,485 | 866,666 | 847,009 | -101,476 | -10.7% |
| | Citizen | Male | 6,853,068 | 6,726,568 | 6,593,193 | -259,875 | -3.8% |
| | | Female | 5,698,178 | 5,553,137 | 5,543,221 | -154,957 | -2.7% |
| Rest of the US | Noncitizen | Male | 6,995,017 | 7,004,121 | 7,114,831 | 119,814 | 1.7% |
| | | Female | 4,414,018 | 4,410,275 | 4,268,811 | -145,207 | -3.3% |
| | Citizen | Male | 55,988,063 | 56,528,751 | 56,520,355 | 532,292 | 1.0% |
| | | Female | 48,959,778 | 48,976,682 | 49,128,008 | 168,230 | 0.3% |

Source: UC Merced Community and Labor Center analysis of US Census Bureau
Current Population Survey Basic Monthly data, May-July 2025

—as well as self-employed workers, not incorporated (PEIO1COW=7), such as those not formally registering a business as a separate legal entity from their own labor. We analyzed these trends among workers in California (GESTFIPS=6), for citizens and noncitizens (PRCITSHP=5), and by sex (PESEX). We weighted data with the CPS' final weight (PWSSWGT/10,000).

## FINDINGS

*California's Declining Workers.* The US (outside of California) had an estimated 116,356,877 private sector workers the week of May 11, 2025, which slightly increased by 675,128 (or 0.6%) to 117,032,005 by the week of July 6 (see Table 1). In contrast, the number Californians reporting work declined over the same period. The week of May 11, California had 15,220,150 workers, but that figure declined by 464,970 (or -3.1%) the week of June 8 and by 742,492 (or -4.9%) by the week of July 6 (see Table 1).

*Californians' Hours Worked.* The average number of hours worked in the private sector remained nearly identical during the same period, however. In California, workers averaged 37.6 hours of work per week in May and 37.9 hours per week in July, an increase of 0.7% (see Table 2). In the rest of the US, workers averaged 38.2 hours of work per week in May and 38.0 hours per week in July, a decline of -0.7% (see Table 2).

*California's Declining Citizen and Noncitizen Workers.* California's decline in the number of private sector workers was greatest among noncitizens, although the number of citizens declined as well. California had an estimated 2,668,903 noncitizen workers in May, but only 2,341,244 by July, a decline of 327,659 workers (or -12.3%) (see Table 3).

Californian citizens reporting work declined from an estimated 12,551,246 to 12,136,414, a loss of 414,832 (or -3.3%), over the same period (see Table 3). As a whole, the estimated number of workers in the rest of the US outside of California changed very little; US noncitizen workers decreased by 25,393 (or 0.2%), while the number of US citizen workers changed from 104,947,842 to 105,648,363, an increase of 700,522 persons working (or 0.7%) (see Table 3).

*California's Declining Male and Female Workers.* California also saw declines in the number of male and female workers reporting private sector work, though the decline was slightly more pronounced among males. Between May and July 2025, California had more than one in eight fewer noncitizen males reporting work; noncitizen males working declined from 1,720,419 in May to 1,494,235 in July—a loss of 226,184, or -13.1% (see Table 4). Over the same period, the state had over one in ten fewer noncitizen females working, a decline from 948,485 to 847,009—a loss of -101,476, or -10.7% (see Table 4). In contrast, in the rest of the US, noncitizen male workers (1.7%) and male citizen workers (1.0%) experienced increases. Citizen female workers (0.3%) remained virtually consistent from the prior period, while noncitizen female workers (-3.3%) saw declines (see Table 4).

*California's Declining Latino, White, Black and Asian Workers.* Private sector work in California significantly decreased among the four major racial/ethnic groups. Between May and July 2025, the number of Californian Latinos reporting work decreased from 6,511,032 to 5,991,211, a change of -519,821, or -8.0% (see Figure 4). The number of whites in California reporting work decreased from 4,912,455 in May, to

4

**Figure 1. Change in number of private sector workers, California and rest of the US**



Source: UC Merced Community and Labor Center analysis of US Census Bureau Current Population Survey Basic Monthly data, May-July 2025

**Figure 2. Change in number of private sector workers, by citizenship, California and rest of the US**

Source: UC Merced Community and Labor Center analysis of US Census Bureau Current Population Survey Basic Monthly data, May-July 2025

5

**Figure 3. Change in number of private sector workers, by citizenship and sex, California and rest of the US**



Source: UC Merced Community and Labor Center analysis of US Census Bureau Current Population Survey Basic Monthly data, May-July 2025

**Figure 4. Change in number of private sector workers, by race, California only**



Source: UC Merced Community and Labor Center analysis of US Census Bureau Current Population Survey Basic Monthly data, May-July 2025

SA-347

4,745,657 in July, a change of -166,798, or -3.4% (See Figure 4). Californian Asian workers decreased from 2,809,986 in May, to 2,664,565 in July, a change of -145,421, or -5.2% (See Figure 4). Californian Black workers also decreased from 675,256 in May to 637,736 in July, a change of -37,520, or -5.6% (see Figure 4).

## CONCLUSION

Our analysis of CPS data suggests that following the escalated immigration enforcement of the week of June 8, private sector work among Californians as a whole initially decreased by 3.1%, and then further declined to 4.9% (compared with the week of May 11) by the week of July 6. While citizens accounted for the greatest decline in private sector work, noncitizens had a higher rate of decline. In contrast, in the rest of the US, the number of citizen workers increased slightly. In sum, the federal administration's escalating immigration enforcement actions seem to have profoundly negative consequences for California's economy.

Taking into account the seasonality of hiring, only two historical cases can compare with the loss of work that has just occurred in California from May to July 2025: the Great Recession and the COVID-19 pandemic. Since 1983, when the CPS began to collect data on private sector and self-employed, not incorporated workers, only during the COVID-19 pandemic did the US experience a greater month-to-month decline in private sector work (a decline of 3.4% from February

to March 2020, and a decline of 19.7% from March to April 2020).[1]

The second comparable historical case is that of the Great Recession, when the state's decline in private sector work was 2.9% in the first year of the downturn (December 2007 to December 2008), while the US' decline was 3.2% in the first year.

To put this in context, the recent escalation in immigration enforcement had a more immediate impact on California's economy than the Great Recession did for the US. The recent decline of 4.9% of fewer persons reporting private sector work occurred in *two months* compared to the US' 3.2% decline in private sector work during the Great Recession's first *year*.

We have reason to suspect that immigration enforcement will further escalate in California and the rest of the US. First, California only experienced 8,460 ICE arrests from the beginning of Trump's second inauguration to June 26 (Jarvie and LeMee 2025). From the beginning of escalated federal actions in Los Angeles on June 6 to June 22, however, the US Department of Homeland Security reported 2,792 detentions of immigrants in Los Angeles alone (Wilner and Uranga 2025).

Some recent developments suggest that we might expect a reduction in the types of federal immigration enforcement actions associated with declines in Californians reporting private sector work. For example, a recent court order has prohibited ICE from

---

[1] Analysis (not shown) finds that in January 1996 the US had private sector decline in work of 3.6%, and in January 1991 it was 3.3%. These were the only other months with figures above 3%. However, they are statistically not different from the figures in this

report given the typical margin of error of US (.1%) and California (.6%) CPS estimates in this range. In addition, the January 1991 and 1996 figures are not seasonally-adjusted. The month of January typically sheds the most jobs in any given year.

SA-348

the tactics of racial profiling and denying access to counsel in immigration raids that were seen in Los Angeles the week of June 8 (ACLU Southern California 2025b). Nonetheless, Congress recently allocated an unprecedented $160 billion for immigration enforcement and deportation (PBS News Hour 2025). Meanwhile, neither federal legislators nor the Supreme Court have challenged the presidential administration's efforts to advance mass, indiscriminate immigration enforcement actions. As a result, efforts to protect or enhance immigrant workers' rights may require policy innovation on behalf of states, municipalities and employers.

Given that the Great Recession and COVID-19 pandemic are the most comparable examples of massive loss of work, state policymakers should consider how the current moment may require significant action on behalf of the state. In the cases of the Great Recession and the COVID-19 pandemic, lawmakers invested massive amounts of public resources for one-time stimulus or disaster relief spending. Similarly, policymakers might examine how to simultaneously protect those workers who must shelter in place during heightened immigration enforcement while infusing massive amounts of cash into the economy.

Los Angeles Mayor Karen Bass has recently announced a privately-funded plan to support undocumented immigrants affected by federal actions; similarly, state lawmakers might consider extending access (on a much wider scale) to the economic safety net to those affected by the recent federal actions. The state might, for example, create a state-funded unemployment benefit system for undocumented workers.

The recent workplace raids in California reveal how the state currently lacks an adequate economic safety net system for undocumented immigrant workers, and the downstream effects of escalated immigration enforcement on citizens' employment. Given the historic magnitude of the effects of recent federal actions on California's private sector employment, state lawmakers should begin planning and developing a major economic stimulus and disaster package—for all workers.

# REFERENCES

ACLU Southern California. 2025a. "United Farm Workers and Bakersfield Residents Sue Border Patrol for Unlawful Practices." Press Release. February 26, 2025. Accessed on July 13, 2025 from: https://www.aclusocal.org/en/press-releases/united-farm-workers-and-bakersfield-residents-sue-border-patrol-unlawful-practices

ACLU Southern California. 2025b. "Court Prohibits Federal Government from Racial Profiling, Denying Access to Counsel in Immigration Raids." Press Release. July 11, 2025. Accessed on July 13, 2025 from: https://www.aclusocal.org/en/press-releases/breaking-court-prohibits-federal-government-racial-profiling-denying-access-counsel

Alvarez, Alayna. 2024. "Trump pledges "largest deportation" in U.S. history, starting in Ohio and Colorado." Axios. September 13, 2024. Accessed on July 13, 2025 from: https://www.axios.com/2024/09/13/trump-deportation-immigrants-springfield-ohio-aurora-colorado

Chishti, Muzaffar and Kathleen Bush-Joseph. 2025. "In First 100 Days, Trump 2.0 Has Dramatically Reshaped the U.S. Immigration System, but Is Not Meeting Mass Deportation Aims." Policy Beat. Migration Policy Institute. Accessed on July 13, 2025 from: https://www.migrationpolicy.org/article/trump-2-immigration-first-100-days?eType=EmailBlastContent&eId=51cf34f0-7709-4662-a56e-c02c07c00fc0

Fry, Wendy and Sergio Olmos. 2025. "Trump administration asks Supreme Court to lift temporary ban on roving immigration stops in L.A." CalMatters. August 7, 2025. Accessed on August 11, 2025 from: https://calmatters.org/justice/2025/08/trump-appeals-ban-on-la-immigration-raids/

Goldberg, Noah. 2025. "L.A. will provide cash assistance to immigrants affected by raids." Los Angeles Times July 11, 2025. Accessed on July 13, 2025 from: https://www.latimes.com/california/story/2025-07-11/l-a-will-provide-cash-assistance-to-immigrants

Hernandez, Joe and Steve Futterman. 2025. "Protesters clash with law enforcement in Los Angeles as Trump sends National Guard." National Public Radio. June 8, 2025. Accessed on July 13, 2025 from: https://www.npr.org/2025/06/08/nx-s1-5426679/national-guard-california-immigration-protests

Hesson, Ted and Kristina Cooke. 2025. "ICE's tactics draw criticism as it triples daily arrest targets." Reuters June 10, 2025. Accessed on July 13, 2025 from: calmatters.org/economy/2025/04/b

Jarvie, Jenny and Gabrielle LaMarr LeMee. 2025. "Texas, Florida hit with far more ICE arrests than California. But that's not the whole story." Los Angeles Times August 10, 2025. Accessed on August 11, 2025 from: https://www.latimes.com/california/story/2025-08-10/california-was-center-stage-in-ice-raids-but-texas-and-florida-each-saw-more-immigration-arrests

Olmos, Sergio and Wendy Fry. 2025. "Border Patrol said it targeted known criminals in Kern County. But it had no record on 77 of 78 arrestees." CalMatters. June 27, 2025. Accessed on July 13, 2025 from: https://calmatters.org/economy/2025/04/border-patrol-records-kern-county/

PBS News Hour. 2025. "GOP gives ICE massive budget increase to expand Trump's deportation effort." July 8, 2025. Accessed on July 13, 2025 from: https://www.pbs.org/newshour/show/gop-gives-ice-massive-budget-increase-to-expand-trumps-deportation-effort

Solis, Nathan, Rachel Uranga, Brittny Mejia and David Zahniser. 2025. "Federal agents use Penske rental truck as 'Trojan Horse' to raid Los Angeles Home Depot." Los Angeles Times August 6, 2025. Accessed on August 11, 2025 from: https://www.latimes.com/california/story/2025-08-06/more-raids-home-depot-in-macarthur-park-raided

United States Census Bureau. 2024. "Methodology." June 4, 2024. Accessed on July 13, 2025 from: https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html

Wick, Julia. 2025. "'It reminded me of COVID': Mayor Bass decries economic effect of immigration raids on L.A." Los Angeles Times June 16, 2025. Accessed on July 13, 2025 from: https://www.latimes.com/california/story/2025-06-16/mayor-bass-decries-economic-impact-of-immigration-raids-on-l-a

Wilner, Michael and Rachel Uranga. 2025. "Federal arrests in L.A. approach 2,800 since raids began, DHS says." Los Angeles Times July 8, 2025. Accessed on July 13, 2025 from: https://www.latimes.com/politics/story/2025-07-08/federal-arrests-in-la-are-accelerating-homeland-security

**Research brief prepared by** Edward Orozco Flores, Quy Lam, Keila Luna and Todd Sorensen.

**Acknowledgements to** Ana Padilla for her comments on an earlier draft.

**MISSION STATEMENT**

The UC Merced Community and Labor Center conducts research and education on issues of community, labor and the environment, in the San Joaquin Valley and beyond.

# EXHIBIT 15

# Trump suggests using military against 'enemy from within' on Election Day

☰  **CNN** Politics                                    Subscribe  **Sign in**

🕐 3 min read · Updated 3:17 PM EDT, Mon October 14, 2024

**Trump suggests military action against 'enemy from within' during Fox News interview**

02:27

**(CNN)** — Former President Donald Trump suggested using the military to handle what he called "the enemy from within" on Election Day, saying that he isn't worried about chaos from his supporters or foreign actors, but instead from "radical left lunatics."

"I think the bigger problem are the people from within. We have some very bad people. We have some sick people. Radical left lunatics," Trump said told Fox News' Maria Bartiromo in an interview on "Sunday Morning Futures."

"I think it should be very easily handled by, if necessary, by National Guard, or if really necessary, by the military, because they can't let that happen," he added.

The former president, whose supporters stormed the US Capitol on January 6, 2021, in an attempt to thwart Congress' certification of his 2020 election loss, downplayed any threat from his voters.

"No, I don't think — not from the side that votes for Trump," the former president said when Bartiromo asked whether he was expecting chaos on Election Day. When she alluded to the Justice Department arresting and charging an Afghan national for allegedly plotting a terrorist attack in the US on Election Day and cited the threat of "outside agitators" and undocumented immigrants, Trump pivoted to talking about political opponents on the left.

"I think the bigger problem is the enemy from within, not even the people that have come in and destroying our country, by the way, totally destroying our country, the towns, the villages, they're being inundated," he said, referring to immigrants whom Trump has repeatedly attacked with dehumanizing rhetoric.

Vice President Kamala Harris' campaign seized on Trump's comments, arguing that they should "alarm every American."

"Trump is suggesting that his fellow Americans are worse 'enemies' than foreign adversaries, and he is saying he would use the military against them," Ian Sams, a senior spokesperson and adviser for the campaign, said in a statement Sunday. "Taken with his vow to be a dictator on 'day one,' calls for the 'termination' of the Constitution, and plans to surround himself with sycophants who will give him unchecked, unprecedented power if he returns to office, this should alarm every American who cares about their freedom and security."

The former president has in the years since the January 6 insurrection denied any wrongdoing and looked to cast blame for the riot on others, including Democrats, in a barrage of false claims even as he faces federal and state charges for interfering in the 2020 election in Washington, DC, and Georgia, respectively. He has pleaded not guilty in those cases.

Trump has also been laying groundwork to question the integrity of the 2024 election. He's threatened, if he wins the White House again, prosecution and "long-term prison sentences" for election officials and political operatives, who he suggested could cheat. And he has routinely suggested he would weaponize the justice system to go after his political opponents if voters return him to the White House.

*CNN's Jack Forrest, Sam Fossum, Marshall Cohen, Daniel Dale and Kate Sullivan contributed to this report.*

## Up next

The thing Trump's generals feared about him could now be arriving 

5 minute read



## Tracking Trump's retaliation

16 minute read



## This one word captures the most important division among Democrats

11 minute read



## Trump readies crushing autumn power plays as Democrats search for direction

7 minute read



# Most read

**1**   A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was shot in a road rage incident

**2**   11-year-old fatally shot after 'ding dong ditching' in Houston, police say

**3**   Trump raises fresh questions about Covid-19 vaccines that he says have 'ripped apart' CDC

## ▌MORE FROM CNN



A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was ...



11-year-old fatally shot after 'ding dong ditching' in Houston, police say



Trump raises fresh questions about Covid-19 vaccines that he says have

that he says have
'ripped apart' CDC

## ▌ NEWS & BUZZ

 A grieving family cares for a tiny baby girl, delivered after her 17-year-old mother was ...

 11-year-old fatally shot after 'ding dong ditching' in Houston, police say

 Trump raises fresh questions about Covid-19 vaccines that he says have 'ripped apart' CDC

---

Search CNN...

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

Labor Day Sales

About CNN

Politics

FOLLOW CNN POLITICS

   

Terms of Use    Privacy Policy    Do Not Sell Or Share My Personal Information    Ad Choices    Accessibility & CC    About

Subscribe    Newsletters    Transcripts    Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 16



INDEPENDENT

NEWS    SPORTS    VOICES    CULTURE    LIFESTYLE    TRAVEL    CLIMATE    PREMIUM

News > World > Americas > US politics

# Trump says he plans to sue California over redistricting - but Texas is apparently OK

The president intends to challenge California's redistricting plan which state officials created in response to the Texas map-grab that Trump encouraged

Josh Marcus in San Francisco • Monday 25 August 2025 21:30 BST • 2 Comments

Trump claims people are saying maybe the US would like a dictator



## Your support helps us to tell the story

**Read more** ⌄

**SUPPORT NOW**

**Read more** ⌄

President Donald Trump has threatened to sue the state of California over the redistricting plan it adopted last week, which Democratic lawmakers there said was a response to a similar plan in Texas, that the president called on his Republican allies to initiate.

"Well think I'm going to be filing a lawsuit pretty soon," Trump told reporters in the Oval Office on Monday. "And I think we're going to be very successful in it."

The president added the suit would come from the Department of Justice.

"BRING IT," California Governor Gavin Newsom, a frequent legal and political adversary of the president, wrote on X following the announcement.

A White House official declined to answer further questions about the nature of the lawsuit and directed inquiries to the Department of Justice.



🔘 2

The president encouraged Texas to redraw congressional maps because he was 'entitled' to more seats but plans to sue California over legislation it passed in response to Texas' plan *(AP)*

---

**RECOMMENDED**

> Trump says he and Secretary Hegseth want to take 'Department of Defense' back 80 years

> 'Fire with fire': The doomsday political scenarios after Texas and California launch their warheads over redistricting

> Gavin Newsom signs bill to redraw California districts in response to Texas effort to add five GOP seats

---

*The Independent* has contacted the Department of Justice for comment.

It is unclear under what basis the Trump administration plans to use to challenge the California map plan.

The California legislation asks voters to approve a new series of congressional maps in a November special election that could add as many as five Democratic seats to Congress.

Newsom described the bill as a way to counteract an effort to carve as many as five new GOP congressional seats in Texas which also passed last week.

"We're neutralizing what occurred and we're giving the American people a fair chance," Newsom said on Thursday. "Because when all things are equal and we're all playing by the same set of rules, there's no question the Republican party will be the minority party in the House of Representatives."



California is calling on voters to approve new congressional maps in November special election, a response to a Texas redistricting plan that could add five

The Texas plan, which does not require voter approval, came after Trump encouraged Republicans in the Lone Star state this summer to find him more seats, arguing he was "entitled" to them after his success in the 2024 election.

"Texas will be the biggest one," Trump said at the time. "And that'll be five."

Texas's effort has set off a national redistricting war, bucking the usual trend of drawing new maps once per decade after the Census.

**RECOMMENDED**

**Stephen King shares theory about how Donald Trump will be remembered in history**

**Trump responds to speculation about his health**

**My Men's Handbag Boutique is Closing - Clearance Sale is Live**
Sponsored | James Andrews

**California: Gov Will Cover Your Cost To Install Solar If You Live In These Zip Codes**
Sponsored | SunValue

Powered by Taboola

At least half a dozen states are threatening to redraw their maps, in an effort to wrest control of the House of Representatives, where Republicans hold a seven seat advantage, while four seats remain vacant.

Republicans ultimately have the potential to add more seats than Democrats, given it controls more state legislatures.

**More about:**   Donald Trump   California   Texas   Gavin Newsom   House of Representatives   Trump

**Join our commenting forum**

Join thought-provoking conversations, follow other Independent readers and see their replies

2 Comments ↓

Promoted stories                                          U.S. Privacy

## Wall Street Passed—Now This Crypto Bet Has Political Muscle Behind It

This isn't a single-thread gamble. The plan is built on two profit engines.

Sponsored | BULLSEYEALERTS                                          Read More

## Cesar Millan Reveals What Honey Does to Your Aging Dog

Is honey safe for senior dogs? Find out what pet experts think.

Sponsored | EXPERTS IN PET HEALTH                                          Learn More

## San Francisco: Gov Will Give You Back Up To $30,000 Credit If You Install Solar In These Zips

If you pay more than $99/month for power and own a home, you better read this.

Sponsored | ENERGY BILL CRUNCHER                                          Click Here

## Heart Surgeon Begs Americans: Stop Drinking This Plant Based Milk

Think plant milk is safe? This doctor's discovery will change your mind.

Sponsored | WELL BEING FOR ALL                                          Learn More

## Top Urologist: Most Muscle Loss in Older Men Starts With This One Mistake

Sponsored | PRIMENUTRITIONSECRETS



## Think Neuropathy Is From Vitamin B Deficiency? Think Again

When The Burning, Tingling & Numbness Won't Stop

Sponsored | HEALTH INSIGHT JOURNAL

## New HELOC Program Lets You Keep Your Same Mortgage Rate While Getting Cash Fast

Borrow without affecting your current mortgage interest rate.

Sponsored | LENDGO                                          Click Here

## Costco Shoppers Say This Fat-Burning Patch Triggers Weight Loss "Unlike Any Other"

Shocking results without diets or lifestyle changes

Sponsored | HEALTH ADVICE TODAY

**US POLITICS**

Donald Trump set to make key change to future US elections

Newsom's trolling of Trump continues with post taking aim at president's health

## Simple Nail Fungus Treatment Shocks Experts from California - It's a Shoe!

Millions are affected – but hardly anyone knows the solution. Learn more now and act quickly.

Sponsored | BAREFOOT VITALITY

Learn More

## I went from Ozempic to Mounjaro with this unexpected side effect

The first time around, 59-year-old James Brown lost a stone and a half when he took medication that aids weight loss. This time, he tried what has been declared the 'king kong' of diet jabs and the results have been startlingly different...

Sponsored | PROMOTED BY INDEPENDENT PREMIUM

## Fed Just Quietly Took Control of Your Money

Sponsored | PRIORITY GOLD

**Read More**

## Maximize travel rewards and make every trip feel VIP

Make traveling feel more affordable and rewarding. See how a travel card could help you earn miles, enjoy perks and make every trip memorable.

Sponsored | INTUIT CREDIT KARMA

**Learn More**

**US POLITICS**

Cause of death revealed for US attorney who stepped down the day Trump was sworn in

Trump says he's awarding Rudy Giuliani the Presidential Medal of Freedom

## Warren Buffett, Elon Musk and other moguls all use the 5-hour rule. Here's what I learned from...

Thousands swear by the learning routing of the 5-Hour Rule. I gave it a go to see what all the fuss is about.

Sponsored | BLINKIST MAGAZINE

**NEWS**

Woody Allen praises Donald Trump's acting skills and would like to direct him again



**GET IN TOUCH**

Contact us

 

**OUR PRODUCTS**

Register

Newsletters

Donate

Today's Edition

Install our app

Archive

**OTHER PUBLICATIONS**

International editions

Independent en Español

Independent Arabia

Independent Turkish

Independent Persian

Independent Urdu

The Standard

**LEGAL**

Code of conduct and complaints

Contributors

Cookie policy

Donations Terms & Conditions

Privacy policy

Do Not Sell or Share My Information

User policies

Modern Slavery Statement

**EXTRAS**

Puzzles

All topics

Betting offers

Latest deals

Competitions and offers

Independent Advertising

Independent Ignite

Syndication

Working at The Independent



# Trump says he plans to sue California over redistricting – but Texas is apparently OK

## The president intends to challenge California's redistricting plan which state officials created in response to the Texas map-grab that Trump encouraged

**Your support helps us to tell the story**
Support Now



From reproductive rights to climate change to Big Tech, The Independent is on the ground when the story is developing. Whether it's investigating the financials of Elon Musk's pro-Trump PAC or producing our latest documentary, 'The A Word', which shines a light on the American women fighting for reproductive rights, we know how important it is to parse out the facts from the messaging.

At such a critical moment in US history, we need reporters on the ground. Your donation allows us to keep sending journalists to speak to both sides of the story.

The Independent is trusted by Americans across the entire political spectrum. And unlike many other quality news outlets, we choose not to lock Americans out of our reporting and analysis with paywalls. We believe quality journalism should be available to everyone, paid for by those who can afford it.
**Your support makes all the difference.**

President Donald Trump has threatened to sue the state of California over the redistricting plan it adopted last week, which Democratic lawmakers there said was a response to a similar plan in Texas, that the president called on his Republican allies to initiate.

"Well think I'm going to be filing a lawsuit pretty soon," Trump told reporters in the Oval Office on Monday. "And I think we're going to be very successful in it."

The president added the suit would come from the Department of Justice.

"BRING IT," California Governor Gavin Newsom, a frequent legal and political adversary of the president, wrote on X following the announcement.

A White House official declined to answer further questions about the nature of the lawsuit and directed inquiries to the Department of Justice.



*The president encouraged Texas to redraw congressional maps because he was 'entitled' to more seats but plans to sue California over legislation it passed in response to Texas' plan (AP)*

*The Independent* has contacted the Department of Justice for comment.

It is unclear under what basis the Trump administration plans to use to challenge the California map plan.

The California legislation asks voters to approve a new series of congressional maps in a November special election that could add as many as five Democratic seats to Congress.

Newsom described the bill as a way to counteract an effort to carve as many as five new GOP congressional seats in Texas which also passed last week.

"We're neutralizing what occurred and we're giving the American people a fair chance," Newsom said on Thursday. "Because when all things are equal and we're all playing by the same set of rules, there's no question the Republican party will be the minority party in the House of Representatives."



*California is calling on voters to approve new congressional maps in November special election, a response to a Texas redistricting plan that could add five GOP seats to Congress (Getty Images)*

The Texas plan, which does not require voter approval, came after Trump encouraged Republicans in the Lone Star state this summer to find him more seats, arguing he was "entitled" to them after his success in the 2024 election.

"Texas will be the biggest one," Trump said at the time. "And that'll be five."

Texas's effort has set off a national redistricting war, bucking the usual trend of drawing new maps once per decade after the Census.

At least half a dozen states are threatening to redraw their maps, in an effort to wrest control of the House of Representatives, where Republicans hold a seven seat advantage, while four seats remain vacant.

Republicans ultimately have the potential to add more seats than Democrats, given it controls more state legislatures.

# EXHIBIT 17

## Los Angeles Times

CALIFORNIA

# Veterans' advocates warn of low morale amid L.A. deployment: 'This is not what we signed up for'



U.S. Marines watch from inside the Federal Building in downtown Los Angeles while demonstrators participate in the Interfaith Prayer Walk for Family Unity in downtown Los Angeles this month.  (Genaro Molina/Los Angeles Times)

 

**By Hailey Branson-Potts and Phi Do**

June 24, 2025 3 AM PT

Ever since President Trump seized control of the California National Guard and deployed thousands of troops to Los Angeles, calls from distressed service members and their families have been pouring in to the GI Rights Hotline.

Some National Guard troops and their loved ones have called to say they were agonizing over the legality of the deployment, which is being litigated in federal court, according to Steve Woolford, a resource counselor for the hotline, which provides confidential counseling for service members.

Others phoned in to say the Guard should play no part in federal immigration raids and that they worried about immigrant family members who might get swept up.

"They don't want to deport their uncle or their wife or their brother-in-law," Woolford said. "Some of the language people have used is: 'I joined to defend my country, and that's really important to me — but No. 1 is family, and this is actually a threat to my family.'"

Although active-duty soldiers are largely restricted from publicly commenting on their orders, veterans' advocates who are in direct contact with troops and their families say they are deeply concerned about the morale of the roughly 4,100 National Guard members and 700 U.S. Marines deployed to Los Angeles amid protests against immigration raids.

In interviews with The Times, spokespeople for six veterans' advocacy organizations said many troops were troubled by the assignment, which they viewed as overtly political and as pitting them against fellow Americans.

Advocates also said they worry about the domestic deployment's potential effects on military retention and recruitment, which recently rebounded after several years in which various branches failed to meet recruiting goals.

"What we're hearing from our families is: 'This is not what we signed up for,' " said Brandi Jones, organizing director for the Secure Families Initiative, a nonprofit that advocates for military spouses, children and veterans. "Our families are very concerned about morale."



Horse riders make their way past U.S. Marines near the Paramount Home Depot during the Human Rights Unity Ride on Sunday.  (Carlin Stiehl/Los Angeles Times)

Janessa Goldbeck, a U.S. Marine Corps veteran and chief executive of the nonprofit Vet Voice Foundation, said that, among the former Marine Corps colleagues she has spoken to in recent weeks, "There's been a universal expression of, 'This is an unnecessary deployment given the operational situation.'"

"The fact that the LAPD and local elected officials repeatedly said deploying the National Guard and active -duty Marines would be escalatory or inflammatory and the

president of the United States chose to ignore that and deploy them anyway puts the young men and women in uniform in an unnecessarily political position," she said.

She added that the "young men and women who raised their right hand to serve their country" did "not sign up to police their own neighbors."

Trump has repeatedly said Los Angeles would be "burning to the ground" if he had not sent troops to help quell the protests.

"We saved Los Angeles by having the military go in," Trump told reporters last week. "And the second night was much better. The third night was nothing much. And the fourth night, nobody bothered even coming."

The troops in Los Angeles do not have the authority to arrest protesters and were deployed only to defend federal functions, property and personnel, according to the military's U.S. Northern Command.

Task Force 51, the military's designation of the Los Angeles forces, said in an email Saturday that "while we cannot speak for the individual experience of each service member, the general assessment of morale by leadership is positive."

The personnel's "quality of life," the statement continued, is "addressed through the continued improvement of living facilities, balanced work-rest cycles, and access to chaplains, licensed clinical social workers, and behavioral health experts."



U.S. Marines guard the Federal Building at the corner of Veteran Avenue and Wilshire Boulevard in Los Angeles. (Genaro Molina/Los Angeles Times)

It is unclear whether the National Guard troops, federalized under Title 10 of the United States Code, had been paid as of this weekend. Task Force 51 told The Times on Saturday that the soldiers who received 60-day activation orders on June 7 "will start receiving pay by end of the month" and that "those that have financial concerns have access to resources such as Army Emergency Relief," a nonprofit charitable organization.

U.S. Rep. Derek Tran (D-Orange), an Army veteran and member of the House Armed Services Committee, said he has asked Defense Secretary Pete Hegseth "for his plan to manage the logistics of this military activation, but he has failed to provide me with any clear answers."

Tran said in a statement to The Times that "the pattern of disrespect this Administration has shown our Veterans and active-duty military personnel is disgraceful, and I absolutely think it will negatively impact our ability to attract and retain the troops that keep America's military capacity the envy of the world."

Diana Crofts-Pelayo, a spokeswoman for Gov. Gavin Newsom, said in an email that the governor is "worried how this mission will impact the physical and emotional well-being of the soldiers deployed unnecessarily to Los Angeles."

On June 9, Newsom posted photos on X depicting National Guard soldiers crowded together, sleeping on concrete floors and what appeared to be a loading dock. Newsom wrote that the president sent troops "without fuel, food, water or a place to sleep."

Task Force 51 told The Times that the soldiers in the photos "were not actively on mission, so they were taking time to rest." At the time, the statement continued, "it was deemed too dangerous for them to travel to better accommodations."

Since then, according to Task Force 51, the military has contracted "for sleeping tents, latrines, showers, hand-washing stations, hot meals for breakfast, dinner and a late-night meal, and full laundry service."

"Most of the contracts have been fulfilled at this time," the military said.

Abigail Jackson, a White House spokeswoman, said in a statement to The Times that Newsom "should apologize for using out-of-context photos of National Guardsmen to try and make a political argument."

"Under President Trump's leadership military morale is sky high because our troops know they finally have a patriotic Commander-In-Chief who will always have their backs," Jackson wrote.

Troops have been posted outside federal buildings in an increasingly quiet downtown
Civic Center — a few square blocks within the 500-square-mile city.

Their interactions with the public are far different from those earlier this year, when
Newsom deployed the National Guard to L.A. County to help with wildfire recovery
efforts after the Eaton and Palisades fires.

At burn zone check points, National Guard members were often spotted chatting with
locals, some of whom brought food and water and thanked them for keeping looters
away.

But downtown, soldiers have stood stone-faced behind riot shields as furious protesters
have flipped them off, sworn at them and questioned their integrity.



Members of the California National Guard stand by as thousands participate in the "No Kings" protest demonstration in
downtown Los Angeles on June 14.  (Genaro Molina/Los Angeles Times)

During the boisterous "No Kings" protests on June 14, a woman held up a mirror to troops outside the downtown Federal Building with the words: "This is not your job. It's YOUR LEGACY." On a quiet Wednesday morning, a UCLA professor, standing solo outside the Federal Building, held up a sign to half a dozen Guard members reading: "It's Called the Constitution You F—ers."

James M. Branum, an attorney who works with the Military Law Task Force of the National Lawyers Guild, said that, in recent weeks, the task force has received two to three times more than the usual volume of referrals and direct calls. The upward trend began after Trump came into office, with people calling about the war in Gaza and increased military deployment to the U.S. southern border — but calls spiked after troops were sent to Los Angeles, he said.

"A lot of these folks joined because they want to fight who they see as the terrorists," Branum said. "They want to fight enemies of the United States … they never envisioned they would be deployed to the streets of the United States."

In his June 7 memo federalizing the National Guard, Trump called for their deployment in places where protests against federal immigration enforcement were occurring or "are likely to occur." The memo does not specify Los Angeles or California.

California officials have sued the president over the deployment, arguing in a federal complaint that the Trump administration's directives are "phrased in an ambiguous manner and suggest potential misuse of the federalized National Guard."

"Guardsmen across the country are on high alert, [thinking] that they could be pulled into this," said Goldbeck, with the Vet Voice Foundation.

Jones, with the Secure Families Initiative, said military families "are very nervous in this moment."

"They are so unprepared for what's happening, and they're very afraid to speak publicly," she said.

Jones said she had been communicating with the wife of one National Guard member who said she had recently suffered a stroke. The woman said her husband had been on Family and Medical Leave Act leave from his civilian job to care for her. The woman said his leave was not recognized by the military for the domestic assignment. He was deployed to Los Angeles, and she has been struggling to find a caregiver, Jones said.

Jones said her own husband, an active-duty Marine, deployed to Iraq in 2004 with the 2nd Battalion, 7th Marine Regiment based at Twentynine Palms — the same infantry unit now mustered in Los Angeles.

The unit was hard hit in Afghanistan in 2008, with at least 20 Marines killed and its high rate of suicide after that year's deployment highly publicized.

Jones said she was stunned to learn the battalion — nicknamed the War Dogs — was being deployed to Los Angeles.

"I said, 'Wait, it's 2/7 they're sending in? The War Dogs? Releasing them on Los Angeles?' It was nuts for me," Jones said. "To hear that unit affiliated with this — for my family that's been serving for two decades, it brings up a lot."

The Los Angeles deployment comes at a time of year when the California National Guard is often engaged in wildfire suppression operations — a coincidence that has raised concerns among some officials.

On June 18, Capt. Rasheedah Bilal was activated by the California National Guard and assigned to Sacramento, where she is backfilling in an operational role for Joint Task Force Rattlesnake, a National Guard firefighting unit that is now understaffed because roughly half its members are deployed to Los Angeles.

"That's a large amount to pull off that mission ... so you have to activate additional Guardsmen to cover on those missions," said Bilal, speaking in her capacity as executive director of the nonprofit National Guard Assn. of California.

National Guard members are primarily part-time soldiers, who hold civilian jobs or attend college until called into active duty. In California — a state prone to wildfires, earthquakes and floods — they get called into duty a lot, she said.

Many of the National Guard soldiers in downtown Los Angeles are the same ones who just finished a 120-day activation for wildfire recovery, she said.

"You have the state response to fire and then federal activation? It becomes a strain," Bilal said.

"They haven't complained," she added. "Soldiers vote with their feet. We're mostly quiet professionals and take a lot of pride in our job. [But] you can only squeeze so much of a lemon before it is dry. You can only pound on the California Guardsmen without it affecting things like retention and recruiting."

## More to Read

### From the L.A. Olympics to Oakland, California braces for Trump National Guard deployments

Aug. 13, 2025



### More than 1,000 National Guard troops leaving L.A. Newsom says Trump's 'political theater backfired'

July 31, 2025



### National Guard came to L.A. to fight unrest. Troops ended up fighting boredom

July 17, 2025





**Hailey Branson-Potts**

Hailey Branson-Potts is a Metro reporter who joined the Los Angeles Times in 2011. She reports on a wide range of issues and people, with a special focus on communities along the coast. She grew up in the small town of Perry, Okla., and graduated from the University of Oklahoma.



**Phi Do**

Phi Do is a data journalist for the Los Angeles Times. Before joining The Times in 2018, she helped develop databases for Voice of OC and wrote for the Santa Barbara Independent and the Hollywood Reporter. She graduated from UC Santa Barbara where she created a new data journalism section at the student newspaper, the Daily Nexus. Tips can be sent to Signal: (213) 267-3953.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT 18

# *Trump's National Guard Troops Are Questioning Their Mission in L.A.*

Thousands of National Guard members have served in the L.A. region since last month. Six soldiers spoke in interviews about low morale over the deployment.

▶ Listen to this article · 11:09 min   Learn more

 **By Shawn Hubler**

July 16, 2025

When the California National Guard rolled into Los Angeles to respond to devastating wildfires in January, Southern Californians largely hailed the troops as heroes. Celebrities thanked them for their service in Pacific Palisades. Suburban homeowners competed to chat them up at traffic checkpoints in Altadena.

Seven months later, much of that good will is gone.

Protesters jeer the troops as they guard federal office buildings. Commuters curse the behemoth convoys clogging freeways. Family members grill members with questions about whether they really have to obey federal orders.

The level of public and private scorn appears to have taken a toll on the National Guard deployment to Los Angeles that President Trump announced last month, citing protests over immigration raids. Interviews with nearly two dozen people — including soldiers and officers as well as officials and civilians who have worked closely with the troops — show that many members of the Guard are questioning the mission. The deployment's initial orders to quell scattered protests have given way to legally disputed assignments backing up federal immigration agents.



"They gave Disneyland tickets to the people who worked in the wildfires," one soldier said. "Nobody's handing out Disneyland tickets now."

Six members of the Guard — including infantrymen, officers and two officials in leadership roles — spoke of low morale and deep concern that the deployment may hurt recruitment for the state-based military force for years to come. Those who were interviewed spoke on the condition of anonymity, because military orders bar Guard personnel from publicly discussing the federal deployment and they feared retribution for talking to the media.

All but one of the six expressed reservations about the deployment. Several said they had raised objections themselves or knew someone who objected, either because they did not want to be involved in immigration crackdowns or felt the Trump administration had put them on the streets for what they described as a "fake mission."

The New York Times reached out to a broad pool of soldiers seeking interviews about the deployment. While a small sample, the six soldiers' comments aligned with other signs of poor morale.

At least 105 members of the deployment sought counseling from behavioral health officers, and at least one company commander and one battalion commander who objected to the mission were reassigned to work unrelated to the mobilization, the Guard officers said. Some troops became so disgruntled that there were several reports of soldiers defecating in Humvees and showers at the Southern California base where the troops are stationed, prompting tightened bathroom security.

The California National Guard had 72 soldiers whose enlistment was set to expire during the deployment. Of those 72, at least two have now left the Guard and 55 others have indicated that they will not extend their service, according to the office of Gov. Gavin Newsom, who is fighting Mr. Trump's deployment in court. That number, if troops act on it, would amount to a 21 percent retention rate, far lower than the Guard's typical 60 percent rate, officials said.



President Trump deployed National Guard troops to Southern California starting on June 7.  Alex Welsh for The New York Times

"The moral injuries of this operation, I think, will be enduring," one of the two Guard officials said. "This is not what the military of our country was designed to do, at all."

**Sign up for the Race/Related Newsletter**  Join a deep and provocative exploration of race, identity and society with New York Times journalists. Get it sent to your inbox.

The six soldiers are a fraction of the thousands of troops who have been deployed to Los Angeles. Many members of the Guard have had no trouble taking part in the operation and have voiced no personal conflicts or concerns. It's not uncommon for soldiers in Guard deployments to complain about their assignments, question the

reasons they were called up or seek counseling during deployments. Earlier this year, after National Guard soldiers were called in to keep order in the New York State prison system after corrections officers went on strike, some troops described feeling unprepared and took issue with not being provided pepper spray or other means of protecting themselves.

Officials with the military's Northern Command, which is overseeing the president's military response in California, said the deployment was more organized than the interviewed soldiers suggested. The officials declined to comment on the morale of the troops, their behavioral health, the reassignments or the deployment's impact on re-enlistment.

Mr. Trump began deploying thousands of troops on June 7 to Southern California, making the case that the state's Democratic leaders were failing to protect federal agents and property after immigration raids sparked protests. The president commandeered a total of 4,100 California National Guard members who ordinarily are controlled by Mr. Newsom, and dispatched an additional 700 Marines.

Since then, the military presence in California has been a flashpoint of debate, as armed soldiers have faced down protesters outside federal buildings and accompanied federal agents conducting raids in the Los Angeles region. Several operations have drawn intense backlash, including a show of force in MacArthur Park and an immigration raid on a cannabis farm in Ventura County where a fleeing farmworker fell from a greenhouse and later died.

The deployment has started scaling back. On July 1, the president agreed to release about 150 Guard troops in a specialized wildfire fighting unit, and on Tuesday, the Pentagon announced that 1,990 members of the Guard's 79th Infantry Brigade Combat Team will begin demobilization. It was unclear if the president would end the mission after 60 days, as his order initially suggested. The other half of the deployment — 1,892 members of the 49th Military Police Brigade — remains.

The six soldiers said that even though they are receiving higher pay and more benefits on a federal mission than they would under a state activation, they are eager to go home. The National Guard is ordinarily a part-time commitment, and

many members have been on almost continuous duty since Mr. Newsom summoned them after the fires to assist local authorities.

The new mission has put them at odds with communities and families, several soldiers said. Mr. Trump's immigration crackdown has spread fear and panic in Hispanic immigrant communities in the Los Angeles region. A majority of the California National Guard's 18,000 members are based in Southern California, and roughly 40 percent of them are of Hispanic heritage.



A California National Guard soldier guards a federal building in downtown Los Angeles.  Philip Cheung for The New York Times

Not all the Latino soldiers who spoke with The Times objected to the mission. One Hispanic commander from the Central Valley said that his grandparents came to the United States legally and that he felt no conflict. He noted, however, that National Guard soldiers must obey orders either way.

Other Latino soldiers have raised formal and informal objections.

In one incident that several soldiers said occurred early in the deployment, 60 troops were awaiting transport to planned immigration raids in Ventura County when a Latino soldier approached officers in charge of the mission. He told them that he strongly objected, and he offered to be arrested rather than take part in the operation. Eventually, they said, he was reassigned to administrative tasks. Officials at the military's Northern Command declined to comment about the incident.

Missions have come under intense scrutiny for potential constitutional violations. California authorities have challenged the legality of the deployment, citing a 19th-century law, the Posse Comitatus Act, which generally makes it illegal to use federal troops for law enforcement on domestic soil unless there is an insurrection.

Trump administration officials and Justice Department lawyers have argued that troops are "not engaged in law enforcement" but are merely protecting federal agents. Civil liberties groups have disputed that portrayal, pointing to the temporary detention of one man by Marines early in the deployment.

A federal judge has set a trial for August to determine whether the use of the National Guard and Marines has violated federal law.

Most troops have been stationed at the Joint Forces Training Base in Los Alamitos, a federally-owned facility operated by the California National Guard near Long Beach. The soldiers said breakfasts are hearty — eggs, hash browns, sausage, pancakes — and accommodations are comfortable. Despite efforts to keep them busy, however, they reported long stretches of downtime and frustration with missions that leaked or were canceled by the time lumbering convoys reached their destinations.

MacArthur Park was all but empty on July 7 when federal agents arrived to show that they could "go anywhere, anytime we want in Los Angeles," as one immigration official told Fox News. About 80 National Guard members who arrived for backup mostly stayed in their trucks.



A mix of U.S. Marines and National Guard soldiers guard a federal building in the Westwood neighborhood of Los Angeles last month.  Philip Cheung for The New York Times

On the base, soldiers said, they received riot training, reviewed battlefield maneuvers and drilled to leap from their cots and gear up at a moment's notice. But mostly, they said, they lounged in warehouse-sized tents, listening to music

and playing games on their cell phones. Only about 400 of the 3,882 deployed Guard members had actually been sent on assignments away from the base, Guard figures showed.

A spokeswoman for the Northern Command's U.S. Army North component said that the routine for service members "varies on a day-to-day basis." Many assignments on the base involve "practicing de-escalation and crowd control techniques and fulfilling annual training requirements, all while maintaining cycles of rest and recuperation," she added.

In Los Alamitos, a coastal suburb of about 12,000 people, the troops have crowded into a two-square-mile facility that is shared with other government agencies, which have balked at the encroachment. In emails obtained through a public records request, workers in a joint program to eradicate the Mediterranean fruit fly complained that troops shaving and brushing their teeth are crowding the bathrooms and that scientists are unsettled by nearby trucks full of explosives.

Soldiers meander down new walkways between a huge tent city and new semi-permanent buildings. "I've lived here 33 years and this is the first I've seen anything like this," the mayor of Los Alamitos, Shelley Hasselbrink, said. "We call it the circus — they look like big circus tents."

Two Democratic officials who were granted brief access to the base — Josh Fryday, a Navy veteran who leads community engagement for the governor's office, and Representative Derek Tran, an Army veteran who represents Los Alamitos — said the massive military presence, which has been projected to cost $134 million, seemed excessive and extreme.

"If they can do this here," Mr. Fryday said, "they can do it in any community."

**Shawn Hubler** is The Times's Los Angeles bureau chief, reporting on the news, trends and personalities of Southern California.

---

A version of this article appears in print on , Section A, Page 17 of the New York edition with the headline: Some National Guard Troops Deployed by Trump Question Mission